U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MAR 28 1996
DAVID J. MALAND, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | |
| | § | CIVIL NO.: 5-96CV91 |
| Plaintiff | § | |
| | § | SECTION: ______ |
| VS. | § | |
| | § | JUDGE: ______ |
| THE AMERICAN TOBACCO COMPANY; R.J. REYNOLDS TOBACCO COMPANY; BROWN & WILLIAMSON TOBACCO CORPORATION; B.A.T. INDUSTRIES, P.L.C; PHILIP MORRIS, INC.; LIGGETT GROUP, INC.; LORILLARD TOBACCO COMPANY, INC.; UNITED STATES TOBACCO COMPANY; HILL & KNOWLTON, INC.; THE COUNCIL FOR TOBACCO RESEARCH-USA, INC. (Successor to Tobacco Institute Research Committee); and THE TOBACCO INSTITUTE, INC., | § | MAGISTRATE: ______ |
| | § | **JURY** |
| Defendants | § | |

************************************************************************

## ORIGINAL COMPLAINT

The State of Texas, by Dan Morales, Attorney General of the State of Texas ("The State"), complains against the Defendants as follows:

## PRELIMINARY STATEMENT

The health, welfare and property of Texas citizens have been damaged by the tobacco industry's unlawful conduct and injurious

and unreasonably dangerous products. The tobacco companies have placed corporate profits above any concern for the health and property of the consumers of their products. The toll of human misery from the mass addiction, disease and death caused by their products has not been sufficient to deter the tobacco companies from their unified campaign of disinformation and denials regarding the dangerousness of their products. The tobacco companies have unlawfully shifted the financial responsibility for their tortious and illegal conduct and for their unreasonably dangerous products, to the business of state and federal governments that provide for the general welfare of their citizens.

This lawsuit seeks to have the tobacco companies' liability to the State judicially recognized and to restore to the State's treasury those funds spent for tobacco-attributable costs to the Medicaid Program, the State Employee Retirement System, the State Employee Group Insurance Program, charity care, tobacco cessation programs and related wellness and health care programs and other damages to be determined by a jury.

This lawsuit also seeks to protect the future health of our children. Marketing strategies of the tobacco companies target our children to induce them to start using tobacco products. Dr. David Kessler, Commissioner of the U.S. Food and Drug Administration,

classifies the nicotine addiction of teenagers as a pediatric disease.

According to a 1994 U.S. Surgeon General's Report, more than three million American children currently smoke cigarettes and an additional one million adolescent males use smokeless tobacco. Everyday, another 3,000 children become regular smokers. Eighty-two percent of adults who have ever smoked, had their first cigarette before age 18, and more than half of them had already become regular smokers by that age. Reports published by the U.S. Centers for Disease Control and Prevention indicate that anyone who does not begin smoking in childhood is unlikely to begin. For those 3,000 children who do become current regular users of tobacco products, projections of current trends indicate 1,000 will die prematurely as a result of their tobacco use.

The tobacco industry has been successful in planning, implementing and executing the largest and most destructive campaign of corporate misinformation in U.S. business history. The Executive Officers and Board of Trustees of the American Medical Association (AMA) have stated that recently disclosed internal tobacco industry documents "...show us how this industry has managed to spread confusion by suppressing, manipulating, and distorting the scientific record.... The evidence is unequivocal -

the U.S. public has been duped by the tobacco industry. No right-thinking individual can ignore the evidence.[1]"

It is the duty and obligation of the Attorney General as the chief law enforcement officer for the State of Texas, to bring this suit to seek reimbursement to the public, those funds expended because of the tobacco companies' illegal conduct and unreasonably dangerous products, to halt tobacco marketing aimed at children, to restrain the tobacco companies' unlawful conduct and to dispel any illusion of a scientific controversy regarding tobacco and health.

**NATURE OF THE CASE**

1. This action arises out of the State's participation in the Medicaid program created by Title XIX of the Social Security Act. The Medicaid program is a cooperative endeavor in which the Federal Government provides financial assistance to participating States to aid them in furnishing health care to needy persons. For every dollar spent on Medicaid assistance by the State, the Federal Government provides approximately two dollars in matching funds. The State of Texas participation in this federal program is one of many programs conducted by the

[1] Todd, S.T., et al., *The Brown and Williamson Documents: Where Do We Go from Here?* Journal of the American Medical Association, July 19, 1995 - Vol. 274, No. 3, pp. 256-258.

State to promote the general welfare of its citizens and meet its specific objective to insure that adequate and high quality health care is available to its citizens who cannot afford it.

2. The State is required to take all reasonable measures to ascertain the legal liability of third parties to pay for care and services available under the Medicaid Act, and to seek reimbursement to the public fund to the extent of such legal liability. The State has discovered that the Defendants have been engaged in a protracted and willful course of corporate misconduct and misrepresentation in violating numerous federal and state laws, and in the actionable breach of the duties owed to the State and its citizens.

3. The Defendants are cigarette and tobacco product manufacturers and/or their trade associations that control virtually the entire cigarette industry in Texas and the Nation. For decades, the State has incurred significant expenses associated with the provision of necessary health care and other such necessary assistance under various State programs to citizens who suffer, or

who have suffered, from tobacco-related injuries, diseases or sickness.

4. This action is based on the deliberate and willful misconduct by Defendants toward the Nation, the State and its citizens. Defendants' misconduct and offenses came to light as the result of congressional hearings in 1994 and subsequent investigation by private and public entities. The Defendants' misconduct, actions and statements are violations of the following areas of law:

A. **Federal Racketeer Influenced and Corrupt Organizations Act:** The Defendants' knowing and concerted actions from the 1950s to date, constitute a pattern of public fraud, via mail and wire fraud on a nationwide scale, with callous disregard to the health and lives of millions of people. Attorney Generals' lawsuits brought by Mississippi, Minnesota, West Virginia, Florida, Massachusetts, and Louisiana and a Prosecution Memorandum by Massachusetts Congressman Martin Meehan (Exhibit 1) uniformly characterize the Defendants' acts as public fraud. The duration, scope and devastating impact on the health and lives of Americans from the pattern of fraudulent conduct of Defendants, violates federal

corrupt organization statutes. The intended victims of the public fraud are the industry's own customers, perspective customers, and for purposes of this action, the public fund of the State of Texas. The public fraud was perpetrated by a pattern of conduct violative of mail fraud, 18 U.S.C. § 1341, and wire fraud statutes, 18 U.S.C. § 1343.

B. **Federal and State Antitrust Acts:** Beginning at least as early as the 1950s, and continuing to the present, Defendants entered into a combination and conspiracy to control the sale and maintain the market for cigarettes and other tobacco products in the United States and Texas, and to restrain and suppress competition in that market in order to sell nicotine-laden cigarettes and nicotine delivery devices to consumers. The Defendants' conspiracy had the purpose and effect of stabilizing and otherwise fixing the price of cigarettes and other tobacco products, and standardizing the tobacco products manufactured and sold in the U.S. by retarding the research,

development, production, and sale of alternative products.

The conspiracy to control and maintain the market was accomplished by anti-competitive patent accumulation practices and other conduct causing restraint and suppression of research on the harmful effects of smoking; restraining and suppressing alternative, higher quality and safer competitive cigarette and other tobacco products. In furtherance of their conspiracy, Defendants also engaged in a comprehensive campaign of misrepresentation, obfuscation, and public fraud in their actions and statements before the U.S. Congress, state legislatures, federal and state officials and regulators, and the public, which included deceptive advertisements, promotions, marketing and public relations schemes.

Defendants' conspiracy was motivated by their desire to maintain the status quo in the tobacco industry -- to perpetuate the unregulated and unfettered sale of nicotine in their products -- thereby creating and maintaining a stabilized

market demand through nicotine dependency in consumers.

C. **Federal and State common law:** The recovery of damages under the common law doctrines of fraud, negligent misrepresentation, restitution-unjust enrichment, equitable estoppel, equitable indemnity, negligence, and public nuisance are applicable to Defendants' manufacture, promotion and sale of tobacco products to Texas citizens/consumers while knowing, but denying and concealing, that their tobacco products caused injury and sickness, including cancer, emphysema, heart disease and other illnesses causing disability and death. Their tobacco products contain the highly addictive drug nicotine. The Defendants have concealed from the public the fact that they have controlled and manipulated the amount of nicotine and/or its bioavailability in their tobacco products for the purpose and with the intent of creating and sustaining addictions to these products.

D. **Product Liability Law:** The Defendant manufacturers and/or their trade organizations, at all pertinent times, manufactured, tested, designed, promoted, marketed, packaged, sold, distributed, and/or placed into the stream of commerce in and into the State, numerous brands of defective, unreasonably dangerous and hazardous cigarettes, or other tobacco products, or, in the course of business, materially participated with, conspired with and/or otherwise, abetted and assisted others in so doing, thereby causing damage for which Defendants are responsible under product liability doctrines of strict liability and breach of express and implied warranty.

**JURISDICTION AND VENUE**

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, § 1367; 15 U.S.C. § 15 and 18 U.S.C. § 1964.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391. Defendants advertised in this District, received substantial compensation and profits from the sales of tobacco products in this District, and made material

misrepresentations and breached warranties in this District. Further, significant health care services were provided in this District to qualified citizens under the Medicaid Act whose necessary health care services and the expense therefore were attributable to smoking-related disease and illness.

## PARTIES

### PLAINTIFF

7. Dan Morales, Attorney General for the State of Texas, is authorized to bring this action on behalf of the State by the Texas Constitution, Art. 4 § 22; the Texas Government Code, Section 402.021, et seq.; the Texas Free Enterprise and Antitrust Act of 1983, Business and Commerce Code, Chapter 15; 42 U.S.C. 1396, et seq., also known as the Social Security Act, Chapter 7, subchapter XIX, Grants to States for Medical Assistance Programs; the Texas Medical Assistance Act, Texas Human Resources Code § 32.001, et seq.; the Sherman Antitrust Act, 15 U.S.C. § 15; and, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964.

DEFENDANTS

8. **The American Tobacco Company** is a Delaware corporation whose principal place of business is located at 6 Stamford Forum, Stamford, Connecticut 06904, and upon whom process may be served. The American Tobacco Company (ATC) manufactured, advertised and sold Lucky Strike, Pall Mall, Tareyton, Malibu, American, Montclair, Newport, Misty, Barkeley, Iceberg, Silk Cut, Silva Thins, Sobrania, Bull Durham and Carolton cigarettes throughout the United States. On information and belief, the American Tobacco Company was purchased by Brown & Williamson who has succeeded to the liabilities of ATC by operation of law or as a matter of fact.

9. **R.J. Reynolds Tobacco Company** is a corporation organized and existing under and by virtue of the laws of the State of New Jersey, with an agent for service in the State of Texas, to-wit: Prentice-Hall Corporation System, 400 North St. Paul Street, Dallas, Texas 75201. R. J. Reynolds is a wholly-owned subsidiary of RJR Nabisco Holdings Corp. R.J. Reynolds Tobacco Company manufactures, advertises and sells Camel, Vantage, Now,

Doral, Winston, Sterling Magna, More, Century, Bright Rite and Salem cigarettes throughout the United States.

10. **Brown & Williamson Tobacco Corporation** is a corporation organized and existing under and by virtue of the laws of the State of Delaware, with an agent for service in the State of Texas, to-wit: C.T. Corporation Systems, 350 North St. Paul Street, Dallas, Texas 75201. Brown & Williamson Tobacco Corporation is a subsidiary division of Batus, Inc. Brown & Williamson Tobacco Corporation manufactures, advertises and sells Kool, Barclay, Belair, Capri, Raleigh, Richland, Laredo, Eli Cutter and Viceroy cigarettes throughout the United States.

11. **B.A.T. Industries P.L.C. ("B.A.T. Industries")** is a British corporation with its principal place of business at Windsor House, 50 Victoria St., London. Through a succession of intermediary corporations and holding companies, B.A.T. Industries is the sole shareholder of Brown & Williamson. Through Brown & Williamson, B.A.T. Industries has placed cigarettes into the stream of commerce with the expectation that substantial sales of cigarettes would be made in the United States and in Texas. B.A.T. Industries has also conducted, or through

its agents, subsidiaries, associated companies, and/or co-conspirators, conducted significant research for Brown & Williamson on the topics of smoking, disease and addiction. On information and belief, Brown & Williamson also sent to England, research conducted in the United States on the topics of smoking, disease and addiction, in order to remove sensitive and inculpatory documents from United States jurisdiction, and such documents were subject to B.A.T. Industries' control. B.A.T. Industries is a participant in the conspiracy described herein and has caused harm in Texas.

12. **Philip Morris, Inc.** (Philip Morris U.S.A.), a subsidiary of Philip Morris Companies, Inc., is a corporation organized and existing under and by virtue of the laws of the State of Virginia, with an agent for service in the State of Texas, to-wit: C.T. Corporation Systems, 350 North St. Paul Street, Dallas, Texas 75201. Philip Morris, Inc. manufactures, advertises and sells Philip Morris, Merit, Cambridge, Marlboro, Benson & Hedges, Virginia Slims, Alpine, Dunhill, English Ovals, Galaxy, Players, Saratoga and Parliament cigarettes throughout the United States.

13. **Liggett Group, Inc.**, a subsidiary of the Brooke Group, Ltd. and operating successor of Liggett & Myers Tobacco Co. (Liggett & Myers), is a corporation organized and existing under and by virtue of the laws of the State of Delaware, with an agent for service in the State of Texas, to-wit: Corporations Service Company, 100 Congress, Suite 1100, Austin, Texas 78701. Liggett Group, Inc. manufactures, advertises and sells Chesterfield, Decade, L&M, Pyramid, Dorado, Eve, Stride, Generic and Lark cigarettes throughout the United States.

14. **Lorillard Tobacco Company, Inc.** is a corporation organized and existing under and by virtue of the laws of the State of Delaware, with an agent for service in the State of Texas, to-wit: Prentice-Hall Corporation System, 400 North St. Paul Street, Dallas, Texas 75201. Lorillard Tobacco Company, Inc. is a subsidiary of Loews Corporation. Lorillard Tobacco Company, Inc. manufactures, advertises and sells Old Gold, Kent, Triumph, Satin, Max, Spring, Newport and True throughout the United States.

15. **United States Tobacco Company** is a Delaware corporation whose principal place of business is located at 100 West

Putnam Avenue, Greenwich, Connecticut, and upon whom process may be served. United States Tobacco Company manufactures, advertises and sells Sano cigarettes and smokeless tobacco products throughout the United States.

16. **Hill & Knowlton, Inc.** is a corporation organized and existing under and by virtue of the laws of the State of New Jersey, with an agent for service in the State of Texas, to-wit: United Corporation Services, Inc., 400 E. Anderson Lane, Austin, Texas 78752. Defendant, Hill & Knowlton, Inc. is an international public relations firm. Defendant Hill & Knowlton, Inc. played an active and knowing role in the conspiracy complained of, aiding the circulation and/or publication of many false statements of the tobacco industry attributable to the Tobacco Institute Research Committee (TIRC) and the Council for Tobacco Research. Hill & Knowlton, Inc. has been the primary advertising agency responsible for dissemination of the false and misleading information in question in its capacity as the advertising and public relations agency for the Tobacco Institute, Inc. and the Tobacco Companies.

17. **The Council for Tobacco Research -- U.S.A., Inc.** (successor in interest to the Tobacco Institute Research Committee) is a non-profit corporation organized under the laws of the State of New York with its principal place of business located at 900 3rd Avenue, New York, New York 10022, and upon whom process may be served.

18. **The Tobacco Institute, Inc.** is a non-profit corporation organized under the laws of the State of New York whose agent for service of process in New York is C.T. Corporation, 1633 Broadway, New York, New York 10019, with its principal place of business located at 1876 "I" Street N.W., Suite 800, Washington, D.C. 20006.

19. The American Tobacco Company, R.J. Reynolds Tobacco Company; B.A.T. Industries, P.L.C.; Brown & Williamson Tobacco Corporation; Philip Morris, Inc.(Philip Morris U.S.A.); Liggett Group, Inc.; Lorillard Tobacco Company, Inc.; and United States Tobacco Company are referred to hereinafter as the "Tobacco Companies."

20. The Council for Tobacco Research-U.S.A., Inc., (successor to the Tobacco Institute Research Committee) and the Tobacco Institute, Inc., collectively, are referred to hereinafter as the "Tobacco Trade Associations."

21. At all pertinent times, Defendants acted through their duly authorized agents, servants, and employees who were then acting in the course and scope of their employment, and in furtherance of the business of said Defendants. At all pertinent times, the Tobacco Trade Associations and Hill & Knowlton, Inc. were the agents, servants, and/or employees of the Tobacco Companies and acted within the scope of said agency, servitude and/or employment.

22. The Defendants listed above, and/or their predecessors and successors in interest, did business in the State of Texas; made contracts to be performed in whole or in part in Texas; and/or manufactured, tested, sold, offered for sale, supplied or placed in the stream of commerce, or, in the course of business, materially participated with others in so doing, tobacco products which the Defendants knew to be defective, unreasonably dangerous and hazardous, and which the Defendants knew would be substantially certain to cause injury to the State, and to persons within the State, thereby negligently and intentionally causing injury to persons within Texas and to the State, and as described herein, committed and

continue to commit tortious and other unlawful acts in the State of Texas.

23. The Defendants, and/or their predecessors and successors in interest, performed such acts as were intended to, and did, result in the sale and distribution of tobacco products in the State of Texas.

24. The term "addictive" used in this complaint is synonymous and interchangeable with the term "dependence - producing"; both terms refer to the persistent and repetitive intake of psychoactive substances despite evidence of harm and a desire to quit. Some scientific organizations have replaced the term "addictive" with "dependence - producing" to shift the focus to dependent patterns of behavior and away from the moral and social issues associated with addiction. Both terms are equally relevant for purposes of understanding the drug effects of nicotine.

**FACTUAL BACKGROUND: EVENTS LEADING TO**

**DECEMBER 15, 1953 CONSPIRACY MEETING**

25. Although tobacco in various forms has been consumed by Americans for many centuries, it was not until the 19th century that an easily inhalable tobacco product, the

cigarette, became widely popular. With the introduction of the Bonsack mechanized cigarette-rolling machine in 1884 by W. Duke and Sons, cigarettes were mass-produced and distributed and sold nationwide.

26. In 1881, Duke's factory produced 9.8 million cigarettes, 1-1/2 percent of the total market. But five years later, W. Duke and Sons were able to manufacture 744 million cigarettes, more than the national total in 1883. By 1890, Duke's competitors, who themselves had now become mechanized, joined forces with him to establish the American Tobacco Company. By the turn of the century, 9 out of every 10 cigarettes carried the Duke label. Shortly after the American Tobacco Company was formed, the State of North Carolina started an antitrust suit against it -- and other such litigation followed. In May 1911, the American Tobacco Company was dissolved by order of the Supreme Court, to be succeeded by four large firms -- Liggett and Myers, Reynolds, Lorillard, and American -- plus many smaller ones.

27. The increased availability and consumption of cigarettes at the end of the 19th century corresponded with an increased incidence of lung disease and cancer.

28. The modern period of investigation into the question of smoking and health began about 1900 when an increase in what was by then recognized as cancer of the lungs was noted by vital statisticians.

29. Cigarette smoking increased dramatically in the first half of the 20th century. With the increase of cigarette smoking came an increase in lung cancer. Dr. Alton Ochsner, a New Orleans surgeon and regional medical director of the American Cancer Society, told an audience at Duke University on October 23, 1945, that "there is a distinct parallelism between the incidence of cancer of the lung and the sale of cigarettes...the increase is due to the increased incidence of smoking and that smoking is a factor because of the chronic irritation it produces."

30. In 1946, Tobacco Company chemists themselves reported concern for the health of smokers. A 1946 letter from a Lorillard chemist to its manufacturing committee states that "Certain scientists and medical authorities have claimed for many years that the use of tobacco contributes to cancer development in susceptible people. Just enough evidence has been presented to justify the possibility of such a presumption."

31. Despite the evidence showing their cigarettes caused lung disease and cancer, the Tobacco Companies failed to conduct any investigation of the smoking and health relationship for the safety of their customers. Instead, the Tobacco Companies chose sales over public health and safety. In the 1930s through the 1950s, in response to what industry spokesmen referred to as "the health scare", the Tobacco Companies made express claims and warranties as to the healthiness of their products with reckless disregard to the falsity of their claims and the consequential adverse impact on consumers. Examples of these health warranties include the following: Old Gold - "Not a cough in a Carload"; Camel - "Not a single case of throat irritation due to smoking Camels"; Philip Morris - "The Throat-tested cigarette."

32. In 1942, Brown and Williamson claimed that Kools would keep the head clear and/or give extra protection against colds.

33. In 1952, Liggett & Myers conducted a test for advertising purposes to demonstrate the absence of harmful effects of smoking Chesterfields on the nose, throat, and affected organs. The test was conducted by Arthur D. Little, Inc.

and was designed so as to have no real scientific value. Nonetheless, its conclusion that smoking Chesterfields had no harmful effect on the organs in question was widely publicized and the purported results used to assure the general public that Chesterfields were harmless.

34. During the 1950s, Liggett & Myers sponsored the nationally popular Arthur Godfrey radio and television show wherein health claims were made based on the alleged scientific studies assuring "smoking Chesterfields would have no adverse effects on the throat, sinuses or affected organs." Arthur Godfrey subsequently died from lung cancer caused by smoking cigarettes.

35. Earlier consumer-oriented ads from the 1930s and 1940s often carried wide-ranging medical claims that placed cigarette-touting physicians in the company of endorsers such as Santa Claus ("Luckies are easy on my throat"), movie stars, sports heroes, and steady-nerved circus stars. Similar ads even appeared in medical journals, where ads were directed solely at physicians. One, for example, touted the Camel cigarettes booth at the American Medical Association's 1942 Annual Meeting.

36. In the *New York State Journal of Medicine*, Chesterfield ads began running in 1933. They often carried claims such as, "Just as pure as the water you drink...and practically untouched by human hands."

37. The Tobacco Companies sponsored cigarette ads in the *New England Journal of Medicine*, *Journal of the American Medical Association ("JAMA")*, and *The Lancet* from the 1930s through the 1950s.

38. For 15 years, Philip Morris used various claims, including one it ran in JAMA in 1949: "Why many leading nose and throat specialists suggest, 'Change to Philip Morris'..." In 1935, Philip Morris ran an ad in the *New York State Medical Journal* touting studies that purportedly showed Philip Morris cigarettes were less irritating. An ad by the company in a 1943 issue of the *National Medical Journal* read: "'Don't smoke' is advice hard for patients to swallow. May we suggest instead, 'Smoke Philip Morris?' Tests showed three out of every four cases of smokers' cough cleared on changing to Philip Morris. Why not observe the results for yourself?"

39. Other companies added different angles for physicians. Camel cigarettes paid tribute to medical pioneers and concluded: "Experience is the best teacher....experience is the best teacher in cigarettes, too." Old Gold reacted to early negative medical studies with the slogan: "If pleasure's your aim, not medical claims..." Some companies hired attractive women to deliver cigarette samples to physicians and the patients in their waiting rooms.

40. The appearance of landmark studies such as the 1952 JAMA article on smoking and bronchial carcinoma, by Alton Ochsner, M.D., and others prompted JAMA's decision to ban cigarette ads from their journal.

41. The health-claim advertising campaigns by Defendants were patently false, misleading, deceptive and/or fraudulent. These campaigns were disseminated nationally in popular magazines, press, radio and television and were calculated to induce non-smokers to commence smoking and to induce smokers to continue in their addiction to their harm and injury and to the damage of the State.

42. During the 1950s the Tobacco Companies employed yet another method of deception in manufacturing and

advertising to boost sales to counter the "health scare" -- "The Filter Derby" and "Tar Wars". The Tobacco Companies manufactured filtered cigarettes that were advertised with explicit and/or implicit warranties of tar/nicotine content and health claims. The Tobacco Companies' health claims and claims as to the effectiveness of the filters in removing tar and nicotine were knowingly deceptive when made, and/or were made with reckless disregard for the health risks to the cigarette smokers.

43. In addition to conducting an industry-wide campaign of false health claim advertising during the 1930s and 1940s, certain Tobacco Companies engaged in antitrust violations that set the pattern for current violations.

44. American Tobacco Company, Liggett & Myers Tobacco Company, and R. J. Reynolds Tobacco Company are convicted violators of the Sherman Antitrust Act, 15 U.S.C.A. §§ 1 and 2[2]. In the 1930s and 1940s, ATC, Liggett & Myers and R. J. Reynolds, at that time the so-called "Big Three,"

[2] ATC's conviction of antitrust violations was affirmed and a decree of dissolution ordered in 1911 by the Supreme Court, United States v. The American Tobacco Co., 221 U.S. 185. Included in the fourteen successor companies from ATC's break-up were ATC, Liggett & Myers, P. Lorillard Co., R. J. Reynolds Tobacco Co., and British-American Tobacco Co. ATC was convicted again of antitrust violations, along with Liggett & Myers and R. J. Reynolds Tobacco Co. in 1944. See American Tobacco Co. v. United States, 147 F.2d 93 (6th Cir. 1944) aff'd 328 U.S. 781 (1946).

had combined to restrain competition in order to control prices of leaf tobacco. The methods employed were 1) limitations and restrictions on the prices their buyers were permitted to pay for tobacco; 2) maintenance of price ceiling agreements among them; 3) stabilization and fixing of prices through percentage buying; 4) formulation of certain grades of tobacco so as to construct barriers to competition; and, 5) combining to manipulate and raise the price of lower-grade tobaccos in order to eliminate competition from manufacturers of low-priced cigarettes.

45. By the 1950s, the Defendants had known for decades of the lethal dangers of smoking their cigarettes and consuming their smokeless tobacco products.

46. The course of history for the tobacco industry was forever changed in 1953. A 1953 report by Dr. Ernst L. Wynder disclosed to the scientific community and to the Tobacco Companies, a definitive link between smoking and cancer. In these tests, researchers painted condensed cigarette smoke onto the backs of mice. As a result, the mice grew cancerous tumors. While previous statistical and epidemiologic studies indicated a relationship

between smoking and cancer, Dr. Wynder's study demonstrated a direct biological link between smoking and cancer. (Although Defendants have sought to discredit the Wynder findings, recently disclosed documents include a 1962 letter from Lorillard to Dr. Wynder, regarding his work establishing smoking to be a carcinogen and the principal cause of lung cancer, and stating that Lorillard "considered [Dr. Wynder's] work above reproach, as usual.")

**THE MODERN CONSPIRACY ERA:**

**DECEMBER 15, 1953 TO PRESENT**

47. In response to the publication of Dr. Wynder's study in 1953, the presidents of the leading tobacco manufacturers, including American Tobacco Co., R.J. Reynolds, Philip Morris, U.S. Tobacco Co., Lorillard, and Brown & Williamson Tobacco Corporation, conspired with the public relations firm of Hill and Knowlton, Inc. to form a monopolistic trust to deal with the "health scare" presented by smoking. Acting in concert, at an industry strategy meeting on December 15, 1953 at the Plaza Hotel in New York, the participants agreed to form a committee to orchestrate a public relations campaign to protect

their cigarette market from the perceived threat posed by the adverse medical reports. This committee was designed to promote an offensive, pro-cigarettes stance to counter reports of health dangers caused by cigarettes. As a result of these efforts, the Tobacco Institute Research Committee (TIRC), an entity later known as the Council for Tobacco Research (CTR), was established.

48. Hill & Knowlton notes from the December 15, 1953 meeting show that ATC executive Paul Hahn served as chairman. Defendants knowingly conspired to conceal illegal antitrust activity by avoiding the incorporation of a formal association; instead, they would work in informal committees within a front organization to be established and designated the Tobacco Institute Research Committee (later the CTR). The purpose of their meeting and conspiracy was to protect the cigarette market structure along the same lines and utilizing the same methods employed in their last such meeting in 1939, which resulted in the conviction of the "Big Three" under the Sherman Antitrust Act.

49. Although Liggett & Myers did not become a signatory member of the CTR until 1965, Liggett & Myers helped

organize, support, aid and abet the conspiracy and illegal acts of the TIRC/CTR from the latter's inception through the present.

50. The TIRC immediately ran a full-page promotion in more than 400 newspapers aimed at an estimated 43 million Americans. That piece was entitled "A Frank Statement To Cigarette Smokers" and contained the following language:

> RECENT REPORTS on experiments with mice have given wide publicity to a theory that cigarette smoking is in some way linked to lung cancer in human beings.
>
> Although conducted by doctors of professional standing, these experiments are not regarded as conclusive in the field of cancer research. However, we do not believe that any serious medical research, even though its results are inconclusive, should be disregarded or lightly dismissed.
>
> At the same time, we feel it is in the public interest to call attention to the fact that eminent doctors and research scientists have publicly questioned the claimed significance of these experiments.
>
> Distinguished authorities point out:
>
> 1. That medical research of recent years indicates many possible causes of lung cancer.

2. That there is no agreement among the authorities regarding what the cause is.

3. That there is no proof that cigarette smoking is one of the causes.

4. That statistics purporting to link cigarette smoking with the disease could apply with equal force to any one of many aspects of modern life. Indeed the validity of the statistics themselves is questioned by numerous scientists.

We accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business.

We believe the products we make are not injurious to health.

We always have and always will cooperate closely with those whose task it is to safeguard the public health.

For more than 300 years tobacco has given solace, relaxation, and enjoyment to mankind. At one time or another during those years, critics have held it responsible for practically every disease of the human body. One by one these charges have been abandoned for lack of evidence.

Regardless of the record of the past, the fact that cigarette smoking today should even be suspected as a cause of serious

disease is a matter of deep concern to us.

Many people have asked us what we are doing to meet the public's concern aroused by the recent reports. Here is the answer:

1. We are pledging aid and assistance to the research effort into all phases of tobacco use and health. This joint financial aid will of course be in addition to what is already being contributed by individual companies.

2. For this purpose we are establishing a joint group consisting initially of the undersigned. This group will be known as the TOBACCO INDUSTRY RESEARCH COMMITTEE.

3. In charge of the research activities of the Committee will be a scientist of unimpeachable integrity and national repute. In addition there will be an Advisory Board of scientists disinterested in the cigarette industry. A group of distinguished men from medicine, science and education will be invited to serve on this Board. These scientists will advise the Committee on its research activities.

This statement is being issued because we believe the people are entitled to know where we stand on this matter and what we intend to do about it.

51. In this advertisement, the participating tobacco companies recognized their "special responsibility" to the public, and promised to learn the facts about smoking and health. The participating tobacco companies promised to sponsor independent research on the subject, claiming they would make health a basic responsibility, paramount to any other consideration in their business. The participating tobacco companies also promised to cooperate closely with public health officials. At the time these promises were made, Defendants had no intent to honor their promises. In fact, these promises so publicly and dramatically made to the public, the citizens of Texas and government regulators, have been breached over and over again.

52. After lulling the public into a false sense of security concerning smoking and health, the TIRC continued to act as a front for tobacco industry interests. Despite the initial public statements and posturing, and the repeated assertions that they were committed to full disclosure and vitally concerned with public health, the TIRC failed to make the public health a concern. Rather the TIRC, at the direction of the Tobacco Companies, acted to protect

tobacco industry profits and failed to protect the public health. A coordinated, industry-wide strategy was designed to actively mislead and confuse the public about the true dangers associated with smoking cigarettes. Rather than work for the good of the public health and sponsor independent research, as it had promised, the Tobacco Companies, acting through the TIRC/CTR, concealed, undermined and distorted information coming from the scientific and medical community.

53. The Defendants, in their December 15, 1953 and subsequent meetings in forming, operating and maintaining the TIRC/CTR, knowingly replicated the framework of the "Big Three" combination in restraint of trade from the 1930s and 1940s by conspiring, agreeing and attempting to stabilize and protect their commodity's pricing structure from the "health scare" threat by, inter alia, 1) limiting and restricting scientific research and public dissemination of adverse product information or data from within the industry; 2) forming Ad Hoc Committees comprised of company lawyers to control jointly sponsored scientific research funded by and based upon market share percentages, in order to further conspiratorial

objectives and self-policing; 3) conducting an extensive disinformation campaign to contradict or neutralize legitimate science and health reports linking smoking or tobacco use with cancer and disease, in order to stabilize and protect the tobacco market demand structure; 4) formulating combined and monopolistic opposition to any development and/or marketing of safer and/or alternative non-tobacco, non-nicotine, smoking devices by the conspirators or outsiders/non-conspirators; and 5) conspiring and combining to manipulate public and governmental awareness and responses to science adverse to the tobacco industry by a knowing, extensive and combined course of misrepresentation, deception and disinformation conducted via mail, wire, press, radio and television mediums, among others.

54. For purposes of this action, the sale of cigarettes and other tobacco products is the relevant product market. The Tobacco Companies manufacture, ship and sell tobacco products throughout the United States. Relevant geographic markets are the United States and the State of Texas.

55. The tobacco industry is highly concentrated, and has been one of the most concentrated industries in the United States throughout this century. Six tobacco companies dominate and control the market for cigarettes and other tobacco products in the United States and Texas. These six tobacco companies -- American Tobacco, R.J. Reynolds, Brown & Williamson, Philip Morris, Liggett, and Lorillard -- have a combined market share of nearly 100% of the market.

56. This market concentration and lack of significant price competition has long enabled the tobacco industry to be one of the most profitable businesses in the United States.

57. The concentration in the industry has also benefitted the Tobacco Companies and the Tobacco Trade Associations in their combination and conspiracy to control and maintain the market for cigarettes and other tobacco products.

58. All of the Defendants herein have acted pursuant to their conspiracy and agreement from 1953 without interruption until the present. The most recent example of Defendants' acts in furtherance of their conspiracy is the combined response of Brown and Williamson, Liggett,

Lorillard, Philip Morris, and the Tobacco Institute in their January 1996 joint submission of twelve volumes in opposition to the 1995 proposed regulations of cigarettes and nicotine by the FDA. In this joint submission, Defendants perpetuate their disinformation campaign by denying that nicotine is a drug, by denying that cigarettes or smokeless tobacco are drug delivery devices, and by denying that nicotine in tobacco products is addictive.

59. The public disinformation strategy employed by the Tobacco Companies and the Tobacco Trade Associations was a strategy best described as "see no evil, hear no evil, and speak no evil" concerning the health effects of cigarette smoking. A publication called *Tobacco and Health* (later, *Tobacco and Health Research*) was created by the Tobacco Companies and the Tobacco Trade Associations and was used by them to disseminate false information and create confusion over the causal connection between cigarette smoking and disease. It was distributed to the press, doctors, and health officials. The "Criteria For Selection" of articles for publication

included an example of "a report in which smoking-associated diseases are questioned."

60. The January 15, 1968 issue of *True Magazine* contained an article written by Stanley Frank called, "To Smoke or not to smoke--that is *still* the Question." The article dismissed the evidence against smoking as "inconclusive and inaccurate" and claimed that "Statistics alone link cigarettes with lung cancer...it is not accepted as scientific proof of the cause and effect." A few months later, a similar but shorter article appeared in the *National Enquirer* entitled "Cigarette Cancer Link is Bunk" written by "Charles Golden" (a fictitious name commonly used by the Enquirer.) The real author was Stanley Frank. Two million reprints of the *True Magazine* article were distributed to physicians, scientists, journalists, government officials, and other opinion leaders with a small card which stated, "As a leader in your profession and community, you will be interested in reading this story from the January issue of *True Magazine* about one of today's controversial issues." The cost for this was said by Brown and Williamson, Philip Morris and R. J. Reynolds. It was subsequently disclosed

that author Frank had been paid $500 to write the article, by Joseph Field, a public relations professional working for Brown and Williamson. Brown and Williamson reimbursed Field for that amount.

61. Other public statements by the Defendants over the years have repeated the misrepresentations that the industry was dedicated to the pursuit and dissemination of the scientific truth regarding smoking and health.

62. For example, the Tobacco Institute in 1970 ran an advertisement captioned "A Statement About Tobacco and Health," which stated:

a. "We recognize that we have a special responsibility to the public--to help scientists determine the facts about tobacco and health, and about certain diseases that have been associated with tobacco use."

b. "We accepted this responsibility in 1954 by establishing the Tobacco Industry Research Committee, which provides research grants to independent scientists. We pledge continued support of this program of research until all the facts are known."

c. "Scientific advisors inform us that until much more is known about such diseases as lung cancer, medical science probably will not be able to determine whether tobacco or any other single factor plays a causative role -- or whether such a role might be direct or indirect, incidental or important."

d. "We shall continue all possible efforts to bring the facts to light."

63. Also, in 1970, the Tobacco Institute ran an advertisement captioned, "The question about smoking and health is still a question." In this advertisement, the Tobacco Institute stated:

a. "[A] major portion of this scientific inquiry has been financed by the people who know the most about cigarettes and have a great desire to learn the truth...the tobacco industry."

b. "[T]he industry has committed itself to this task in the most objective and scientific way possible".

c. "In the interest of absolute objectivity, the tobacco industry has supported totally independent

research efforts with completely non-restrictive funding."

d. "Completely autonomous, CTR's research is directed by a board of ten scientists and physicians...This board has full authority and responsibility for policy, development and direction of the research effort."

e. "The findings are not secret."

f. "From the beginning, the tobacco industry has believed that the American people deserve objective, scientific answers."

64. Again, in 1970, the Tobacco Institute stated, "The Tobacco Institute believes that the American public is entitled to complete, authenticated information about cigarette smoking and health". The Tobacco Institute further stated that, "The tobacco industry recognizes and accepts a responsibility to promote the progress of independent scientific research in the field of tobacco and health."

65. In direct contrast to what the Defendants were telling the public, a memo from Tobacco Institute vice president Fred Panzer to president Horace Kornegay dated May 1,

1972, acknowledges that the industry had employed a single strategy for nearly 20 years to defend itself on three major fronts: litigation, politics, and public opinion. This strategy consisted of "creating doubt about the health charge without actually denying it--advocating the public's right to smoke, without actually urging them to take up the practice--encouraging objective scientific research as the only way to resolve the question of health hazard." Panzer said this strategy had been successful on the litigation front and had "helped make possible an orderly retreat" on the political front, but that the situation had deteriorated on the public-opinion front. To remedy the public-opinion problem, he proposed that the industry supply the public with "ready-made credible alternatives" to the prevalent view that smoking causes cancer, such as genetic and environmental explanations for smoking-related diseases.

66. The Tobacco Companies, through the Tobacco Trade Associations, intentionally breached their promises to the American public, to the citizens of Texas and to the State, to study and report independently and honestly on

the health effects of smoking and the use of smokeless tobacco products. Defendants caused the cancellation of press conferences where their scientists sought to inform the public, actively and wrongfully suppressed the publishing of reports concerning the health dangers presented by cigarette smoking, attacked research linking smoking to disease, and threatened professionally the researchers themselves. Their scientists were not allowed to "freely publish what they find as they choose" as a CTR director once claimed.

67. Numerous scientists formerly employed by the Tobacco Companies and the Tobacco Trade Associations have spoken out against the suppression of scientific data and the practice of deception known to exist in the tobacco industry generally. For example, in April of 1994, Dr. Victor DeNoble, a former research scientist for Philip Morris, Inc., testified before the United States House of Representatives Health & Environment Subcommittee that the Philip Morris Company, in 1983, suppressed and refused to allow him or his colleague, Dr. Paul Mele, to publish or to talk publicly about the research that they had conducted with respect to nicotine tolerance in rats,

the potentially addictive nature of nicotine in rats, and research with respect to synthetic nicotine substances. Dr. DeNoble testified that his research demonstrated that the animals would administer nicotine to themselves and that this fact indicated that nicotine had the potential to be addictive. Dr. DeNoble testified that the focus of his research was nicotine's effect on the brain, not nicotine's effect on the flavor of tobacco in cigarettes. He further testified that his laboratory was closed and his research was terminated following the filing of a lawsuit by Rose Cipollone against Philip Morris and other tobacco companies.

68. In a similar vein, Liggett & Myers, while publicly refusing to acknowledge the validity of Dr. Wynder's tests, hired the consulting firm of Arthur D. Little, Inc. to duplicate Dr. Wynder's tests. Defendant Lorillard Corporation also duplicated Dr. Wynder's mouse tests. The results of the duplicated tests were essentially the same as Dr. Wynder's, and both Liggett & Myers and Arthur D. Little became aware by 1954 of the cancer-causing propensity of cigarettes. A Liggett & Myers researcher requested that the results of this

testing be published, but Liggett & Myers would not allow it. In furtherance of the conspiracy objectives of the TIRC, the results of these additional tests were never made public.

69. The vast body of credible medical and scientific evidence identifies smoking as the leading cause of lung cancer. Tobacco industry scientific consultants also have accepted the causal association between smoking and disease.

**SAFER CIGARETTES SUPPRESSED**

70. The Tobacco Companies could have designed and manufactured a safer cigarette, but refused to do so. The need for a "safer" tobacco product results from the harmful chemical compounds occurring in tobacco products and/or formed as a result of burning. These compounds include carbon monoxide, nicotine, nickel, carbon dioxide, benzene, hydrazine, formaldehyde, Polonium-210, ammonia, nicotine sulfate, Freon II, hydrogen cyanide and certain liver toxins known collectively as furans. More than forty (40) known carcinogens are found in cigarette tobacco. The Tobacco Companies artificially add

chemicals and flavorings to their products that increase toxicity and/or carcinogenicity.

71. At Liggett & Myers, Dr. James Mold conducted tests to divide the components of cigarette smoke into separate entities and to interrupt the process that produces carcinogens by using a catalyst. Liggett & Myers researchers were able to produce a so-called "safer" cigarette, designated as the "XA Project" that eliminated the carcinogenic activity on mouse skin. However, Liggett & Myers did not want to be identified publicly as the source of the research behind this non-carcinogenic "safer" cigarette.

72. Liggett & Myers instructed its researchers that any meetings held that pertained to the "safer" cigarette project were to be attended by a lawyer and that all reports, notes or memoranda should go to the Liggett & Myers legal department. The "safer" cigarette was never marketed.

73. Liggett abandoned its XA Project for two apparent reasons. One was that Liggett feared that the marketing of a "safer" cigarette would be, in essence, a concession that its -- and the industry's -- other cigarettes were

not safe. Second, industry leader Philip Morris threatened to retaliate against Liggett if it broke ranks with the industry conspiracy.

74. Dr. Mold, who was assistant director of research at Liggett during the development of the safer cigarette, has provided the following overview of the XA Project and its abandonment:

a. Dr. Mold stated that the XA project produced a safer cigarette. He stated, "We produced a cigarette which was, we felt, commercially acceptable as established by some consumer tests, which eliminated carcinogenic activity...."

b. Dr. Mold stated that after 1975, all meetings on the project were attended by lawyers. Lawyers collected notes after all meetings. All documents were directed to the law department to cloak the documents with the attorney-client privilege. He stated, "Whenever any problem came up on the project, the Legal Department would pounce upon that in an attempt to kill the project, and this happened time and time again."

c. Dr. Mold was asked why Liggett didn't market a safer cigarette. He stated,

> "Well, I can't give you, you know, a positive statement because I wasn't in the management circles that made the decision, but I certainly had a pretty fair idea why...(T)hey felt that such a cigarette, if put on the market, would seriously indict them for having sold other types of cigarettes that didn't contain this, for example...(a)t a meeting we held in...New Jersey at the Grand Met headquarters...at which the various legal people involved and the management people involved and myself were present. At one point, Mr. Dey...who at that time, and I guess still is the president of Liggett Tobacco, made the statement that he was told by someone in the Philip Morris Company that if we tried to market such a product that they would clobber us."

75. A memorandum authored by an attorney at the firm of Shook, Hardy & Bacon, long-time lawyers for the cigarette

industry, confirmed the industry-wide position regarding the issue of a safer cigarette.

76. The 1987 memorandum was written in the context of the marketing by R.J. Reynolds of a smokeless cigarette, Premier, that heated rather than burned tobacco. The Shook, Hardy attorney wrote that the smokeless cigarette could "have significant effects on the tobacco industry's joint defense efforts" and "(t)he industry position has always been that there is no alternative design for a cigarette as we know them." The attorney also noted that, "Unfortunately, the Reynolds announcement... seriously undercuts this component of industry's defense."

**TOBACCO, NICOTINE AND DEPENDENCY**

77. The tobacco products manufactured and sold by the Tobacco Companies contain nicotine, a highly addictive substance. The Defendants know of the difficulties smokers experience in quitting smoking and of the tendency of addicted individuals to focus on any rationalization to justify their continued smoking. The Defendants exploit this weakness and capitalize upon the known addictive nature of nicotine. An internal tobacco industry memo

acknowledged in 1972: "(w)ithout nicotine...there would be no smoking...the cigarette (is) a dispenser for a dose unit of nicotine." Nicotine addiction guarantees a market for cigarettes. The addictive nature of the nicotine in cigarettes virtually eliminates personal choice in those who become addicted.

78. The industry's recognition of the extent to which nicotine -- and not tobacco -- defines its product is illustrated in a 1972 Philip Morris report on a CTR conference, which stated:

> As with eating and copulating, so it is with smoking. The physiological effect serves as the primary incentive; all other incentives are secondary. The majority of the conferees would go even further and accept the proposition that nicotine is the active constituent of cigarette smoke. Without nicotine, the argument goes, there would be no smoking."
>
> ***
>
> Why then is there not a market for nicotine per se, eaten, sucked, drunk, injected, inserted or inhaled as a pure aerosol? The answer, and I feel quite strongly about this, is that the cigarette is in fact among the most awe-inspiring examples of the ingenuity of man. Let me explain my conviction.

> The cigarette should be conceived not as a product but as a package. The product is nicotine.
>
> ***
>
> Think of the cigarette pack as a storage container for a day's supply of nicotine...Think of the cigarette as a dispenser for a dose unit of nicotine.

79. Accordingly, the industry has developed sophisticated technology to control the levels of nicotine in cigarettes in order to maintain its market. David A. Kessler, M.D., Commissioner of Food and Drugs, recently testified before a congressional committee that cigarette manufacturers can manipulate precisely nicotine levels in cigarettes, manipulate precisely the rate at which the nicotine is delivered in cigarettes, and add nicotine to any part of cigarettes.

80. Dr. Kessler testified that "the cigarette industry has attempted to frame the debate on smoking as the right of each American to choose. The question we must ask is whether smokers really have that choice." Dr. Kessler stated:

> Accumulating evidence suggests that cigarette manufacturers may intend this result -- that they may be

controlling the levels of nicotine in their products in a manner that creates and sustains an addiction in the vast majority of smokers.

***

We have information strongly suggesting that the amount of nicotine in a cigarette is there by design.

***

[T]he public thinks of cigarettes as simply blended tobacco rolled in paper. But they are much more than that. Some of today's cigarettes may, in fact, qualify as high technology nicotine delivery systems that deliver nicotine in precisely calculated quantities -- quantities that are more than sufficient to create and to sustain addiction in the vast majority of individuals who smoke regularly.

***

[T]he history of the tobacco industry is a story of how a product that may at one time have been a simple agricultural commodity appears to have become a nicotine delivery system.

***

[T]he cigarette industry has developed enormously sophisticated methods for manipulating nicotine levels in cigarettes.

***

> In many cigarettes today, the amount of nicotine present is a result of choice, not chance.
>
> ***
>
> [S]ince the technology apparently exists to reduce nicotine in cigarettes to insignificant levels, why, one is led to ask, does the industry keep nicotine in cigarettes at all?

***

81. In a subsequent appearance before Congress, Dr. Kessler testified that one manufacturer, Brown & Williamson, had developed a tobacco plant, code-named Y-1, with perhaps twice the nicotine content of regular tobacco. Brown & Williamson manufactured and marketed cigarettes with Y-1 tobacco in the United States in 1993.

82. The story of Brown & Williamson's development of Y-1 is one of the more egregious examples of the cigarette industry's concealment of its control and manipulation of the nicotine levels in its products.

83. On June 21, 1994, Dr. Kessler told the Waxman Subcommittee that FDA investigators had discovered that Brown & Williamson had developed a high nicotine tobacco

plant, which the company called Y-1. This discovery followed Brown & Williamson's flat denial to the FDA on May 2, 1994, that it had engaged in "any breeding of tobacco for high or low nicotine levels."

84. When four FDA investigators visited the Brown & Williamson plant in Macon, Georgia on May 3, 1994, Brown & Williamson officials denied that the company was involved in breeding tobacco for specific nicotine levels. Only after the FDA had learned of the development of Y-1 in its investigation and confronted company officials with the evidence, did the company admit that it was growing and using the high-nicotine plant.

85. In fact, in a decade-long project, Brown & Williamson secretly developed a genetically-engineered tobacco plant with a nicotine content more than twice the average found naturally in flue-cured tobacco. Brown & Williamson took out a Brazilian patent for the new plant, which was printed in Portuguese. Brown & Williamson and a Brazilian sister company, Souza Cruz Overseas, grew Y-1 in Brazil and shipped it to the United States where it was used in five Brown & Williamson cigarette brands sold

in Texas, including three labeled "light." When the company's deception was uncovered, company officials admitted that close to four million pounds of Y-1 were stored in company warehouses in the United States.

86. As part of its cover-up, Brown & Williamson even went so far as to instruct the DNA Plant Technology Corporation of Oakland, California, which had developed Y-1, to tell FDA investigators that Y-1 had "never [been] commercialized." Only after the FDA discovered two United States Customs Service invoices indicating that "more than a half-million pounds" of Y-1 tobacco had been shipped to Brown & Williamson on September 21, 1992, did the company admit that it had developed the high-nicotine tobacco.

87. Y-1 is one example of an overall trend in the tobacco industry to increase the nicotine content and/or impact of tobaccos.

88. As a result of the industry's actions, as many as 74% to 90% of smokers are addicted. Eight out of ten smokers say they wish they had never started smoking. Two-thirds of adults who smoke say they wish they could quit. Seventeen million try to quit each year, but fewer than

one out of ten succeed. A high percentage of the smokers who have had surgery for lung cancer or heart attacks return to smoking, as do 40% of smokers who have had their larynxes removed.

89. Beyond its addictive qualities, nicotine is believed to contribute to cardiovascular disease and death -- a fact known to the cigarette industry for many years.

**DECEIT AND FRAUD-A CONTINUING CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE**

90. The general counsel of the major cigarette manufacturers, through joint meetings to review and direct proposals for scientific research for the entire industry, aided in the conspiracy of the tobacco industry to defraud the public on the issue of tobacco and health.

91. The tobacco industry's combination in restraint of trade was also referred to as the "gentlemen's agreement." The "gentlemen's agreement" among the manufacturers was to suppress independent research on smoking and health. This agreement was referenced in a 1968 internal Philip Morris draft memo, which states, "We have reason to believe that in spite of gentlemens (sic) agreement from the tobacco industry in previous years that at least some

of the major companies have been increasing biological studies within their own facilities." This memo also acknowledged that cigarettes are inextricably intertwined with the health field, stating, "Most Philip Morris products both tobacco and non-tobacco are directly related to the health field."

92. The industry believed that individual companies were performing certain research on their own in addition to the joint industry research. But the fundamental understanding and agreement remained intact; any harmful information and activities would be restrained, suppressed, and/or concealed. This secret agreement included restraining, suppressing, and concealing research on the health effects of smoking, including the addictive qualities of nicotine, and restraining, concealing, and suppressing the research and marketing of safer cigarettes.

93. The Defendants designed a litigation strategy over the years to conceal, delay, and to run up consumers' expenses in a war of attrition. For example, a memo written by J. Michael Jordan, an attorney for Defendant R.J. Reynolds Tobacco Company, noted:

> "(T)he aggressive posture we have taken regarding depositions and discovery in general continues to make these cases extremely burdensome and expensive for plaintiffs' lawyers, particularly sole practitioners. To paraphrase General Patton, the way we won these cases was not by spending all of Reynolds' money, but by making that other son of a bitch spend all his."

94. Additionally, corporate officials of the Tobacco Companies and the Tobacco Trade Associations have attempted wrongfully to create a privilege for various documents that they wish to conceal by sending such documents through their legal departments and law firms in order that they might claim the documents to be protected by the attorney-client or attorney work-product privileges. A "Special Projects" division within CTR was set up to conceal research that was harmful to the tobacco industry and to promote and develop research and expert witnesses needed for the defense of tort litigation. Incriminating reports and documents contained within this division were passed through attorneys and are now claimed by the Defendants to be privileged.

95. The industry has congratulated itself on a brilliantly conceived and executed strategy to create doubt about the charge that cigarette smoking is deleterious to health without actually denying it. A 1962 memo stated that they had handled the "emergency" (of the Wynder report) effectively, by treating the public health threat as a public relations problem that was solved for the self-preservation of the industry's image and profit. One Defendant's executive called the CTR the best, cheapest insurance the tobacco industry can buy, noting that without it the Tobacco Companies would have to invent CTR or would be dead.

96. Not content with the holding strategy employed by the TIRC and the CTR, the Tobacco Companies advocated a more offensive role through their lobbying arm, the Tobacco Institute (TI). This tobacco industry-supported group actively seeks to increase doubt about the negative health effects of smoking by suggesting that there are alternative explanations to the data. One "theory" detailed how individual genetic makeups predisposed individuals to illness. Another, the "multi-factorial hypothesis," asserted that multiple factors should be

blamed, i.e., food additives, viruses, occupational hazards, air pollution or stress, for causing cancer. The tobacco industry financed, supported and encouraged the manufacture of fraudulent science.

97. However, evidence began to surface concerning the Defendants' illegal scheme. On February 6, 1992, United States District Court Judge H. Lee Sarokin for the District of New Jersey issued an opinion in Haines v. Liggett Group, Inc., Civ. Action 84-678. After reviewing 1500 documents in camera, Judge Sarokin noted that "In 1954, the tobacco industry promised to disseminate the results of industry-sponsored, independent scientific research for the purpose of answering the question: "Does cigarette smoking cause illness?" To fulfill its promise, the tobacco industry proffered the allegedly "independent research organization, the Council for Tobacco Research (the 'CTR'), which purportedly would examine the risks of smoking and report its findings to the public." After his review of the withheld documents, Judge Sarokin concluded:

> Despite the industry's promise to engage independent researchers to explore the dangers of cigarette

> smoking and to publicize their findings, the evidence clearly suggests the research was not independent; that potentially adverse results were shielded under the caption of "special projects;" that the attorney-client privilege was intentionally employed to guard against such unwanted disclosure; and that the promise of full disclosure was never meant to be honored, and never was.

As a result of this finding, Judge Sarokin went on to note:

> A jury might reasonably conclude that the industry's announcement of proposed independent research into the dangers of smoking and its promise to disclose its findings was nothing but a public relations ploy -- a fraud -- to deflect the growing evidence against the industry, to encourage smokers to continue and non-smokers to begin, and to reassure the public that adverse information would be disclosed.

98. Undaunted by Judge Sarokin's findings, in April, 1994, Tobacco Company executives asserted, under oath, that tobacco does not cause cancer, that nicotine is not addictive and that tobacco advertising does not target new smokers. Judge Sarokin's earlier written opinion in <u>Haines</u> is still valid for describing the Defendants: "...despite some rising pretenders, the tobacco industry

may be the king of concealment and disinformation." Recently, the fight to uncover the truth has been joined by the Food and Drug Administration (FDA).

99. On February 25, 1994, David A. Kessler, M.D., Commissioner of the FDA, sent a letter to Scott D. Ballin, Esq., Chairman of the Coalition on Smoking OR Health, asserting:

> Evidence brought to our attention is accumulating that suggests that cigarette manufacturers may intend that their products contain nicotine to satisfy an addiction on the part of some of their customers. The possible inference that cigarette vendors intend cigarettes to achieve drug effects in some smokers is based on mounting evidence we have received that: (1) the nicotine ingredient in cigarettes is a powerfully addictive agent and (2) cigarette vendors control the levels of nicotine that satisfy this addiction.

100. In response to Kessler's letter, on March 15, 1994, in a letter to *The New York Times*, James W. Johnston, Chairman and Chief Executive Officer of R.J. Reynolds, continued to assert that nicotine was not addictive. Johnston based his assertion upon the success rate of American adults who had quit smoking.

101. The Chief Executive Officers of The American Tobacco Company, R.J. Reynolds Tobacco Company, Brown & Williamson Tobacco Corporation, Philip Morris, Inc., Lorillard and Liggett Group, Inc. all testified under oath before the same Subcommittee in April of 1994 that they believed nicotine is not addictive.

102. The recent disclosures of the sworn testimony of a former research chief for Brown & Williamson Tobacco Corporation, Dr. Jeffrey S. Wigand, and former Philip Morris scientists, Jerome Rivers, Dr. Ian L. Uydess and Dr. William A. Farone, directly contradict the Tobacco Companies' CEOs' testimony regarding addiction, as well as the industry's denial of nicotine manipulation.

## TARGETING CHILDREN

103. For many years, the Defendants have engaged in a vast and misleading promotional, public relations, and sham lobbying blitz that had as its goal increasing the numbers of people addicted to nicotine in cigarettes and/or smokeless tobacco products and decreasing the number of people who attempt or succeed in quitting. Their efforts have been and continue to be directed toward children. They have done so and continue to do so

in contravention of their duty not to make false statements of material fact and their duty not to conceal such true facts from the public. At the cost of countless lives, the Defendants spend billions of dollars every year misleading the public and promoting the myth that smoking cigarettes and using smokeless tobacco products does not cause cardiovascular disease, lung and other cancers, emphysema and other diseases and that smokers live healthy and vital lives. The Defendants have at all pertinent times presented and promoted smoking as an attractive, glamorous, youthful, and relaxing pastime, associating it with movie stars, athletes and successful professionals.

104. Every day, more than 1,200 cigarette smokers die of cigarette-related diseases. Others manage to break their addiction to nicotine and quit. In order to prevent a precipitous decline in cigarette sales, the cigarette companies must attract more than 3,000 new smokers each day. Children and teenagers have become the main target; and as a result of the Tobacco Companies' fraudulent and false advertising, more than 3,000 of them begin the habit every day.

105. The Defendants specifically target children. By way of example, the Joe Camel campaign waged by Defendant R.J. Reynolds Tobacco Company is intended to and has had great appeal to children. More than one million new underage smokers become addicted in the United States each year. Such efforts by the Defendants create more sales for the tobacco industry, and more resulting health care costs for the State.

106. As previously alleged, the Defendants have engaged in a concerted effort to circumvent and violate the laws of the State of Texas by targeting children with sophisticated promotional schemes designed to create successive generations of addicted customers. As a result of Defendants' campaigns, it is virtually impossible for parents or law enforcement resources to control the efforts of the Defendants to make children the users of tobacco products.

107. Despite the best efforts of parents, educators and the medical profession, smoking among young people has remained alarmingly constant since the late 1970s. Tobacco Companies use advertising to create a mental image associating smoking with health, glamorous and

athletic lifestyles, and with success and sexual attractiveness. Their advertising and marketing campaigns increase demand for tobacco products among young people. The ease with which children and teenagers can obtain cigarettes from vending machines, assures that there is a ready supply to meet this demand. Results of a Texas state-wide vending machine survey show children are successful in their attempts 90% of the time. It has been shown repeatedly that cigarette vending machines (even those located in bars and other supposedly adult locations) are readily available to children and teenagers. Within a short period of time, the young smoker becomes physiologically and emotionally dependent, i.e., addicted to tobacco. Later, as the maturing smoker begins to wish he or she could quit, advertising reinforces the practice and seeks to minimize health concerns, create doubt and confusion, which are used by smokers as an excuse to avoid the pain and discomfort of attempting to break their addiction to nicotine.

108. The advertising imagery used to promote smoking among young people particularly appeals to those with low self-esteem and emotional insecurity. Once the young person

has been predisposed toward smoking, a variety of factors can precipitate actual experimentation. For many young people, the precipitating factor is being given a free pack of cigarettes by a tobacco company representative, or purchasing cigarettes in order to obtain an attractive t-shirt, baseball cap, or other gimmick used to promote cigarette smoking.

109. One of the best examples of this was the transformation of Marlboro cigarettes, from a red-tipped cigarette for women to the cigarette for the "macho cowboy". By changing advertising imagery, Philip Morris was able to tap into a wholly new and different market. In 1950, R.J. Reynolds was the king of the cigarette business. It sold more cigarettes than any other company. Philip Morris, though doing well on the basis of its fraudulent health-oriented advertising, was still far behind. In 1981, Philip Morris overtook R.J. Reynolds, and each year has extended its lead, by developing an effective marketing campaign for recruiting young new smokers to its brands. The wild spirit of the Marlboro man captured the adolescent imagination. The children and teenagers who started smoking Marlboro became tenaciously loyal

customers. Soon, Marlboro became the "gold standard" of cigarettes among teenagers. Through the year 1988, nearly three-fourths of teenage smokers used Marlboro.

110. At about the time it lost market leadership to Philip Morris, R.J. Reynolds dedicated itself to a ruthless advertising campaign encouraging children and teenagers to smoke. One of the key elements of the R.J. Reynolds' strategy for attracting children was to reposition many of its cigarette brands to younger audiences. Just as Marlboro was repositioned from the women's market, to the macho male market, by a new advertising campaign, R.J. Reynolds has positioned its cigarette advertising campaigns to younger and younger audiences, using a succession of advertising images of men engaged in extraordinary feats of physical and athletic achievements.

111. R.J. Reynolds' Vantage cigarettes entered the 1980s as a brand targeted at the health conscious adult smoker. Advertisements were intended to assuage fears of lung cancer and other diseases and give the concerned smoker arguments for rationalizing their continuation of the addiction Through multiple-advertising

transmogrifications, Vantage cigarettes have been progressively repositioned to ever-younger audiences. During the mid-1980s, this advertising campaign featured young, successful professionals (including architects, fashion designers, lawyers, etc.) with the slogan "The Taste of Success." These ads promoted the implication that smoking is helpful-if not essential-to success or prominence. In the late 1980s, the advertising theme for Vantage cigarettes began to feature professional-caliber athletes and auto racers. These advertisements depict physical activity requiring strength or stamina beyond that of everyday activity. The obvious implication is that smoking does not harm you.

112. During the 1980s, advertising for Salem cigarettes also became more youth-oriented. Whereas the dominant advertising theme for Salem cigarettes used to be clean, fresh country air, during the 1980s`, Salem ads were populated by muscular surfers and bikini-clad women, fun-loving party animals, and other attractive adolescent role models. Another successful advertising campaign targeted at young people is the Lorillard Tobacco Company campaign promoting Newport cigarettes. Newport ads

frequently show men and women in sexually suggestive positions always having fun, using the slogan "Alive With Pleasure."

113. Another successful advertising campaign has been the "You've Come A Long Way Baby" campaign, promoting Virginia Slims cigarettes. One of the most important psychological needs of most adolescent girls, is to become independent from their parents. By associating smoking with women's liberation, Philip Morris intended to create in the minds of teenage girls, the vision of smoking as a symbol of autonomy and independence. Ads for Virginia Slims and other "feminine" cigarettes prey upon the natural and common insecurity and sense of inferiority experienced by adolescents, by portraying the cigarette as a crutch and a symbol of superiority. Perhaps the most acute psychological need of adolescence is to fit in, to be accepted, to be popular. Ads for Philip Morris' Benson & Hedges cigarettes developed an image of smoking as a happy pleasure to be shared in the company of others and the easy road to instant acceptance within a group.

114. In today's culture, many teenage girls perceive that a prerequisite to popularity is to be thin. Philip Morris and other cigarette companies capitalize upon this perception by presenting cigarette smoking as a suitable alternative to a diet, for being thin. Virtually every "feminine" cigarette includes words like slim, light, super slim, ultra light, etc. The photographic imagery in cigarette advertising that targets young females universally portrays attractive young women in glamorous outfits. Smoking is thus associated with being sexy and beautiful. In cigarette ads, the air is fresh and clear; magical things happen. The reality is that cigarette smoking causes addiction, disease and death.

115. Many teenage boys fantasize about owning a powerful motorcycle. For this reason, many cigarette brands have used motorcycle imagery to encourage teenage boys to smoke. Many cigarette ads that target young boys glamorize high risk activities like hang gliding, motorcycle racing, mountain climbing, etc. Cigarette makers do this deliberately to undermine awareness that smoking is dangerous. In its campaign to attract adolescent boys to become smokers, the R.J. Reynolds

Tobacco Company has made extensive use of risk-taking and danger in its advertising. By glorifying risk-taking, these ads have a more insidious purpose. How a person estimates the magnitude and likelihood of a risk can be significantly affected by what it is compared against. By portraying dangerous activities like hang-gliding, mountain climbing, and stunt motorcycle riding in tobacco advertising, R.J. Reynolds minimizes the dangers of smoking in adolescent minds.

116. The great success that R.J. Reynolds had in its effort to overtake Philip Morris in the youth market is the "Joe Camel" cartoon character. This campaign was inaugurated in the United States in 1987 to commemorate the 75th anniversary of Camel cigarettes. In the first ads, the camel leered out over the ad saying, "75 Years And Still Smoking." The implication is obvious. It soon became evident that "Joe Camel" would strike a responsive chord among children and teenagers and has been used by R.J. Reynolds to target children to get them to start smoking as early as possible, so they can become addicted to nicotine at the earliest age possible. R.J. Reynolds has more than tripled its advertising expenditures for Camel

cigarettes since 1988, utilizing themes like "Joe Camel" guaranteed to be attractive to young people at high risk of becoming smokers.

117. When R.J. Reynolds began the Joe Camel cartoon campaign, Camel's share of the children's market was only 0.5%. In just a few years, Camel's share of this illegal market has increased to 32.8%, representing sales estimated at $476 million per year. Another indication of the phenomenal success of this marketing campaign is the fact that in a recent survey of six year olds, 91% of the children could correctly match Joe Camel with a picture of a cigarette, and both the silhouette of Mickey Mouse and the face of Joe Camel were nearly equally well-recognized by almost all children surveyed.

118. The themes within cigarette advertising are not the only feature of tobacco marketing that betray the real target. The location and placement of those ads further reveal that children are the intended target. During the decade of the 1980s, there was a steady migration of cigarette advertising into youth-oriented publications. Magazines with sexually-oriented themes and those concerning entertainment and sporting activities, had the highest

concentration of cigarette ads. For many of these magazines, teenagers comprise a quarter or more of the total readership. Cigarette ads in these youth-oriented magazines were frequently multi-page, pop-up ads which are significantly more costly, but also more attention-grabbing than conventional ads. News magazines, like *Time* and *Newsweek*, which have older audiences, had few cigarette ads, and those tended to emphasize implicit health promises concerning tar and nicotine rather than glamorous images.

119. The cigarette companies sell more than one billion packs of cigarettes per year to children under the age of 18. In 1988, the tobacco industry reaped $221 Million in profits from $1.25 Billion in sales to children under the age of 18. Marlboro and Camel cigarettes dominate the teenage smoking market.

120. In late 1990, the Tobacco Institute, on behalf of the industry, inaugurated a public relations campaign designed to convince the public that the cigarette companies wished to discourage young people from smoking. Several tobacco companies began their own campaigns at the same time. In fact, these programs are just a

continuation of the Defendants' ongoing fraud and conspiracy. While these programs call for age 18 as the national standard for tobacco sales to children, and for requiring "adult supervision" of cigarette vending machines, in fact, the Institute and Tobacco Companies hope to freeze the status quo with regard to children's access to tobacco as most states already have a minimum age of 18 or older. Brochures, like "Tobacco: Helping Youth Say No", are being distributed by the Institute and tobacco industry. In reality, this is a pro-smoking subterfuge. The brochure presents smoking as a permissible "adult" decision and smoking as something an "adult" can safely do. The only reason given children for not smoking is that -like getting married or driving a car - smoking is for grown ups. Of course, that message really makes the smoking more desirable to kids. An R.J. Reynolds' brochure even tells parents to tell their children that the parents smoke "because they enjoy it." None of these brochures disclose that smoking is highly addictive and harmful to human life.

121. Perhaps the most vicious element of this advertising campaign has been advertising aimed at young girls.

Nearly every issue of magazines for young girls, like *Teen* and *Young Miss*, includes an advertisement by Reynolds urging children not to smoke. But the reasons given for refraining are not that smoking is addictive, that it can harm or kill the infants of pregnant women, or that it causes cancer and other lethal diseases; rather, the reason given is that it is an "adult decision."

122. The likely effect of these ads is that, rather than discouraging children from smoking, they plant in impressionable young girls' minds the notion that smoking is something to do to show one's independence, to act grown-up. This notion is, of course, reinforced by the ubiquitous cigarette ads depicting glamorous young adult women smoking, as a way of demonstrating their independence.

123. This despicable conduct has gone on for 40 years and continues into this decade. In January 1990, the Manager of Public Relations of R.J. Reynolds wrote the principal of a public school that:

> The tobacco industry is also concerned about the charges being made that smoking is responsible for

> so many serious diseases. Long before the present criticism began, the tobacco industry in a sincere attempt to determine the harmful effects, if any, smoking might have on human health, established the Council for Tobacco Research-USA. The industry has also supported research grants directed by the American Medical Association. Over the years the tobacco industry has given in excess of $162 million to independent research on the controversies surrounding smoking - more than all voluntary health associations combined.
>
> Despite all the research going on, the simple and unfortunate fact is that scientists do not know the cause or causes of the chronic diseases reported to be associated with smoking. The answers to many unanswered controversies surrounding smoking - and the fundamental causes of the diseases often statistically associated with smoking - we do believe can only be determined through much more scientific research. Our company intends, therefore, to continue to support such research in a continuing search for answers.

124. The targeting of children, while unquestionably wanton, reckless, and unethical, and cynically denied by the industry, was and continues to be, vitally important to the tobacco industry. Children enticed into smoking provide a guaranteed future market for a product that

kills the industry's customers by the hundreds of thousands.

125. The reckless disregard by the Defendants for the health risks for the youth and minorities of America, is reflected in the response of an R. J. Reynolds executive to the question of a former "Winston Man", David Goerlitz, when he asked why the R.J. Reynolds executives did not smoke: "We don't smoke the s---, we just sell it. We reserve that for the young, the black, the poor and the stupid."

**FRAUDULENT ADVERTISING OF**

**TAR/NICOTINE CONTENT**

126. The campaign of deception in advertising by the Defendants regarding filters and tar/nicotine content that began in the 1950s, has continued unabated through the present. Although an "FTC Method" has been developed that measures the amount of tar and nicotine in a cigarette with a "smoking machine" (measurements the Tobacco Companies advertise for their brands), the FTC method is not a valid or reliable method to measure tar/nicotine intake by "human smokers". In fact, the Tobacco Companies have specifically designed their

products to deceive the public into thinking they are getting a low tar/nicotine cigarette, when in fact they are getting significantly higher deliveries of tar/nicotine in their smoke.

127. In 1982, *The New York Times* noted that Brown and Williamson had complained to the FTC that American Brands, Inc., Philip Morris, U.S.A. and R.J. Reynolds were engaging in deceptive advertising. While promoting very low-tar cigarettes packaged in flip-top boxes, the three were also marketing cigarettes containing 10 to 100 times more tar -- in look-alike soft packages. The *Times* also reported that Brown and Williamson's much publicized low-tar Barclay was designed to fool the FTC's smoking machines. The machines preserve Barclay filter -- but the human lips probably destroy it, giving smokers heavy doses of just what they were trying to avoid. In January 1983, *Consumer Reports* noted that while the Barclay ads claimed "1 mg. of tar," smokers actually got 3 to 7 times as much.

128. In the 1980s and 1990s, the Tobacco Companies have continued the "tar/nicotine reduction" deception by increasing bioavailability of nicotine through pH

manipulation and use of additives, such as acetaldehyde to boost the reinforcer pharmacological impact of nicotine, while still publishing "FTC Method" measurements and advertising their products as "Light" or "Ultra-light".

**OTHER TOBACCO PRODUCTS**

129. The Defendants Brown & Williamson and R.J. Reynolds also manufacture and distribute loose tobacco used in the "roll your own" process of cigarette-making.

130. The "roll your own" tobacco products distributed in Texas by these Defendants are unreasonably dangerous to the consumer.

131. Even though the medical evidence regarding the hazards of cigarette smoking and addiction have been known to these Defendants for many years, the packages and containers of the "roll your own" tobacco bear no warning regarding such hazards.

132. The fact that nicotine delivered by tobacco products is highly addictive was carefully and comprehensily documented in the 1988 Surgeon General's Report, "The Health Consequences of Smoking: Nicotine Addiction." The major conclusions contained in this report are:

(1) "Cigarettes and other forms of tobacco are addicting"; (2) "Nicotine is the drug in tobacco that causes addiction"; and (3) "The pharmacologic and behavioral processes that determine tobacco addiction are similar to those that determine addiction to drugs such as heroin and cocaine."

Likewise, in a 1988 report addressing the health effects of smokeless tobacco, the World Health Organization concluded:

> "There is ample evidence that the blood nicotine levels of smokeless tobacco users were as high as or even higher than those found in many cigarette smokers. Its continued use therefore, does cause addiction and dependence in humans."

133. Nicotine in cigarettes and smokeless tobacco is now recognized as an addictive substance by such major medical organizations as the Office of U.S. Surgeon General, the World Health Organization, the American Medical Association, the American Psychiatric Association, the American Psychological Association, the American Society of Addiction Medicine, the American Public Health Association, and the Medical Research Counsel in the United Kingdom. The National Institute on

Drug Abuse ("NIDA") has called cigarette smoking the most common example of drug dependence in the United States.

134. Despite their knowledge that cigarette smoking and the use of smokeless tobacco is, as a result of nicotine, extremely addictive, the Tobacco Companies to this day deny that smoking, "dipping," or "chewing" tobacco is addictive. Through their individual advertising and public relations campaigns, and collectively, through the Tobacco Institute, the Tobacco Companies have successfully promoted and sold tobacco products by concealing and misrepresenting the highly addictive nature of cigarettes and smokeless tobacco.

135. Defendant United States Tobacco Company makes approximately 90 percent of the oral snuff and chewing tobacco sold in the United States. As alleged above, smokeless tobacco delivers a similar amount of nicotine as cigarettes and is equally as addictive. Plaintiff is informed and believes that smokeless tobacco manufacturers intend to cause nicotine dependence among consumers through a strategy that involves promoting the use of lower nicotine brands with the intent of moving users up to higher, more addictive brands over time. The

"graduation" strategy calls for three different brands of low, medium and high nicotine content. The strategy is based on the premise that new users of smokeless tobacco are most likely to begin with products that are milder tasting, more flavored and lighter in nicotine content. After a period of time, there is a natural progression to products switching to brands that are more full-bodied and have more concentrated tobacco taste, with more nicotine, than the entry brand. This graduation strategy is supported by the manufacturers' advertising practices which indicate the manufacturers' intent to have consumers experiment with low-nicotine brands and graduate to higher-nicotine brands over time.

**RECENT DEVELOPMENTS AND DISCLOSURES**

136. After an extensive investigation, in August, 1995, the FDA published its report and proposed regulations of cigarettes and nicotine. The results of that inquiry and analysis support a finding that nicotine in cigarettes and smokeless tobacco is a drug, and that these tobacco products are drug delivery devices within the meaning of the Federal Food, Drug, and Cosmetic Act.

137. The August 1995 FDA report included findings on the statements, research and actions by the Tobacco Companies. The factual findings of the FDA investigation cover the following subjects:

A. Industry Statements on Nicotine Drug Effects.

B. Industry Research on the Drug Effects of Nicotine.

C. Industry Research on the Consumers' Need for an Adequate Dose of Nicotine.

D. Industry Product Development Research to Ensure an Adequate Dose of Nicotine.

E. Industry Manipulation and Control of Nicotine Delivery in Marketed Tobacco Products.

F. Industry Knowledge that Nicotine's Sensory Effects are Secondary to its Pharmacological Effects.

G. Industry Failure to Remove Nicotine from Tobacco Despite Available Technology.

The above-referenced FDA findings are set forth in pages 121-318 of the August 1995 report that are attached hereto as Exhibit 2.

138. On May 12, 1994, Stanton A. Glantz, Ph.D., a professor of medicine in the Division of Cardiology at the University of California, San Francisco (UCSF) and a scholar

interested in the field of tobacco and the public health, received from an unknown source, "Mr. Butts," approximately 4000 pages of memoranda, reports, and letters, covering a 30-year period, from the Brown and Williamson Tobacco Corporation (B&W) and its parent company, the British American Tobacco Company (now BAT Industries). In the subsequent months, Glantz received several thousand additional pages of documents from Congressman Henry Waxman's House Subcommittee on Health and the Environment and another few hundred pages of documents from the estate of the chief scientist of BAT. Glantz ultimately put all the documents into the library at UCSF. The July 19, 1995 Journal of the American Medical Association is largely devoted to an analysis by Glantz and his colleagues of these three sets of documents.

139. As reported in JAMA, the documents show:

1) that research conducted by Tobacco Companies into the deleterious health effects of tobacco was often more advanced and sophisticated than studies by the medical community; 2) that executives at B&W knew early on that tobacco use was harmful and that nicotine was addictive

and debated whether to make the research public; 3) that the industry decided to conceal the truth from the public; 4) that the industry hid its research from the courts by sending the data through its legal departments, and that its lawyers asserted that the results were immune to disclosure in litigation because they were the privileged product of the lawyer-client relationship; and, 5) that despite knowledge to the contrary, the industry's public position was (and continues to be) that the link between smoking and ill-health was not proven, that they were dedicated to determining whether there was such a link and revealing this to the public, and that nicotine was not addictive.

140. The pertinent articles of the July 19, 1995 JAMA are as follows:

1) "Looking Through a Keyhole at The Tobacco Industry: The Brown and Williamson Documents," pages 219-224, JAMA, July 19, 1995-Vol. 274, No. 3, Glantz, et al.;

2) "Lawyer Control of the Tobacco Industry's External Research Program: The Brown and Williamson

Documents," pages 241-247, JAMA, July 19, 1995-Vol. 274, No. 3, Bero, et al.;

3) "Lawyer Control of Internal Scientific Research to Protect Against Products Liability Lawsuits: The Brown and Williamson Documents," pages 234-240, JAMA, July 19, 1995, Vol. 274, No. 3, Hanauer, et al.; and

4) "Nicotine and Addiction: The Brown and Williamson Documents," pages 225-233, JAMA, July 19, 1995, Vol. 274, No. 3, Slade, et al.

Copies of the above referenced JAMA Articles are attached as Exhibits 3, 4, 5 and 6, respectively.

141. Factual details of how the tobacco industry and Hill & Knowlton initiated its public fraud campaign are set forth in a Staff Report dated May 26, 1994, prepared for the Subcommittee on Health and the Environment, U.S. House of Representatives. A copy of this report is attached as Exhibit 7.

142. Factual details of nicotine manipulation by the American Tobacco Company are set forth in a Staff Report dated December 20, 1994, prepared by the Majority Staff for the Subcommittee on Health and the Environment, entitled

"Evidence of Nicotine Manipulation by the American Tobacco Company." A copy of this report is attached as Exhibit 8.

## THE IMPACT OF DEFENDANTS' ACTIONS ON THE STATE OF TEXAS

143. Tobacco-caused disease has killed, and continues to kill, millions of Americans. The Centers for Disease Control (CDC) has estimated that, currently, more than 400,000 Americans die each year from smoking; that is 26 times more deaths than result from illegal drugs and indicates that approximately one in five deaths is attributable to smoking. Thousands of Texas citizens die each year as a result of smoking cigarettes. According to the Texas Bureau of Vital Statistics, 25,900 Texans died in 1993 as a result of tobacco use.

144. The economic consequences of smoking cigarettes are equally staggering. In May of 1993, the Office of Technology Assessment advised the United States Congress that in 1990, smoking-related illnesses cost United States taxpayers a total of approximately $50 billion in direct health care costs; $68 billion in indirect costs

for morbidity; and $40.3 billion in direct costs for mortality.

145. The State spends millions of dollars each year to provide or pay for health care and other necessary facilities and services on behalf of indigents and other eligible citizens whose health care costs are directly caused by tobacco-induced cardiovascular disease, lung and other cancers, emphysema, other respiratory diseases as well as the complications of pregnancy and childbirth including, but not limited to, low-weight babies.

146. The State of Texas has suffered damages from the Defendants' illegal and tortious conduct and as a result of their unreasonably dangerous products. Those damages include, but are not limited to, costs and expenditures from the public fund in the following areas: the Medicaid Program, the State Employee Group Insurance Program, the State Employee Retirement System, charity care and related health and wellness programs.

147. The State of Texas, as an employer which provides health coverage for its approximately 250,000 employees and retirees pursuant to statutory and contractual obligations, is mandated by law to offer comprehensive

and major medical health coverage and benefits that include coverage for treatment of smoking-caused diseases. The State of Texas has entered into contractual agreements with certain health care service providers and plans in order to make available to its employees health coverage that includes these mandated benefits. In fiscal year 1995, the State paid more than $820 million in claims and premium payments to insurance carriers for such benefits. The State of Texas has paid and will pay substantial sums of money pursuant to these statutory and contractual obligations due to the increased cost of providing health care services for treatment of smoking-caused diseases. These increased expenditures have been caused by the unlawful actions of the Defendants.

148. The State of Texas operates a number of health care facilities, including state hospitals and university health science centers, that provide medical care to qualifying persons who are not eligible for Medicaid. The State of Texas pays for all or part of this care. The State of Texas has expended and will expend substantial sums of money due to the increased cost of

providing health care services for treatment of smoking-related diseases. These increased expenditures have been caused by the unlawful actions of the Defendants.

149. The State of Texas has expended and will expend substantial sums of money to fund and promote wellness and healthy lifestyle programs in order to reduce health care costs, including smoking cessation. In addition, the State of Texas operates a program of preventive health services for state employees. These expenditures have been and will be increased by the unlawful actions of the Defendants.

**CONSPIRACY AND CONCERT OF ACTION**

150. From the 1950s and continuing through the filing of this suit, the Tobacco Companies have entered into agreements to suppress, distort and/or obfuscate scientific and medical information relating to the use of tobacco products and the resulting diseases.

151. The Tobacco Companies participated in and cooperated with each other in the above conspiracy enabling each and every manufacturer and distributor of tobacco products to take the position that the association between using tobacco products and disease had not been established.

152. In order to carry out their conspiracy, the Tobacco Companies and Hill and Knowlton, Inc. formed the Tobacco Institute and the Council for Tobacco Research.

153. The TI and the CTR actively participated in the conspiracy to conceal and suppress the hazards of cigarette smoking and use of smokeless tobacco products.

154. The TI and the CTR, acting on behalf of the Tobacco Companies, monitored research and literature in the scientific and medical communities regarding cigarette smoking and/or smokeless tobacco products, and actively attempted to suppress any negative reports.

155. When TI and CTR were unsuccessful in suppressing negative reports regarding cigarette smoking, the two organizations acted to challenge, dilute and diminish the influence of such reports.

156. As a result of the conspiracy, the Tobacco Companies were able to continue selling tobacco products to an unsuspecting and confused public, including the Texas citizens who had relied on their misrepresentation to their detriment.

157. As a result of the conspiracy, government regulators were mislead and deceived; thereby distorting perceptions and understanding of regulators whose task was to properly assess and control the hazards presented by cigarette use and/or smokeless tobacco products.

158. As a direct and proximate result of the Defendants' actions, the consumers of tobacco products became ill and required medical care paid for by the State.

**AIDING AND ABETTING LIABILITY**

159. The actions of the Defendants, individually and collectively, provided substantial support and encouragement and aid to the Tobacco Companies in the sale of cigarettes and other tobacco products.

160. All of the Defendants, individually and collectively, aided and abetted the fraud perpetuated on the State of Texas, government regulators and the citizens of Texas.

161. All of the Defendants, individually and collectively, aided and abetted the sale of tobacco products that they knew to be hazardous and defective.

## CAUSES OF ACTION

### COUNT ONE

### FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT

162. The State of Texas incorporates and adopts by reference the allegations contained in this Complaint.

163. In implementing the fraudulent objectives of the TIRC/CTR and the advertising/marketing campaigns as set forth above, the Defendants repeatedly have committed acts prohibited by Federal law, including 18 U.S.C. §§ 1341 and 1342, which constitute predicate acts of mail and wire fraud, respectively, within the meaning of 18 U.S.C. § 1961(1). These acts were related in their common objective, or were consistently repeated, and are capable of further repetition. This conduct constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

164. The Defendants' schemes or artifices to defraud the public regarding their tobacco products and health issues have involved fraudulent misrepresentations and/or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension.

165. The Defendants engaged in schemes outlined <u>supra</u> to defraud members of the public and used the U.S. mails for the purpose of executing or attempting to execute such schemes in violation of 18 U.S.C. § 1341, which states:

> "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

166. The Defendants' engaged in the above-described schemes to defraud members of the public by transmitting

fraudulently deceptive and misleading information and advertisements by means of wire, radio and television communication in interstate commerce, and making misrepresentations of material fact, resulting in passage of money to these same companies in response to their misrepresentations in violation of 18 U.S.C. § 1343, which states:

> "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

167. The Tobacco Companies' representatives, acting in their official capacities, have violated the prohibitions set forth at 18 U.S.C. § 1962(Racketeer Influenced and Corrupt Organizations) by participating in a commercial enterprise or an enterprise affecting commerce through a

pattern of specific racketeering activity. Section 1962 states in part:

> "(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . ."
>
> . . .
>
> "(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

168. The Defendants' knowing and concerted actions from December 15, 1953 through the present, constitute a pattern of racketeering activity as defined by 18 U.S.C.A., § 1961.

169. The State of Texas has been injured in its business and property by reason of Defendants' violation of 18 U.S.C.A., § 1962, i.e., as a direct result of the public fraud perpetrated by a pattern of conduct violative of 18 U.S.C.A., §§ 1341 and 1343, millions of Texas citizens have commenced and continue to smoke cigarettes or consume smokeless tobacco products requiring the State to

incur significant costs and expenses in administering the State's health-related programs.

COUNT TWO

**FEDERAL ANTITRUST LAW; SHERMAN ACT SECTION 1**
**CONSPIRACY TO RESTRAIN TOBACCO MARKET**

170. The State of Texas realleges and incorporates herein the foregoing allegations of this Complaint.

171. Beginning at a time uncertain, but at least as early as the 1950s, and continuing to the present, Defendants have entered into a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in the market for cigarettes and other tobacco products in the United States, including the State of Texas, in willful and/or flagrant violation of 15 U.S.C. § 1. The market for cigarettes and tobacco products is directly related to and inextricably intertwined with health care.

172. This contract, combination, or conspiracy had the purpose and effect of restraining competition in the market for cigarettes and other tobacco products in the United States, including the State of Texas, and controlling the market for cigarettes and other tobacco products in the United States, including the State of Texas, by anti-

competitive patent accumulation practices and other conduct restraining and suppressing the competition, research, development, production and marketing of a higher quality and safer cigarette and tobacco product. Defendants' restraint of trade and commerce has resulted in millions of persons beginning and continuing to smoke, causing the cost of medical care for Texans to increase dramatically and impacting Federal and State Medicaid expenditures and related programs as set forth above.

173. Defendants' anti-competitive activity affected the price of cigarettes and other tobacco products in the U.S.; restrained and suppressed competition in the research, development, production, and sale of alternative products, and resulted in artificially-inflated demand for Defendants' cigarettes and other tobacco products.

174. The Defendants, through their funding and control of certain studies concerning the effects of the use of tobacco products on human health, their control over trade publications, promoting, marketing, and/or through other agreements, understandings and joint undertakings and enterprises, conspired with, cooperated with and/or assisted each other in the wrongful suppression, active

and fraudulent concealment and/or misrepresentation of the true relationship between tobacco products and various diseases, all to the detriment of the public health, safety and welfare and thereby causing harm to the State and diminution of the State's assets.

175. As a direct result of Defendants' unlawful activity, the State will continue to suffer substantial injuries to its business and property.

176. Unless enjoined from doing so, Defendants will continue to violate the federal antitrust laws.

**COUNT THREE**

**TEXAS FREE ENTERPRISE AND ANTITRUST ACT OF 1983, SECTION 15.05(a) CONSPIRACY TO RESTRAIN TOBACCO MARKET**

177. The State of Texas incorporates and adopts by reference the allegations contained in this Complaint.

178. Beginning at a time uncertain, but at least as early as the 1950s, and continuing to the present, Defendants have entered into a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in the market for cigarettes and other tobacco products in the United States, including the State of Texas, in willful and/or flagrant violation of TEX. BUS. & COM. CODE

§ 15.05(a). The market for cigarettes and tobacco products is directly related to and inextricably intertwined with health care.

179. This contract, combination, or conspiracy had the purpose and effect of restraining competition in the market for cigarettes and other tobacco products in the United States, including the State of Texas, and controlling the market for cigarettes and other tobacco products in the United States, including the State of Texas, by anti-competitive patent accumulation practices and other conduct restraining and suppressing research on the harmful effects of smoking; restraining and suppressing the dissemination of information on the harmful effects of smoking and the use of smokeless tobacco; and restraining and suppressing the competition, research, development, production and marketing of a higher quality and safer cigarette and tobacco product. Defendants' restraint of trade and commerce has resulted in millions of persons beginning and continuing to smoke, causing the cost of medical care for Texans to increase dramatically and impacting Federal and State Medicaid expenditures and related programs as set forth above.

180. Defendants' anti-competitive activity affected the price of cigarettes and other tobacco products in the State of Texas; restrained and suppressed competition in the research, development, production, and sale of alternative products; and resulted in artificially-inflated demand for Defendants' cigarettes and other tobacco products.

181. As a direct result of Defendants' unlawful activity, the State will continue to suffer substantial injuries to their business and property.

182. Unless enjoined from doing so, Defendants will continue to violate the Texas antitrust laws.

**COUNT FOUR**

**NEGLIGENCE**

183. The State of Texas realleges and incorporates herein the foregoing allegations of this Complaint.

184. The Defendants had a duty to exercise reasonable care in the manufacture, sale and/or distribution of Defendants' cigarettes and/or smokeless tobacco products.

185. The Defendants breached that duty by the conduct alleged above.

186. As a result of Defendants' breach, citizens of the State of Texas became nicotine dependent and contracted diseases as a result. The State was required to provide medical and other assistance to these tobacco consumers.

**COUNT FIVE**

**STRICT LIABILITY FOR DEFECTIVE AND UNREASONABLY DANGEROUS PRODUCT**

187. The State of Texas realleges and incorporates herein the foregoing allegations of this Complaint.

188. The Defendants collectively sold or aided and abetted in the sale of cigarettes, "roll your own" tobacco and smokeless tobacco products, which products were and are defective and unreasonably dangerous.

189. The Tobacco Companies' tobacco products are designed, manufactured, marketed and/or sold by the Defendants to be smoked, chewed or dipped by the consuming public.

190. The smoking of cigarettes and/or the chewing or dipping of tobacco products was not only a foreseeable use, it was the very purpose for which these Defendants manufactured, sold or distributed their tobacco products.

191. At all pertinent times, the Defendants knew, or should have known, that the smoking of cigarettes and/or use of

smokeless tobacco products was and is hazardous to human health.

192. Cigarettes and smokeless tobacco products are abnormally and unreasonably dangerous. The health risks and costs of cigarette smoking and using smokeless tobacco products to the citizens of the State and to the State, greatly outweigh any claimed utility of the tobacco products. The Defendants knew, or should have known, of the dangers inherent in the use of their tobacco products and that the public and the State's fund and its citizens' property would be directly harmed and diminished by the intended and foreseeable use of their tobacco products.

193. For many years, the Defendants have been engaged in the business of manufacturing, testing, designing, promoting, marketing, packaging, selling, distributing, and/or placing into the stream of commerce into the State, numerous defective, unreasonably dangerous and hazardous tobacco products or, in the course of their business, materially have participated with, conspired with and/or otherwise aided, abetted and assisted other Defendants in doing so.

194. As a direct and proximate result of the defective design, testing, manufacturing, marketing, and assembly choices and practices of the Tobacco Companies, the Tobacco Companies' cigarettes, "roll your own" tobacco and smokeless tobacco products were and are themselves defective and unreasonably dangerous.

195. The Tobacco Companies' tobacco products reached the users, consumers and bystanders thereof in substantially the same condition that they were in when originally manufactured, distributed and sold by the Tobacco Companies. At the time the Tobacco Companies' tobacco products were sold or placed on the market, they were in a defective condition, unreasonably dangerous to users and consumers.

196. The defective condition of the Tobacco Companies' tobacco products directly and proximately caused thousands of Texans to suffer various tobacco-related diseases, injuries and sicknesses, and directly and proximately caused the State to expend millions of dollars in order to provide necessary health care to these citizens, thereby damaging the State.

197. At all pertinent times, it was foreseeable by the Tobacco Companies that certain of the Texas residents who used the Tobacco Companies' tobacco products would become ill and suffer injury, disease and sickness as a direct result of using the tobacco products as the Tobacco Companies intended. It was further foreseeable by the Tobacco Companies that the State would be required, in the past and in the future, to expend millions of dollars each year to provide necessary medical treatment and facilities to those citizens so injured.

198. The residents of the State of Texas used the Tobacco Companies' tobacco products in the manner in which the tobacco products were intended to be used, without any substantive alteration or change in the product.

199. The Tobacco Companies' tobacco products were delivered to the residents of the State of Texas in a condition that was unreasonably dangerous to the user. The Tobacco Companies expected and intended for the products to be used by residents of the State of Texas without substantial change affecting the unreasonably dangerous condition.

200. The Tobacco Companies' tobacco products were unreasonably dangerous due to their design in that:

a. The tobacco products failed to perform as safely as an ordinary consumer would expect when used as intended;

b. The risk of danger in the design of the tobacco products outweighed any benefits associated with the use of the tobacco products; and

c. The manufacturers of "roll your own" tobacco failed to provide any warnings of the dangerousness of their tobacco products.

201. In breaching their duties to the consumers, as described above, the Tobacco Companies acted intentionally, recklessly, maliciously and wantonly in that each Tobacco Company knew or should have known, through information available exclusively to them, that their tobacco products were defective and unreasonably dangerous. The Tobacco Companies further knew or should have known that their breach of duty would result in the injuries complained of herein.

## COUNT SIX

## BREACH OF EXPRESS AND/OR IMPLIED WARRANTIES

202. The State of Texas realleges and incorporates herein the foregoing allegations of this Complaint.

203. The Tobacco Companies made affirmations or promises regarding the health effects of their products to the public. The Tobacco Companies affirmed or promised through their "Frank Statement" in 1954 and subsequent representations through the present, to study the health effects of their products and fully disclose the results of this research to the residents of the State of Texas.

204. These affirmations, as well as the extensive advertising of the industry, became the basis of the bargain for many individuals, both in beginning to use tobacco or continuing to use tobacco. The residents of the State of Texas, including Medicaid recipients, relied on these continuing affirmations in buying and using the Tobacco Companies' products. The residents of Texas relied on the Tobacco Companies' skill or judgment in manufacturing a product fit for human consumption.

205. The Tobacco Companies' products are unmerchantable and are unfit for safe use when sold and consumed as

intended. The Tobacco Companies have breached their implied warranty of merchantability because their products are not fit for their intended purposes. The Tobacco Companies had reason to know that the particular purposes for which their products are intended are unreasonably dangerous.

206. The Tobacco Companies have breached both the express and implied warranties described above.

207. As a direct result of the Defendants' breach of express and implied warranties of merchantability, the State has been damaged because it has incurred medical expenses under the Medicaid Program and other programs in the treatment of sickness, disease or injury caused by the Defendants' conduct.

**COUNT SEVEN**

**RESTITUTION-UNJUST ENRICHMENT**

208. The State of Texas alleges and incorporates herein the foregoing allegations of this Complaint.

209. Many of the State's citizens who are afflicted with tobacco-related diseases are poor and unable to provide for their own medical care, and must rely upon the State to provide for their care. This reliance results in an

extreme burden on the taxpayers and the financial resources of this State. Yet, these very citizens, along with our youth, are targeted by tobacco promotional techniques. Texas taxpayers have expended hundreds of millions of dollars in caring for their fellow citizens who have suffered from tobacco-related illness.

210. The State was legally obligated to pay the aforementioned sums and did not conduct itself in any wrongful manner in being so obligated to pay and in paying the aforementioned sums.

211. The Defendants have been unjustly enriched as a result.

212. While the State and its various agencies and institutions are struggling to pay for the health care costs of tobacco, the tobacco industry and its co-conspirators continue to reap billions of dollars in profits from the sale of cigarettes and other tobacco products.

213. The Defendants have avoided regulations and have promoted the sale of their tobacco products to the citizens of Texas by continuing to misinform the federal and State authorities about the true carcinogenic, pathologic and addictive qualities of cigarettes and other tobacco products.

214. The Defendants have spent billions of dollars on targeted marketing programs designed to encourage children to purchase and smoke cigarettes and use other tobacco products, which is prohibited by the laws of Texas.

215. The Defendants, not the taxpayers of Texas, should bear the costs of tobacco-related diseases. By avoiding their own duties to stand financially responsible for the harm done by their cigarettes and other tobacco products, the Defendants wrongfully have forced the State of Texas to perform such duties and to pay the health care costs of tobacco related disease. As a result, the Defendants have been unjustly enriched to the extent that the State of Texas has had to pay these costs.

**COUNT EIGHT**

**COMMON LAW PUBLIC NUISANCE**

216. The State of Texas realleges and incorporates herein the foregoing allegations of this Complaint.

217. The Defendants have intentionally interfered with the public's right to be free from unwarranted injury, disease and sickness and have caused damage to the public health, the public safety and the general welfare of the citizens of Texas, and have thereby wrongfully caused the

State to expend millions of dollars in support of the public health and welfare.

**COUNT NINE**

**NEGLIGENT PERFORMANCE OF A VOLUNTARY UNDERTAKING**

218. The State of Texas realleges and incorporates herein the foregoing allegations of this Complaint.

219. The Defendants voluntarily assumed the duty and responsibility to report honestly and completely on all research regarding cigarette smoking and/or use of smokeless tobacco products and health, based upon their public pronouncements to do so.

220. The Defendants breached this duty by not only failing to report on such research, but also knowingly and actively publishing and publicizing fraudulent science.

221. The Defendants further breached this duty by suppressing negative research data regarding cigarettes and health.

222. The Defendants knew or should have known that the State, government regulators and others would rely on their pronouncements.

223. The Defendants knew or should have known that such reliance would result in injury.

## COUNT TEN

## FRAUD, INTENTIONAL MISREPRESENTATION

224. The State of Texas realleges and incorporates herein the foregoing allegations of this Complaint.

225. The Tobacco Companies and the Tobacco Trade Associations, have conspired together, sometimes acting through a clandestine "Special Projects" program of the Tobacco Institute Research Committee, later called the Council for Tobacco Research-U.S.A. Inc., for the purpose of fraudulently misleading the public, including Texas citizens, the State and government regulators, with regard to the health risks of smoking, all for the purpose of enhancing the Defendants' profits from the sale of their cigarettes.

226. Specifically, and in addition to the allegations above, the Tobacco Companies and Tobacco Trade Associations knew of the hazards of using tobacco products. The Defendants affirmatively and actively concealed information that clearly demonstrated the dangers of using tobacco products and affirmatively misled the public with regard to the material and clear risks of using tobacco

products. The Defendants knowingly engaged in these activities with the intent that the public would continue to purchase the Defendants' tobacco products. The Defendants knew that the public, particularly children, would not be in a position reasonably to discover and understand the true risks of the use of tobacco products, and the public relied upon the misleading information that the Defendants promulgated to their detriment.

227. At all pertinent times, the Defendants purposefully and intentionally engaged in these activities, and continue to do so, knowing full well that when the State's citizens use their tobacco products as those products are intended to be used, that the State's citizens would suffer disease, injury and sickness and that the State would be injured thereby.

228. At all pertinent times, the Defendants purposefully and intentionally engaged in these activities, and continue to do so, with knowledge that the State would be obligated to, and would, provide health care and other necessary facilities and services for certain of the State's citizens and that the State itself would be harmed.

229. At all pertinent times, these Defendants, individually and collectively, had a duty not to deceive or mislead government regulators or the public. Defendants intentionally breached their duty not to deceive or mislead the public and governmental regulators by their individual and collective activities.

230. The statements and representations made and promotional schemes used by the Defendants were deceptive, false, incomplete, misleading and untrue. The Defendants knew, or should have known, that the statements, representations and advertisements were deceptive, false, incomplete, misleading and untrue at the time of making such statements. The Defendants had an economic interest in making such statements. The residents of Texas who purchased and used the Defendants' tobacco products had no knowledge of the falsity, misleading or deceptive nature of the Defendants' statements, representations and advertisements when they purchased the Defendants' tobacco products; moreover, those citizens had a right to rely on such statements, representations and advertisements. Each of the Defendants' misleading and deceptive statements, representations and advertisements

were material to those residents' purchasing the Defendants' tobacco products in that Texas residents would not have purchased the Defendants' tobacco products if Defendants would have honestly told the public about the dangerousness of their products.

231. The residents of Texas, the State and government regulators had a right to rely upon the representations of the Defendants.

232. The Defendants intentionally suppressed material facts about the hazards of the use of tobacco products.

233. The Defendants knowingly and intentionally lied and deceived the government regulators who sought to investigate the hazards of tobacco products and control those hazards through regulations.

234. The Defendants participated in advertising of tobacco products that portrayed them as, at best, harmless and, at worst, healthy; such a portrayal was an intentional misrepresentation of the hazardous nature of their tobacco products.

235. The purpose of the suppression of damaging research data and the manufacture of fraudulent science was to confuse potential consumers about the hazards of tobacco products

in order to encourage users to continue to consume Defendants' tobacco products.

236. The consumers of tobacco products relied on Defendants' advertising, purchased Defendants' tobacco products and consumed the tobacco products to their harm and detriment.

237. As a result, the tobacco consumers became ill and required medical care for which the State was required to pay.

**PRAYER FOR RELIEF**

The State of Texas prays for relief and judgment against the Defendants, jointly and severally, as follows:

a. Declaring that Defendants have violated the provisions of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C.A. § 1962;

b. Enjoining the Defendants and their respective agents, servants, officers, directors and employees from any further violations of the provisions of 18 U.S.C.A. § 1962;

c. Declaring that Defendants have engaged in unreasonable restraints of trade and commerce in violation of Section

1 of the Sherman Act, 15 U.S.C. § 1 and § 15.05(a), Tex. Bus. & Com. Code;

d. Ordering the Defendants to dissolve the Council for Tobacco Research and the Tobacco Institute;

e. Enjoining the Defendants and their respective agents, servants, officers, directors and employees from unreasonable restraints of trade and commerce in violation of Section 1 of the Sherman Antitrust Act and Section 15.05(a) of the Texas Free Enterprise and Antitrust Act of 1983.

f. Awarding the State recovery under § 15.20(a) of the Texas Free Enterprise and Antitrust Act of 1983 against each Defendant in the sum of One Million Dollars ($1,000,000.00) for each violation of said Act;

g. Awarding the State money damages for an amount that is sufficient to provide restitution and repay the State and the Medicaid Program for the sums it has spent or will spend, past and present, and such other monetary damages as provided by law on account of the Defendants' wrongful conduct, which amount is to be determined at trial by a jury;

h. Awarding the State prejudgment interest, the State's reasonable attorneys' fees, expert witness fees, and costs of this action;

i. Awarding the State punitive money damages against the Defendants for their intentional wrong-doing in an amount that will sufficiently punish the Defendants for their conduct and that will deter such conduct in the future;

j. Declaring that the Defendants, now and in the past, use and did use marketing and advertising campaigns that target and/or encourage children to purchase and consume tobacco products;

k. Enjoining the Defendants from using marketing or advertising campaigns that target and/or encourage children to purchase and consume tobacco products;

l. Awarding the State such other extraordinary equitable, declaratory and/or injunctive relief as permitted by law as necessary to assure the State has an effective remedy; and

m. For such other and further relief, as the Court deems just and proper, that the State is entitled to receive.

**JURY DEMAND**

The State demands a trial by jury.

Respectfully submitted:

DAN MORALES
Attorney General of Texas
Tx. Bar No.: 14417450

JORGE VEGA
First Assistant Attorney General
Tx. Bar No.: 20533800

JAVIER AGUILAR
Special Assistant Attorney General
Tx. Bar No.: 00936300

TOM PERKINS
Chief, Consumer Protection Division
Tx. Bar No.: 15790850

BY: Harry G. Potter, III
HARRY G. POTTER, III
Special Assistant Attorney General
Tx. Bar No.: 16175300
P. O. Box 12548
Capitol Station
Austin, TX. 78711-2548
(512) 463-2191
(512) 463-2063 Fax

OF COUNSEL:

LAURENCE H. TRIBE
Hauser Hall 420
1575 Massachusetts Ave.
Cambridge, MA 02138

ARTHUR MILLER
Areeda Hall 228
1545 Massachusetts Ave.
Cambridge, MA 02138

WALTER UMPHREY, P.C.
490 Park
P. O. Box 4905
Beaumont, TX. 77704
(409) 835-6000
(409) 838-8888 Fax

By: ______________________
WALTER UMPHREY
Tx. Bar No.: 20380000
**ATTORNEY-IN-CHARGE**

JOHN M. O'QUINN, P.C.
440 Louisiana St., Ste 2300
Houston, TX. 77002
(713) 223-1000
(713) 222-6903 Fax

By: ______________________
JOHN M. O'QUINN
Tx. Bar No.: 15296000

JOHN EDDIE WILLIAMS, JR.
8441 Gulf Freeway, Suite 600
Houston, TX. 77017
(713) 649-6464
(713) 943-6226 Fax

By: ______________________
JOHN EDDIE WILLIAMS, JR.
Tx. Bar No.: 21600300

REAUD, MORGAN & QUINN, INC.
801 Laurel
Beaumont, TX. 77701
(409) 838-1000
(409) 833-8236 Fax

By: ______________________
WAYNE A. REAUD
Tx. Bar No.: 16642500

NIX LAW FIRM
205 Linda Drive
P. O. Box 679
Daingerfield, TX. 75638
(903) 645-7333
(903) 645-5389 Fax

By: [signature]
HAROLD W. NIX
Tx. Bar No.: 150410000

[signature]
HUGH E. MCNEELY, of Counsel for
Provost & Umphrey Law Firm, L.L.P
LSBA No.: 10,628
2901 Turtle Creek Drive, Ste 201
Port Arthur, Texas 77642
(409) 727-0800
(409) 727-7671 Fax

MARTIN T. MEEHAN
5TH DISTRICT, MASSACHUSETTS

1223 LONGWORTH HOUSE OFFICE BUILDING
WASHINGTON, D.C. 20515
(202) 225-3411

COMMITTEES:
ARMED SERVICES
SUBCOMMITTEE ON MILITARY FORCES AND PERSONNEL
SUBCOMMITTEE ON RESEARCH AND TECHNOLOGY
SUBCOMMITTEE ON READINESS
SMALL BUSINESS
SUBCOMMITTEE ON SBA LEGISLATION AND THE GENERAL ECONOMY
SUBCOMMITTEE ON REGULATION, BUSINESS OPPORTUNITIES AND TECHNOLOGY

# Congress of the United States
## House of Representatives
## Washington, DC 20515-2105

DISTRICT OFFICES:
11 KEARNEY SQ
LOWELL, MA 01852
(508) 459-0101

BAY STATE BUILDING
11 LAWRENCE ST
SUITE 806
LAWRENCE, MA 01840
(508) 681-6200

WALKER BUILDING
255 MAIN ST
ROOM 102
MARLBOROUGH MA 01752
(508) 460-9292

December 14, 1994

The Honorable Janet Reno
Attorney General of the United States
Department of Justice
Room 4400
Tenth Street and Constitution Avenue, N.W.
Washington, D.C. 20530

Dear Attorney General Reno:

I am writing to request that the Department of Justice initiate a formal criminal investigation into the conduct of the following corporations and individuals:

* American Brands, Inc./American Tobacco Company
  Donald S. Johnston, President and CEO, American Tobacco Company

* Brown & Williamson Tobacco Corporation ("B&W")
  Thomas E. Sandefur, Jr., Chairman and CEO
  T.F. Riehl, Vice President for Research and Development

* Batus Corporation/British-American Tobacco Co. Ltd./B.A.T. Industries P.L.C.

* Brooke Group Ltd./Liggett Group, Inc./Liggett and Myers, Inc.
  Edward A. Horrigan, Jr., Chairman and CEO, Liggett Group Inc.

* Center for Indoor Air Research

* Council for Tobacco Research - U.S.A., Inc.
  James F. Glenn, M.D., Chairman, President and CEO

* Healthy Buildings International
  Gray Robertson, President

* Hill & Knowlton, Inc.

* Kimberly-Clark Corporation and LTR Industries

PRINTED ON RECYCLED PAPER

PLAINTIFF'S EXHIBIT 1

* Loews Corporation/Lorillard Tobacco Company
  Andrew H. Tisch, Chairman and CEO, Lorillard Tobacco Company
  Dr. Alexander Spears, Vice-Chairman and Chief Operating Officer, Lorillard Tobacco Company

* Philip Morris Companies, Inc./Philip Morris Incorporated/Philip Morris USA
  William I. Campbell, President and CEO, Philip Morris U.S.A.

* RJR Nabisco, Inc./R.J. Reynolds Tobacco Co.
  James W. Johnston, Chairman and CEO
  Andrew J. Schindler, President and Chief Operating Officer U.S.A., R.J. Reynolds Tobacco Company

* Shook, Hardy & Bacon
  Donald Hoel, Partner

* Smokeless Tobacco Council

* The Tobacco Companies of the Contraf Group

* Tobacco Institute, Inc.
  Samuel Chilcote, President
  Walker Merryman, Vice President
  Brennan Dawson, Vice President
  Charles O. Whitley, Senior Consultant

* U.S.T. Inc./United States Tobacco Company
  Joseph Taddeo, President, U.S. Tobacco Company

At the Department's discretion, such investigation may also include other tobacco companies, their agents, their suppliers and/or other persons or entities affiliated or doing business with the tobacco industry.

In light of the numerous and complex facts that are involved, and the great obstacles encountered by Federal government officials and agencies when they have attempted over many years to obtain complete and truthful information from tobacco companies and their representatives, I recommend that the Department of Justice convene a grand jury to investigate these matters.

Following ground breaking hearings before the Subcommittee on Health and the Environment of the House Committee on Energy and Commerce and related investigative reports in the media earlier this year, on May 26, 1994, I and other Members of Congress asked your Department to examine the newly available evidence to determine whether individuals or corporations within, or doing business with or for, the tobacco industry may have engaged in criminal conduct. My colleagues and I identified several areas of inquiry, and I understand that your Department's Criminal Division subsequently carried out a preliminary examination of these matters.

Since then, more hearings have been held and investigative reports published. The additional evidence uncovered through these activities strongly suggests that tobacco company witnesses committed perjury while giving sworn testimony before Congress on April 14, 1994. The evidence further indicates that other Federal crimes may also have been committed by the individuals and corporations named above.

As a former prosecutor and as a Member of Congress who is concerned both about the toll wrought on my constituents and our society by tobacco and about the conduct of sworn witnesses in hearings before the United States Congress, I looked further into these issues and assembled the attached Prosecution Memorandum in order to assist your office in more fully investigating these matters.

The attached document is not exhaustive but, rather, is intended to highlight certain key areas for further investigation by the Department of Justice. It identifies numerous instances of alleged criminal conduct. It also identifies some, though not necessarily all, of the Federal criminal laws which may have been violated, and recommends options for further investigation by your Department.

The enormity of the harm perpetrated by tobacco companies and their agents on American consumers is difficult to comprehend. It is apparent, however, that the crimes alleged here, committed over decades, have contributed profoundly to the serious illness and early death experienced by tens of millions of Americans, as well as to literally trillions of dollars in health care costs and lost productivity borne by the economy of this nation and the individual States.

Cigarettes and smokeless tobacco products prematurely take the lives of more than 400,000 Americans each year. Moreover, the marketing and public relations efforts of the U.S. tobacco companies and their agents also succeed in recruiting more than 3,000 new smokers and users of smokeless tobacco products into nicotine addiction each day. Most of these beginners are children and teenagers and, tragically, many of them will succumb years before their time to the ravages of tobacco - leaving friends, colleagues and family members behind to mourn their loss.

Failure to hold tobacco companies and their agents fully accountable for their conduct would permit them to continue in the present course of conduct. The result would be the perpetuation of massive illness and early death, as well as furtherance of the tobacco industry's successful efforts to thwart public health measures, not only by lawful means but through massive fraud and disinformation.

I urge you promptly to instruct the Criminal Division of the Department of Justice to open a formal investigation into these matters and to give such investigation the highest priority. I will, of course, be pleased to assist your Department's efforts. I would appreciate having your response to this request by January 31, 1995.

Sincerely,

Marty Meehan
Member of Congress

# PROSECUTION MEMORANDUM

REQUESTING A FORMAL INVESTIGATION BY

THE UNITED STATES DEPARTMENT OF JUSTICE

OF THE

POSSIBLE VIOLATION OF FEDERAL CRIMINAL LAWS

BY NAMED INDIVIDUALS AND CORPORATIONS

IN, OR DOING BUSINESS WITH,

THE TOBACCO INDUSTRY

SUBMITTED ON DECEMBER 14, 1994

BY

THE HONORABLE MARTIN T. MEEHAN
MASSACHUSETTS FIFTH DISTRICT
HOUSE OF REPRESENTATIVES
UNITED STATES CONGRESS

# TABLE OF CONTENTS


I. IDENTIFICATION OF PROPOSED TARGETS OF CRIMINAL INVESTIGATION p. 1

II. STATEMENT OF ALLEGED CRIMINAL VIOLATIONS p. 3

III. SUMMARY OF THE CASE p. 7

IV. STATEMENT OF THE LAW p. 9

A. TOBACCO INDUSTRY CRIMES ARISING OUT OF DECEPTION OF THE UNITED STATES CONGRESS p. 9

B. TOBACCO INDUSTRY CRIMES ARISING OUT OF DECEPTION OF THE U.S. SURGEON GENERAL AND THE FOOD AND DRUG ADMINISTRATION p. 10

C. TOBACCO INDUSTRY CRIMES ARISING OUT OF DECEPTION OF THE AMERICAN PUBLIC p. 10
1. DISSEMINATION OF FALSE ADVERTISEMENTS PRESS RELEASES AND STATEMENTS TO THE MEDIA p. 10
2. MAIL FRAUD p. 11
3. FRAUD BY WIRE, RADIO OR TELEVISION p. 13

D. OTHER POSSIBLE VIOLATIONS OF FEDERAL CRIMINAL LAWS p. 14
1. CRIMINAL CONSPIRACY p. 14
2. "RICO" VIOLATIONS p. 14
3. FALSE CLAIMS AND UNPAID TAXES p. 15

V. STATEMENT OF THE FACTS p. 16

A. TOBACCO COMPANIES ENGAGED IN CRIMINAL CONDUCT BY DELIBERATELY DECEIVING THE U.S. CONGRESS p. 16

1. PERJURY BEFORE THE HOUSE COMMITTEE ON HEALTH AND THE ENVIRONMENT p. 16
a. Perjury by William Campbell (Philip Morris) p. 17
b. Perjury by James Johnston and Andrew J. Schindler (RJR Nabisco/R.J. Reynolds Tobacco Company) p. 32
c. Perjury by Andrew H. Tisch and Alexander Spears (Lorillard Tobacco Company) p. 37
d. Perjury by Edward A. Horrigan (Liggett Group, Inc.) p. 39
e. Perjury by Joseph Taddeo (U.S. Tobacco Company) p. 40
f. Perjury by T.F. Riehl (Brown & Williamson Tobacco Company) p. 53

2. TOBACCO INDUSTRY AGENTS ENGAGED IN CRIMINAL CONDUCT BY PROVIDING FALSE INFORMATION TO, AND WITHHOLDING INFORMATION FROM, A COMMITTEE OF THE U.S. CONGRESS IN THE ABSENCE OF OATH p. 63

a. The Tobacco Institute Failed to Provide Requested Information to the House Subcommittee on Health and the Environment and Also May Have Provided or Facilitated False Testimony by Healthy Buildings International before the Subcommittee p. 63

b. Misrepresentations by Charles O. Whitley (Senior Consultant, Tobacco Institute) before House Subcommittee on Health and the Environment p. 66

c. Deceptive Communications of Smokeless Tobacco Council with House Subcommittee on Health and the Environment p. 67

d. Deception of Congress by Council for Tobacco Research and James F. Glenn, M.D., CTR's Chairman, President and CEO p. 67

B. TOBACCO COMPANIES ENGAGED IN CRIMINAL CONDUCT BY DELIBERATELY DECEIVING THE U.S. SURGEON GENERAL AND THE FOOD AND DRUG ADMINISTRATION p. 69

1. BROWN AND WILLIAMSON'S DECEPTION OF THE U.S. SURGEON GENERAL REGARDING THE HEALTH EFFECTS AND ADDICTIVENESS OF TOBACCO AND NICOTINE p. 69

2. BROWN AND WILLIAMSON'S DECEPTION OF THE FOOD AND DRUG ADMINISTRATION REGARDING THE "Y-1" HIGH-NICOTINE TOBACCO PLANT p. 71

C. TOBACCO COMPANIES ENGAGED IN CRIMINAL CONDUCT BY DELIBERATELY DECEIVING THE AMERICAN PUBLIC p. 74

1. DISSEMINATION OF FALSE ADVERTISEMENTS, PRESS RELEASES AND STATEMENTS TO THE MEDIA p. 74

2. MAIL FRAUD p. 99

3. FRAUD BY WIRE, RADIO OR TELEVISION p. 107

D. OTHER POTENTIAL VIOLATIONS OF FEDERAL CRIMINAL LAWS p. 109

1. CRIMINAL CONSPIRACY p. 109

2. "RICO" VIOLATIONS p. 109

3. FALSE CLAIMS AND UNPAID TAXES p. 109

VI. CONCLUSION p. 111

# PROSECUTION MEMORANDUM

## I. IDENTIFICATION OF PROPOSED TARGETS OF CRIMINAL INVESTIGATION

The Department of Justice is asked to initiate a formal investigation into the activities of the following tobacco companies and their executives, lawyers, public relations agents, scientists, trade associations and suppliers.

* American Brands, Inc./American Tobacco Company
  Donald S. Johnston, President and CEO, American Tobacco Company

* Brown & Williamson Tobacco Corporation ("B&W")
  Thomas E. Sandefur, Jr., Chairman and CEO
  T.F. Riehl, Vice President for Research and Development

* Batus Corporation/British-American Tobacco Co. Ltd./B.A.T. Industries P.L.C.

* Brooke Group Ltd./Liggett Group, Inc./Liggett and Myers, Inc.
  Edward A. Horrigan, Jr., Chairman and CEO, Liggett Group Inc.

* Council for Tobacco Research - U.S.A., Inc.

* Healthy Buildings International
  Gray Robertson, President

* Hill & Knowlton, Inc.

* Kimberly-Clark Corporation and LTR Industries

* Loews Corporation/Lorillard Tobacco Company
  Andrew H. Tisch, Chairman and CEO, Lorillard Tobacco Company
  Dr. Alexander Spears, Vice-Chairman and Chief Operating Officer, Lorillard Tobacco Company

* Philip Morris Companies, Inc./Philip Morris Incorporated/Philip Morris USA
  William I. Campbell, President and CEO, Philip Morris U.S.A.

* RJR Nabisco, Inc./R.J. Reynolds Tobacco Co.
  James W. Johnston, Chairman and CEO, RJR Nabisco
  Andrew J. Schindler, President and Chief Operating Officer U.S.A., R.J. Reynolds Tobacco Company

* Shook, Hardy & Bacon
  Donald Hoel, Partner

* Smokeless Tobacco Council

* The Tobacco Companies of the Contraf Group

* Tobacco Institute, Inc.
  Samuel Chilcote, President
  Walker Merryman, Vice President
  Brennan Dawson, Vice President
  Charles O. Whitley, Senior Consultant

* U.S.T. Inc./United States Tobacco Company
  Joseph Taddeo, President, U.S. Tobacco Company

At the Department's discretion, such investigation may also include other tobacco companies, their agents and/or other persons or entities affiliated or doing business with the tobacco industry.

## II. STATEMENT OF ALLEGED CRIMINAL VIOLATIONS

| Target | Charges |
|---|---|
| American Brands, Inc./American Tobacco Company<br><br>Donald S. Johnston, President and CEO, American Tobacco Company | FALSE ADVERTISING, 15 U.S.C. §52(A)(1)<br>WIRE FRAUD, 18 U.S.C. §1343<br>MAIL FRAUD, 18 U.S.C. §1341<br>DECEPTION OF PUBLIC, 15 U.S.C. §52(A)(2) |
| * * * | |
| Brown & Williamson Tobacco Corporation ("B&W") and Batus Corporation/British-American Tobacco Co. Ltd./B.A.T. Industries P.L.C.<br><br>Thomas E. Sandefur, Jr., Chairman and CEO, B&W and T.F. Riehl, Vice President for Research and Development, B&W | PERJURY, 18 U.S.C. §1621<br>MAIL FRAUD, 18 U.S.C. §1341<br>DECEPTION OF FEDERAL AGENCY, 18 U.S.C. §1001<br>FALSE ADVERTISING, 15 U.S.C. §52(A)(1)<br>DECEPTION OF FEDERAL AGENCIES, 18 U.S.C. §1001<br>DECEPTION OF PUBLIC, 15 U.S.C. §52(A)(2)<br>WIRE FRAUD, 18 U.S.C. §1343 |
| * * * | |
| Brooke Group Ltd./Liggett Group, Inc./Liggett and Myers, Inc.<br><br>Edward A. Horrigan, Jr., Chairman and CEO, Liggett Group Inc. | PERJURY, 18 U.S.C. §1621<br>MAIL FRAUD, 18 U.S.C. §1341<br>FALSE ADVERTISING, 15 U.S.C. §52(A)(1)<br>DECEPTION OF PUBLIC, 15 U.S.C. §52(A)(2)<br>WIRE FRAUD, 18 U.S.C. §1343 |
| * * * | |

| | |
|---|---|
| Center for Indoor Air Research | DECEPTION OF PUBLIC, 15 U.S.C. §52(A)(2)<br>WIRE FRAUD, 18 U.S.C. §1343 |

* * *

| | |
|---|---|
| Council for Tobacco Research - U.S.A., Inc.<br><br>James F. Glenn, M.D., Chairman, President and CEO | DECEPTION OF CONGRESS, 18 U.S.C. §1001<br>FALSE ADVERTISING, 15 U.S.C. §52(A)(1)<br>MAIL FRAUD, 18 U.S.C. §1341<br>DECEPTION OF PUBLIC, 15 U.S.C. §52(A)(2)<br>WIRE FRAUD, 18 U.S.C. §1343 |

* * *

| | |
|---|---|
| Healthy Buildings International<br><br>Gray Robertson, President | DECEPTION OF CONGRESS, 18 U.S.C. §1001<br>DECEPTION OF PUBLIC, 15 U.S.C. §52(A)(2) |

* * *

| | |
|---|---|
| Hill & Knowlton, Inc. | MAIL FRAUD, 18 U.S.C. §1341<br>FALSE ADVERTISING, 15 U.S.C. §52(A)(1)<br>WIRE FRAUD, 18 U.S.C. §1343 |

* * *

| | |
|---|---|
| Loews Corporation and Lorillard Tobacco Company ("Lorillard")<br><br>Andrew H. Tisch, Chairman and CEO, Lorillard and Dr. Alexander Spears, Vice-Chairman and Chief Operating Officer, Lorillard | PERJURY, 18 U.S.C. §1621<br>MAIL FRAUD, 18 U.S.C. §1341<br>FALSE ADVERTISING, 15 U.S.C. §52(A)(1)<br><br>DECEPTION OF PUBLIC, 15 U.S.C. §52(A)(2)<br>WIRE FRAUD, 18 U.S.C. §1343 |

* * *

| | |
|---|---|
| Philip Morris Companies, Inc./Philip Morris Incorporated/ Philip Morris USA<br><br>William I. Campbell, President and CEO, Philip Morris U.S.A. | PERJURY, 18 U.S.C. §1621<br>MAIL FRAUD, 18 U.S.C. §1341<br>FALSE ADVERTISING, 15 U.S.C. §52(A)(1)<br>DECEPTION OF PUBLIC, 15 U.S.C. §52(A)(2)<br>WIRE FRAUD, 18 U.S.C. §1343 |

* * *

| | |
|---|---|
| RJR Nabisco, Inc./R.J. Reynolds and R.J. Reynolds Tobacco Company ("RJR")<br>James W. Johnston, Chairman and CEO, RJR and Andrew J. Schindler, President and Chief Operating Officer U.S.A., RJR | PERJURY, 18 U.S.C. §1621<br>MAIL FRAUD, 18 U.S.C. §1341<br>FALSE ADVERTISING, 15 U.S.C. §52(A)(1)<br>DECEPTION OF PUBLIC, 15 U.S.C. §52(A)(2)<br>WIRE FRAUD, 18 U.S.C. §1343 |

* * *

| | |
|---|---|
| Shook, Hardy & Bacon<br><br>Donald Hoel | MAIL FRAUD, 18 U.S.C. §1341<br>WIRE FRAUD, 18 U.S.C. §1343<br>DECEPTION OF PUBLIC, 15 U.S.C. §52(A)(2) |

* * *

| | |
|---|---|
| Smokeless Tobacco Council | MAIL FRAUD, 18 U.S.C. §1341<br>WIRE FRAUD, 18 U.S.C. §1343<br>DECEPTION OF CONGRESS, 18 U.S.C. §1001<br>FALSE ADVERTISING, 15 U.S.C. §52(A)(1) |

* * *

| | |
|---|---|
| Tobacco Institute, Inc.<br><br>Samuel Chilcote, President,<br>Walker Merryman, Vice President,<br>Brennan Dawson, Vice President,<br>and<br>Charles O. Whitley, Senior Consultant | MAIL FRAUD, 18 U.S.C. §1341<br>FALSE ADVERTISING,<br>15 U.S.C. §52(A)(1)<br>DECEPTION OF CONGRESS,<br>18 U.S.C. §1001<br>DECEPTION OF PUBLIC,<br>15 U.S.C. §52(A)(2)<br>WIRE FRAUD, 18 U.S.C. §1343 |
| * * * | |
| U.S.T. Inc.<br>and<br>United States Tobacco Company ("UST")<br><br>Joseph Taddeo, President, UST | PERJURY, 18 U.S.C. §1621<br>MAIL FRAUD, 18 U.S.C. §1341<br>FALSE ADVERTISING,<br>15 U.S.C. §52(A)(1)<br>DECEPTION OF PUBLIC,<br>15 U.S.C. §52(A)(2)<br>WIRE FRAUD, 18 U.S.C. §1343 |

*OTHER STATUTES CITED*:

| | |
|---|---|
| 18 U.S.C. §371 | Criminal Conspiracy |
| 18 U.S.C. §1962<br>18 U.S.C. §1961(1)<br>18 U.S.C. §1961(5) | Racketeer Influenced and Corrupt Organizations, ("RICO") |
| 31 U.S.C. §3729<br>31 U.S.C. §3733 | False Claims |
| 26 U.S.C. §7401 | Internal Revenue Code (unpaid taxes) |

## III. SUMMARY OF THE CASE

This Prosecution Memorandum submitted by Congressman Martin T. Meehan asks the Department of Justice to initiate a formal criminal investigation into the conduct of the named tobacco companies and their executives, lawyers, public relations agents, scientists, trade associations and suppliers. The following are named as potential targets of a possible Department of Justice investigation:

* 8 tobacco manufacturers
* 10 tobacco company executives and scientists
* 4 tobacco industry trade associations and tobacco company-funded research entities and 5 officials affiliated with these groups
* 1 scientific consulting group and its president
* 1 public relations consulting firm
* 2 companies that serve as suppliers to tobacco manufacturers
* 1 law firm and 1 lawyer representing tobacco companies and a tobacco company-funded research entity

At the Department's discretion, the proposed investigation may also include other tobacco companies, their agents and/or other persons or entities affiliated or doing business with members of the tobacco industry.

The Prosecution Memorandum provides substantial documentation of the conduct and statements of the proposed investigative targets, which, it is argued, may constitute violations of one or more Federal criminal statutes. Some of the laws that may apply, according to the analysis, are as follows:

* Perjury, 18 U.S.C. §1621
* Mail Fraud, 18 U.S.C. §1341
* Wire Fraud, 18 U.S.C. §1343
* False Advertising, 15 U.S.C. §52(A)(1)
* Deception of the Public, 15 U.S.C. §52(A)(2)
* Deception of Federal Agencies, 18 U.S.C. §1001
* Deception of Congress, 18 U.S.C. §1001

The Prosecution Memorandum identifies two additional Federal criminal statutes that the Department of Justice may consider in light of the alleged commission of the "predicate" acts identified above. They are as follows:

* Criminal Conspiracy, 18 U.S.C. §371
* Racketeer Influenced and Corrupt Organizations ("RICO"), 18 U.S.C. §1962

The Department of Justice is asked, in addition, to examine whether the tobacco companies who have funded the Council for Tobacco Research may improperly have

received tax credits for their contributions to "research," in light of the potentially fraudulent nature of the research and its use for public relations purposes. The governing statute is the False Claims Act, 31 U.S.C. §3729 *et seq.*

Given the numerous and complex facts that are involved, and the obstacles encountered by Federal government officials and agencies when they have attempted over many years to obtain complete and truthful information from tobacco companies and their representatives, the Prosecution Memorandum recommends that the Department of Justice convene a grand jury to investigate these matters.

The Prosecution Memorandum is intended to provide a basis from which the Department of Justice can open a formal investigation and conduct the fact-finding and legal analysis necessary to reach a determination of whether criminal prosecution may be warranted.

## IV. STATEMENT OF THE LAW

### A. TOBACCO INDUSTRY CRIMES ARISING OUT OF DECEPTION OF THE UNITED STATES CONGRESS

#### 1. PERJURY

The evidence indicates that tobacco company representatives, acting in their official capacities, committed perjury in oral and written testimony before the United States Congress in violation of 18 U.S.C. §1621. A finding of perjury requires a false statement, willfully made as to material fact, under an oath authorized by law and taken before a competent tribunal, officer or person authorized by Federal law to administer such an oath. Section 1621 states, in part:

> "Whoever -
> (1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true ...
>
> is guilty of perjury and shall, except as otherwise expressly provided by law, be fined not more than $2,000 or imprisoned not more than five years, or both. This section is applicable whether the statement or subscription is made within or without the United States."

#### 2. PROVIDING FALSE INFORMATION TO, OR WITHHOLDING INFORMATION FROM, A COMMITTEE OF THE U.S. CONGRESS, IN THE ABSENCE OF OATH

The evidence indicates that tobacco company representatives, acting in their official capacities, deceived committees of the United States Congress in violation of 18 U.S.C. §1001, which states:

> "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

Section 1001 has been held to apply to the making of false statements to Congress. *See, e.g.*, *United States v. Poindexter*, 951 F.2d 369 (D.C.Cir. 1991), *citing Marzani v. United States*, 168 F.2d 133, 141 (D.C.Cir.), *aff'd by an equally divided court*, 335 U.S. 895, 69 S.Ct. 299, 93 L.Ed. 431 (1948).

B. TOBACCO INDUSTRY CRIMES ARISING OUT OF DECEPTION OF THE U.S. SURGEON GENERAL AND THE FOOD AND DRUG ADMINISTRATION

The evidence indicates that tobacco company representatives, acting in their official capacities, violated 18 U.S.C. §1001 by providing false information to, and withholding information from, the U.S. Surgeon General and the Food and Drug Administration on matters within their jurisdiction. (For text of §1001, *see* Section A(2), *supra*.

C. TOBACCO INDUSTRY CRIMES ARISING OUT OF DECEPTION OF THE AMERICAN PUBLIC

1. DISSEMINATION OF FALSE ADVERTISEMENTS, PRESS RELEASES AND STATEMENTS TO THE MEDIA

a. By Other than the United States Mails.

The evidence indicates that tobacco companies, by disseminating or causing to be disseminated false advertisements via means other than the United States mails, sought directly or indirectly to induce individual members of the public to purchase substances known by such companies to be drugs or devices in violation of 15 U.S.C. §52(a)(2), which states:

"(a) Unlawfulness

It shall be unlawful for any person, partnership, or corporation to disseminate, or cause to be disseminated, any false advertisement -

. . .

(2) By any means, for the purpose of inducing, or which is likely to induce, directly or indirectly, the purchase in or having an effect upon commerce, of food, drugs, devices, or cosmetics."

b. By the United States Mails.

The evidence indicates that tobacco companies, by disseminating or causing to be disseminated false advertisements through the United States mails, sought directly or indirectly to induce individual members of the public to purchase substances known by such companies to be drugs or devices in violation of 15 U.S.C. §52(a)(1), which states:

"(a) Unlawfulness

It shall be unlawful for any person, partnership, or corporation to disseminate, or cause to be disseminated, any false advertisement -

(1) By United States mails, or in or having an effect upon commerce, by any means, for the purpose of inducing, or which is likely to induce, directly or indirectly the purchase of food, drugs, devices, or cosmetics ..."

2. MAIL FRAUD

The evidence indicates that tobacco companies engaged in a scheme to defraud members of the public and used the U.S. mails for the purpose of executing or attempting to execute such scheme in violation of 18 U.S.C. §1341, which states:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

The tobacco companies' schemes or artifices to defraud need not have been fraudulent on their face or have involved affirmative representations, but must have involved fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406 (3d Cir. 1991), *cert. denied* 501 U.S. 1222, 111 S.Ct. 2839. The rule enunciated in *Kehr* and echoed in *United States v. Biesiadecki*, 933 F.2d 539, 541-542 (7th Cir. 1991), that a scheme to defraud may be found when a defendant omitted information so as to cause people of

ordinary intelligence to make uninformed decisions, takes on added significance in the case of the tobacco companies.

In *Biesiadecki*, the court found that the defendant participated in a scheme to defraud when he enticed people to participate in his investment program by not telling investors of the money that other customers had lost and by misrepresenting customer successes. *Id.* at 543. The defendant's scheme was designed to entice customers by fraudulently minimizing the risk, through the misrepresentation of some figures and the omission of others. (*See infra* regarding the creation and role of the Council for Tobacco Research ["CTR"], which bears a striking resemblance, albeit in a different and considerably larger context, to the scheme considered in *Biesiadecki*. The CTR, which originally was named the Tobacco Industry Research Committee, was formed not as a legitimate entity to fund research on tobacco and health, but rather as a public relations front whose primary purpose was to protect the profits of tobacco companies, who were its sole funders. Like the defendant in *Biesiadecki*, the CTR, on behalf of the tobacco companies that fund it, is an integral component in a scheme designed to entice customers by fraudulently minimizing the risk of tobacco use, through the misrepresentation of some health data and the omission of other health data.)

In *United States v. Green*, 745 F.2d 1205, 1207 (9th Cir. 1984), *cert. denied* 106 S.Ct. 259 (1985), the court identified intent by examining the scheme itself. The court found that if the scheme would be expected to deceive the reasonable or ordinary person, the requisite intent existed. The court found that intent existed when the defendant falsified test reports for nuclear coatings (which were subject to Nuclear Regulatory Commission standards) in order to persuade a corporation to buy them. *Id.* at 1207-1208. Rejecting the defendant's claim that he believed that the buyer had not relied on the falsified reports to make its purchasing decision, the court determined that the defendant had devised a scheme intended to deprive the buyer of the ability to make an informed choice among nuclear coatings. Thus, a scheme to defraud existed. *See infra* regarding the falsification of data on the impact of environmental tobacco smoke by Healthy Buildings International in its paid consulting work for the Tobacco Institute. Intent could be demonstrated in the case of HBI and the Tobacco Institute by, *e.g.*, identifying internal memoranda that show the actual falsification of data.

Also relevant to an examination of the tobacco companies' conduct is the finding in *United States v. Hathaway*, 798 F.2d 902, 909 (6th Cir. 1986), where the court found that where a defendant acts with reckless indifference as to the truth or falsity of his statements, he is charged with *de facto* knowledge of the falsity of the scheme and, therefore, the requisite intent.

The tobacco companies have misrepresented material facts in order to maintain and increase their profits, and the misrepresentations have resulted in the passage of money to the companies. *See McNally v. United States*, 107 S.Ct. 2875 (1987). Moreover, the scope of fraud under the mail and wire fraud statutes is broader than common law fraud, and no

misrepresentation of fact must be shown in order to establish a scheme to defraud. McEvoy Travel Bur., Inc. v. Heritage Travel, Inc., 904 F.2d 786 (1st Cir. 1990, *cert. den.* 498 U.S. 992, 111 S.Ct. 536.

The validity of a mail fraud conviction does not hinge on a showing of actual loss by the intended victim. It is enough that the defendant knowingly devised a scheme to defraud and caused use of the mails in furtherance of the scheme. *United States v. King*, 860 F.2d 54 (2d Cir. 1988), *cert. denied* 490 U.S. 1065, 109 S.Ct. 2062. The government need not prove actual injury in a prosecution for mail fraud. *United States v. Nelson*, 988 F.2d 798 (8th Cir. 1993), *cert. denied* 126 L.Ed.2d 250, 114 S.Ct. 302. It is not necessary, therefore, to prove that particular consumers were injured by tobacco products. While contemplation of harm or injury must be shown to establish mail fraud, it may be inferred when the scheme has such an effect as a necessary result of carrying it out. *See United States v. London*, 753 F.2d 202 (2d Cir. 1985). Thus, if millions of consumers have been harmed by fraudulent concealment of the adverse health consequences of tobacco use, the intent of the scheme may be inferred, since the harm to the consumers was the necessary result of the concealment.

A reckless disregard for truth or falsity also has been held sufficient to sustain a mail fraud conviction. *United States v. Schaflander*, 719 F.2d 1024 (9th Cir. 1983), *cert. denied* 467 U.S. 1216, 104 S.Ct. 2660. While the government must prove that the defendant had the specific intent to defraud, the showing of an evil motive on the part of the defendant is not necessary, and intent may be inferred through circumstantial evidence. *United States v. Savran*, 755 F.Supp. 1165 (E.D.N.Y. 1991).

## 3. FRAUD BY WIRE, RADIO OR TELEVISION

The evidence indicates that tobacco companies engaged in a scheme to defraud members of the public by transmitting by means of wire, radio and television communication in interstate commerce misrepresentations of material fact, resulting in passage of money to these same companies in response to their misrepresentations in violation of 18 U.S.C. §1343, which states:

> "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses,representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

## D. OTHER POSSIBLE VIOLATIONS OF FEDERAL CRIMINAL LAWS

### 1. Criminal Conspiracy

The evidence indicates that two or more tobacco company representatives, acting in their official capacities, may have violated 18 U.S.C. §371 by conspiring to violate multiple laws of the United States (*see supra*) and to defraud the United States, the Food and Drug Administration and the U.S. Surgeon General (*see supra*), since one or more of such persons committed acts to effect the object of said conspiracy. Section 371 states:

> "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.
>
> "If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor."

### 2. "RICO" Violations

The evidence indicates that tobacco company representatives, acting in their official capacities, may also have violated the prohibitions set forth at 18 U.S.C. §1962 (Racketeer Influenced and Corrupt Organizations, or "RICO") by participating in a commercial enterprise or an enterprise affecting commerce through a pattern of specific criminal racketeering activity. Section 1962 states in part:

> "(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce ...
>
> . . .
>
> "(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ..."

Tobacco company representatives appear repeatedly to have committed acts prohibited by Federal law, including 18 U.S.C. §1341 and 18 U.S.C. §1342, which constitute predicate

acts of mail and wire fraud, respectively (*see supra*), within the meaning of 18 U.S.C. §1961(1). Many of these acts were related in their common objective, or were consistently repeated, and are capable of further repetition. This conduct, therefore, may have constituted a pattern of racketeering activity within the meaning of 18 U.S.C. §1961(5).

3. False Claims and Unpaid Taxes

In a letter dated February 7, 1983, to Brown & Williamson's General Counsel Ernest Pepples, Samuel B. Witt III, R.J. Reynolds Tobacco Company's ("RJR's") Vice President, General Counsel and Secretary, suggests that the tobacco companies who fund the Council for Tobacco Research ("CTR") (*see* multiple discussions, *infra*) might be able "to take advantage of a new tax credit for basic research expenditures." Witt goes on to explain that RJR expects to take advantage of the tax credit by "paying our share of the grant to the [CTR] grantee directly," adding that RJR "will shortly be working out the details with the CTR staff."

It is not clear at this writing what the tobacco companies who have funded the CTR have done to carry out such a tax strategy. If, in fact, they have executed such a strategy, their having done so raises the question of whether they have improperly received tax credits for contributions for "research" when, in fact, the research they have funded has been supported, often with the facilitation of tobacco industry lawyers, primarily for public relations purposes.

An action can be brought under the False Claims Act, 31 U.S.C. §3729 *et seq.*, where there is a claim submitted to the government to receive money. Under 31 U.S.C. §3733, the Federal government can issue civil investigative demands in order to obtain documents and testimony from any party. Dependent upon the investigative findings of the Department of Justice, an action also might lie against the tobacco companies named in this Prosecution Memorandum for recovery of unpaid taxes. The Internal Revenue Code, at 26 U.S.C. §7401, provides that "[n]o civil action for collection or recovery of taxes ... shall be commenced unless the Secretary authorizes or sanctions the proceedings and the Attorney General ... directs that the action be commenced." *See United States v. Western Pac. R. Co.*, 190 F.2d 243 (9th Cir. 1951).

## V. STATEMENT OF THE FACTS

### A. TOBACCO COMPANIES ENGAGED IN CRIMINAL CONDUCT BY DELIBERATELY DECEIVING THE U.S. CONGRESS

#### 1. PERJURY BEFORE THE HOUSE COMMITTEE ON HEALTH AND THE ENVIRONMENT

Tobacco company representatives, acting in their official capacities, are believed to have committed perjury in oral and written testimony before the United States Congress. Each of these commissions satisfied the statutory test of perjury, which requires a finding of a false statement, willfully made as to material fact, under an oath authorized by law and taken before a competent tribunal, officer or person authorized by Federal law to administer such an oath, including the Congress. 18 U.S.C. §1621.

Seven tobacco company chief executives, accompanied by other individuals also appearing on behalf of their companies, testified under oath before the Subcommittee on Health and the Environment of the Committee on Energy and Commerce, U.S. House of Representatives, on April 14, 1994.[1] The tobacco executives and the individuals accompanying them included the following:

**William I. Campbell**, President and CEO, accompanied by **Dr. Kathy Ellis**, Director of Research, and **Harold Burnley**, Director of Process Development, **Philip Morris U.S.A.**

**James W. Johnston**, Chairman and CEO, accompanied by **Andrew J. Schindler**, President and Chief Operating Officer U.S.A., and **Carl Ehmann**, Head of Research and Development, **R.J. Reynolds Tobacco Company** ("RJR"), and **Richard Cooper**, outside counsel and partner with Williams & Connolly

**Thomas E. Sandefur, Jr.**, Chairman and CEO, accompanied by **T.F. Riehl**, Vice President for Research and Development, and **John Jewell**, Vice President for Manufacturing, **Brown and Williamson Tobacco Corporation** ("B&W")

**Andrew H. Tisch**, Chairman and CEO, accompanied by **Dr. Alexander Spears**, Vice-Chairman and Chief Operating Officer, **Lorillard Tobacco Company**

---

[1] Hearing before Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, April 14, 1994.

**Donald S. Johnston**, President and CEO, accompanied by **Robert Sprinkle, III**, Executive Vice-President for Research and Quality Assurance, **American Tobacco Company**

**Edward A. Horrigan, Jr.**, Chairman and CEO, accompanied by **Gregory Sulin**, Vice President of Operations, **Liggett Group Inc.** ("Liggett")

**Joseph Taddeo**, President, accompanied by **Dr. Robert Lawrence**, Executive Vice-President, **U.S. Tobacco Company** ("UST")

The following statements, all of which, because of their apparent falsity are believed to constitute acts of perjury pursuant to 18 U.S.C. §1621, were made without qualification,[2] and were willfully made as to material facts by the identified tobacco company representatives in the course of their testimony. Key portions are identified by *italics*.

a. **Perjury by William Campbell (Philip Morris)**

Campbell Perjury #1 and #2

#1 "*Cigarette smoking is not addictive.*"

#2 "*The presence of nicotine, however, does not make cigarettes a drug or smoking an addiction.*"

Discussion of Campbell Perjury #1 and #2

The existence of substantial scientific research studies conducted by William Campbell's company demonstrates that Philip Morris scientists and executives have known for decades that nicotine, and therefore cigarette smoking, is addicting.

For example, an 18-page internal report by William L. Dunn, Jr., a senior scientist with the Philip Morris Tobacco Company,[3] which Campbell directs as Chairman and CEO, clearly confirmed in 1972, sixteen years before publication of the landmark

---

[2] The fact that on some occasions the tobacco executives in their testimony may have framed statements as beliefs or opinions does not change or negate the fact that they also made the clear, declaratory statements addressed here.

[3] William L. Dunn, Jr., Philip Morris Research Center, "Motives and Incentives in Cigarette Smoking" (describing the conclusions of a 1972 Council for Tobacco Research Council conference in St. Maarten), Plaintiff's Exhibit P-5171 in the case of *Cipollone v. Liggett*.

U.S. Surgeon General's report on nicotine addiction,[4] the addictive nature of nicotine and its fundamental importance to cigarette smoking. The report states:

> "[T]he cigarette is in fact among the most awe-inspiring examples of the ingenuity of man. Let me explain my conviction.
>
> "The cigarette should be conceived not as a product but as a package. *The product is nicotine*. The cigarette is but one of many package layers. There is the carton, which contains the pack, which contains the cigarette, which contains the smoke. The smoke is the final package. The smoker must strip off all these package layers to get to that which he seeks.
>
> "But consider for a moment what 200 years of trial and error designing has brought in the way of nicotine packaging:
>
> "*Think of the cigarette pack as a storage container for a day's supply of nicotine*:
>
> "1) It is unobtrusively portable.
>
> "2) Its contents are instantly accessible.
>
> "*Think of the cigarette as a dispenser for a dose unit of nicotine*:
>
> "1) It is readily prepped for dispensing nicotine.
>
> "2) Its rate of combustion meters the dispensing rate, setting an upper safe limit for a substance that can be toxic in large doses.
>
> "3) Dispensing is unobtrusive to most ongoing behavior.
>
> "*Think of a puff of smoke as the vehicle of nicotine*:
>
> "1) A convenient 35 cc mouthful contains approximately the right amount of nicotine.

---

[4] U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control, Center for Chronic Disease Prevention and Health Promotion, Office on Smoking and Health, *The Health Consequences of Smoking: Nicotine Addiction. A Report of the Surgeon General*. 1988.

"2) The smoker has wide latitude in further calibration: puff volume, puff interval, depth and duration of inhalation. We have recorded wide variability in intake among smokers. Among a group of pack-a-day smokers, some will take in less than the average half-pack smoker, some will take in more than the average two-pack-a-day smoker.

"3) *Highly absorbable: 97% nicotine retention.*

"4) *Rapid transfer: nicotine delivered to blood stream in 1 to 3 minutes.*[5]

"5) Non-noxious administration [sic].

"*Smoke is beyond question the most optimized vehicle of nicotine and the cigarette the most optimized dispenser of smoke.*"

Similarly, a confidential "special" report prepared by the Philip Morris U.S.A. Research Center for top Philip Morris executives in March 1978 reaffirms the central pharmacological role played by nicotine in the difficulty experienced by consumers trying to quit smoking. It makes no mention of taste or flavor in this context, and also questions the prudence of introducing low-nicotine products because their availability might make it easier for addicted smokers to quit. The report states:

"We think that *most smokers can be considered nicotine seekers, for the pharmacological effect of nicotine is one of the rewards that come from smoking*. When the smoker quits, he foregoes [sic] his accustomed nicotine. *The change is very noticeable*, he misses the reward, and so he returns to smoking.

. . .

[5] "Actually," as noted by addiction medicine expert John Slade, M.D., "delivery is in a matter of a few seconds." Testimony of John Slade, M.D., before the Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, March 25, 1994.

> "If the industry's introduction of acceptable low-nicotine products does make it easier for dedicated smokers to quit, then the wisdom of the introduction is open to debate."[6]

Other Philip Morris research on nicotine and addiction is discussed *infra*.

Furthermore, William Campbell contradicted himself, thus admitting Philip Morris's intent to use addictive substances in its cigarettes, in the following exchange:

> Mr. Synar: "Mr. Campbell, was [former Philip Morris research scientist] Dr. [Victor] DeNoble's work part of your company's effort to develop a nicotine analog, which are *chemicals which would have addicting or reenforcing features* without any or some of the nicotine side effects? Yes or no?"
>
> Mr. Campbell: "Yes."

Additional background: Campbell and other tobacco company executives and scientists frequently assert publicly that nicotine is not addictive. It is notable, and relevant to the question of whether perjury has been committed, that a substantial number of documents from within Philip Morris itself, as well as from other tobacco companies' internal files, demonstrates that these companies, their executives and their scientists have reached precisely the opposite conclusion - *i.e.*, that nicotine is a drug and is addictive. Only a small fraction of this evidence is cited in this Discussion and later in this Prosecution Memorandum.

Based on information and belief, the only critics of the concept that nicotine is addictive are those with direct financial ties to tobacco companies or their agents.[7]

---

[6] F.J. Ryan (approved by W.L. Dunn, Jr.), Philip Morris U.S.A. Research Center, "Exit Brand Cigarettes: A Study of Ex-Smokers," March 1978, Plaintiff's Exhibit 671 in the case of *Cipollone v. Liggett* (underlining in original).

[7] *See, e.g.*, John H. Robinson and Walter S. Pritchard (Biobehavioral R&D, R.J. Reynolds Tobacco Company), "The Role of Nicotine in Tobacco Use," 108 *Psychopharmacology* 397-407, 1992. *Inter alia*, while identifying nicotine's effect on the body and its ability to reduce anxiety and increase mental alertness, and also acknowledging that "the beneficial effects of smoking on cognitive performance are a function of nicotine absorbed from cigarette smoke," the authors claim that the definition of addiction applied by the U.S. Surgeon General and other leading experts is in error and that nicotine is, therefore, not addictive. Playing a semantic game, the tobacco industry authors claim that to be defined as "addictive," a substance must cause intoxication, a view rejected by independent, mainstream scientists. "It is not that Dr. Robinson and other scientists supported by tobacco companies disagree with the main points made by mainstream scientists, but that they define addiction differently," said the *New York Times*. In fact, the tobacco industry scientists admit that nicotine use

The approach taken by British psychologist David M. Warburton, who frequently is cited by the tobacco companies as the primary -- and often, the only -- support for the claim that nicotine is not addictive, has been rejected by virtually every, if not every, credible and independent expert in the world.[8] Even Warburton acknowledges in his own research that the "effects of smoking on cognitive function, when considered together with the rapid absorption and elimination of nicotine, suggest a major role in the motivation for smoking."

The investigation coincident to preparation of this Prosecution Memorandum confirmed, moreover, that Warburton's research has been extensively funded by the tobacco industry at least since 1978,[9] and that he was given honoraria and sent on all-

---

does feature the hallmarks of addiction, including compulsive use, withdrawal symptoms and continued use despite knowledge of harm to oneself and others. Philip J. Hilts, "Is Nicotine Addictive? It Depends on Whose Criteria You Use," *New York Times*, August 2, 1994, p. C3.

[8] *See* D.M. Warburton, "Is Nicotine Use an Addiction?," *The Psychologist*, April 1989, pp. 166-170. While some of Warburton's work has been accepted, his and other tobacco industry supporters' claim that nicotine is non-addictive has been soundly rejected, most recently by the FDA Drug Abuse Advisory Committee on August 2, 1994, which reaffirmed overwhelmingly that nicotine is: 1) addictive; and 2) the substance in tobacco products that causes addiction. *See, generally*, Philip J. Hilts, "F.D.A. Panel Takes Step Toward Setting Control on Nicotine," *New York Times*, August 3, 1994, p. A1. Tobacco industry representatives note that Warburton contributed to the 1988 Surgeon General's report on nicotine addiction, but they invariably fail to mention that Warburton's contribution to that report did not address the fundamental issue of whether nicotine is addictive. *See* Discussion of Taddeo Perjury #1, *infra*.

*See also* Medical Research Council, *The Basis of Drug Dependence* (Medical Research Council: London, England, 1994). The MRC report is a leading authoritative reference for the scientific and medical communities in the United Kingdom, Warburton's home. It states: "Tobacco is widely regarded as one of the major environmental causes of illness and death. *That most people use tobacco to obtain the effects of nicotine, and that nicotine is an addictive drug that supports dependence processes, is widely accepted.*" Rejecting the tobacco industry's frequent comparison of nicotine to caffeine, it states: "Caffeine is almost certainly the most widely used drug of dependence in the world. Despite this, almost no evidence of morbidity other than gastric irritation, insomnia and cardiovascular effects has been found. *Studying caffeine is unlikely to tell us very much about the harmful effects of drugs of dependence*, but it does illustrate that dependence per se is not a problem." (Emphasis added.)

[9] *E.g.*, by the Tobacco Research Council and Carreras Rothmans Ltd. Warburton also has acknowledged assistance from the British-American Tobacco Company. All of the following research has been so funded: Keith Wesnes and David M. Warburton, "The Effects of Cigarette Smoking and Nicotine Tablets Upon Human Attention," *in Smoking Behaviour: Physiological Influences*, Raymond E. Thornton, Senior Scientist, Group Research and Development Centre, British-American Tobacco Company Limited, ed. (Churchill Livingstone: Edinburgh, London and New York, 1978); K. Wesnes and D.M. Warburton, "Effects of Smoking on Rapid Information Processing Performance,"

expenses-paid trips by tobacco interests to testify on their behalf against the regulation of tobacco at hearings held in New Zealand.[10]

Warburton also is the founder of Associates for Research into the Science of Enjoyment ("ARISE"), a British organization funded by tobacco, distilling and brewing companies which, among other things, advocates for "smokers' rights." Explaining ARISE's mission, Warburton recently claimed that the health benefits of cigarette smoking may outweigh the damage. He said: "It's interesting how few people die from smoking. Most smokers live to a ripe old age. Don't forget, the death rate for smokers and non-smokers is the same in the end - 100 per cent."[11] Further placing the position of Warburton's group in perspective, ARISE member James McCormick said that "[t]he addictive properties of cocaine and heroin are overstated. Not everyone becomes dependent. A lot of people are stable addicts."[12]

*See, generally*, this Prosecution Memorandum for a review of significant, additional evidence on the tobacco industry's thorough understanding of the addictive nature of nicotine.

Campbell Perjury #3

#3 "*Philip Morris research does not establish that smoking is addictive.* At the March 25th hearing, [FDA] Commissioner [David] Kessler made the statement, supported by Dr. [Jack] Henningfield [of the National Institute on Drug Abuse],[13] that in 1983, a company, later identified as Philip Morris,

---

*Neuropsychobiology*, Vol. 9, 1983, pp. 223-229; K. Wesnes and D.M. Warburton, "The Effects of Cigarettes of Varying Yield on Rapid Information Processing Performance, *Psychopharmacology*, Vol. 82, 1984, pp. 338-342; K. Wesnes and D.M. Warburton, "Smoking, Nicotine and Human Performance," *Pharma. Ther.*, Vol. 1, 1983, pp. 189-208; K. Wesnes, D.M. Warburton, B. Matz, "Effects of Nicotine on Stimulus Sensitivity and Response Bias in a Visual Vigilance Task," *Neuropsychobiology.*, Vol. 9, 1983, pp. 41-44.

[10] Telephone interviews with Martin Jarvis, M.Phil., Principal Scientist, Imperial Cancer Research Fund, Health Behaviour Unity, Department of Psychiatry, Institute of Psychiatry, December 1-2, 1994; private communications received from Dr. Murray Laugesen, scientific editor of Toxic Substances Board, Department of Health (Wellington, New Zealand), *Health or Tobacco*, May 1989.

[11] *Quoted in* Madeleine Bunting, "Eat, Drink, and Be Very Provocative," *The Guardian*, November 12, 1994, p. 29.

[12] *Id.*

[13] Dr. Henningfield is a research psychologist and Chief of the Clinical Pharmacology Branch at the Addiction Research center of the National Institute on Drug Abuse, National Institutes of Health.

suppressed research by one of its own scientists who, allegedly, concluded that nicotine was an addictive substance. *That is false*. In fact, that scientist published two full papers and five abstracts related to the work in question, including one published in 1982, a year prior to the creation of the manuscript in question. The manuscript subsequently provided to the committee by [FDA] Commissioner [David] Kessler presented some evidence that rats will self-administer nicotine, and that nicotine, therefore, is a weak reinforcing agent. The researcher later concluded that nicotine is a reinforcer in the class of non-addictive chemical compounds such as saccharin and water. In addition, and Commissioner Kessler failed to note this, the manuscript itself states, and I quote, 'Termination of prolonged access to nicotine under conditions in which it functions as a positive reinforcer does not result in physiological dependence.' *Thus the manuscript did not conclude that nicotine is addictive*."

Discussion of Campbell Perjury #3

Campbell's testimony is highly misleading and may rise to the level of perjury, based on the following evidence:

1) *Congressional Testimony of Victor DeNoble*: According to the Congressional testimony of chief study author Victor J. DeNoble, Ph.D., the research conducted for Philip Morris by DeNoble and his colleagues led them to the conclusion that nicotine is addicting "on a level comparable to cocaine."[14] The study itself[15] was co-authored by three Philip Morris scientists five years before publication of the Surgeon General's landmark report on nicotine addiction in 1988. It resulted from the work conducted in the Philip Morris laboratory, directed by Dr. DeNoble, whose explicit charge was to identify the effects of nicotine on the central nervous system and brain.

Philip Morris may attempt to argue that at that time, 11 years ago, the company considered the DeNoble study to be an early, rather than a conclusive, indication of nicotine's addictiveness. That argument cannot be true, first, because of the other extensive scientific information that Philip

[14] Testimony of Victor John DeNoble, Ph.D., before Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, April 28, 1994 (underlining added).

[15] Victor J. DeNoble, Paul C. Mele and Francis J. Ryan (Philip Morris Research Center), "Nicotine as a Positive Reinforcer for Rats: Effect of Infusion Dose and Fixed Ratio Size," 1983 (withdrawn from publication by Philip Morris).

Morris already possessed showing that nicotine is a highly addictive drug (as discussed elsewhere in this Prosecution Memorandum).

Second, DeNoble testified before Congress that even taken alone, irrespective of the Philip Morris researchers' substantial additional findings on nicotine's addictiveness, the study "demonstrate[d] that both physiological and behavioral tolerance develops to chronic nicotine administration. Following tolerance development, higher doses of nicotine were required to produce effects that were both quantitatively and qualitatively similar to those observed before tolerance had developed." As summarized by the *New York Times*, "[o]ne important measure of a drug's addictive potential is whether a laboratory animal will work hard pressing a lever to get the drug. Nicotine will get a rat to press a bar steadily, more than 100 times an hour, and Dr. DeNoble found that the animals will do the same for acetaldehyde [*see infra*, this Discussion], though they will not do so for water or saccarin [sic] or other favored substances."[16]

The DeNoble study and other Philip Morris research underscore the company's significant interest in the pharmacology, *i.e.*, the drug effects of nicotine and other substances in tobacco and tobacco smoke. Indeed, DeNoble and his colleagues' extensive research for the company led them to discover an artificial version of nicotine that had few of the toxic effects on the heart that nicotine is known to have. The significance of the identification of the psychoactive and possibly addictive substance *acetaldehyde* grew greater when the researchers learned that by combining nicotine and acetaldehyde, the addictive effects more than tripled, causing the Philip Morris test rats to press a bar more than 500 times an hour.[17]

DeNoble in his testimony also flatly contradicted Campbell's and the other tobacco witnesses' sworn testimony that nicotine was in cigarettes for "taste," noting that nicotine's effect on the brain, not flavor, was the *sole* focus of

[16] Philip J. Hilts, "Scientists Say Cigarette Company Suppressed Findings on Nicotine," *New York Times*, April 29, 1994, p. A1.

[17] Testimony of Victor John DeNoble, Ph.D., before Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, April 28, 1994. *See also* Philip J. Hilts, "Scientists Say Cigarette Company Suppressed Findings on Nicotine," *New York Times*, April 29, 1994, p. A1; Eben Shapiro, "Scientist Says Philip Morris Suppressed His Research on Nicotine Addiction," *Wall Street Journal*, April 29, 1994, p. B8.

Philip Morris's research.[18] Even taken alone, these facts strongly support a finding that Philip Morris's scientists clearly confirmed the highly addictive character of nicotine (as well as, possibly, other substances) and the unambiguous understanding by Philip Morris executives of the addictiveness of nicotine.

*See also* Discussion, *infra*, regarding the nicotine manipulation process patented by Kimberly-Clark Corporation and LTR Industries, which is believed to have been used, and may be used currently, by Philip Morris, possibly in manufacturing facilities abroad, though this has not been confirmed.

2) *Philip Morris's Suppression of Unfavorable Research*: Philip Morris acknowledged the seriousness of its nicotine laboratory's findings when it suppressed continuation of the research because of the company's growing concern that the evidence of the drug's addictiveness would cause legal problems in connection with tobacco products liability litigation. According to Dr. DeNoble and fellow Philip Morris scientist Paul C. Mele, Ph.D., also in testimony before Congress, Philip Morris forbade the researchers from discussing their work, even with other company employees, and prohibited them from publishing it. After the complaint in the smoker-death lawsuit of *Cipollone v. Liggett* was filed in August 1983, Philip Morris forced DeNoble to withdraw his paper on the rat test from the scientific journal *Psychopharmacology*, which already had accepted the report for publication following full peer-review. Then, on April 5, 1984, the scientists were abruptly forced by Philip Morris officials to halt their studies, turn off all their instruments, kill all the laboratory rats and turn in their security badges by

---

[18] *See also* Testimony of David A. Kessler, M.D., Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, March 25, 1994:

> "The tobacco industry may tell you that nicotine is important in cigarettes solely for 'flavor.' There is a great deal of information that suggests otherwise. Some of the patents specifically distinguish nicotine from flavorants. [Footnote omitted.] An RJR book on flavoring tobacco, while listing around a thousand flavorants, fails to list nicotine as a flavoring agent. [Citing J.C. Leffingwell and H.J. Yound, *Tobacco Flavoring for Smoking Products* (R.J. Reynolds Tobacco Company, 1972).]"

morning. According to Drs. DeNoble and Mele, Philip Morris executives threatened legal action if the scientists published or talked about their nicotine research, directly contradicting Campbell's sworn testimony of April 14, 1994.[19]

3) *Philip Morris Scientists Did Not Conclude Nicotine to be Non-Addictive*: By stating in the context of this testimony that "[t]he researcher[20] later concluded that nicotine is a reinforcer in the class of non-addictive chemical compounds such as saccharin and water," Campbell adroitly implied, falsely, that the Philip Morris scientists thereby found that nicotine is itself non-addictive, a conclusion they specifically did not reach (*see* this Discussion, *supra*).

*See also* Discussion, *supra*, of the internal reports produced by Philip Morris Tobacco Company scientists William L. Dunn, Jr., in 1972 and F.J. Ryan in 1978, describing in clear detail the addictive effects of nicotine on smokers.

Campbell Perjury #4

#4 *"Consumers are not misled by the published nicotine deliveries as measured by the FTC method."*

Discussion of Campbell Perjury #4

There simply is no dispute that consumers are seriously misled by the published nicotine deliveries as measured by the FTC method, and Philip Morris and other

[19] *See* Philip J. Hilts, "Scientists Say Cigarette Company Suppressed Findings on Nicotine," *New York Times*, April 29, 1994, p. A1; Eben Shapiro, "Scientist Says Philip Morris Suppressed His Research on Nicotine Addiction," *Wall Street Journal*, April 29, 1994, p. B8; Clifford E. Douglas, *Special Report: The Tobacco Industry's Use of Nicotine as a Drug: What Do the Recent Revelations Mean for Tobacco Control?* (American Council on Science and Health: New York, NY, May 1994). *Note*: Subsequent to the April 28, 1994, testimony by Dr. DeNoble and Mele, the *Wall Street Journal* reported that DeNoble had been fired from a job with DuPont Merck Pharmaceutical Co. in 1992 for allegedly falsifying scientific research, following which DeNoble sued the company for wrongful termination and defamation. That suit is pending. In its article, the *Journal* concluded that "[d]espite his dismissal from DuPont Merck, Dr. DeNoble's testimony on Philip Morris's extensive nicotine research program remains damaging to the tobacco industry. Most of his testimony was confirmed by Dr. Paul C. Mele, another former Philip Morris scientist." Eben Shapiro, "Ex-Philip Morris Scientist Lost Later Job for Allegedly Falsifying Scientific Data," *Wall Street Journal*, May 6, 1994, p. B3.

[20] Campbell suggests that there was only one researcher. In fact, there were several.

tobacco companies clearly know this. Thus, Campbell's statement, made as a blunt declaration and not as a qualified opinion, may have risen to the level of perjury. In fact, tobacco manufacturers have, through their conduct, ensured that this is the case. As documented by the *New York Times* and summarized here:[21]

(1) The measurements of nicotine and tar, which are carried out by tobacco company laboratories under the supervision of the Federal Trade Commission ("FTC"), bear no relation to the levels of these poisons that smokers actually ingest.

(2) The misleading measurements of nicotine and tar are attributable to testing that "has not kept up with the changes [made by tobacco manufacturers themselves] in cigarette design over the last 20 years." (Underlining added.) Tobacco manufacturers have engineered several new features that make the machine tests meaningless, according to Jack E. Henningfield, Ph.D., Chief of Clinical Pharmacology Research at the National Institute on Drug Abuse and Senior Scientific Editor of the 1988 Surgeon General's report on nicotine addiction. Most of the cigarettes produced by cigarette companies now contain nearly invisible holes in the cigarette paper near the filter, ostensibly to dilute the smoke. The testing machines, which hold the cigarette by the tip of the filter, both "inhale" the smoke in an even and consistent manner and allow a significant quantity of the smoke's contents to escape through the holes. This process dilutes the smoke that reaches the measuring device and results in significantly lower nicotine and tar measurements.

Tobacco manufacturers know that human smokers, who are not machines, frequently compensate, often unconsciously, for a reduction in nicotine levels both by puffing more often and more deeply and by blocking the filtration holes with their lips or fingers. Thus, smokers ingest more smoke, more nicotine and more tar. By compensating in this way, smokers sometimes ingest more of the addictive drug and the other poisons when smoking so-called low-tar/nicotine cigarettes than they would if they were to use the tobacco manufacturers' full-strength brands.

(4) National Gallup polls have found that smokers believe that cigarette brands labeled "light" are less hazardous and deliver less nicotine and tar. However, as reaffirmed by Judith D. Wilkenfeld, Assistant Director in the FTC's Division of Advertising Practices, "[w]e know

---

[21] Philip J. Hilts, "Major Flaw Cited in Cigarette Data: Testing for Tar and Nicotine Underreports Amounts," *New York Times*, May 2, 1994, p. A1.

> that consumers do not smoke in exactly the same manner as the machine" used in testing. "So the tests will not predict the actual human consumption."

*See also* the 1972 internal report by William L. Dunn, Jr., a senior scientist with the Philip Morris Tobacco Company,[22] which states:

> "Think of a puff of smoke as the vehicle of nicotine:
>
> "1) A convenient 35 cc mouthful contains approximately the right amount of nicotine.
>
> "2) The smoker has wide latitude in further calibration: puff volume, puff interval, depth and duration of inhalation. We have recorded wide variability in intake among smokers. Among a group of pack-a-day smokers, some will take in less than the average half-pack smoker, some will take in more than the average two-pack-a-day smoker.

## Recommendations for Further Investigation

To understand more fully Philip Morris's genuine views on this issue and the full extent of Campbell's apparent perjury, the Department of Justice is advised to obtain from Philip Morris, its agents and other appropriate entities and individuals doing business with or for Philip Morris the following information: 1) internal studies and survey data on consumers' views concerning the levels of nicotine and tar as posted on tobacco product packages and advertisements; and 2) internal studies on the effect of such labels on consumers' purchasing and consumption practices.

## Campbell Perjury #5, #6, #7 and #8

#5 *"Philip Morris does not manipulate nor independently control the level of nicotine in out products."*[23]

#6 *"Cigarettes contain nicotine because it occurs naturally in tobacco."*

---

[22] William L. Dunn, Jr., Philip Morris Research Center, "Motives and Incentives in Cigarette Smoking" (describing the conclusions of a 1972 Council for Tobacco Research Council conference in St. Maarten), Plaintiff's Exhibit P-5171 in the case of *Cipollone v. Liggett* (underlining added).

[23] Stated twice, verbatim.

#7 "But we basically, as I said, also, in my opening remarks, *we do not blend for nicotine*. Nicotine is a result."

#8 The following exchange took place with Campbell:

Mr. Bryant: "Well, if nicotine is not addictive and it has no harmful characteristics in particular, why are you or why is Mr. Johnson, somebody, suing ABC for alleging that you're manipulating the nicotine? If all you're really doing is manipulating it for the purposes of flavor, why don't you just say 'so what if we are, it doesn't hurt anything'? What's your answer to that?"

Mr. Campbell: "The ABC charges are for the misrepresentation that we are spiking our products with nicotine."

Mr. Bryant: "My point is, why bother to refute them if all you need to say is, 'well, so what, all we're doing is doing it for flavor,' which is what you're saying to us today? If you're only doing it for flavor, why are you worried about the implications of that program?"

Mr. Campbell: "We were very worried about the fact that our stock dropped the next day because there were some implications that we were doing something sinister."

Mr. Bryant: "My point is, why not simply say there's nothing wrong? If you believe it, why don't you just say there's nothing wrong with manipulating the levels of nicotine, if it's only for flavor?

Mr. Campbell: "*We don't do it. That's why I won't acknowledge it.* I'm sorry."

<u>Discussion of Campbell Perjury #5, #6, #7 and #8</u>

These statement are false and misleading, and may constitute the most glaring amalgamation of untruthful testimony by William Campbell.

Based on information and belief, though not yet confirmed, Philip Morris cigarette manufacturing facilities in the United States and/or abroad either utilize or previously have utilized a process for controlling nicotine levels patented and marketed by the Kimberly-Clark Corporation subsidiary LTR Industries. The Kimberly-Clark tobacco reconstitution process is believed to be used throughout the tobacco industry in a

number of countries. A Kimberly-Clark advertisement published in tobacco industry trade publications states:

> "Nicotine levels are becoming a growing concern to the designers of modern cigarettes, particularly those with lower 'tar' deliveries. The Kimberly-Clark tobacco reconstitution process used by LTR INDUSTRIES permits adjustments of nicotine to your exact requirements. These adjustments will not affect the other important properties of customized reconstituted tobacco produced at LTR INDUSTRIES: low tar delivery, high filling power, high yield and the flexibility to convey organoleptic modifications. We can help you control your tobacco."[24]

The Kimberly-Clark advertisement and related information underscore two critical points:

1) Nicotine is manipulated and used as an additive. As explained in the professional medical literature, "The use of nicotine as an additive permits precise titration of the amount of this alkaloid in the finished [tobacco] product." Fortification of reconstituted tobacco is a routine part of the Kimberly-Clark process.[25] This is confirmed in the tobacco industry's own trade literature, which explains that the Kimberly-Clark process enables manufacturers to triple or even quadruple the nicotine content of reconstituted tobacco,[26] thereby increasing the nicotine content of the final manufactured product.

2) Nicotine is not used for taste. The Kimberly-Clark advertisement admits that nicotine is not used for taste by stating that by using the Kimberly-Clark process, a tobacco manufacturer can adjust nicotine

---

[24] *E.g.*, Advertisement, "More or Less Nicotine," *Tobacco Reporter*, March 1992 (underlining added).

[25] John Slade, "Nicotine Delivery Devices," in *Nicotine Addiction: Principles and Management*, C. Tracy Orleans and John Slade, eds. (Oxford University Press: New York, New York, 1993), pp. 3-23.

[26] Donald A. Silberstein, "Flavouring Reconstituted Tobacco," *Tobacco Journal International*, Vol. 1, 1985, pp. 28-30:

> "Though standard reconstituted tobacco products contain 0.7 - 1.0 percent nicotine, LTR Industries [Kimberly-Clark] offers the possibility of increasing the nicotine content of the final sheet to a maximum of 3.5 percent ...
>
> "A dramatic increase in tobacco taste and smoke body is noted in the nicotine-fortified reconstituted tobacco."

levels without affecting the "other" important properties of reconstituted tobacco, including control over the taste of the product.[27] In a subtle but telling exposition of the fact that nicotine is not being used to affect taste, the advertisement explains that the adjustment of nicotine "will not affect ... the flexibility to convey organoleptic modifications," rather than suggesting that nicotine can be used to modify the organoleptic character of the product. "Organoleptic" refers to "being, affecting, or relating to qualities (as taste, color, odor, and feel) of a substance (as a food or drug) that stimulate the sense organs."[28]

## Recommendations for Further Investigation

To further understand the apparent perjury committed by Campbell in this instance, the Department of Justice is asked to confirm Philip Morris's and other tobacco manufacturers' current or previous use of the patented Kimberly-Clark tobacco reconstitution process and/or any other processes used by Philip Morris which provide for adjustment of nicotine levels in tobacco or tobacco products. Such information may be obtained from Philip Morris, its agents and other appropriate entities and individuals doing business with or for Philip Morris, including Kimberly-Clark Corporation and LTR Industries.

It is noted that at least one other enterprise that evidently specializes in the manipulation of nicotine and the use of the drug as an additive goes by the name of "The Tobacco Companies of the Contraf Group." An advertisement run by the Contraf Group in the international trade press states, "Don't Do Everything Yourself! Let us do it More Efficiently!" Calling the group "The Niche Market Specialists," Contraf lists among its areas of specialization one dealing with "Pure Nicotine and

[27] (Underlining added under the quotation.) *See also* Testimony of David A. Kessler, M.D., Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, March 25, 1994:

> "The tobacco industry may tell you that nicotine is important in cigarettes solely for 'flavor.' There is a great deal of information that suggests otherwise. Some of the patents specifically distinguish nicotine from flavorants. [Footnote omitted.] An RJR book on flavoring tobacco, while listing around a thousand flavorants, fails to list nicotine as a flavoring agent. [Citing J.C. Leffingwell and H.J. Yound, *Tobacco Flavoring for Smoking Products* (R.J. Reynolds Tobacco Company, 1972).]"

[28] *Webster's Ninth New Collegiate Dictionary* (Merriam-Webster Inc.: Springfield, Massachusetts, 1986), p. 832. *See also* multiple Discussions, *infra*.

other special additives."[29] The Department of Justice is encouraged to investigate the activities and involvement of this company, as well.

Campbell Perjury #9

#9 *"The fact is that tar and nicotine levels have decreased dramatically over the past 40 years."*

Discussion of Campbell Perjury #9

It is fact, not opinion, that the tobacco from the five leading cigarette brands (including cigarettes manufactured by Philip Morris) in 1952 contained less, not more, nicotine (an average of 1.58 - 1.82 percent nicotine on a dry weight basis) than the 1.5 - 2.5 percent nicotine reported for finished cigarettes by RJR Chairman and CEO James W. Johnston in a February 28, 1994, letter to the Food and Drug Administration ("FDA").[30] Campbell perjury #9, which is consistent with similar assertions made by Campbell, Philip Morris and other tobacco companies and their representatives in other forums, is not only false, but also material and significant as to its potential impact on the drug addiction and overall health of millions of American consumers.[31]

b. **Perjury by James Johnston and Andrew J. Schindler (RJR)**

James Johnston Perjury #1, #2, #3 and #4

#1 *"We do not add or otherwise manipulate nicotine to addict smokers."*

---

[29] *E.g.*, Advertisement, "CNT/CIR: The Niche Market Specialists," *Tobacco International*, April 1, 1994 (underlining added).

[30] Letter from James W. Johnston to David A. Kessler, M.D., February 28, 1994. *See* testimony of John Slade, M.D., before the Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, March 25, 1994.

[31] *See generally* U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control, Center for Chronic Disease Prevention and Health Promotion, Office on Smoking and Health, *Reducing the Health Consequences of Smoking: 25 Years of Progress: A Report of the Surgeon General*, 1989.

#2 "We do reduce the amount of nicotine in our products... But *we do not do anything to hook smokers or to keep them hooked. Let me repeat, we do not manipulate nicotine to addict smokers.*"

#3 The following exchange took place with James Johnston:

Mr. Waxman: "There's been a lot of interest in tobacco extract and whether nicotine is added by use of a tobacco extract. Mr. Johnson, has RJR ever used tobacco extract on any of its products sold domestically or abroad?"

Mr. James Johnston: "Not to my knowledge, Mr. Chairman."

Mr. Waxman: "Maybe your research advisor - "

Mr. James Johnston: "Pardon me. In Premier, there was a spray dried tobacco extract used. *In our Winstons and Camels and so forth, that is not the case.*"

#4 "During the past several years, there have been a wide variety of attempts to convince the American public that cigarettes are 'addictive,' and some public officials have even gone so far as to put cigarettes in the same class as such truly addictive drugs as heroin and cocaine. One does not have to be a trained behavioral scientist to see *this is not true.*"

<u>Schindler Perjury #1</u>

#1 The following exchange took place with Schindler:

Mr. Waxman: "Mr. Johnston, given RJR's interest in quality control, is there a point in the manufacturing process where nicotine which is lost due to processing is restored, and could you identify each of the manufacturing procedures utilized by your company to adjust upwards, however incrementally, the nicotine level of your product, Mr. Johnston? You, RJR. You're RJR."

Mr. Schindler: "Yes."

Mr. Waxman: "I'm sorry."

Mr. Schindler: "*We do not restore any nicotine anywhere in our process.* We lose nicotine in the process. We lose nicotine, for example, in the reconstituted sheet process, which handles the byproducts from that stemery that I just discussed... So, generally, throughout the process, from the time

we take our tobacco in, you will find a loss of nicotine and *nowhere in that process is any nicotine being incrementally added into the process.*"

## Discussion of James Johnston Perjury #1, #2, #3 and #4 and Schindler Perjury #1

The sworn statements of James Johnston and Andrew Schindler may rise to the level of perjury. The likelihood that this is so grows greater in light of the witnesses' repetition of these representations multiple times during their testimony.

House Subcommittee on Health and the Environment Chairman Henry Waxman observed at the April 14, 1994, hearing that on April 13, the evening prior to James Johnston's testimony, Dr. Robert Suber, a toxicologist with Johnston's R.J. Reynolds Tobacco Company, admitted that RJR controls the nicotine in its products. Responding during a taped interview broadcast on CNN to a question about whether RJR manipulates the level of nicotine, Suber said: "In order to deliver to the consumer a product that he wants, a consistent level of nicotine, we have to blend the tobaccos accordingly. So we do control it." When asked at the hearing about Suber's statement, Johnston testified that he "disagree[d] with that wording of [Suber's] statement, yes."

It is important to understand that reconstituted tobacco ordinarily contains 25 percent or less of the nicotine in regular tobacco. At the request of ABC News's "Day One" program, the American Health Foundation performed a thorough, independent analysis of the reconstituted tobacco implanted by RJR in at least four of its cigarette brands: Winston, Magna, Salem and Now. The samples that were tested were found to have up to 70 percent, rather than the expected 25 percent, of the nicotine that would be found in regular tobacco, indicating that RJR had fortified the reconstituted tobacco with additional nicotine. In an interview broadcast on "Day One," Bogdan Prokopczyk, Ph.D., the Section Head of Bio-Organic Chemistry for the American Health Foundation who performed the analysis, expressed surprise at the nicotine levels identified, "because," he said, "I expected it to be less. The most likely explanation," he concluded, "is that some nicotine has been added, either with flavoring agents or by itself." RJR provided no credible alternative explanation for the unexpectedly high level of nicotine found in its reconstituted tobacco.[32]

Dr. Prokopczyk confirmed in a telephone conversation on November 23, 1994, that RJR added nicotine to its reconstituted tobacco. Dr. Prokopczyk said he was certain that this nicotine was added either alone or as a part of a solution of flavorings. It is notable that since RJR and other tobacco companies have the technology to add

---

[32] *Day One*, ABC News, "Smoke Screen," February 28, 1994.

flavorings with or without nicotine, the addition of nicotine to reconstituted tobacco is purely at the manufacturer's discretion, he said.[33]

In addition, a confidential source interviewed by "Day One," who was identified as a former RJR manager, stated in response to the question, "In commercially sold cigarettes, what percentage of tobacco extract is nicotine?," that the precise amount of nicotine added in RJR's manufacturing process "depends on what level the process calls for. In other words, I can say to you, 'I want it at one percent, I want it at five percent, I want it at 10 percent, I want it at 50 percent." Thus, the former RJR manager not only did not question the fact that RJR fortifies its reconstituted tobacco with nicotine, but stated that RJR controls, purely at its discretion, the levels of nicotine used in its cigarettes to an exacting degree.[34]

A fundamental question underlying all of the tobacco industry witnesses' testimony regarding the nature and use of nicotine in tobacco products is whether there is any genuine use of nicotine in tobacco products other than for its pharmacologic and addictive effects. When asked this question during testimony before Congress, FDA Commissioner David Kessler, basing his response on the extensive analysis conducted by his agency and reflected in his testimony, said simply, "No."[35]

Going to the central question not only of whether RJR manipulates nicotine but also why it does so is the unadorned admission made publicly by F. Ross Johnson, who was James Johnston's predecessor at the helm of RJR Nabisco for several years in the mid- to late-1980s. Johnson was a driving force behind the development of Premier, RJR's high-technology nicotine delivery product that contained substantial quantities of artificially added nicotine extract.

Johnson was quoted by the *Wall Street Journal* as saying the following about tobacco: "*Of course it's addictive. That's why you smoke the stuff.*"[36]

---

[33] Telephone interview with Bogdan Prokopczyk, Ph.D., American Health Foundation, November 23, 1994.

[34] *Day One*, ABC News, "Smoke Screen," February 28, 1994.

[35] Testimony of David Kessler, M.D., before the Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, March 25, 1994.

[36] Eben Shapiro, "Big Spender Finds a New Place to Spend," *Wall Street Journal*, October 6, 1994, p. B1.

Recommendations for Further Investigation

The Department of Justice is asked to obtain additional information from RJR, other tobacco companies and other parties, such as the Kimberly-Clark Corporation subsidiary LTR Industries and The Tobacco Companies of the Contraf Group, involved in manufacturing reconstituted tobacco and controlling nicotine. In light of the apparent perjury and other criminal acts (*see infra*) committed by representatives of the named tobacco companies, as well as the difficulty that the Congress, the Surgeon General, the Food and Drug Administration and other government officials have had in securing truthful and complete information from these parties, the Department of Justice is strongly encouraged to exercise its subpoena powers to obtain relevant information from the targets of the proposed criminal investigation.

*"ECLIPSE"*: The Department of Justice also is alerted to the fact that RJR currently is test-marketing a new smoking product called Eclipse. Like Premier, another unconventional smoking product marketed by RJR in the late 1980s, Eclipse contains a charcoal element, which, when lit, heats but does not burn the product's contents. RJR Chairman and CEO James Johnston admitted in his testimony of April 14, 1994, that RJR artificially had added previously extracted nicotine to Premier (*see supra*); in that case, the nicotine extract was added to the product's non-tobacco contents. News stories on Eclipse report that it contains reconstituted tobacco, suggesting that RJR may also be adding nicotine to the new product.[37]

U.S. Patent No. 5,020,548 ("Smoking Article with Improved Fuel Element"), issued on June 4, 1991, and assigned to the R.J. Reynolds Tobacco Company, appears to describe major features of Eclipse. The patent states that, *inter alia*, "nicotine," "spray dried tobacco extract" and "tobacco extracts" can be added to the product, supporting the presumption that RJR may be adding one or more of these additives to Eclipse in the manufacturing process. If RJR is doing so, James Johnston and Andrew Schindler may have further perjured themselves when they denied that any RJR product, other than Premier, contained added nicotine. RJR has been conducting consumer tests of Eclipse for more than a year, starting several months before the hearing on April 14, 1994, according to the *New York Times*.[38]

Based on information and belief, RJR also manipulates the nicotine content and delivery of Eclipse in at least four other ways, which James Johnston and Andrew Schindler failed to make any mention of in their sworn Congressional testimony,

---

[37] Philip J. Hilts, "Little Smoke, Little Tar, but Still Lots of Nicotine," *New York Times*, November 27, 1994, p. 1; Suein L. Hwang and Alix M. Freedman, "RJR is Testing a 'Smokeless Cigarette' After Attempt Failed Five Years Ago," *Wall Street Journal*, November 28, 1994, p. A5.

[38] Philip J. Hilts, "Little Smoke, Little Tar, but Still Lots of Nicotine," *New York Times*, November 27, 1994, p. 1.

despite the obvious material relevance of this information to the proceedings. These include:

> 1) the addition of specially blended, not ordinary, tobacco near the filter end of the product, which contains extremely high nicotine levels of between four and five percent (versus the average of 1.5 to 2.5 percent);
>
> 2) the addition of potassium carbonate to change the product's pH level, freeing up more nicotine for absorption into the consumer's bloodstream;
>
> 3) the transfer of nicotine and other poisons to the consumer by vapor, rather than by ordinary tobacco smoke, a portion of whose contents may, because of vapor's different makeup, not be detectable by the outmoded and inaccurate Federal Trade Commission tests employed by the tobacco companies; and
>
> 4) the use of nearly invisible vent holes near the filter, which dilute the smoke or vapor in machine tests, but which often are covered by the consumer's fingers or lips, resulting in a higher delivery of nicotine, tar and carbon monoxide than the test levels indicate.[39]

In light of the RJR officials' apparently perjurious denials about the company's manipulation of nicotine and the fact that there appears to be much more to Eclipse than meets the eye, the Department of Justice is asked to further investigate RJR's use and manipulation of the content and delivery of nicotine in Eclipse and the company's other products.

### c. **Perjury by Andrew H. Tisch and Alexander Spears (Lorillard)**

Tisch Perjury #1 and #2

#1 *"Nicotine levels follow tar levels and are not raised or reduced for particular brands."*

#2 *"Lorillard does not take any steps to assure a minimum level of nicotine in our products. Lorillard does not add nicotine to cigarette tobacco for the purpose of manipulating or spiking the amount of nicotine received by the smoker."*

---

[39] It is also noteworthy that the dissection of an Eclipse discloses that the filter is much smaller than the markings on the external wrap indicate.

Spears Perjury #1

#1 "The statement [that Spears made at a March 25, 1994, hearing before the same subcommittee[40]] was that *nicotine follows tar from the period 1950s to 1990. I stick with that statement and I believe it is accurate*. We've gone back and rechecked the calculations." At the March 25 hearing, Spears said: "*We do not set nicotine levels for particular brands of cigarettes. Nicotine levels follow the tar level*." He also stated that the correlation between tar and nicotine levels "is essentially perfect."

Discussion of Tisch Perjury #1 and #2
and Spears Perjury #1

A 1981 study co-authored by Dr. Spears in his capacity as Vice Chairman of Lorillard, and S.T. Jones, who also worked for Lorillard, discusses techniques for raising or lowering the amount of nicotine in cigarettes. The paper states explicitly that low-tar cigarettes use special blends of tobacco to keep the level of nicotine up while tar is reduced: "Higher nicotine levels can be achieved by decreasing Oriental [tobacco], and the stem and tobacco sheet, and increasing the Burley and upper stalk positions of both the Flue-cured and the Burley tobacco." As a result, "current research is directed toward increasing the nicotine levels while maintaining or marginally reducing the tar deliveries." The Spears/Jones report further states: "The lowest tar segment [of product categories] is composed of cigarettes utilizing a tobacco blend which is significantly higher in nicotine."[41]

Spears released a statement on the day of the April 14, 1994, hearing, in which he appears to have claimed falsely that there was no inconsistency between his 1981 study and his March 25, 1994, testimony. He asserted that the amount of nicotine in ultra-low-tar cigarettes was lower than the nicotine in regular cigarettes. However, of material relevance is the fact that Spears' statement did not dispute that tobacco companies used tobacco blends with higher levels of nicotine when they make low-tar cigarettes. As a result, the nicotine levels of the low-tar brands are closer to the nicotine levels of the regular brands than they would be if high-nicotine blends were

---

[40] Testimony of Alexander Spears before the Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, March 25, 1994.

[41] The report by Alexander W. Spears and S.T. Jones was presented to the 35th Tobacco Chemists' Research Conference in 1981 (underlining added).

not used,[42] a fact that is in direct conflict with Spears's sworn testimony and the findings of his own 1981 report.

Further contradicting Tisch's and Spears' testimony is the fact, not opinion, that the tobacco from the five leading cigarette brands in 1952 contained less, not more, nicotine (an average of 1.58 - 1.82 percent nicotine on a dry weight basis) than the 1.5 - 2.5 percent nicotine reported for finished cigarettes by RJR Chairman and CEO James W. Johnston in a February 28, 1994, letter to the FDA.[43]

d. **Perjury by Edward A. Horrigan (Liggett)**

Horrigan Perjury #1, #2 and #3

#1 "Secondly, *Liggett does not manipulate the level of nicotine in our cigarettes to hook or addict smokers*."

#2 "Therefore, *Liggett, like the rest of us, does not manipulate or spike the amount of nicotine during the manufacture of its cigarettes to achieve an alleged addicting level of nicotine*."

#3 "In all of my years in this business worldwide, *I have never known of a product-designed objective or goal that included even the notion of spiking the amount of nicotine in a cigarette to achieve a level that would hook or addict smokers*."

Discussion of Horrigan Perjury #1, #2 and #3

Horrigan worked from 1978 until the late-1980s for R.J. Reynolds Tobacco Company, where he served as Chairman and CEO, and for RJR Nabisco, where he was Vice Chairman of the Board. Based on information and belief, Horrigan was directly involved in corporate decisions and the setting of strategy concerning the development and marketing of Premier and numerous other RJR cigarette brands whose manufacturing processes included the manipulation of nicotine content and delivery. *See* Discussions, *supra*, regarding the alleged perjury of current RJR CEO James Johnston.

---

[42] For a useful factual background, *see* Philip J. Hilts, "'81 Tobacco Study Discussed Raising Levels of Nicotine," *New York Times*, April 14, 1994, p. A1; John Schwartz, "1981 Report on Tobacco is Released," *Washington Post*, April 14, 1994, p. A3.

[43] Letter from James W. Johnston to David A. Kessler, M.D., February 28, 1994.

Notably, too, Liggett (then called Liggett & Myers) had extensive tobacco-related health research done by the Arthur D. Little, Inc. in Boston, Massachusetts. For example, a report for Liggett dated March 15, 1961, labeled "confidential -- limited," states:

> "1. There are biologically active materials present in cigarette tobacco.
>
> These are: a) cancer causing
> b) cancer promoting
> c) poisonous
> d) stimulating, pleasurable, and flavorful."[44]

*See* multiple discussions throughout this Prosecution Memorandum regarding the addictiveness of nicotine and the manipulation of nicotine by tobacco manufacturers and companies doing business with the tobacco industry.

e. **Perjury by Joseph Taddeo (UST)**

Taddeo Perjury #1

#1 "The assertion that smokeless tobacco use can be addictive is without merit."

Discussion of Taddeo Perjury #1

Nicotine in tobacco is addicting, according to the overwhelming consensus of the scientific and medical communities, including all of the following:

[44] Arthur D. Little, Inc., "L & M - Perspective Review, March 15, 1961, Plaintiff's Exhibit in the case of *Cipollone v. Liggett*. *See also* Philip J. Hilts, "A History of Starting Research, and Stopping It," *New York Times*, June 17, 1994, p. A22.

U.S. Surgeon General[45]

U.S. Department of Health and Human Services[46]

National Institutes of Health[47]

National Cancer Institute[48]

Food and Drug Administration Drug Abuse Advisory Committee[49]

World Health Organization[50]

Medical Research Council (United Kingdom)[51]

American Medical Association

---

[45] U.S. Department of Health and Human Services, Public Health Service, *The Health Consequences of Using Smokeless Tobacco: A Report of the Advisory Committee to the Surgeon General*, 1986; U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control, Center for Chronic Disease Prevention and Health Promotion, Office on Smoking and Health, *Reducing the Health Consequences of Smoking: 25 Years of Progress: A Report of the Surgeon General*, 1989.

[46] U.S. Department of Health and Human Services, Office of the Inspector General, *Spit Tobacco and Youth*, 1992; U.S. Department of Health and Human Services, *Drug Abuse and Drug Abuse Research: The Third Triennial Report to Congress from the Secretary*, 1991.

[47] National Institutes of Health, U.S. Department of Health and Human Services, *Health Implications of Smokeless Tobacco Use: National Institutes of Health Consensus Development Conference Statement*, Vol. 6, No. 1, 1986.

[48] *E.g.*, National Cancer Institute, "NCI Supports FDA's Position on Nicotine and Cigarettes" (Press Release), February 28, 1994 ("Nicotine is a naturally occurring drug found in all tobacco plants, and the pharmacologically active ingredient responsible for tobacco addiction.").

[49] *See* Philip J. Hilts, "F.D.A. Panel Takes Step Toward Setting Control on Nicotine," *New York Times*, August 3, 1994, p. A1.

[50] World Health Organization, *Smokeless Tobacco Control: A Report of a WHO Study Group (World Health Organization Technical Report Series 777)*, 1988.

[51] Medical Research Council, *The Basis of Drug Dependence* (Medical Research Council: London, England, 1994). The Medical Research Council serves as the official conduit for government funding for scientific and medical research in the United Kingdom, and is comparable to the National Institutes of Health in the United States.

American Psychiatric Association

American Psychological Association

Royal Society of Canada

It is apparent that the only critics of the concept that nicotine addicts are those with financial ties to tobacco companies or their agents.[52] It is the work of these individuals that Joseph Taddeo and UST consistently rely on in claiming that nicotine is non-addictive. In contrast, the combination of UST's own internal research and conduct demonstrate a clear understanding on the part of UST's own executives and scientists that nicotine is a drug and that it is indeed addictive.

The approach taken by David M. Warburton, whom Taddeo cited in support of his claim that smokeless tobacco is not addictive, has been rejected by every leading expert source, including those listed above.[53] Warburton, himself, has acknowledged

---

[52] *See, e.g.*, John H. Robinson and Walter S. Pritchard (Biobehavioral R&D, R.J. Reynolds Tobacco Company), "The Role of Nicotine in Tobacco Use," 108 *Psychopharmacology* 397-407, 1992. Robinson and Pritchard of RJR admit that nicotine has pharmacological effects on the human body and central nervous system it reduces anxiety and increases mental alertness. They also acknowledge that "the beneficial effects of smoking on cognitive performance are a function of nicotine absorbed from cigarette smoke." However, the RJR scientists, like those who work within or for other tobacco companies, claim that the definition of addiction applied by the U.S. Surgeon General and other leading experts is faulty and that nicotine is, therefore, not addictive. Playing a semantic rather than substantive game, the tobacco industry authors claim that to be defined as "addictive," a substance must cause intoxication. "It is not that Dr. Robinson and other scientists supported by tobacco companies disagree with the main points made by mainstream scientists, but that they define addiction differently," reported the *New York Times*. Indeed, the tobacco industry scientists have admitted the existence of the hallmarks of addiction, including compulsive use, withdrawal symptoms and continued use despite knowledge of harm to oneself and others. *See* Philip J. Hilts, "Is Nicotine Addictive? It Depends on Whose Criteria You Use," *New York Times*, August 2, 1994, p. C3.

[53] Taddeo relied, as tobacco industry witnesses often do, on the work of British psychologist D.M. Warburton ("Is Nicotine Use an Addiction?," *The Psychologist*, April 1989, pp. 166-170). While some of Warburton's work has been accepted, his and other tobacco industry supporters' claim that nicotine is non-addictive has been soundly rejected, most recently by the FDA Drug Abuse Advisory Committee on August 2, 1994, which reaffirmed overwhelmingly that nicotine is: 1) addictive; and 2) the substance in tobacco products that causes addiction. *See, generally*, Philip J. Hilts, "F.D.A. Panel Takes Step Toward Setting Control on Nicotine," *New York Times*, August 3, 1994, p. A1. In addition, Taddeo testified that Warburton contributed to the 1988 Surgeon General's report on nicotine addiction, but he failed to mention that Warburton's contribution to that report was small and specifically did not address the fundamental issue of whether nicotine is addictive.

in his own research that the "effects of smoking on cognitive function, when considered together with the rapid absorption and elimination of nicotine, suggest a major role in the motivation for smoking."

The investigation coincident to preparation of this Prosecution Memorandum has confirmed, moreover, that Warburton's nicotine research has been extensively funded by the tobacco industry at least since 1978,[54] and that he was given honoraria and sent on all-expenses-paid trips by tobacco interests to testify against the regulation of tobacco at hearings held in New Zealand.[55]

It also has been learned that Warburton is the founder of Associates for Research into the Science of Enjoyment ("ARISE"), a British organization funded by tobacco, distilling and brewing companies which, among other things, advocates for "smokers' rights." Explaining ARISE's mission, Warburton recently claimed that <u>the health</u>

---

*See also* Medical Research Council, *The Basis of Drug Dependence* (Medical Research Council: London, England, 1994). The MRC report is a leading authoritative reference for the scientific and medical communities in the United Kingdom, Warburton's home. It states: "Tobacco is widely regarded as one of the major environmental causes of illness and death. *That most people use tobacco to obtain the effects of nicotine, and that nicotine is an addictive drug that supports dependence processes, is widely accepted.*" Rejecting the tobacco industry's frequent comparison of nicotine to caffeine, it states: "Caffeine is almost certainly the most widely used drug of dependence in the world. Despite this, almost no evidence of morbidity other than gastric irritation, insomnia and cardiovascular effects has been found. *Studying caffeine is unlikely to tell us very much about the harmful effects of drugs of dependence*, but it does illustrate that dependence per se is not a problem." (Emphasis added.)

[54] *E.g.*, by the Tobacco Research Council and Carreras Rothmans Ltd. Warburton also has acknowledged receiving assistance from the British-American Tobacco Company. All of the following studies have been so funded: Keith Wesnes and David M. Warburton, "The Effects of Cigarette Smoking and Nicotine Tablets Upon Human Attention," *in Smoking Behaviour: Physiological Influences*, Raymond E. Thornton, Senior Scientist, Group Research and Development Centre, British-American Tobacco Company Limited, ed. (Churchill Livingstone: Edinburgh, London and New York, 1978); K. Wesnes and D.M. Warburton, "Effects of Smoking on Rapid Information Processing Performance," *Neuropsychobiology*, Vol. 9, 1983, pp. 223-229; K. Wesnes and D.M. Warburton, "The Effects of Cigarettes of Varying Yield on Rapid Information Processing Performance, *Psychopharmacology*, Vol. 82, 1984, pp. 338-342; K. Wesnes and D.M. Warburton, "Smoking, Nicotine and Human Performance," *Pharma. Ther.*, Vol. 1, 1983, pp. 189-208; K. Wesnes, D.M. Warburton, B. Matz, "Effects of Nicotine on Stimulus Sensitivity and Response Bias in a Visual Vigilance Task," *Neuropsychobiology.*, Vol. 9, 1983, pp. 41-44.

[55] Telephone interviews with Martin Jarvis, M.Phil., Principal Scientist, Imperial Cancer Research Fund, Health Behaviour Unity, Department of Psychiatry, Institute of Psychiatry, December 1-2, 1994 ; private communications received from Dr. Murray Laugesen, scientific editor of Toxic Substances Board, Department of Health (Wellington, New Zealand), *Health <u>or</u> Tobacco*, May 1989.

benefits of cigarette smoking may outweigh the damage. "It's interesting how few people die from smoking," he said. "Most smokers live to a ripe old age. Don't forget, the death rate for smokers and non-smokers is the same in the end - 100 per cent."[56] Further placing the position of Warburton's group in perspective, ARISE member James McCormick said that "[t]he addictive properties of cocaine and heroin are overstated. Not everyone becomes dependent. A lot of people are stable addicts."[57]

The fact that Taddeo cited one discredited researcher for the blanket statement quoted above is tantamount to citing no support at all. One who wishes to cite support for an insupportable proposition and who has the resources to do so, can nearly always locate, or create, such support based on junk science. Unfortunately, there will always be someone, or a handful of persons, who are willing to present themselves as experts on a given subject and who to attest for financial or other reasons to the "fact" that, *e.g.*, the Earth is flat. Taddeo appears to have quite knowingly exploited this phenomenon and, thus, it is argued here, testified falsely under oath. The likelihood that this deception rises to the level of perjury seems greater in light of the other omissions and misstatements of fact conveyed elsewhere in his testimony.

Taddeo's testimony is contradicted, moreover, by his company's internal communications, which acknowledge the real role played by nicotine in smokeless tobacco. For example, intra-company correspondence dated June 5, 1981, from Per Erik Lindqvist, UST Senior Vice President of Marketing, to B.J. Nova, President of the Tobacco Division, stated: "Flavorwise we should try for innovation, taste, and strength. Nicotine should be medium, recognizing the fact that virtually all tobacco usage is based upon nicotine, 'the kick,' satisfaction."[58] Lindqvist was examined about this reference at trial in *Marsee v. United States Tobacco*, a celebrated case that addressed the death of a teenage smokeless tobacco user. Marsee's counsel, George W. Braly, asked what Lindqvist meant by "the kick," to which the witness responded, "All tobacco products contain nicotine. Nicotine gives the consumer satisfaction. Some would describe it as a pleasant feeling. Others would describe it as a kick...

---

[56] *Quoted in* Madeleine Bunting, "Eat, Drink, and Be Very Provocative," *The Guardian*, November 12, 1994, p. 29.

[57] *Id.*

[58] *See Marsee v. U.S. Tobacco Co.* (W.D.Okla. 1986), UST document read into evidence by plaintiff's attorney George Braly (*Marsee* trial transcript, Vol. 4, May 21, 1986, pp. 1661-1662), *quoted in* Testimony of Gregory N. Connolly, D.M.D., M.P.H., before Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, March 25, 1994, and November 29, 1994 (underlining added).

Others would describe it as a relaxing feeling."[59] In another intra-company memorandum, dated September 22, 1981, and addressed to UST's Strategic Management Team regarding development of "portion pack" starter brands, Lindqvist refers to "difficulties in finding the acceptable product as regards taste, strength, kick and size."[60] *See also, infra.*

Taddeo Perjury #2, #3 and #4

#2 "*U.S. Tobacco does not in any way manipulate the nicotine level in its tobacco products, nor does U.S. Tobacco take any action to control the nicotine content of its tobacco products before, during, or after the manufacturing process*. In fact, an incidental effect of our manufacturing process is that the nicotine content of our smokeless tobacco products is less than that which occurs naturally in the tobacco. Other than tobacco itself, the only material used in the manufacture of U.S. Tobacco's smokeless tobacco products which contains nicotine is denatured alcohol, which is purchased from a supplier as a carrying agent for the application of certain flavorings that do not dissolve in water."

#3 "Furthermore, the inflammatory allegations of Drs. [Gregory] Connolly and [David] Kessler regarding a so-called 'graduation strategy' are not supported by the facts. *Smokeless tobacco products, like all tobacco products, vary in nicotine content. Any suggestion that U.S. Tobacco's line of products is developed based on 'graduating' levels of nicotine is not true.*"

#4 "*The only material used in the manufacture of U.S. Tobacco's smokeless tobacco products, other than the tobacco itself, which contains nicotine, is denatured alcohol* which is purchased from a supplier as a carrying agent for the application of certain flavorings that do not dissolve in water. The denatured alcohol (SDA-4) used by U.S. Tobacco has been denatured by its manufacturer with small amounts of nicotine."

Discussion of Taddeo Perjury #2, #3 and #4

Extensive evidence has come to light that UST for years has deliberately manipulated the nicotine levels ingested by its consumers by controlling the total quantity of nicotine in its products and the portion of that nicotine that is "freed" by chemical

---

[59] *Id.*

[60] *Marsee v. U.S. Tobacco Co.*, U.S. Tobacco Intra-Company Correspondence, "Re: Product Development," September 22, 1981, Exhibit 5 to Per Erik Lindqvist Deposition (obtained from Fort Worth, Texas, Federal Records Center) (underlining added).

processes for absorption into the human body.[61] Exercising total discretion, UST manipulates upward the levels of free nicotine by increasing the pH levels of tobacco, causing rapid absorption of elevated quantities of the addictive drug through the membranes of the mouth directly into the bloodstream. UST also controls total nicotine levels through selection and blending of tobacco leaf, fermentation and the addition of alkaline buffering agents such as sodium carbonate and ammonium carbonate.[62]

Even if it were true in some extremely narrow sense that, as Taddeo falsely testified, UST "does not in any way manipulate the nicotine level in its tobacco products ... or take any action to control the nicotine content," his testimony seriously misled the Congress by failing either to disclose or explain the fact that UST controls to an exacting degree the amount of nicotine absorbed into consumers' bodies and, thus, the addiction of consumers to UST's products.

As explained by Jack Henningfield, Ph.D., Chief of the Clinical Pharmacology Branch of the National Institute on Drug Abuse's Addiction Research Center, in

---

[61] For extensive background on UST's manipulation and control of nicotine content and delivery, *see*, respectively, Testimony of Gregory N. Connolly, D.M.D., M.P.H., and Jack Henningfield, Ph.D., before Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, November 29, 1994. *See also* Alix M. Freedman, "Juiced Up: How a Tobacco Giant Doctors Snuff Brands to Boost Their 'Kick,'" *Wall Street Journal*, October 26, 1994, p. A1. (The evidence discussed here is based, in significant part, on these sources.)

[62] Sodium carbonate and ammonium carbonate are included in a list of 562 additives that the Smokeless Tobacco Council, the industry's trade association, submitted to the Subcommittee on Health and the Environment in May 1994. The additives were misleadingly described by the Smokeless Tobacco Institute merely as ingredients in edibles such as baked goods. Larry D. Story, a UST chemist until 1982, disclosed that UST routinely adds chemicals to its snuff "to deliver the free nicotine faster and to make the product stronger." Similarly, James C. Taft, head of UST's product development from 1972 until 1991, said: "The fermentation process involves adding chemicals during and after fermentation and, at the end, you add some more chemicals which increase pH, too." Without increasing the pH levels, "you couldn't get nicotine release." *See* Alix M. Freedman, "Juiced Up: How a Tobacco Giant Doctors Snuff Brands to Boost Their 'Kick,'" *Wall Street Journal*, October 26, 1994, p. A1.

In addition, another manufacturer of oral snuff, the Swedish Tobacco Company, with which UST has cooperated closely (*see infra*), has admitted and described its control over nicotine delivery in a 1994 report on its production process, stating that "In order to release the nicotine from the tobacco, the snuff" is manipulated by adding "slightly alkaline sodium carbonate ... during the production process, as this alters into bicarbonate." *Quoted in* Testimony of Gregory N. Connolly, D.M.D., M.P.H., before Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, November 29, 1994.

testimony before the House Subcommittee on Health and the Environment: "Without pH levels, nicotine content is of little value in comparing nicotine bioavailability across products... pH is a crucial determinant of nicotine absorption through the nose and mouth... [T]he amount of nicotine available for absorption ... ultimately determines the dose of nicotine delivered to the user."[63]

Furthermore, there are numerous examples of UST's own internal statements, which, when coupled with the company's actual conduct, illuminate the active execution of the "graduation" strategy that Taddeo, under oath, denied his company uses.[64] One such example is a statement by UST Executive Vice President Jack Africk in an interview published in the Spring 1985 edition of "Up to Snuff," a UST newsletter,[65] which was mailed to members of UST's sales force:

> "As far as our strategy for entering a new market is concerned - for each market there is a set of criteria which have been established, and must be met. *Skoal Bandits is the introductory product, and then we look towards establishing a normal graduation process*.

(Underlining added.) The *Wall Street Journal* explains further:

> "U.S. Tobacco denies that it has a 'graduation process' to ratchet users up the line to stronger brands, saying that 'there is no set pattern of brand switching.' However, the company itself used the term internally, and publicly alluded to it in the mid-1980s. 'They talked about graduation all the time - in sales meetings, memos and manuals for the college program. It was a mantra,' says Ken Carlsen, a division manger in U.S. Tobacco's sales department, who worked at the company from 1979 until 1986.

---

63 Committee on Energy and Commerce, House of Representatives, United States Congress, November 29, 1994.

64 *See* Alix M. Freedman, "Juiced Up: How a Tobacco Giant Doctors Snuff Brands to Boost Their 'Kick,'" *Wall Street Journal*, October 26, 1994, p. A1; Testimony, respectively, of Gregory N. Connolly, D.M.D., M.P.H., and Jack Henningfield, Ph.D., before Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, November 29, 1994; Testimony of Gregory N. Connolly, D.M.D., M.P.H., before Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, March 25, 1994.

65 Appended to Testimony of Gregory N. Connolly, D.M.D., M.P.H., before Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, November 29, 1994.

> "'For people who haven't ever tasted [snuff], you'd of course begin them on a product that had a little tobacco taste, but wouldn't turn them off,' explains Barry Nova, U.S. Tobacco's president until 1984. He adds: 'The graduation is to a more tobacco-y product ... to a stronger product.'"[66]

The use of the graduation strategy was highlighted, as well, at the time that the starter product Skoal Bandits was introduced in 1983. Based on an interview with Barry Nova, then-President of UST's tobacco division, *Advertising Age* reported the following:

> "Aside from appealing to smokers, the new product is designed to hook consumers into what Mr. Nova called a 'graduation process' from Bandits to Skoal itself and then to Copenhagen, the company's strongest chewing tobacco. The success of those two products has given U.S. Tobacco a 40% increase in volume sales over the last five years. Because the product is aimed at new users of oral tobacco, Mr. Nova denied that Bandits will cannibalize the older brands."[67]

Underscoring the fact that UST naturally would have a vested interest in employing a "graduation" strategy is the company's acknowledgement in internal communications of the role played by nicotine in smokeless tobacco. For example, intra-company correspondence dated June 5, 1981, from Per Erik Lindqvist, UST Senior Vice President of Marketing, to B.J. Nova, President of the Tobacco Division, states: "Flavorwise we should try for innovation, taste, and strength. Nicotine should be medium, recognizing the fact that virtually all tobacco usage is based upon nicotine, 'the kick,' satisfaction."[68] In another intra-company memorandum, dated September 22, 1981, and addressed to UST's Strategic Management Team regarding development of "portion pack" starter brands, Lindqvist refers to "difficulties in finding the acceptable product as regards taste, strength, kick and size."[69]

---

[66] Alix M. Freedman, "Juiced Up: How a Tobacco Giant Doctors Snuff Brands to Boost Their 'Kick,'" *Wall Street Journal*, October 26, 1994, p. A1 (underlining added).

[67] Jeremy Feigelson, "Skoal Bandits Blitz Kicks Off N.Y. Entry," *Advertising Age*, August 8, 1983 (underlining added).

[68] *See Marsee v. U.S. Tobacco Co.*, UST document read into evidence by plaintiff's attorney George Braly (*Marsee* trial transcript, pp. 1661-1662), *quoted in* Testimony of Gregory N. Connolly, D.M.D., M.P.H., before Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, March 25, 1994, and November 29, 1994 (underlining added).

[69] *Marsee v. U.S. Tobacco Co.*, U.S. Tobacco Intra-Company Correspondence, "Re: Product Development," September 22, 1981, Exhibit 5 to Per Erik Lindqvist Deposition (obtained from Fort Worth, Texas, Federal Records Center) (underlining added).

Yet another internal document confirming UST's use of the graduation strategy and the central role played by nicotine in UST's products is a March 30, 1981, memorandum from Tom Molito of Product Marketing Management to Lindqvist. Molito's memorandum describes Good Luck, a starter product, as "Just strong enough to re-inforce nicotine expectation" (underlining added).

*See also* Discussion of Taddeo Perjury #6, *infra*.

Taddeo Perjury #5

#5 "*Oral tobacco has not been established as a cause of oral cancer.*"

Discussion of Taddeo Perjury #5

Taddeo had no credible basis whatsoever on which to claim that oral tobacco has not been established as a cause of oral cancer. As important, while he is, of course, at liberty to hold any opinion he chooses, no matter how outlandish, he in no way framed the quoted statement as opinion, but delivered it as a blanket declaration of fact while under oath.

A recent report of the prestigious National Academy of Science's Institute of Medicine concluded, as have the U.S. Surgeon General, the National Cancer Institute, the Centers for Disease Control and Prevention, the American Cancer Society, the American Heart Association and the American Lung Association, that "Use of tobacco products is the nation's deadliest addiction."[70] This statement fully encompasses smokeless tobacco products.

It has been proven overwhelmingly that the use of smokeless (or "spit") tobacco, including the brands manufactured and marketed by UST, causes oral cancer, gum disease and tooth loss. Long term snuff users are 48 times more likely than non-users to develop cancers of the gingiva (gums) and buccal mucosa (cheek) and four times more likely to develop mouth cancer than non-users. Persons chewing tobacco are six times more likely to develop mouth cancer or the hypopharynx and three times more likely to develop cancer of the oropharynx. Nearly 30,000 new cases of oral cancer are diagnosed each year in the United States, many of them due directly to the use of

[70] National Academy of Sciences, Institute of Medicine, Committee on Preventing Nicotine Addiction in Children and Youths, *Growing Up Tobacco Free: Preventing Nicotine Addiction in Children and Youths*, Barbara S. Lynch and Richard J. Bonnie, eds. (National Academy Press: Washington, D.C., 1994), p. 3.

smokeless tobacco, and half of those diagnosed die within five years.[71] One popular form of smokeless tobacco, snuff, which is the foremost smokeless tobacco product manufactured by UST, is considered such an alarming cause of oral cancer and other illnesses that its sale is prohibited in numerous countries, including the nations of the European Community, Australia and New Zealand.

Taddeo Perjury #6

#6 "Dr. [Gregory] Connolly [in testimony before the Subcommittee on Health and the Environment][72] asserts that U.S. Tobacco's Skoal Bandit product was targeted at 'new users, mainly cigarette smokers, age 15-35.' *That allegation is also false.* The [Lotus Project] document relied upon by Dr. Connolly to support his assertion was written over 20 years ago, does not mention Skoal Bandits, was not created by U.S. Tobacco and *does not reflect U.S. Tobacco policy.*"

Discussion of Taddeo Perjury #6

Again under oath, Taddeo seriously misrepresented Dr. Connolly's testimony regarding the "Lotus Project" and UST's connection to it, again deceiving the Congressional subcommittee to a degree that may have reached the level of perjury. The *Wall Street Journal*, in an extensive investigative article, recently identified the Lotus Project as "a joint venture between UST and Swedish Tobacco Co."[73] A document containing the minutes from a July 18, 1972, meeting held in the office of UST's then-President Louis A. Bantle, relied upon in part by Dr. Connolly and also

---

[71] U.S. Department of Health and Human Services, Office of the Inspector General, *Spit Tobacco and Youth*, 1992, p. 3-6; Testimony of Michael P. Eriksen, Sc.D. (Office on Smoking and Health, Department of Health and Human Services), before Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress; D.M. Winn, W.J. Blot, C.M. Shy, L.W. Pickle *et al.*, "Snuff Dipping and Oral Cancer Among Women in the Southern United States," *New England Journal of Medicine*, March 26, 1981, pp. 745-749; National Academy of Sciences, Institute of Medicine, Committee on Preventing Nicotine Addiction in Children and Youths, *Growing Up Tobacco Free: Preventing Nicotine Addiction in Children and Youths*, Barbara S. Lynch and Richard J. Bonnie, eds. (National Academy Press: Washington, D.C., 1994), p. 3.

[72] Committee on Energy and Commerce, House of Representatives, United States Congress, March 25, 1994.

[73] Alix M. Freedman, "Juiced Up: How a Tobacco Giant Doctors Snuff Brands to Boost Their 'Kick,'" *Wall Street Journal*, October 26, 1994, p. A1 (underlining added).

cited by the *Journal*, indicates that the meeting was attended by 10 individuals and concerned "The Lotus Project."[74] That document states:

> "Mr. L.A. Bantle opened the meeting by explaining that 'Lotus' is the code name for smokeless tobacco in a portion pack form. This project is being launched this fall in Sweden by Swedish Tobacco Company. It is an understanding between the Swedish Tobacco Company and United States Tobacco to keep one another informed and to cooperate on this project.
>
> "Mr. Bantle further declared that he wanted a Lotus product for the U.S. market as soon as possible and that this product should not be a Copenhagen or Skoal in the portion pack form, but an entirely new product aimed at new consumers, mainly cigarette smokers.
>
> . . .
>
> "Mr. Bantle explained that in agreement with Swedish Tobacco Company, United Scandia International is going to offer Lotus to the international market. The product USI [United Scandia International] will offer may be choosen [sic] from either of the two mother companies, whichever company USI thinks is making the right product for X market. This could mean that several products might have to be developed although the ideal situation would be if the U.S.-Lotus could be used worldwide.
>
> "To accomplish a sound an [sic] rapid development of the Lotus project, Mr. Bantle declared that he wanted to set up a special task force with the following participants: ..."

The document then lists eight individuals under the heading "United States Tobacco Co." and two, including P.E. Lindqvist (identified, *supra*, as Per Erik Lindqvist, UST Senior Vice President of Marketing), under the heading "U.S.I." The document then states, "This task force should report directly to Mr. Bantle and always bear in mind the secrecy of the project" (underlining added).

A second UST document relied on by Dr. Connolly -- curiously, Taddeo referred only to one document in his testimony -- is an internal memorandum entitled "LOTUS," printed on "United States Tobacco Company" letterhead and addressed from W.W. Watson, President, United Scandia International, to L.A. Bantle, UST's

[74] "Minutes from a Meeting in Greenwich 7-18-72 at Mr. L.A. Bantle's Office." Doc. No. UST 000004026, *in Marsee v. U.S. Tobacco Co.*, appended to Testimony of Gregory N. Connolly, D.M.D., M.P.H., before Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, March 25, 1994 (underlining added).

President. The memorandum, dated June 2, 1972, describes the activities of two working groups, one from UST and the other from Swedish Tobacco.[75]

Yet a third document obtained from UST's internal files and relied on by Dr. Connolly, entitled "THE LOTUS PROJECT,"[76] describes the project and identifies the "target group" as "[n]ew users, mainly cigarette smokers, age group 15-35." Under the heading "Strength," it lists the following:

> "1. Nicotine satisfaction.
>
> Mild like Happy Days.
> Instant but not shocking.
>
> 2. Feeling in the mouth.
>
> As little harshness as possible
> on the gum and in the throat."

Soon after the UST documents cited by Dr. Connolly (and used by the *Wall Street Journal*) were written, UST did in fact introduce a snuff product in a tea-bag-like pouch called Good Luck, which was in many ways the mirror image of the product described in the Lotus Project. Good Luck ultimately failed in the marketplace.[77] Subsequently (in 1983), as Dr. Connolly accurately testified, UST successfully introduced another "starter" smokeless tobacco product, Skoal Bandits, likewise sold in a tea-bag-like pouch.[78]

---

[75] Doc. No. UST 000001471, *in Marsee v. U.S. Tobacco Co.*, appended to Testimony of Gregory N. Connolly, D.M.D., M.P.H., before Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, March 25, 1994. *See also* Dr. Connolly's testimony of November 29, 1994.

[76] Doc. No. UST 000004028, *in Marsee v. U.S. Tobacco Co.*, appended to Testimony of Gregory N. Connolly, D.M.D., M.P.H., before Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, March 25, 1994. *See also* Dr. Connolly's testimony of November 29, 1994.

[77] Alix M. Freedman, "Juiced Up: How a Tobacco Giant Doctors Snuff Brands to Boost Their 'Kick,'" *Wall Street Journal*, October 26, 1994, p. A1.

[78] Testimony of Gregory N. Connolly, D.M.D., M.P.H., before Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, March 25, 1994, and November 29, 1994.

To date, Taddeo and UST have taken no action against the *Wall Street Journal* or Dr. Connolly for allegedly misrepresenting the nature of UST's internal communications and conduct.

f. **Perjury by T.F. Riehl (B&W)**

Riehl Perjury #1

1. The following exchange took place with Riehl:

Mr. Bryant: "The average nicotine content in tobacco is 1.7 percent. So if 2.3 percent [in B&W's Barclay cigarette] is correct, it's 35 percent higher than the nicotine content in the average tobacco leaf. My question is, do you deliberately mix the tobacco for the Barclay cigarette so that it will have a much higher concentration of nicotine?"

. . .

Mr. Riehl: "*No, sir. We blend for taste, not nicotine.*"

Mr. Bryant: "In order to obtain your goals with regard to taste, do you deliberately mix the tobacco for the Barclay cigarette so that it will have a much higher concentration of nicotine?"

Mr. Riehl: "*No, sir, we don't. We blend for taste.*"

Discussion of Riehl Perjury #1

Internal documents from B&W indicate that Riehl himself has for years conducted research and development on nicotine and tar content and delivery for his company. His research appears to have focused on adjusting nicotine and tar levels without regard to taste. At the 1984 Smoking Behavior-Marketing Conference, for example, Riehl gave a presentation on "Project Aries," the aim of which was to develop a "safer" cigarette. According to Riehl's presentation, Aries used a novel filter that "achieved tar reduction by ventilation alone and thus provided unfiltered smoke at low tar deliveries." He said, further, that "Aries' smoke chemistry differs" because it provides "nicotine enrichment in later puffs." His observations were made in the context of considering the levels of certain constituents found to be transmitted in Aries' cigarette smoke, and did not address the question of "taste."

A thorough review of available tobacco company-sponsored research and publications has unearthed little, if any, analysis of nicotine's role as a flavor or taste agent. As noted by FDA Commissioner David Kessler in testimony before the House Subcommittee on Health and the Environment:

> "The tobacco industry may tell you that nicotine is important in cigarettes solely for 'flavor.' There is a great deal of information that suggests otherwise. Some of the patents specifically distinguish nicotine from flavorants. [Footnote omitted.] An RJR book on flavoring tobacco, while listing around a thousand flavorants, fails to list nicotine as a flavoring agent."[79]

On the other hand, tobacco companies and their agents have funded extensive research on the pharmacology of nicotine. In testimony before Congress three weeks prior to the tobacco executives' appearance on April 14, 1994, John Slade, M.D., a leading expert in nicotine addiction and the specialty of addiction medicine, stated:

> "Funded research [by or for the tobacco industry] has encompassed the entire spectrum of subjects relevant to nicotine pharmacology. Studies have ranged from basic work on nicotine receptors and nicotine analogues to human psychopharmacology studies. The existence of these research programs means that the cigarette industry is knowledgeable about all aspects of the pharmacology of nicotine.
>
> "While there is a very large body of published research on the pharmacology of nicotine, there is remarkably little on the contribution nicotine makes to the taste and flavor of tobacco products. In fact, apart from a few patents in which experimental cigarettes were assessed for flavor, taste, harshness and the like, <u>I cannot recall a single published study since the 1930s in which this aspect was a central focus of the research</u>."[80]

---

[79] Committee on Energy and Commerce, House of Representatives, United States Congress, March 25, 1994 (citing J.C. Leffingwell and H.J. Yound, *Tobacco Flavoring for Smoking Products* [R.J. Reynolds Tobacco Company, 1972]).

[80] Testimony of John Slade, M.D., before the Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, March 25, 1994 (underlining added).

*Re:* *Evidence from internal documents from B&W and its parent, British-American Tobacco Company*[81]

A series of internal documents from B&W's parent, British-American Tobacco Company,[82] illustrate vividly the company's long-term, sophisticated awareness that it manufactures and markets a powerfully addictive product, whose addictive character results from use of the drug nicotine and its manipulation by the manufacturer. Selected examples follow, with key portions highlighted by *italics*:

1) **1963**: A research report dated May 30, 1963, prepared under contract by researchers in Switzerland for British-American Tobacco/B&W and deliberately withheld by B&W from the U.S. Surgeon General, explained the physiological basis of nicotine addiction. The report did not question that nicotine is addictive. Rather, it sought to explain the addiction by using "the then-current understanding of how nicotine might interact in the brain and with the endocrine system," according to Dr. Slade, who analyzed the report. In an interview broadcast on National Public Radio, Dr. Slade observed that the B&W-commissioned report shows that tobacco industry research on the addictive properties of nicotine was years ahead of the research on the subject conducted outside of the industry. He noted, as well, that B&W and other

---

[81] The working relationship between parent British-American Tobacco and Brown and Williamson is, and has long been, a close one. Therefore, it is likely that B&W has been well aware of the tobacco-related health research carried out by the parent company. A July 9, 1969, contract between the two companies ("BAT/B&W R&D Cost and Risk Pooling Agreement"), and a February 7, 1977, letter plus handwritten notes suggesting later amendments to their agreement, provide a detailed look at the close working relationship.

[82] Brown and Williamson Tobacco Corporation (B&W) was formed in 1906. B&W was purchased by the British-American Tobacco Company in 1967. British-American Tobacco is now called BAT Industries (BAT). Imperial Tobacco Company is also a subsidiary of BAT Industries. In 1961, B&W and BAT entered into an agreement to pool their research efforts. In 1969, B&W and BAT entered a cost-sharing arrangement, under which B&W would help fund the research conducted at BAT laboratories. The principal research laboratory for the BAT-affiliated companies is the Group R&D Centre in Southampton, England. The BAT research program receives research recommendations and makes research reports to committees made up of representatives of BAT-affiliated companies. *E.g.*, the "Biological Research Committee" makes recommendations for biological testing. Representatives of B&W regularly sit on these supervisory committees. Since 1962, the BAT-affiliated companies have held annual research conferences involving researchers from each of the affiliated companies. At these conferences, the results of all BAT-affiliated research are discussed and recommendations for future research are made. Representatives of B&W regularly attend these annual conferences. (Information adapted from explanatory documents prepared by Majority Staff, Subcommittee on Health and the Environment, June 23, 1994.)

tobacco companies never admitted to conducting such research.[83] The report stated:

> "In a chronic smoker the normal equilibrium in the corticotropin releasing system can be maintained *only by continuous nicotine intake*."

If denied nicotine, the report said:

> *"A body left in this unbalanced state craves for renewed drug intake in order to restore the physiological equilibrium. This unconscious desire explains the addiction of the individual to nicotine."*[84]

2) **1967**: At a June 1967 meeting of British-American Tobacco scientists convened specifically to discuss nicotine, the company's research chronology, emphasizing the importance of nicotine to the company, reported that "Sir Charles Ellis [Scientific Advisor to the Board of British-American Tobacco] states that Batco is *in the nicotine rather than the tobacco industry*."[85]

3) **1962**: Sir Charles Ellis, himself, presented a paper in 1962, which he said:

> "One result of the recent public discussions on smoking and health must have been to make each of us examine whether smoking is just a habit or addiction or has any positive effects. *It is my conviction that nicotine is a very remarkable beneficent drug that both helps the body to resist external stress and also can as a result show a pronounced tranquilizing effect*. You are all aware of the very great increase in the use of artificial controls, stimulants, tranquilizers, sleeping pills and it is a fact that under modern conditions of life people find that they cannot depend just on their subconscious reactions to meet the various environmental strains with which they are confronted, *they must have drugs available* which they can take when they feel the need. *Nicotine is not only a very fine drug, but the techniques of administration by smoking has considerable psychological advantages* and a built-in

---

[83] Richard Harris, National Public Radio, "Report Shows Study of Nicotine Addiction in 1963," *Morning Addition*, May 20, 1964; *see also* Philip J. Hilts, "Tobacco Company Was Silent on Hazards," *New York Times*, May 7, 1994, p. A1, reporting that B&W explicitly decided to withhold from the U.S. Surgeon General significant research findings from Battelle Laboratories of Geneva, which had been hired to do health-related research on tobacco.

[84] Philip J. Hilts, "Tobacco Maker Studied Risk But Did Little About Results," *New York Times*, June 17, 1994, p. A1.

[85] *Id.*

control against excessive absorption. It is almost impossible to take an overdose of nicotine in the way it is only too easy to do with sleeping pills."[86]

4) **1968**: A British-American Tobacco research conference held on Hilton Head Island, South Carolina, in 1968 reached the following conclusion:

> "*In view of its pre-eminent importance, the pharmacology of nicotine should continue to be kept under review* and attention paid to the possible discovery of other substances possessing *the desired features of brain stimulation and stress-relief* without direct effects on the circulatory system. The possibility that nicotine and other substances together may exert effects larger than either separately (synergism) should be studied and if necessary the attention of Marketing Departments should be drawn to these possibilities."

5) **1972**: A report of the British-American Tobacco Company, dated November 9, 1972,[87] accented the fundamental role of nicotine in the success of the tobacco industry:

> "It has been suggested that *a considerable proportion of smokers depend on the pharmacological action of nicotine for their motivation to continue smoking*. If this view is correct, *the present scale of the tobacco industry is largely dependent on the intensity and nature of the pharmacological action of nicotine*."

6) **1980**: A British-American Tobacco Company report dated May 21, 1980,[88] found that:

> "*Nicotine is an extremely active biological compound capable of eliciting a range of pharmacological, biochemical and physiological responses in vivo* ... In some instances, *the pharmacological response of smokers to nicotine is believed to be responsible for an individual's smoking behavior*, providing the motivation for and the degree of satisfaction required by the smoker."

---

[86] Sir Charles Ellis, "The Smoking and Health Problem," Paper presented at Research Conference, Southampton, England, pp. 15-16 (1962).

[87] "Preparation and Properties of Nicotine Analogues."

[88] "Method for Nicotine and Cotinine in Blood and Urine."

7) **1984**: The following statements were made in presentations by scientists at British-American Tobacco's Smoking Behavior-Marketing Conference in 1984:

> "Nicotine interacts with specialized sites in the body termed receptors (nicotinic cholinergic receptors) ... *[I]n its simplest sense puffing behavior is the means of providing nicotine dose in a metered fashion.*"[89]

> "Smoking is then seen as a personal tool used by the smoker to refine his behavior and reactions to the world at large. *It is apparent that nicotine largely underpins those contributions through its role as a generator of central physiological arousal effects which express themselves as changes in human performance and psychological well-being.*"[90]

8) **1984**: The Proposed Revisions for 1985-1987 submitted to British-American Tobacco GR&DC Research Programme, Smoker Behavior, dated September 1984, stated:

> "*Smoke Pharmacology ... The work will continue to identify the mechanisms of nicotine interaction within the central nervous system. It will be extended to determine the specific and changing brain concentration of nicotine using the positron emission* tomography techniques."

*Re: Evidence that B&W manipulates nicotine levels in its cigarette manufacturing process*

Reconstituted tobacco ordinarily contains 25 percent or less of the nicotine in regular tobacco. At the request of ABC News's "Day One" program, the American Health Foundation performed a thorough, independent analysis of the reconstituted tobacco in several brands of cigarettes, including B&W brand GPC. The samples that were tested were found to have up to 70 percent (as opposed to the expected 25 percent) of the nicotine that would be found in regular tobacco, indicating that B&W had fortified the reconstituted tobacco in GPC cigarettes with additional nicotine. B&W is not known to have provided any credible alternative explanation for the unexpectedly high level of nicotine found in its reconstituted tobacco. In an interview broadcast on

---

89 Presentation by G.A. Read, Group Leader, Smoker Behavior, British-American Tobacco Company, 1984.

90 Presentation by Rob Ferris, Manager, Psychology Group, British-American Tobacco Company, 1984.

"Day One," Bogdan Prokopczyk, Ph.D., the Section Head of Bio-Organic Chemistry for the American Health Foundation who performed the analysis, expressed surprise at the nicotine levels identified, "because," he said, "I expected it to be less. The most likely explanation," he concluded, "is that some nicotine has been added, either with flavoring agents or by itself."[91]

Dr. Prokopczyk confirmed in a telephone conversation on November 23, 1994, that B&W added nicotine to the reconstituted tobacco implanted in GPC. Dr. Prokopczyk said he was certain that this nicotine was added either alone or as a part of a solution of flavorings. Since B&W and other tobacco companies have the technology to add flavorings with or without nicotine, the addition of nicotine to reconstituted tobacco is purely at the manufacturer's discretion, he said.[92]

Internal documents from B&W itself also highlight some of the tobacco industry's early research efforts to blend for higher nicotine content while lowering tar levels. In a "strictly confidential" report to B&W executives, Dr. R.B. Griffith, the company's chief of research, discussed research being done at the Tobacco Research Council laboratory in Harrogate, England. In addition to noting that the Harrogate research showed the health hazards of cigarettes and ways to produce less hazardous cigarettes, Griffith reported that Harrogate's "approach seems to be to find ways of obtaining maximum nicotine for minimum tar." According to the *New York Times*, Harrogate's research was halted in the mid-1960s because of concerns that it could prompt significant government regulation.[93]

*"Y-1"*: On June 21, 1994, FDA Commissioner David A. Kessler, M.D., disclosed in testimony before the Subcommittee on Health and the Environment that FDA investigators had discovered that Brown and Williamson had developed a super-high-nicotine tobacco plant, which the tobacco company called "Y-1." The discovery followed B&W's denials to the FDA on May 3, 1994, that it had engaged in "any breeding of tobacco for high or low nicotine levels."[94] Four FDA investigators who had visited the B&W plant in Macon, Georgia, on May 3 swore in affidavits that they had asked company officials whether B&W was involved in breeding tobacco for

---

[91] *Day One*, ABC News, "Smoke Screen," February 28, 1994.

[92] Telephone interview with Bogdan Prokopczyk, Ph.D., American Health Foundation, November 23, 1994.

[93] *See* Philip J. Hilts, "Method to Produce Safer Cigarette Was Found in 60's, but Company Shelved Idea," *New York Times*, May 13, 1994, p. A20 (emphasis added).

[94] Testimony of David A. Kessler, M.D., before Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, June 21, 1994.

specific nicotine levels, and that the officials had said no. Only after the FDA learned of the development of the plant in its investigation and confronted company officials with the evidence did B&W admit that it was growing and using the high-nicotine plant.[95]

The facts are that in a decade-long project, B&W secretly developed a genetically-engineered tobacco plant with a nicotine content of 6.2 percent by weight, more than twice the average found naturally in flue-cured tobacco. Use of this tobacco would enable B&W simultaneously to lower tar and raise nicotine levels. B&W took out a Brazilian patent for the new plant, which was printed in Portuguese. B&W and a Brazilian sister company, Souza Cruz Overseas, grew Y-1 in Brazil and shipped it to the United States for use in five B&W cigarette brands: Viceroy King Size, Viceroy Lights King Size, Richland King Size, Richland Lights King Size and Raleigh Lights King Size. When B&W's deception was uncovered, company officials admitted that it had as much as four million pounds of Y-1 stored in company warehouses in the United States.[96]

Dr. Kessler testified that B&W's cover-up extended to the company's going so far as to instruct the DNA Plant Technology Corporation of Oakland, California, which had helped develop the tobacco, to tell FDA investigators that Y-1 had "never [been] commercialized." Only after the FDA discovered two United States Customs Service invoices indicating that "more than a half-million pounds" of Y-1 tobacco had been shipped to B&W on September 21, 1992, did B&W confess that it had developed the high-potency tobacco.[97]

In subsequent testimony before the Subcommittee on Health and the Environment, B&W CEO Thomas E. Sandefur, Jr., denied secretly growing Y-1 and stated that his company was being "set up." He admitted that B&W controlled nicotine, but stated that the company did so only for "taste."[98]

---

[95] *See generally* Marlene Cimons, "FDA Followed Paper Trail in Hunt for Potent Tobacco," *Los Angeles Times*, July 18, 1994, p. A1; John Schwartz, "FDA Chief Discloses High-Nicotine Leaf," *Washington Post*, June 22, 1994, p. A1; Warren E. Leary, "Cigarette Company Developed a Potent Gene-Altered Tobacco," *New York Times*, June 22, 1994, p. A1; Laurie McGinley, "FDA Chief Says Firm Developed Altered Tobacco," *Wall Street Journal*, June 22, 1994, p. A3; Doug Levy, "FDA: 'Y-1' Boosts Nicotine," *USA Today*, June 22, 1994, p. 1A.

[96] *Id.*

[97] *Id.*

[98] Testimony of Thomas E. Sandefur, Jr., before Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, June 23, 1994.

In his testimony, Dr. Kessler stated, "These findings lay to rest any notion that there is no manipulation and control of nicotine undertaken in the tobacco industry."

As for the "taste" argument, B&W and other tobacco manufacturers' claim that they blend and manipulate tobacco for taste and not for nicotine is further belied by the fact that, as noted by Dr. Kessler, "[a]fter surgery for lung cancer, almost half of smokers resume smoking. Among smokers who suffer a heart attack, 38 percent resume smoking while they are still in the hospital. Even when a smoker has his or her larynx removed, 40 percent try smoking again."[99] Health policy expert Clifford E. Douglas observed in public testimony before the FDA's Drug Abuse Advisory Committee, that:

> "[M]uch of the so-called flavor comes when the nicotine is burned, and ... the burning sensation experienced by the smoker is replicated in nicotine chewing gum merely by adding ground pepper. In short, the industry's argument about 'flavor' is specious, and it is remarkable that the industry has got us talking about it at all. As far as flavor goes, perhaps the industry witnesses here today can explain why so many smokers who have endured tracheostomies due to throat cancer find it necessary to continue to smoke through the holes in their throats, where they cannot taste a thing."[100]

Further, a tobacco extract industry manager told ABC News's "Day One" in an interview that, as reported by "Day One" correspondent John Martin, "cigarette makers use his [the tobacco extract industry manager's] product to give reconstituted tobacco a 'kick.' That kick, he [the tobacco extract industry manager] says, comes from nicotine."[101]

*See also* the April 28, 1994, Congressional testimony of former Philip Morris Tobacco Company scientist Victor DeNoble, Ph.D., discussed more fully *supra*. DeNoble flatly contradicted tobacco executives' sworn testimony that nicotine was in cigarettes for "taste," noting that nicotine's <u>effect on the brain, not flavor</u>, was the focus of his own company's research.

---

[99] Testimony of David A. Kessler, M.D., before Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, March 25, 1994 (footnotes omitted).

[100] Testimony of Clifford E. Douglas before Food and Drug Administration Drug Abuse Advisory Committee, August 2, 1994.

[101] *Day One*, ABC News, "Smoke Screen," February 28, 1994.

*See also* Discussion, *supra*, regarding the widely used nicotine manipulation process patented by the Kimberly-Clark Corporation subsidiary LTR Industries, whose primary use is to control nicotine levels without affecting the taste or other sensory characteristics of tobacco products.

## 2. PROVIDING FALSE INFORMATION TO, OR WITHHOLDING INFORMATION FROM, A COMMITTEE OF THE U.S. CONGRESS IN THE ABSENCE OF OATH

Tobacco company representatives, acting in their official capacities, also deceived committees of the United States Congress in violation of 18 U.S.C. §1001. Following are documented instances of specific conduct constituting the provision of false and misleading information to, or withholding of information from, a committee of the U.S. Congress:

### a. The Tobacco Institute Failed to Provide Requested Information to the House Subcommittee on Health and the Environment and Also May Have Provided or Facilitated False Testimony by Healthy Buildings International before the Subcommittee

On March 17, 1994, Gray Robertson, President of Healthy Buildings International ("HBI"), testified before the Subcommittee on Health and the Environment, Committee on Energy and Commerce, U.S. House of Representatives on behalf of the Tobacco Institute ("TI"). In his testimony, Robertson argued that environmental tobacco smoke is not a health hazard.

Documents obtained by *USA Today* indicate that HBI has consulted for the Tobacco Institute since at least 1985. Donald Hoel, an attorney with the Kansas City, Missouri, law firm of Shook, Hardy & Bacon, representing the Council for Tobacco Research, recommended at that time payment to HBI (then called ACVA Atlantic Inc.) for a study to determine causes of indoor air pollution other than cigarette smoke. Homes included in the study were to be chosen "by the Tobacco Institute," according to the consultant's May 2, 1985, proposal signed by Robertson. "Results of such a study ... could demonstrate that environmental tobacco smoke has a relatively insignificant effect on indoor air quality," stated the proposal, which was circulated among tobacco industry lawyers.[102]

Robertson's testimony before the Subcommittee on Health and the Environment was based in part on data that reportedly was falsified. Former HBI technician Reginald Simmons and another unnamed former HBI technician have said that HBI falsified field measurements of indoor smoke levels. A former "senior consultant" at HBI, Jeffrey Seckler, said that he regrets the three years he spent telling tobacco industry "lies of omission."[103] The unnamed technician told Subcommittee investigators that Roberston himself falsified the data. At the time, the tobacco industry-funded Center for Indoor Air Research paid HBI $118,415 to measure tobacco smoke in "typical"

---

[102] Doug Levy, "Struggling to Clear the Air on Tobacco," *USA Today*, October 12, 1994, p. 1D.

[103] *Id.*

offices. HBI's attorney, Jeffrey Howard, has denied the allegations of falsification.[104]

HBI also received between $500,000 and $750,000 per year to publish a slick-glossy magazine in French, German, Spanish, Italian and Dutch. Seckler and another source said that the money was funnelled by Philip Morris through Covington & Burling, a Washington, D.C., law firm that represents the TI and Philip Morris. Most of the magazine's articles stressed ventilation improvements and made no reference to smoking.[105]

On August 23, 1994, the Subcommittee on Health and the Environment of the Committee on Energy and Commerce, U.S. House of Representatives, requested that the TI provide copies of all correspondence between the TI and HBI. On October 31, 1994, the Chairman of the Subcommittee on Health and the Environment, Rep. Henry Waxman, wrote to the TI's President, Samuel Chilcote, expressing his "dismay at the failure of the Tobacco Institute to cooperate fully with the Subcommittee in its tobacco investigation."[106] His letter further states:

> "The Tobacco Institute has so far refused to provide the Subcommittee with this correspondence.
>
> "New information received by the Subcommittee makes the failure to provide this correspondence particularly troubling. As you know, one of the allegations being investigated by the Subcommittee is the allegation of a former employee of HBI, Jeffrey Seckler, that HBI falsified environmental tobacco smoke measurements in exchange for financial assistance from the Tobacco Institute and other tobacco interests. Now new information obtained by the Subcommittee appears to corroborate the allegation that falsification occurred.
>
> "The new information is a building inspection report and field notes for a building inspection conducted by HBI at an office building in San Diego, California, in July 1989. The information shows that the inspection data appears to have been altered to cover up an environmental tobacco smoke problem in the building. Excerpts from the building inspection report (Exhibit

---

104 Doug Levy, "Smoking Data Tampered With, Researchers Say," *USA Today*, November 2, 1994, p. 1D. *See also* Myron Levin, "Who's Behind the Building Doctor," *The Nation*, August 9/16, 1993, p. 168-171.

105 Myron Levin, "Who's Behind the Building Doctor?," *The Nation*, August 9/16, 1994, pp. 168-171.

106 Letter to Mr. Samuel Chilcote, President, Tobacco Institute, from Henry A. Waxman, Chairman, Subcommittee on Health and the Environment, October 31, 1994.

A) and field notes (Exhibit B) are attached.[107] (In the final inspection report, the name of the building has been changed from the field notes, because apparently the report was used as a model report by HBI for promotional purposes. However, a comparison between the field notes and the inspection report shows that the same building is involved in each case.)

"In the summary of findings in the final building report, there is no mention made of an environmental tobacco smoke problem in the building. To the contrary, the summary states:

> "'Measurement of the environmental tobacco smoke (ETS) fraction of indoor air pollution in two areas featuring active smoking <u>showed no excessive accumulation of pollutants</u> from this source. This confirms that the current ventilation system is able to cope with moderate smoking activity' (p. 43)

"The field notes appear to contradict this statement, however. They show that the particulate level in an area occupied by two smokers was 150 micrograms per cubic meter (see 'ACVA Air Quality Survey Form,' sample 43). This is a high level. It is twice the level that HBI recommends as acceptable for indoor air.

"The field notes further disclose an apparent attempt to alter this measurement. The notes show that the reading of '150' was struck out, and a lower number, '75,' inserted in its place. Likewise, in the final report, the particulate level for sample 43 is reported as '85' -- not the reading of '150' originally recorded (p. 19).

"To further understand these changes, the Subcommittee contacted the field inspector who conducted the building inspection in question. This inspector told the Subcommittee that the true reading was '150' and that the change in the measurement to '75' in the field notes and '85' in the final report was an alternation [sic] of the actual measurement. The inspector further informed the Subcommittee that the change in the field notes was made in the handwriting of the President of HBI, Gray Robertson.

"The Subcommittee has further been informed, by persons other than HBI, that during the period that this inspection was conducted, HBI was receiving compensation from tobacco-industry organizations, including your

---

107 Exhibits are not included here.

organization, to inspect levels of environmental tobacco smoke in buildings and to testify about these results before federal, state, and local panels.

"These are matters of great concern to the Subcommittee. The charge of alteration or falsification of data is extremely serious in its own right. Moreover, in this case the data may have been used to mislead Congress and the State of California.

"As you may recall, HBI appeared before the Subcommittee on March 17, 1994, on your behalf to argue that environmental tobacco smoke is not a health hazard. Similar testimony by HBI was provided to the California Assembly Labor Committee in 1991 and 1993. In these appearances, HBI relied heavily on the data from HBI field inspections to substantiate its contentions. If this data were tampered with, it would call into question the basis for the testimony that environmental tobacco smoke is not a health hazard."

It is not known at this writing whether, or in what fashion, the Tobacco Institute, Samuel Chilcote, Healthy Buildings International or Gray Robertson have responded to Chairman Waxman's letter.

b. Misrepresentations by Charles O. Whitley (Senior Consultant, Tobacco Institute) before House Subcommittee on Health and the Environment

Charles O. Whitley, the Tobacco Institute's Senior Consultant, testified before the Subcommittee on Health and the Environment, Committee on Energy and Commerce, U.S. House of Representatives, on March 25, 1994. In his testimony, he stated:

> "[FDA] Commissioner [David] Kessler suggested that the cigarette manufacturers ... deliberately manipulate the amount of nicotine in cigarettes in order to 'produce and sustain addiction.' ... *I am here today to tell you -- unequivocally -- that these suggestions are false ... [N]icotine levels are a function of 'tar' levels. When 'tar' levels are set, nicotine levels follow.*" (Emphasis Added.)

In light of the evidence presented throughout this Prosecution Memorandum of tobacco companies' manipulation of nicotine content and delivery and of the companies' knowledge that nicotine is addictive, it appears that Charles Whitley deliberately sought to mislead Congress in this testimony. The Tobacco Institute, and thus Whitley, represents most of the major cigarette manufacturers in the United States, including those shown to manipulate nicotine content and delivery.

c. Deceptive Communications of Smokeless Tobacco Council with House Subcommittee on Health and the Environment

The Smokeless Tobacco Council is the trade association of the major smokeless, or "spit," tobacco companies in the United States. In May 1994, the Smokeless Tobacco Council submitted to the House Subcommittee on Health and the Environment a list of 562 additives used in the manufacture of smokeless tobacco.

Two of the additives listed were sodium carbonate and ammonium carbonate. The Smokeless Tobacco Council's list described these additives merely as ingredients in edibles such as baked goods. This representation of two chemicals used, in fact, to "free" nicotine from smokeless tobacco for more efficient absorption into the user's bloodstream was highly deceptive.

Larry D. Story, a U.S. Tobacco chemist until 1982, disclosed that UST routinely adds such chemicals to its snuff "to deliver the free nicotine faster and to make the product stronger." Similarly, James C. Taft, head of UST's product development from 1972 until 1991, said: "The fermentation process involves adding chemicals during and after fermentation and, at the end, you add some more chemicals which increase pH, too." Without increasing the pH levels, "you couldn't get nicotine release."[108] UST is the Smokeless Tobacco Council's largest member company.

In short, for the Smokeless Tobacco Council and its member companies, these chemical additives appear to have nothing to do with edibles such as baked goods and much to do with boosting the pharmacological impact of the addictive drug nicotine on the nervous system and brain of the user.

d. Deception of Congress by Council for Tobacco Research and James F. Glenn, M.D., CTR's Chairman, President and CEO

As discussed at some length elsewhere in this Prosecution Memorandum (*see* Section C(1)(a)(2)(a), *infra*), one of the primary means by which the major tobacco companies have sought to induce members of the public to purchase tobacco products containing addictive levels of nicotine was by the creation and utilization of the Council for Tobacco Research - U.S.A., Inc. ("CTR"), a joint tobacco industry group originally named the Tobacco Industry Research Committee. The establishment of the tobacco company-funded CTR has consistently provided the major tobacco manufacturers with an effective vehicle for disseminating or causing to be disseminated to the media, the

[108] *See* Alix M. Freedman, "Juiced Up: How a Tobacco Giant Doctors Snuff Brands to Boost Their 'Kick,'" *Wall Street Journal*, October 26, 1994, p. A1.

public, the Congress and others false and misleading information regarding the health effects of tobacco use.

James F. Glenn, M.D., the CTR's current chairman, president and CEO, testified before the Subcommittee on Health and the Environment of the Committee on Energy and Commerce, U.S. House of Representatives, on May 25, 1994. His testimony included several attempts to mislead the Subcommittee. Some examples follow, with key portions highlighted by *italics*. Brief explanatory comments, which are based on the extensive information now available concerning CTR's true activities (*see* Section C(1)(a)(2)(a), *infra*), are included.

> Glenn began by referring to "the *contributions* the Council has made *to the progress of scientific knowledge about diseases associated with smoking*." **(Fact: CTR has long blocked, sidetracked or weakened scientific research it deemed unfavorable to its sponsoring tobacco companies. The most damning study results were secreted away in CTR's "Special Projects" unit.)**
>
> Glenn stated that the CTR "sponsors research into questions of tobacco use and health *and makes the results of that research available to the public*." **(Fact: CTR has sponsored only that research which is unlikely to result in any meaningful progress in the understanding of the health impact of tobacco use. CTR has made available to the public only those results that the organization and its lawyers deemed harmless.)**
>
> "Council grantees *are assured complete scientific freedom* in conducting their studies. They alone are responsible for reporting their findings in the accepted scientific manner -- through medical and scientific journals and societies. Publication of research results *is encouraged in all instances*." **(Fact: Based on the extensive information now available regarding the inner-workings of CTR and the influence of its sponsoring tobacco companies and their lawyers, this statement appears to be patently untrue.)**

## B. TOBACCO COMPANIES ENGAGED IN CRIMINAL CONDUCT BY DELIBERATELY DECEIVING THE U.S. SURGEON GENERAL AND THE FOOD AND DRUG ADMINISTRATION

This Prosecution Memorandum documents what appears to be a pattern and practice, spanning decades, on the part of tobacco companies and their executives, lawyers, public relations agents, scientists, trade associations and suppliers of failing to disclose critical health and manufacturing information to the U.S. Surgeon General and the Food and Drug Administration, as well as members of the public, the U.S. Congress and others.

The tobacco industry is an oligopoly consisting of a few large manufacturing companies which, while in competition with each other, have shared resources, information and strategy, informally and through trade associations -- *e.g.*, the Tobacco Institute and the Smokeless Tobacco Council -- and other entities such as the Council for Tobacco Research and the Center for Indoor Air Research.

These companies and the entities formed to represent or work for them, having long been informed of the addictive and debilitating health effects of their tobacco products, and having long been engaged in (and/or fully informed of) the willful manipulation of such products to cause and maintain addiction in American consumers, appear to have violated 18 U.S.C. §1001 by providing false information to, and withholding information from, the U.S. Surgeon General and the Food and Drug Administration on matters within their jurisdiction. Tobacco company representatives and agents, acting in their official capacities, have systematically provided misleading and incomplete information, or no information at all, to these Federal government offices.

Following are selected examples of conduct that may have risen to the level of such crimes.

### 1. Brown and Williamson's Deception of the U.S. Surgeon General Regarding the Health Effects and Addictiveness of Tobacco and Nicotine:

In 1963, members of the tobacco industry were fully aware that the U.S. Surgeon General was preparing the first Surgeon General's report on smoking and health, which was released on January 11, 1964. Tobacco industry officials were consulted during the process and, prior to that, recommended and unofficially signed off on the naming of experts to the Surgeon General's committee assigned to oversee preparation of the report. Tobacco company officials kept in contact with the committee, sought to monitor its progress and undertook to provide their own health-related information to the committee.

It was during this period that B&W general counsel Addison Yeaman and senior British-American Tobacco Company official A.D. McCormick exchanged six letters and telexes, dated between June 28, 1963, and August 8,

1963, in which they discussed whether to submit to the U.S. Surgeon General their research findings on the addictive and other harmful effects of nicotine and the disease-causing properties of cigarettes. In the course of this dialogue, the two senior officials explicitly agreed to withhold this information, which they then proceeded to do.

According to the *New York Times*:

> "The [Battelle] report found that there were some beneficial effects of nicotine, including a tranquilizer-like drug effect and an appetite-suppressing effect. But it also showed that it might cause heart disease.
>
> "Mr. Yeaman wrote to Anthony D. McCormick, a senior executive of the parent company in London, that the company would have to decide what to disclose to the American Surgeon General, Dr. Luther Terry, who was about to issue the first report by a Surgeon General condemning cigarettes as a health hazard.
>
> "Mr. Yeaman referred to the Battelle 'nicotine report' and to a new filter created by a company scientist, R.B. Griffith, which could filter out some hazardous substances in cigarettes.
>
> "Mr. McCormick cabled back on July 3, 1963, that 'it is too early to submit Battelle reports to Surgeon General's Committee.'
>
> "Mr. Yeaman cabled back 'submission Battelle or Griffith developments to Surgeon General undesirable and we agree continuance of Battelle work useful but disturbed at its implications re cardiovascular disorders.' He said the new research should cause a 'reassessment fundamental policy re health.'
>
> "Two weeks later, as part of the corporate debate about how to handle the health hazards of cigarettes while continuing to keep the company free of the possibility of lawsuits by smokers, Mr. Yeaman wrote a 2,000-word analysis of whether the company should acknowledge the hazards of cigarettes and accept the risks of litigation, or say nothing, but give up the ability to talk about its research in public and give up credible standing to analyze and criticize the Surgeon General's report.
>
> "Mr. Yeaman said in the report, labeled 'strictly private and confidential' and dated July 17, 1963, that the new information about the tranquilizing effects of nicotine and its positive effects on weight

loss 'delivers to the industry what may well be the first effective instrument of propaganda counter to that of the American Cancer Society, et al., damning cigarettes as having a causal relationship to cancer of the lung.'

"He said the positive nicotine findings and the Griffith filter were 'a bridge over which the industry could pass from its present terrain of defense to a field for effective counter-attack.' The Griffith filter could selectively take hazardous substances out of cigarette smoke, but could leave the good taste and the nicotine. This device would provide the opening politically, and the positive uses of nicotine would be their 'weapon.'

"He noted that company research had shown that nicotine has a tranquilizing, or anxiety-reducing effect, and helps control body weight, and 'moreover, nicotine is addictive.'

"'We are, then, in the business of selling nicotine, an addictive drug effective in the release of stress mechanisms,' he wrote.

"The research found that despite the beneficial effects of nicotine, cigarettes 'cause, or predispose, lung cancer.'

"'They contribute to certain cardiovascular disorders,' the research found. 'They may well be truly causative in emphysema, etc. etc.'"[109]

2. <u>Brown and Williamson's Deception of the Food and Drug Administration Regarding the "Y-1" High-Nicotine Tobacco Plant</u>:

On June 21, 1994, FDA Commissioner David A. Kessler, M.D., disclosed in testimony before the Subcommittee on Health and the Environment of the Committee on Energy and Commerce, U.S. House of Representatives, that FDA investigators recently had discovered that Brown and Williamson had developed a super-high-nicotine tobacco plant, which the tobacco company called "Y-1." The discovery followed B&W's denials to the FDA on May 3, 1994, that it had engaged in "any breeding of tobacco for high or low nicotine

[109] Philip J. Hilts, "Tobacco Company Was Silent on Hazards," *New York Times*, May 7, 1994, p. A1.

levels."[110] Four FDA investigators who had visited the B&W plant on May 3 swore in affidavits that they had asked company officials whether B&W was involved in breeding tobacco for specific nicotine levels, and that the officials had said no. Only after the FDA learned of the development of the plant in its investigation and confronted company officials with the evidence did B&W admit that it was growing and using the high-nicotine plant.[111]

The facts are that B&W secretly developed a genetically-engineered tobacco plant with a nicotine content of 6.2 percent by weight, more than twice the average found naturally in flue-cured tobacco. B&W grew Y-1 in Brazil and shipped to the United States for use in five B&W cigarette brands: Viceroy King Size, Viceroy Lights King Size, Richland King Size, Richland Lights King Size and Raleigh Lights King Size. When B&W's deception was uncovered, company officials admitted that it had at least three million pounds of Y-1 stored in company warehouses in the United States.

Dr. Kessler testified that B&W's cover-up extended to the company's going so far as to instruct the DNA Plant Technology Corporation of Oakland, California, which had helped develop the tobacco, to tell FDA investigators that Y-1 had "never [been] commercialized." Only after the FDA discovered two United States Customs Service invoices indicating that "more than a half-million pounds" of Y-1 tobacco had been shipped to B&W on September 21, 1992, did B&W confess that it had developed the high-potency tobacco.

In subsequent testimony before the Subcommittee on Health and the Environment, B&W CEO Thomas E. Sandefur, Jr., denied secretly growing Y-1 and stated that his company was being "set up." He admitted that B&W controlled nicotine, but stated that the company did so only for "taste."[112]

---

[110] Testimony of David A. Kessler, M.D., before Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, June 21, 1994.

[111] *See generally* Marlene Cimons, "FDA Followed Paper Trail in Hunt for Potent Tobacco," *Los Angeles Times*, July 18, 1994, p. A1; John Schwartz, "FDA Chief Discloses High-Nicotine Leaf," *Washington Post*, June 22, 1994, p. A1; Warren E. Leary, "Cigarette Company Developed a Potent Gene-Altered Tobacco," *New York Times*, June 22, 1994, p. A1; Laurie McGinley, "FDA Chief Says Firm Developed Altered Tobacco," *Wall Street Journal*, June 22, 1994, p. A3; Doug Levy, "FDA: 'Y-1' Boosts Nicotine," *USA Today*, June 22, 1994, p. 1A.

[112] Testimony of Thomas E. Sandefur, Jr., before Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, June 23, 1994.

In his testimony, Dr. Kessler stated, "These findings lay to rest any notion that there is no manipulation and control of nicotine undertaken in the tobacco industry."

C. TOBACCO COMPANIES ENGAGED IN CRIMINAL CONDUCT BY DELIBERATELY DECEIVING THE AMERICAN PUBLIC

1. DISSEMINATION OF FALSE ADVERTISEMENTS, PRESS RELEASES AND STATEMENTS TO THE MEDIA

a. By Other than the United States Mails.

Tobacco companies, by disseminating or causing to be disseminated false advertisements, press releases and statements to the media via means other than the United States mails, sought directly or indirectly to induce individual members of the public to purchase substances known by such companies to be drugs or devices in violation of 15 U.S.C. §52(a)(2).

(1) Background: Tobacco Industry Representatives Fully Understand and Have Admitted -- Privately, or Publicly Following Separation from the Industry -- that Nicotine is an Addictive Drug and that Tobacco Causes Illness and Death.

(a) Beyond Dispute: Nicotine is Addictive and Tobacco Causes Disease and Death

i. *ADDICTION*

A great deal of evidence, some of which is discussed elsewhere in this Prosecution Memorandum[113] makes clear the tobacco industry's understanding of the addicting nature of nicotine and the companies' manipulation of nicotine and other chemicals to exploit the addictive nature of the drug in order to addict consumers.[114]

---

[113] *E.g.*, *inter alia*, internal tobacco company communications, scientific studies and meeting minutes, and the advertising and manufacturing activities of companies doing business with tobacco companies.

[114] For a thorough background, *see* Testimony of David A. Kessler, M.D., Commissioner of Food and Drugs, before the House of Representatives, Committee on Energy and Commerce, Subcommittee on Health and the Environment, March 25, 1994; Testimony of John Slade, M.D., before the Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, March 25, 1994; Clifford E. Douglas, *Special Report: The Tobacco Industry's Use of Nicotine as a Drug: What Do the Recent Revelations Mean for Tobacco Control?* (American Council on Science and Health: New York, NY, May 1994). *See also* *Day One*, ABC News, "Smoke Screen," February 28, 1994; *Day One*, ABC News, "Smoke Screen, Part 2," March 7, 1994; Letter from David A. Kessler, M.D., to Coalition on Smoking OR Health, February 25, 1994.

It is beyond legitimate dispute that nicotine is a highly addictive substance, comparable in its physiological and psychological properties to other addictive substances of abuse, according to the U.S. Surgeon General and the overwhelming consensus of the world's medical and scientific community.[115] Recently, the independently constituted Drug Abuse Advisory Committee of the Food and Drug Administration, after holding hearings that included extensive testimony from health officials and tobacco industry representatives, concluded that nicotine is an addictive drug and the chief reason people smoke cigarettes.[116]

It is well-documented that nicotine has the features of prototypic addictive drugs: it is psychoactive and produces tolerance, physical dependence and reinforcement. After a smoker inhales, nicotine from the cigarette reaches the brain within a few seconds and produces a complex series of chemical reactions that alter mood, increase the heart rate and drive the craving with which millions of smokers are intimately familiar. Addiction to nicotine through tobacco use, like addiction to heroin or cocaine, is characterized by drug craving, compulsive use and relapse after withdrawal.[117]

It appears that, without exception, the only critics of the concept that nicotine is addictive are those with financial ties to tobacco companies or their agents.[118] Scientists at R.J. Reynolds Tobacco Company, for example, admit that nicotine has pharmacological effects on the human body and that it reduces anxiety and increases mental alertness. They also acknowledge that "the beneficial effects of smoking on cognitive performance are a function of nicotine absorbed from cigarette smoke."[119] However, the RJR scientists, like

---

[115] *See* U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control, Center for Chronic Disease Prevention and Health Promotion, Office on Smoking and Health, *The Health Consequences of Smoking: Nicotine Addiction. A Report of the Surgeon General*, 1988.

[116] *See* Philip J. Hilts, "F.D.A. Panel Takes Step Toward Setting Control on Nicotine," *New York Times*, August 3, 1994, p. A1; Laurie McGinley, "Cigarettes Now on Market are Addictive, FDA Drug Abuse Advisory Panel Finds," *Wall Street Journal*, August 3, 1994, p. B8.

[117] U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control, Center for Chronic Disease Prevention and Health Promotion, Office on Smoking and Health, *The Health Consequences of Smoking: Nicotine Addiction. A Report of the Surgeon General*, 1988. *See also* Testimony of Jack Henningfield, Ph.D., before Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, November 29, 1994.

[118] *E.g.*, D.M. Warburton, "Is Nicotine Use an Addiction?," *The Psychologist*, April 1989, pp. 166-170. *See* Discussion, *supra*, of Taddeo Perjury #1.

[119] *See*, *e.g.*, John H. Robinson and Walter S. Pritchard (Biobehavioral R&D, R.J. Reynolds Tobacco Company), "The Role of Nicotine in Tobacco Use," 108 *Psychopharmacology* 397-407, 1992.

those who work within or for other tobacco companies, claim that the definition of addiction applied by the U.S. Surgeon General and other leading experts is faulty and that nicotine is, therefore, not addictive. Playing a semantic rather than substantive game, the tobacco industry authors claim that to be defined as "addictive," a substance must cause intoxication.

"It is not that Dr. Robinson and other scientists supported by tobacco companies disagree with the main points made by mainstream scientists, but that they define addiction differently," reported the *New York Times*. Indeed, the tobacco industry scientists have admitted the existence of the hallmarks of addiction, including compulsive use, withdrawal symptoms and continued use despite knowledge of harm to oneself and others.[120]

Moreover, tobacco industry representatives often assert, for public consumption, that since 40 million Americans have quit smoking, nicotine cannot be addictive. This "logic" is false and misleading. As explained by leading experts in the field of tobacco-related and other addictions, "[t]he 40 million Americans who quit did not do so all at once -- the figure represents an accumulation of about 2.5 percent of all cigarette smokers per year over 25 years. Most of them had stopped a number of times and relapsed before final success." These experts note further that just as 90 percent of those who stop smoking do so without professional help, 90 percent of soldiers addicted to heroin in Vietnam were able to stop on their own when they returned to the United States.[121]

ii. *HEALTH EFFECTS*

A recent report of the prestigious National Academy of Science's Institute of Medicine concluded that "Use of tobacco products is the nation's deadliest addiction."[122] This conclusion has been affirmed by the U.S. Surgeon General, the National Cancer Institute, the Centers for Disease Control and Prevention, the American Cancer Society, the American Heart Association and the American Lung Association (*see supra*).

---

[120] *See* Philip J. Hilts, "Is Nicotine Addictive? It Depends on Whose Criteria You Use," *New York Times*, August 2, 1994, p. C3.

[121] *See, e.g.*, Herbert D. Kleber, M.D. (Medical Director, Center on Addiction and Substance Abuse, Columbia University) and David Conney, M.D. (Lecturer in Psychology, Columbia University's College of Physicians and Surgeons), Letter to the Editor, "Don't You Believe that Nicotine Isn't Addictive," *New York Times*, April 4, 1994, p. A14.

[122] National Academy of Sciences, Institute of Medicine, Committee on Preventing Nicotine Addiction in Children and Youths, *Growing Up Tobacco Free: Preventing Nicotine Addiction in Children and Youths*, Barbara S. Lynch and Richard J. Bonnie, eds. (National Academy Press: Washington, D.C., 1994), p. 3.

An estimated 419,000 Americans die prematurely each year from diseases caused by tobacco use,[123] constituting one out of every five deaths in the United States.[124] The number of deaths caused by tobacco use is greater than the combined number of deaths caused by the human immunodeficiency virus epidemic (AIDS), alcohol consumption, illicit drug use, homicides, suicides, fires, automobile crashes and unintentional injuries.[125] Cigarette smoking causes 87 percent of deaths from lung cancer, 30 percent of all cancer deaths, 82 percent of deaths from pulmonary disease and 21 percent of deaths due to chronic heart disease.[126] Smokeless tobacco use causes oral cancer, gum disease and tooth loss. Long term snuff users are 50 times more likely to develop gum cancer and four times more likely to develop mouth cancer than non-users. Nearly 30,000 new cases of oral cancer are diagnosed each year in the United States, and half of those diagnosed die within five years.[127]

---

[123] Centers for Disease Control and Prevention, "Cigarette Smoking - Attributable Mortality and Years of Potential Life Lost - United States, 1990," *Morbidity and Mortality Weekly Report*, August 27, 1993, pp. 645-649.

[124] J.M. McGinnis and W.H. Foege, "Actual Causes of Death in the United States," *Journal of the American Medical Association*, Vol. 270, 1993, pp. 2207-2212.

[125] *Id.*

[126] U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control, Center for Chronic Disease Prevention and Health Promotion, Office on Smoking and Health, *Reducing the Health Consequences of Smoking: 25 Years of Progress: A Report of the Surgeon General*, 1989; National Academy of Sciences, Institute of Medicine, Committee on Preventing Nicotine Addiction in Children and Youths, *Growing Up Tobacco Free: Preventing Nicotine Addiction in Children and Youths*, Barbara S. Lynch and Richard J. Bonnie, eds. (National Academy Press: Washington, D.C., 1994), p. 3.

[127] U.S. Department of Health and Human Services, Office of the Inspector General, *Spit Tobacco and Youth*, 1992, p. 3-6; D.M. Winn, W.J. Blot, C.M. Shy, L.W. Pickle *et al.*, "Snuff Dipping and Oral Cancer Among Women in the Southern United States," *New England Journal of Medicine*, March 26, 1981, pp. 745-749; National Academy of Sciences, Institute of Medicine, Committee on Preventing Nicotine Addiction in Children and Youths, *Growing Up Tobacco Free: Preventing Nicotine Addiction in Children and Youths*, Barbara S. Lynch and Richard J. Bonnie, eds. (National Academy Press: Washington, D.C., 1994), p. 3.

(b) Admissions by Current and Former Tobacco Industry Representatives Regarding Addiction, Manipulation of Nicotine Content or Delivery, and the Health Effects of Tobacco Use

(Note: *Italics* added for emphasis.)

i. F. Ross Johnson (former Chief Executive of **RJR Nabisco**):

F. Ross Johnson, who ran RJR Nabisco for several years in the mid- to late-1980s, is recognized as having been the driving force behind development of Premier, RJR's high-technology nicotine delivery product that contained substantial quantities of artificially added nicotine extract. Johnson was quoted by the *Wall Street Journal* as saying the following about tobacco: "*Of course it's addictive. That's why you smoke the stuff.*"[128]

ii. Victor L. Crawford (former lobbyist for the **Tobacco Institute**):

Victor Crawford, a lobbyist for the Tobacco Institute from the mid-1980s to 1991 and a former state senator from Maryland, was diagnosed in 1992 with throat cancer caused by cigarette smoking. Since then, he has admitted the following:

> "*[Smoking is] the most insidious habit, an addiction.* I was an addictive personality. I'd stop six or eight weeks. Then I'd have one cigarette and the next day I was back up to two packs and the next day I was back up to three. *It is highly addictive.*"
>
> "*The fact of the matter is that it's a killer.*"[129]
>
> "[I am] *an addict, as most cigarette smokers are.*"

---

128 Eben Shapiro, "Big Spender Finds a New Place to Spend," *Wall Street Journal*, October 6, 1994, p. B1.

129 Roger Rosenblatt, "How Do They Live with Themselves?," *New York Times Magazine*, March 20, 1994, p. 73.

His throat cancer, which has metastasized to his pelvis and lung, "*was caused by cigarette smoking.*" "*This stuff is a killer. I'm living proof -- dying proof -- of what can happen.*"[130]

iii. Larry D. Story (former **UST** chemist who left UST in 1982)

UST routinely adds chemicals to its snuff "*to deliver the free nicotine faster and to make the product stronger.*"

UST tried to control as precisely as possible the dose of nicotine that each product delivered. He said, "*There used to be a saying at UST that 'There's a hook in every can.' And that hook is nicotine.*"[131]

iv. James C. Taft (chemist who is former **UST** head of product development from 1972 to 1991)

Reflecting the nicotine-rich varieties of the tobaccos used in UST's snuff, Taft joked that *UST's products "all have enough nicotine to kill a horse."*

Taft said that while he was with UST, it used certain chemicals, such as sodium carbonate and ammonium carbonate, to increase the alkalinity of its tobaccos and, thus, the levels of "free" nicotine. UST added these chemicals during and after fermentation, the process that turns tobacco into snuff. Taft said: "The fermentation process involves adding chemicals during and after fermentation and, at the end, you add some more chemicals which increase pH, too." *Without increasing the pH levels, "you couldn't get nicotine release."*[132]

---

130 CBS "This Morning," October 18, 1994.

131 Alix M. Freedman, "Juiced Up: How a Tobacco Giant Doctors Snuff Brands to Boost Their 'Kick,'" *Wall Street Journal*, October 26, 1994, p. A1.

132 Alix M. Freedman, "Juiced Up: How a Tobacco Giant Doctors Snuff Brands to Boost Their 'Kick,'" *Wall Street Journal*, October 26, 1994, p. A1.

v. Victor DeNoble (Associate Senior Scientist for **Philip Morris** from 1980-1984)

Victor DeNoble, Ph.D., testified before Congress that nicotine is addicting "on a level comparable to cocaine."[133]

vi. Sir Charles Ellis (Scientific Advisor to Board of **British-American Tobacco PLC**, **B&W's** British parent)

In an annual meeting between executives and researchers from B&W, Batco and British-American Tobacco PLC held in Southampton, England, in July 1962, Batco's chief researcher Sir (Dr.) Charles Ellis, presented a paper in which he called nicotine "*a remarkable, beneficent drug that both helps the body to resist external stress and also can as a result show a pronounced tranquilizing effect. Nicotine is not only a very fine drug*," he continued, "*but the techniques of administration by smoking has considerable psychological advantages*."[134] He also noted stated that "*smoking is a habit of addiction*." Ellis was leading the discussion, which also included Dr. S.J. Green, Vice President of Batco research, and Dr. Robert B. Griffith, Director of Research for B&W.[135]

vii. Addison Yeaman (then-General Counsel for **B&W** and, later, President of **Council on Tobacco Research**)

A "strictly private and confidential" report by B&W general counsel Addison Yeaman, dated July 17, 1963, after reviewing the findings of B&W-sponsored research on the effects of nicotine, states the following:

"Moreover, *nicotine is addictive*.

---

133 Testimony of Victor John DeNoble, Ph.D., before Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, April 28, 1994.

134 Sir Charles Ellis, "The Smoking and Health Problem," Paper presented at Research Conference, Southampton, England, pp. 15-16 (1962).

135 *Id*.

"*We are*, then, *in the business of selling nicotine, an addictive drug effective in the release of stress mechanisms*."[136]

viii. Dr. J.G. Burgan (Researcher, **Batco**, B&W's British sister company under parent **British-American Tobacco PLC**)

In the July 1962 meeting noted *supra*, Batco researcher Dr. J.G. Burgan told meeting participants that a new set of dangerous compounds had just been identified by a German researcher: "*They*

---

[136] *See* Philip J. Hilts, "Tobacco Company Was Silent on Hazards," *New York Times*, May 7, 1994, p. A1, reporting that B&W explicitly decided to withhold from the U.S. Surgeon General significant research findings from Battelle Laboratories of Geneva, which had been hired to do health-related research on tobacco, and R.B. Griffith, B&W's chief of research. According to the *Times*:

> "The [Battelle] report found that there were some beneficial effects of nicotine, including a tranquilizer-like drug effect and an appetite-suppressing effect. But it also showed that it might cause heart disease.
>
> . . .
>
> "Mr. Yeaman referred to the Battelle 'nicotine report' and to a new filter created by a company scientist, R.B. Griffith, which could filter out some hazardous substances in cigarettes.
>
> . . .
>
> "[Yeaman] noted that company research had shown that nicotine has a tranquilizing, or anxiety-reducing effect, and helps control body weight, and 'moreover, nicotine is addictive.'
>
> "'We are, then, in the business of selling nicotine, an addictive drug effective in the release of stress mechanisms,' he wrote.
>
> "The research found that despite the beneficial effects of nicotine, cigarettes 'cause, or predispose, lung cancer.'
>
> "'They contribute to certain cardiovascular disorders,' the research found. 'They may well be truly causative in emphysema, etc. etc.'"

(Underlining added.) In addition, according to the *Wall Street Journal*, Yeaman's report discussed cigarettes delivering "a nice jolt of nicotine." Eben Shapiro, "Tobacco Firms May Face New Pressure with Disclosure of Executive's Memo," May 9, 1994, p. A4 (underlining added).

*[nitrosamines] are several hundred times more potent as carcinogens than things like benzoapyrene; he's getting tumor yields of 100 percent and he has the feeling that there may be some of these compounds in cigarette smoke.*"[137]

(2) False Advertisements, False Press Releases and False Statements Made to the Media by the Tobacco Industry.

Tobacco company executives, employees and agents have made numerous false public statements regarding the health effects of tobacco and nicotine, in violation of 15 U.S.C. §52(a)(2). One of the primary means by which the major tobacco companies have sought to induce members of the public to purchase tobacco products containing addictive levels of nicotine was by the creation and utilization of the Council for Tobacco Research - U.S.A., Inc. ("CTR"), a joint tobacco industry group originally named the Tobacco Industry Research Committee ("TIRC").

*Re:* *The Council for Tobacco Research,*
*Its "Special Projects" Unit, and*
*the Tobacco Industry's Public*
Misinformation Campaign

The establishment of the tobacco company-funded CTR has consistently served the major tobacco manufacturers as an effective vehicle for disseminating or causing to be disseminated false advertisements, press releases and statements to the media, thereby misleading consumers about the addictiveness and debilitating health effects of tobacco use, in violation of 15 U.S.C. §52(a)(2).

The CTR was formed not as a legitimate entity to fund research on tobacco and health, but rather as a public relations front whose primary purpose was to protect the profits of tobacco companies. Since its creation 40 years ago, the CTR, on behalf of the tobacco companies that fund it, has functioned as an integral part of the tobacco industry's endeavor to entice customers by fraudulently minimizing the risk of tobacco use, through the misrepresentation of some health data and the omission of other health data.

---

[137] Philip J. Hilts, "Cigarette Makers Debated the Risks They Denied," *New York Times*, June 16, 1994, p. A1.

Based on an extensive investigation, the *Wall Street Journal* has characterized the CTR as the "hub" of "the longest-running misinformation campaign in U.S. business history."[138]

All member companies of the CTR, as well as the CTR itself, may be chargeable, therefore, for violation of §52(a)(2).[139]

Soon after the first independent study directly linking cigarette smoking to cancer was published in 1953,[140] most of the major tobacco companies[141] joined forces, under the guidance of the Hill & Knowlton public relations consulting firm, and formed what eventually came to be called the CTR. CTR's publicly announced undertaking was and still is to provide funding for scientific research on tobacco and health and to make accurate tobacco-related health information available to the public. The creation of the CTR's predecessor, the TIRC, was announced with fanfare by the sponsoring tobacco companies, who claimed that the TIRC would offer "aid and assistance to the [tobacco and health] research effort." An advertisement entitled "A Frank Statement to Cigarette Smokers," which the companies jointly ran in 448 newspapers and magazines,[142] stated: "We accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business... We always have and always will cooperate closely with those whose task it is to safeguard the public health." The advertisement said further:

> "Distinguished authorities point out:
>
> 1. That medical research of recent years indicates many possible causes of lung cancer.
>
> 2. That there is no agreement among the authorities regarding what the cause is.

---

138 Alix M. Freeman and Laurie P. Cohen, "Smoke and Mirrors: How Cigarette Makers Keep Health Question 'Open' Year After Year," *Wall Street Journal*, February 11, 1993, p. A1.

139 In addition, the tobacco companies whose representatives appeared before the House Subcommittee on Health and the Environment on April 14, 1994, issued press releases and other statements which, in light of their contents and the context in which they were produced (as described here), may similarly fall within the prohibitions of this statute.

140 Ernest L. Wynder, Evarts A. Graham and Adele B. Croningen, "Experimental Production of Carcinoma with Cigarette Tar," *Cancer Research*, Volume 13, Number 12, December 1953, pp. 855-864.

141 American Brands, Brown & Williamson, Liggett & Myers, Philip Morris and R.J. Reynolds.

142 *E.g.*, *New York Times*, January 4, 1954 (underlining added).

3. That there is no proof that cigarette smoking is one of the causes.

4. That statistics purporting to link cigarette smoking with the disease could apply with equal force to any one of many other aspects of modern life. Indeed the validity of the statistics themselves is questioned by numerous scientists..."

Behind this announcement lay a wholly contradictory goal. In a meeting among tobacco company CEOs and chief scientists on December 15, 1953, in New York City, the executives agreed that "the industry should not engage in a merely defensive campaign," according to minutes taken by Hill & Knowlton. Rather, "[t]hey feel they should sponsor a campaign which is positive in nature and entirely 'pro-cigarettes.'" The goal was "reassurance of the public" through "communication of ... the existence of weighty scientific views which hold there is no proof that cigarette smoking is a cause of lung cancer." The TIRC was formed soon thereafter as a public relations arm of the industry, as documents from within the tobacco companies and Hill & Knowlton make clear.[143] The ensuing public relations campaign was so extensive that, as early as 1955, the TIRC hired 35 Hill & Knowlton staff members to conduct the campaign.[144] The TIRC and Hill & Knowlton were located one floor apart in the Empire State Building.

---

[143] *See* Philip J. Hilts, "Cigarette Makers Debated the Risks They Denied," *New York Times*, June 16, 1994, p. A1 (underlining added). *E.g.*, an internal B&W memorandum written by chief counsel Addison Yeaman, marked "Strictly Private and Confidential," states that the TIRC "was conceived as a public relations gesture and ... it has functioned as a public relations operation." "Implications of Battelle Hippo I & II and the Griffith Filter," July 17, 1963. *See also* letter from Ernest Pepples (Vice President and General Counsel) to several fellow B&W officials, dated April 4, 1978, stating that CTR originally was organized as a public relations effort, and that it has since become a useful tool, as well, for identifying expert witnesses for use in litigation.

*See also* internal memorandum from B&W's Director of Public Relations to Marketing Department regarding the role of Hill & Knowlton, dated June 18, 1963: "This organization [Hill & Knowlton] serves as the Public Relations Counsel to The Tobacco Institute and the Tobacco Industry Research Committee. It is so intimately involved in the affairs of both that a proper separation of functions, as well as a strict definition of operations, is virtually impossible in this brief summary... The T.I.R.C. should not become involved in matters of public relations, but serve as the source of basic scientific data for use by the Tobacco Institute in its P.R. efforts." (Underlining added.)

[144] Hill & Knowlton quit the CTR account in the late-1960s, according to Loet Velmans, a former Hill & Knowlton chief executive, out of frustration that the tobacco industry "for legal reasons felt it couldn't admit to anything [on tobacco and health] because then it would be sued out of existence." *Quoted in* Alix M. Freeman and Laurie P. Cohen, "Smoke and Mirrors: How Cigarette Makers Keep Health Question 'Open' Year After Year," *Wall Street Journal*, February 11, 1993, p. A1.

The Hill & Knowlton documents that were obtained and made public this year in Congressional hearings and by the media[145] illustrate that the tobacco industry, with the CTR and Hill & Knowlton, launched an aggressive tobacco industry campaign to saturate the media environment with positive, reassuring messages about cigarette smoking. TIRC-generated studies seen as favorable to the industry were transformed into headlines across the United States, according to a "highly confidential" memorandum from Hill and Knowlton, Inc., to T.V. Hartnett, Chairman, Tobacco Industry Research Committee, providing a "Report of Activities through July 31, 1954."[146]

The TIRC also sought successfully to influence the content of news reports in major newspapers, magazines and television shows, including the *New York Times*, the *Washington Post* and the "Edward R. Murrow Television Show," according to an internal Hill and Knowlton, Inc. "Confidential Memorandum" on the subject of "Tobacco Industry Research Committee Information Activities, August and September, 1954."

CTR past-President Addison Yeaman, who also served as B&W's General Counsel, is quoted in a contemporaneous B&W memorandum as saying at a CTR meeting in 1975 that "CTR is [the] best and cheapest insurance the tobacco industry can buy and without it the

---

[145] *See, e.g.*, Philip J. Hilts, "Cigarette Makers Debated the Risks They Denied," *New York Times*, June 16, 1994, p. A1.

[146] *See also* an internal memorandum from the Tobacco Institute's Fred Panzer to the TI's President, Horace R. Kornegay, dated May 1, 1972, which provides an informative review of the tobacco industry's success in executing the TIRC/CTR-based public relations strategy. The Panzer memorandum states:

> "For nearly twenty years, this industry has employed a single strategy to defend itself on three major fronts -- litigation, politics, and public opinion.
>
> "While the strategy was brilliantly conceived and executed over the years helping us win important battles, it is only fair to say that it is not -- nor was it intended to be -- a vehicle for victory. On the contrary, it has always been a holding strategy, consisting of
>
> --creating doubt about the health charge without actually denying it
>
> --advocating the public's right to smoke, without actually urging them to take up the practice
>
> --encouraging objective scientific research as the only way to resolve the question of health hazard"

*Cipollone v. Liggett Group, Inc.* (D.C.N.J. 1988), Plaintiff's Exhibit P-1105.

Industry [sic] would have to invent CTR or would be dead."[147] Yeaman told the *Wall Street Journal* in 1993 that the passage of time had not altered his faith in this view."[148]

Recently obtained internal documents from the files of Brown and Williamson have exposed the fact that the research conducted through the CTR typically has been "nondirected" -- that is, not designed to learn the truth about the health effects of tobacco use -- in contrast with the research conducted in-house by the tobacco manufacturers and through carefully guarded outside contracts.[149] The internal documents also illustrate CTR's key role as a tool to defend against, not learn the truth about, newly identified health concerns involving tobacco. In an internal B&W missive[150] to several B&W officials regarding the CTR budget, dated April 4, 1978, Ernest Pepples writes:

---

[147] *Cipollone v. Liggett Group, Inc.* (D.C.N.J. 1988), Plaintiff's Exhibit 964; *quoted in* Alix M. Freeman and Laurie P. Cohen, "Smoke and Mirrors: How Cigarette Makers Keep Health Question 'Open' Year After Year," *Wall Street Journal*, February 11, 1993, p. A1.

[148] *See* Alix M. Freeman and Laurie P. Cohen, "Smoke and Mirrors: How Cigarette Makers Keep Health Question 'Open' Year After Year," *Wall Street Journal*, February 11, 1993, p. A1.

[149] *E.g.*, "Privileged" Memorandum from Mr. E. Pepples (Vice President and General Counsel) to Mr. C.I. McCarty (Chairman and Chief Operating Officer) discussing the value of the CTR to B&W, dated September 29, 1978 (underlining added). The memorandum states:

> "The point here is the value of having CTR doing work in a nondirected and independent fashion as contrasted with work either in-house or under B&W contract which, if it goes wrong, can become the smoking pistol in a lawsuit.
>
> "You may also want to refer to the note of February 11, 1977, to you and Dr. Hughes on this subject. A copy is attached to this memorandum. It is pointed out there that CTR provides a yardstick by which to measure and challenge the claims made against us on the basis of other research reports. Furthermore, the mere fact that CTR now has over two decades and $46 million worth of experience behind it shows that there is [underlining in original] a real controversy here and that the industry is in it for the long haul, at least until real answers are found to take the place of Hammond's statistical guesswork.
>
> "This history of staying power and steadiness encourages good scientists to respond favorably to the industry when we ask them to tackle tough long-term assignments. A corollary is that, without CTR, the government and the American Cancer Society would be the only game in town. In that situation, the strongminded scientists willing to deviate from the partyline of the Mary Laskers of this world would have no place to go. As long as there is a CTR that can -- and do -- have some place to bring their applications."

[150] It is not clear whether it is a letter or a memorandum. (Underlining added.)

"Originally, CTR was organized as a public relations effort. The industry told the world CTR should look at the diseases which were being associated with smoking. There was even a suggestion by our political spokesmen that if a harmful element turned up the industry would try to root it out. The research of CTR also discharged a legal responsibility. The manufacturer has a duty to know its product. The [CTR's] Scientific Advisory Board composed of highly reputable independent scientists constitute a place where the present state of the art is constantly being updated. Theoretically SAB is showing us the way in a highly complex field. There is another political need for research. Recently it has been suggested that CTR or industry research should enable us to give quick responses to new developments in the propaganda of the avid anti-smoking groups. For example, CTR or someone should be able to rebut the suggestion that smokers suffer from a peculiar disease, as widely alleged in the press some months ago. A properly designed research effort should encompass the need for instant response on subjects of public interest in the smoking and health controversy. Finally the industry research effort has included special projects designed to find scientists and medical doctors who might serve as industry witnesses in lawsuits or in a legislative forum. All of these matters and more should be considered in asking what kind of research the industry should do."

Moreover, a series of internal communications highlight the fact that the CTR and its member companies and their executives, devised sophisticated strategies for handling documents relating to smoking and health research in order to shield them under lawyer-client privilege from discovery by plaintiffs who sued the companies.[151]

At times, nonetheless, CTR officials were forced to kill, hide or weaken research findings considered unfavorable to the tobacco industry. "When CTR researchers found out that cigarettes were bad and it was better not to smoke, we didn't publicize that" in press releases, said Dorothea Cohen, who for 24 years until her retirement in 1989 wrote summaries of grantee research for the CTR's annual report. "The CTR is just a lobbying thing. We were lobbying for cigarettes."[152]

One instance of altered and squelched research findings that has come to light involved the work of Freddy Homburger, M.D., a certified toxicologist and research

---

[151] *See, e.g.*, three internal B&W memoranda from J. Kendrick Wells, III (Corporate Counsel), to Ernest Pepples (Vice President and General Counsel), dated June 15, 1979, November 9, 1979 (marked "Privileged"), and February 7, 1986.

[152] *Quoted in* Alix M. Freeman and Laurie P. Cohen, "Smoke and Mirrors: How Cigarette Makers Keep Health Question 'Open' Year After Year," *Wall Street Journal*, February 11, 1993, p. A1.

professor in pathology at Boston University. He received TIRC and then CTR funding from approximately 1955 until 1973.[153] Dr. Homburger and his colleagues at the Bio-Research Institute in Cambridge, Massachusetts, developed a sophisticated new test that enabled them to get Syrian hamsters to smoke like humans. In research conducted in the early-1970s, the scientists found that after exposure over a period of months to such smoking, more than 47 percent of the hamsters suffered cancer of the larynx and the upper respiratory tract. In similar tests using British cigarette brands, they obtained even higher cancer rates.

Dr. Homburger informed CTR officials of the results and showed them a manuscript designed for publication. Dr. Homburger testified that he was required to show the manuscript to the CTR because the CTR had changed the study from a grant to a contract "so they could control publication -- they were quite open about that."[154] CTR research director Robert Hockett instructed Dr. Homburger to alter the manuscript to falsely state that the hamsters experienced only pre-cancerous lesions. The CTR's chief counsel, Edwin Jacob, told Homburger, moreover, "You realize that if you publish it, you will never get a penny more from the Council for Tobacco Research."[155] By that time, Dr. Homburger and his colleagues had received approximately $800 thousand in CTR funding. Notably, according to Dr. Homburger, the study in question was "the first time we had come up with a neoplasm, cancer in the respiratory tract." But, he added, the CTR "didn't want us to call anything cancer."[156]

Dr. Homburger ultimately published the paper after softening its findings, although he strengthened them somewhat before the paper went to press by reinstating its references to *cancer*. In April 1974, he presented the paper at a meeting of the American Federation of Biological Societies. The CTR acted to make certain that the paper received no press attention. As described in a confidential memorandum from Leonard Zahn, public relations counsel for the CTR, Zahn secretly "killed" a press conference that had been scheduled for Dr. Homburger "without [Homburger's] knowing why or how," resulting in "[n]o press

---

153 *See* sworn deposition of Freddy Homburger, M.D., in *Cipollone v. Liggett Group, Inc.* (D.C.N.J., February 23, 1988). The details that follow were obtained from the Homburger deposition transcript and Alix M. Freeman and Laurie P. Cohen, "Smoke and Mirrors: How Cigarette Makers Keep Health Question 'Open' Year After Year," *Wall Street Journal*, February 11, 1993, p. A1.

154 *Quoted in* Alix M. Freeman and Laurie P. Cohen, "Smoke and Mirrors: How Cigarette Makers Keep Health Question 'Open' Year After Year," *Wall Street Journal*, February 11, 1993, p. A1.

155 *Id.*

156 *Id.* (underlining added).

mention of his report." Zahn's memorandum further refers to Zahn's success in this endeavor as involving "censorship of [Homburger's] findings, et cetera."[157]

Today, the CTR boasts that it "awards approximately $20 million a year in grants-in-aid to assist biomedical research, making it one of the largest private grant-giving organizations funding scientific research in the United States," according to the May 25, 1994, testimony of James F. Glenn, M.D., CTR's Chairman, President and CEO, before the House Subcommittee on Health and the Environment. According to Glenn, the CTR "is funded primarily by five tobacco manufacturers" and has awarded more than $220 million during its (and its predecessor's) existence.[158] Glenn also testified that "Council grantees are assured complete scientific freedom in conducting their studies."[159]

At least since the early 1950s, the tobacco companies have advertised widely that the scientific evidence that tobacco use causes disease is inconclusive, while promising to continue to seek the truth about smoking and health. Following are typical examples of these false advertisements:

> **1970**: Tobacco Institute editorial-style advertisement, "The question about smoking and health is still a question" (excerpt):
>
> > "[A] major portion of this scientific inquiry has been financed by the people who know the most about cigarettes and have a great desire to learn the truth ... the tobacco industry.
> >
> > "And the industry has committed itself to this task in the most objective and scientific way possible.
> >
> > . . .
> >
> > "Completely autonomous, CTR's research is directed by a board of ten scientists and physicians ... This board has full authority and responsibility for policy, development and direction of the research effort."[160]

---

[157] *See* deposition of Freddy Homburger, M.D., in *Cipollone v. Liggett Group, Inc.* (D.C.N.J., February 23, 1988).

[158] Committee on Energy and Commerce, House of Representatives, United States Congress, May 25, 1994.

[159] *Id.*

[160] *Haines v. Liggett Group, Inc.*, C.A. 84-678 (D.N.J. 1992), Plaintiff's Exhibit I, p. 3.

* * *

**1984**: R.J. Reynolds editorial-style advertisement in the *New York Times* (excerpt):

> "Studies which conclude that smoking causes disease have regularly ignored significant evidence to the contrary. These scientific findings come from research completely independent of the tobacco industry."[161]

Tobacco industry officials also have cited the CTR/TIRC and the results of the studies it has funded in testimony before Congress.[162] In 1972, for example, Tobacco Institute president Horace Kornegay testified as to the following:

> "Let me state at the outset that the cigarette industry is as vitally concerned or more so than any other group in determining whether cigarette smoking causes human disease, whether there is some ingredient as found in cigarette smoke that is shown to be responsible and if so what it is.
>
> "That is why the entire tobacco industry ... since 1954 has committed a total of $40 million for smoking and health research through grants to independent scientists and institutions.[163]

In fact, however, the tobacco companies, their lawyers and Hill & Knowlton have controlled the CTR and manipulated its affairs so as to suppress research which demonstrated the addictive or disease-causing effects of tobacco use. The CTR, by design, has publicized only that research which either obscures or has little or no bearing on the relationship between tobacco use and disease. Research indicating that cigarette smoking is addictive or otherwise harmful has been carefully screened by tobacco industry lawyers and assigned to the secret "Special Projects" unit, which hid it from the public and concealed it from discovery in tort litigation against the cigarette companies by what appears to be the unfounded assertion of the attorney-client privilege.

In addition, overtures to scientists usually have been handled by outside law firms, including Edwin Jacob's firm, Jacob, Medinger, Finnegan & Hart in New York City. Jacob,

---

161 *Haines v. Liggett Group, Inc.*, C.A. 84-678 (D.N.J. 1992), Plaintiff's Exhibit I, p. 5.

162 *See* Matthew Myers, "Choosing Sales Over Safety? What *Haines v. Liggett* Reveals," *World Smoking & Health*, Volume 17, Number 2, 1992.

163 Testimony of Horace Kornegay before the Consumer Subcommittee, Committee on Commerce, United States Senate, United States Congress.

Medinger served as counsel to the CTR and Edwin Jacob took a lead role at Special Projects. According to Roy Morse, a former RJR research director, "As soon as Mr. Jacob funded" a study, "it was a privileged relationship and it couldn't come into court" because it was protected by attorney-client privilege. "So they could do projects that they could bury if they chose."[164]

The Special Projects unit was founded at least as early as 1966, according to Hill & Knowlton documents. Internal discussions at B&W make clear that Special Projects was designed, moreover, to identify contrarian scientists and medical doctors who could assist in tobacco industry litigation and legislative efforts.[165]

The Kansas City, Missouri, law firm of Shook, Hardy & Bacon has for years been intimately involved with the CTR and the control and perpetuation of the Special Projects division. In an opinion in the case of *Haines v. Liggett Group, Inc.*, C.A. 84-678 (D.N.J. 1992), Federal District Judge H. Lee Sarokin suggested that the tobacco industry, with the help of Shook, Hardy counsel, had withheld tobacco-related health studies from public and legal scrutiny, depending on the potential impact of such studies on liability suits. "If that is true," he wrote, "then the 'use' of selected information generated for 'litigation' purposes ... in and of itself establishes fraudulent intent."[166] The Sarokin opinion stated, further, that "[t]he evidence presented by plaintiff supports a finding that the industry research which might indict smoking as a cause of illness was diverted to secret research projects and that the publicized efforts were primarily directed at finding causes other than smoking for the illnesses being attributed to it."

Judge Sarokin's analysis is supported by the contents of documents such as the following one, a November 6, 1978, memorandum from Shook, Hardy law firm partner Donald Hoel regarding a CTR meeting of October 26, 1978, in Lexington, Kentucky:

> "After some further discussion, Janet and Arnie Henson expressed American Tobacco Company's view that CTR must be maintained but needed new people. It must be more politically oriented. They felt that CTR must look at what is happening and

---

[164] *Quoted in* Alix M. Freeman and Laurie P. Cohen, "Smoke and Mirrors: How Cigarette Makers Keep Health Question 'Open' Year After Year," *Wall Street Journal*, February 11, 1993, p. A1.

[165] In an internal B&W missive -- it is not clear whether it is a letter or a memorandum -- to several B&W officials regarding the CTR budget, dated April 4, 1978, Ernest Pepples states: "Finally the industry research effort has included special projects designed to find scientists and medical doctors who might serve as industry witnesses in lawsuits or in a legislative forum." (Underlining added.)

[166] (Underlining added.) *See also* Linda Himelstein and Richard A. Melcher, "Did Big Tobacco's Barrister Set Up a Smokescreen?, *Business Week*, September 5, 1994, pp. 68-70.

what others are doing to see what questions can be raised, etc. The approach must be steady, slow and conservative. They must find skeptical scientists ... The staff at CTR also needed to be more tobacco oriented with a skeptical view." (Underlining added.)

In another internal memorandum, the research director of Lorillard, Inc., describes CTR-funded research as having "been selected ... for various purposes, such as public relations, political relations, position for litigation etc."[167]

One example of the sort of "public relations" for which CTR-funded research is used is illustrated by a letter dated January 11, 1990, from R.J. Reynolds Tobacco Company to an elementary school principal in response to letters received from the school's fifth grade students.[168] After denying, in response to concerns raised by the children, that RJR allows its brand names to be used on toys or candy cigarettes, the letter states:

> "The tobacco industry is also concerned about the charges being made that smoking is responsible for so many serious diseases. Long before the present criticism began, the tobacco industry, in a sincere attempt to determine what harmful effects, if any, smoking might have on human health, established the Council for Tobacco Research--USA. The industry has also supported research grants directed by the American Medical Association. Over the years the tobacco industry has given in excess of $162 million to independent research on the controversies surrounding smoking -- more than all the voluntary health associations combined.
>
> "Despite all the research going on, the simple and unfortunate fact is that scientists do not know the cause or causes of the chronic diseases reported to be associated with smoking. The answers to the many unanswered controversies surrounding smoking -- and the fundamental causes of the diseases often statistically associated with smoking -- we believe can only be determined through more scientific research. Our company intends, therefore, to continue to support such research in a continuing search for answers.
>
> "We would appreciate your passing this information along to your students. You may also be interested in the enclosed publications presenting the position of our company and the tobacco industry on the issue of youth smoking."

* * *

---

167 Myron Levin, "Favored Scientists Got Tobacco Firm Funding," *Los Angeles Times*, May 26, 1994, p. A1.

168 Letter from Jo F. Sprach, Manager, Public Information, Public Relations Department, R.J. Reynolds Tobacco Company, to Principal, Willow Ridge School, Amherst, New York, January 11, 1990 (underlining added).

Following are selected examples of acts that may be found to violate 15 U.S.C. §52(a)(2). Each of them makes material assertions which are flatly contradicted both by the medical evidence and the tobacco industry's own admissions, as discussed supra.

(a) RJR Advertisement Published in Numerous Newspapers Across the United States in 1994:

"WE DO NOT 'SPIKE' OUR CIGARETTES WITH NICOTINE.
"James W. Johnston, Chairman, R.J. Reynolds
Tobacco Company

"Recently a TV show accused tobacco companies of somehow 'spiking' the level of nicotine in our products to 'addict' smokers.

"As the Chairman of a tobacco company and a smoker, I want America's 45 million smokers to know that this is sheer nonsense. At R.J. Reynolds we do not increase the level of nicotine in any of our products in order to 'addict' smokers.

"Instead of increasing the nicotine levels in our products, we have in fact worked hard to decrease 'tar' and nicotine. Much of the recent controversy has focused on our use of various techniques that help us reduce the 'tar' (and consequently the nicotine) yields of our products.

"We could stop using those techniques. But the consequences of doing that would be a return to the 1940s, when the average cigarette yielded 40 milligrams of 'tar' and 2.8 milligrams of nicotine -- more than three times what the average is today. According to the 1989 Surgeon General's Report, since 1957 'tar' and nicotine have been reduced by over 60%.

"Please rest assured that there is no truth whatsoever in these accusations. They represent yet another tactic in the anti-tobacco lobby's commitment to achieve what amounts to backdoor prohibition.

"We are committed to bringing the best quality products that we can make to our customers and we will continue to do so. If you have any questions you'd like to ask, please don't hesitate to write to me (c/o R.J. Reynolds Tobacco Company, PO Box 2959, Winston-Salem, NC 27102) or call our toll-free information number at 1-800-366-8441.

"TOGETHER, WE CAN WORK IT OUT"

(Underlining in original.)

Discussion of RJR Advertisement

This advertisement from RJR is false and misleading in several critical respects, in part because of its bald omission of material facts. Earlier sections in this Prosecution Memorandum[169] document the fact that RJR knows, but clearly fails to admit or disclose in this advertisement, that:

* nicotine is highly addictive;

* RJR extracts, adjusts and uses nicotine to fortify the reconstituted tobacco implanted in RJR's cigarettes;

* in contrast to RJR's manufacturing practices of the 1940s, RJR now applies sophisticated technology that enables RJR to exercise absolute discretion and control over the level and even the presence of nicotine in RJR's products;

* "[m]uch of the recent controversy" to which the RJR advertisement refers has focused not, as the advertisement claims, "on [RJR's] use of various techniques that help[s RJR] reduce the 'tar' (and consequently the nicotine) yields of [RJR's] products," but has focused chiefly on RJR's use of its techniques to increase nicotine levels in its reconstituted tobacco and on RJR's manipulation of tobacco to increase nicotine levels in lower-tar tobacco products; and

* the tobacco from the five leading cigarette brands (including cigarettes manufactured by RJR) in 1952 contained less, not more, nicotine (an average of 1.58 - 1.82 percent nicotine on a dry weight basis) than the 1.5 - 2.5 percent nicotine reported for finished cigarettes by James Johnston in a February 28, 1994, letter to the FDA.[170] In fact, while the advertisement states that 2.8 milligrams of nicotine is "three times what the average is today" (underlining in original), which entails that

---

[169] *See also* Clifford E. Douglas, *Special Report: The Tobacco Industry's Use of Nicotine as a Drug: What Do the Recent Revelations Mean for Tobacco Control?* (American Council on Science and Health: New York, NY, May 1994); Testimony of John Slade, M.D., before the Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, March 25, 1994; Testimony of David Kessler, M.D., before the Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, March 25, 1994.

[170] Letter from James W. Johnston to David A. Kessler, M.D., February 28, 1994. *See* testimony of John Slade, M.D., before the Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, March 25, 1994.

the average today must be less than one milligram, Johnston's own letter written during the same period as RJR published this advertisement states, as noted, that the average is now no less than 1.5 milligrams and as high as 2.5 milligrams. This inconsistency is both material and significant as to its inevitable impact on the tobacco use and, thereby, the drug addiction and overall health of millions of American consumers.[171]

Furthermore, Johnston and RJR compare apples with oranges. Comparing average nicotine yields from the 1940s with those today, as the advertisement does, is a highly misleading exercise - one that is guaranteed to confuse and deceive the average consumer. Cigarettes in the 1940s bore little resemblance to cigarettes today. For example, they had no vent holes to dilute the smoke reaching the test machines (but which are often ineffective when smoked by human consumers). They did not contain the thousands of additives used in modern-day cigarettes. They also did not contain the substances that tobacco manufacturers now add to raise the pH of the smoke in order to free up more nicotine for absorption into the user's bloodstream.

(b) Walker Merryman (Vice President, Tobacco Institute) to CNN:[172]

*"There isn't any manipulation of nicotine in the cigarettes."*

(c) Walker Merryman (Vice President, Tobacco Institute) to *New York Times*:[173]

The Tobacco Institute objected to the finding of a study from the National Bureau of Economic Research that smoking is addictive, citing statistics indicating that 95 percent of those who stop smoking do so on their own.

---

171 *See, generally*, U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control, Center for Chronic Disease Prevention and Health Promotion, Office on Smoking and Health, *Reducing the Health Consequences of Smoking: 25 Years of Progress: A Report of the Surgeon General*, 1989.

172 CNN, "The World Today," April 13, 1994 (emphasis added).

173 *Quoted in* Anthony Ramirez, "Lower Cigarette Sales Linked to Tax Rise," *New York Times*, June 12, 1990, p. D1 (emphasis added).

Merryman said: *"These figures and common sense contradict any claim that cigarette smoking is addictive."*

Discussion of False Representations (b) and (c)

*See*, *inter alia*, Section V(A)(1)(a), *supra*, including Discussions regarding testimony of James Johnston of RJR, which is, with other major cigarette companies, represented by the Tobacco Institute.

(d) Brennan Dawson (Vice President, Tobacco Institute) to *USA Today*:[174]

Manufacturers of cigarettes *are "absolutely, categorically not" adding nicotine* to tobacco.

(e) Brennan Dawson (Vice President, Tobacco Institute) on "Face the Nation":[175]

"The industry does take the position that ... *not only do they not add nicotine, but they don't manipulate nicotine.* So Congress has been told formally by every cigarette manufacturer in the United States that this claim is without foundation."

Discussion of False Representations (d) and (e)

*See*, *inter alia*, Section V(A)(1)(a), *supra*, including, *e.g.*, Discussions regarding testimony of James Johnston of RJR, which is, with other major cigarette companies, represented by the Tobacco Institute.

---

174 *Quoted in* Anita Manning, "Smoking Under Fire from the FDA and Others," *USA Today*, p. 6D, March 29, 1994 (emphasis added).

175 March 27, 1994.

(f) Press Release from U.S. Tobacco Company Responding to *Wall Street Journal* Article:[176]

In a press release responding to the *Wall Street Journal's* investigative article on UST discussed earlier in this Prosecution Memorandum, UST falsely denies the *Journal's* findings and the nature of the company's conduct. The highly misleading press release states, *inter alia*:

> "With respect to the article's central thesis that the company somehow manipulates 'the amount of nicotine users absorb,' the fact is the 1988 Surgeon General's report concludes to the contrary that because of the 'complexity' of smokeless tobacco use, 'the dose of nicotine cannot be predicted from the nicotine content of the tobacco or its absorption characteristics.'
>
> . . .
>
> "The suggestion that there is a so called 'graduation strategy' enticing consumers to begin using low nicotine smokeless tobacco products and manipulating them to products with higher levels of nicotine is untrue - the oral tobacco market does not work that way. The company's various product lines of smokeless tobacco are based on an appreciation that we cannot make any part of the public like and use any one of our products if it does not respond to their taste and form preferences."

Discussion of False Representation (f)

*See* Discussions, *supra*, of Joseph Taddeo's alleged perjury, at Section V(A)(1)(a).

(g) Statements Made to the Press by Healthy Buildings International at the (Paid) Behest of the Tobacco Institute and Center for Indoor Air Research

The Tobacco Institute paid Healthy Buildings International ("HBI") officials to pose as independent experts on environmental tobacco smoke and indoor air

---

176 U.S. Tobacco Company Press Release, Contact: Alan Kaiser, October 26, 1994. *See* Alix M. Freedman, "Juiced Up: How a Tobacco Giant Doctors Snuff Brands to Boost Their 'Kick,'" *Wall Street Journal*, October 26, 1994, p. A1.

issues. In this arrangement, HBI officials appeared on talk shows and testified in legislatures to argue, purportedly from a "scientific" perspective, that environmental tobacco smoke is not a health hazard and that smoking should not be restricted.[177] Documents obtained by *USA Today* indicate that HBI has consulted for the Tobacco Institute since at least 1985. The documents indicate, further, that HBI and its president, Gray Robertson, falsified data in order to justify HBI's public pronouncements. At the time that HBI is believed to have falsified its data, the tobacco industry-funded Center for Indoor Air Research was paying HBI $118,415 to measure tobacco smoke in "typical" offices. HBI's attorney, Jeffrey Howard, has denied the allegations of falsification.[178]

b. By the United States Mails.

The evidence establishes that tobacco companies, by disseminating or causing to be disseminated false advertisements through the United States mails, sought directly or indirectly to induce individual members of the public to purchase substances known by such companies to be drugs or devices in violation of 15 U.S.C. §52(a)(1).[179]

An example of such activity, described above, is a letter dated January 11, 1990, from R.J. Reynolds Tobacco Company to an elementary school principal in response to letters received from the school's fifth grade students.[180] After denying, in response to concerns raised by the children, that RJR allows its brand names to be used on toys or candy cigarettes, the letter states:

> "The tobacco industry is also concerned about the charges being made that smoking is responsible for so many serious diseases. Long before the present criticism began, the tobacco industry, in a sincere attempt to determine what harmful effects, if any, smoking might have on human health, established the Council for Tobacco Research--USA. The industry has also supported research grants directed by the American

---

[177] Doug Levy, "Struggling to Clear the Air on Tobacco," *USA Today*, October 12, 1994, p. 1D.

[178] Doug Levy, "Smoking Data Tampered With, Researchers Say," *USA Today*, November 2, 1994, p. 1D. *See also* Myron Levin, "Who's Behind the Building Doctor," *The Nation*, August 9/16, 1993, p. 168.

[179] *See, generally*, multiple sections throughout this Prosecution Memorandum regarding the addictive nature of nicotine and its use as a drug by tobacco manufacturers.

[180] Letter from Jo F. Sprach, Manager, Public Information, Public Relations Department, R.J. Reynolds Tobacco Company, to Principal, Willow Ridge School, Amherst, New York, January 11, 1990 (underlining added).

Medical Association. Over the years the tobacco industry has given in excess of $162 million to independent research on the controversies surrounding smoking -- more than all the voluntary health associations combined.

"Despite all the research going on, the simple and unfortunate fact is that scientists do not know the cause or causes of the chronic diseases reported to be associated with smoking. The answers to the many unanswered controversies surrounding smoking -- and the fundamental causes of the diseases often statistically associated with smoking -- we believe can only be determined through more scientific research. Our company intends, therefore, to continue to support such research in a continuing search for answers.

"We would appreciate your passing this information along to your students. You may also be interested in the enclosed publications presenting the position of our company and the tobacco industry on the issue of youth smoking."

Tobacco manufacturers in the United States spend more than $5 billion a year on advertising and promotion, according to the Federal Trade Commission. Tobacco companies spend millions of dollars on promoting, via the United States mails, the sale of tobacco products. This Prosecution Memorandum provides extensive evidence of tobacco companies' knowing and deliberate use and manipulation of nicotine as a drug in the manufacture of their products and the hiding of critical health-related information through apparent acts of perjury, withholding of information and the activities of such industry public relations organs as the Council for Tobacco Research, the Tobacco Institute and the Smokeless Tobacco Council. Based on information and belief, the companies' extensive advertising of these products through the mails appears, therefore, in some cases to constitute false advertising within the meaning of 15 U.S.C. §52(a)(1). Organizations, such as the trade associations and consultants named above, that have aided and abetted such false advertising may also be chargeable for such violations.

## 2. MAIL FRAUD

It is apparent that the tobacco companies identified in this Prosecution Memorandum have engaged in schemes to defraud members of the public, and have used the U.S. mails for the purpose of executing or attempting to execute such schemes, in violation of 18 U.S.C. §1341. Each separate use of the mails to further these schemes to defraud constitutes a separate offense. The tobacco companies have misrepresented material facts, and these misrepresentations have resulted in the passage of money to the companies. While the schemes or artifices to defraud need not have been fraudulent on their face or have involved affirmative representations, they must have involved, as they in fact did, fraudulent misrepresentations and omissions reasonably calculated to deceive persons of ordinary prudence and comprehension. Moreover, the scope of fraud under the mail and wire fraud

statutes is broader than common law fraud, and no misrepresentation of fact must be shown in order to establish a scheme to defraud.

The validity of a mail fraud conviction does not hinge on a showing of actual loss by the intended victim. It is enough that the defendant knowingly devised a scheme to defraud and caused use of the mails in furtherance of the scheme. The government need not prove actual injury in a prosecution for mail fraud. *United States v. Nelson*, 988 F.2d 798 (8th Cir. 1993), *cert. denied* 126 L.Ed.2d 250, 114 S.Ct. 302. It is not necessary, therefore, to prove that particular consumers were injured by tobacco products or duped into spending money to buy tobacco products. While contemplation of harm or injury must be shown to establish mail fraud, it may be inferred when the scheme has such an effect as a necessary result of carrying it out. *See United States v. London*, 753 F.2d 202 (2d Cir. 1985). Thus, if millions of consumers have been harmed by fraudulent concealment of the adverse health consequences of tobacco use, the intent of the scheme may be inferred, since the harm to the consumers was the necessary result of the concealment.

A reckless disregard for truth or falsity also has been held sufficient to sustain a mail fraud conviction. *United States v. Schaflander*, 719 F.2d 1024 (9th Cir. 1983), *cert. denied* 467 U.S. 1216, 104 S.Ct. 2660. While the government must prove that the defendant had the specific intent to defraud, the showing of an evil motive on the part of the defendant is not necessary, and intent may be inferred through circumstantial evidence. *United States v. Savran*, 755 F.Supp. 1165 (E.D.N.Y. 1991).

Following are documented instances of specific conduct constituting mail fraud:

i. *The Council for Tobacco Research Scheme:*[181] The creation and role of the Council for Tobacco Research ("CTR") bears a striking resemblance to the scheme considered in *United States v. Biesiadecki*, 933 F.2d 539, 541-542 (7th Cir. 1991). In *Biesiadecki*, the court found a scheme to defraud where the defendant omitted information so as to cause people of ordinary intelligence to make uninformed decisions. *See also Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406 (3d Cir. 1991), *cert. denied* 501 U.S. 1222, 111 S.Ct. 2839. The defendant in *Biesiadecki* had participated in a scheme to defraud when he enticed people to participate in his investment program by not telling investors of the money that other customers had lost and by misrepresenting customer successes. *Id.* at 543. The defendant's scheme was designed to entice customers by fraudulently minimizing the risk, through the misrepresentation of some figures and the omission of others.

[181] *See also* discussion of Council for Tobacco Research, *supra*, at Section C(1)(a)(2)(a).

Likewise, the CTR was formed (originally as the Tobacco Industry Research Committee) not as a legitimate entity to fund research on tobacco and health, but rather as a public relations front whose primary purpose was to protect and increase the profits of tobacco companies. Like the defendant in *Biesiadecki*, the CTR, on behalf of the tobacco companies that fund it, has been and continues to be an integral component in an ongoing scheme designed to entice customers by fraudulently minimizing the risk of tobacco use, through the misrepresentation of some health data and the omission of other health data.

Recently obtained internal documents from the files of Brown and Williamson have exposed the fact that the research conducted through the CTR typically has been "nondirected" -- that is, not designed to learn the truth about the health effects of tobacco use -- in contrast with the research conducted in-house by the tobacco manufacturers and through carefully guarded outside contracts.[182] The internal documents also illustrate CTR's key role as a tool to defend against, not learn the truth about, newly identified health concerns involving tobacco. In an

---

[182] *E.g.*, "Privileged" Memorandum from Mr. E. Pepples (Vice President and General Counsel) to Mr. C.I. McCarty (Chairman and Chief Operating Officer) discussing the value of the CTR to B&W, dated September 29, 1978. The memorandum states:

> "The point here is the value of having CTR doing work in a nondirected and independent fashion as contrasted with work either in-house or under B&W contract which, if it goes wrong, can become the smoking pistol in a lawsuit.
>
> "You may also want to refer to the note of February 11, 1977, to you and Dr. Hughes on this subject. A copy is attached to this memorandum. It is pointed out there that CTR provides a yardstick by which to measure and challenge the claims made against us on the basis of other research reports. Furthermore, the mere fact that CTR now has over two decades and $46 million worth of experience behind it shows that there is a real controversy here and that the industry is in it for the long haul, at least until real answers are found to take the place of Hammond's statistical guesswork.
>
> "This history of staying power and steadiness encourages good scientists to respond favorably to the industry when we ask them to tackle tough long-term assignments. A corollary is that, without CTR, the government and the American Cancer Society would be the only game in town. In that situation, the strongminded scientists willing to deviate from the partyline of the Mary Laskers of this world would have no place to go. As long as there is a CTR that can -- and do -- have some place to bring their applications."

internal B&W missive[183] to several B&W officials regarding the CTR budget, dated April 4, 1978, Ernest Pepples writes:

> "Originally, CTR was organized as a public relations effort. The industry told the world CTR should look at the diseases which were being associated with smoking. There was even a suggestion by our political spokesmen that if a harmful element turned up the industry would try to root it out. The research of CTR also discharged a legal responsibility. The manufacturer has a duty to know its product. The [CTR's] Scientific Advisory Board composed of highly reputable independent scientists constitute a place where the present state of the art is constantly being updated. Theoretically SAB is showing us the way in a highly complex field. There is another political need for research. Recently it has been suggested that CTR or industry research should enable us to give quick responses to new developments in the propaganda of the avid anti-smoking groups. For example, CTR or someone should be able to rebut the suggestion that smokers suffer from a peculiar disease, as widely alleged in the press some months ago. A properly designed research effort should encompass the need for instant response on subjects of public interest in the smoking and health controversy. Finally the industry research effort has included special projects designed to find scientists and medical doctors who might serve as industry witnesses in lawsuits or in a legislative forum. All of these matters and more should be considered in asking what kind of research the industry should do."

Based on information and belief, numerous letters and other documents have been sent via the United States mails in furtherance of the CTR public relations fraud. Among the letters sent via the U.S. mails that have been identified recently as a result of the disclosure of internal tobacco company documents are the following:

a) Two letters from the CTR to five tobacco company attorneys outlining the proposed CTR budget for 1978 of the CTR's Literature Retrieval Division, the division's budget for 1977, the estimated expenses for 1977, the procedure for billing the companies according to their

[183] It is not clear whether it is a letter or a memorandum. (Underlining added.)

market share percentages, and the relationship between the five companies and the CTR.[184]

b) Letter and attached memorandum from attorney Edwin J. Jacob to Ernest Pepples "setting forth the current status of CTR's consideration of the proposals made by Microbiological Associates for the year beginning July 1, 1978.[185]

c) Three letters exchanged among the RJR, B&W and Lorillard tobacco companies concerning the funding of CTR grantees and the companies' interest in obtaining tax credits for their contributions.[186]

ii. *The Scheme to Mislead and Withhold Information from the U.S. Surgeon General*: In 1963, members of the tobacco industry were fully aware that the U.S. Surgeon General was preparing the first Surgeon General's report on smoking and health, which was released on January 11, 1964. Tobacco industry officials were consulted by, and undertook to submit tobacco and health-related information to, the Surgeon General's committee during the process of producing the report. At the outset, members of the tobacco industry recommended and unofficially approved the naming of experts to the Surgeon General's committee. Tobacco company officials kept in regular contact with the committee and sought closely to monitor its progress.

It was during this period that B&W general counsel Addison Yeaman and senior British-American Tobacco Company official A.D. McCormick <u>exchanged six letters and telexes</u>, dated between June 28, 1963, and August 8, 1963, in which they discussed whether to submit

[184] Letter from Addison Yeaman (President of CTR) to Messrs. Thomas F. Ahrensfeld, Joseph H. Greer, Arnold Henson, Ernest Pepples and H.C. Roemer, dated December 6, 1977; letter from W. Hoyt to American Brands, Inc., Brown & Williamson Tobacco Corp., Liggett & Myers Incorporated, Philip Morris, Incorporated and R.J. Reynolds Tobacco Company, dated December 28, 1970.

[185] Letter from Edwin J. Jacob (Jacob and Medinger) to Ernest Pepples, Esq. (Vice President and General Counsel, B&W), dated June 22, 1978.

[186] Two letters from Samuel B. Witt, III (Vice President, General Counsel and Secretary, RJR) to Ernest Pepples (B&W), dated February 7, 1983; Letter from Ernest Pepples (B&W) to Arthur Stevens (Senior Vice President & General Counsel, Lorillard), dated February 25, 1983.

to the U.S. Surgeon General their research findings on the addictive and other harmful effects of nicotine and the disease-causing properties of cigarettes. In the course of this dialogue, the two senior officials explicitly agreed to withhold this information, which they then did. According to the *New York Times*:

"The [Battelle] report found that there were some beneficial effects of nicotine, including a tranquilizer-like drug effect and an appetite-suppressing effect. But it also showed that it might cause heart disease.

"Mr. Yeaman wrote to Anthony D. McCormick, a senior executive of the parent company in London, that the company would have to decide what to disclose to the American Surgeon General, Dr. Luther Terry, who was about to issue the first report by a Surgeon General condemning cigarettes as a health hazard.

"Mr. Yeaman referred to the Battelle 'nicotine report' and to a new filter created by a company scientist, R.B. Griffith, which could filter out some hazardous substances in cigarettes.

"Mr. McCormick cabled back on July 3, 1963, that 'it is too early to submit Battelle reports to Surgeon General's Committee.'

"Mr. Yeaman cabled back 'submission Battelle or Griffith developments to Surgeon General undesirable and we agree continuance of Battelle work useful but disturbed at its implications re cardiovascular disorders.' He said the new research should cause a 'reassessment fundamental policy re health.'

"Two weeks later, as part of the corporate debate about how to handle the health hazards of cigarettes while continuing to keep the company free of the possibility of lawsuits by smokers, Mr. Yeaman wrote a 2,000-word analysis of whether the company should acknowledge the hazards of cigarettes and accept the risks of litigation, or say nothing, but give up the ability to talk about its research in public and give up credible standing to analyze and criticize the Surgeon General's report.

"Mr. Yeaman said in the report, labeled 'strictly private

and confidential' and dated July 17, 1963, that the new information about the tranquilizing effects of nicotine and its positive effects on weight loss 'delivers to the industry what may well be the first effective instrument of propaganda counter to that of the American Cancer Society, et al., damning cigarettes as having a causal relationship to cancer of the lung.'

"He said the positive nicotine findings and the Griffith filter were 'a bridge over which the industry could pass from its present terrain of defense to a field for effective counter-attack.' The Griffith filter could selectively take hazardous substances out of cigarette smoke, but could leave the good taste and the nicotine. This device would provide the opening politically, and the positive uses of nicotine would be their 'weapon.'

"He noted that company research had shown that nicotine has a tranquilizing, or anxiety-reducing effect, and helps control body weight, and 'moreover, nicotine is addictive.'

"'We are, then, in the business of selling nicotine, an addictive drug effective in the release of stress mechanisms,' he wrote.

"The research found that despite the beneficial effects of nicotine, cigarettes 'cause, or predispose, lung cancer.'

"'They contribute to certain cardiovascular disorders,' the research found. 'They may well be truly causative in emphysema, etc. etc.'"[187]

iii. *UST's Scheme to Addict Young Consumers to Smokeless Tobacco Products Through a "Graduation" Strategy*: As discussed at Section A(1)(e), regarding the alleged perjury of UST's Joseph Taddeo, UST has for a number of years executed a "graduation" strategy, whereby it actively recruits new young users to consume lower-nicotine "starter" brands of smokeless tobacco and then endeavors to "graduate" them upwards to more addictive, higher-nicotine brands. Taddeo testified falsely, it appears, that UST does not do so, in violation of 18 U.S.C. §1621. UST has, in fact, used the mails in support of its apparently

---

[187] Philip J. Hilts, "Tobacco Company Was Silent on Hazards," *New York Times*, May 7, 1994, p. A1.

fraudulent efforts to carry out its graduation strategy. Thus, *e.g.*, UST Executive Vice President Jack Africk said the following in an interview published in the Spring 1985 edition of "Up to Snuff," a UST newsletter[188] which was mailed to members of UST's sales force:

> "As far as our strategy for entering a new market is concerned - for each market there is a set of criteria which have been established, and must be met. *Skoal Bandits is the introductory product, and then we look towards establishing a normal graduation process*.

(Underlining added.) The *Wall Street Journal* explains further:

> "U.S. Tobacco denies that it has a 'graduation process' to ratchet users up the line to stronger brands, saying that 'there is no set pattern of brand switching.' However, the company itself used the term internally, and publicly alluded to it in the mid-1980s. 'They talked about graduation all the time - in sales meetings, memos and manuals for the college program. It was a mantra,' says Ken Carlsen, a division manger in U.S. Tobacco's sales department, who worked at the company from 1979 until 1986.
>
> "'For people who haven't ever tasted [snuff], you'd of course begin them on a product that had a little tobacco taste, but wouldn't turn them off,' explains Barry Nova, U.S. Tobacco's president until 1984. He adds: 'The graduation is to a more tobacco-y product ... to a stronger product.'"[189]

Recommendation for Further Investigation

It is clear, given the enormity and duration of the business conducted by the named tobacco companies and what might be seen as a pattern and practice of criminal conduct committed by these companies, as documented by this Prosecution Memorandum, that the these companies, their executives, their agents and other involved individuals have used the mails in furtherance of

---

[188] Appended to Testimony of Gregory N. Connolly, D.M.D., M.P.H., before Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, United States Congress, November 29, 1994.

[189] Alix M. Freedman, "Juiced Up: How a Tobacco Giant Doctors Snuff Brands to Boost Their 'Kick,'" *Wall Street Journal*, October 26, 1994, p. A1 (underlining added).

such criminal acts. *See, generally*, this Prosecution Memorandum, *supra*. The Department of Justice is asked, therefore, as part of the requested criminal investigation, to endeavor to identify such activity on the part of the companies and individuals named here.

3. FRAUD BY WIRE, RADIO OR TELEVISION

The tobacco companies engaged in a scheme to defraud members of the public by transmitting by means of wire, radio and television communication in interstate commerce misrepresentations of material fact, resulting in passage of money to these same companies in response to their misrepresentations in violation of the wire fraud statute, 18 U.S.C. §1343.

An example of conduct underlying such fraudulent conduct is as follows:

* An internal B&W paper, dated October 3, 1967, from president E.P. Finch, outlined answers to be given publicly regarding smoking-related health issues. The paper proposes responding to the assertion that "Nicotine in cigarette smoke was shown by the 1964 Surgeon General's Report to be harmful" by quoting the same report to the effect that "'Nicotine is not usually considered a carcinogen (cancer-producing substance) on the basis of animal experiments.' [sic] and that *it 'probably does not represent an important health hazard.'*" (Emphasis added.)

DISCUSSION

In contrast with the public stance recommended in the Finch paper, a British-American Tobacco/B&W research conference held on Hilton Head Island, South Carolina, in 1968 made clear B&W's awareness that nicotine had debilitating effects on the circulatory system in connection with the company's search for a substitute substance that would have the pharmacological impact of nicotine without the other harmful effects. It stated:

> "In view of its pre-eminent importance, the pharmacology of nicotine should continue to be kept under review and attention paid to the possible discovery of other substances possessing the desired features of brain stimulation and stress-relief without direct effects on the circulatory system. The possibility that nicotine and other substances together may exert effects larger than either separately (synergism)

> should be studied and if necessary the attention of Marketing Departments should be drawn to these possibilities."[190]

*See also* multiple discussions of B&W's knowledge of nicotine's addictiveness and the company's manipulation of nicotine, *supra*.

Recommendation for Further Investigation

The foregoing serves as but one small example of potentially unlawful conduct, or, in the alternative, conduct that served to encourage unlawful conduct. It is clear, given the enormity and duration of the business conducted by the named tobacco companies and their representatives, as well as the alleged criminal conduct documented throughout this Prosecution Memorandum, that the probability is high that these companies and individuals may have defrauded the public by the use of wire, radio and television communication. The Department of Justice is asked, therefore, as part of the requested criminal investigation, to endeavor to identify such activity on the part of the companies and individuals named here.

---

[190] *See* Philip J. Hilts, "Tobacco Company Was Silent on Hazards," *New York Times*, May 7, 1994, p. A1, reporting that B&W explicitly decided to withhold from the U.S. Surgeon General significant research findings from Battelle Laboratories of Geneva, which had been hired to do health-related research on tobacco.

D. OTHER POTENTIAL VIOLATIONS OF FEDERAL CRIMINAL LAWS

1. CRIMINAL CONSPIRACY

The evidence indicates that two or more tobacco company representatives, acting in their official capacities, may have violated 18 U.S.C. §371 by conspiring to violate multiple laws of the United States (*see supra*) and to defraud the United States, the Food and Drug Administration and the U.S. Surgeon General (*see supra*), since one or more of such persons committed acts to effect the object of said conspiracy.

This Prosecution Memorandum does not specifically address the issue of criminal conspiracy, leaving it to the discretion of the Department of Justice. The Department of Justice may choose, upon examination of the evidence documented *supra*, to investigate the applicability of 18 U.S.C. §371 to the cumulative conduct of the named corporations, associations and individuals.

2. "RICO" VIOLATIONS

The evidence indicates that tobacco company representatives, acting in their official capacities, may also have violated the prohibitions set forth at 18 U.S.C. §1962 (Racketeer Influenced and Corrupt Organizations, or "RICO") by participating in a commercial enterprise or an enterprise affecting commerce through a pattern of specific criminal racketeering activity. Tobacco company representatives appear repeatedly to have committed acts prohibited by Federal law, including 18 U.S.C. §1341 and 18 U.S.C. §1342, constituting predicate acts of mail and wire fraud, respectively (*see supra*), within the meaning of 18 U.S.C. §1961(1). Many of these acts were related in their common objective, or were consistently repeated, and are capable of further repetition. This conduct, therefore, may have constituted a pattern of racketeering activity within the meaning of 18 U.S.C. §1961(5).

The Prosecution Memorandum does not specifically address the applicability of RICO to the facts documented *supra*. As with the issue of criminal conspiracy, it is appropriate for the Department of Justice, in its discretion, to determine upon consideration of the foregoing whether to investigate the applicability of 18 U.S.C. §371 to the cumulative conduct of the named corporations, associations and individuals.

3. FALSE CLAIMS AND UNPAID TAXES

In a letter dated February 7, 1983, to B&W's General Counsel Ernest Pepples, Samuel B. Witt III, RJR's Vice President, General Counsel and Secretary, suggests that the tobacco companies who fund the Council for Tobacco Research ("CTR") (*see* multiple discussions, *supra*) might be able "to take advantage of a new tax credit for basic research expenditures." Witt goes on to explain that RJR expects to take advantage of the tax credit

by "paying our share of the grant to the grantee directly," adding that RJR "will shortly be working out the details with the CTR staff."

It is not clear at this writing what the tobacco companies who have funded the CTR have done to carry out such a tax strategy. If, in fact, they have executed such a strategy, their having done so raises the question of whether they have improperly received tax credits for contributions for "research" when, in fact, the research they have funded has been supported, often with the facilitation of tobacco industry lawyers, primarily for public relations purposes.

An action can be brought under the False Claims Act where there is a claim submitted to the government to receive money. Under 31 U.S.C. §3733, the Federal government can issue civil investigative demands in order to obtain documents and testimony from any party. Dependent upon the investigative findings of the Department of Justice, an action also might lie against the tobacco companies named in this Prosecution Memorandum for recovery of unpaid taxes. The Internal Revenue Code, at 26 U.S.C. §7401, provides that "[n]o civil action for collection or recovery of taxes ... shall be commenced unless the Secretary authorizes or sanctions the proceedings and the Attorney General ... directs that the action be commenced." *See United States v. Western Pac. R. Co.*, 190 F.2d 243 (9th Cir. 1951).

The Department of Justice is asked to investigate the conduct of the named tobacco companies in funding the Council for Tobacco Research and the treatment of their "contributions" under the Federal tax laws.

## VI. CONCLUSION

The information uncovered during the past year and assembled for the preparation of this Prosecution Memorandum provides substantial evidence that tobacco company witnesses committed perjury in sworn testimony before the United States Congress. The evidence also demonstrates the likelihood that additional violations of Federal criminal laws have been committed by the named individuals and corporations.

The Prosecution Memorandum is not intended to be exhaustive. Rather, it seeks to identify for the U.S. Attorney General and the Department of Justice those areas of inquiry that appear most urgently to deserve the focused resources of a formal criminal investigation. While not comprehensive, this document nonetheless catalogues numerous instances of apparent criminal conduct. It also identifies some of the Federal criminal laws which may have been violated, and recommends options for further investigation by the Department of Justice.

The enormity of the harm perpetrated by tobacco companies and their agents on American consumers is difficult to comprehend. It is apparent, however, that the conduct described here, committed over decades, has contributed profoundly to the serious illness and premature death experienced by tens of millions of Americans, as well as to trillions of dollars in health care costs and lost productivity borne by the economy of this nation and the individual States.

In light of the numerous and complex facts that are involved, and the extraordinary difficulty faced by Federal government officials and agencies when they have attempted to obtain complete and truthful information from the tobacco companies and their representatives, the Department of Justice is strongly encouraged to convene a grand jury to investigate these matters. By exercising the power of subpoena, a grand jury could more effectively seek the truth. Likewise, the executives, scientists and others implicated by the evidence could be questioned in a constructive fashion, removed from the glare of television lights, in a forum designed for this purpose.

Please give this request your highest priority. I would appreciate having your response by January 31, 1995.

Respectfully submitted,

Marty Meehan
Member of Congress

MTM/ced

## II. STATEMENTS, RESEARCH, AND ACTIONS BY TOBACCO COMPANIES

The evidence presented in this section describes the statements, research activities, and actions of the tobacco industry related to the role of nicotine in cigarettes and smokeless tobacco. Industry statements show that tobacco company officials at the highest levels are aware that nicotine's drug effects are the primary reason people use their products. The tobacco industry's research shows that it has knowledge of the pharmacological role of nicotine in tobacco use, including its ability to affect brain function and behavior and to produce dependence. The industry has also conducted research to determine what constitutes an adequate dose of nicotine. The tobacco industry's actions show that it has manipulated nicotine delivery in marketed products and attempted to develop products to provide a dose of nicotine that satisfies consumers' desire for the pharmacological effects of nicotine.



PLAINTIFF'S EXHIBIT 2

## A. INDUSTRY STATEMENTS ON NICOTINE'S DRUG EFFECTS

Recently disclosed industry documents contain explicit statements, made by high-ranking tobacco company officials over more than three decades, acknowledging nicotine's drug effects and the central role those effects play in tobacco use. These documents also include research reports and conference summaries describing the specific pharmacological and physiological effects of nicotine, including, in some cases, its addictive properties. Covering a period of more than 30 years, these company documents show that tobacco companies have long recognized that nicotine in tobacco is a drug, that nicotine is the primary reason people use cigarettes and smokeless tobacco, and that cigarettes and smokeless tobacco are nicotine delivery systems. Internal statements of company officials and researchers reflect the industry's true knowledge and real intentions. The internal statements contained in these documents confirm that tobacco manufacturers intend nicotine-containing cigarettes and smokeless tobacco to be used as drugs. The extent of these statements was not known to FDA at the time of its earlier determinations about the intended use of tobacco.

### 1. Statements That Nicotine's Drug Effects Are Essential to Tobacco Use

Tobacco company researchers have, for more than 30 years, studied the effects of nicotine on the body. Industry documents reveal that the manufacturers' research has convinced the industry that nicotine in tobacco produces pharmacological effects in tobacco users and that these effects are the major reason that consumers use tobacco products. These documents reveal further that tobacco company executives and senior officials share these convictions about the central role of nicotine's drug effects in tobacco use.

#### a. Tobacco Company Researchers' Views

A wide range of industry documents reveals that tobacco company researchers have known for several decades that nicotine in tobacco functions as a drug and that nicotine's drug effects are the central reason that consumers use tobacco.

More than 30 years ago, in 1962-63, BATCO received the results of its Project HIPPO study (HIPPO I and HIPPO II), the aim of which was to "understand some of the activities of nicotine -- those activities that could explain why smokers are so fond of their habit."[161] A second purpose of the Project HIPPO study was to compare the effects of nicotine with those of then-new tranquilizers, "which might supersede tobacco habits in the near future."[162] Thus,

---

[161] *See:*
Hersch J, Libert O, Rogg-Effront C. *Final Report on Project HIPPO I.* Battelle Memorial Institute. International Division. Geneva, Switzerland. January 1962. (Hereafter cited as Final Report on Project HIPPO I.)

Haselbach CH, Libert O. *Final Report on Project HIPPO II.* Battelle Memorial Institute. International Division. Geneva, Switzerland. March 1963. Pages 1-3. (Hereafter cited as Final Report on Project HIPPO II.)

[162] *Id.* Final Report on Project HIPPO II. Page 1.

these researchers believed that nicotine-containing tobacco and tranquilizers were used for the same purposes by consumers. The researchers concluded that, despite some similarities, nicotine has different drug effects than tranquilizers:

> *both kinds of drugs [nicotine and tranquilizers] act quite differently, and [] nicotine may be considered (its cardiovascular effects not being contemplated here) as more "beneficial" or less noxious -- than the new tranquilizers from some very important points of view.*
>
> *The so-called "beneficial" effects of nicotine are of two kinds:*
> *1. Enhancing effect on the pituitary adrenal response to stress;*
> *2. Regulation of body weight.*[163] [Emphasis added.]

In the final conclusion of the HIPPO study, the researchers discuss the effect of nicotine in the "stress reaction":

> *The understanding and thorough investigation of this effect seems of the greatest importance: it is by this very effect that nicotine acts as a 'tranquilliser.'*[164]

The Project HIPPO reports were disseminated to officials of Brown and Williamson (B&W).[165] The exchange of information between BATCO and B&W is important because it

---

[163] Final Report on Project Hippo II. Page 2. Based on studies of rats, the Project HIPPO I researchers also concluded:

> *We have been in a position to show a definite enhancing effect of nicotine in the normal mechanism of defence [sic] against stress, i.e., in the stimulation of the release of the pituitary corticotropic hormone (ACTH).*

Final Report on Project HIPPO I. Page 2.

[164] Final Report on Project HIPPO I. Page 48.

[165] These reports were also circulated to various other U.S. tobacco companies, and the Tobacco Industry Research Committee, the forerunner to the Council for Tobacco Research (Little, CC. "Report of the Scientific Director," 1963, at p. 5), demonstrating that at least some of the industry's nicotine research was shared. *See, e.g.*:

June 28, 1963, letter from Sir Charles Ellis, Scientific Advisor to the Board of BATCO to A. Yeaman of B&W.

August 5, 1963, letter from A. Yeaman to E.J. Jacob of R.J. Reynolds Tobacco Co.:

demonstrates B&W's awareness of the results of studies such as Project HIPPO,[166] which was just one of a number of studies commissioned by BATCO to study the physiological and pharmacological effects of nicotine. For example, a 1980 report addresses the critical role of nicotine's drug effects:

> *Nicotine is an extremely biologically active compound capable of eliciting a range of pharmacological, biochemical, and physiological responses in vivo . . . In some instances, the pharmacological response of smokers to nicotine is believed to be responsible for an individual's smoking behaviour, providing the motivation for and the degree of satisfaction required by the smoker.*[167]

The BATCO documents include not only some of the research reports themselves, but also summaries or minutes of numerous BATCO research and development (R&D) meetings at which nicotine's drug effects and importance to the industry were discussed. These papers demonstrate both the consistency and the extent of industry's interest in and knowledge of

---

> *I suggest to you and Henry that it is now timely to release these reports to the S.A.B. [Scientific Advisory Board of the Tobacco Institute Research Council].*

June 19, 1963, note for Mr. Cutchins of B&W, noting that Sir Charles Ellis had sent Mr. Cutchins reports of research that BATCO had sponsored at Battelle :

> *. . . . showing the beneficial effects of nicotine . . . . BAT decided to make this research available to the T.R.C. [Tobacco Research Council of the U.K.] . . . .Todd, of T.R.C. is to-day sending copies to T.I.R.C. [Tobacco Industry Research Committee of the U.S.] with a request that they consider whether it would help the U.S. industry for these reports to be passed on to the Surgeon General's Committee.*

166 Appendix 2 contains a detailed description of how the research was shared between B&W and BATCO. The B&W/BATCO documents that recently were made public offer an extraordinary glimpse into the workings of the third largest U.S. tobacco company. Although the five other leading U.S. tobacco companies received requests from FDA on July 11, 1994, for similar documentary evidence, to date the companies have failed to provide the requested information. *See* Appendix 3. Tobacco industry material is cited throughout the Legal Analysis and Findings sections of this document that refers to the workings of the five U.S. tobacco companies. This material constitutes just a representative sample of the internal information still in the possession of those companies.

167 BATCO Group R & D. Southampton, England. *Method for Nicotine and Cotinine in Blood and Urine*. Report No. RD.1737-C. May 21, 1980. Page 2.

nicotine as the primary pharmacological agent in tobacco. For example, at a 1974 BATCO Group R&D Meeting, it was noted that:

> *Nicotine (which has been assumed to be the main pharmacologically active component in smoke) may act in a bi-phasic manner, either as a stimulant (CNV increase) or depressant (CNV decrease).*[168]

In addition, a 1977 report concerning an International Smoking Behavior Conference includes the following statements about nicotine's effects:

> *Nicotine was the focal point of the conference. In many cases, psychological and physiological changes observed in subjects . . . . were shown to be due to nicotine.*
>
> *Most researchers conclude that the nicotine effect is biphasic and dosage dependent; small doses stimulate and large doses depress.*[169]

Subsequent BATCO research conferences offer equally revealing statements about the drug effects of nicotine. A BATCO Group R&D Smoking Behaviour-Marketing Conference held in 1984 focused almost entirely on the role of nicotine pharmacology in smoking. Summaries of the presentations at that conference include numerous references to the pharmacological effects of nicotine and the importance of these effects in maintaining tobacco use. For example, one presentation included the following observation:

> *Smoking is then seen as a personal tool used by the smoker to refine his behaviour and reactions to the world at large.*
>
> *It is apparent that nicotine largely underpins these contributions through its role as a generator of central physiological arousal effects which express*

---

[168] BATCO Group R&D. Southampton, England. *Interaction of Smoke and the Smoker, Part 3: The Effect of Cigarette Smoking on the Contingent Negative Variation.* Report No. RD.1164-R. December 12, 1974. Page 1.

[169] BATCO International Smoking Behavior Conference: Trip Report. Chelwood Vachery, England. November 27-30, 1977. Pages 1-2.

*themselves as changes in human performance and psychological well-being.*[170] [Emphasis added.]

Reporting on a study testing the hypothesis that extroverts smoke for nicotine and introverts smoke for the motor activity provided by smoking, another presentation concluded:

*Extraverts [sic] relied principally on nicotine and did not pay attention to the motor aspects of smoking except to gain nicotine and so did not show well developed motor potentials preceding the motor act. However, the effect of nicotine is to enhance the extravert's motivation to act, and this increases motor activity rate after smoking (as was shown in the tapping rate recorded for extraverts after smoking) . . . . For preparatory smokers (extraverts): Smoking functions as a kind of portable, stationary generator inducing the effects of activity on the CNS [central nervous system] without the usual requirement of stressful activity to achieve those effects.*[171]

Finally, another BATCO conference focusing on nicotine was held in 1984. One of the presentations was characterized by a Brown and Williamson official:

*The presentation was concerned with summarising and outlining <u>the central role of nicotine in the smoking process and our business generally</u>. . . There are two areas of nicotine action that are of primary importance: (i.) to identify to what extent the pharmacological properties or responses to nicotine are influenced by blood and tissue levels of nicotine. (ii) what is the significance and role of nicotine in eliciting the impact response and upper respiratory tract responses . . .* [Emphasis added.][172]

---

[170] Ferris RP. *The role of smoking behavior in product development: some observations on the psychological aspects of smoking behaviour.* In: Proceedings of the BATCO Smoking Behaviour-Marketing Conference, Session III. July 9-12, 1984. Page 79.

[171] Proceedings of the BATCO Smoking Behaviour-Marketing Conference, Session III. July 9-12, 1984. Slides. Pages BW-W2-02772-02775.

[172] Ayres CI. Notes from the GR&DC [Group Research and Development Centre] Nicotine Conference June, 1984. Page 62. The conference was devoted predominantly to nicotine's pharmacological effects. The conference's seven sessions are listed as follows:

*Session I - Nicotine Dose Requirement - Background; Session II - Nicotine Dose Estimation; Session III - Sensory and Psychological Effects of Nicotine; Session IV - Effect of Nicotine - Interaction with the Brain (Pharmacology); Session V - Effects of Nicotine - Interaction with Peripheral Tissues (Physiology);Session VI - Product Modification for Maximal Nicotine Effects Session VII - General Session.* Pages BW-W2-02639, 12641-46.

*See also:*

As described in FINDINGS § II.B., infra, comparable research on the pharmacological effects of nicotine has been conducted or sponsored by all the major tobacco companies. For example, researchers at the R.J. Reynolds Tobacco Co. have published studies in which they freely acknowledge the pharmacological effects of nicotine in tobacco and the importance of those effects to smokers:

> *The beneficial effects of smoking on cognitive performance . . . are a function of nicotine absorbed from cigarette smoke upon inhalation.*[173]

---

BATCO R&D Conference. Hilton Head, SC. September 24-30, 1968. Page 3. The conferees recognized "that the reasons why people smoke are partly pharmacological and partly psychological."

BATCO R&D Conference. Montreal, Canada. October 25, 1967. Page 6. The conferees concluded:
*While recognizing the importance of psychological factors in smoking and the possibility that some smokers would accept non-nicotine cigarettes, it was felt that nicotine is important for the majority of smokers and that the form of nicotine can be significant.* [Emphasis added.]

BATCO R&D Conference. Kronberg, Germany. June 2-6, 1969. Page 7 of summary:
*The Conference agreed that all the evidence continues to demonstrate the importance of nicotine to the smoker, and again emphasises the importance of keeping separate TPM and nicotine figures.* [Emphasis added.]

BATCO Group R&D report. Southampton, England. *Preparation and Properties of Nicotine Analogues.* Report No. RD 953-R. November 9, 1972.

BATCO Group R&D Conference on Smoking Behavior. Southampton, England. October 11-12, 1976. Pages BW-W2-02145-02149, BW-W2-02150-02165, BW-W2-02292-02311.

February 9, 1984, letter from C.I. Ayres to E.E. Kohnhorst (both of Brown and Williamson) summarizing the August 30-September 3, 1982, BATCO R&D Conference. Montebello, Canada.

[173] Robinson JH, Pritchard WS, Davis RA (R.J. Reynolds Tobacco Co.). Psychopharmacological effects of smoking a cigarette with typical "tar" and carbon monoxide yields but minimal nicotine. *Psychopharmacology.* 1992;108:471.

*See also* Pritchard WS, Robinson JH, Guy TD (R.J. Reynolds Tobacco Co.). Enhancement of continuous performance task reaction time by smoking in non-deprived smokers. *Psychopharmacology.* 1992;108:437-442.

Pritchard WS, Gilbert DG, Duke DW (R.J. Reynolds Tobacco Co.). Flexible effects of quantified cigarette smoke delivery on EEG dimensional complexity. *Psychopharmacology.* 1993;113:95-102.

*An enduring question regarding human cigarette smoking is the basis of the so-called "nicotine paradox." Although the peripheral effects of smoking appear to be stimulatory (e.g., increased heart rate, especially for the initial cigarette of the day [citation omitted]) and many smokers say that smoking increases their mental alertness, other smokers report that smoking helps them to function in the face of environmental stress by having a calming effect on their mood [citation omitted].*[174]

*We recognize that nicotine plays an important role in smoking behavior for many people.*[175] [Emphasis added.]

Philip Morris researchers conducted extensive research on nicotine pharmacology from the late 1960's until at least the mid-1980's. See note 240a, infra. The nature and magnitude of the research, as well as statements made in internal documents, show that the Philip Morris researchers strongly believed that nicotine has potent psychoactive effects and that these effects provide a primary motivation for smoking. For example, in 1969, a Philip Morris researcher proposed a study whose purpose was to show that cigarette smoking is more likely in stressful situations. The researcher stated that such a study would demonstrate "one of the advantages of smoking, its use as an anxiety reducer."[175a] In 1974, Philip Morris researchers began a study designed to test their theory that hyperkinetic children take up

---

[174] Pritchard WS (R.J. Reynolds Tobacco Co.). Electroencephalographic effects of cigarette smoking. *Psychopharmacology.* 1991;104:485-490. Page 00033640. (Smokers who inhale lightly appear to use tobacco to achieve "mental activation and performance enhancement" while those who inhale more deeply achieve effects in the portion of their brains that is associated with anxiety reduction after administration of benzodiazepines. *Id.* at p. 00033643. [Benzodiazepines are drugs used as sedatives and to treat anxiety.])

*See also* Gibert DG, Robinson JH, Chamberlin CL (R.J. Reynolds Tobacco Co.), and Spielberger, CD. Effects of smoking/nicotine on anxiety, heart rate, and lateralization of EEG during a stressful movie. *Psychophysiology.* 1989;26(3):311-319. (High-nicotine cigarettes associated with reductions in anxiety and activation of the right hemisphere of the brain.)

[175] Robinson J, Pritchard W. The role of nicotine in tobacco use. *Psychopharmacology.* 1992;108:405.

[175a] Memorandum to W.L. Dunn from F.J. Ryan. Proposed Research Project: Smoking and Anxiety. December 23, 1969. *In* 141 Cong. Rec. H7648 (daily ed. July 25, 1995).

smoking in adolescence because nicotine may perform the same pharmacological function as prescription medications used to treat hyperkinesis:

> *It has been found that amphetamines, which are strong stimulants, have the anomalous effect of quieting these children down . . . Many children are therefore regularly administered amphetamines throughout grade school years . . . . We wonder whether such children may not eventually become cigarette smokers in their teenage years as they discover the advantage of self-stimulation via nicotine. We have already collaborated with a local school system in identifying some such children in the third grade.*[175b] [Emphasis added.]

In 1976, a Philip Morris researcher wrote a memo explaining why people smoke. In his memo, he reported on a survey in which smokers were asked why they smoked. The researcher concluded that

> *the circumstances in which smoking occurs may be generalized as follows:*
> 1. *As a narcotic, tranquilizer, or sedative. Smokers regularly use cigarettes at times of stress.*
> 2. *At the beginning or ending of a basic activity . . . .*
> 3. *Automatic smoking behavior. . .*[175c] [Emphasis added.]

In a research paper funded by the Council for Tobacco Research, U.S.A. (CTR),[176]

---

175b Dunn WL. 1600/Smoker Psychology/May 1-31, 1974 [Monthly Report]. June 10, 1974.

*See also:*
Memorandum from W.L. Dunn to P.A. Eichorn. Quarterly Report- February-March, 1972. April 4, 1972. This memo reports on a study conducted by Philip Morris comparing the "arousal response" produced by nicotine, caffeine, and placebo. The researchers reported that the "arousal response was clearly present with nicotine" and that the caffeine response was nearer to placebo. *In* 141 Cong. Rec. H7651 (daily ed. July 25, 1995).

175c Memorandum from A. Udow, Philip Morris, New York, NY, to Mr. J.J. Morgan. Why People Start to Smoke. June 2, 1976. *In* 141 Cong. Rec. H7664 (daily ed. July 25, 1995).

176 In January, 1954, 14 presidents of tobacco manufacturers, growers, and warehousemen organized the forerunner organization to CTR, known as the Tobacco Industry Research Committee (TIRC), to sponsor a research program into questions of tobacco use and health. (By-laws of the Tobacco Industry Research Committee, subscribed and adopted on January 1, 1954.) TIRC was founded in response to growing concern by tobacco executives over the appearance of published articles claiming an established relationship between cigarette smoking and lung cancer.

reporting on the "beneficial" pharmacological effects of nicotine in cigarettes, the authors said:

> *Nicotine is recognized as the primary psychoactive compound in cigarette smoke.*[177]

Many other industry documents refer to the central role of nicotine's drug effects for smokers and, therefore, for the industry.[178] Nicotine is repeatedly identified as a primary

---

The driving force behind the creation of TIRC was Paul M. Hahn, President of the American Tobacco Company. Other original signers of the TIRC by-laws were Timothy V. Hartnett, President of Brown and Williamson Tobacco Corp., Herbert A. Kent, Chairman of P. Lorillard & Co., O. Parker McComas, President of Philip Morris & Co., E.A. Darr, President of R. J. Reynolds Tobacco Co., J.W. Peterson, President of U.S. Tobacco Co., and Joseph F. Cullman, President of Benson & Hedges. (Minutes of the Meeting of the Presidents of the Leading Tobacco Companies at the Hotel Plaza, December 15, 1953. Page 1.)

By 1963, grants had been made to 140 scientists from $6,250,000 appropriated by TIRC from its member companies. In January, 1964, TIRC changed its name to the Council for Tobacco Research (CTR), its current name. The current members of CTR include Philip Morris, R.J. Reynolds, Brown and Williamson, American Tobacco, Lorillard Corp., and U.S. Tobacco. By 1993, CTR had funded more than $223 million in research. Annual Reports issued by CTR reveal that the organization has provided extensive funding to research on nicotine pharmacology. *See* note 195, *infra.*

177 Levin ED, Briggs SJ, Christopher NC, Rose JE. Persistence of chronic nicotine-induced cognitive facilitation. *Behavioral and Neural Biology*. 1992;58:152-158.

178 For example, the American Tobacco Company (ATC) published a document entitled *A Summary of Biological Research on Tobacco Supported in Whole or in Part by the American Tobacco Company* (April 1962). In a chapter entitled "Role of Nicotine in the Cigarette Habit," ATC referred to a 1945 study and stated that "[t]he authors concluded that with some individuals, nicotine becomes a major factor in their cigarette habit." Page 66. (*See* Finnegan JK, Larson PS, Haag B. The role of nicotine in the cigarette habit. *Science*. 1945;102:94.)

*See also:*
Willey LC, Kellett ND (for Imperial Tobacco Group Ltd.). *Effects of Nicotine on the Central Nervous System*. Huntingdon Research Centre. 1971. Page 9:

> *We aim, by using various different schedules of behavioural training, and by comparing the effects of many different drugs on these schedules, to be able to classify the effect of nicotine, when given intermittently in smoking doses, as similar to a known class of drug acting on the central nervous system. Alternatively, it may, perhaps, act like one type of drug in some tests and at some doses and like another type in other tests.*

U.S. Patent No. 4,340,072. Bolt AJ, Chard B. *Smokable Device*. Imperial Group Ltd. 1982. C1:

> *Among the reasons why most people smoke conventional cigarettes is that they wish to*

reason consumers smoke or use other nicotine-containing products. A "Proposal for Low Delivery Project for B&W" prepared by a marketing firm hired by B&W in the late 1970's contained the following statement that a sufficient dose of nicotine is essential to sell cigarettes and, implicitly, to maintain market share based on nicotine addiction:

> *Current market trends clearly indicate a major trend toward low-tar brands although current "ultra" low "tar" brands, have had limited success because of their failure to deliver satisfaction/maintain an adequate nicotine level. An ancillary concern relative to nicotine delivery is that if a satisfying, low-nicotine cigarette were to be developed, it could represent an effective means of withdrawal . . . with severe implications for long-term market growth.* [Emphasis added.][179]

Finally, a 1976 BATCO Conference on Smoking Behavior underscores tobacco industry researchers' awareness of the fundamental importance (to the huge majority of smokers) of nicotine's effects on the brain:

> *Some insight into the likely benefits of smoking follows from a consideration of the properties of nicotine, which is considered to be the reinforcing factor in the smoking habit for at least 80% of smokers . . .* [Emphasis added.][180]

---

*inhale an aerosol containing nicotine.*

Note from S.J. Green (BATCO R&D) to Dr. G. Hook (BATCO R&D). June 11, 1974.

[179] Lisher & Company Inc. memo. Proposal for Low Delivery Project for B&W. On the copy of this proposal, lines 3 - 7, beginning with "maintain an adequate nicotine level," are crossed out. The unedited quote makes clear that the term "satisfaction" is a euphemism used by the industry to refer to satisfaction of the desire for nicotine.

[180] BATCO Group R&D Conference on Smoking Behavior. Group Research and Development Centre. Southampton, England. October 11-12, 1976. *"Benefits" of Smoking.* (Pages BW-W2-02152 and 02153). The summary of a presentation at this conference also notes that all types of tobacco usage -- smoking, chewing and snuffing -- allow nicotine to go directly into the blood and to the brain. The speaker observed that nicotine is not ingested, a route that converts nicotine to a pharmacologically inactive metabolite, cotinine, before it can affect the brain. The summary then notes:

> *It would therefore be surprising if nicotine, which is known to be pharmacologically active in the brain (unlike cotinine), and which is obtained in the ways most likely to enable it to reach the brain unchanged, were not involved in the reasons why people smoke.*

*Id.*, Session II: Current Views on the Role of Nicotine in Smoking Behaviour. Page BW-W2-02145.

**b. Tobacco company executives' and senior officials' views**

Internal and published documents demonstrate that tobacco company executives and senior officials have also long understood that nicotine is a drug and that nicotine's pharmacological effects are essential to consumer satisfaction.

In 1988, during the case Cipollone v. Liggett, Joseph Cullman III, former CEO of the Philip Morris Tobacco Company, testified as follows:

*Q: Let me ask you the question, then, Mr. Cullman. Is nicotine a drug?*

*A: Well it's so described in every book on pharmacology.*

*Q: So then you agree that it's a drug?*

*A: I have no reason to disagree with books on pharmacology.*[181]

In 1981, the Tobacco Advisory Council, representing the United Kingdom tobacco manufacturers[182] (including BATCO), published a monograph on nicotine pharmacology and toxicology that expressly treats nicotine as a drug delivered by tobacco.[183] The monograph states that "nicotine is regarded as the most pharmacologically-active compound in tobacco smoke" and states that nicotine's main effects, "at doses absorbed by inhalers (i.e. 1 mg approx per cigarette)" are:

> *central stimulation and/or depression (which vary with the individual), transient hyperpnoea, peripheral vasoconstriction (usually associated with a rise in systolic pressure), suppression of appetite, stimulation of peristalsis and, at larger nicotine intakes, nausea of central origin, associated with*

---

[181] *Transcript of proceedings in* Cipollone v. Liggett Group, Inc., at p. 3290 (D.N.J. Feb. 23, 1988). (Civil Action No. 83-2864 (SA)).

[182] 1981 document of the Tobacco Advisory Council (corrections sheet).

[183] Cohen AJ, Roe FJC. *Monograph on the pharmacology and toxicology of nicotine*. Tobacco Advisory Council. Occasional paper 4. 1981. Page 1.

*vomiting.*[184]

More than three decades ago, in 1961, a presentation by Dr. Helmut Wakeham, a senior Philip Morris research scientist, to the company's Research and Development Committee noted that:

> *Low nicotine doses stimulate, but high doses depress functions . . . It is also recognised that smoking produces pleasurable reactions or tranquility, and that this is due at least in part to nicotine . . . .*[185]

Dr. Wakeham also noted that "nicotine is believed essential to cigarette acceptability,"[186] a view later restated by William Dunn, Jr., another high-ranking Philip Morris official. In summarizing a 1972 conference sponsored by the Council for Tobacco Research, Dr. Dunn reported:

> *Most of the conferees would agree with this proposition: The primary incentive to cigarette smoking is the immediate salutary effect of inhaled smoke upon body function.* [Emphasis added.][187]

After describing "the physiological effect" as "the primary incentive" for smoking, Dr. Dunn continued:

---

[184] *Id.* at p.17.

[185] Wakeham H. *Tobacco and Health -- R&D Approach.* In: 3.10 Tobacco Products Liability Reporter (TPLR) 8.129. *See also* Wakeham H. Presentation to R & D Committee at meeting held in New York Office on November 15, 1961.

Later, when Wakeham was a Vice President at Philip Morris, his introduction to a tobacco industry symposium included the following acknowledgment that nicotine produces psychoactive effects: "Tobacco and other psychoactive plants have probably been part and parcel of our cultural baggage for thousands of years..." Wakeham H. *Tobacco Smoke: Its Formation and Composition.* 31st Tobacco Chemists Research Conference. October 5-7, 1977. Greensboro, NC. In: *Recent Advances in Tobacco Science*. 1977;3:iii.

[186] *Id.*, TPLR 8.129.

[187] Dunn, note 133, *supra,* at p. 3.

*The majority of the conferees would go even further and accept the proposition that nicotine is the active constituent of cigarette smoke. Without nicotine, the argument goes, there would be no smoking. Some strong evidence can be marshalled to support this argument:*

*1) No one has ever become a cigarette smoker by smoking cigarettes without nicotine.*

*2) Most of the physiological responses to inhaled smoke have been shown to be nicotine-related.*

*3) Despite many low nicotine brand entries in the market place, none of them have captured a substantial segment of the market . . .* [Emphasis added.][188]

In 1969, Dr. Wakeham, then Vice President for Research and Development, briefed the Philip Morris Board of Directors on why people smoke. A draft of his remarks, which contains the notation "delivered with only minor changes," includes several unequivocal statements that cigarettes are smoked for the pharmacological effects of nicotine:

*[T]he psychosocial motive is not enough to explain continued smoking. Some other motive force takes over to make smoking rewarding in its own right. Long after adolescent preoccupation with self-image has subsided, the cigarette will even preempt food in times of scarcity on the smoker's priority list . . . . We are of the conviction . . . that the ultimate explanation for the perpetuated cigarette habit resides in the pharmacological effect of smoke upon the body of the smoker, the effect being most rewarding to the individual under stress.*[188a]

---

[188] *Id.* at p. 4.

[188a] Ryan/Dunn Alternate -Third version of Board presentation. Fall, 1969. *In* 141 Cong. Rec. H7648 (daily ed. July 25, 1995).
*See also:*
Memorandum to P.A. Eichorn from W.L. Dunn. Five-year Objectives and Plans for Project 1600. September 25, 1970. *In* 141 Cong. Rec. H7650, *supra.* This document details Philip Morris' plans to study the "short-term psychological and psychophysiological" effects of smoking "as manifested through changes in autonomic, perceptual, cognitive and central nervous system processes and motor performance." The author goes so far toward presuming the essential role of nicotine as to propose that research be undertaken to answer the question: "Can the smoking habit be sustained in the absence of nicotine?"

Dunn WL. 1600/Smoker Psychology/January 1- January 31, 1973 [Monthly Report]. February 9, 1973. *In* 141 Cong. Rec. H7650, *supra.* This report shows that several studies were underway at Philip Morris

A 1974 annual report on the Behavioral Research program at Philip Morris approved by Thomas Osdene (later Vice President for science and technology) and distributed to Dr. Wakeham, also reflects the view that cigarettes are drugs consumed for pharmacological effects. The report states that a person regulates smoke intake "to achieve his habitual quota of the pharmacological action [of the components of smoke]." [188b]

In the following year, the annual report on the "Behavioral Research" program explicitly acknowledged that nicotine is a stimulant drug. Describing a theory concerning the effect of an individual's CNS arousal level on performance efficiency, the report says that while one way to increase the CNS arousal level is to seek out stimulating situations, another way is to:

> *consume socially approved chemicals which would have a similar effect on the*

---

to determine the effects of nicotine on the central nervous system and on performance, including studies on the effects of smoking on: electrical activity in the brain, the "arousal mechanisms of the central nervous system," and "spare mental capacity."

Philip Morris Research Center. Behavioral Research Annual Report (Part II). November 1, 1974. *In* 141 Cong. Rec. H7658, *supra.* The report lists the following "working hypotheses" of Philip Morris researchers:

> *IA. Cigarette smoke improves efficiency in the performance of complex psychological tasks.*
> *1B. Cigarette smoking attenuates, modulates or otherwise influences emotional arousal such as to be gratifying or rewarding to the smoker, thus reinforcing the smoking act.*
> . . . .
> *IIA. Dose-control continues even after the puff of smoke is drawn into the mouth.*

Dunn WL, Ryan FJ, Martin P. Behavioral Research Annual Report. July 18, 1975. *In* 141 Cong. Rec. H7658, *supra.* This report describes a study being undertaken by Philip Morris, entitled "Nicotine as a Modulator of CNS Arousal." The study was to be conducted because the researchers believed that previous studies had provided evidence that nicotine reduces emotional responsiveness:

> *[Previous] observations imply the influence of nicotine upon some control mechanism governing affective responsivity, the net effect upon overt behavior being to reduce the intensity of the emotionally-toned response, or raise the threshold for the elicitation of that response.*

[188b] Philip Morris Research Center. Behavioral Research Annual Report, Part II. Approved by T.S. Osdene. November 1, 1974. *In* 121 Cong. Rec. H7660 (daily ed. July 25, 1995).

*body--such as the stimulant drugs caffeine and nicotine.*[188c]

Two years later, William Dunn provided a detailed description of the pharmacological effects produced by nicotine that cause smokers to continue smoking:

> *[T]he doses of nicotine inhaled produce definite, mild, and transient neuropsychopharmacological effects which are positively reinforcing and thus promote repetition of smoking. These effects include: (a) modulation of conditioned behavior; (b) mixed depression and facilitation of the neural substrates of reward; (c) transient (in minutes) EEG and behavioral arousal crudely reminiscent of d-amphetamine but pharmacologically quite different; and at the same time (d) skeletal muscle relaxation.*[188d]

Finally, a memorandum from a Philip Morris official in 1980 confirms the company's view that nicotine's pharmacological effects on the central nervous system are critical to the tobacco industry's success:

> *Nicotine is a powerful pharmacological agent with multiple sites of action and*

---

[188c] Dunn WL, Ryan FJ, Martin P. Behavioral Research Annual Report. July 18, 1975. *In* 141 Cong. Rec. H7655 (daily ed. July 25, 1995). The same report states that the authors have proposed an international industry conference on "the regulatory influence of nicotine upon behavior."

[188d] Memorandum to T.S. Osdene from W.L. Dunn. Rationale for Investigating the Effects of Smoking upon Electroencephalographic Phenomena. December 22, 1976. [Citing Domino EF, in Dunn (ed.). Smoking Behavior: Motives and Incentives. 1973.] *In* 141 Cong. Rec. H7665 (daily ed. July 25, 1995). *See also:*

Philip Morris. Research and Development Five Year Plan-1979-1983. September 1978. *In* 141 Cong. Rec. H7668 (daily ed. July 25, 1995):

> *Nicotine may be the physiologically active component of smoke having the greatest consequence to the consumer.*

Memorandum to T.S. Osdene from W.L. Dunn. Plans and Objectives-1980. January 7, 1980. *In* 141 Cong. Rec. H7671 (daily ed. July 25, 1995). The author reports:

> *Cigarette smoking results in EEG changes associated with arousal, while smoke deprivation results in . . . [brain] waves associated with drowsiness . . . . [S]moke appears to have opposite effects on visual and auditory evoked potentials . . . [N]icotine, rather than being a general stimulant, may be exerting a selective influence on brain structures.* [Emphasis added.]

The same document describes a new research program underway at Philip Morris intended to study, among other things, "how . . . cigarette smoking can have psychosocial consequences through its . . . central-nervous-system-mediated effects upon the coping abilities of the smoking social participant." [Emphasis added.] *Id.*

*may be the most important component of cigarette smoke. Nicotine and an understanding of its properties are important to the continued well being of our cigarette business since this alkaloid has been cited often as 'the reason for smoking' and theories have been advanced for 'nicotine titration' by the smoker. Nicotine is known to have effects on the central and peripheral nervous system as well as influencing memory, learning, pain perception, response to stress and level of arousal.* [Emphasis added.][189]

---

[189] Philip Morris Interoffice Correspondence from J.L. Charles to Dr. R.B. Seligman. Nicotine Receptor Program-University of Rochester. March 18, 1980. Other Philip Morris documents contain similar statements. *See, e.g.*:

Wakeham H. *Smoker Psychology Research. Presented to the PM Board of Directors, November 26, 1969.* Page 11:

*We are of the conviction, in view of the foregoing, that the ultimate explanation for the perpetuated cigaret habit resides in the pharmacological effect of smoke upon the body of the smoker, the effect being most rewarding to the individual under stress.*

Ryan, FJ. Philip Morris Research Center Special Report. *Exit-Brand Cigarettes: A Study of Ex-smokers.* March 1978. Page 2.

*We think that most smokers can be considered nicotine seekers, for the pharmacological effect of nicotine is one of the rewards that comes from smoking. When the smoker quits, he foregoes his accustomed nicotine. The change is very noticeable, he misses the reward and so he returns to smoking.*

Philip Morris employee (almost certainly W.L. Dunn). *Smoker Psychology Program Review.* Date not specified. Page 5. This paper states the theory that the reinforcing effects of smoking are *likely to be found among the chemical compounds being introduced into the bloodstream . . . Without the chemical compound, the cigarette market would collapse, P.M. would collapse, and we'd all lose our jobs and our consulting fees.*

The same paper later says that the research program at Philip Morris is based on "*a strong conviction about the central role of the pharmacologic effects of inhaled smoke.*" Page 8.

Ryan, FJ, Jones, BW, Martin, PG, Dunn, WL. Behavioral Research Annual Report. July 18, 1975. Pages 18-22, 25.

Memo to H. Wakeham from W.L. Dunn. *Stating the Risk Study Problem.* July 29, 1969. (Tobacco is used by consumers to modulate arousal level, and to avoid withdrawal.)

Memo to W.L. Dunn from T.R. Schori. *Smoking and Caffeine: A Comparison of Physiological Arousal Effects.* May 17, 1972. This memo attaches a report of the same name by Schori and B.W. Jones, which concludes that caffeine and nicotine, which is generally "administered by smoking," both have stimulant effects, but that the effects of caffeine are more like those of placebo than those of smoking. Pages 1, 7 of report.

Memo to T.S. Osdene from W.L. Dunn. Plans and Objectives - 1982. November 5, 1981. Memo says that Philip Morris is conducting research on the effects of nicotine on electrical activity in the brain "*on the premise that events which reinforce the smoking act are central nervous system events.*" Page 4.

BATCO documents also make clear that top company officials recognize nicotine's drug effects and recognize that the company's sales are tied to those effects. In a July 1962 meeting, Sir Charles Ellis, who served as the science advisor to the BATCO board, gave a presentation in which he affirmed the central role of nicotine in tobacco use and enthusiastically endorsed its pharmacological benefits to smokers as similar to those provided by stimulants and tranquilizers:

> *It is my conviction that* *nicotine is a very remarkable beneficent drug* *that both helps the body to resist external stress and also can as a result show a* *pronounced tranquilising effect.* *You are all aware of the very great increase in the use of artificial controls, stimulants, tranquilisers, sleeping pills, and it is a fact that under modern conditions of life people find that they cannot depend just on their subconscious reactions to meet the various environmental strains with which they are confronted:* *they must have drugs* *available which they can take when they feel the need.* *Nicotine is not only a very fine drug, but the techniques of administration by smoking has considerable psychological advantages and a built-in control against excessive absorption.*[190] [Emphasis added.]

Dr. Sidney J. Green, a BATCO board member as well as the firm's director of research, frequently acknowledged, in internal documents, the central role of nicotine's pharmacological effects in tobacco use. In a 1967 memo on BATCO research needs, Dr. Green pointed out that:

> *There has been significant progress in understanding why people smoke and opinion is hardening in medical circles that* *the pharmacological effects of nicotine* *play an important part and that these effects on balance may be beneficial.* [Emphasis added.][191]

In a paper on future research policy entitled "B.A.T. Group Research" (1968), Dr. Green wrote

---

Dunn, WL. *Smoking as a Possible Inhibitor of Arousal.* Submitted to Philip Morris Manuscript Review Board on August 16, 1976.

[190] BATCO Research Conference. Southampton, England. Presentation by Sir Charles Ellis entitled *The Smoking and Health Problem.* 1962. Pages 15-16.

[191] Green SJ. March 2, 1967, memorandum to D.S.F. Hobson entitled *Smoking and Health: Some Recent Findings.* Appendix I, page 1. In the same document at Appendix II, page 1, Dr. Green also wrote that "[t]here is now no doubt that nicotine plays a large part in the action of smoking for many smokers."

that there were four motives for smoking, at least three of which depend on the pharmacological and addictive effects of nicotine:

> *There appear to be four recognisable types of smoking behaviour:*
> 1. *Habitual*
> 2. *Addictive*
> 3. *Enhancing desirable emotions and feelings such as enjoyment or excitement.*
> 4. *Decreasing undesirable emotions and feelings such as anger, fear and shame.*[192]

In another paper a few years later, Dr. Green wrote more forcefully:

> *The tobacco smoking habit is reinforced or dependent upon the psycho-pharmacological effects mainly of nicotine.*[193]

Attorneys for some of the major U.S. tobacco manufacturers have asserted that the "benefits" of smoking include a range of significant pharmacological effects. For example, attorneys for R.J. Reynolds Tobacco Company described the following pharmacological benefits of smoking in a court filing:

> *[S]atisfaction; stress reduction; relaxation; stimulation; aided concentration; increased memory retention; alleviation of boredom and fatigue; avoidance of loss of vigilance in repetitive and sustained tasks. . .*[194]

CTR has also supported research on the psychopharmacology of nicotine and has concluded that nicotine's drug effects play an important role in why people use tobacco. CTR's annual report for 1966-67 described reports of smokers that they liked or needed to smoke

---

192 Green SJ. Lecture notes of Chelwood talk. BATCO Group Research Conference. Chelwood Vachery, England. September 4, 1968. Pages 1, 2.

193 Green SJ. *The Association of Smoking and Disease.* July 26, 1972. Page 1.

194 Reply to Interrogatories, *Gilboy v. American Tobacco Co. et al.*, No. 314002 (La. 19th Jud. Dist. Ct.). Attorneys for Lorillard Tobacco Company similarly characterized the pharmacological effects of smoking in a Reply to Interrogatories filed in *Covert v. Lorillard et al*, No. 88-1018-B (M.D. La):

> *Some of the benefits that are commonly reported by various smokers are. . .relaxation; relief of anxiety and stress; reduction of boredom; increased alertness; improvement in concentration. . .*

because smoking gave them a "pickup" or relaxed them.[195] The report went on to say

---

[195] Report of the Scientific Director, 1966-67. Council for Tobacco Research. 1967. Page 12. CTR's annual reports disclose that the organization has funded research on nicotine's effects on the central nervous system continuously since the 1960's. *See, e.g.:*

Report of the Scientific Director, 1964-65. Council for Tobacco Research-U.S.A. Page 22:

> *Systematic study of the mode of action of nicotine at various synapses has been continued. Meanwhile increasing emphasis has been placed upon the psychopharmacology of nicotine . . . . Specific actions on the central nervous system have been described and the effects of these upon behavior are being sought.*

Report of the Scientific Director, 1968-1969. Council for Tobacco Research-U.S.A. Page 14:

> *Some of the bases for human use of tobacco . . . might also be found in the realm of psycho-pharmacology, that is, in the effects of smoking and/or nicotine on the central nervous system . . . . The effects of nicotine on the brain are not always the same. Depending on the state of the nervous system and on the dosage, an "arousal" or "wake-up" effect may occur which is reflected both in brain waves and in behavior . . . . In larger doses or in a different state of the nervous system, a peculiar steady state of longer duration is produced . . . [which] has been described as a "tranquilizer effect."*

Report of the Scientific Director, 1969-1970. Council for Tobacco Research-U.S.A. Page 13.

> *Most of the pharmacological studies currently being supported by The Council are concerned with the effects of nicotine and/or smoking on the central nervous system (the brain) with the object of learning more about why people like, want, or need to smoke.*

Annual Report of The Council for Tobacco Research - U.S.A., Inc. 1971. Pages 16-17, 59 *passim.*

Report of The Council for Tobacco Research - U.S.A., Inc. 1972. Page 11.

> *The Council is currently supporting five studies in the field of psychopharmacology that are directed toward further elucidating the paradoxical arousal and tranquilizing effects of nicotine and its facilitation of the learning process in animals. . . . Because human smokers ordinarily receive nicotine chronically . . . a new emphasis has developed concerning habituation effects on the psychopharmacological responses to nicotine.*

Report of The Council For Tobacco Research-U.S.A., Inc. 1973. Pages 13-14, 52 *passim.*

Report of the Council for Tobacco Research-U.S.A., Inc. 1974. Page 43 *passim.*

Report of the Council for Tobacco Research-U.S.A., Inc. 1975. Page 47 *passim.*

Report of the Council for Tobacco Research-U.S.A., Inc. 1977. Page 45 *passim.*

Report of the Council for Tobacco Research-U.S.A., Inc. 1978. Page 49 *passim.*

Report of the Council for Tobacco Research-U.S.A., Inc. 1979. Page 39 *passim.*

Report of the Council for Tobacco Research-U.S.A., Inc. 1981. Page 65 *passim.*

Report of the Council for Tobacco Research-U.S.A., Inc. 1982. Page 60 *passim.*

that the study of nicotine in the "new field" of psychopharmacology was providing scientific substantiation for smokers' subjective views that tobacco could both "arouse the lethargic and calm the agitated."[196]

Thus, industry documents reveal that tobacco company researchers and top officials understand and unequivocally state that nicotine is a drug and that consumers of tobacco products use them for the pharmacological effects of nicotine.

---

Report of the Council for Tobacco Research-U.S.A., Inc. 1983. Page 80 *passim.*

Report of the Council for Tobacco Research-U.S.A., Inc. 1984. Page 83 *passim.*

Report of the Council for Tobacco Research-U.S.A., Inc. 1985. Page 89 *passim.*

Report of the Council for Tobacco Research-U.S.A., Inc. 1986. Page 68 *passim.*

Report of the Council for Tobacco Research-U.S.A., Inc. 1987. Page 85 *passim.*

Report of the Council for Tobacco Research-U.S.A., Inc. 1988. Page 88 *passim.*

Report of the Council for Tobacco Research-U.S.A., Inc. 1990. Page 101 *passim.*

Report of the Council for Tobacco Research-U.S.A., Inc. 1991. Page 90 *passim.*

Report of the Council for Tobacco Research-U.S.A., Inc. 1992. Page 97 *passim.*

[196] *See id.*, Report of the Scientific Director, 1966-67, at p. 13.

### 2. Statements Recognizing That Nicotine Is Addictive

Tobacco company documents show that company researchers and executives not only have acknowledged that nicotine's pharmacological effects play a central role in consumer satisfaction with tobacco products, but have recognized nicotine's addictive properties. These documents demonstrate that tobacco companies understand that nicotine addiction is one of the major reasons that consumers use their products.

#### a. Tobacco Company Researchers' Views

In 1963, a report was completed for BATCO that specifically addressed the mechanism of nicotine addiction in smokers. The report, dated May 30, 1963, and titled "A Tentative Hypothesis on Nicotine Addiction,"[197] describes nicotine's effects on the brain, specifically through hypothalamo-pituitary stimulation. The report states that initially, small doses of nicotine are sufficient to trigger this mechanism, which helps people to cope with stress. However, chronic intake of nicotine, such as occurs with regular smokers, creates a situation where:

> *ever-increasing dose levels of nicotine are necessary to maintain the desired action. Unlike* <u>*other dopings, such as morphine*</u>*, the demand for increasing dose levels is relatively slow for nicotine.* [Emphasis added.][198]

After noting that when chronic smokers are deprived of nicotine, their endocrine system becomes unbalanced, the report states:

---

[197] Haselbach C, Libert O. BATCO R&D. *A Tentative Hypothesis on Nicotine Addiction.* Southampton, England. May 30, 1963. Pages 1-3. A copy of this report was personally sent by Sir Charles Ellis of BATCO to Addison Yeaman, the General Counsel of B&W. *See* letter from Ellis to Yeaman, dated June 28, 1963.

[198] *Id.*, Haselbach et al, at p. 1.

*A body left in this unbalanced status craves for renewed drug intake in order to restore the physiological equilibrium. This unconscious desire explains the addiction of the individual to nicotine.* [Emphasis added.][199]

The report concludes:

*In conclusion, a tentative hypothesis for the explanation of nicotine addiction would be that of an unconscious desire to restore the normal physiological equilibrium of the corticotropin releasing system in a body in which the normal functioning of the system has been weakened by chronic intake of nicotine.* [Emphasis added.][200]

In the decades that followed this report, tobacco industry researchers repeatedly recognized nicotine's addictive properties.[201] In an article reporting on a study supported by a grant from the Tobacco Industry Research Committee (TIRC), the researcher stated that smoking is addictive:

*Addiction to smoking is found to be consistently greater among men in military service than in civilian life, irrespective of peace or war, and greater in veterans than in nonveterans.* [Emphasis added.][202]

Similarly, a report prepared for Liggett & Myers in anticipation of the 1964 Surgeon General's Report implicitly acknowledged that nicotine dependence and withdrawal are the reasons smokers have difficulty quitting:

*If reliance is to be placed on stopping cigarette smoking by men with warnings of high*

---

199 *Id.* at p. 2.

200 *Id.* at p. 3.

201 Recognition of nicotine's addictive properties apparently extended to the smokeless tobacco industry. In a Wall Street Journal article, Larry D. Story, a former U.S. Tobacco Co. (UST) chemist, was quoted as saying, "There used to be a saying at UST that 'There's a hook in every can' . . . [a]nd that hook is nicotine." Freedman AM. Juiced up: how a tobacco giant doctors snuff brands to boost their 'kick'. Wall Street Journal. October 26, 1994:A.

202 Seltzer CC. Why people smoke. *Atlantic Monthly.* July 1962. Page 42. In a TIRC memo to the Scientific Advisory Board from R.C. Hockett, "Papers by grantees of the Tobacco Industry Research Committee," Carl Seltzer was identified as a recipient of a TIRC grant-in-aid.

*mortality, then heavy research is badly needed . . . on means enabling such smokers to stop smoking more easily and effectively. Use of declining doses of injected nicotine or orally administered nicotine analogs during withdrawal were reported as providing some benefit . . .* [203]

In Project Wheat,[204] a study of smoking behavior conducted by BATCO, researchers concluded that consumer preferences for different cigarette types could be predicted using only two factors: 1) "Inner Need," a measure of the extent to which a smoker uses cigarettes for drug-type uses (to relieve stress, to aid concentration, as a substitute for food); and 2) concern for health. The researchers felt their conclusion to be:

*very much in line with that made by Russell who . . . concluded that it might prove more useful to classify smokers according to their position on a single dimension of pharmacological addiction rather than in terms of their profiles on the six types of smoking.*[205]

Nicotine addiction/dependence is also acknowledged in a number of other BATCO studies and other documents.[206]

---

[203] L&M Littlefield. January 17, 1963, memo from Harry B. Wissman to C.J. Kensler.

[204] *See:*
BATCO. Project Wheat - Part 1: Cluster profiles of U.K. male smokers and their general smoking habits. Southampton, England. July 10, 1975.

BATCO. Project Wheat - Part 2: U.K. male smokers: their reactions to cigarettes of different nicotine delivery as influenced by inner need. Southampton, England. January 30, 1976. (Project Wheat is described in greater detail in FINDINGS § II.C., *infra.*)

[205] *Id.*, Part 2, at p. 49.

[206] *See:*
Proceedings of the BATCO Smoking Behaviour-Marketing Conference. Session III. July 9-12, 1984. Ferris slides (BW-W2-02737-02759). One chart (BW-W2-02750), entitled *Role of Nicotine: Hypotheses*, states: "If smokers are ADDICTED to nicotine then . . . 1. The nicotine smokers get from cigarettes may be replaced by nicotine from alternative sources. 2. Cigarettes of different strengths should be smoked differently, e.g., smokers given a low/reduced delivery cigarette should smoke it more intensively (and vice versa)." [Emphasis in original.] Subsequent slides show both that nicotine replacement reduced smokers intake of cigarettes, and that cigarette consumption increased as nicotine yields decreased. Pages BW-W2-02751-02759.

In addition, a Philip Morris researcher who studied a group of smokers in a small town that had gone through a cold turkey campaign described at length the withdrawal symptoms of those who had quit smoking. Even after eight months quitters were apt to report symptoms such as feeling depressed, being restless and tense, being ill-tempered, having a loss of energy, being apt to doze off.[207] They were further troubled by constipation and weight gains which averaged about five pounds per quitter.[208] The researcher stated:

> *This is not the happy picture painted by the Cancer Society's anti-smoking commercial which shows an exuberant couple leaping in the air and kicking their heels with joy because they've kicked the habit. A more appropriate*

---

Armitage AK. *Appraisal of Report: "The Fate of Nicotine in the Body."* August 28, 1963. Armitage wrote:

> *The authors themselves admit (p.27) that the present results offer no conclusive evidence for any particular mechanism involved in tolerance to nicotine, nor do they indicate a lead to the phenomenon of addiction. This important problem was, I imagine, the main object of the research.*

Final Report on Project HIPPO II, note 161, *supra*, at page 4:

> *A quantitative investigation of the relations with time of nicotine - and of some possible brain mediators - on adreno-corticotrophic activity could give us the key to the explanation of both phenomena of tolerance and of addiction, in showing the symptoms of withdrawal.*

In the Minutes of the BATCO R&D Conference in Montreal (October 24, 1976), the list of "assumptions" includes the statement: "Smoking is an addictive habit attributable to nicotine." (The word "addictive" has been crossed out.) Page 2.

A report of the BATCO Group R&D Conference Part I, February 5-9, 1979, attended by Sanford and Reynolds of Brown and Williamson, under the heading "Behavioral Research," states: "With regard to dependence [the researcher] wants to study the nature and effect of dependence on smoking behavior and break smokers down into dissonant and consonant smokers." Page BW-W2-03526.

A report of the BATCO Group R&D Psychology Research (1984-86) states:

> *Activity continues in the area of researching the functional significance of smoking in everyday life, current emphasis being placed on the role of personality in relation to nicotine dependance [sic] and personal requirements of the product.* Page BW-W2-02004.

[207] Ryan FJ (Philip Morris). *Bird-1, A study of the Quit-Smoking campaign in Greenfield, Iowa, in Conjunction with Movie, Cold Turkey*. 1971. Summary, pages 30-33. *See* FINDINGS § II.C.4, *infra*.

[208] *Id.*

*commercial would show a restless, nervous, constipated husband bickering viciously with his bitchy wife who is nagging him about his slothful behavior and growing waistline.*[209]

In his report, the Philip Morris researcher also observed that some smokers "need" tobacco, and that this need may be correlated with use of high-nicotine cigarettes.[210] In 1976, the same Philip Morris researcher elaborated on his view that smokers smoke many cigarettes to satisfy their physiological "need" for a specific level of nicotine in the blood:

> *Although nicotine intake appears a critical mainstay of tobacco consumption, not all people smoke for nicotine on all occasions . . . . All . . . cigarettes contribute to the total nicotine in the system, so that a cigarette smoked out of habit will delay the time until a cigarette is smoked out of need.*[210a]

A BATCO report, as well as a report by the American Tobacco Company, also implicitly acknowledge that nicotine produces withdrawal/physical dependence.[211]

Nicotine's capacity to produce "tolerance," often cited as a defining feature of addiction, see p. 81, is also acknowledged in several internal documents. For example, the BATCO-commissioned report "Fate of Nicotine in the Body" acknowledges that nicotine produces tolerance and/or addiction:

---

209 *Id.* at p. 33.

210 *Id.* at p. 20.

210a Ryan FJ. Habit and Need Cigarettes. *In* Dunn WL. 1600/Smoker Psychology/October 1-31, 1977 [Monthly Report]. November 11, 1977. *In* 141 Cong. Rec. H7665 (daily ed. July 25, 1995).

211 *See:*
BATCO R&D. *Relative Contributions of Nicotine and Carbon Monoxide to Human Physiological Response.* Report No. RD.839-R. November 15, 1971. Page 20:

> *All the regular smokers in this trial were required not to smoke for at least half an hour before the trials, which may have caused an additional stress factor, shown as a stimulation due to the ending of a period of forced abstinence. . .*

The American Tobacco Company, note 178, *supra,* at p. 66.

> *In addition, the alkaloid [nicotine] appears to be intimately connected with the phenomena of tobacco habituation (tolerance) and/or addiction.*

Notes from a BATCO Nicotine Conference[212] include a chart titled "Session IV -- Effects of Nicotine-interaction with the Brain (Pharmacology)." The chart includes the statement "Nicotine and smoke exposure causes adaptation of the nicotine receptor," a change that has been recognized as being associated with tolerance.

Perhaps the most telling admissions that nicotine is addictive come from marketing research studies prepared for tobacco companies. In these documents, the market researchers candidly assert nicotine's addictiveness, in a manner that appears to assume that the tobacco company recipients of the reports will not find the assertion unusual or controversial. For example, in a market research report prepared for Imperial Tobacco Ltd., on attitudes of adolescent smokers, the authors state:

> *until a certain nicotine dependence has been developed [taste] is somewhat less important than other things . . ."*[213]

Another market research firm refers to attitudes of adolescents "[o]nce addiction does take place . . ."[214] and states that "addicted they do indeed become."[215] The same firm, discussing its research on smokers' attempts to quit, reported that:

---

[212] *See* Ayres note 172, *supra,* at p. BW-W2-02643.

[213] Spitzer, Mills & Bates. *The Player's Family: A Working Paper.* Report prepared for Imperial Tobacco Ltd. March 25,1977. Page 12.

[214] Kwechansky Marketing Research. *Project Plus/Minus*, in "Study Highlights." Report prepared for Imperial Tobacco Ltd. May 7, 1982.

[215] *Id.* at p. 26. This same documents notes that: "The desire to quit seems to come earlier now than before, even prior to the end of high school. In fact, it often seems to take hold as soon as the recent starter admits to himself that he is hooked on smoking. However, the desire to quit, and actually carrying it out, are two quite different things, as the would-be quitter soon learns." *Id.* in "Study Highlights."

> *Recidivism has several causes . . . . Another is the belief that after a few weeks off cigarettes, one could begin again to smoke "just a few" . . . . This "just a few" business is actually a surrender to addiction while trying to save face for an interim period, to pretend to oneself and to others that addiction is no longer present, which is nonsense.* [216]

A market research report that was widely circulated in Britain included the following editorial comment, contained in a description of smokers' views of the role played by tar and nicotine in smoking-related health problems:

> *Another idea was that nicotine and tar combined to have a harmful effect upon health (i.e., quite apart from nicotine's addictive function).*[217] [Emphasis added.]

Later in the same study, the researchers reported under the heading "Nicotine's addictive function" that:

> *Most respondents, with a bias towards men, realised that nicotine was the attribute in cigarettes causing addiction. It was also usually seen as the component providing satisfaction.*[218] [Emphasis added.]

---

[216] *Id.* at p. 36-37. The same document also says, at page ii:

> *It is likely more difficult to break the ritualistic aspects of smoking than it is to overcome the physical withdrawal.*

*See also* an advertising strategy document prepared for Imperial Tobacco which recommends the following advertisement:

> *The chosen scene should ideally depict a pause or moment of relaxation before, during or after the activity. This moment should correspond to the physiological need for smoking.*

Publicite BCP. *Player's Filter '81 Creative Guidelines.* January 25, 1980. [Emphasis added.]

[217] *Attitudes Towards Smoking and Health.* Page 11. Transmitted by letter dated July 26, 1979, to Dr. H.E. Bentley, Imperial Tobacco Ltd., from A.H. Johnston, Market Research Manager, Carreras Rothmans Ltd.

[218] *Id.* at p. 12.

### b. Tobacco Company Executives' and Senior Officials' Views

High-ranking tobacco company officials have also acknowledged that nicotine is addictive and that this is the reason why people use tobacco.[219]

For example, in the aforementioned July 1962 tobacco industry meeting, BATCO board science advisor Sir Charles Ellis stated:

> *Smoking is a habit of addiction.*[220]

In an internal memo, the general counsel to Brown and Williamson makes the same point in clear, simple language:

> *Moreover, nicotine is addictive* . . . . *We are, then, in the business of selling nicotine, an addictive drug* . . . [Emphasis added.][221]

Dr. Green, the director of research for BATCO, also repeatedly stated his view that some portion of smoking behavior was due to its addictive effects.[222] In a note to Dr. G. Hook, another scientist at BATCO, Dr. Green wrote, "If you consider Russell's study on cigarette dependence and his five types of smoking you can conceive a pattern as follows . . ." The note follows with a hand-drawn triangle symbolizing the reasons for smoking, with the three points of the triangle labeled "sensory rewards," "psychosocial rewards," and "pharmacological rewards." In the corner of the triangle near "pharmacological rewards" are

---

219 One tobacco company, which markets a cigarette brand called "Death Cigarettes," now states on the package that "cigarettes are addictive." FDA was informed on December 23, 1994, by John D. Slade, M.D., that "Death Cigarettes" stands for "Daring Enterprises Against Tobacco Hypocrisy." The company, owned by Charles and Amelie Southwood, has a post office box in Venice, CA, and an office in Marina Del Ray, CA.

220 Ellis C. *The Smoking and Health Problem*. BATCO Research Conference. Smoking and Health-Policy on Research. Southampton, England. 1962. Page 4.

221 Yeaman, A. Implications of Battelle Hippo I and II and the Griffith Filter. July 17, 1963. Page 4.

222 *See* Green, note 191, *supra,* at Appendix I.

the words "addictive smoking."[223]

In a handwritten note about the likely continued success of the tobacco industry, Dr. Green wrote:

> *The main factor ensuring the continuation of the habit is the dependency induced in smokers. . . . Certainly large numbers of people will continue to smoke because they are unable to give it up. If they could they would do so. They can no longer be said to make an adult choice. And many new smokers become dependent.*[224] [Emphasis added.]

In a handwritten paper entitled "Marketing Cigarettes in the 80's," Dr. Green again stated that addiction is a major reason that people smoke. Noting various failures and constraints in the marketing of cigarettes, including a "close down in advertising" and "the U.K. tar premium,"[225] he writes:

> *Nevertheless smokers will continue - addiction . . .*
>
> *Perhaps 50-60% dissonant smokers [smokers who continue despite desire and motivation to quit] . . .*
>
> *Regard cig[arettes] as catering for addicts.*

Finally, in a paper stating that there was adequate evidence that smoking causes disease, written shortly after he retired from BATCO, Dr. Green wrote that, while it may be up to the individual, "if he is able," to decide whether to accept the "considerable risk" from smoking:

> *on behalf of those unable to make judgments such as children and addicted smokers, the social apparatus must be used to exercise value judgments on the*

---

[223] Green SJ. Note to Hook G. BATCO R&D. Southampton, England. June 11, 1974. Also in the end of the triangle marked "pharmacological rewards" were "stimulation smoking" and "tranquilisation smoking."

[224] Green SJ. Transcript of handwritten note. Undated. Attached to documents, Green SJ, *Cigarette Smoking and Causality,* and Green SJ, *Smoking, Associated Diseases and Causality.*

[225] The U.K. tar premium is a tax imposed on products on the basis of tar content.

*acceptability of the risks.*[226] [Emphasis added.]

In 1961, Dr. Wakeham of Philip Morris noted in a presentation to the company's Research and Development Committee that "continued usage [of nicotine] develops tolerance."[227]

William Dunn, a senior scientist at Philip Morris, made numerous statements reflecting the position that nicotine has the properties of an addictive drug. In 1969, Dunn wrote a memorandum to his supervisor, entitled "Objectives and Plans - 1600," describing the research Philip Morris planned to undertake in the coming year. One of the planned research projects were designed to investigate the addictive properties of nicotine, by teaching rats:

> *to seek the inhalation of cigarette smoke . . . . ultimately through the reinforcing effect of the psychopharmacological effects of the inhaled smoke.*[227a]

As described in § I.B.3., supra, the ability of a substance to function as "positive reinforcer" in animals is one of the most significant pieces of evidence that the substance will be addictive in humans. By 1980, Dunn reported that Philip Morris researchers had successfully demonstrated that rats will self-administer nicotine,

> *making it quite clear that nicotine can function as a positive reinforcer for rats.*[227b]

---

226 Green, note 224, *supra*, at p. 92238.

227 Wakeham, note 185, *supra*.

227a Dunn WL and Eichorn PA. Objectives and Plans - 1600. January 8, 1969. *In* 141 Cong. Rec. H7646 (daily ed. July 25, 1995). A second research project planned for 1969 was intended to discover "any product that can potentially replace the cigarette in need-gratification."

227b Memorandum to T.S. Osdene from W.L. Dunn. Plans and Objectives - 1981. November 26, 1980. *In* 141 Cong. Rec. H7682 (daily ed. July 25, 1995). Philip Morris undertook a range of animal studies on nicotine that constitute the classic methods for assessing the addictive properties of drugs, including self-administration, tolerance, and discrimination studies:

Other statements are equally revealing. A 1974 annual research report from the Behavioral Research program at Philip Morris, which was approved by Thomas Osdene (later Philip Morris' Vice President for science and technology) and distributed to the Vice President for research and development, states that people continue to smoke because the "pharmacologically active components of smoke" are "reinforcing":

> *A general premise in our model of the cigarette smoker is that the smoking habit is maintained by the reinforcing effect of the pharmacologically active components of smoke. A corollary to this premise is that the smoker will regulate his smoke intake so as to achieve his habitual quota of the pharmacological action.*[227c]

The report goes on to acknowledge that stopping smoking produces a withdrawal syndrome like that of other habit-forming drugs. Commenting on a proposed study to test the hypothesis that smoking decreases aggressivity, the researchers note that any increase in

---

> *Nicotine discrimination, self-administration, and tolerance studies will enable us to examine the cueing and reinforcing properties of nicotine and nicotine analogues in rats. These are the state-of-the-art bioassays for central nervous system activity which we believe will serve as useful models of human smoking behavior.* [Emphasis added.]

Memorandum to T.S. Osdene from J.I. Seeman et al. Nicotine Program: Specific Implementation. March 31, 1978. *In* 141 Cong. Rec. H7668, *supra*. In 1980, Philip Morris decided to perform yet another study of "the rewarding properties of nicotine" using a technique developed to study the similar properties of morphine:

> *Mucha and Van der Kooy (1979) have reported that a place preference paradigm may be used to demonstrate the rewarding properties of morphine. We plan to use a similar paradigm to examine the rewarding properties of nicotine.*

Memorandum to T.S. Osdene from W.L. Dunn. Plans and Objectives-1980. January 7, 1980. *In* 141 Cong. Rec. H7671, *supra*.

[227c] Philip Morris Research Center. Behavioral Research Annual Report (Part II). *In* 141 Cong. Rec. H7660 (daily ed. July 25, 1995). Approved by T.S. Osdene and distributed to H. Wakeham et al. November 1, 1974. Philip Morris officials consistently held the view that the reinforcing properties of cigarette smoking have a pharmacological basis, as shown by a document written six years later, in which the following statement appears:

> *It is our belief that the reinforcing properties of cigarette smoking are directly relatable to the effects that smoking has on the electrical and chemical events within the central nervous system.*

Memorandum to T.S. Osdene from W.L. Dunn. Plans and Objectives-1981. November 26, 1980. *In* 141 Cong. Rec. H7681, *supra*.

aggressivity following deprivation

> *may be as readily explained as the emergence of reactions to [cigarette] deprivation, not unlike those to be observed upon withdrawal from any of a number of habituating pharmacological agents.*[227d]

A Philip Morris research report written by Dunn again acknowledged that cigarette deprivation produces a withdrawal syndrome in 1980, and stated that those smokers who suffered withdrawal in the absence of sufficient nicotine showed "nicotine dependence." The report began by stating the Philip Morris had attempted to identify

> *two smoking population subgroups, one of which has greater nicotine needs than the other. We have described these people in the past as compensators and noncompensators, and attempted to define them by their consumption changes when nicotine deliveries were moderately shifted . . . . Now we may have two extra tools to use: PM cigarettes of ultra low tar and nicotine, and salivary nicotine concentrations . . . . We therefore propose a shift study in which smokers are shifted to an ultra low brand, and the key dependent variable becomes the presence or absence of the withdrawal syndrome. Those who show evidence of nicotine dependence and those who do not can then be used to test our hypotheses on the relationship of salivary concentration to smoking behavior.*[227e] [Emphasis added.]

CTR documents also refer to the addictive properties of nicotine. In a section of its annual report for 1966-67 entitled "Nicotine and the Central Nervous System," CTR described research in which monkeys self-administered nicotine.[228]

Much more recently, tobacco companies have attempted to rely on the "common

---

[227d] Behavioral Research Annual Report, Part II. Approved by T.S. Osdene. November 1, 1974. *In* 141 Cong. Rec. H7660 (daily ed. July 25, 1995).

[227e] Memorandum to T.S. Osdene from W.L. Dunn. Plans and Objectives-1980. January 7, 1980. *In* 141 Cong. Rec. H7672 (daily ed. July 25, 1995).

[228] *See* Report of the Scientific Director, 1966-67, note 195, *supra,* at pp. 12-13. As discussed earlier, it is well-established that self-administration of a substance by animals, under laboratory conditions, demonstrates that the substance is a "positive reinforcer," one of the hallmark properties of addictive drugs. *See* p. 96.

knowledge" that nicotine is addictive to defend against product liability cases brought by smokers. For example, in Rogers v. R.J. Reynolds et al., attorneys for Philip Morris, R.J. Reynolds, the American Tobacco Co., and the Liggett Group argued that the plaintiff could not claim that her deceased husband was not adequately warned that cigarettes were addictive, because their addictive properties are so well known:

> *There can be no serious suggestion that ordinary consumers do not expect to find nicotine in cigarettes, or that ordinary consumers have not long been well aware that it may be very difficult to stop smoking. [Footnote omitted.] The common knowledge of the alleged habituating or "addicting" properties of cigarettes has resulted in almost casual references to these properties in decisions from around the country throughout this century.*[229]

Finally, F. Ross Johnson, the former chief executive of RJR Nabisco, has openly acknowledged that tobacco is addictive and that its addictive properties are why people smoke. In an interview for an article in the Wall Street Journal, Mr. Johnson was asked about tobacco. He responded:

> *Of course it's addictive. That's why you smoke . . .*[230]

Accordingly, it is clear that high-ranking officials of tobacco companies have long known that nicotine is an addictive drug and, more importantly, that the market for tobacco products in large part depends on the addictive effects of nicotine.

---

[229] Rogers v. R.J. Reynolds et al (Sup.Ct. Ind.)(No. 49A02-8904 CV 164)(1990), Appellees Brief in Reply to Appellants' Opposition to Petition for Transfer, at pp. 7-8.

[230] Shapiro E. Big spender finds new place to spend. *The Wall Street Journal.* October 6, 1994.

### 3. Statements That Tobacco Products Are Nicotine Delivery Systems

Internal and published documents also show that top-ranking tobacco industry officials intend to offer tobacco products to consumers as nicotine delivery systems. In summarizing the 1972 conference sponsored by CTR, William Dunn, Jr., of Philip Morris characterized the cigarette as a nicotine delivery system:

> *Think of the cigarette pack as a storage container for a day's supply of nicotine*
>
> . . . .
>
> *Think of the cigarette as a dispenser for a dose unit of nicotine:*
> *1) It is readily prepped for dispensing nicotine.*
> *2) Its rate of combustion meters the dispensing rate, setting an upper safe limit for a substance that can be toxic in large doses.*
> *3) Dispensing is unobtrusive to most ongoing behavior.*
>
> *Think of a puff of smoke as the vehicle of nicotine:*
> *1) A convenient 35 cc mouthful contains approximately the right amount of nicotine.*
> *2) The smoker has wide latitude in further calibration: puff volume, puff interval, depth and duration of inhalation. . . .*
> *3) Highly absorbable: 97% nicotine retention.*
> *4) Rapid transfer: nicotine delivered to blood stream in 1 to 3 minutes . . . .*
>
> *Smoke is beyond question the most optimized vehicle of nicotine and the cigarette the most optimized dispenser of smoke.*[231]

In a document entitled "RJR confidential research planning memorandum on the nature of the tobacco business and the crucial role of nicotine therein," quoted in the New York Times, RJR executive Claude Teague, Jr. wrote:

> *In a sense, the tobacco industry may be thought of as being a specialized, highly ritualized, and stylized segment of the pharmaceutical industry. Tobacco products uniquely contain and deliver nicotine, a potent drug with a*

---

[231] *See* Dunn Summary, note 133, *supra*. (Indeed, when interviewed by FDA officials in May 1994, Dunn stated that he was known as "the Nicotine Kid" at Philip Morris. See handwritten notes summarizing meeting May 10, 1994, between FDA and Dr. W.L. Dunn.)

### 3. Statements That Tobacco Products Are Nicotine Delivery Systems

Internal and published documents also show that top-ranking tobacco industry officials intend to offer tobacco products to consumers as nicotine delivery systems. In summarizing the 1972 conference sponsored by CTR, William Dunn, Jr., of Philip Morris characterized the cigarette as a nicotine delivery system:

> *Think of the cigarette pack as a storage container for a day's supply of nicotine*
> . . . .
> *Think of the cigarette as a dispenser for a dose unit of nicotine:*
> *1) It is readily prepped for dispensing nicotine.*
> *2) Its rate of combustion meters the dispensing rate, setting an upper safe limit for a substance that can be toxic in large doses.*
> *3) Dispensing is unobtrusive to most ongoing behavior.*
>
> *Think of a puff of smoke as the vehicle of nicotine:*
> *1) A convenient 35 cc mouthful contains approximately the right amount of nicotine.*
> *2) The smoker has wide latitude in further calibration: puff volume, puff interval, depth and duration of inhalation. . . .*
> *3) Highly absorbable: 97% nicotine retention.*
> *4) Rapid transfer: nicotine delivered to blood stream in 1 to 3 minutes . . . .*
>
> *Smoke is beyond question the most optimized vehicle of nicotine and the cigarette the most optimized dispenser of smoke.*[231]

In a document entitled "RJR confidential research planning memorandum on the nature of the tobacco business and the crucial role of nicotine therein," quoted in the New York Times, RJR executive Claude Teague, Jr. wrote:

> *In a sense, the tobacco industry may be thought of as being a specialized, highly ritualized, and stylized segment of the pharmaceutical industry. Tobacco products uniquely contain and deliver nicotine, a potent drug with a*

[231] *See* Dunn Summary, note 133, *supra*. (Indeed, when interviewed by FDA officials in May 1994, Dunn stated that he was known as "the Nicotine Kid" at Philip Morris. See handwritten notes summarizing meeting May 10, 1994, between FDA and Dr. W.L. Dunn.)

*variety of physiological effects.*[231a]

The memo goes on:

> *If nicotine is the sine qua non of tobacco products, and tobacco products are recognized as being attractive dosage forms of nicotine, then it is logical to design our products - and where possible our advertising - around nicotine delivery rather than around tar delivery or flavor.*[231b]

As noted above, Sir Charles Ellis, BATCO's scientific advisor, considered smoking a method of administering nicotine as early as 1962:

> *Nicotine is not only a very fine drug, but the techniques of administration by smoking has [sic] considerable psychological advantages and a built-in control against excessive absorption.*[232]

Dr. S.J. Green, BATCO board member and research director, also viewed the cigarette as a vehicle for delivering nicotine. In a document describing BATCO's research needs, he made the following statement:

> *It may be useful, therefore, to look at the tobacco industry as if for a large part its business is the administration of nicotine (in the clinical sense).*[233]

In a draft of another document entitled "A Blueprint for B.A.T. Scientific Departments," Green repeated this belief:

---

231a Hilts PJ. U.S. Convenes Grand Jury to Look at Tobacco Industry. *New York Times*. July 26, 1995.

231b *Id.*

232 Ellis C. *The Smoking and Health Problem*. BATCO Research Conference. Smoking and Health-Policy on Research. Southampton, England. 1962. Page 16.

233 Green, note 191, *supra*, at Appendix II.

*See also* Green, note 192, *supra*, at p. 2:

> *[w]hile other factors cannot be ignored and their influence is not completely understood, it seems a good assumption that nicotine plays a predominant role for many smokers. So that a good part of the tobacco industry is concerned with the administration of nicotine to consumers . . . . [T]hus a large part of our research problem can be identified as the improvement in quality by improving the administration of nicotine . . .*

*We must assume that the main objective is the administration of nicotine . . .* [234]

In a handwritten chart, attached to a paper entitled "The Association of Smoking and Disease," Green described all forms of tobacco as different methods of nicotine administration.[235]

The 1981 monograph on nicotine pharmacology and toxicology published by the British Tobacco Advisory Council expressly states that nicotine is a drug and that tobacco is simply a vehicle for its administration.[236] After setting forth the purpose of the monograph -- to help medical authorities decide whether smoking-related illness should be handled by eliminating smoking altogether, by progressively reducing smoke deliveries, or by developing a cigarette that delivers "an adequate dose of nicotine without the necessity of <u>inhaling large doses of toxic vehicle</u>" -- the introduction states succinctly:

> *In a nutshell our approach has been to regard nicotine as a "drug" to which man is exposed in various "vehicles" and by various routes.*[237]

A presentation at the 1984 BATCO Smoking Behaviour-Marketing Conference included the following slides:

> <u>*Relationship Between Smoking Behaviour and Nicotine Intake*</u>
>
> *Is there any commonalty [sic] in the process [of smoking]:*
> - *broad similarities in wholebody nicotine dose of nicotine across smoking groups*
> - *strong indirect evidence of smokers smoking for nicotine*
> - *is this cause and effect or a reflection for something else*

---

234 Undated draft of *A Blueprint for B.A.T. Scientific Departments.* Page 4.

235 *See* Green, note 193, *supra.* Handwritten chart attached.

236 Cohen, note 183, *supra,* at p. 1.

237 *Id.* at p. 1. (Emphasis added.)

*What is the Significance of this Observation:*

> *-underlying smoking maintenance through nicotine, and as a consequence probably provides the basis of smoking satisfaction - in its simplest sense puffing behaviour is the means of providing nicotine dose in a metered fashion* [Emphasis added.][238]

Finally, in a list of expected changes in cigarettes over the next several years, a BATCO official suggested that cigarettes could become delivery systems for drugs in addition to nicotine:

> *"Increases in the use of drugs other than nicotine. Potential legalisation of the use of marijuana. Possible introduction of caffeine."* [Emphasis added.][239]

Thus, tobacco company executives have both recognized that nicotine's drug effects are central to the use of tobacco and stated their clear understanding that cigarettes are being sold to and used by smokers as nicotine delivery systems. On the basis of this evidence, these products are intended to affect the structure or function of the body.

---

[238] Proceedings of the BATCO Smoking Behaviour-Marketing Conference. Session I. July 9-12, 1984. Slides.

[239] FH [Initials of BATCO employee]. BATCO R&D. *Technical and Product Developments Envisaged Over the Next Five Years*. January 22, 1974. Page 1.

## B. INDUSTRY RESEARCH ON THE DRUG EFFECTS OF NICOTINE

The tobacco industry has conducted and funded extensive research to characterize nicotine's addictive potential and properties. This research includes studies on nicotine's absorption into the bodies of tobacco users, its effects on behavior, and its effects on the brain and endocrine systems.[240] Sections II.B., C., and D. detail the extensive research conducted and funded by the tobacco industry on: 1) nicotine's pharmacological effects, § II.B., infra; 2) how consumers use tobacco products to obtain an adequate dose of nicotine, § II.C., infra; and 3) how to manipulate nicotine delivery from tobacco to provide an adequate dose to consumers, § II.D., infra.[240a]

---

[240] The long history of tobacco and nicotine use for pharmacological purposes is also well known to the tobacco industry. Larson PS, Silvette H. Medical uses of tobacco (past and present), (funded by a grant from the Tobacco Industry Research Committee and presented at industry-sponsored symposium). In: VonEuler, ed. *Tobacco Alkaloids and Related Compounds.* New York, NY: Pergamon Press; 1965:3-11.

*See also* Cohen, note 183, *supra,* at p. 1.

[240a] The extent of the industry's research on nicotine pharmacology is very likely to be even greater than that reflected in this section. According to a recent report in the New York Times, Philip Morris conducted internal research on nicotine's pharmacological effects on smokers from the late 1960's to the mid-1980's. The Times reported that Charles Wall, a Philip Morris lawyer, confirmed that company documents showed that Philip Morris carried out extensive research on nicotine over many years. Hilts PJ. "Documents Disclose Philip Morris Studied Nicotine's Effect on Body." *New York Times.* June 8, 1995. Documents later disclosed by Congress provide detailed evidence of Philip Morris' long-term research on nicotine pharmacology, including studies to isolate and characterize nicotine receptors in the central nervous system, the effects of nicotine/smoking on the electrical activity of the brain, the effects of nicotine on human and animal behavior, self-administration of nicotine by rats, nicotine discrimination in rats, nicotine tolerance, and the effects of nicotine administration on human physiologic function, including the relationship between blood nicotine levels and central nervous system activity. 141 Cong. Rec. H7470-76 (daily ed. July 24, 1995); 141 Cong. Rec. H7646-83 (daily ed. July 25, 2995). Philip Morris has not contested the authenticity of these documents. R.J. Reynolds, too, appears to have conducted extensive research on nicotine pharmacology that is not fully reflected here. In response to questions about that company's research on nicotine, a spokeswoman for R.J. Reynolds Tobacco Company stated that "[w]e've not only done research on the pharmacological effects of nicotine but we've published it in at least 250 peer-reviewed journals and symposia. We're extremely proud of the quality and number of the studies." Collins G. "Legal Attack on Tobacco Intensifies." *New York Times.* June 9, 1995.

It is important to understand why the tobacco industry has conducted this research. Tobacco industry documents show that the industry research described in the following sections was undertaken because industry officials strongly suspected, more than 30 years ago, that nicotine's pharmacological effects were vital to the successful marketing of tobacco. For example, internal BATCO documents disclose that the major BATCO-sponsored nicotine studies completed or underway in the early 1960's were undertaken "to elucidate the effects of nicotine as a beneficent alkaloid drug"[241] because of the belief of Sir Charles Ellis, the leading BATCO scientist, that "we are in a nicotine rather than a tobacco industry."[242]

Another nicotine study commissioned by BATCO in the early 1960's similarly reveals that industry research on nicotine's pharmacological effects was undertaken because of the industry's understanding that consumers use tobacco to obtain those effects:

> *There is increasing evidence that nicotine is the key factor in controlling, through the central nervous system, a number of the beneficial effects of tobacco smoke . . . . Detailed knowledge of these effects of nicotine in the body*

---

[241] *See* Ellis, note 232, *supra*, at p. 16. On the same page Ellis describes upcoming research "to investigate whether cigarette smoke produces effects on the central nervous system characteristic of tranquilising or stimulating drugs and, if so, to see if such activity is due solely to nicotine."

[242] Johnson RR. *Comments on nicotine.* June 30, 1963. Pages 10-11. This document goes on to reveal that these studies on nicotine's pharmacological effects were part of a broader research initiative that was being conducted by the industry and included altering nicotine delivery:

> *The Southampton group is going to be doing a large amount of work on nicotine, and for some good reasons. To summarize:*
> *Project ARIEL [a cigarette alternative developed by BATCO] - This is dormant for the moment. The first samples tried gave a tremendous kick, even though the nicotine delivery was quite small. It would appear that the project will be reinitiated within a few months.*
> *Dr. S.R. Evelyn is presently investigating the absorption of extractable and non-extractable nicotine in the mouth . . . .*
> *Dr. J.D. Backhurst is setting up an analysis for pH of whole smoke on a puff-by-puff basis. This correlates with his previous interest in extractable nicotine.*
> *Mr. H.G. Horsewell continues to work with alkaline filter additives which selectively increase nicotine delivery.*

*of a smoker is therefore of vital importance to the tobacco industry.*[243]

An annual report from the Council for Tobacco Research discloses that the research it funded on nicotine's pharmacology was designed to elucidate the effects of nicotine on the smoker's central nervous system:

> *Most of the pharmacological studies currently being supported by The Council are concerned with the effects of nicotine and/or smoking on the central nervous system (the brain) with the object of learning more about why people like, want, or need to smoke.*[244]

The studies of nicotine's pharmacokinetics and pharmacodynamics described in § II.B., infra, were undertaken to assist the industry in marketing products that would satisfy tobacco users' nicotine requirements. This information relating to how nicotine acted in the body was needed by the industry for additional studies specifically designed to establish the dose of nicotine required by consumers, § II.C., infra. As noted in the report of one study whose purpose was to validate a method for assaying nicotine and a metabolite in urine:

> *It can be concluded from the comparative studies that analysis of nicotine and cotinine in urine is likely to be a good indicator of whole body nicotine dose in man. This technique has an immediate and direct relevance for . . . human behavioural studies in the assessment of an individuals' [sic] nicotine dose in response to modification in cigarette design.* [Emphasis added.][245]

---

243 Geissbuhler H, Haselbach C. *The Fate of Nicotine in the Body*. Battelle Memorial Institute. Geneva, Switzerland. May 1963. Page 1. Report prepared by Battelle for BATCO. (Hereafter cited as: BATCO. *The Fate of Nicotine in the Body*.).

244 Report of the Scientific Director, 1969-1970. Council for Tobacco Research-U.S.A. Page 13.

245 BATCO Group R&D Centre. *Nicotine Studies: A Second Report. Estimation of Whole Body Nicotine Dose By Urinary Nicotine and Cotinine Measurement.* Report No. RD.1792. March 31, 1981. Page 1.

Industry documents related to other basic research studies on nicotine show a similar nexus with product development. For example, the report from a 1974 Brown and Williamson study of nicotine's brain effects states that:

> *The development of new products and the modification of existing ones requires that we have some knowledge of the smoker toward whom these efforts are directed. The work described in this report is focused on the acute, or immediate physiological response of*

Thus, this research demonstrates the tobacco industry's fundamental interest in the dose of nicotine absorbed into the systemic circulation of the tobacco user (rather than simply the amount of nicotine necessary to deliver sensory effects to the mouth of the user.)

The ultimate purpose of the tobacco industry's studies on nicotine was to better understand the nicotine requirements of tobacco users and to develop products that delivered the desired pharmacological effects of nicotine. Philip Morris officials stated that the rationale for the company's extensive research program on nicotine pharmacology was that the information would

> *strengthen Philip Morris R&D capability in developing new and improved smoking products.*[245a]

Accordingly, the industry-sponsored studies described in the following sections provide further evidence that tobacco manufacturers intend to market their products to deliver the pharmacological effects of nicotine to consumers.[246]

---

*smokers.*
Brotzge RF, Kennedy JE. Brown and Williamson. *Human Smoking Studies: Acute Effect of Cigarette Smoke on Brain Wave Alpha Rhythm - First Report.* October 31, 1974. Report No. 74-20. Page 1.

Similarly, a 1974 BATCO study on nicotine's effects on brain electrical activity was intended to "help elucidate the mode of action of nicotine during smoking" so as to better understand smoker behavior in response to nicotine. BATCO Group Research & Development. Comer AK, Thornton RE. *Interaction of Smoke and the Smoker Part 3: The Effect of Cigarette Smoking on the Contingent Negative Variation.* Report No. RD.1164-R. December 12, 1974. Page 2.

[245a] Memorandum from W.L. Dunn to T.S. Osdene-Plans and Objectives-1979. December 6, 1978. *In* 141 Cong. Rec. H7669 (daily ed. July 25, 1995).

[246] The full citations for the references in notes 247 through 279 can be found in Appendix 4. Entries under the heading "OTHER" include studies sponsored by the Smokeless Tobacco Research Council (whose members include U.S. tobacco companies), Swedish Tobacco Co. (which has corporate relationships with both Pinkerton and U.S. Tobacco Co.), Svenska Tobaks (a subsidiary of Swedish Tobacco Co.), the Tobacco Advisory Council and the Tobacco Research Council of the U.K. (whose members included British-American Tobacco Co.), Imperial Tobacco Co. (which has corporate relationships with British-American Tobacco Co., and manufactures cigarettes that are marketed in the U.S.), Carreras Rothmans Ltd. (whose affiliated companies manufacture cigarettes that are marketed in the U.S.), Swiss Association of Cigarette Manufacturers (whose members include affiliates of U.S. tobacco companies, and the Canadian Tobacco Manufacturers Council (whose members include affiliates of U.S. tobacco companies).

## 1. Industry Research on Nicotine's Effects on the Brain

The tobacco industry has extensively studied, in its own laboratories and through grants or contracts to other laboratories, the effects of nicotine on the brain and other parts of the central nervous system, including the sites in the brain on which nicotine acts.[247]

---

[247] COUNCIL FOR TOBACCO RESEARCH-USA

Abood. Comparison of the binding of optically pure (-)- and (+)-[3H]nicotine to rat brain membranes

Abood. Electrophysiological, behavioral, and chemical evidence for a noncholinergic, stereospecific site for nicotine in rat brain

Abood. Receptor binding characteristics of a 3H-labeled azetidine analogue of nicotine

Abood. Tritiated methylcarbamylcholine a new radioligand for studying brain nicotinic receptors

Abood. Evidence for a noncholinergic site for nicotine's action in brain: Psychopharmacological, electrophysiological and receptor binding studies

Abood. Acute and chronic effects of nicotine in rats and evidence for a non-cholinergic site of action

Andersson. Involvement of D1 dopamine receptors in the nicotine-induced neuro- endocrine effects and depletion of diencephalic catecholamine stores in the male rat

Andersson. Effects of acute central and peripheral administration of nicotine on hypothalamic catecholamine nerve terminal systems and on the secretion of adenohypophyseal hormones in the male rat

Andersson. Interactions of nicotine and pentobarbitone in the regulation of telencephalic and hypothalamic catecholamine levels and turnover and of adenohypophyseal hormone secretion in the normal male rat

Andersson. Effects of single injections of nicotine on the ascending dopamine pathways in the rat

Andersson. Mecamylamine induced blockade of nicotine induced inhibition of gonadotrophin and TSH secretion and of nicotine induced increases of catecholamine turnover in the rat hypothalamus

Andersson. Nicotine-induced increases of noradrenaline turnover in discrete noradrenaline nerve terminal systems of the hypothalamus and the median eminence of the rat and their relationship to changes in the secretion of adenohypophyseal hormones

Andersson. Involvement of cholinergic nicotine-like receptors as modulators of amine turnover in various types of hypothalamic dopamine and noradrenaline nerve terminal systems and of prolactin, LH, FSH and TSH secretion in the castrated male rat

Andersson. Effects of acute intermittent exposure to cigarette smoke on catecholamine levels and turnover in various types of hypothalamic DA and NA nerve terminal systems as well as on the secretion of adenohypophyseal hormones and corticosterone

Andersson. Effects of chronic exposure to cigarette smoke on amine levels and turnover in various hypothalamic catecholamine nerve terminal systems and on the secretion of pituitary hormones in the male rat

Andersson. Mecamylamine pretreatment counteracts cigarette smoke induced changes in hypothalamic catecholamine neuron systems and in anterior pituitary function

Bhagat. Effects of chronic administration of nicotine on storage and synthesis of noradrenaline in rat brain

Bhagat. Influence of chronic administration of nicotine on the turnover and metabolism of noradrenaline in the rat brain

Bhagat. Effect of chronic administration of nicotine on the concentrations of adrenal enzymes involved in the synthesis and metabolism of adrenaline

Bhattacharya. Influence of acute and chronic nicotine administration on EEG reactivity to drugs in rabbits: 2. Psychoactive agents

Chance. A comparison of nicotine and structurally related compounds as discriminative stimuli

Chang. Effect of chronic administration of nicotine on acetylcholinesterase activity in the hypothalamus and medulla oblongata of the rat brain An ultrastructural study

Davies. Evidence for a noncholinergic nicotine receptor on human phagocytic leukocytes

Domino. Electroencephalographic and behavioral arousal effects of small doses of nicotine: A neuropsychopharmacological study

Erwin. Nicotine alters catecholamines and electrocortical activity in perfused mouse brain

Essman. Changes in cholinergic activity and avoidance behavior by nicotine in differentially housed mice

Fuxe. Increases in dopamine utilization in certain limbic dopamine terminal populations after a short period of intermittent exposure of male rats to cigarette smoke

Fuxe. Neurochemical mechanisms underlying the neuroendocrine actions of nicotine: focus on the plasticity of central cholinergic nicotinic receptors

Grenhoff. Selective stimulation of limbic dopamine activity by nicotine

Grenhoff. Chronic continuous nicotine treatment causes decreased burst firing of nigral dopamine neurons in rats partially hemitransected at the meso-diencephalic junction

Harfstrand. Distribution of nicotinic cholinergic receptors in the rat tel- and diencephalon: a quantitative receptor autoradiographical study using [3H]-acetylcholine, [alpha-125I]bungarotoxin and [3H]nicotine

Harsing. Dopamine efflux from striatum after chronic nicotine: evidence for autoreceptor desensitization

Huganir. Phosphorylation of the nicotinic acetylcholine receptor regulates its rate of desensitization

Kawamura. Differential actions of m and n cholinergic agonists on the brainstem activating system

Knapp. Action of nicotine on the ascending reticular activating system

Kramer. The effect of nicotine on catecholaminergic storage vesicles

Lapin. Dopamine-like action of nicotine: lack of tolerance and reverse tolerance

Lapin. Action of nicotine on accumbens dopamine and attenuation with repeated administration

Lindstrom. Structural and functional heterogeneity of nicotinic receptors

London. Glucose metabolism: An index of nicotine action in the brain

Lowy. Antagonism by cholinergic drugs of behavioural effects in cats of an anticholinergic psychotomimetic drug and enhancement by nicotine

Lukas. Heterogeneity of high-affinity nicotinic [3H]acetylcholine binding sites

Lukas. Pharmacological distinctions between functional nicotinic acetylcholine receptors on the PC12 rat pheochromocytoma and the TE671 human medulloblastoma

Marks. Characterization of nicotine binding in mouse brain and comparison with the binding of alpha-bungarotoxin and quinuclidinyl benzilate

Martin. Nicotine binding sites and their localization in the central nervous system

Marty. Effects of nicotine on beta-endorphin, alpha MSH, and ACTH secretion by isolated perfused mouse brains and pituitary glands, in vitro

Mitchell. Increases in tyrosine hydroxylase messenger RNA in the locus coeruleus after a single dose of nicotine are followed by time-dependent increases in enzyme activity and noradrenaline release

Mitchell. Role of the locus coeruleus in the noradrenergic response to a systemic administratio of nicotine

Naftchi. Acute reduction of brain substance P induced by nicotine

Nelsen. Chronic nicotine treatment in rats: 2. Electroencephalographic amplitude and variability changes occurring within and between structures

Owman. Chronic nicotine treatment eliminates asymmetry in striatal glucose utilization following unilateral transection of the mesostriatal dopamine pathway in rats

Pradhan. Effects of nicotine on self-stimulation in rats

Rosecrans. Noncholinergic Mechanisms involved in the behavioral and stimulus effects of nicotine, and relationships to the process of nicotine dependence

Rosecrans. Nicotine as a discriminative stimulus: a neurobehavioral approach to studying central cholinergic mechanisms

Schaeppi. Nicotine treatment of selected areas of the cat brain: effects upon EEG and autonomic system

Sershen. Effect of nicotine and amphetamine on the neurotoxicity of N-methyl-4-phenyl-1,2,3,6-tetrahydropyridine (MPTP) in mice

Sershen. Noncholinergic, saturable binding of (+/-)-[3H]nicotine to mouse brain

Sershen. Nicotinic Binding Sites in the brain: properties, regulation, and putative endogenous ligands

Siegel. Rapid and discrete changes in hypothalamic catecholamine nerve terminal systems induced by audiogenic stress, and their modulation by nicotine-relatinship to neuroendocrine function

Silvette. The actions of nicotine on central nervous system functions

Sorenson. The reducing agent dithiothreitol (DTT) does not abolish the inhibitory nicotinic response recorded from rat dorsolateral septal neurons

Stadnicki. Nicotine changes in EEG and behavior after intravenous infusion in awake unrestrained cats

Stadnicki. Nicotine infusion into the fourth ventricle of unrestrained cats: changes in EEG and behavior

Stitzer. Effects of nicotine on fixed-interval behavior and their modification by cholinergic antagonists

Sugiyama. [3H]Nicotine binding sites in developing fetal brains in rats

Svensson. Effect of nicotine on dynamic function of brain catecholamine neurons

Toth. Effect of nicotine on extracellular levels of neurotransmitters assessed by microdialysis in various brain regions: role of glutamic acid

Toth. Effect of nicotine on levels of extracellular amino acids in regions of the rat brain in vivo

Tung. Peripheral induction of burst firing in locus coeruleus neurons by nicotine mediated via excitatory amino acids

Vincek. Synthesis of 4,4-ditritio-(+)-nicotine: comparative binding and distribution studies with natural enantiomer

Westfall. Effect of nicotine and related substances upon amine levels in the brain

Whiting. Expression of nicotinic acetylcholine receptor subtypes in brain and retina

Wong. Pharmacology of nicotinic receptor-mediated inhibition in rat dorsolateral septal neurones

Wong. A direct nicotinic receptor-mediated inhibition recorded intracellularly in vitro

Yamamoto. Nicotine-induced EEG and behavioral arousal

**COUNCIL FOR TOBACCO RESEARCH - USA, Literature Review**
Edwards. Smoking, nicotine and electrocortical activity

Fuxe. Neuroendocrine actions of nicotine and of exposure to cigarette smoke: medical implications

**PHILIP MORRIS TOBACCO COMPANY**
DeNoble. Behavioral effects of intraventricularly administered (-)-nicotine on fixed ratio schedules of food presentation in rats

Sahley. Antinociceptive effects of central and systemic administrations of nicotine

Vezina. The effect of acute and repeated nicotine injections on brain dopamine activation: Comparisons with morphine and amphetamine

**R. J. REYNOLDS COMPANY**
Bjercke. Anti-idiotypic antibody probes of neuronal nicotinic receptors

Brazell. Effect of acute administration of nicotine on in vivo release of noradrenaline in the hippocampus of freely moving rats: a dose-response and antagonist study

Collins. Modulation of Nicotine Receptors by Chronic Exposure to Nicotinic Agonists and Antagonists

Gilbert. Effects of smoking/nicotine on anxiety, heart rate, and lateralization of EEG during a stressful movie

Lippiello. The Role of Desensitization in CNS Nicotinic receptor function

Lippiello. Characterization of nicotinic receptors on cultured cortical neurons using anti-idiotypic antibodies and ligand binding

Lippiello. The binding of L-[3H]nicotine to a single class of high affinity sites in rat brain membranes

Lippiello. Identification of putative high affinity nicotinic receptors on cultured cortical neurons

Lippiello. Kinetics and mechanism of L-[3H]nicotine binding to putative high affinity receptor sites in rat brain

Marks. Downregulation of nicotinic receptor function after chronic nicotine infusion

Mitchell. Nicotine-induced catecholamine synthesis after lesions to the dorsal or ventral noradrenergic bundle

Mitchell. Regionally specific effects of acute and chronic nicotine on rates of catecholamine and 5-hydroxytryptamine synthesis in rat brain

Prince. Actions of the general anesthetic propofol (2,6- diisopropylphenol) on the binding of [3H] nicotine to rat cortical membranes

Pritchard. Flexible effects of quantified cigarette-smoke delivery on EEG dimensional complexity

Smith. Effects of chronic and subchronic nicotine on tyrosine hydroxylase activity in noradrenergic and dopaminergic neurones in the rat brain

Wonnacott. Presynaptic actions of nicotine in the CNS

**BROWN AND WILLIAMSON TOBACCO CORPORATION, Unpublished**
Brotzge. Human smoking studies: acute effect of cigarette smoke on brain wave alpha rhythm-first report

**BRITISH-AMERICAN TOBACCO COMPANY, LTD.**
Golding. Arousing and de-arousing effects of cigarette smoking under conditions of stress and mild sensory isolation

Golding. Effects of cigarette smoking on resting EEG, visual evoked potentials and photic driving

**BRITISH-AMERICAN TOBACCO COMPANY, LTD., Unpublished**
Ayres. Notes from the GR & DC Nicotine Conference

Comer. Interaction of smoke and the smoker part 3: the effect of cigarette smoking on the contingent negative variation

**BRITISH-AMERICAN TOBACCO COMPANY, LTD. Funded – Unpublished Battelle Studies**
Haselbach. Final report on project HIPPO II

Haselbach. A tentative hypothesis on nicotine addiction

Hersch. Final report on project HIPPO I

Libert. Report no 1 regarding project HIPPO II

Willey. Effects of nicotine on the central nervous system

**INDUSTRY SUPPORTED AMA/EDUCATIONAL AND RESEARCH FOUNDATION (ERF) STUDIES:**
Murphree. Elecroencephalographic changes in man following smoking

Rosecrans. Brain area nicotine levels in male and female rats with different levels of spontaneous activity

Rosecrans. Effects of nicotine on behavioral arousal and brain 5-hydroxytryptamine function in female rats selected for differences in activity

Rosecrans. Brain area nicotine levels in male and female rats of two strains

Schechter. Behavioral evidence for two types of cholinergic receptors in the C.N.S.

Schechter. Effect of mecamylamine on discrimination between nicotine- and arecoline- produced cues

Schechter. Nicotine as a discriminative cue in rats: inability of related drugs to produce a nicotine-like cueing effect

Schechter. Nicotine as a discriminative stimulus in rats depleted of norepinephrine or 5-hydroxytryptamine

**TOBACCO RESEARCH COUNCIL LABS., U.K.**
Armitage. Pharmacological basis for the tobacco smoking habit

Armitage. Some recent observations relating to the absorption of nicotine from tobacco smoke

Armitage. Effects of nicotine on electrocortical activity and acetylcholine release from the cat cerebral cortex

Armitage. Nicotine, Smoking and cortical activation

Armitage. The effects of nicotine on the electrocorticogram and spontaneous release of acetylcholine from the cerebral cortex of the cat

Armitage. Effects of nicotine and some nicotine-like compounds injected into the cerebral ventricles of the cat

Armitage. Further evidence relating to the mode of action of nicotine in the central nervous system

Balfour. A possible role for the pituitary-adrenal system in the effects of nicotine on avoidance behaviour

Bhagat. The effects of nicotine and other drugs on the release of injected 3H-norepinephrine and on endogenous norepinephrine levels in the rat brain

Hall. Effects of nicotine and tobacco smoke on the electrical activity of the cerebral cortex and olfactory bulb

Morrison. A comparison of the effects of nicotine and physostigmine on a measure of activity in the rat

Wesnes. Effects of scopolamine and nicotine on human rapid information processing performance

Wesnes. The separate and combined effects of scopolamine and nicotine on human information processing

**OTHER**
Adem. Distribution of nicotinic receptors in human thalamus as visualized by 3H-nicotine and 3H-acetylcholine receptor autoradiography

Adem. Quantitative autoradiography of nicotinic receptors in large cryosections of human brain hemispheres

Andersson. Effects of acute central and peripheral administration of nicotine on ascending dopamine pathways in the male rat brain Evidence for nicotine induced increases of dopamine turnover in various telencephalic dopamine nerve terminal systems

Cohen. Monograph on the pharmacology and toxicology of nicotine and its role in tobacco smoking

Copeland. A comparison of the binding of nicotine and nornicotine stereoisomers to nicotinic binding sites in rat brain cortex

Mechanisms of action: receptors, neurotransmitters, and hormones. The tobacco industry has supported sophisticated studies to identify the sites and mechanisms of nicotine's actions, as well as how the structure of the brain itself is altered by nicotine's effects on nicotinic receptors. These studies have identified the receptors in the central nervous system on which nicotine acts; shown that nicotinic receptors present in the brain of both animals and man mediate the behavioral effects of nicotine; and sought to define the location and functional properties of these nicotinic receptors in the central nervous system.[248]

---

Falkeborn. Chronic nicotine exposure in rat: a behavioural and biochemical study of tolerance

Fuxe. On the action of nicotine and cotinine on central 5-hydroxytryptamine

Fuxe. Reduction of [3H]nicotine binding in hypothalamic and cortical membranes by dopamine D1 receptors

Fuxe. Regulation of endocrine function by the nicotinic cholinergic receptor

Grenhoff. Nicotinic effects on the firing pattern of midbrain dopamine neurons

Hasenfratz. Smoking-related subjective and physiological changes: pre- to postpuff and pre- to post cigarette

Hasenfratz. Post-lunch smoking for pleasure seeking or arousal maintenance?

Knott. Effects of cigarette smoking on subjective and brain evoked responses to electrical pain stimulation

Larsson. Comparative analysis of nicotine-like receptor-ligand interactions in rodent brain homogenate

Larsson. In vitro binding of 3H-acetylcholine to nicotinic receptors in rodent and human brain

Nisell. Systemic nicotine-induced dopamine release in the rat nucleus accumbens is regulated by nicotinic receptors in the ventral tegmental area

Nordberg. Effect of long-term nicotine treatment on [3H]nicotine binding sites in the rats brain

Nordberg. Effect of acute and subchronic nicotine treatment on cortical acetylcholine release and on nicotinic receptors in rats and guinea-pigs

Nordberg. Studies of muscarinic and nicotinic binding sites in brain

Perez de la Mora. Neurochemical effects of nicotine on glutamate and GABA mechanisms in the rat brain

Slotkin. Developmental Effects of Nicotine

Slotkin. Effects of prenatal nicotine exposure on neuronal development: selective actions on central and peripheral catecholaminergic pathways

Svensson. Effect of nicotine on single cell activity in the noradrenergic nucleus locus coeruleus

Zhang. Effects of chronic treatment with (+)- and (-)- nicotine on nicotinic acetylcholine receptors and N-methyl-D-aspartate receptors in rat brain

OTHER, Literature Review
Edwards. Smoking, nicotine and electrocortical activity

[248] COUNCIL FOR TOBACCO RESEARCH-USA

Abood. Comparison of the binding of optically pure (-)- and (+)-[3H]nicotine to rat brain membranes

Abood. Electrophysiological, behavioral, and chemical evidence for a noncholinergic, stereospecific site for nicotine in rat brain

Abood. Evidence for a noncholinergic site for nicotine's action in brain: Psychopharmacological, electrophysiological and receptor binding studies

Abood. Tritiated methylcarbamylcholine a new radioligand for studying brain nicotinic receptors

Andersson. Intravenous injections of nicotine induce very rapid and discrete reductions of hypothalamic catecholamine levels associated with increases of ACTH, vasopressin and prolactin secretion

Andersson. Effects of acute central and peripheral administration of nicotine on hypothalamic catecholamine nerve terminal systems and on the secretion of adenohypophyseal hormones in the male rat

Andersson. Nicotine-induced increases of noradrenaline turnover in discrete noradrenaline nerve terminal systems of the hypothalamus and the median eminence of the rat and their relationship to changes in the secretion of adenohypophyseal hormones

Andersson. Effects of single injections of nicotine on the ascending dopamine pathways in the rat Evidence for increases of dopamine turnover in the mesostriatal and mesolimbic dopamine neurons

Andersson. Effects of acute central and peripheral administration of nicotine on ascending dopamine pathways in the male rat brain Evidence for nicotine induced increases of dopamine turnover in various telencephalic dopamine nerve terminal systems

Britto. Immunohistochemical localization of nicotinic acetylcholine receptor subunits in the mesencephalon and diencephalon of the chick (Gallus gallus)

Chance. A comparison of nicotine and structurally related compounds as discriminative stimuli

Davies. Evidence for a noncholinergic nicotine receptor on human phagocytic leukocytes

Fuxe. Neuroendocrine actions of nicotine and of exposure to cigarette smoke: medical implications

Fuxe. Neurochemical mechanisms underlying the neuroendocrine actions of nicotine: focus on the plasticity of central cholinergic nicotinic receptors

Harfstand. Distribution of nicotinic cholinergic receptors in the rat tel- and diencephalon: a quantitative receptor autoradiographical study using [3H]-acetylcholine, [alpha-125I]bungarotoxin and [3H]nicotine

Huganir. Phosphorylation of the nicotinic acetylcholine receptor regulates its rate of desensitization

Lapin. Action of nicotine on accumbens dopamine and attenuation with repeated administration

Lindstrom. Structural and functional heterogeneity of nicotinic receptors

Lukas. Heterogeneity of high-affinity nicotinic [3H]acetylcholine binding sites

Lukas. Pharmacological distinctions between functional nicotinic acetylcholine receptors on the PC12 rat pheochromocytoma and the TE671 human medulloblastoma

Marks. Characterization of nicotine binding in mouse brain and comparison with the binding of alpha-bungarotoxin and quinuclidinyl benzilate

Martin. Nicotine binding sites and their localization in the central nervous system

Mitchell. Increases in tyrosine hydroxylase messenger RNA in the locus coeruleus after a single dose of nicotine are followed by time- dependent increases in enzyme activity and noradrenaline release

Mitchell. Role of the locus coeruleus in the noradrenergic response to a systemic administration of nicotine

Owman. Chronic nicotine treatment eliminates asymmetry in striatal glucose utilization following unilateral transection of the mesostriatal dopamine pathway in rats

Pradhan. Effects of nicotine on self-stimulation in rats

Rosecrans. Nicotine as a discriminative stimulus: a neurobehavioral approach to studying central cholinergic mechanisms

Rosecrans. Noncholinergic Mechanisms involved in the behavioral and stimulus effects of nicotine, and relationships to the process of nicotine dependence

Schaeppi. Nicotine treatment of selected areas of the cat brain: effects upon EEG and autonomic system

Sershen. Nicotinic Binding Sites in the brain: properties, regulation, and putative endogenous ligands

Sershen. Noncholinergic, saturable binding of (+/-)-[3H]nicotine to mouse brain

Sorenson. The reducing agent dithiothreitol (DTT) does not abolish the inhibitory nicotinic response recorded from rat dorsolateral septal neurons

Stitzer. Effects of nicotine on fixed-interval behavior and their modification by cholinergic antagonists

Sugiyama. [3H]Nicotine binding sites in developing fetal brains in rats

Svensson. Effect of nicotine on dynamic function of brain catecholamine neurons

Toth. Effect of nicotine on levels of extracellular amino acids in regions of the rat brain in vivo

Whiting. Expression of nicotinic acetylcholine receptor subtypes in brain and retina

Wong. A direct nicotinic receptor-mediated inhibition recorded intracellularly in vitro

Wong. Pharmacology of nicotinic receptor-mediated inhibition in rat dorsolateral septal neurones

**COUNCIL FOR TOBACCO RESEARCH-USA, Literature Review**
Fuxe. Effects of Nicotine and exposure to cigarette smoke on discrete dopamine and noradrenaline nerve terminal systems of the telencephalon and diencephalon of the rat: Relationship to reward mechanisms and neuroendocrine functions and distribution of nicotinic binding sites in brain

**R. J. REYNOLDS COMPANY**
Bjercke. Anti-idiotypic antibody probes of neuronal nicotinic receptors

Collins. Modulation of Nicotine Receptors by Chronic Exposure to Nicotinic Agonists and Antagonists

Lippiello. The Role of Desensitization in CNS Nicotinic receptor function

Lippiello. Characterization of nicotinic receptors on cultured cortical neurons using anti-idiotypic antibodies and ligand binding

Lippiello. Identification of putative high affinity nicotinic receptors on cultured cortical neurons

Lippiello. Properties of putative nicotine receptors identified on cultured cortical neurons

Lippiello. Kinetics and mechanism of L-[3H]nicotine binding to putative high affinity receptor sites in rat brain

Lippiello. The binding of L-[3H]nicotine to a single class of high affinity sites in rat brain membranes

Marks. Downregulation of nicotinic receptor function after chronic nicotine infusion

Prince. Actions of the general anesthetic propofol (2,6-diisopropylphenol) on the binding of [3H] nicotine to rat cortical membranes

**BRITISH-AMERICAN TOBACCO COMPANY, LTD. Unpublished**
Ayres. Notes from the GR & DC Nicotine Conference

**PHILIP MORRIS TOBACCO COMPANY, Unpublished**
DeNoble. Brain Sites Involved in the Mediation of the Behavioral Effects of Intraventricularly Administered (-)-nicotine

DeNoble. Manuscript--Brain Sites Involved in the Mediation of the Behavioral Effects of Intraventricularly Administered (-)-nicotine

**INDUSTRY SUPPORTED AMA/ERF STUDIES**
Hirschhorn. Studies on the time course and the effect of cholinergic and adrenergic receptor blockers on the stimulus effect of nicotine

Schechter. Behavioral evidence for two types of cholinergic receptors in the CNS

Schechter. Effect of mecamylamine on discrimination between nicotine- and arecoline- produced cues

Schechter. Nicotine as a discriminative stimulus in rats depleted of norepinephrine or 5-hydroxytryptamine

**TOBACCO RESEARCH COUNCIL LABS., U.K.**
Wesnes. The separate and combined effects of scopolamine and nicotine on human information processing

Wesnes. Effects of scopolamine and nicotine on human rapid information processing performance

**OTHER**
Adem. Quantitative autoradiography of nicotinic receptors in large cryosections of human brain hemispheres

Adem. Distribution of nicotinic receptors in human thalamus as visualized by 3H-nicotine and 3H-acetylcholine receptor autoradiography

Copeland. A comparison of the binding of nicotine and nornicotine stereoisomers to nicotinic binding sites in rat brain cortex

Neurotransmitters. Tobacco industry studies have shown that nicotine and its metabolites produce neurochemical and metabolic effects in the brain.[249]

---

Fuxe. On the action of nicotine and cotinine on central 5-hydroxytryptamine

Fuxe. Reduction of [3H]nicotine binding in hypothalamic and cortical membranes by dopamine D1 receptors

Larsson. In vitro binding of 3H-acetylcholine to nicotinic receptors in rodent and human brain

Larsson. Comparative analysis of nicotine-like receptor-ligand interactions in rodent brain homogenate

Nisell. Systemic nicotine-induced dopamine release in the rat nucleus accumbens is regulated by nicotinic receptors in the ventral tegmental area

Nordberg. Effect of long-term nicotine treatment on [3H]nicotine binding sites in the rats brain

Nordberg. Effect of acute and subchronic nicotine treatment on cortical acetylcholine release and on nicotinic receptors in rats and guinea-pigs

Nordberg. Studies of muscarinic and nicotinic binding sites in brain

Slotkin. Developmental Effects of Nicotine

Svensson. Effect of nicotine on single cell activity in the noradrenergic nucleus

Zhang. Effects of chronic treatment with (+)- and (-)- nicotine on nicotinic acetylcholine receptors and N-methyl-D-aspartate receptors in rat brain

[249] COUNCIL FOR TOBACCO RESEARCH-USA

Andersson. Effects of acute central and peripheral administration. of nicotine on ascending dopamine pathways in the male rat brain. Evidence for nicotine induced increases of dopamine turnover in various telencephalic dopamine nerve terminal systems

Andersson. Mecamylamine pretreatment counteracts cigarette smoke induced changes in hypothalamic catecholamine neuron systems and in anterior pituitary function

Andersson. Intravenous injections of nicotine induce very rapid and discrete reductions of hypothalamic catecholamine levels associated with increases of ACTH, vasopressin and prolactin secretion

Andersson. Involvement of cholinergic nicotine-like receptors as modulators of amine turnover in various types of hypothalamic dopamine and noradrenaline nerve terminal systems and of prolactin, LH, FSH and TSH secretion in the castrated male rat

Andersson. Interactions of nicotine and pentobarbitone in the regulation of telencephalic and hypothalamic catecholamine levels and turnover and of adenohypophyseal hormone secretion in the normal male rat

Andersson. Effects of acute central and peripheral administration of nicotine on hypothalamic catecholamine nerve terminal systems and on the secretion of adenohypophyseal hormones in the male rat

Andersson. Effects of single injections of nicotine on the ascending dopamine pathways in the rat: Evidence for increases of dopamine turnover in the mesostriatal and mesolimbic dopamine neurons

Andersson. Nicotine-induced increases of noradrenaline turnover in discrete noradrenaline nerve terminal systems of the hypothalamus and the median eminence of the rat and their relationship to changes in the secretion of adenohypophyseal hormones

Andersson. Mecamylamine induced blockade of nicotine induced inhibition of gonadotrophin and TSH secretion and of nicotine induced increases of catecholamine turnover in the rat hypthalamus

Andersson. Effects of acute intermittent exposure to cigarette smoke on catecholamine levels and turnover in various types of hypothalamic DA and NA nerve terminal systems as well as on the secretion of adenohypophyseal hormones and corticosterone

Andersson. Effects of chronic exposure to cigarette smoke on amine levels and turnover in various hypothalamic catecholamine nerve terminal systems and on the secretion of pituitary hormones in the male rat

Bhagat. Influence of chronic administration of nicotine on the turnover and metabolism of noradrenaline in the rat brain

Bhagat. Effect of chronic administration of nicotine on the concentrations of adrenal enzymes involved in the synthesis and metabolism of adrenaline

Bhagat. Effects of chronic administration of nicotine on storage and synthesis of noradrenaline in rat brain

Chang. Effect of chronic administration of nicotine on acetylcholinesterase activity in the hypothalamus and medulla oblongata of the rat brain An ultrastructural study

Chiou. The ability of various nicotinic agents to release acetylcholine from synaptic vesicles

Erwin. Nicotine alters catecholamines and electrocortical activity in perfused mouse brain

Essman. Changes in cholinergic activity and avoidance behavior by nicotine in differentially housed mice

Fuxe. Increases in dopamine utilization in certain limbic dopamine terminal populations after a short period of intermittent exposure of male rats to cigarette smoke

Grenhoff. Chronic continuous nicotine treatment causes decreased burst firing of nigral dopamine neurons in rats partially hemitransected at the meso-diencephalic junction

Grenhoff. Selective stimulation of limbic dopamine activity by nicotine

Harsing. Dopamine efflux from striatum after chronic nicotine: evidence for autoreceptor desensitization

Knapp. Action of nicotine on the ascending reticular activating system

Lapin. Dopamine-like action of nicotine: lack of tolerance and reverse tolerance

Lapin. Action of nicotine on accumbens dopamine and attenuation with repeated administration

Lowy. Antagonism by cholinergic drugs of behavioural effects in cats of an anticholinergic psychotomimetic drug and enhancement by nicotine

Marty. Effects of nicotine on beta-endorphin, alpha MSH, and ACTH secretion by isolated perfused mouse brains and pituitary glands, in vitro

Mitchell. Increases in tyrosine hydroxylase messenger RNA in the locus coeruleus after a single dose of nicotine are followed by time-dependent increases in enzyme activity and noradrenaline release

These studies show that nicotine exerts its behavior-modifying effects, in part, through the cascade of effects that are produced through nicotine's actions on existing brain chemicals. Industry-supported studies show that nicotine, like other addictive drugs, acts on dopaminergic receptors[250] in the mesolimbic system to release

---

Mitchell. Role of the locus coeruleus in the noradrenergic response to a systemic administration of nicotine

Naftchi. Acute reduction of brain substance P induced by nicotine

Siegel. Rapid and discrete changes in hypothalamic catecholamine nerve terminal systems induced by audiogenic stress, and their modulation by nicotine-relatinship to neuroendocrine function

Toth. Effect of nicotine on extracellular levels of neurotransmitters assessed by microdialysis in various brain regions: role of glutamic acid

Toth. Effect of nicotine on levels of extracellular amino acids in regions of the rat brain in vivo

Tung. Peripheral induction of burst firing in locus coeruleus neurons by nicotine mediated via excitatory amino acids

Westfall. Effect of nicotine and related substances upon amine levels in the brain

Westfall. Effect of nicotine and other drugs on the release of 3H-norepinephrine and 3H-dopamine from rat brain slices

**R. J. REYNOLDS COMPANY**
Brazell. Effect of acute administration of nicotine on in vivo release of noradrenaline in the hippocampus of freely moving rats: a dose-response and antagonist study

Mitchell. Nicotine-induced catecholamine synthesis after lesions to the dorsal or ventral noradrenergic bundle

Mitchell. Regionally specific effects of acute and chronic nicotine onrates of catecholamine and 5-hydroxytryptamine synthesis in rat brain

Smith. Effects of chronic and subchronic nicotine on tyrosine hydroxylase activity in noradrenergic and dopaminergic neurones in the rat brain

**BRITISH-AMERICAN TOBACCO COMPANY, LTD. Unpublished**
Haselbach. Tentative Hypothesis on Nicotine Addiction

Haselbach. Final Report on Project HIPPO II

**INDUSTRY SUPPORTED SYMPOSIA**
Joseph. Possible mechanisms underlying beneficial effects of nicotine in cognitive function

Nordberg. Assessment of cholinergic neuronal activity in the brain

**INDUSTRY SUPPORTED AMA/ERF STUDIES**
Rosecrans. Effects of nicotine on behavioral arousal and brain 5-hydroxytryptamine function in female rats selected for differences in activity

Schechter. Nicotine as a discriminative stimulus in rats depleted of norepinephrine or 5-hydroxytryptamine

**TOBACCO RESEARCH COUNCIL LABS., U.K.**
Armitage. Effects of nicotine on electrocortical activity and acetylcholine release from the cat cerebral cortex

Armitage. The effects of nicotine on the electrocorticogram and spontaneous release of acetylcholine from the cerebral cortex of the cat

Armitage. Further evidence relating to the mode of action of nicotine in the central nervous system

Balfour. A possible role for the pituitary-adrenal system in the effects of nicotine on avoidance behaviour

Bhagat. The effects of nicotine and other drugs on the release of injected 3H-norepinephrine and on endogenous norepinephrine levels in the rat brain

**OTHER**
Fuxe. Regulation of endocrine function by the nicotinic cholinergic receptor

Fuxe. On the action of nicotine and cotinine on central 5-hydroxytryptamine neurons

Grenhoff. Nicotinic effects on the firing pattern of midbrain dopamine neurons

Nisell. Systemic nicotine-induced dopamine release in the rat nucleus accumbens is regulated by nicotinic receptors in the ventral tegmental area

Nordberg. Effect of acute and subchronic nicotine treatment on cortical acetylcholine release and on nicotinic receptors in rats and guinea-pigs

Perez de la Mora. Neurochemical effects of nicotine on glutamate and GABA mechanisms in the rat brain

Slotkin. Effects of prenatal nicotine exposure on neuronal development: selective actions on central and peripheral catecholaminergic pathways

**OTHER, Literature Review**
Edwards. Smoking, nicotine and electrocortical activity

[250] **COUNCIL FOR TOBACCO RESEARCH-U.S.A**
Abood. Receptor binding characteristics of a 3H-labeled azetidine analogue of nicotine

Andersson. Mecamylamine induced blockade of nicotine induced inhibition of gonadotrophin and TSH secretion and of nicotine induced increases of catecholamine turnover in the rat hypothalmus

Andersson. Effects of acute intermittent exposure to cigarette smoke on catecholamine levels and turnover in various types of hypothalamic DA and NA nerve terminal systems as well as on the secretion of adenohypophyseal hormones and corticosterone

Andersson. Effects of single injections of nicotine on the ascending dopamine pathways in the rat. Evidence for increases of dopamine turnover in the mesostriatal and mesolimbic dopamine neurons

Andersson. Involvement of cholinergic nicotine-like receptors as modulators of amine turnover in various types of hypothalamic dopamine and noradrenaline nerve terminal systems and of prolactin, LH, FSH and TSH secretion in the castrated male rat

Andersson. Interactions of nicotine and pentobarbitone in the regulation of telencephalic and hypothalamic catecholamine levels and turnover and of adenohypophyseal hormone secretion in the normal male rat

Andersson. Effects of acute central and peripheral administration of nicotine on hypothalamic catecholamine nerve terminal systems and on the secretion of adenohypophyseal hormones in the male rat

Erwin. Nicotine alters catecholamines and electrocortical activity in perfused mouse brain

dopamine, a chemical in the brain associated with pleasurable feelings.

Mood modification and EEG effects. In tobacco industry-sponsored trials, nicotine has been shown to induce both behavioral arousal and calming effects.[251] These effects have been correlated with

---

Fuxe. Increases in dopamine utilization in certain limbic dopamine terminal populations after a short period of intermittent exposure of male rats to cigarette smoke

Grenhoff. Selective stimulation of limbic dopamine activity by nicotine

Harsing. N-type calcium channels are involved in the dopamine releasing effect of nicotine

Lapin. Action of nicotine on accumbens dopamine and attenuation with repeated administration

Lapin. Dopamine-like action of nicotine: lack of tolerance and reverse tolerance

Westfall. Effect of nicotine and other drugs on the release of 3H-norepinephrine and 3H-dopamine from rat brain slices

**R. J. REYNOLDS COMPANY**
Lippiello. The role of desensitization in CNS nicotinic receptor function

Marks. Downregulation of nicotinic receptor function after chronic nicotine infusion

**INDUSTRY SUPPORTED SYMPOSIA**
Joseph. Possible mechanisms underlying beneficial effects of nicotine in cognitive function

**OTHER**
Adem. Quantitative autoradiography of nicotinic receptors in large cryosections of human brain hemispheres

Andersson. Effects of acute central and peripheral administration of nicotine on ascending dopamine pathways in the male rat brain. Evidence for nicotine-induced increases of dopamine turnover in various telencephalic dopamine nerve terminal systems

Fuxe. Regulation of endocrine function by the nicotinic cholinergic receptor

Grenhoff. Nicotinic effects on the firing pattern of midbrain dopamine neurons

Nisell. Systemic nicotine-induced dopamine release in the rat nucleus accumbens is regulated by nicotinic receptors in the ventral tegmental area

[251] **COUNCIL FOR TOBACCO RESEARCH-USA**
Domino. Electroencephalographic and behavioral arousal effects of small doses of nicotine: A neuropsychopharmacological study

Heimstra. The effects of deprivation of cigarette smoking on psychomotor performance

Marks. Genetics of nicotine response in four inbred strains of mice

Nelsen. Improvement of performance on an attention task with chronic nicotine treatment in rats

Pradhan. Effects of nicotine on several schedules of behavior in rats

Schaeppi. Nicotine treatment of selected areas of the cat brain: effects upon EEG and autonomic system

Stadnicki. Nicotine infusion into the fourth ventricle of unrestrained cats: changes in EEG and behavior

Stadnicki. Nicotinic changes in EEG and behavior after intravenous infusion in awake unrestrained cats

Yamamoto. Nicotine-induced EEG and behavioral arousal

**COUNCIL FOR TOBACCO RESEARCH-USA**, Literature Review
Silvette. The actions of nicotine on central nervous system functions

**R. J. REYNOLDS COMPANY**
Lippiello. Properties of putative nicotine receptors identified on cultured cortical neurons

Pritchard. Electroencephalographic effects of cigarette smoking

Robinson. The role of nicotine in tobacco use

**BRITISH-AMERICAN TOBACCO COMPANY, LTD.**
Golding. Arousing and de-arousing effects of cigarette smoking under conditions of stress and mild sensory isolation

Mangan. The effects of cigarette smoking on vigilance performance

**BRITISH-AMERICAN TOBACCO COMPANY, LTD. Unpublished**
Comer. Interaction of Smoke and the Smoker Part 3: The Effect of Cigarette Smoking on the Contingent Negative Variation

Thornton. Some "Benefits" of Smoking

**INDUSTRY SUPPORTED SYMPOSIA**
Joseph. Possible mechanisms underlying beneficial effects of nicotine in cognitive function

Wesnes. The effects of cigarette smoking and nicotine tablets upon human attention

**INDUSTRY SUPPORTED AMA/ERF STUDIES**
Rosecrans. Effects of nicotine on behavioral arousal and brain 5-hydroxytryptamine function in female rats selected for differences in activity

**TOBACCO RESEARCH COUNCIL LABS., U.K.**
Armitage. Effects of nicotine on electrocortical activity and acetylcholine release from the cat cerebral cortex

Armitage. Nicotine, smoking and cortical activation

Hall. Effects of nicotine and tobacco smoke on the electrical activity of the cerebral cortex and olfactory bulb

Morrison. Antagonism by antimuscarinic and ganglion-blocking drugs of some of the behavioural effects of nicotine

Morrison. The occurrence of tolerance to a central depressant effect of nicotine

Warwick. Experimental studies of the behavioural effects of nicotine

**OTHER**

electroencephalogram/electrocorticogram changes in electrical activity in the brain.[252] Whether nicotine provides a stimulating or calming effect depends on the dose of nicotine taken, the time elapsed since the last dose, and other factors.[253]

---

Cohen. Monograph on the "Pharmacology and Toxicology of Nicotine and its Role in Tobacco Smoking Draft

Edwards. Evidence of more rapid stimulus evaluation following cigarette smoking

Golding. Effects of cigarette smoking on measures of arousal, response suppression, and excitation/inhibition balance

Nordberg. Effect of nicotine on passive avoidance behaviour and motoric activity in mice

[252] COUNCIL FOR TOBACCO RESEARCH-USA
Domino. Electroencephalographic and behavioral arousal effects of small doses of nicotine: A neuropsychopharmacological study

Erwin. Nicotine alters catecholamines and electrocortical activity in perfused mouse brain

Kawamura. Differential actions of m and n cholinergic agonists on the brainstem activating system

Marty. Effects of nicotine on beta-endorphin, alpha MSH, and ACTH secretion by isolated perfused mouse brains and pituitary glands, in vitro

Nelsen. Chronic nicotine treatment in rats 2 Electroencephalographic amplitude and variability changes occurring within and between structures

Schaeppi. Nicotine treatment of selected areas of the cat brain: effects upon EEG and autonomic system

Stadnicki. Nicotine infusion into the fourth ventricle of unrestrained cats: changes in EEG and behavior

Stadnicki. Nicotinic changes in EEG and behavior after intravenous infusion in awake unrestrained cats

Yamamoto. Nicotine-induced EEG and behavioral arousal

COUNCIL FOR TOBACCO RESEARCH-USA, Literature Review
Silvette. The actions of nicotine on central nervous system functions

PHILIP MORRIS TOBACCO COMPANY
Mangan. Relationships between photic driving, nicotine and memory

(One Philip Morris document explains why the company decided to conduct nicotine-related EEG research: "We are establishing an EEG laboratory in search of the reinforcing event. Brain waves are neuro-physiological phenomena, but they are legitimate subject matter for us in that brain events underlie behavioral events. Smoke-related changes in brain waves can give us clues as to smoke-related psychological changes." Philip Morris employee (almost certainly W.L. Dunn). *Smoker Psychology Program Review*. October 19, 1977. Page 9.)

R. J. REYNOLDS COMPANY
Gilbert. Effects of smoking/nicotine on anxiety, heart rate, and lateralization of EEG during a stressful movie

Pritchard. Flexible effects of quantified cigarette-smoke delivery on EEG dimensional complexity

Pritchard. Electroencephalographic effects of cigarette smoking

Robinson. Psychopharmacological effects of smoking a cigarette with typical "tar" and carbon monoxide yields but minimal nicotine

BROWN AND WILLIAMSON TOBACCO CORPORATION, Unpublished
Brotzge. Human smoking studies: acute effect of cigarette smoke on brain wave alpha rhythm-first report

BRITISH-AMERICAN TOBACCO COMPANY, LTD.
Golding. Effects of cigarette smoking on resting EEG, visual evoked potentials and photic driving

Golding. Arousing and de-arousing effects of cigarette smoking under conditions of stress and mild sensory isolation

Golding. Effects of cigarette smoking on measures of arousal, response suppression, and excitation/inhibition balance

BRITISH-AMERICAN TOBACCO COMPANY, LTD. Unpublished
Comer. Interaction of smoke and the smoker. Part 3: The effect of cigarette smoking on the contingent negative variation

Willey. Effects of nicotine on the central nervous system

INDUSTRY SUPPORTED AMA/ERF STUDIES
Murphree. Elecroencephalographic changes in man following smoking

TOBACCO RESEARCH COUNCIL LABS., U.K.
Armitage. Effects of nicotine on electrocortical activity and acetylcholine release from the cat cerebral cortex

Armitage. The effects of nicotine on the electrocorticogram and spontaneous release of acetylcholine from the cerebral cortex of the cat

Armitage. Pharmacological basis for the tobacco smoking habit

Ashton. The use of event-related slow potentials of the brain as a means to analyse the effects of cigarette smoking and nicotine in humans

Hall. Effects of nicotine and tobacco smoke on the electrical activity of the cerebral cortex and olfactory bulb

OTHER
Edwards. Smoking, nicotine and electrocortical activity

Knott. Effects of cigarette smoking on subjective and brain evoked responses to electrical pain stimulation

Knott. Reaction time, noise distraction and autonomic responsivity in smokers and non-smokers

[253] INDUSTRY SUPPORTED AMA/ERF STUDIES
Rosecrans. Effects of nicotine on behavioral arousal and brain 5-hydroxytryptamine function in female rats selected for differences in activity

R. J. REYNOLDS COMPANY
Robinson. Psychopharmacological effects of smoking a cigarette with typical "tar" and carbon monoxide yields but minimal nicotine

BRITISH-AMERICAN TOBACCO COMPANY, LTD.
Mangan. The effects of cigarette smoking on vigilence performance

<u>Effects on performance and behavior</u>. Industry-funded scientists have conducted research to characterize nicotine's effects on behavioral performance and cognitive function.[254]

---

**COUNCIL FOR TOBACCO RESEARCH-USA**
Domino. Electroencephalographic and behavioral arousal effects of small doses of nicotine: A neuropsychopharmacological study

Marks. Genetics of nicotine response in four inbred strains of mice

Pradhan. Effects of nicotine on several schedules of behavior in rats

Yamamoto. Nicotine-induced EEG and behavioral arousal

**TOBACCO RESEARCH COUNCIL LABS, U.K.**
Warwick. Experimental studies of the behavioral effects of nicotine

[254] **COUNCIL FOR TOBACCO RESEARCH-USA**
Bhagat. Effect of nicotine on the swimming endurance of rats

Heimstra. The effects of deprivation of cigarette smoking on psychomotor performance

Levin. Memory enhancing effects of nicotine

Marks. Genetics of nicotine response in four inbred strains of mice

Nelsen. Chronic nicotine treatment in rats

Nelsen. Protection by nicotine from behavioral disruption caused by reticular formation stimulation in the rat

Nelsen. Improvement of performance on an attention task with chronic nicotine treatment in rats

**COUNCIL FOR TOBACCO RESEARCH-USA, Literature Reviews**
Essman. Drug effects and learning and memory processes

Silvette. The actions of nicotine on central nervous system functions

**PHILIP MORRIS TOBACCO COMPANY**
Colrain. Effects of post-learning smoking on memory consolidation.

DeNoble. Behavioral effects of intraventricularly administered (-)-nicotine on fixed ratio schedules of food presentation in rats

Mangan. Relationships between photic driving, nicotine and memory

Woodson. Effects of nicotine on the visual evoked response

**R. J. REYNOLDS COMPANY**
Pritchard. Enhancement of continuous performance task reaction time by smoking in non-deprived smokers

Pritchard. Electroencephalographic effects of cigarette smoking

**BRITISH-AMERICAN TOBACCO COMPANY, LTD.**
Mangan. The effects of cigarette smoking on vigilance performance

Mangan. The effects of smoking on memory consolidation

**INDUSTRY SUPPORTED AMA/ERF STUDIES**
Schechter. C.N.S. effect of nicotine as the discriminative stimulus for the rat in a T-maze

**TOBACCO RESEARCH COUNCIL LABS., U.K.**
Armitage. Pharmacological basis for the tobacco smoking habit

Balfour. A possible role for the pituitary-adrenal system in the effects of nicotine on avoidance behaviour

Morrison. Effects of nicotine on motor co-ordination and spontaneous activity in mice

Morrison. The effects of nicotine on punished behaviour

Warwick. Experimental studies of the behavioral effects of nicotine

Wesnes. Effects of nicotine on stimulus sensitivity and response bias in a visual vigilance task

Wesnes. The separate and combined effects of scopolamine and nicotine on human information processing

Wesnes. Effects of scopolamine and nicotine on human rapid information processing performance

Wesnes. Effects of smoking on rapid information processing performance

**TOBACCO RESEARCH COUNCIL, UK, Literature Reviews**
Hall. New evidence for a relationship between tobacco smoking, nicotine dependence, and stress

Wesnes. Smoking, nicotine and human performance

**OTHER**
Andersson. Effects of cigarette smoking on incidental memory

Battig. The effect of pre- and post-trial application of nicotine on the 12 problems of the Hebb-Williams-test in the rat

Driscoll. Effects of nicotine on the shuttlebox behavior of trained guinea pigs

Hasenfratz. Action profiles of smoking and caffeine: Stoop effect, EEG, and peripheral physiology

Hasenfratz. Can smoking increase attention in rapid information processing during noise?

Knott. Reaction time, noise distraction and autonomic responsivity in smokers and non-smokers

Knott. Noise and task induced distraction effects on information processing: Sex differences in smokers and non-smokers

Nordberg. Effect of nicotine on passive avoidance behaviour and motoric activity in mice

Roth. Smoking deprivation in "early" and "late" smokers and memory functions

Neuroendocrine effects. Tobacco industry-supported studies have demonstrated that nicotine affects hormone secretion and several endocrine functions involved in modulation of mood and behavior. These studies showed that nicotine stimulates the secretion of corticosteroids and catecholamines and decreases the secretion of thyroid stimulating hormone, leutinizing hormone, and prolactin.[255]

## 2. Industry Research on Nicotine Delivery to the Blood and Brain

The tobacco industry has studied the bioavailability of nicotine in tobacco products and how nicotine is distributed throughout the body, after absorption into the bloodstream. This has led to the industry's development of sophisticated techniques for determining, quantitatively and qualitatively, the presence of nicotine and its metabolites in body fluids.[256]

---

Wesnes. The effects of cigarettes of varying yield on rapid information processing

[255] **COUNCIL FOR TOBACCO RESEARCH-USA**
Andersson. Involvement of D1 dopamine receptors in the nicotine-induced neuro-endocrine effects and depletion of diencephalic catecholamine stores in the male rat

Andersson. Effects of withdrawal from chronic exposure to cigarette smoke on hypothalamic and preoptic catecholamine nerve terminal systems and on the secretion of pituitary hormones in the male rat

Andersson. Nicotine-induced increases of noradrenaline turnover in discrete noradrenaline nerve terminal systems of the hypothalamus and the median eminence of the rat and their relationship to changes in the secretion of adenohypophyseal hormones

Andersson. Mecamylamine induced blockade of nicotine induced inhibition of gonadotrophin and TSH secretion and of nicotine induced increases of catecholamine turnover in the rat hypothalamus

Andersson. Effects of acute intermittent exposure to cigarette smoke on catecholamine levels and turnover in various types of hypothalamic DA and NA nerve terminal systems as well as on the secretion of adenohypophyseal hormones and corticosterone

Andersson. Involvement of cholinergic nicotine-like receptors as modulators of amine turnover in various types of hypothalamic dopamine and noradrenaline nerve terminal systems and of prolactin, LH, FSH and TSH secretion in the castrated male rat

Andersson. Effects of acute central and peripheral administration of nicotine on hypothalamic catecholamine nerve terminal systems and on the secretion of adenohypophyseal hormones in the male rat

Fuxe. Neuroendocrine actions of nicotine and of exposure to cigarette smoke: medical implications

Fuxe. Neurochemical mechanisms underlying the neuroendocrine actions of nicotine: focus on the plasticity of central cholinergic nicotinic receptors

Fuxe. Effects of Nicotine and exposure to cigarette smoke on discrete dopamine and noradrenaline nerve terminal systems of the telencephalon and diencephalon of the rat: Relationship to reward mechanisms and neuroendocrine functions and distribution of nicotinic binding sites in brain

Marty. Effects of nicotine on beta-endorphin, alpha MSH, and ACTH secretion by isolated perfused mouse brains and pituitary glands, in vitro

Rubin. Nicotine-induced stimulation of steroidogenesis in adrenocortical cells of the cat

Siegel. Rapid and discrete changes in hypothalamic catecholamine nerve terminal systems induced by audiogenic stress, and their modulation by nicotine-relatinship to neuroendocrine function

Westfall. Effect of 4.4'-biphenylenebis-[(2-oxoethylene)-bis-(2,2'-diethoxyethyl)] dimethylammonium dibromide (DMAE) on accumulation and nicotine-induced release of norepinephrine in the heart

Westfall. Specificity of blockade of the nicotine-induced release of 3H-norepinephrine from adrenergic neurons of the guinea-pig heart by various pharmacological agents

**R. J. REYNOLDS COMPANY**
Mitchell. Regionally specific effects of acute and chronic nicotine on rates of catecholamine and 5-hydroxytryptamine synthesis in rat brain

**TOBACCO RESEARCH COUNCIL LABS., U.K.**
Balfour. A possible role for the pituitary-adrenal system in the effects of nicotine on avoidance behaviour

**OTHER**
Fuxe. Regulation of endocrine function by the nicotinic cholinergic receptor

[256] **AMERICAN TOBACCO COMPANY**
Castro. Nicotine antibodies: comparison of ligand specificities of antibodies produced against two nicotine conjugates

**COUNCIL FOR TOBACCO RESEARCH-USA**
Castro. Nicotine enzyme immunoassay

Castro. Radioimmunoassays of drugs of abuse in humans: a review

Haines. Radioimmunoassay of plasma nicotine in habituated and naive smokers

McNiven. Determination of nicotine in smokers' urine by gas chromatography

Monji. Plasma nicotine pharmacokinetics in dogs after intravenous administration: determination by radioimmunassay

**R. J. REYNOLDS COMPANY**
Caldwell. Characterization of the glucuronide conjugate of cotinine: a previously unidentified major metabolite of nicotine in smokers' urine

Nicotine pharmacokinetics. Numerous publications document the tobacco industry's involvement in investigating all aspects of the pharmacokinetics of nicotine. (Pharmacokinetics is the study of the absorption, distribution, metabolism, and elimination of drugs in the body.) Areas that the industry has researched include:

- general pharmacokinetics of nicotine (absorption, distribution, metabolism, elimination);[257]

---

Davis. The determination of nicotine and cotinine in plasma

Kyerematen. Radiometric high performance liquid chromatographic assay for nicotine and twelve of its metabolites

Kyerematen. Pharmacokinetics of nicotine and 12 metabolites in the rat

Langone. Idiotype-anti-idiotype hapten immunoassays: assay for cotinine

McManus. A new quantitative thermospray LC-MS method for nicotine and its metabolites in biological fluids

**BRITISH-AMERICAN TOBACCO COMPANY, Unpublished**
Backhurst. Further work on extractable nicotine

Isaac. The absorption and effects of nicotine from inhaled tobacco smoke

Read. Method for nicotine and cotinine in blood and urine

Read. Nicotine studies: A second report. Estimation of whose body nicotine dose by urinary nicotine and contine measurement

**BRITISH-AMERICAN TOBACCO COMPANY, LTD. Funded -- Battelle Unpublished Studies**
Geissbuhler. The fate of nicotine in the body

Haselbach. A tentative hypothesis on nicotine addiction

**TOBACCO RESEARCH COUNCIL LABS., U.K.**
Armitage. The transfer of endogenous and exogenous radioisotopically labelled nicotine to mainstream cigarette smoke and its absorption into the blood of anaesthetized cats

Beckett. Analysis of nicotine-1-N-oxide in urine, in the presence of nicotine and cotinine, and its application to the study of in vivo nicotine metabolism in man

**OTHER**
Biber. Determination of nicotine and cotinine in human serum and urine: an interlaboratory study

Isaac. Cigarette smoking and plasma levels of nicotine

Schievelbein. Nicotine Workshop

Schmiterlow. Distribution of Nicotine in the Central Nervous System

Schmiterlow. Tissue distribution of C14-nicotine and Related Compounds

Szuts. Long-term fate of [14C]nicotine in the mouse: retention in the bronchi, melanin-containing tissues and urinary bladder wall

[257] **COUNCIL FOR TOBACCO RESEARCH-USA**
Becker. Studies on nicotine absorption during pregnancy

Haines. Radioimmunoassay of plasma nicotine in habituated and naive smokers

Hibberd. Enzymology of the metabolic pathway from nicotine to cotinine, in vitro

Kershbaum. Cigarette, cigar, and pipe smoking. Some differences in biochemical effects

Monji. Plasma nicotine pharmacokinetics in dogs after intravenous administration: determination by radioimmunoassay

Rama. Distribution and Retention of nicotine and its major metabolite cotinine in the rat as a function of time

**COUNCIL FOR TOBACCO RESEARCH-USA, Literature Reviews**
Larson. Tobacco -- Experimental and Clinical Studies

Larson. Tobacco -- Experimental and Clinical Studies -- A Comprehensive Account of the World Literature -- Supplement I

Larson. Tobacco -- Experimental and Clinical Studies -- A Comprehensive Account of the World Literature -- Supplement II

Larson. Tobacco -- Experimental and Clinical Studies -- A Comprehensive Account of the World Literature --Supplement III

**AMERICAN TOBACCO COMPANY**
Haag. Studies on the fate of nicotine in the body I: The effect of pH on the urinary excretion of nicotine by tobacco smokers

Larson. Studies on the fate of nicotine in the body VI: Observations on the relative rate of elimination of nicotine by the dog, cat, rabbit and mouse

Larson. Studies on the fate of nicotine in the body II: On the fate of nicotine in the dog

Larson. Studies on the fate of nicotine in the body IV: Observations on the chemical structure of an end product of nicotine metabolism

McKennis. N-methylation of nicotine and cotinine in vivo

Owen. Studies on the fate of nicotine in the animal body. VIII: Observations on the number and chemical nature of nicotine metabolites in the dog and cat

Weatherby. Rate of elimination of nicotine by the rabbit

**R. J. REYNOLDS COMPANY**
Caldwell. Characterization of the glucuronide conjugate of cotinine: a previously unidentified major metabolite of nicotine in smokers' urine

Caldwell. Intragastric nitrosation of nicotine is not a significant contributor to nitrosamine exposure

deBethizy. Chemical and biological studies of a cigarette that heats rather than burns tobacco

deBethizy. Absorption of nicotine from a cigarette that does not burn tobacco

- factors affecting the abs⁻ ⁻tion of nicotine into the bloodstream, in⁻⁻ding route of administration;[258]
- distribution of nicotine to the brain;[259] and

---

Hammond. Metabolism of nicotine by rat liver cytochromes P-450: Assessment utilizing monoclonal antibodies to nicotine and cotinine

Kyerematen. Pharmacokinetics of nicotine and 12 metabolites in the rat

Kyerematen. Disposition of nicotine and eight metabolites in smokers and nonsmokers: Identification in Smokers of two metabolites that are longer lived than cotinine

**BROWN AND WILLIAMSON TOBACCO CORPORATION, Unpublished**
Brotzge. Human smoking studies: acute effect of cigarette smoke on brain wave alpha rhythm - first report

**BRITISH-AMERICAN TOBACCO COMPANY, LTD., Funded - - Unpublished Battelle Studies**
Geissbuhler. The fate of nicotine in the body

**TOBACCO RESEARCH COUNCIL LABS., U.K.**
Armitage. Absorption and metabolism of nicotine from cigarettes

Armitage. Absorption of nicotine in cigarette and cigar smoke through the oral mucosa

Armitage. The transfer of endogenous and exogenous radioisotopically labelled nicotine to mainstream cigarette smoke and its absorption into the blood of anaesthetized cats

Beckett. Effect of smoking on nicotine metabolism in vivo in man

Beckett. Analysis of nicotine-1-N-oxide in urine, in the presence of nicotine and cotinine, and its application to the study of in vivo nicotine metabolism in man

Beckett. Buccal absorption of basic drugs and its application as an in vivo model of passive drug transfer through lipid membranes

Jenner. Species variation in the metabolism of R-(+)- and S-(-)-nicotine by alpha-C- and N-oxidation in vitro

Jenner. Factors affecting the in vitro metabolism of R-(+)- and S-(-)-nicotine by guinea-pig liver preparations

**OTHER**
Cholerton. Sources of inter-individual variability in nicotine pharmacokinetics

Cohen. Monograph on the Pharmacology and Toxicology of Nicotine and its Role in Tobacco Smoking

Hasenfratz. Development of central and peripheral smoking effects over time

Pilotti. Studies on the identification of tobacco alkaloids, their mammalian metabolites and related compounds by gas chromatography- -mass spectrometry

Schievelbein. Nicotine Workshop

Schmiterlow. Tissue distribution of C14-nicotine

Schmiterlow. Distribution of nicotine in the central nervous system

Szuts. Long-term fate of [14C]nicotine in the mouse: retention in the bronchi, melanin-containing tissues and urinary bladder wall

[258] **COUNCIL FOR TOBACCO RESEARCH-USA**
Haines. Radioimmunoassay of plasma nicotine in habituated and naive smokers

Kershbaum. Cigarette, cigar, and pipe smoking. Some differences in biochemical effects

**R. J. REYNOLDS COMPANY**
deBethizy. Chemical and biological studies of a cigarette that heats rather than burns tobacco

deBethizy. Absorption of nicotine from a cigarette that does not burn tobacco

**BRITISH-AMERICAN TOBACCO COMPANY, LTD. Unpublished**
Backhurst. Further Work on Extractable Nicotine

Evelyn. Retention of nicotine and phenols in the human mouth

Evelyn. Transfer of nicotine from smoke into blood using a perfused canine lung

Evelyn. Absorption of nicotine via the mouth: studies using animal models

Isaac. The absorption and effects of nicotine from inhaled tobacco smoke

**TOBACCO RESEARCH COUNCIL LABS., U.K.**
Armitage. Absorption of nicotine by man during cigar smoking [proceedings]

Armitage. Absorption of nicotine from small cigars

Armitage. The transfer of endogenous and exogenous radioisotopically labelled nicotine to mainstream cigarette smoke and its absorption into the blood of anaesthetized cats

Armitage. Absorption of nicotine in cigarette and cigar smoke through the oral mucosa

**OTHER**
Hasenfratz. Development of central and peripheral smoking effects over time

Schievelbein. Nicotine workshop: Absorption of nicotine under various conditions (an introductory review)

[259] **COUNCIL FOR TOBACCO RESEARCH-USA**
Hatchell. The influence of genotype and sex on behavioral sensitivity to nicotine in mice

Vincek. Synthesis of 4,4-ditritio-(+)-nicotine: comparative binding and distribution studies with natural enantiomer

**BRITISH-AMERICAN TOBACCO COMPANY, LTD. Unpublished**
Creighton. Relative contributions of nicotine and carbon monoxide to human physiological response

Creighton. Further studies on the effect of nicotine on human physiological response

## Special Communications

# Looking Through a Keyhole at the Tobacco Industry

## The Brown and Williamson Documents

Stanton A. Glantz, PhD; Deborah E. Barnes; Lisa Bero, PhD; Peter Hanauer, LLB; John Slade, MD

**Objective.**—To introduce a series of papers discussing previously undocumented tobacco industry activities regarding strategies to avoid products liability litigation, understand nicotine addiction, and manipulate both internal and external scientific research on the effects of both active and passive smoking.

**Data Sources.**—Documents from Brown and Williamson Tobacco Corporation (B&W), the British American Tobacco Company (BAT), and other tobacco interests provided by an anonymous source, obtained from Congress, and received from the private papers of a former BAT officer.

**Study Selection.**—All available materials, including confidential reports regarding research and internal memoranda exchanged between tobacco industry lawyers.

**Conclusions.**—These documents provide our first look at the inner workings of the tobacco industry during the crucial period in which the scientific case that smoking is addictive and kills smokers solidified. The documents show a sophisticated legal and public relations strategy to avoid liability for the diseases induced by tobacco use. The documents show that lawyers steered scientists away from particular research avenues, which is inconsistent with the company's purported disbelief in the causation and addiction claims; if the company had been genuinely unconvinced by the causation and addiction hypotheses, then it should have had no concern that new research would provide ammunition for the enemy. Quite the contrary, the documents show that B&W and BAT recognized more than 30 years ago that nicotine is addictive and that tobacco smoke is "biologically active" (eg, carcinogenic).

(*JAMA*. 1995;274:219-224)

UNTIL NOW, the public's understanding of what the tobacco industry actually knew about the addictive nature of nicotine and the dangers of smoking has been largely based on observation of the industry's behavior and suppositions by a few journalists and public health professionals. This situation changed dramatically in 1994, when several thousand pages of internal documents from the Brown and Williamson Tobacco Corporation (B&W) and its parent company, BAT Industries (formerly British American Tobacco Company) of the United Kingdom, became available.[1-4] BAT is the second largest private cigarette manufacturer in the world. In 1992, the company sold 578 billion cigarettes,[5] 10.7% of the total world output and more than were consumed in the entire US market that year.[6] Its wholly owned US subsidiary, B&W, is the third largest cigarette maker in this country. It had an 11% share of the $48 billion US market in 1993.[7] B&W recently bought the domestic cigarette business of American Brands, adding another 6.7% to its US market share.

Some of these documents were delivered unsolicited to the authors from an anonymous source, some were obtained by Congress from B&W and subsequently made public, and some came from private papers of a deceased former BAT officer. While even these 1384 documents* do not provide a complete picture, they provide the most detailed and candid look to date into one tobacco company's internal workings surrounding the smoking and health "controversy" during the last half of the 20th century.

The tobacco industry has used three primary arguments to deter further government regulation of its products and to defend itself in products liability lawsuits. First, it has consistently claimed that there is no conclusive proof that smoking causes diseases such as cancer and heart disease. Second, tobacco companies have claimed that nicotine is not addictive and that anyone who smokes

From the Institute for Health Policy Studies, Department of Medicine and Division of Clinical Pharmacy, University of California, San Francisco (Drs Glantz and Bero, Ms Barnes, and Mr Hanauer), and the Department of Medicine, St Peter's Medical Center, University of Medicine and Dentistry of New Jersey, Robert Wood Johnson Medical School, New Brunswick (Dr Slade).

Reprint requests to Division of Cardiology, Box 0124, University of California, San Francisco, CA 94143-0124 (Dr Glantz).

*We indexed the documents as part of our analysis and assigned each one a six-digit number. Documents are cited in this article using these numbers enclosed in braces (eg, {1234.56}) and listed at the end of the article after the regular reference section. The complete indexed document set has been deposited in the Archives and Special Collections Department of the University of California, San Francisco, Library and Center for Knowledge Management. As of this writing, these documents are being made a[...] www.library.ucsf.ed[...] Web.

PLAINTIFF'S EXHIBIT 3

Public vs Private Statements Made by the Tobacco Industry

| Source | Statements |
|---|---|
| | **NICOTINE AND ADDICTION** |
| Summary | By the early 1960s, the British American Tobacco Company (BAT) and Brown and Williamson Tobacco Corporation (B&W) had developed a sophisticated understanding of nicotine pharmacology and knew that nicotine was pharmacologically addictive. Publicly, however, the tobacco industry has maintained and continues to maintain that nicotine is not addictive. The scientific community was much slower to appreciate nicotine addiction: the surgeon general did not conclude that nicotine was addictive until 1979.[12] |
| Surgeon general's reports | 1964: "The tobacco habit should be characterized as an habituation rather than an addiction."[13,14]<br>1979: ". . . it is no exaggeration to say that smoking is the prototypical substance-abuse dependency and that improved knowledge of this process holds great promise for prevention of risk."[12]<br>1988: "After carefully examining the available evidence, this Report concludes that:<br>• Cigarettes and other forms of tobacco are addicting.<br>• Nicotine is the drug in tobacco that causes addiction.<br>• The pharmacologic and behavioral processes that determine tobacco addiction are similar to those that determine addiction to drugs such as heroin and cocaine."[14(pp1,2)] |
| B&W/BAT research results | "There is increasing evidence that nicotine is the key factor in controlling, through the central nervous system, a number of beneficial effects of tobacco smoke, including its action in the presence of stress situations. In addition, the alkaloid [nicotine] appears to be intimately connected with the phenomena of tobacco habituation (tolerance) and/or addiction."—From *The Fate of Nicotine in the Body,* a report describing results of contract research conducted for BAT by Battelle Memorial Institute in Geneva, Switzerland, 1963 {1200.20}.<br>"Chronic intake of nicotine tends to restore the normal physiological functioning of the endocrine system, so that ever-increasing dose levels of nicotine are necessary to maintain the desired action. . . . This unconscious desire explains the addiction of the individual to nicotine."—From *A Tentative Hypothesis on Nicotine Addiction,* an essay written by scientists at Battelle and distributed to senior executives at BAT and B&W, 1963 {1200.01, p 1}. |
| B&W/BAT private statements | "Moreover, nicotine is addictive. We are, then, in the business of selling nicotine, an addictive drug effective in the release of stress mechanisms."—Addison Yeaman, vice president and general counsel, B&W, 1963 {1802.05, p 4}. |
| Tobacco industry public statements | "I do not believe that nicotine is addictive . . . nicotine is a very important constituent in the cigarette smoke for taste."—Thomas Sandefur, Chairman and CEO, B&W, testifying before the Health and Environment Subcommittee, Energy and Commerce Committee, House of Representatives, June 23, 1994.[15] |
| | **NICOTINE AND ADDICTION: LOW-TAR/LOW-NICOTINE CIGARETTES AND THE PHENOMENON OF SMOKER COMPENSATION** |
| Summary | Smokers compensate for the lack of nicotine in low-tar/low-nicotine cigarettes by puffing more frequently, by increasing the depth or duration of smoke inhalation, by smoking more cigarettes per day, and by smoking cigarettes to a shorter butt length. This means that smokers of low-tar/low-nicotine cigarettes are exposed to more "tar" and other harmful chemicals than would be indicated by an analysis of the cigarette smoke. This phenomenon, known as smoker compensation, was acknowledged internally in the tobacco industry by the early 1970s but was not appreciated in the scientific community until the 1980s. |
| Surgeon general's reports | 1966: "The preponderance of scientific evidence strongly suggests that the lower the 'tar' and nicotine content of cigarette smoke, the less harmful would be the effect."[16]<br>1979: "[The public] should be warned that, in shifting to a less hazardous cigarette, they may in fact increase their hazard if they begin smoking more cigarettes or inhaling more deeply."[12]<br>1981: "Smokers may increase the number of cigarettes they smoke and inhale more deeply when they switch to lower yield cigarettes. Compensatory behavior may negate any advantage of the lower yield product or even increase the health risk."[16] |
| B&W/BAT research results | ". . . whatever the characteristics of cigarettes as determined by smoking machines, the smoker adjusts his pattern to deliver his own nicotine requirements."—Minutes from BAT's Group Research & Development (R&D) conference held in Duck Key, Fla, 1974, taken by S.J.G. (S. J. Green of BAT R&D) {1125.01, p 2}.<br>"Compensation study conducted by Imperial Tobacco Co., a BATCo affiliate, [shows that a smoker] adjusts his smoking habits when smoking cigarettes with low nicotine and TPM [total particulate matter] to duplicate his normal cigarette nicotine intake."—From document titled "Chronology of Brown & Williamson Smoking and Health Research," regarding research conducted in 1975. Chronology dated 1988 {1006.01, p 27}. |
| B&W/BAT internal statements | "In most cases, however, the smoker of a filter cigarette was getting as much or more nicotine and tar as he would have gotten from a regular cigarette."—Ernest Pepples, vice president and general counsel, B&W, 1976 {2205.01, p 2}. |
| Tobacco industry public statements | "All the fuss about smoking got me to thinking I'd either quit or smoke True. I smoke True."—Advertisement for Lorillard's True cigarettes in *Ms.* magazine, October 1975.<br>"I like to smoke, and what I like is a cigarette that isn't timid on taste. But I'm not living in some ivory tower. I hear the things being said against high-tar smoking as well as the next guy. And so I started looking. For a low-tar smoke that had some honest-to-goodness taste. . . ."—Advertisement for Vantage cigarettes in *Time* magazine, November 9, 1977, pp 86-87.<br>"The tobacco industry cannot find definitive evidence that tar above a certain level is harmful, and below it is not. At the same time, they are responding to what we might call the 'scare market.'"—William Kloepfer, Jr, Tobacco Institute spokesman, in a *New York Times* article, October 30, 1976.[17] |
| | **ROLE OF THE TOBACCO INDUSTRY RESEARCH COMMITTEE/COUNCIL FOR TOBACCO RESEARCH** |
| Summary | The Tobacco Industry Research Committee (TIRC), later renamed the Council for Tobacco Research–U.S.A., Inc (CTR), was created by US tobacco companies in 1954. The tobacco industry has publicly claimed that TIRC/CTR is an independent organization that funds unbiased research into the health effects of smoking. Internally, however, tobacco industry representatives have stated that TIRC/CTR was created for public relations purposes and that it later fulfilled political and legal roles. |
| B&W/BAT private statements | "Originally, CTR was organized as a public relations effort. . . . The research of CTR also discharged a legal responsibility. . . . Finally the industry research effort has included special projects designed to find scientists and medical doctors who might serve as industry witnesses in lawsuits or in a legislative forum."—Ernest Peppels, vice president and general counsel, B&W, 1976 {2010.02, p 2}. |
| Tobacco industry public statements | "From the outset, the Tobacco Industry Research Committee has made clear that the object of its research program is to encourage scientific study for facts about tobacco use and health. Its position is that research will help provide the knowledge about lung cancer and heart disease for a full evaluation of all factors being studied in connection with these diseases."—Public relations document, circa 1963 {1903.03, p 1}.<br>"The Council for Tobacco Research–U.S.A., Inc., is the sponsoring agency of a program of research into questions of tobacco use and health. . . .The Council awards research grants to independent scientists who are assured complete scientific freedom in conducting their studies. Grantees alone are responsible for reporting or publishing their findings in the accepted scientific manner—through medical and scientific journals and societies."[18] |

*(continued on next page)*

Public vs Private Statements Made by the Tobacco Industry (cont)

| Source | Statements |
|---|---|
| | **SMOKING AND DISEASE, 1960s** |
| Summary | By the early 1960s, the scientific community had determined that smoking is causally related to lung cancer and probably related to heart disease. Results from tobacco industry laboratories supported these conclusions, but the tobacco industry publicly denied that the links had been proven. |
| Surgeon general's reports | 1964: "Cigarette smoking is causally related to lung cancer in men; the magnitude of the effect of cigarette smoking far outweighs all other factors. The data for women, though less extensive, point in the same direction." "Cigarette smoking is the most important of the causes of chronic bronchitis in the United States, and increases the risk of dying from chronic bronchitis." "Male cigarette smokers have a higher death rate from coronary artery disease than non-smoking males, but it is not clear that the association has causal significance." "Cigarette smoking is a significant factor in the causation of cancer of the larynx [and] an association exists between cigarette smoking and cancer of the urinary bladder in men."[13] |
| B&W/BAT research results | "Scientists with whom I talked [at BATs laboratories in Great Britain] were unanimous in their opinion that smoke is weakly carcinogenic under certain conditions and that efforts should be made to reduce this activity."—Dr R. B. Griffith, head of R&D, B&W, 1965 {1105.01, p 2}. |
| B&W/BAT private statements | "At the best, the probabilities are that some combination of constituents of smoke will be found conducive to the onset of cancer or to create an environment in which cancer is more likely to occur."—Addison Yeaman, vice president and general counsel, B&W, 1963 {1802.05, p 1}. |
| Tobacco industry public statements | "The smoking of tobacco continues to be one of the subjects requiring study in the lung cancer problem, as do many other agents and influences in modern living. Science does not yet know enough about any suspected factors to judge whether they may operate alone, whether they may operate in conjunction with others, or whether they may affect or be affected by factors of whose existence science is not yet aware."—Public relations document, circa 1963 {1903.03, p 3}. |
| | **SMOKING AND DISEASE, 1970s** |
| Summary | Throughout the 1970s, B&W and BAT (and probably the other tobacco companies as well) privately engaged in a massive research campaign to identify and remove any toxic compounds identified in tobacco smoke. Privately, B&W and BAT scientists concluded there was no scientific controversy about smoking being dangerous. Their goal was to create a "safe" cigarette. However, their research showed that there were so many different toxic compounds in tobacco smoke that it would be very difficult to remove them all. Publicly, the industry continued to deny that smoking had been proven harmful to health. |
| Surgeon general's reports | 1972: "Tobacco use is associated with increased risk of coronary heart disease; cerebrovascular disease (stroke); aortic aneurysm; peripheral vascular disease; chronic obstructive bronchopulmonary disease (COPD); cancers of the lung, lip, larynx, oral cavity, esophagus, urinary bladder, and pancreas; and gastrointestinal disorders such as peptic ulcer disease. In addition, maternal smoking during pregnancy retards fetal growth."[19]<br>1979: "The longer a smoker smokes, the higher the risk of dying prematurely. Death rates are higher for smokers who start smoking at young ages and for smokers who inhale. Life expectancy at any given age is significantly shortened by cigarette smoking. Cigar and pipe smoking also increase the risk of premature death. Although death rates are particularly high among cigarette smokers for such diseases as lung cancer, chronic obstructive lung disease, and cancer of the larynx, coronary heart disease is the chief contributor to the excess mortality among cigarette smokers."[12] |
| B&W/BAT research results | "Carbon monoxide [CO] will become increasingly regarded as a serious health hazard for smokers. The methods of control available are ventilation, diffusion and the choice of smoking materials. But the inverse relationship of polycyclic aromatics and carbon monoxide is still observed, e.g. lithium hydroxide reduced CO substantially but is coupled with an increase in tumorigenic activity."—Minutes from the Group Research & Development Conference held in Duck Key, Fla, 1974, taken by S. J. Green of BAT R&D {1125.01, p 3}. |
| B&W/BAT private statements | "There has been no change in the scientific basis for the case against smoking. Additional evidence of smoke-dose related incidence of some diseases associated with smoking has been published. But generally this has long ceased to be an area for scientific controversy."—Minutes from BAT's Group Research & Development Conference held in Sydney, Australia, 1978, taken by S. J. Green of BAT R&D {1174.01, p 1}. |
| Tobacco industry public statements | "Taking all the above into consideration, we believe there is sound evidence to conclude that the statement 'cigarettes cause cancer' is not a statement of fact *but merely an hypothesis.*" [emphasis in original]—B&W public relations document, 1971 {2110.06, p 10}.<br>"As for the lack of research on the 'harmful' effects of smoking, the fact is there is good reason to doubt the culpability of cigarette smoking in coronary heart disease."—Ross R. Millhiser, president, Philip Morris Inc, in *New York Times* opinion editorial, January 12, 1978.[20]<br>"There is still no basic answer to why people who smoke fall victim to some diseases in greater numbers than people who don't smoke."—Walker Merryman, Tobacco Institute spokesman, in *New York Times* article, September 22, 1979.[21] |
| | **SMOKING AND DISEASE, 1980s** |
| Summary | B&W and BAT continued their efforts to develop a "safer" cigarette during the 1980s. The focus of their research was minimizing the "biological activity," or carcinogenic potential, of their products. Unfortunately, this proved more difficult than expected. In addition, as the scientific community noted, even if less carcinogenic cigarettes could be designed, these cigarettes would still cause some cancer, as well as heart disease and other noncancer diseases. |
| Surgeon general's reports | 1981: "Smoking cigarettes with lower yields of 'tar' and nicotine reduces the risk of lung cancer and, to some extent, improves the smoker's chance for longer life, provided there is no compensatory increase in the amount smoked. However, the benefits are minimal in comparison with giving up cigarettes entirely."[16]<br>1989: "Smoking is responsible for more than one of every six deaths in the United States. Smoking remains the single most important preventable cause of death in our society."[22] |
| B&W/BAT research results | "Cigarette *brands* can be readily distinguished [in terms of mutagenicity as judged by an Ames test]. This is in contrast with the earlier mouse skin painting results. An unfortunate side-effect is that the sensitivity increases the probability of an Ames League Table appearing. A further unfortunate examination is that, to date, it is not uncommon for BAT brands to have a higher result [i.e., greater mitogenicity] than those from the opposition."—Minutes from BAT Biological Conference held in Southampton, England, 1984, author unknown {1181.06, p 1}. |
| B&W/BAT private statements | "Despite intense research over the past 25 years, the biological activity of smoke remains a major challenge. In particular, it is not known in quantitative terms whether the smoke from modern low and ultra-low delivery products has a lower specific biological activity than that from previous high delivery products. Nor is it clearly established . . . what are the main factors that influence biological [carcinogenic] activity."—Minutes from BAT Research Conference held in Montebello, Quebec, 1982, prepared by L. C. F. Blackman of BAT R&D {1179.01, p 4}. |
| Tobacco industry public statements | "Cigarette smoking has not been scientifically established to be a cause of chronic diseases, such as cancer, cardiovascular disease, or emphysema. Nor has it been shown to affect pregnancy outcome adversely."—Sheldon Sommers, MD, scientific director of the CTR in congressional testimony, March 1983.[23] |

*(continued on next page)*

Public vs Private Statements Made by the Tobacco Industry (cont)

| Source | Statements |
|---|---|
| | **MOUSE SKIN PAINTING EXPERIMENTS** |
| Summary | Both the tobacco industry and the general scientific community have relied on mouse skin painting experiments to evaluate the carcinogenicity of elements in tobacco smoke. Publicly, however, the tobacco industry has criticized the validity of these tests. |
| Surgeon general's reports | 1964: "[I]nduction of cancer by a compound in one species does not prove that the test compound would be carcinogenic in another species under similar circumstances. Therefore, tests for carcinogenicity in animals can provide only supporting evidence for the carcinogenicity of a given compound or material in man. Nevertheless, any agent that can produce cancer in an animal is suspected of being carcinogenic in man also."[13]<br>"Almost every species that has been adequately tested has proved to be susceptible to the effect of certain polycyclic aromatic hydrocarbons identified in cigarette smoke and designated as carcinogenic on the basis of tests in rodents. Therefore, one can reasonably postulate that the same polycyclic hydrocarbons may also be carcinogenic in one or more tissues of man with which they come in contact."[13] |
| B&W/BAT research results | "Studies in instant [fresh] condensate are showing a biological activity towards mouse-skin of the same order as that of stale condensate, suggesting that the biological activity is not time-dependent. The clear possibility of producing cigarettes with reduced mouse-skin biological activity therefore becomes of greater importance and a research solution to the whole problem is more likely."—Minutes from BAT Research Conference held in Hilton Head Island, SC, 1968, prepared by S. J. Green of BAT R&D {1112.01, p 1}.<br>"The meeting agreed that it would be worthwhile to make a cigarette with lower biological activity on mouse skin painting, provided this did not adversely affect the position with respect to irritation and other factors. It was recognized that this implied certain assumptions about the relevance of mouse skin painting."—Minutes from BAT R&D Conference held in Montreal, Quebec, 1967, author unknown {1165.02, p 3}. |
| B&W/BAT private statements | "Historically, bioassay experiments were undertaken by the Industry with the object of clarifying the role of smoke constituents in pulmonary carcinogenesis. The most widely used of these methods [was] mouse-skin painting. . . . (a) In the foreseeable future, say five years, mouse-skin painting would remain as the ultimate court of appeal on carcinogenic effects."—Minutes from BAT Research Conference held in Kronberg, Germany, 1969, prepared by S. J. Green of BAT R&D {1169.01, pp 2-4}. |
| Tobacco industry public statements | "Much of the experimental work involves mouse-painting or animal smoke inhalation experiments . . . *[T]hese condensates are artificially produced under laboratory conditions and, as such, have little, if any, relation to cigarette smoke as it reaches the smoker.* Further, the results obtained on the skin of mice should not be extrapolated to the lung tissue of the mouse, or to any other animal species. Certainly such skin results should not be extrapolated to the human lung."—B&W public relations document, 1971 [emphasis in original] {2110.06, pp 6-7}. |
| | **ENVIRONMENTAL TOBACCO SMOKE** |
| Summary | During the 1970s and 1980s, scientific evidence began to suggest that exposure to environmental tobacco smoke (ETS) could cause adverse health effects, such as lung cancer and cardiovascular disease, in nonsmokers. B&W and BAT responded by privately attempting to create a product that produced less hazardous sidestream smoke. Publicly, however, the industry has denied that passive smoking has been proven harmful to health. |
| Surgeon general's reports | 1972: "1. An atmosphere contaminated with tobacco smoke can contribute to the discomfort of many individuals.<br>2. The level of carbon monoxide attained in experiments using rooms filled with tobacco smoke had been shown to be equal, and at times to exceed, the legal limits for maximum air pollution permitted for ambient air quality. . .<br>3. Other components of tobacco smoke, such as particulate matter and the oxides of nitrogen, have been shown in various concentrations to affect adversely animal pulmonary and cardiac structure and function. The extent of the contribution of these substances to illness in humans exposed to the concentrations present in an atmosphere contaminated with tobacco smoke is not presently known."[19]<br>1982: Epidemiologic studies on ETS and lung cancer "raise the concern that involuntary smoking may pose a carcinogenic risk to the nonsmoker."[24]<br>1986: "This review leads to three major conclusions:<br>1. Involuntary smoking is a cause of disease, including lung cancer, in healthy nonsmokers.<br>2. The children of parents who smoke compared with the children of nonsmoking parents have an increased frequency of respiratory infections, increased respiratory symptoms, and slightly smaller rates of increase in lung function as the lung matures.<br>3. The simple separation of smokers and nonsmokers within the same air space may reduce, but does not eliminate, the exposure of nonsmokers to environmental tobacco smoke."[25] |
| B&W/BAT research results | "*SIDESTREAM RESEARCH AND DEVELOPMENT.*<br>Strategic objectives remain as follows:<br>1. Develop cigarettes with reduced sidestream yields and/or reduced odour and irritation.<br>2. Conduct research to anticipate and refute claims about the health effects of passive smoking."<br>—Summary of BAT's Group Research and Development Centre Activities, 1984 {1181.12, p 1}. |
| B&W/BAT private statements | "We must get hard data both to help counter anti-smoking attacks, and to support the design of future products . . . We should keep within BAT:<br>i) animal results on sidestream activity<br>ii) thoughts on the biological activity [carcinogenicity] of sidestream [smoke]<br>iii) research findings on the consumer annoyance aspects of environmental [tobacco] smoke—since these have potential commercial value."<br>—Minutes from BAT Research Conference held in Montebello, Quebec, 1982, prepared by L. C. F. Blackman of BAT R&D {1179.01, p 7}. |
| Tobacco industry public statements | "[E]vidence relating ETS to health effects is scanty, contradictory and often fundamentally flawed. . . . [M]ore and better research needs to be done."[26(p1)]<br>[E]xposure to environmental tobacco smoke has not been shown to cause lung cancer in nonsmokers. . . . [S]uch exposure has not been shown to impair the respiratory or cardiovascular health of nonsmoking adults or children, or to exacerbate preexisting disease in these groups, or to cause 'allergic' symptoms on a physiological basis."[26(p51)] |

makes a free choice to do so. Finally, tobacco companies have claimed that they are committed to determining the scientific truth about the health effects of tobacco, both by conducting internal research and by funding external research through jointly funded industry programs.

The documents provide a unique window—or, more precisely, a keyhole view—into how the tobacco industry has responded over the years to the ever-

growing body of scientific evidence proving that its products kill. The documents show that, by the 1960s, B&W and BAT had proven in their own laboratories that cigarette tar causes cancer in animals. In addition, by the early 1960s, BAT's scientists (and B&W's lawyers) were acting on the assumption that nicotine is addictive. BAT responded by secretly attempting to create a "safe" cigarette that would minimize dangerous ingredients and the associated damage to health, but would still deliver nicotine. Publicly, however, it maintained that cigarettes are neither dangerous nor addictive. The Table contrasts the tobacco industry's private knowledge, public statements, and views of the general scientific community on a variety of tobacco-related issues. To this day, despite overwhelming scientific evidence and official government reports to the contrary, the tobacco industry denies that tobacco products are addictive or that they cause any disease whatsoever.

B&W has pursued legal action to keep the documents out of the public eye. Nevertheless, when B&W had obtained subpoenas from the Superior Court for the District of Columbia to require Congressmen Henry Waxman (D, Calif) and Ron Wyden (D, Ore) of the House Subcommittee on Health and the Environment to produce documents from B&W allegedly held by these congressmen, US District Court Judge Harold H. Greene quashed the subpoenas. His opinion stated:

> [The documents] may be evidence supporting a "whistle-blower's" claim that the tobacco company concealed from its customers and the American public the truth regarding the health hazards of tobacco products, and that he was merely bringing them to the attention of those who could deal with this menace. With the situation in that posture, to accept blindly the B&W "stolen goods" argument would be to set a precedent at odds with the law, with equity, and with the public interest.
>
> If the B&W strategy were accepted, those seeking to bury their unlawful or potentially unlawful acts from consumers, from other members of the public, and from law enforcement or regulatory authorities could achieve that objective by a simple yet ingenious strategy: all that would need to be done would be to delay or confuse any charges of health hazard, fraud, corruption, overcharge, nuclear or chemical contamination, bribery, or other misdeeds, by focusing instead on inconvenient documentary evidence and labelling it as the product of theft, violation of proprietary information, interference with contracts, and the like. The result would be that even the most severe public health and safety dangers would be subordinated in litigation and in the public mind to the malefactor's tort or contract claims, real or fictitious.
>
> The law does not support such a strategy or inversion of values. There is a constitutional right to inform the government of violations of federal laws—a right which under [United States Constitution] Article VI supersedes local tort or contract rights and protects the "informer" from retaliation [Maddox v Williams (1994, DC District Court) 855 Federal Supplement 406, p 414, 415].

In this spirit, the accompanying articles[8-11] summarize some of the B&W documents and the story that they tell.

## RESPECTING THE LIMITATIONS OF THE EVIDENCE

These documents provide our first look at the inner workings of the tobacco industry during the crucial period in which the scientific case that smoking is addictive and kills smokers solidified. However, it is important to remember that this view is a limited one.

The documents could be subject to a form of selection bias—they may have been picked by a whistle-blower with an eye toward smoking guns. Another limit of the evidence, which shows up particularly in the legal and public relations aspects, is that it is often difficult to tell from the discussion whether particular ideas were actually carried out. In some cases, the public record clearly shows that the contemplated actions were taken. In other cases, it is not obvious where the line between contemplated and actual action lies.

Many of the documents were prepared by lawyers. Lawyers by nature are asked to evaluate proposed courses of action in terms of their legal risks, but their advice is not always followed. Notwithstanding this fact, we were struck by the active role the lawyers had, not just as advisers, but also as managers, selecting which research would be done or not done, who would be funded, and what public relations and political actions would be pursued. Generally, the documents authored by attorneys do not outline possible courses of action or provide recommendations as to which course to follow, but rather strongly advocate that certain policies or actions be taken.

Finally, in preparing these articles we have not contacted any interested parties for comment (inside or outside the tobacco industry), but rather have concentrated on the story the documents themselves tell.

Despite these limitations, we are confident in the conclusions we draw from the documents. The documents showing lawyers steering scientists away from particular research avenues are inconsistent with the company's purported disbelief in the causation and addiction claims; if the company had been genuinely unconvinced by the causation and addiction hypotheses, then it should have had no concern that new research would provide ammunition for the enemy. Quite the contrary, the documents show that B&W and BAT recognized more than 30 years ago that nicotine is addictive and that tobacco smoke is "biologically active" (eg, carcinogenic).

This work was supported in part by grants from the National Cancer Institute (CA-61021) and the University of California Tobacco Related Diseases Research Program (2KT-0072 and 4RT-0035).

We also thank Phil Lollar of the University of California, San Francisco, Robin Barthalow and Tim Nolan of Lieff, Cabraser and Heimann, who provided assistance in indexing the documents, and Adriana Marchione for assistance in manuscript preparation.

Finally, in an era in which public institutions are increasingly held in disdain, we would like to thank the University of California for providing an environment committed to academic freedom and the public interest. It would have been simpler—and cheaper—for the university to simply walk away from this project. After all, the history of the tobacco issue is one in which many institutions have followed the path of least resistance and failed to confront the issues raised in these documents. No administrator or other official ever told us to stop. Quite the contrary, we were encouraged and protected in our work. This behavior is what makes the University of California a great public institution.

### References

1. Hilts PJ. Tobacco company was silent on hazards. *New York Times.* May 7, 1994:A1.
2. Hilts PJ. Way to make safer cigarette was found in 60's, but idea was shelved. *New York Times.* May 13, 1994:A10.
3. Hilts PJ. Cigarette makers debated the risks they denied. *New York Times.* June 16, 1994:A1.
4. Hilts PJ. Tobacco maker studied risk but did little about results. *New York Times.* June 17, 1994: A1.
5. Maxwell JJ. *The Maxwell Consumer Report: Top World Cigarette Market Leaders.* Richmond, Va: Wheat, First Securities Inc; 1993.
6. Maxwell JJ. *Historical Sales Trends in the Cigarette Industry.* Richmond, Va: Wheat, First Securities Inc; 1993.
7. Weisz P. Smokes 'R' us: cigarette retailers are coming category among category killers. *Brandweek.* March 6, 1995:20-24.
8. Slade J, Bero LA, Hanauer P, Barnes DE, Glantz SA. Nicotine and addiction: the Brown and Williamson documents. *JAMA.* 1995;274:225-233.
9. Hanauer P, Slade J, Barnes DE, Bero LA, Glantz SA. Lawyer control of internal scientific research to protect against products liability lawsuits: the Brown and Williamson documents. *JAMA.* 1995; 274:234-240.
10. Bero LA, Barnes DE, Hanauer P, Slade J, Glantz SA. Lawyer control of the tobacco industry's external research program: the Brown and Williamson documents. *JAMA.* 1995;274:241-247.
11. Barnes DE, Hanauer P, Slade J, Bero LA, Glantz SA. Environmental tobacco smoke: the Brown and Williamson documents. *JAMA.* 1995;274:248-253.
12. US Dept of Health, Education and Welfare. *Smoking and Health: A Report of the Surgeon General.* Washington, DC: US Dept of Health, Education and Welfare, Public Health Services, Office of the Assistant Secretary for Health, Office on Smoking and Health; 1979. DHEW publication PHS 79-50066.
13. US Dept of Health, Education and Welfare. *Smoking and Health: Report of the Advisory Committee to the Surgeon General of the Public Health Service.* Washington, DC: US Dept of Health, Education and Welfare; 1964. PHS publication 1103.
14. US Dept of Health and Human Services. *The Health Consequences of Smoking: Nicotine Addic-*

*tion: A Report of the Surgeon General.* Washington, DC: US Dept of Health and Human Services, Public Health Service, Centers for Disease Control, Center for Health Promotion and Education, Office on Smoking and Health; 1988. DHHS publication CDC 88-8406.
15. Sandefur TJ. Testimony before the House Subcommittee on Energy and the Environment, June 23, 1994.
16. US Dept of Health and Human Services. *The Health Consequences of Smoking: The Changing Cigarette: A Report of the Surgeon General.* Washington, DC: US Dept of Health and Human Services, Public Health Service, Office of the Assistant Secretary of Health, Office on Smoking and Health; 1981. DHHS publication PHS 81-50156.
17. King W. Low-tar cigarettes creating a 'revolution.' *New York Times.* October 30, 1976:A8.
18. Council for Tobacco Research. *Organization and Policy Statement.* New York, NY: Council for Tobacco Research; 1985.
19. US Dept of Health, Education and Welfare. *The Health Consequences of Smoking: A Report of the Surgeon General.* Washington, DC: US Dept of Health, Education and Welfare, Public Health Service, Health Services and Mental Health Administration; 1972. DHEW publication HSM 72-7516.
20. Millhiser RR. In defense of smoking. *New York Times.* January 12, 1978:A19.
21. Associated Press. Study asserts nonsmokers live 2 years more by heeding alerts. *New York Times.* September 22, 1979:A6.
22. US Dept of Health and Human Services. *Reducing the Health Consequences of Smoking: 25 Years of Progress.* Washington, DC: US Dept of Health and Human Services, Public Health Service, Centers for Disease Control, Center for Chronic Disease Prevention and Health Promotion, Office on Smoking and Health; 1989. DHHS publication CDC 89-8411.
23. Wolinsky H. When researchers accept funding from the tobacco industry, do ethics go up in smoke? *N Y State J Med.* 1985;85:451-455.
24. US Dept of Health and Human Services. *The Health Consequences of Smoking: Cancer: A Report of the Surgeon General.* Washington, DC: US Dept of Health and Human Services, Public Health Service, Office on Smoking and Health; 1982. DHHS publication PHS 82-50179.
25. US Dept of Health and Human Services. *The Health Consequences of Involuntary Smoking: A Report of the Surgeon General.* US Dept of Health and Human Services, Public Health Service, Centers for Disease Control; 1986. DHHS publication CDC 87-8398.
26. Tobacco Institute. *Tobacco Smoke and the Nonsmoker: Scientific Integrity at the Crossroads.* Washington, DC: Tobacco Institute; 1986.

**Cited Brown and Williamson Documents**

**1006.01.** Chronology of Brown & Williamson Smoking and Health Research, 1988.
**1105.01.** Griffith R. Report to Executive Committee, 1965.
**1112.01.** Green S. Research conference held at Hilton Head Island, SC. Minutes, September 24, 1968.
**1125.01.** Green S. Notes on the Group Research & Development Conference at Duck Key, Fla, January 12-18, 1974. Notes, January 12, 1974.
**1165.02.** BAT R&D conference, Montreal, Quebec, Proceedings, Wednesday, October 25, 1967. Minutes, 1967.
**1169.01.** Green S. Research conference held at Kronberg, Germany, June 2-6, 1969. Minutes, June 23, 1969.
**1174.01.** Green S. Notes on Group Research & Development Conference, Sydney, Australia, March 1978. Minutes, April 6, 1978.
**1179.01.** Blackman L. Research conference, Montebello, Quebec, August 30-September 3, 1982. Minutes, September 10, 1982.
**1181.06.** Biological conference, Southampton, England, April 9-11, 1984. BAT Research Conference 1984.
**1181.12.** Summary of GR&DC [Group Research & Development Centre] activities on: sidestream, psychology, 1984?
**1200.01.** Haselbach C, Libert O. *A Tentative Hypothesis on Nicotine Addiction.* London, England: British American Tobacco Co Ltd; 1963.
**1200.20.** Geissbuhler H, Haselbach C. *The Fate of Nicotine in the Body.* Geneva, Switzerland: Battelle Memorial Institute (for BAT); 1963.
**1802.05.** Yeaman A. Implications of Battelle Hippo I & II and the Griffith filter, 1963.
**1903.03.** Tobacco Industry Research Committee organization and policy, 1967?
**2010.02.** Pepples E. Re: CTR budget. Letter to J. Edens, B&W Industries, C. McCarty, I. Hughes, and D. Bryant. April 4, 1978.
**2110.06.** Brown & Williamson. Project Truth: the smoking/health controversy: a view from the other side (prepared for the *Courier-Journal* and *Louisville Times*). Brown and Williamson Tobacco Company, 1971.
**2205.01.** Pepples E. Industry response to cigarette/health controversy, 1976.

# Lawyer Control of the Tobacco Industry's External Research Program

## The Brown and Williamson Documents

Lisa Bero, PhD; Deborah E. Barnes; Peter Hanauer, LLB; John Slade, MD; Stanton A. Glantz, PhD

**Objective.**—To examine the involvement of tobacco industry lawyers in the selection of tobacco industry scientific research projects and to examine how the research was used to influence public policy.

**Data Sources.**—Documents from Brown and Williamson Tobacco Corporation, the British American Tobacco Company (BAT), and other tobacco interests provided by an anonymous source, obtained from Congress, and received from the private papers of a former BAT officer.

**Study Selection.**—All available materials, including confidential reports regarding research and internal memoranda exchanged between tobacco industry lawyers.

**Conclusions.**—The involvement of tobacco industry lawyers in the selection of scientific projects to be funded is in sharp contrast to the industry's public statements about its review process for its external research program. Scientific merit played little role in the selection of external research projects. The results of the projects were used to generate good publicity for the industry, to deflect attention away from tobacco use as a health danger, and to attempt, sometimes surreptitiously, to influence policymakers.

(*JAMA*. 1995;274:241-247)

THE TOBACCO industry consistently maintains that it funds independent scientific research to resolve the "smoking and health controversy." The Brown and Williamson Tobacco Corporation (B&W) documents,[1] however, describe the role of lawyers in the selection of research projects for funding.* The documents also describe how these lawyers used externally funded scientific research in an effort to refute the scientific evidence about tobacco, to perpetuate controversy about the health effects of tobacco, and to provide defensive research that could be used to respond to adverse publicity, all without involving tobacco industry scientists directly. The industry's selection and reporting process differs dramatically from that of traditional scientific organizations, such as the National Institutes of Health.

### DESCRIPTION OF TOBACCO INDUSTRY EXTERNAL RESEARCH PROGRAMS

Scientific research projects involving tobacco industry lawyers received funding from three sources: the Council for Tobacco Research (CTR), tobacco company law firms, and the tobacco companies directly. They involved both original research and nonresearch consultant activities (Table 1). Table 2 lists the 12 largest research projects funded between 1972 and 1990 through these mechanisms.

### CTR Special Projects

In 1954, US tobacco companies jointly formed the Tobacco Industry Research Committee (TIRC), which was renamed the Council for Tobacco Research–U.S.A. (CTR) in 1964. Over the years, the industry has staunchly maintained that CTR is an independent organization devoted to determining the health effects of tobacco use, which awards grants after peer review by an independent Science Advisory Board (SAB) of outside researchers.*

The TIRC was actually formed for public relations purposes, to convince the public that the health dangers of smoking had not been proven. A public relations firm, Hill and Knowlton, played a major role in the formation of the TIRC. The increasing importance of CTR to the tobacco industry is described in an April 4, 1978, memo from Ernest Pepples, B&W's vice president and general counsel, to J. E. Edens, the chairman and CEO:

> *Originally, CTR was organized as a public relations effort.* The industry told the world CTR would look at the diseases which were being associated with smoking. There was even a suggestion by our political spokesmen that if a harmful element turned up the industry would try to root it out. *The research of CTR also discharged a legal responsibility.* The manufacturer has a duty to know its product. The Scientific Advisory Board composed of highly reputable independent scientists constitute a place where the present state of the art is constantly being updated. Theoretically SAB is showing us the way in a highly complex field. *There is another political need for research. Recently it has been suggested that CTR or industry research should enable us to give quick responses to new developments in the propaganda of the avid anti-smoking groups.* For example, CTR or someone should be able to rebut the suggestion that smokers suffer from a peculiar disease, as widely alleged in the press some few months ago.... *Finally the industry research effort has included special projects designed to find scientists and medical doctors who might serve as industry witnesses in lawsuits or in a legislative forum.* All of these matters and more should be considered in asking what kind of research the industry should do. [emphasis added] {2010.02, p 2}

Pepples' description of CTR is remarkable in two respects. First, he confirms that CTR was formed for public relations purposes. In addition, he notes that CTR has served as a political and legal shield for the industry over the years.

In its annual reports published between 1985 and 1992, CTR states that it funded and continues to fund peer-reviewed research projects:

> The Scientific Advisory Board to The Council [CTR] meets regularly to evaluate applications for research support, j[...] solely on the basis of scientific m[...] evance.[2]

From the Institute for Health Policy Studies, Department of Medicine and Division of Clinical Pharmacy, University of California, San Francisco (Drs Bero and Glantz, Ms Barnes, and Mr Hanauer), and the Department of Medicine, St Peter's Medical Center, University of Medicine and Dentistry of New Jersey, Robert Wood Johnson Medical School, New Brunswick (Dr Slade).

Reprint requests to Division of Cardiology, Box 0124, University of California, San Francisco, CA 94143-0124 (Dr Glantz).

*We indexed the documents as part of our analysis and assigned each one a six-digit number. Documents are cited in this article using these numbers enclosed in braces (eg, {1234.56}) and listed at the end of the article after the regular reference section. The complete indexed document set has been deposited in the Archives and Special Collections Department of the University of California, San Francisco, Library and Center for Knowledge Management. As of this writing, these documents are being made available via the Internet at http://www.library.ucsf.edu/tobacco through the World Wide Web.

PLAINTIFF'S EXHIBIT 4

Table 1.—Types of Projects Involving Lawyers, 1972 to 1991*

| Type of Project | Description of Project | Expenditure |
|---|---|---|
| CTR special project | Research projects funded by the Council for Tobacco Research (CTR) that did not go through peer review by the Scientific Advisory Board {1001.01, p 31}. Instead, CTR special projects were selected for funding by tobacco industry lawyers. The money for the CTR special projects came from pooled contributions according to cigarette market share directly from the tobacco companies. CTR began funding special projects in 1966 {1000.01, p 13}. | $14 636 918 |
| Law firm project | Research projects that were funded directly by law firms and selected for funding by the lawyers in the firm. Special Account 4 was administered by Jacob and Medinger. Little is known about Special Account 5, except general description information about the projects that were funded through the account. | $2 486 496 |
| Tobacco company special project | Research projects that were funded directly by the tobacco companies, sometimes individually by Brown and Williamson and sometimes by pooled contributions from several companies. Grantees were selected by tobacco company executives and lawyers. Projects funded directly by tobacco companies included relatively large and unrestricted grants to universities. Some of these university special projects were not related to tobacco, but were used to support general research. | $2 200 000† |
| Consultancy | In addition to funding research projects, lawyers were also involved in funding "consultancies" through the three mechanisms described above. Consultancies were for specific tasks (eg, preparation of expert scientific testimony for a congressional hearing) or ongoing consultancies (eg, a scientist "on call" to attend scientific meetings or review the scientific literature), rather than research projects. The consultancies were funded through CTR, law firm accounts, and directly by the companies. | $1 140 760 |

*This table is based on a series of pages in the documents that appear to have been complied by and for lawyers; many pages are marked "Confidential—For Counsel Use Only." This table does not contain a complete list of all the special projects and consultancies that have been funded by the tobacco industry, because it began funding CTR special projects in 1966, and the data available to us begin in 1972. Other information in the documents suggests, however, that the tobacco industry spent more than $20 million on special projects and consultancies from 1972 to 1991.
†This amount only covers the Washington University special project.

Documents revealed during tobacco products liability suits have indicated that the peer-reviewed CTR projects have been manipulated by lawyers. The court in the case of *Cipollone v Liggett Group, Inc* determined:

In this instance [CTR funded research on designing a less hazardous cigarette], as well as all aspects of the research being conducted by the companies and under the auspices of the Tobacco Institute, *there was the ever prevalent presence of lawyers determining, or at least participating in what research should be conducted, and what should be published or made available to the general public.*[3] [emphasis added]

Beginning in 1966, 2 years after release of the first surgeon general's report on smoking and health in 1964,[4] CTR began to fund "special projects" whose primary purpose was to develop research data that could be used to defend the industry in court {1000.01, p 13}. Documents obtained during the discovery process for the case of *Haines v Liggett Group Inc*, first revealed the existence of CTR special projects.[5] These special projects were awarded by tobacco industry lawyers, rather than the SAB. The money for the CTR special projects came from pooled contributions made directly by the tobacco companies. The documents show that between 1972 and 1990, CTR awarded $14 636 918 in special project funding (Table 1).

The minutes of a 1965 meeting of the Committee of Counsel, a Tobacco Institute committee of the chief counsels for the member tobacco companies, describe the critical role that lawyers played in the monitoring of projects that were selected for funding.

It is understood that both CTR, in respect of its special projects, and the Ad Hoc Committee [a committee of tobacco company lawyers, scientific directors, and executives who monitored the CTR special projects] will as occasion warrants, but upon no fixed schedule, report the status of all projects as they proceed to General Counsel. {2000.04, p 4}

## Law Firm Special Projects: Special Accounts 4 and 5

The documents contain limited information about two special accounts, Special Account 4 and Special Account 5 (Table 1). We have no information about Special Accounts 1, 2, 3, or numbers above 5, or even whether such accounts existed. Special Accounts 4 and 5 supported research projects and consultancies with money provided directly by law firms. Special Account 4 was administered by the law firm of Jacob and Medinger {2010.01, p 1}. Special accounts funded research by expert witnesses in preparation for testimony directly related to a particular case, preparation of testimony for congressional or other hearings, and other research deemed useful by the lawyers {1000.01, p 44}. Seventy-two projects (49 research projects and 23 consultancies) were funded between 1976 and 1993 by these special accounts.

The documents list only one project funded through Special Account 5. This Special Account 5 project appears to have been a consultancy because two individuals received $637 000 between 1979 and 1983 to complete a project entitled "Analysis of Policy Issues Dealing With Control and Regulation of Routine Behavior in a Democratic Society" {2048.01}. The analyses generated from this project may have been used for the tobacco industry's "smokers' rights" campaigns.[6]

Most of the research projects funded through Special Account 4 during the time described in the documents were related to environmental tobacco smoke (ETS). Other Special Account 4 research projects studied potential confounding factors for adverse health effects associated with smoking. For example, projects examined genetic factors associated with disease, the influence of low-protein diets on health, and the influence of psychological stress on pregnancy outcomes. Funding research on confounding factors so as to divert attention from research on the adverse health effects of tobacco use has been a long-standing tactic of the tobacco industry.[7,8] Twenty-two of the consultancies funded through Special Account 4 were to support the preparation of statements for hearings on public smoking restrictions. Individuals were paid from $2500 to $4000 to prepare these statements, which favored the tobacco industry's position that smoking in public places need not be regulated. The Special Account 4 consultancies also supported the preparation of reviews of the scientific literature on topics ranging from the "tobacco habit" to lung retention of particulate matter. It has been shown that when tobacco industry–sponsored reviews are published in symposium proceedings, they consistently favor the industry's position that tobacco is not dangerous.[9] Some individuals were also paid for "continuing consultancies" for unspecified purposes. These continuing consultancies ranged from $500 to $1500 per month, and as high as $62 400 for 1 year.

## Special Projects Funded Directly by the Tobacco Companies: University Projects

Some research projects were funded directly by the tobacco companies, rather than through CTR or the law firms (Table 1). The documents describe how some projects were funded individually by B&W and some by pooled contributions from companies. Projects funded directly by tobacco companies apparently included relatively unrestricted grants to universities {2003.01}.

In contrast to projects funded through

Table 2.—Largest Special Projects and Consultancies Described in the Documents, 1972 to 1991*

| Investigator | Type of Project | Project Title | Dates Funded | Total Funded, $ |
|---|---|---|---|---|
| Aviado, Domingo | Special Account 4 consultancy | Continuing review of relevant smoking and health topics | 1981-1990 | 675 500 |
| Brotman, Richard/ Freedman, Alfred | Special Account 5 | Analysis of policy in issues dealing with control and regulation of routine behavior in a democratic society | 1979-1983 | 637 000 |
| DiNardi, Salvatore | CTR special project | Assessing the contribution of environmental tobacco smoke to the respirable suspended particulate levels in the indoor environment | 1986-1988 | 688 878 |
| Feinstein, Alvan R. | CTR special project | Basic epidemiologic research studies | 1985-1986, 1988-1990 | 700 960 |
| Gorlin, Richard/ Klein, Lloyd | Tobacco company special project | Clinical study of the relationship between smoking and other activities and myocardial ischemic events | 1983-1986 | 431 503 |
| Hickey, Richard J. | CTR special project | Epidemiologic and etiologic studies on the relation of air pollution, smoking, and other environmental variables to human chronic diseases | 1976-1986 | 579 849 |
| Jenson, A. Bennett | CTR special project | Search for papillomavirus structural antigens in premalignant and malignant squamous cell lesions of the oral cavity and upper and lower respiratory tracts | 1982-1990 | 493 853 |
| Oak Ridge National Laboratory | CTR special project | Methodology for quantitating exposure to inhalable ambient tobacco smoke | 1985-1987 | 855 000 |
| Seltzer, Carl | CTR special project | Constitutional differences between smokers and nonsmokers | 1976-1987 | 650 000 |
| Seltzer, Carl/ van den Berg, Bea | CTR special project | Study of smoker/nonsmoker differences | 1981-1989 | 597 000 |
| Sterling, Theodor | CTR special project | A continuing critical review of the major factors in the etiology of lung cancer and other lung diseases emerging from statistical studies | 1973-1990 | 5 214 253 |
| Washington University | Tobacco company special project | Funding for the cancer immunology laboratories | 1984-1991 | 2 200 000 |

*See notes to Table 1.

CTR or the law firms, these university projects did not focus exclusively on research related to tobacco use. There was debate among the tobacco companies concerning whether or not projects that were not directly related to tobacco should be funded. For example, some of the tobacco companies declined to join in support of projects at Washington University ($8 100 000 from April 1, 1971, through March 31, 1991 {2003.01}) and the University of California, Los Angeles (UCLA) ($2 750 000 from June 1, 1974, through May 31, 1982 {2003.01}). The Washington University project involved research on diabetes and the UCLA project involved research on genetic markers, host defenses of the lung, and immune action in the body.

As with CTR and law firm special projects, lawyers and tobacco industry executives were intimately involved in funding decisions for university projects. For example, a site visit of Washington University in 1980 to review the university's request for continued support was organized by William Shinn of Shook, Hardy & Bacon {2019.01}. The site visit committee consisted of the executive officers of B&W, Liggett & Myers, Philip Morris, R.J. Reynolds, Tobacco Associates, the Tobacco Institute, and U.S. Tobacco {2019.09}. This situation contrasts with the scientific peer review process, where the typical site visit team consists largely of scientists.

### Nature of Consultancies

The tobacco companies apparently began funding consultancies in the late 1970s (Table 1). Consultancies were used to support expert witnesses favorable to the industry and to respond to adverse publicity about tobacco use. In 1978, the idea of consultancies was suggested by Shinn to the Research Liaison Committee (a group of tobacco company lawyers), which met to discuss

> research in a larger context, ie, what are the industry's present needs? This, of course, involves consideration of the role of institutional type projects . . . ; the role of CTR; and the need for special areas of research with due regard for the politics of science, *the importance of developing witnesses and the need for a responsive mechanism to meet unfounded claims made about tobacco. It may also be important to evaluate the desirability of increased attendance at scientific meetings.* [emphasis added] {1910.05, p 2}

The types of projects funded through consultancies are unusual because they are not research projects. Typical granting agencies, such as the National Institutes of Health or research foundations, do not fund the development of witnesses for legal cases or provide funds for scientists to attend meetings not associated with their research projects.

## SELECTION OF PROJECTS FOR FUNDING

The documents show that when a project was submitted, the tobacco company lawyers decided under which category (CTR special project, law firm account, or tobacco company account) the project should be funded {2000.01; 2000.03; 2012.02; 2015.02}. Selecting projects was a coordinated effort of the tobacco companies and their lawyers.

One proposal to CTR was apparently rejected because the investigator had a history of conducting research that was unfavorable to the industry's position that tobacco use is not dangerous. In December 1976, the Addiction Research Foundation, directed by Stanford University pharmacologist Avram Goldstein, MD, submitted a formal grant application to CTR requesting $400 000 for the purpose of constructing a new research facility. The rationale for the facility was that the Addiction Research Foundation hoped to expand its work on the mechanism of opiate addiction into the area of research on the mechanism of nicotine addiction. The CTR told Dr Goldstein that it would consider proposals "specifically directed to tobacco use and health, but that it was not in a position to provide funds for structuring the Addiction Research Foundation" {1913.08, p 1}. Goldstein then pursued funding from individual tobacco companies. After several failed attempts to obtain funding, Leonard Cornell of the Addiction Research Foundation wrote to Shinn on August 9, 1978, arguing that the tobacco industry should be interested in funding the Addiction Research Foundation because the foundation's work could be directed to developing a "safe cigarette" that "could create the nicotine effect that smokers enjoy without the toxicity of nicotine" {1913.04, p 1}. Although Cornell wrote that his appeal was "attuned to the needs and desires of the tobacco industry in terms of public relations

and accelerating profits" {1913.04, p 2}, he did not realize that the tobacco industry would simply refuse to fund any proposals that acknowledged that nicotine is addictive or that smoking is dangerous. According to a memo on September 19, 1978, from C. L. Waite to H. R. Kornegay, president of the Tobacco Institute:

> Mr. Cornell's foundation actually assumes tobacco (nicotine) is addictive and costs the U.S. citizen 42 billion dollars a year! He also believes tobacco causes 300 000 premature deaths each year. And he wonders if this is why we might not be interested. {1913.01}

The tobacco companies refused to fund the Addiction Research Foundation because of the foundation's conclusion about nicotine, even though the British American Tobacco Company (BAT) research program had come to similar conclusions regarding nicotine and addiction 16 years earlier.[10]

Tobacco industry lawyers also helped identify researchers sympathetic to the tobacco industry as acceptable candidates for funding. In a May 19, 1981, letter from Ernest Pepples, vice president and general counsel, B&W, to Patrick Sirridge, an attorney at Shook, Hardy & Bacon, Pepples asked if he would

> check the literature and see if these gentlemen [that B&W planned to hire for consulting work] have written anything in the smoking and health field and let me know. Also any other curriculum vitae that you think is of interest would be appreciated. {1919.03}

Sirridge replied with brief biographical sketches of each potential consultant that included comments such as:

> Based on these titles [of a potential consultant's publications], there is no discernible pattern among Erwin's publications. . . . Dr. Erwin conducted one study in 1971 of the effects of spontaneous smoking on EKG. Under the conditions of that study, no effect of smoking on EKG was found. {1919.02}

These documents show that the tobacco company went to a lawyer to evaluate the qualifications of a scientist seeking funding. Typical research granting agencies, such as the National Institutes of Health or research foundations, do not consult lawyers before making decisions about which projects merit funding.

## LAWYER INVOLVEMENT IN THE DESIGN OF RESEARCH PROJECTS

Apparently, lawyers also influenced the design of research projects. One example is the Response Analysis Corporation project, which involved measuring ETS. A November 10, 1976, letter from Donald K. Hoel of Shook, Hardy & Bacon to the attorneys of five tobacco companies described a meeting at which Response Analysis Corporation's questionnaire for assessing annoyances in indoor air was discussed:

> Concern was expressed that the questionnaire's list of annoyance items which included several related to tobacco products, did not have a modern empirical foundation. . . . In order to strengthen the study in the above regard, a two-step effort was proposed by the Response Analysis staff. First, a national sample of approximately 200 persons would be asked essentially to list items that they find annoying. Then a different national sample of 200 persons would be asked to rate the annoyances obtained in the first step as to their frequency of occurrence and intensity. {2006.02, pp 1-2}

A later letter, dated July 6, 1977, from Hoel to the attorneys showed how the data obtained from this modified proposal had indicated

> a new and potentially profitable direction to pursue. Specifically, of the total of 852 annoyances or irritations reported by the 207 respondents, only 26 (about 3%) were annoyances related to cigarettes, smokers, or tobacco smoke. In the judgment of those in the Public Smoking Research Group, if the above results were to be obtained from a national sample of approximately 750 respondents, its impact in the public smoking controversy would be substantial. {2006.05, p 1}

The rest of the letter approved Response Analysis Corporation's request for money to conduct the larger survey. This seemingly minor change in design is important because it shows how switching from a closed questionnaire (better design) to an open-ended questionnaire (poorer design) gave the tobacco industry the results it wanted.

The documents contain an example of how lawyers steered the direction of research away from research that might prove unfavorable toward the industry. A July 24, 1981, memo from J. K. Wells III, B&W's corporate counsel, to Pepples described a conversation that Wells had with attorney Timothy Finnegan of Jacob & Medinger:

> At your request, Tim visited Dean Sullivan. It was a cordial meeting and Tim believes he has persuaded them to take a new thrust with their research. *The new thrust will have questionable value but no negative.* Sullivan and his people are enthusiastic but of questionable sophistication. Tim expects to receive a revised proposal and he will contact you then. [emphasis added] {2017.06, p 1}

## INVOLVEMENT OF LAWYERS IN PUBLICATION OF SCIENTIFIC RESEARCH

According to the principles of academic freedom, researchers who work at universities are free to publish the findings of their research in the scientific literature regardless of the outcome of the research. Tobacco industry–sponsored research organizations have maintained publicly that they do not restrict publication by their researchers {1920.01, p 6}. Nevertheless, tobacco company lawyers were kept abreast of the progress of publications by their special project grantees, to the point of offering to let tobacco industry lawyers review scientific manuscripts before they were even submitted for publication.

An April 19, 1979, letter from Louisiana State University professor Dr Henry Rothschild to Finnegan requested that Finnegan review a scientific paper. Rothschild was funded by a CTR special project from 1977 through 1983 to study genetic factors associated with cancer. The letter stated:

> Enclosed is a summary of our accomplishments during the past year. A copy of our proposal for the coming year including the budget, and a preprint of a next to final copy of the paper we would like to submit to the New England Journal of Medicine is also enclosed. (I say the penultimate copy because *I await your comments prior to submission.*) [emphasis added] {2034.18}

The paper in question never appeared in the *New England Journal of Medicine*, although the manuscript could have been rejected for a number of reasons including poor writing, poor quality of research, or lack of importance. The document demonstrates that a tobacco company lawyer was involved in commenting on a scientific paper before its publication. Presumably the lawyer provided a legal critique of the paper, and not a scientific one.

When CTR special project research that was unfavorable toward the tobacco industry was published, CTR had to defend the research to the tobacco companies. In a 1977 memo from Robert C. Hockett, scientific director of CTR, to Addison Yeaman, president of CTR and former counsel for B&W, Hockett attempted to undermine the conclusion of a paper published by CTR grantee C. G. Becker in the *Journal of Experimental Medicine*.[11] The paper concluded that glycoproteins isolated from tobacco leaves produce a substance known to cause allergic reactions and blood clotting. In his letter to Yeaman, Hockett claimed that Becker did not provide evidence showing that tobacco contained glycoproteins. Hockett went on to say that CTR could not be held responsible for the publication of Becker's results:

> The present paper was seen here [at CTR] only after its submission to and acceptance by the journal. It represented a wide digression from the subject of the grant as we understood it. *Our request that credit lines to The Council and to individual persons be deleted was reported to be 'too late' and the paper, with press releases, was published shortly thereaf-*

*ter, to our discomfort.* [emphasis added] {1910.01, p 3}

The request to delete credit to CTR is contrary to the requirement that most scientific journals have for full disclosure of the source of research support. Although CTR attempted to discredit Becker's findings, the documents show that researchers at BAT took Becker's results seriously. Minutes from BAT's annual research conference in 1977 {1164.24, p 2} stated that BAT had confirmed that glycoproteins were present in both mainstream and sidestream smoke.[12]

Another type of damage control used by CTR was to attempt to turn the publication of CTR-sponsored research that was unfavorable to the industry into a public relations advantage. When such results were published, the tobacco industry publicized the fact that they encourage publication of their funded work, while at the same time it prepared a response to discredit the work. For example, in response to an article published by CTR grantee Gary Friedman in the *New England Journal of Medicine* linking smoking with heart disease,[13] CTR released the following public statement:

> Grantees are always encouraged to publish their findings. This study reports relationships between various factors and death rates. There isn't any suggestion of cause-and-effect.... This and so much else in the medical literature just shows that we have a great deal more to learn before we can reach any solid conclusions about smoking. It may or may not be hazardous, and that's where we are. {1916.01}

Although the tobacco industry attempted to discredit Friedman's findings, his paper clearly demonstrated an association between smoking and death from heart disease.

## USE OF RESEARCH FROM SPECIAL PROJECTS FOR TOBACCO INDUSTRY PUBLIC RELATIONS AND PUBLIC POLICY ACTIVITIES

The documents show that the main purpose of the special projects was to generate results that could be useful to the industry, effectively perpetuating the controversy about the adverse effects of tobacco use. Special projects were also used to bolster the industry's public policy position that cigarettes should not be regulated. In addition, the special projects generated good publicity for the tobacco industry and kept tobacco industry lawyers abreast of the latest scientific data about tobacco.

### Creating Controversy, Where None Existed, About the Adverse Effects of Tobacco

The tobacco industry's strategy of perpetuating controversy about the adverse effects of tobacco involved two steps. First, the industry generated controversy among scientists, and then it publicized the controversy in the lay press.

Sponsoring scientific conferences was identified early on as a way of achieving these goals, since they provided a way to publicize findings that were favorable to the tobacco industry position. Support "in conducting conferences of scientists" was first mentioned in connection with formation of TIRC in 1954 {1903.03, p 2}. Sponsoring and publishing the results of scientific conferences has been used as a strategy by both the pharmaceutical and tobacco industries to publicize research that supports their interests.[9,14]

Tobacco industry lawyers apparently realized that it was important that tobacco industry–supported scientists attend scientific meetings to present data that was opposed to that presented by the general scientific community. As already discussed, in 1978, Shinn wrote a memo to the Research Liaison Committee, a group of tobacco company lawyers, noting the desirability of having proindustry scientists attend scientific meetings {1910.05, p 2}. Shinn then summarized the work of four non–industry-funded scientists who would be presenting data unfavorable to the industry at meetings. For example, he wrote:

> The Banff International Conference on Behavior Modification set for March 19-23 at Alberta, Canada, will have as a speaker Stanley Schechter. His topic: "Smoking is an Addiction." {1910.05}

The tobacco industry evidently wanted to have scientists present who would present data at such a session that would support the industry position. The memo went on to describe how Dr Gary Huber, then director of the CTR-supported research facility at Harvard University, would conduct a session at another meeting:

> Dr. Huber has agreed to conduct a two-hour presentation at an American Thoracic Society/American Lung Association meeting in May. There will be several participants, who will discuss the status of tobacco research in the fields of cancer, cardiovascular disease and chronic obstructive pulmonary disease. Dr. Huber also contemplates a section on the non-smoker and tobacco smoke. {1910.05, p 2}

It is very unusual for lawyers to take such a great degree of interest in the organization or content of a scientific meeting. The attendance of researchers supported through special projects at scientific conferences was encouraged and monitored by the funders, apparently to ensure that the industry-funded scientists performed well in advancing the tobacco companies' scientific message. For example, an April 22, 1981, letter from Shinn to the counsels for the tobacco companies describes a meeting attended by special projects grantee Theodor Sterling:

> At a meeting held on occupational health, held earlier this month, he [Sterling] gave a presentation titled "Job Discrimination Based on Exposure Consideration and Smoking." *This meeting was monitored by one of our research analysts;* she felt that Dr. Sterling's manner of presentation put his potentially hostile audience in a receptive mood and that the audience paid close attention to what Dr. Sterling had to say. He reviewed published evidence contrary to the idea that smoking heightens the risk of disease by interacting with certain substances to which workers are occupationally exposed. He also stated that the questions of whether other people's tobacco smoke is hazardous to nonsmoking workers, and whether smoking workers represent an additional cost to industry, are not settled and that the published reports in these areas are based on data which can be questioned on sound scientific grounds. [emphasis added] {2022.03, pp 2-3}

The tobacco industry sometimes sponsored conferences through independent organizations so that their sponsorship would not be apparent. For example, in 1972, Dr Theodor Sterling wrote to Shinn asking for $5000 to fund a panel on "Effects of Pollutants on Human Health" at the International Meeting of the Society of Engineering Science in Tel Aviv, Israel. Sterling also suggested that the grant be awarded to the ALEPH Foundation to "enable us to manage the arrangement of support in a proper and desirable manner" {2002.02}. In a letter to other tobacco company lawyers, Shinn recommended funding Sterling's request through a "non-CTR special project" {2002.05, p 2}. It is advantageous for the tobacco industry to hide its sponsorship of scientific conferences because it makes the results presented at the conferences appear independent of the industry. Shinn believed that the conference proposed by Sterling would be valuable for advancing the industry's position that ETS is not harmful because Sterling had been effective in this way in the past:

> The work which Dr. Theodor Sterling has been doing in connection with air pollution became unusually valuable following the President's transmission on January 31 of an air pollution message to Congress, which you have received, that attempted to implicate cigarette smoking in 95% of lung cancer and 90% of chronic obstructive lung disease. {2002.05, p 1}

### Influencing Policy

An undated, unsigned document labeled "Privilege Attorney Work Product" and entitled "CTR special projects" shows that both CTR and Special Account 4 special projects were used to directly fund re-

searchers to testify at legislative hearings. The document states

> Dr. LGS Rao also received Special Account 4 money for testifying in the Hatch-Packwood, Waxman hearings. {2005.01, p 1}

Rao's research, funded from 1977 through 1986 ($455 000) from Special Account 4, supported the tobacco industry's position that poor nutrition, rather than smoking, causes poor fetal outcome. The document also states:

> [Dr. Henry Rothschild] also testified at Hatch-Packwood, Waxman Hearings and probably received Special Acct 4 money. {2005.01, p 2}

Rothschild's work, funded as a special project from 1977 through 1988 ($289 544), was designed to support the tobacco industry's position that cancer is genetically determined. Likewise,

> Dr Schrauzer also testified in hearings re: Comprehensive Smoking Prevention Act of 1982. {2005.01, p 3}

Schrauzer received support through CTR special projects from 1981 to 1985 ($50 000) to study selenium in tobacco and tobacco smoke and to conduct statistical and epidemiologic studies on lung cancer. He also was paid through a Special Account 4 consultancy to prepare a statement on public smoking.

The same document {2005.01} also shows how the results of CTR and Special Account 4 special projects might be useful for deflecting the attention of the general public away from the adverse effects of tobacco use. It summarizes studies that conclude that factors other than tobacco use are associated with poor health outcomes, thereby suggesting that diseases in smokers are due to causes other than tobacco use:

> Low protein intake (poor nutrition) is associated with poor fetal outcome more than smoking habits. (NUTRITIONAL HYPOTHESIS) [From a summary of L.G.S. Rao's Special Project through Account 4.] . . . All studies deal with rebutting contention that ETS [environmental tobacco smoke] aggravates allergies. . . . [From a summary of projects awarded to Drs. Salvaggio and Lehrer between 1981-1983 and 1985-1988].
>
> RESULTS: Challenge studies showed that exposure to cigarette smoke did not cause a significant decline in lung function among "smoke sensitive" individuals. Found that ETS did impair lung function in asthmatics. . . .
>
> RESULTS: Preliminary clinical trails [*sic*] suggest that there are little, if any, human allergens in tobacco smoke. {2005.01, pp 1-4}

In addition, it also reports how the results of special projects could actually suggest positive health benefits of tobacco:

> Henry and Linda Russek have long investigated the link between [psychological] stress and heart disease using prospective epidemiological studies. *Have also found that smoking may be an effective means of coping with stress. . . .*
>
> RESULTS: Proposal approved, and *expected results to show that cigarette smoking is the best mechanism for smokers to cope with stress. Expect to show benefits of smoking (i.e. to reduce risk of stress-related heart disease.)* [emphasis added] {2005.01, p 3}

At least one special project was used in an attempt to directly influence the publication of a government public policy document on cigarettes through the establishment of an "independent" advisory group without disclosing the role of the tobacco industry. The documents describe how a CTR special project awarded to Theodor Sterling, then at Washington University, supported an "Advisory Group" convened by Sterling to make recommendations concerning the feasibility of a review and public analysis of a US Public Health Service report on morbidity entitled "Cigarette Smoking and Health Characteristics," as well as to criticize the process used for generating the report. A December 26, 1968, letter from David R. Hardy, of Shook, Hardy & Bacon to the counsels for the tobacco companies described enclosures that were in a letter from Sterling. (Neither the letter from Sterling nor the enclosures are among the documents.)

> It is worth quoting the concluding paragraph in [Sterling's submission to the Public Health Service]:
>
> "There can be no doubt, however, that the claims made by Cigarette Smoking and Health Characteristics cannot be justified. Neither are the data of adequate validity and reliability, nor is the analysis of these data properly designed and executed. The problems raised by these unjustified claims ought to be reviewed with the authority of a public body, properly constituted to do so, behind it."
>
> Final recommendations of the valuation group were delayed because of an apparent loss in the mail of comments from one member. These have just been received by me and are enclosed as document number 5. I recommend your early review of this document in particular. *It contains (a) the actual recommendations of the "Advisory Panel", (b) the principal justifications for such recommendations (*Cigarette Smoking and Health Characteristics *and PHS claims based on it are examples used to demonstrate why a review procedure is needed) and (c) minutes of the group's discussions (**"not to be distributed outside the sponsoring agency"**)* which bear on many problems in the health area.
>
> The group which Sterling convened saw little use in going forward with a "definitive evaluation" of the morbidity study preferring, in the words of the "Status Report" enclosed, *to recommend that "a permanent commission needs to be formed for the purpose of establishing a consensus on the results of various studies and what they mean."*
>
> This is an extremely ambitious undertaking and is not dissimilar to other recommendations made in the past. Dr. Sterling feels, however, that *simply attacking the morbidity study alone would not cause the Government to withdraw the report nor make any headlines. Sterling believes that a top level advisory group (perhaps working with the President's Science Advisory Committee or under its auspices, for example) would have the necessary prestige to prevent the future publication of documents such as* Cigarette Smoking and Health Characteristics. *He also believes that such a group would be prestigious enough that persons such as Hammond could not deny the group access to any data in which the Advisory Group was interested.* [emphasis added] {2001.02, pp 1-3}

The committee convened by Sterling is an example of how a tobacco industry–supported researcher played a prominent role in critiquing government documents that were unfavorable to the tobacco industry. The criticisms of the government document were used not only in an attempt to withdraw the report, but also to attempt to prevent the publication of further documents. The tobacco industry has continued to use this strategy, such as when it attacked the Environmental Protection Agency[15] risk assessment of lung cancer and respiratory effects of ETS.[7]

### Generating Good Publicity

Just as the tobacco industry funds the arts to appear philanthropic, so it funds scientific research for the same purpose. The documents show how a university special project supported directly by tobacco companies was announced with great fanfare by UCLA press releases. Martin Cline at the UCLA School of Medicine received $350 000 per year from 1974 to 1982 to investigate "a possible relationship between tobacco and lung disease, including cancer" {2023.16}. The project was supported by B&W, Philip Morris, Inc., R.J. Reynolds, and United States Tobacco Company. It is remarkable that, in 1974, 10 years after publication of the original surgeon general's report on "Smoking and Health,"[4] the UCLA School of Medicine was willing to investigate the "possible" relationship between tobacco use and lung disease. The press releases announcing the project portrayed the tobacco companies as benevolent supporters of science. A June 11, 1979, press release stated:

> The grant has been termed "an important development in biomedical research" by Dr Martin Cline, Bowyer Professor of Medical Oncology and director of the project. . . . "Support of the kind provided by the tobacco companies is critical in the exploration of novel approaches to human disease," he said. "Our goal is the pursuit of accurate scientific information, and this generous contribution adds significantly to the furtherance of that goal." {2023.16}

On the other hand, the tobacco companies did not want their names associated with research that received unfavorable press attention. When news articles were published in 1981 that criticized Dr Cline for giving genetic treatment to patients overseas without obtaining approval from an ethics committee, Lee Stanford of Shook, Hardy & Bacon withheld transmission of additional funds to UCLA {2023.01}.

## CONCLUSION

The results of special projects and consultancies were useful to the tobacco industry for a variety of reasons. The results were used to generate good publicity for the industry, to deflect attention away from tobacco as a health hazard, and to attempt, sometimes surreptitiously, to influence policymakers. The tobacco companies perpetuated controversy about the adverse effects of tobacco by publicizing the results of the special projects at scientific meetings as well as in the lay press. Tobacco industry lawyers and executives and industry-funded scientists had a coordinated plan for producing and publicizing data that supported the tobacco industry's position that tobacco use is not dangerous.

The involvement of tobacco industry lawyers in the selection of scientific projects to be funded is in sharp contrast to the public statements made by the industry about its review process for the external research program.[2] The documents show that scientific merit played little role in the selection of special projects or consultancies. Instead, tobacco industry lawyers played an important role in selecting grantees on the basis of their potential legal or political usefulness to the tobacco industry. Projects or investigators that had the potential to produce data unfavorable to the industry were unlikely to be funded. This pattern of behavior should be considered by federal, state, and local decision makers when weighing claims by the tobacco industry and its consultants made as part of legislative or administrative proceedings.

This work was supported in part by grant CA-61021 from the National Cancer Institute and grants 2KT-0072 and 4RT-0035 from the University of California Tobacco Related Diseases Research Program.

We also thank Phil Lollar of the University of California, San Francisco, and Robin Barthalow and Tim Nolan of Lieff, Cabraser and Heimann, who provided assistance in indexing the documents, and Adriana Marchione for assistance in manuscript preparation.

Finally, in an era in which public institutions are increasingly held in disdain, we would like to thank the University of California for providing an environment committed to academic freedom and the public interest. It would have been simpler—and cheaper—for the university to simply walk away from this project. After all, the history of the tobacco issue is one in which many large institutions have followed the path of least resistance and failed to confront the issues raised in these documents. No administrator or other official ever told us to stop. Quite the contrary, we were encouraged and protected in our work. This behavior is what makes the University of California a great public institution.

### References

1. Glantz SA, Barnes DE, Bero L, Hanauer P, Slade J. Looking through a keyhole at the tobacco industry: the Brown and Williamson documents. *JAMA* 1995;274:219-224.
2. Council for Tobacco Research. *1992 Report of the Council for Tobacco Research USA, Inc.* New York, NY: Council for Tobacco Research; 1992.
3. Sarokin H. Opinion, *Cipollone v Liggett Group, Inc.* (683 Federal Supplement 1487, page 1492). US District Court for the District of New Jersey, 1988.
4. *Smoking and Health: Report of the Advisory Committee to the Surgeon General of the Public Health Service.* Washington, DC: US Dept of Health, Education and Welfare; 1964. Public Health Service publication 1103.
5. Sarokin H. Opinion, *Haines v Liggett Group Inc.* (1992 DC NJ) 140 Federal Rules Decisions 681. US District Court for the District of New Jersey, 1992.
6. Samuels B, Glantz S. The politics of local tobacco control. *JAMA.* 1991;266:2110-2117.
7. Bero L, Glantz S. Tobacco industry response to a risk assessment of environmental tobacco smoke. *Tobacco Control.* 1993;2:103-113.
8. Durbin R. The tobacco industry strategy: new subject, same tactics. *Tobacco Control.* 1993;2:8-9.
9. Bero L, Galbraith A, Rennie D. Sponsored symposia on environmental tobacco smoke. *JAMA.* 1994; 271:612-617.
10. Slade J, Bero L, Hanauer P, Barnes DE, Glantz SA. Nicotine and addiction: the Brown and Williamson documents. *JAMA.* 1995;274:225-233.
11. Becker C, Dubin T. Activation of factor XII by tobacco glycoprotein. *J Exp Med.* 1977;146:457-467.
12. Barnes DE, Hanauer P, Slade J, Bero LA, Glantz SA. Environmental tobacco smoke: the Brown and Williamson documents. *JAMA.* 1995;274:248-253.
13. Friedman G, Dales L, Ury H. Mortality in middle-aged smokers and nonsmokers. *N Engl J Med.* 1979;300:213-217.
14. Bero L, Galbraith A, Rennie D. The publication of sponsored symposiums in medical journals. *N Engl J Med.* 1992;327:1135-1140.
15. *Respiratory Health Effects of Passive Smoking: Lung Cancer and Other Disorders.* Washington, DC: Indoor Air Division, Office of Atmospheric and Indoor Programs, Office of Air and Radiation, US Environmental Protection Agency; 1992. US Environmental Protection Agency document EPA/600/6-90/006F.

### Cited Brown and Williamson Documents

**1000.01.** Master Summary for B&W Subjective Document Review, 1989.
**1001.01.** Definitions for the Brown & Williamson Subjective Coding Taxonomy, 1988.
**1164.24.** Biological Research Meeting, Minutes of the Meeting Held at Chelwood on November 27, 1977. Minutes, November 29, 1977.
**1903.03.** Tobacco Industry Research Committee Organization and Policy, 1967?
**1910.01.** Hockett R. Re: Press reports on paper by Drs. C.G. Baker and T. Dubin of Cornell University College of Medicine. Memo to A. Yeaman, October 31, 1977.
**1910.05.** Shinn W. [Encouraging attendance at scientific meetings.] Letter to General Counsel, February 9, 1978.
**1913.01.** Waite C. Re: The Addiction Research Foundation—(a) Mr. Pepple's Letter of September 11, 1978, (b) Mr. Cornell's Letter to William Shinn of August 9, 1978. Memo to H. Kornegay, September 19, 1978.
**1913.04.** Cornell L. [Requesting financial support for the Addiction Research Foundation], Letter to W. Shinn, August 9, 1978.
**1913.08.** Yeaman A. [Addiction Research Foundation.] Letter to C. McCarty, May 19, 1977.
**1916.01.** [Memo to staff regarding how to respond to CTR-funded project by Gary Friedman implicating smoking as a cause of heart disease.] Memo to staff, February 1, 1979.
**1919.02.** Stone W. [Provides requesting background information on Charles Erwin and Craig Daniels], Memo 19??
**1919.03.** Pepples E. [Requests background information on Daniels and Erwin.] Letter to P. Sirridge, May 19, 1981.
**1920.01.** [Detailed description of CTR], 19??
**2000.01.** Parmele H. [Sending a sample of tobacco tar disolved in acetone.] Letter to R. Roberts, February 4, 1955.
**2000.03.** Fudenberg H. [Request for research funding.] Letter to E. Jacob, July 20, 1972.
**2000.04.** Yeaman A. Meeting of General Counsel on December 17, 1965. Memo, December 17, 1965.
**2001.02.** Hardy D. [Theodor Sterling.] Letter to P. Grant, F. Haas, C. Hetsko, H. Ramm, P. Smith, and A. Yeaman, December 26, 1968.
**2002.02.** Sterling T. [Requesting $5000 for panel on effects on environmental pollution on human health.] Letter to W. Shinn, February 29, 1972.
**2002.05.** Shinn W. [Value of Sterling's work to tobacco industry.] Letter to T. Ahrensfeld, D. Bryant, F. Haas, C. Hetsko, H. Roemer, A. Stevens, and A. Yeaman, March 1, 1972.
**2003.01.** Washington University Special Project. 19??
**2005.01.** CTR Special Projects. List 19??
**2006.02.** Dille J, Linder M. The effects of tobacco on aviation safety. *Aviation Space Environ Med.* 1981; 52(2):112-115.
**2006.05.** Pepples E. [Funding of Response Analysis Corp.] Letter to D. Hoel, July 6, 1977.
**2010.01.** Shinn W. [Importance of encouraging attendance at scientific meetings.] Letter to T. Ahrensfeld, M. Crohn, J. Greer, A. Henson, E. Pepples, and A. Stevens, February 9, 1978.
**2010.02.** Pepples E. Re: CTR Budget. Letter to J. Edens, B&W Industries, C. McCarty, I. Hughes, and D. Bryant, April 4, 1978.
**2012.02.** Shinn W. [Payment of Dr Gibbons at University of Alabama.] Letter to T. Ahrensfeld, J. Greer, A. Henson, E. Pepples, H. Roemer, and A. Stevens, March 24, 1978.
**2015.02.** Finnegan T. Re: Dr Henry Rothschild. Letter to J. Greer, A. Henson, A. Holtzman, E. Pepples, A. Stevens, and S. Witt, February 15, 1982.
**2017.06.** Wells J. Re: Smoking And Health—Tim Finnegan. Memo to E. Pepples, July 24, 1981.
**2019.01.** Shinn W. [Site visit to Washington University.] Letter to P. Lacy, February 21, 1980.
**2019.09.** Speake M. Washington University Project, 1980.
**2022.03.** Shinn W. Re: T.D. Sterling and Elia Sterling: An Investigation of Office Building Syndrome. Letter to T. Ahrensfeld, M. Crohn, J. Greer, A. Henson, E. Pepples, and A. Stevens, April 22, 1981.
**2023.01.** Stanford L. Re: UCLA Research Project. Letter to (?) Chapin, M. Crohn, A. Holtzman, and E. Pepples, May 29, 1981.
**2023.16.** Kloepfer W. [Draft press release regarding UCLA project.] Memo to E. Pepples, June 7, 1979.
**2034.18.** Rothschild H. [Past accomplishments and proposal for next year.] Letter to T. Finnegan, April 17, 1979.
**2048.01.** Harvard University Special Project. 19?? List.

# Lawyer Control of Internal Scientific Research to Protect Against Products Liability Lawsuits

## The Brown and Williamson Documents

Peter Hanauer, LLB; John Slade, MD; Deborah E. Barnes; Lisa Bero, PhD; Stanton A. Glantz, PhD

**Objective.**—To understand how attorneys for the tobacco industry in general, and Brown and Williamson Tobacco Corporation (B&W) in particular, have responded to the threat of products liability litigation arising from smoking-induced diseases.

**Data Sources.**—Documents from B&W, the British American Tobacco Company (BAT), and other tobacco interests provided by an anonymous source, obtained from Congress, or received from the private papers of a former BAT officer.

**Study Selection.**—All available materials, including confidential reports regarding research and internal memoranda exchanged between tobacco industry lawyers.

**Conclusions.**—The documents demonstrate that the tobacco industry in general, and B&W in particular, were very concerned about the threat of products liability lawsuits, and they illustrate some of the steps taken by lawyers at one company to avoid the discovery of documents that might be useful to a plaintiff in such a lawsuit. These steps included efforts to control the language of scientific discourse on issues related to smoking and health, to bring all potentially damaging internal scientific documents under attorney work product and attorney-client privilege to avoid discovery, to remove "deadwood" documents, and to insulate B&W from knowledge of potentially damaging scientific information from other BAT companies.

(*JAMA*. 1995;274:234-240)

UNDER products liability law, the manufacturer of a product may be held liable for injuries sustained by the consumer because of some defect in the product caused by negligent manufacture or design. There have been two waves of products liability litigation against the tobacco industry.[1] The first wave, which began in the mid 1950s after the first evidence that smoking causes lung cancer was published, lasted for about a decade. The second wave began in the mid 1980s, when public concern over health and the environment increased and products liability law regarding toxic substances took on a new significance. The Brown and Williamson Tobacco Corporation (B&W) documents[2] illuminate the concerns facing B&W and the British American Tobacco Company (BAT), particularly during the second wave of litigation, and the tactics they developed to avoid liability. These tactics generally involved efforts to avoid having damaging statements about the scientific evidence on the health dangers of smoking attributed to the company, and avoiding discovery of company research documents.*

From the Institute for Health Policy Studies, University of California, San Francisco (Mr Hanauer, Ms Barnes, and Drs Bero and Glantz), and the Department of Medicine, St Peter's Medical Center, University of Medicine and Dentistry of New Jersey, Robert Wood Johnson Medical School, New Brunswick (Dr Slade).

Reprint requests to Division of Cardiology, Box 0124, University of California, San Francisco, CA 94143-0124 (Dr Glantz).

*We indexed the documents as part of our analysis and assigned each one a six-digit number. Documents are cited in this article using these numbers enclosed in braces (eg, {1234.56}) and listed at the end of the article after the regular reference section. The complete indexed document set has been deposited in the Archives and Special Collections Department of the University of California, San Francisco, Library and Center for Knowledge Management. As of this writing, these documents are being made available via the Internet at http://www.library.ucsf.edu/tobacco through the World Wide Web.

### THE DISCOVERY PROCESS AND PROTECTIONS FROM IT

Discovery is the process by which a party to a lawsuit obtains information from the opposing party to prepare for the trial. Discovery is generally permitted with respect to any matter that is relevant to the pending lawsuit, but the court may refuse to allow discovery with respect to particular documents, such as documents that are protected under the attorney work product rule or the attorney-client privilege. The work product rule protects the work of an attorney in preparing for litigation from discovery. The rule provides that when a court orders discovery of documents prepared in anticipation of litigation or for trial by or for another party, the court is required to protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of the party concerning the litigation.[3] While the work product rule bars the disclosure of certain work of an attorney in preparation for litigation, the attorney-client privilege bars the disclosure of documents that contain confidential communications between an attorney and his or her client, and neither the attorney nor the client may be compelled to disclose them.[4] The attorney-client privilege applies not only to pretrial discovery, but also to testimony at trial. Thus, an attorney is not permitted, and cannot be compelled, to testify as to communications made by a client to the attorney in his or her professional character, unless the client consents.[5]

### LAWYER CONCERNS ABOUT STATEMENTS BY BAT AND B&W SCIENTISTS

The tobacco industry has actively sought over the years to develop a "safe" cigarette, and it has dir

PLAINTIFF'S EXHIBIT 5

research toward that goal. This research requires discussions among industry scientists regarding the constituents of tobacco smoke that cause disease and how they might be eliminated. This research, in turn, has led to concerns by industry lawyers as to how statements by those scientists, if discovered by a plaintiff's attorney, might be used against the industry in products liability lawsuits.

Toward the end of the first wave of products liability litigation, on August 20, 1970, one of the tobacco industry's principal outside counsels, David R. Hardy of Shook, Hardy, Ottman, Mitchell & Bacon, wrote a lengthy "Confidential, for Legal Counsel Only" letter to DeBaun Bryant, general counsel at B&W, giving his observations and opinion as to BAT's possible involvement in US smoking and health litigation. He warned:

> It would, no doubt, be virtually impossible to determine to what extent statements have been made [by B&W or BAT scientists] which would be damaging to defendant's [tobacco company's] position in a smoking and health case, *but I have seen sufficient documentation from you to conclude that the dangers I describe in this letter have a very real foundation.* For example, the minutes of a [BAT research] conference at Kronberg, Germany, held from June 2 to June 6, 1969 and attended by research personnel of both BAT and B&W, [{1169.01}] reflect statements such as the following:
>
> (i) "*... a mouse-skin safer cigarette is a worthwhile objective ...*" [mouse-skin painting was a bioassay for cancer caused by tobacco tar; the tobacco industry publicly criticized its use],
>
> (ii) "... it was necessary to set up some hypothetical model of *how smoke aerosol could cause cancer in the basal cells of the human lung epithelium,*"
>
> (iii) "... there is a possibility that the experiments taking place at R. & D.E., Southampton, with the membrane of the chicken embryo might be showing *genuine carcinogenic effects in days,*" and
>
> (iv) "*The conclusion of the Conference was that at the present time the Industry had to recognize the possibility of adverse health reaction to smoke aerosol: (a) Lung Cancer (b) Emphysema and bronchitis....*" [emphasis added] {1840.01, p 2}

Hardy continues:

> At the St Ives Conference, May 8-12, 1970, an opening statement was made which included an acknowledgment that tobacco manufacturers are not competent to give authoritative medical opinions and stating that "causation" is still an open question. *In the minutes of this Conference, however, we note a number of statements or expressions which could be most damaging, notwithstanding the disclaimer in the opening statement.* For example: (i) reference is made on page 6 to the fact that research "will continue in the search for a safer product"; (ii) on page 14 a product is characterized as "attractive" because less biologically active; (iii) on page 15 the phrase "biologically attractive" is used; and (iv) on page 18 reference is made to a "healthy cigarette." {1840.01, pp 2-3}

"Biologically active" is a tobacco industry euphemism for "causing cancer and other diseases." Hardy explained why the types of statements quoted from the two conference summaries were worrisome:

> *It is our opinion that statements such as the above constitute a real threat to the continued success in the defense of smoking and health litigation.* Of course, we would make every effort to "explain" such statements if we were confronted with them during a trial, but I seriously doubt that the average juror would follow or accept the subtle distinctions and explanations we would be forced to urge. {1840.01, p 3}

In elaborating as to why the statements posed a danger, Hardy pointed out how the statements, if admitted into court, could convince a jury as to where the balance of the scientific evidence lies:

> As you know, with the testimony of independent and well-informed doctors and scientists, it has been repeatedly demonstrated in court to the satisfaction of impartial jurors that cigarette smoking has not been scientifically proved to cause disease. This is certainly one very good reason that the industry has attained a one hundred percent record of victories in its health litigation. Jurors are, however, aware that a substantial segment of the medical and scientific community has accepted smoking as a cause of disease notwithstanding the deficiencies in the proof. This group includes many well-intentioned but inadequately informed doctors and scientists who operate on a philosophy that if smoking may be hazardous to health no further inquiry is necessary. In other words, they are willing to settle for suspicion in lieu of proof in condemning cigarettes. We have been able to show this to be the case when such suspicion has been claimed by our known enemies to be established fact. *Obviously our problem becomes entirely different and far more serious when agents and employees of the defendant cigarette company or its parent become the spokesmen against us.*
>
> *Fundamental to my concern is the advantage which would accrue to a plaintiff able to offer damaging statements or admissions by persons employed by or whose work was done in whole or in part on behalf of the* [tobacco] *company defending the action. A plaintiff would be greatly benefited by evidence which tended to establish actual knowledge on the part of the defendant that smoking is generally dangerous to health, that certain ingredients are dangerous and should be removed, or that smoking causes a particular disease. This would not only be evidence that would substantially prove a case against the defendant company for compensatory damages, but could be considered as evidence of willfulness or recklessness sufficient to support a claim for punitive damages.* The psychological effect on judge and jury would undoubtedly be devastating to the defendant. To be more specific:
>
> (1) It would certainly be difficult for a defendant to effectively contest or question the work of some particular "anti-cigarette" scientists if such work had been labeled as "valid" by defendant's own people. *How, for example, would our position that "mouse-skin painting" does not provide data which can be extrapolated to humans stand up if the reference to mouse-skin painting "as the ultimate court of appeal on carcinogenic effects" from page 5 of the Kronberg minutes* [{1169.01, p 4}] *was offered in evidence by a plaintiff?*
>
> (2) The testimony of outstanding and independent doctors and scientists of the type who have enabled us to win a number of cancer cases on the causation issue would be nullified or weakened by our own people's statements. Furthermore, after one experience of being disputed by statements of our own employees, it is doubtful that such independent experts would agree to testify again.
>
> (3) *If a plaintiff's contention as to causation of a disease by cigarettes seems to be supported by statements and opinions of our own scientific employees, this important issue on which we have prevailed in the past would undoubtedly be decided against us,* despite our best efforts to explain them. [emphasis added] {1840.01, pp 3-4}

As discussed below, Hardy also explained how the existence of the BAT/B&W research and development (R&D) cost- and risk-pooling agreement added to the problem created by the scientists' statements, and he also discussed in some detail how a plaintiff's attorney might use various discovery procedures to obtain the statements, and why more liberal court rules have made it more likely that the statements would be subject to discovery. Hardy concludes his letter:

> In conclusion, I would like to emphasize that, *in our opinion, the effect of testimony by employees or documentary evidence from the files of either BAT or B&W which seems to acknowledge or tacitly admit that cigarettes cause cancer or other disease would likely be fatal to the defense of either or both companies in a smoking and health case. I am afraid that any attempted explanation to a jury that such statements were made only in the context of a "working hypothesis" for the further development of our products would fall on deaf ears.* Clearly, the admission of such evidence would cause a plaintiff's case to attain a posture of strength and danger never before approached in cigarette litigation. It could even be the basis for an assessment of punitive damages if it were deemed to indicate a reckless disregard for the health of the smoker. Certainly such evidence would make B&W the most vulnerable cigarette manufacturer in the United States to smoking and health suits.
>
> We, of course, know that the position of BAT, as well as B&W, is that disease causation by smoking is still very much an open question. Cigarettes have not been proved to cause any human disease. Thus, any state-

ment by responsible and informed employees subject to a contrary interpretation could only result from carelessness. Therefore, *employees in both companies should be informed of the possible consequences of careless statements on this subject.* [emphasis added] {1840.01, p 7}

In other words, "careless" scientific discussion of the health effects of smoking by industry scientists, such as those made at the Kronberg and St Ives scientific meetings, must stop.

## THE BLACKMAN PAPER: REWRITING SCIENTIFIC DOCUMENTS

The extent to which lawyers for B&W were concerned about having damaging scientific statements linked to the company is conveyed in a letter written on October 25, 1984, by J. Kendrick Wells III, B&W's corporate counsel, to H. A. Morini, a lawyer at BAT {1833.01}. The letter contains Wells' comments on a draft paper entitled "The Controversy on Smoking and Health—Some Facts and Anomalies," which had been written by Dr L. C. F. Blackman, executive director of R&D for BAT. The paper presents the industry's view on the "controversy" over the health effects of smoking and was evidently intended to be a primer for BAT executives on issues relating to smoking and health {1833.02}. As it was originally written, the paper contained a reasonably complete presentation of the evidence that smoking causes disease and then used quotations from various scientists and scientific reports to support the claim that a causal link between smoking and disease had not been proved. Even merely acknowledging the evidence that smoking causes disease, however, was unacceptable to Wells.

A draft of Blackman's paper, with Wells' comments written in the margins, is included in the documents. {1833.02} Wells made a total of 45 specific comments on Blackman's 33-page paper, including line-by-line recommendations regarding items that he thought should be deleted or included in the final report. (Wells made comments on virtually every page of Blackman's paper, but most of them were too long to be written in the margins and were instead enumerated in his letter to Morini.)

Wells' comments on the draft paper were prefaced with the following caution:

> Recent developments have reaffirmed the need for the attention we customarily have given to proposed BAT publications. The smoking and health litigation in the U.S. has demonstrated that plaintiffs' lawyers are aggressive in questioning tobacco CEOs about published company statements, as we had predicted they would be. Peter Taylor's *Smoke Ring*[6] demonstrated that BAT publications which may be intended for limited distribution can be obtained and scrutinized by our most articulate adversaries. {1833.01, p 1}

This comment suggests that attorneys for B&W routinely reviewed BAT documents prior to publication, even if they were only intended for "limited distribution" within BAT.

Among the revisions that Wells recommended were changes in chapter titles to reinforce the idea that there was a "controversy" regarding the dangers of smoking. For example, he suggested changing the chapter "Background to the *Medical Concern*" to "Background to the *Scientific Dilemma*." [emphasis added] Other suggestions were for rewriting material to make Blackman's paper conform to the company's stated positions, rather than the scientific evidence.

Wells also seemed particularly interested in removing references to researchers who had done certain research work that did not agree with the tobacco industry's position, even if that work was not cited in Blackman's paper. For example, the original document contained a quotation from Sir Richard Doll and Richard Peto. Doll had conducted one of the first epidemiologic studies showing that smoking was associated with lung cancer. In the draft paper, Doll and Peto were quoted as stating:

> To say that these conditions [lung cancer and heart disease] were related to smoking does not necessarily imply that smoking caused (or prevented) them.
>
> The relation may have been secondary in that smoking was associated with some other factor, such as alcohol consumption or a feature of the personality, that caused the disease. {1833.02}

Wells suggested that this reference should be deleted:

> Delete Doll and Peto reference. Doll and Peto have published a table which shows "cancer of the lung" is "caused by cigarette smoking" and have concluded that "much of the excess mortality in cigarette smoking can be attributed with certainty to the habit." {1833.01, p 2}

Later in his comments, Wells noted that any mention of Doll should be handled with care:

> Parenthetically, any reference to Doll must be crafted carefully because he is a dedicated advocate of the causal hypothesis. {1833.01, p 6}

The editorial changes suggested by Wells effectively removed any reasonable presentation of the then-current state of the scientific information from the paper and turned it into a purely propaganda piece. We do not know which, if any, of Wells' 45 recommended changes were incorporated into the final document.

## LAWYER INVOLVEMENT IN SCIENTIFIC RESEARCH

On May 29 and 30, 1984, shortly after the *Cippolone* case was filed (*Cippolone v Liggett Group, Inc*, filed in 1983 in the US District Court for New Jersey, docket 83-2864SA), attorneys from B&W and BAT held a conference on US products liability litigation. The *Cippolone* case, which would wind its way through the courts for several years, is the only products liability case in which the tobacco industry has been held liable for damages (an award to the husband of the plaintiff, who had died during the litigation), although even that award was subsequently overturned on appeal. The conference was summarized in a June 12, 1984, memo to the file by J. K. Wells, B&W's corporate counsel. After discussion of the attribution problem (see below), the memo discusses "Project Rio, Project Ship and other biological testing programs." Project Rio was a major effort to organize "safe cigarette" research that would develop cigarettes with less "biological activity" {1164.26}. Such studies required explicit evaluation of the carcinogenicity of tobacco smoke. Project Rio was extremely sensitive:

> Within the limited time available, we were able to hold significant discussions about implications for U.S. products liability litigation only regarding Project Rio. BAT Legal acknowledged the needs for lawyer involvement in the project and for possible restructuring, but there was not enough time to plot a course of action. Alec [Morini, a lawyer at BAT] said that he had not been aware of Project Rio until about two weeks prior to the meeting when he heard it mentioned briefly in a description of Southampton work. {1830.01}

After noting the success of the discussions, Wells proposed some follow-up activities:

> [W]e should arrange a meeting in London with BAT Legal . . . to delineate more specific counsel to the BAT, including proposals for the structure and organization of BAT programs and statements which would hold to the minimum feasible level their potential impact upon U.S. products liability litigation. Topics would include proposals for organizing programs already on the table and general procedural guides for lawyer counseling of ongoing and future programs. For example, if Project Rio must continue, *restructuring probably will be required to control the risk of generating adverse evidence admissible in U.S. lawsuits.* . . .
>
> *Direct lawyer involvement is needed in all BAT activities pertaining to smoking and health from conception through every step of the activity.*

*The problem posed by BAT scientists and frequently used consultants who believe cause is proven* [ie, that smoking causes disease] *is difficult.* A sound recommendation must be based upon consideration of several factors, including the basis upon which senior management relies in concluding that the opinion of the scientist is incorrect; the overall reliance of senior management on opinions of the scientist; the responsibilities assigned to the scientist; and the company's duty to encourage scientific inquiry. [emphasis added] {1830.01}

The memo ends with a reference to the question of whether BAT or BATUS (the US-based holding company of BAT, owner of B&W and other major assets) could be held as a party in a US products liability lawsuit based on consumption of B&W products by the plaintiff {1830.01}. This document suggests that the B&W attorneys saw the need for themselves and the BAT attorneys to become totally involved in the research process to prevent potentially damaging research information from being developed or distributed.

The problem was that the attorneys in England, where products liability law was not as well developed as it was in the United States, were reluctant to become so intimately involved in scientific work. The B&W attorneys also recognized that at least some BAT scientists and consultants were convinced that smoking causes disease {1830.01}. This fact was all the more reason to keep BAT scientific information away from the United States, even though some BATUS lawyers believed that documents in the possession of BAT Industries or BAT would be discoverable by a plaintiff in a US lawsuit {1836.02}.

## AVOIDING DISCOVERY

The attorneys at B&W and BAT routinely labeled many of the documents as "work product" or "privileged," apparently to prevent them from being subject to discovery by an opposing party in litigation or from being admitted as evidence in a trial. They also developed special procedures for handling documents sent to B&W from BAT and affiliated companies so that they would become privileged, although the documents do not indicate whether these procedures were ever implemented. And apparently there were efforts to remove certain documents and all traces of their existence.

### Sharing Information Between B&W and BAT

Among the many concerns of the attorneys at B&W was the extent to which information should be exchanged, both within and outside BAT-associated companies. The documents indicate that this concern was a long-standing one, preceding the second wave of products liability litigation by many years.

On December 11, 1968, Ed Finch wrote a letter to R. P. Dobson at BAT, discussing the difficulties in exchanging information between individual BAT companies:

I am in complete agreement with your statement that the subject of the exchange of information [on smoking and health] between individual companies within B.A.T. is full of difficulty. As you know, I have been and still am concerned about the problems that might arise as a result of individual companies corresponding with each other on this matter.... From this information, it seems to me you would know best how the information should be used and whether or not it should be transmitted to other companies. In addition, I also agree with your thought that there should be personal visits between the major companies to discuss the health matters whenever possible. {1809.03}

This letter appears to suggest that the sensitive issues of smoking and health should only be discussed in person rather than being committed to paper.

### Special Procedures for Handling Documents Sent to B&W

Toward the end of the 1970s, B&W's attorneys developed special procedures for handling internal scientific documents so that, to avoid discovery by plaintiffs, it could be claimed that they came within the attorney-client privilege. If implemented, these procedures might have been an abuse of the attorney-client privilege insofar as they would have been aimed at making otherwise unprivileged documents subject to the privilege. The purpose for which the procedures were designed is explicitly spelled out in the memorandum that established them. The June 15, 1979, memo, from J. K. Wells, the corporate counsel, to Ernest Pepples, vice president, Law, summarizes how scientific materials from BAT were to be received at B&W:

The [scientific] material should come to you under a policy statement between you and [BAT's research laboratory in] Southampton which describes the purpose of developing the documents for B&W and sending them to you as use for defense of potential litigation. It is possible that a system can be devised which would exempt the Engineering reports [which Wells previously stated were almost never concerned with smoking and health] because it might be difficult to maintain a privilege for covering such reports under the potential litigation theory.

*Continued Law Department control is essential for the best argument for privilege. At the same time, control should be exercised with flexibility to allow access of the R&D staff to the documents. The general policy should be clearly stated that access to the documents and storage of the documents is under control of the Law Department and access is granted only upon approval of request.* A secured storage area of the documents should be arranged, perhaps in the R&D library [as opposed to the law library], and the policy statement would designate the same terms and conditions of storage for the documents as were spelled out for the literature retrieval service files. [emphasis added] {1824.02}

After suggesting that the documents might be divided into different categories according to how sensitive they are, the memo continues:

The abstracts of the documents should be circulated only for the less sensitive categories and then only to a list given prior approval by the Law Department.

The policy should explicitly make Dr. R.A. Sanford [director, R&D] the agent of the Law Department with regard to these procedures. {1824.02}

These procedures would have put the Law Department in control of the dissemination of internal scientific reports.

Five months later, on November 9, 1979, Wells sent another "privileged" memo to Pepples on the same subject. It may be that the proposal in the June memo had not been adopted, because this memo discusses the problem as if it had just arisen:

I have discussed with Gil Esterle [International and External Technical Services Department (RD&E)] various alternatives for *handling BAT scientific reports which come to B&W in a way that would afford some degree of protection against discovery....* One alternative discussed was that all BAT scientific reports would be sent to you. [emphasis added] {1824.01}

Wells noted that this procedure would be cumbersome because the vast majority of the documents were routine, and then stated:

*The cost sharing agreement between B&W and BAT, under which B&W pays for BAT scientific research and receives reports, is an obstacle because as presently written it would probably contradict the position that you were acquiring the reports for purposes of litigation....*

I recommend a second alternative, which would be that all BAT scientific reports be shipped directly to Dr. Esterle under *a formal arrangement that Dr. Esterle was assigned to be your agent for the acquisition of scientific materials in anticipation of litigation. Dr. Esterle would separate the reports which were relevant to smoking and health, or otherwise sensitive, for special handling as described below and place the routine reports into regular R&D circulation.* [emphasis added] {1824.01}

After discussing how this procedure would provide work product coverage for sensitive documents under federal and Kentucky law, Wells continued:

There would still be the matter of the cost sharing agreement. Regardless of the initial recipient of the documents, *in order to be covered by the rules of civil procedure they must be "prepared in anticipation of litigation."* Appropriate paper work should be established with BAT, including any amendments to the cost sharing agreement to establish that documents of a certain nature are prepared for B&W in anticipation of litigation. *I have in mind paper work which would make the statement as a policy between the parent and sibling, but that in the operational context BAT would send documents without attempting to distinguish which were and were not litigation documents.* [emphasis added] {1824.01}

More than 6 years later, on February 17, 1986, Wells sent another memo to Pepples that dealt with the question of whether B&W should receive certain scientific reports from affiliated companies generally, and how B&W could receive such reports without receiving information that would be useful to a plaintiff. The memo included references to specific projects and notations as to whether B&W was interested in them. Wells stated that he had counseled Esterle and David Gordon, controller in the B&W R&D administration, as follows:

[W]e should approach these projects on the basis of whether the reports are limited to the information from good science and whether the information is useful in the United States market. *Our market is a "tar" and nicotine market, and information pertaining to other constituent delivery levels and biological effects will not be helpful.*

*B&W will receive concise reports, estimated to be about one-half page in length, twice each year for each project it wishes to follow. While the brevity of the reports will reduce the potential for receipt by B&W of information useful to a plaintiff, disadvantageous information would be included and the reports would serve as road maps for a plaintiff's lawyer.*

*I have advised that we can receive reports from some of these projects notwithstanding the risk. The reason is that we cannot shut out the flow of information:* the BAT will find ways to get information into B&W from the scientific projects it is running in its laboratories worldwide. The only way BAT can avoid having information useful to plaintiff found at B&W is to obtain good legal counsel and cease producing information in Canada, Germany, Brazil and other places that is helpful to plaintiffs. [emphasis added] {1824.03}

The memo goes on to summarize the discussions among Wells, Esterle, and Gordon about eight specific projects in which the scientific staff had expressed initial interest. The criterion for projects' not being "interesting" to the B&W RD&E staff seems to have been the potential usefulness of the results to plaintiffs in products liability cases against the company. Research results from elsewhere in BAT that were aimed at cosmetic improvements (less visible sidestream smoke), reduced irritation (which makes smoking easier), and customer satisfaction were of interest to B&W, but results that might delineate the toxicity of tobacco smoke or the pharmacological properties of nicotine were to be avoided.

### 'Deadwood' Documents

At one point, J. K. Wells, B&W's corporate counsel, decided that certain documents should simply be removed offshore. Thus, what a plaintiff's attorney might have wished to discover, Wells determined was "deadwood." This plan was outlined in a January 17, 1985, memo to file, memorializing a conversation with Earl Kohnhorst, vice president of RD&E, during which Wells explained how he had marked various documents in the behavioral and biological studies area as deadwood:

I said that the "B" series are "Janus" series studies [which were BAT mouse-skin painting studies that demonstrated that tobacco tar was carcinogenic] and are also deadwood.

I said in the course of my review of scientific documents stored by RD&E, a great deal of deadwood had appeared, such as studies of the chemical composition of Canadian tobacco leaf in 1966. {1835.01}

Wells went on to say that he had suggested that RD&E should remove the deadwood from its files in the context of moving RD&E to a new building and building a reference set for smoking and health materials.

I suggested that Earl [Kornhorst] have the documents indicated on my list pulled, put into boxes and stored in the large basement storage area. I said that we would consider shipping the documents to BAT when we had completed segregating them. *I suggested that Earl tell his people that this was part of an effort to remove deadwood from the files and that neither he nor anyone else in the department should make any notes, memos or lists.* [emphasis added] {1835.01}

Wells concluded:

I mentioned that Carol Lincoln [a B&W librarian] had said that offshore research and engineering studies sent to B&W in care of Earl and Bob Sanford [vice president, R&D] during roughly last one year period had not been sent to her for logging in and that *most of those documents may be in the offices of Earl and Bob and would not be reflected on the list which I had received.* Earl said he would send all of the studies in his possession to Carol, who would make a list of the documents and send it to me for review. Earl suggested that I should ask Bob Sanford to do the same. [emphasis added] {1835.01}

Evidently there was to be no written record of the existence or fate of the deadwood documents, much less the documents themselves.

### B&W AND BAT RESEARCH COLLABORATION

While B&W attorneys were busy trying to conceal the fact that the company was aware of certain information obtained from research conducted by BAT, the documents themselves tell us that B&W was actually an active partner in much of the BAT group research and, therefore, must have known of the scientific results. Personnel from B&W actively participated in BAT research, and there were formal R&D cost- and risk-pooling agreements between the two companies from at least as far back as 1958 and continuing at least into the 1980s.

Scientists from B&W regularly attended BAT R&D meetings and conferences, including meetings on the direction of the biological testing programs, such as Project Janus, a large series of mouse skin painting studies that BAT completed in the 1970s to assess tobacco smoke carcinogenicity as part of the effort to design a "safer" cigarette. B&W contributed experiments to Project Janus {1112.04; 1164.03}, and a B&W scientist was a member of the Biological Testing Committee.

At least one delegate from B&W took part in each of the 17 BAT worldwide Group Research Conferences that are described in the documents. In several instances B&W scientists made comments on proposed agendas of research conferences and edited drafts of minutes that resulted from these meetings. For example, Dr Alan Heard of BAT Southampton sent Dr R. A. Sanford of B&W a questionnaire about the draft agenda for the 1980 Sea Island research conference; Dr Sanford responded with a number of comments about areas of research such as inhalation that should *not* be further pursued {1132.01}. In July 1983, the director of R&D at BAT's Millbank laboratory, Dr L. C. F. Blackman, sent Earl Kohnhorst of R&D at B&W the proposed agenda for the 1983 research conference in Rio de Janerio, Brazil, and asked him to comment on it {1180.05}. Likewise, draft minutes of the 1983 Rio meeting were sent to B&W for comment and feedback. Edits appearing in handwriting in the draft from B&W's files {1180.09} were incorporated into the final set of minutes {1180.07}. For example, in a discussion of research at the BAT German affiliate, the draft minutes contain the following paragraph about cigarette filters:

A description was given of a number of filter designs capable of directing smoke to specific areas of the mouth. This technology, which is an extension of the B&W Actron concept, has led to patent applications. Results with other novel filters which make use of the

principles of "smoke elasticity" were given. {1180.09, p 14}

The phrase "which is an extension of the B&W Actron concept" is lined out in the draft, and the final version of the minutes reflects this edit {1180.09, p 14}.

Handwritten notes made sometime in 1980, probably by J. Kendrick Wells, B&W's corporate counsel, describe the cost- and risk-pooling agreements as they had existed since at least 1958 until that time {1838.01}. In 1961, the 1958 agreement was ended, and a new arrangement was made whereby B&W and other BAT units bore the cost of their own research, with free sharing of all results. However, the two companies focused on different areas of concern: B&W was "best suited for research [on] seed to warehouse," while BAT was "better suited for work on processing, smoking, [and] smoke effects" {1838.01, p 1}. The agreement was revised several times over the years, but the research consistently included biological, product, smoker, process, and new smoking material areas.

These cost- and risk-pooling agreements created a liability problem for B&W according to the letter written on August 20, 1970, by David R. Hardy of Shook, Hardy, Ottman, Mitchell & Bacon to DeBaun Bryant, general counsel at B&W {1840.01}. After explaining how "careless" statements made by BAT and B&W scientists could be used by a plaintiff (see above), Hardy noted that the then-existing cost- and risk-pooling agreement exacerbated the problem:

> Also adding to the need for recognition of the problem created by statements such as those I have described is the existence of the "BAT/B&W R&D Cost and Risk Pooling Agreement" executed in July, 1969. This document creates an inter-relationship (or confirms a relationship which already existed) that would assist a plaintiff's attorney greatly in obtaining information from B&W about BAT research and development work. {1840.01, p 4}

Later, Hardy pointed out:

> The findings and opinions of persons engaged in work covered by the "BAT/B&W R&D Cost and Risk Pooling Agreement" are available to both BAT and B&W. Carefully framed discovery would certainly force disclosure of the Agreement as well as other documents bearing on smoking and health issues. {1840.01, p 5}

## ATTRIBUTION OF STATEMENTS BY SUBSIDIARIES

Another problem facing BAT was the possible attribution to the group's tobacco companies of statements regarding the dangers of smoking made, or decisions taken, by other nontobacco subsidiaries. This issue was the topic of several memos between corporate attorneys. A memo entitled "Legal Considerations on Smoking and Health Policy," {1828.01} which was unsigned and undated, summarizes the policy of BAT Industries Group in relation to smoking and health issues, and then warns that nontobacco companies must be aware of the group's stance, because the spread of "no fault" liability may result in the future attribution to the group's tobacco companies of statements made or decisions taken by other nontobacco subsidiaries:

> For this reason it is essential that statements about cigarette smoking or the smoking and health issue generally must be factually and scientifically correct. The issue is controversial and there is no case for either condemning or encouraging smoking. It may be responsible for the alleged smoking related diseases or it may not. No conclusive scientific evidence has been advanced and the statistical association does not amount to proof of cause and effect. Thus a genuine scientific controversy exists.
>
> The Group's position is that causation has not been proved and that we do not ourselves make health claims for tobacco products. *Consequently the Group cannot participate in any campaigns stressing the benefits of a moderate level of cigarette consumption, of cigarettes with low tar and/or nicotine deliveries or any other positive aspects of smoking except those concerned with the dissemination of objective information and the right of individuals to choose whether or not they smoke.* However, the Group encourages constructive dialogue with the authorities, the dissemination of information about the smoking and health controversy and research and new product development.
>
> Non-tobacco companies in the Group must particularly beware of any commercial activities or conduct which could be construed as discrimination against tobacco or tobacco manufacturers (whether or not involving companies within the Group), since this could adversely affect the position of Brown & Williamson in current US product liability litigation in the US. If in doubt, companies should not hesitate to consult their in house counsel, or BAT Industries Legal Department, who have up-to-date information on the legal situation affecting the tobacco companies. [italic emphasis added] {1828.01}

The recommendation against participating in the promotion of health claims for low-tar cigarettes is in sharp contrast with the industry's active promotion of such cigarettes during the "tar derby" of the late 1950s.[7(p79ff)] However, the principal point being made here is that the companies in the BAT group were not to engage in any dialogue concerning the health aspects of smoking.

On May 29 and 30, 1984, attorneys from B&W and BAT held a conference on US products liability litigation. This conference was summarized in a June 12, 1984, memo to file by J. K. Wells, B&W's corporate counsel. The conference placed particular emphasis on the problem of the attribution to the tobacco companies of statements and actions by affiliated companies:

> Trial counsel described evidence rulings in United States courts pertinent to the admissibility of statements (used herein to include written and oral statements and actions whether internal or published) of an affiliate of B&W. A prudent lawyer in a U.S. products liability action must assume that any damaging statement will be admitted into the evidence and will be discussed by the plaintiff. *It is likely that statements by a tobacco affiliate of B&W would be admitted and smoking and health research done in-house or by contract by any company owned by the BAT certainly would be admissible.* Statements by a non-tobacco affiliate would be admissible where control or close functional relationship, either on a general line of business or a specific project basis, was shown. [emphasis added] {1830.01}

A February 4, 1985, letter from R. G. Baker, a senior scientist at BAT's Southampton laboratory, to D. A. Schechter, an attorney at BATUS, Inc, in Louisville, Ky, labeled as an "Attorney Work Product," discussed the need to set up guidelines for affiliated companies outside the United States to follow when making public statements with regard to the attribution problem. The letter suggests six issues to be addressed:

> (1) Does this particular statement amount to an admission [of anything that could be compromising in a lawsuit]?
>
> (2) Does this particular statement amount to product assurance which can be attributed to an affiliated US defendant?
>
> (3) Is this statement admissible in cross examination of defendants' witnesses?
>
> (4) Are statements of this type by non-US affiliates discoverable?
>
> (5) What are the risks of overseas companies becoming parties of US cases? Is their public posture relevant to this question?
>
> (6) Given the range of company activity in the Group, what are the risks associated with expert status being attributed to employees of certain companies in the Group? {1829.01}

Included with the letter is a two-page legal analysis of the attribution issue put together by Baker, with an introduction stating:

> A substantial discussion took place about the risks of statements and positions of affiliates of Brown & Williamson being attributed to it. The intention is, so far as possible, to conduct matters so that no connection can be shown. {1829.02}

## CONCLUSION

The documents demonstrate that the tobacco industry in general, and B&W in particular, were very concerned about the threat of products liability lawsuits, and they illustrate some of the steps taken by lawyers at one company to

avoid the discovery of documents that might be useful to a plaintiff in such a lawsuit. These steps included efforts to control the language of scientific discourse on issues related to smoking and health, to bring all potentially damaging internal scientific documents under attorney work product and attorney-client privilege to avoid discovery, to remove "deadwood" documents, and to insulate B&W from knowledge of potentially damaging scientific information from other BAT companies.

This work was supported in part by grant CA-61021 from the National Cancer Institute and grants 2KT-0072 and 4RT-0035 from the University of California Tobacco Related Diseases Research Program.

We also thank Phil Lollar of the University of California, San Francisco, and Robin Barthalow and Tim Nolan of Lieff, Cabraser and Heimann, who provided assistance in indexing the documents, and Adriana Marchone for assistance in manuscript preparation.

Finally, in an era in which public institutions are increasingly held in disdain, we would like to thank the University of California for providing an environment committed to academic freedom and the public interest. It would have been simpler—and cheaper—for the university to simply walk away from this project. After all, the history of the tobacco issue is one in which many institutions have followed the path of least resistance and failed to confront the issues raised in these documents. No administrator or other official ever told us to stop. Quite the contrary, we were encouraged and protected in our work. This behavior is what makes the University of California a great public institution.

### References

1. Rabin RL. A sociological history of the tobacco tort litigation. *Stanford Law Rev.* 1992;44:853.
2. Glantz SA, Barnes DE, Bero LA, Hanauer P, Slade J. Looking through a keyhole at the tobacco industry: the Brown and Williamson documents. *JAMA.* 1995;274:219-224.
3. *Hickman v Taylor* (1947) 329 United States 495, 91 Lawyer's Edition 451.
4. *23 American Jurisprudence 2d,* Depositions and Discovery §30.
5. *81 American Jurisprudence 2d,* Witnesses §337.
6. Taylor P. *The Smoke Ring: Tobacco, Money, and Multi-national Politics.* New York, NY: Pantheon Books; 1984.
7. Wagner S. *Cigarette Country: Tobacco in American History and Politics.* New York, NY: Praeger; 1971.

### Cited Brown and Williamson Documents

**1112.04.** Sanford R. [Submitting samples for skin hyperplasia test at Frankfurt, Germany.] Letter to D. Felton, December 18, 1968.
**1132.01.** Sanford R. [Avoid "dangerous" research.] Letter to A. Heard, August 18, 1980.
**1164.03.** Green SJ. Minutes of the 16th Biological Testing Committee; meeting held in R. & D. E., Southampton, England, June 13, 1969.
**1164.26.** Thornton R. Biological meeting held at GR&DC [Group Research & Development Centre], May 19-20, 1983. Minutes, July 27, 1983.
**1169.01.** Green SJ. Research conference, Kronberg, Germany, June 2-6, 1969. Minutes, June 23, 1969.
**1180.05.** Blackman L. Research conference, Rio de Janeiro, Brazil, August 22-26, 1983. Letter to E. Kornhorst, July 13, 1983.
**1180.07.** Blackman L. Research conference, Rio de Janeiro, Brazil, August 22-26, 1983. Minutes, October 13, 1983.
**1180.09.** Blackman L. Research conference, Rio de Janeiro, Brazil, August 22-26, 1983. Minutes, September 9, 1983.
**1809.03.** Finch E. [Exchange of information between B&W and BAT.] Letter to R. Dobson, December 11, 1968.
**1824.01.** Wells J. Re: Procedure for handling BAT scientific documents. Memo to E. Pepples, November 9, 1979.
**1824.02.** Wells J. Re: Southampton smoking and health material. 1979.
**1824.03.** Wells J. BAT science. Memo to E. Pepples. February 17, 1986.
**1828.01.** Legal considerations on smoking and health policy. 19??
**1829.01.** Baker R. [Letter transmissing legal memo on attribution of statements by BAT subsidiaries.] Letter to D. Schechter, February 4, 1985.
**1829.02.** Baker R. Attribution. 1985. Notes.
**1830.01.** Wells J. Re: Conference with BAT Legal on U.S. products liability litigation. Notes to file note. June 12, 1984.
**1833.01.** Wells J. [Suggested changes to Blackman paper.] Letter to H. Morini, October 25, 1984.
**1833.02.** Blackman LCF. The Controversy on Smoking and Health: Some Facts and Anomalies. 1984.
**1835.01.** Wells J. Re: Document retention. Memo to file note. January 17, 1985.
**1836.02.** Rosdeitcher S. [Concerns that BAT research could be discovered in a US lawsuit.] Memo to D. Schechter. July 8, 1985.
**1838.01.** [Handwritten notes on history of B&W/BAT cost- and risk-pooling agreement from 1958 through 1980.] Notes. 19??
**1840.01.** Hardy D. [Warning to B&W about problems created by "careless" statements by B&W and BAT scientists at research conferences and problems created by the B&W/BAT cost and risk pooling agreement.] Letter to D. Bryant, August 20, 1970.

# Nicotine and Addiction

## The Brown and Williamson Documents

John Slade, MD; Lisa A. Bero, PhD; Peter Hanauer, LLB; Deborah E. Barnes; Stanton A. Glantz, PhD

**Objective.**—To learn how nicotine has been regarded by a major tobacco company.

**Data Sources.**—Documents from Brown and Williamson Tobacco Corporation (B&W), the British American Tobacco Company (BAT), and other tobacco interests provided by an anonymous source, obtained from Congress, and received from the private papers of a former BAT officer.

**Study Selection.**—All available materials, including confidential reports regarding research and internal memoranda exchanged between tobacco industry lawyers.

**Conclusions.**—During a period of 22 years (1962 to 1984), employees of B&W and BAT conducted research and commented on the pharmacology of nicotine. They consistently regarded nicotine as the pharmacological agent that explained tobacco use. In the early part of the period under study, officials of the companies wrote about nicotine addiction explicitly. Inhalation of cigarette smoke by the consumer was recognized throughout the period as necessary for the normal function of a cigarette. The documents contain little indication that research was conducted on either the taste or the flavor of nicotine. The documents reveal an intention on the part of B&W and its corporate parent to affect the function of the body with nicotine.

(*JAMA*. 1995;274:225-233)

OF THE THOUSANDS of chemicals in tobacco smoke, nicotine may be the most important. Nicotine makes tobacco addictive and largely explains why people use tobacco products.[1] The addictiveness of nicotine keeps people smoking long enough and heavily enough for tobacco smoke to cause serious illness and death.[2] While the importance of nicotine in tobacco use has been common knowledge in medical and public health circles for years, it has not been clear how nicotine is understood by the tobacco companies. The Brown and Williamson documents[3] reveal that Brown and Williamson Tobacco Corporation (B&W) and its British parent company, BAT Industries (formerly British American Tobacco Company), had a sophisticated and scientifically accurate understanding of nicotine pharmacology, including an explicit recognition of nicotine's addictiveness, more than 30 years ago. By 1963, scientists at B&W and BAT and executives at B&W readily acknowledged to each other that nicotine is addictive. A senior B&W executive emphasized to his colleagues that they were, essentially, in the business of "selling nicotine" {1102.01; 1802.05}. The documents reveal that both B&W and BAT clearly recognized that nicotine is pharmacologically active, that it is addictive, and that cigarettes are, in essence, nicotine delivery devices. Brief glimpses into what these documents have to say about nicotine have been provided by the press and by David A. Kessler, MD, JD, the commissioner of the Food and Drug Administration (FDA), in congressional testimony. Dr Kessler told Congress that these documents are "relevant to the determination of whether nicotine-containing cigarettes are drugs" under federal law. If cigarettes are drugs, the FDA has regulatory jurisdiction over them.[4]*

### THE SOUTHAMPTON RESEARCH CONFERENCE, 1962

For many years, BAT held annual research conferences so that scientists from major subsidiary companies could share the results of research and discuss various issues affecting the industry.[5] The 1962 research conference was held in Southampton, England, and was attended by 29 BAT representatives from five countries. Four delegates from B&W attended.

The keynote address was delivered by Sir Charles Ellis, an executive in the Research and Development Establishment (R&DE) at BAT's Millbank headquarters in London, England. Sir Charles began his address with an overview of the smoking and health issues that were facing BAT. One of the problems at the time was the impact of the British Royal College of Physicians' (RCP) first report on smoking and health, which had been released 4 months earlier.[6] The RCP report concluded that smoking was a cause of lung cancer and that the British government should take "decisive steps" to control the problem.

Sir Charles attempted to explain the conclusions of the RCP report by suggesting that its authors were predisposed to believing that cigarettes are harmful for a variety of reasons. The last reason he cited was:

> [S]*moking is a habit of addiction* that is pleasurable; many people, therefore, find themselves sub-consciously prepared to believe that it must be wrong. [emphasis added] {1102.01, p 4}

Sir Charles acknowledged that nicotine is responsible for the addictiveness of smoking. However, he also indicated that the tobacco industry in the United Kingdom was funding research on whether nicotine has beneficial properties through the Tobacco Manufacturers Standing Committee (TMSC).

> One result of the recent public discussions on smoking and health must have been to make each of us examine whether smoking *is just a habit of addiction* or has any positive benefits. It is my conviction that nicotine is a very remarkable beneficent drug that both helps the body to resist external stress and also can as a result show a pronounced tranquillising effect.... *Nicotine is not only a very fine drug, but the techniques of administration by smoking has considerable psychological advantages an*[obscured] *against excessive absor*[obscured] impossible to take an ove[obscured]

PLAINTIFF'S EXHIBIT 6

*We indexed the documents as part of our analysis and assigned each one a six-digit number. Documents are cited in this article using these numbers enclosed in braces (eg, {1234.56}) and listed at the end of the article after the regular reference section. The complete indexed document set has been deposited in the Archives and Special Collections Department of the University of California, San Francisco, Library and Center for Knowledge Management. As of this writing, these documents are being made available via the Internet at http://www.library.ucsf.edu/tobacco through the World Wide Web.

From the Department of Medicine, St Peter's Medical Center, University of Medicine and Dentistry of New Jersey, Robert Wood Johnson Medical School, New Brunswick (Dr Slade), and the Institute for Health Policy Studies, Department of Medicine and Division of Clinical Pharmacy, University of California, San Francisco (Drs Bero and Glantz, Mr Hanauer, and Ms Barnes).

Reprint requests to Division of Cardiology, Box 0124, University of California, San Francisco, CA 94143-0124 (Dr Glantz).

the way it is only too easy to do with sleeping pills. Perhaps, therefore, in the midst of all this consideration of the possible harmful effects of smoking you will be pleased to hear that T.M.S.C. is supporting work to elucidate the effects of nicotine as a beneficent alkaloid drug. [emphasis added] {1102.01, pp 15-16}

## BATTELLE'S NICOTINE RESEARCH PROGRAM

Not disclosed in Sir Charles' 1962 speech was contract research on nicotine that was being conducted for BAT by the Battelle Memorial Institute laboratory in Geneva, Switzerland. The ultimate purpose of the project was to develop a novel nicotine delivery device that would avoid the toxicity of conventional cigarettes.

Battelle undertook several projects for BAT on nicotine from the late 1950s through about 1967. Project Hippo I involved animal experiments exploring the effects of nicotine on stress, weight gain, water balance, and hormonal regulation. Project Hippo II extended this work on the hypothalamic effects of nicotine by exploring whether nicotine acted in ways similar to major tranquilizing drugs, such as reserpine. A separate series of experiments worked out the pharmacokinetics of nicotine (absorption, distribution, and fate). Finally, Project Ariel was a project to develop an alternative nicotine delivery device: a product that would provide the consumer with nicotine while delivering negligible amounts of the other toxins found in tobacco smoke.

### Project Hippo I

Project Hippo I explored nicotine's role in several areas involving hypothalamic functions, including reduction of stress, inhibition of weight gain, maintenance of water balance (hormonally controlled through the hypothalamus), and regulation of gonadotropic hormones. The results of Project Hippo I are described in a January 1962 report from Battelle to BAT {1212.01}. The report explicitly acknowledges the central importance of nicotine in tobacco use:

> It is an everyday experience to each smoker that smoking a cigarette helps mastering the numerous stressful stimuli of modern life.
> This effect is possibly one of the most powerful reasons which make one smoke.
> How does nicotine exert this action? {1212.01, p 6}

In these experiments, Battelle tested some of the most advanced neuroendocrine theories of the day. Since the mid 1950s, neuroendocrinologists had been coming to understand the central role of the hypothalamus in the regulation of pituitary gland function.[7,8] Among the pharmacological phenomena studied by Battelle was tolerance to nicotine. The report noted that tolerance could be induced in all rats studied.

Project Hippo I included an elegant series of experiments on weight control in rats using nicotine. Nicotine inhibited food intake in both tolerant and nontolerant animals. Reserpine did not modify this action of nicotine. Nicotine rapidly stimulated the mobilization of lipid deposits and stimulated the degradation of free fatty acids. Each of these actions was in the direction expected for a drug that would be of benefit in controlling obesity {1212.01, p 3}. The Battelle work on weight control preceded published accounts of these phenomena by 20 years.[1,9] The first scientist to publish work in this area (in 1982) has indicated that the fact that these data were not published seriously delayed progress in this area (Neil E. Grunberg, written communication, December 9, 1994). The Hippo I report concludes with the following observations:

> From all our data it seems that the effect of nicotine in the "stress reaction" is a very prominent and a very complicated one.
> The understanding and thorough investigation of this effect seems of the greatest importance: it is by this very effect that nicotine acts as a "tranquilliser." {1212.01, p 48}

### Project Hippo II

Battelle extended its research on the hypothalamic actions of nicotine in Project Hippo II. The primary purpose of Project Hippo II was to determine whether nicotine's effects on the brain were similar to the effects of tranquilizing drugs, particularly reserpine. The findings are described in an interim report (1962) {1212.02} and a final report (1963) {1212.03}. The interim report discusses the thinking behind Project Hippo II.

> Is it possible to perceive any similarities between these effects of the new drugs called "tranquilizers" and the feeling of comfort experienced by a smoker?
> Some of these similarities appear at first sight and are certainly worth while studying:
> 1. Nicotine, like reserpine itself, releases noradrenaline from its stores; it seems also to release serotonine stores from the brain.
> 2. The administration of one dose of nicotine enhances the hyperproduction of corticosteroids in the adrenal consecutive [*sic*] to a stress, as does reserpine itself. {1212.02, p 15}

The final report on Project Hippo II indicates why BAT was interested in comparing nicotine and reserpine: there was concern that the then new tranquilizing agents would compete with cigarettes as stress reducers. In this regard, the results of Battelle's research must have been reassuring to BAT, since the experiments demonstrated that nicotine had far fewer adverse effects than reserpine.

The report noted two beneficial effects of nicotine:

> The so-called "beneficial" effects of nicotine are of two kinds:
> 1. Enhancing effect on the pituitary-adrenal response to stress;
> 2. Regulation of body weight. {1212.03, p 2}

The report assumed that tolerance, withdrawal, and addiction to nicotine were real phenomena:

> A quantitative investigation of the relations with time of nicotine—and of some possible brain mediators—on adreno-corticotrophic activity could give us the key to the explanation of both phenomena of tolerance and of addiction, in showing the symptoms of withdrawal. {1212.03, p 4}

The hypotheses guiding Hippo II are summarized in a diagram reproduced in the Figure {1212.03, p 5}. In this model, nicotine acts in the brain and at the level of the hypothalamus to affect appetite, stress reactions mediated through the adrenal gland, and changes in blood pressure and in water balance (antidiuretic effect). The experimental data gathered by the Battelle scientists in Hippo I and Hippo II provided direct empiric support for this model.

### The Fate of Nicotine in the Body

In addition to conducting the Hippo projects for BAT, Battelle also studied how nicotine is absorbed into, distributed within, and eliminated from the body. This work seems to have been part of the overall development process for Ariel, the code name for BAT's alternative nicotine delivery device. To properly design such a product, BAT needed basic pharmacokinetic data. The results of these pioneering experiments are described in a May 1963 report entitled "The Fate of Nicotine in the Body" {1213.01}. The report begins:

> *There is increasing evidence that nicotine is the key factor in controlling, through the central nervous system, a number of beneficial effects of tobacco smoke, including its action in the presence of stress situations. In addition, the alkaloid [nicotine] appears to be intimately connected with the phenomena of tobacco habituation (tolerance) and/or addiction.* Detailed knowledge of these effects of nicotine in the body of a smoker is therefore of vital importance to the tobacco industry, not only in connection with their present standard products, but also with regard to future potential uses of tobacco alkaloids. [emphasis added] {1213.01, p 1}

Inhalation is essential for nicotine absorption from a cigarette.[1] To study the absorption of nicotine, Battelle used nicotine labeled with carbon 14 to measure the amount of nicotine absorbed by different types of smokers. The two subjects described as "non-inhalers" absorbed 22% and 42% of the nicotine




Brown and Williamson (B&W) had a sophisticated understanding of how nicotine acts on the nervous system in 1962, when it was conducting the Project Hippo research. CRF indicates corticotropin-releasing factor; GRF, gonadotropin-releasing factor; TRF, thyrotropin-releasing factor; and SRF, somatotropin-releasing factor. (Typeset from a manuscript page of a B&W document {1212.03, p 5} with correction of spelling and typographical errors.)

drawn into their mouths while most of those who inhaled absorbed between 70% and 90% of the ingested dose. The two subjects who "eject[ed] the smoke immediately after inhalation" had nicotine absorption rates in the 40% to 50% range. Daily consumption of nicotine among these subjects was found to range from 10 to 91 mg {1213.01, p 8}. These data demonstrate the importance of inhalation for nicotine absorption from cigarette smoke. Inhalation is unrelated to taste and flavor; it is only important for nicotine absorption into the blood stream.[10]

The report also discusses earlier work on nicotine absorption, which had demonstrated that freebase nicotine is absorbed more rapidly than nicotine salts. Nicotine exists in the freebase form at an alkaline pH. In acidic environments, nicotine exists as a salt. The more rapid the absorption, the greater the impact nicotine has on the brain.[11]

The report concludes with a discussion of nicotine metabolism in the context of tolerance and addiction. It was known that tolerance can develop either from metabolizing a drug faster with repeated exposure (metabolic tolerance) or from adaptation to the drug at the level of the target tissue (cellular tolerance). It was also clear at the time that there is an important relationship between the development of tolerance and the potential a drug has to cause addiction.

Although tolerance to some drugs may depend on accelerated enzymatic breakdown, prolonged consumption of others, including morphine, appears to induce cellular adaptations. In any case, the present results offer no conclusive evidence for any particular mechanism involved in tolerance to nicotine, nor do they indicate a lead to the phenomenon of addiction. *We believe that both tolerance and addiction are intimately connected, and that it would be most useful to investigate the two phenomena with regard to cellular adaptation, especially in target organs of the central nervous system.* [emphasis added] {1213.01, p 27}

The authors clearly understood nicotine pharmacology in terms of tolerance and addiction. Indeed, at about this time, they wrote Sir Charles Ellis a thoughtful, brief essay on a possible mechanism for nicotine addiction (see below).

Within a few weeks of the transmission of "The Fate of Nicotine in the Body" to BAT, Sir Charles sent a copy to William S. Cutchins, president of B&W. In his cover letter, Sir Charles asked that the report be given no wider circulation than the Hippo reports had received. He noted:

[The report] is an account of work which has been carried out in association with the other researches which were sent to you recently under the title of HIPPO. I feel sure you will agree that a knowledge of the fate of nicotine in the body is a necessary accompaniment to studying the physiological effects that nicotine can produce. {1200.16}

The documents do not include any acknowledgment from Cutchins, but the man who would shortly replace him as president, Ed Finch, received the report along with an accurate summary of the research prepared by the B&W vice president of research, T. M. Wade, Jr {1200.06}.

## A Tentative Hypothesis on Nicotine Addiction

The Battelle scientists who conducted the Hippo projects also wrote a speculative essay about the mechanism underlying nicotine addiction. "A Tentative Hypothesis on Nicotine Addiction" {1200.01} sought to explain nicotine tolerance, withdrawal, and addiction in terms of neuroendocrinology.

The hypothalamo-pituitary stimulation of nicotine is the beneficial mechanism which makes people smoke; in other words, nicotine helps people to cope with stress. In the beginning of nicotine consumption, relatively small doses can perform the desired action. *Chronic intake of nicotine tends to restore the normal physiological functioning of the endocrine system, so that ever-increasing dose levels of nicotine are necessary to maintain the desired action. Unlike other dopings, such as morphine, the demand for increasing dose levels is relatively slow for nicotine.*

In a chronic smoker the normal equilibrium in the corticotropin-releasing system can be maintained only by continuous nicotine intake. It seems that those individuals are but slightly different in their aptitude to cope with stress in comparison with a non-smoker. If nicotine intake, however, is prohibited to chronic smokers, the corticotropin-releasing ability of the hypothalamus is greatly reduced, so that these individuals are left with an unbalanced endocrine system. A body left in this unbalanced status craves for renewed drug intake in order to restore the physiological equilibrium. *This unconscious desire explains the addiction of the individual to nicotine.* [emphasis added] {1200.01, pp 1-2}

Pharmacological research at Battelle sponsored by BAT in the early 1960s was based on a paradigm of addiction. It sought to elucidate "beneficial" effects of nicotine, specifically stress reduction and weight loss. The work included fundamental pharmacokinetic studies with an eye toward future product development.

### Reaction to Battelle Research at B&W

The documents include internal discussions over whether to share the results of the Battelle research with the US Public Health Service, which was then conducting the review that would become the 1964 surgeon general's report {1200.10, 1200.12, 1802.01, 1802.02, 1802.05}. The exchanges demonstrate that B&W and BAT executives regarded these studies as reliable. (The reports were not shared.)

As part of this internal discussion of whether to share the Battelle reports with the US Public Health Service, B&W's general counsel, Addison Yeaman, summarized his views about nicotine in a memorandum dated July 17, 1963 {1802.05}. Yeaman saw the Battelle work on nicotine as a way to justify smoking because of its positive benefits. If B&W could remove harmful constituents from smoke, it could then, with a clear conscience, promote cigarettes as nicotine delivery devices for people under stress. The memo opens:

> The determination by Battelle of the "tranquilizing" function of nicotine, as received by the human system in the delivered smoke of cigarettes, together with nicotine's possible effect on obesity, delivers to the industry what well may be its first effective instrument of propaganda counter to that of the American Cancer Society, et al, damning cigarettes as having a causal relationship to cancer of the lung. {1802.05, p 1}

Yeaman saw nicotine as being important for its "tranquilizing" effects, not for its taste. In fact, he even mentions taste and nicotine separately in the document, indicating that these qualities are distinct. Toward the end of the memo, he noted:

> *Moreover, nicotine is addictive.*
>
> *We are, then, in the business of selling nicotine, an addictive drug effective in the release of stress mechanisms.* [emphasis added] {1802.05, p 4}

### Project Ariel

The basic pharmacology embodied in the Battelle projects was founded on the realization that cigarettes are nicotine delivery systems. In the process of delivering nicotine, however, cigarettes also deliver many carcinogens and other toxins. BAT, with help from Battelle, developed an alternative delivery system to administer nicotine free of the toxins from tobacco smoke. The design goal was a safe cigarette. The device was code-named Ariel.

Two patents were issued to Battelle on Ariel, but BAT's Sir Charles Ellis is listed in both as the lead inventor.[12,13] A 1970 letter from BAT to Addison Yeaman at B&W notes that "the patents were put in Battelle's name rather than B.A.T.'s for security reasons" {1202.01, p 1}. Ariel relied on burning tobacco to heat a centrally arranged tube containing nicotine and an aerosol generator, a material such as water that would form an aerosol when heated and then cooled. The consumer would inhale through the central core and avoid taking in tobacco smoke. Nicotine dissolved in the droplets could be inhaled as part of the aerosol.

The patents for Ariel emphasize the importance of nicotine for the smoking experience and indicate that its action is pharmacological. One of the patents notes:

> A total and satisfying "smoke" can be obtained with a high nicotine to tar ratio or, as sometimes expressed, a low ratio of total particulate matter (T.P.M.) to nicotine. This latter ratio can readily be reduced to one-quarter or less of the values normally expected of smoke from cigarettes having no special provision for reducing the ratio. *If desired, the nicotine content may be made normal, but with little of the normal particulate and vapor phases.*
>
> Thus, *when the smoking device is smoked the smoker will draw into his mouth a small amount of smoke adequate to satisfy the taste of the smoker along with the nicotine containing aerosol.*
>
> Although the invention thus seeks primarily to furnish *a smoking device which will yield nicotine in an acceptable form, both psychologically and physiologically,* but without the necessity for taking into the system so much of the products of combustion as is usual when smoking a conventional cigarette, it may also be used mainly or partially as a means for achieving greater freedom for influencing the taste of the smoke, for introducing flavors and so forth.† [emphasis added]

This patent demonstrates the pharmacological role nicotine plays in cigarettes. It shows that the essence of a conventional cigarette, stripped of its undesirable elements, is "a smoking device which will yield nicotine in an acceptable form, both psychologically and physiologically." While the product was never brought to market, its design and conception demonstrate what BAT and B&W thought was the most important part of their tobacco products: nicotine.

Ariel continues to live on at B&W. The company has received three additional patents based on the Ariel concept, most recently in 1994.[14-16]

## BAT'S INTERNAL WORK ON NICOTINE

BAT also conducted studies on nicotine at its own laboratory in Southampton and at other company laboratories around the world. Some of these research activities are described in reports of BAT's annual research conferences. Other research activities on nicotine are described in site visit reports and in research reports. These documents indicate that the central importance of nicotine was recognized throughout the company over an extended period of time and that nicotine was useful for its pharmacological properties.

In September 1969, D. J. Wood from R&DE at BAT gave a presentation for company executives about the R&D work the company was doing. The notes of his talk, which summarize the work being done on nicotine, provide numerous details about this systematic program of pharmacological research:

> The presence of nicotine is the reason why the tobacco plant was singled out from all other plants for consumption in this rather unusual way.
>
> Nicotine has well documented pharmacological action. It is claimed to have a dual effect, acting both as a stimulant and a tranquilliser. It is believed to be responsible for the "satisfaction" of smoking, using this term in the physiological rather than the psychological sense.
>
> Investigations at R.&D.E. are aimed at finding out more about the factors controlling nicotine absorption in the human respiratory system.
>
> Extractable and Non-extractable nicotine (define).
>
> Possibility of getting satisfaction from fairly low nicotine cigarettes, provided sufficient nicotine is in the extractable form.
>
> Certain medical studies would seek to blame nicotine for cardio-vascular disease, so high levels of total nicotine are not likely to be fashionable in health-conscious countries in the future.
>
> Mention absorption of nicotine via the mouth, e.g. cigar smokers. {1184.02, p 7}

### BAT Research on Nicotine

Robert J. Johnson, a senior scientist with B&W research and development, summarized a June 1967 meeting to discuss past and present research on nicotine. Sir Charles Ellis started the meeting by reminding those present "that he had first brought out the concept that we are in a nicotine rather than a tobacco industry" {1201.01, p 10}.

Dr Johnson described six areas of research on nicotine that the BAT R&D group had on its agenda at the time. These included Project Ariel, studies on "extractable and non-extractable" nicotine, the pH of tobacco smoke (related to the work on extractable nicotine), alkaline filter additives "which selectively increase nicotine delivery," the synthesis of radiolabeled nicotine, and studies on the organoleptic properties of nicotine {1201.01, pp 10-11}. The proportion of nicotine that was extractable with chloroform was rec-

†Reference 13, column 2, lines 30-38, 52-55, and 66, and column 3, line 3.

ognized to be a better gauge of "strength" of tobacco products than the total nicotine level. It was thought that extractable nicotine reached the brain more quickly than unextractable nicotine {1205.01}. Extractable nicotine was, essentially, free nicotine, the form that is more easily absorbed across biologic membranes.[1]

The research program was concerned with the delivery of nicotine in smoke and its absorption. The organoleptic work comes closer than anything else in the documents to suggesting an interest in the taste and flavor of nicotine, but it actually seems to have been more concerned with the irritating properties of nicotine on mucous membranes. This is an important problem in cigarette design since alkaline nicotine, which is readily absorbed in the mouth, is also irritating to the throat.[10]

A filter additive (polyethyleneimine [PEI]) that boosted the delivery of "extractable nicotine" by alkalinizing cigarette smoke was used in a series of human test panel experiments {1205.03}. Increased levels of "extractable nicotine" increased the "impact of inhaling" while producing a "small increase" in throat and nose irritation. Mouth impact and mouth irritation were unaffected.

### Research Conference, 1967

The 1967 R&D conference was held during a 3-day period in October {1165.01, 1165.02, 1165.03}. Among the underlying assumptions the participants explicitly agreed on were the following having to do with nicotine:

> There is a minimum level of nicotine. *Smoking is an addictive habit attributable to nicotine and the form of nicotine affects the rate of absorption by the smoker.*
>
> *If there is no inhaling, there is no lung cancer or respiratory disease.*
>
> Smoking has both physiological and psychological effects.
>
> There will be some government involvement in the tobacco industry in the future. [emphasis added] {1165.01, p 2}

A handwritten edit in the document changes the phrase "an addictive habit" to "a habit."

The meeting notes reflect a concern with the inevitability of future government regulation.

> It was agreed that smoking is likely to be associated with health continuously in the future and that it was not a passing phase. *It was likely, moreover, that tobacco would be involved in legislation of a food and drug administration nature in respect both of product and of manufacture.* [emphasis added] {1165.01, p 4}

Thus, the top BAT scientists recognized that health concerns were never going to disappear (ie, be disproven). Furthermore, they felt that FDA-style product regulation could be justified by the public health community.

Ariel was discussed, as was "a cigarette aimed to be pleasantly non-inhalable" {1165.02, p 5}. Moreover, "[i]t was noted in passing that the trend towards making cigarlets [little cigars] milder and therefore more easily inhalable was undesirable on health grounds" {1165.02, p 5}. These two comments emphasize the importance of inhalation to the normal functioning of cigarettes as well as the fundamental problem that this poses in the production of disease.

The importance of nicotine was emphasized elsewhere in the conference notes as well:

> A general discussion followed on basic assumptions which guided thinking in the field of smoking and health. While recognizing the importance of psychological factors in smoking and the possibility that some smokers would accept non-nicotine cigarettes, *it was felt that nicotine is important for the majority of smokers and that the form of nicotine can be significant.* It was also considered that nicotine will be increasingly subject to attack. It was agreed that there will be increasing government involvement in the industry. [emphasis added] {1165.02, p 6}

In the context of the laboratory work these scientists were doing on nicotine at the time, these comments emphasize the importance of nicotine as a pharmacological agent in tobacco products.

### Research Conference, 1968

A major conclusion of the BAT research conference in 1968 concerned the need to look for substances that would have the actions of nicotine in the brain but that would not be toxic to the circulatory system. The intended effects were "brain stimulation and stress-relief":

> *In view of its pre-eminent importance, the pharmacology of nicotine should continue to be kept under review and attention paid to the possible discovery of other substances possessing the desired features of brain stimulation and stress-relief without direct effects on the circulatory system.* The possibility that nicotine and other substances together may exert effects larger than either separately (synergism) should be studied and if necessary the attention of Marketing Departments should be drawn to these possibilities. [emphasis added] {1112.01, p 3}

Thus, the pharmacological effects of nicotine were of "pre-eminent importance," and it was believed that other substances that could do the same thing without adversely affecting the circulatory system should be sought. This conclusion may have led to work that would be reported internally at BAT's R&D laboratories a few years later on nicotine analogues.

### Research Conference, 1969

The minutes of the 1969 research conference include several salient comments related to nicotine {1169.01}.

In discussing PEI-treated filters (PEI is an additive that boosts extractable nicotine delivery), the minutes note that a suggested upper limit for PEI is 3% of the filter by weight because of concern about adverse effects on bioassay (toxicology) tests {1169.01, p 8}.

Nicotine came up in the discussion of nontobacco materials for smoking:

> There was a general discussion on non-tobacco materials and, largely due to the difficulties foreseen with the addition of nicotine, the Conference did not envisage at present the likely success of a totally non-tobacco cigarette. However, it now seems quite likely that non-tobacco materials will be successfully incorporated into cigarettes as blend constituents, particularly in health oriented products. *A large usage of non-tobacco materials would be likely to increase the demand for high-nicotine tobaccos.* [emphasis added] {1169.01, p 8}

The provision of a completely tobacco-free product was seen as unlikely because in such a case, nicotine would have to be added. It is doubtful that this represented a technical obstacle, which suggests that this judgment reflected a perceived regulatory barrier. Were nicotine to be added to a tobacco substitute material, it might not have been a large step for a drug regulatory authority, such as the FDA, to raise questions about whether the nicotine in this instance was a drug.

### Research Conference, 1970

A research conference was held in November 1970 {1170.01}. As had been discussed the previous year, pure nicotine was not to be used as an additive in a tobacco product, but a high-nicotine tobacco extract was permissible.

> The addition of nicotine to SM [substitute materials] was considered, and it was recommended that nicotine per se, should not be used inside any tobacco factory. However, high nicotine content tobacco extract might be added. So long as SM remains a blend constituent, it would not be considered desirable for the supplier to include nicotine in the formulation. Nevertheless, for purposes of laboratory experimentation under suitable controls, nicotine-containing materials offered by suppliers may be used. {1170.01, p 4}

Once again, this conclusion seems to reflect a regulatory, rather than a technical, concern.

The Canadian subsidiary was encouraged to explore the development of reconstituted tobacco with high-nicotine tobaccos {1170.01, p 5}. Consumer needs were to be addressed:

It was agreed that insufficient work is being done on those benefits perceived by the consumer, and that psychological and pharmacological studies should be initiated, both at industry and group level, to identify the consumers' needs. {1170.01, p 9}

The importance of pharmacological research to identify consumer needs illustrates the underlying intent of BAT and B&W as reflected in the approach taken by the companies' leading scientists.

### Studies on Central Nervous System Effects of Nicotine

The documents include summaries of several research reports that examine the effects of nicotine on the central nervous system. Two electroencephalographic (EEG) studies of smoking were reported in 1974 {1205.14, 1205.15}. The first, from B&W in Louisville, Ky, was undertaken to facilitate product development.

The development of new products and the modification of existing ones requires that we have some knowledge of the smoker toward whom these efforts are directed. The work described in this report is focused on the acute, or immediate physiological response of smokers. {1205.14, p 1}

In saying that product design can be guided by pharmacological studies such as this, the authors reveal an intention to affect the structure or function of the body.

The results were interpreted as showing both psychological and pharmacological effects of smoking.

We presently interpret these responses of the smokers to the two cigarettes in both psychological and pharmacological terms. The alpha abundance reflecting a subjective or conditioned response to smoke and alpha amplitude indicating pharmacological response to nicotine. {1205.14, p 5}

The second EEG study was conducted by A. K. Comer and R. E. Thornton at BAT's Southampton laboratory {1205.15}. The study found that smoking increases the brain wave activity being measured in some subjects but decreases it in others. In the discussion, the authors note that nicotine "has been assumed to be the main pharmacologically active component in smoke." They speculate that the disparate results may be explained by the hypothesis "that smoking may assist some people to optimise the level of activity in the brain."

### Research Conference, 1974

By the 1970s, dilution of mainstream cigarette smoke with room air had become a major technique for reducing machine-measured tar and nicotine deliveries.[2,10,17,18] Termed "ventilation," dilution was accomplished with a variety of techniques, including the use of porous cigarette paper and the drilling of holes around the filter tip. The BAT research conference in January 1974 discussed research at the BAT laboratory in Germany, which showed that smokers adjust the way they smoke to control the levels of nicotine in their blood.

An apparent replication of the German work was completed in the following year in Canada. The "Chronology of B&W's Smoking and Health Research" includes the following item for 1975:

Compensation study conducted by Imperial Tobacco Co., a BATCo affiliate, [shows that a smoker] adjusts his smoking habits when smoking cigarettes with low nicotine and TPM [total particulate matter] to duplicate his normal cigarette nicotine intake. (Imperial Tobacco Project T-8077) {1006.01, p 27}

BAT scientists continued to study compensation. By 1984, the consensus among them was that consumers adjusted their smoking behavior to achieve specific nicotine dosing. The immediate signal consumers got to gauge nicotine dose was the "impact" of the puff on the throat. The impact, in turn, was a signal to the consumer about the dose that would be absorbed. This was summarized at a joint R&D/marketing conference in 1984 as follows: "it is accepted that nicotine is both the driving force and the signal (as impact) for compensation in human smoking behaviour." {1226.01, p 56}

The inhalability of tobacco smoke was discussed at the 1974 research conference and led to two summary conclusions. The first dealt with cigars:

The policy of discouraging inhalable cigars was questioned. On the one hand, it was suggested that more behavioural information was necessary before a judgment could be made and, on the other, that our present policy of caution is correct. {1125.01, p 4}

The second was about cigarettes:

Although the Conference had concluded in the past that the non-inhalable cigarette was a worthwhile concept, no work had been done in this field and the operating companies represented did not feel that it presented a realistic approach. It was agreed to record a difference of view on this subject. {1125.01, p 4}

The rapid absorption of nicotine from inhaled smoke in the lungs is the chief advantage cigarettes have over cigars, the smoke from which is usually not inhaled, in producing the desired pharmacological effects.[19]

### Research Conference, 1978

The pharmacology of nicotine was featured in discussions at the 1978 research conference:

The two themes being contemplated for future work by the Verband [in Germany] are the beneficial effects of nicotine as a drug, and a study of blood and urine levels of specified constituents to explore the degree of compensation by cigarette smokers. {1174.01, p 2}

At another point, the importance of improving the dosing of nicotine from cigarettes was emphasized:

With conventional cigarettes, the transfer of nicotine to the smoker from the tobacco has very low efficiency. Potentially, therefore, opportunities exist for very big savings in tobacco if this low efficiency can be greatly increased. {1174.01, p 4}

This comment relates to the fact that, in general, a smoker absorbs only about 10% of the nicotine found in a cigarette.[20] This can be increased to a maximum of about 40% with intensive smoking techniques. The comment is meaningless if the manufacturer's intent is the delivery of nicotine for taste. The comment only has meaning in the context of nicotine absorption.

### Research Conference, 1980

While the documents do not include a summary report on the 1980 research conference, they include a set of notes made by Dr R. A. Sanford, vice president of R&D at B&W, in response to a questionnaire circulated by Dr Alan Heard of BAT R&D about the proposed agenda for this conference {1132.01}. The document is somewhat cryptic: since it only supplies answers, it is not clear what the questions were. In light of the work BAT had previously done on smoker compensation, though, one of Dr Sanford's responses deserves mention.

On a proposed discussion of "compensation/smoker behaviour," Dr Sanford indicated that B&W had "definite interest" in the area, but he also noted that this area of research was "dangerous" {1132.01, p 3}. The obvious danger, from B&W's perspective, would have been that the compensation phenomenon demonstrated the customers' desire for nicotine in a way that undermined the company's implied statements about the health benefits of switching to low-yield cigarettes and its public statements about smoking being a matter of free choice. Data on this phenomenon from the company could be embarrassing.

### Research Conference, 1982

The first entry in the minutes for the September 1982 research conference, under the heading "Subjects of Major Group Importance," is "Human Smoking Behaviour." Nicotine research and psychological studies of consumers form the bulk of this section. One conclusion was:

More must be known about how different consumers smoke different products and derive different levels of satisfaction or response therefrom. We are concerned with two aspects: (a) Sensations and responses at the mouth level—which influence initial selection and brand loyalty. (b) The pharmacological result of smoke uptake. (1179.01, p 1)

The minutes outline work under way in Germany on precise nicotine dose measurements in consumers, in Canada on puff duplication techniques to measure smoker behavior with precision, and work planned in the United States at B&W on surreptitious videotaping to measure smoking in natural settings. While the BAT research program at its Southampton facility was aimed at identifying market segments based on "smoking behavioural characteristics," it also was paying attention to "the biochemistry and pharmacology associated with the inhalation of major smoke components" (1179.01, pp 2-3).

A design objective for new products was

*to enhance or maximise sensory and pharmacological sensations, i.e. to "make the smoke work harder"* so as to achieve maximum sensation at a given delivery level without encouraging the smoker to compensate. [emphasis added] (1179.01, p 3)

In this statement, the R&D staffs of BAT and B&W showed their understanding of the purpose of a cigarette. "Pharmacological sensations" are not only intended but are to be manipulated so that the consumer won't have to take in more smoke than intended to get the right dose of nicotine.

### Miscellaneous Studies and Statements Related to Nicotine

Several other conference presentations by BAT scientists in 1976 and 1977 emphasized the importance of nicotine. At a conference on smoking behavior, A. K. Comer gave a presentation entitled "The Smoking Habit: Some Current Views on the Role of Nicotine." Her review indicated that nicotine's effects on the brain are among the important reasons people smoke (1207.01). R. E. Thornton, in a talk entitled "Some 'Benefits' of Smoking," reviews improvements in performance from smoking and psychological "benefits" (1223.01, p 1), related mainly to pharmacological effects of nicotine (1223.01). They include improved performance of vigilance tasks, pleasure from smoking because of stimulation of the limbic system of the brain, amelioration of the symptoms of mental illness, weight control, counteracting the effects of other drugs, such as marijuana, and a reduction in the symptoms of Parkinson's disease.

Two BAT R&D (Southampton) reports of methods for measuring nicotine and cotinine levels in blood and urine provide valuable insights into the important role BAT scientists thought nicotine played in smoking behavior (1208.04, 1208.05). The first study, from May 1980, states:

In some instances, the pharmacological response of smokers to nicotine is believed to be responsible for an individual's smoking behaviour, providing the motivation for and the degree of satisfaction required by the smoker. (1208.04, p 2)

The second report describes a technique for estimating the "whole body nicotine dose to the rat following intravenous administration." The authors' interest in using knowledge of the absorbed dose of nicotine as an aid in cigarette design is revealed in the report's description of the value of the new technique:

This technique has an immediate and direct relevance for (i) animal toxicity studies in the comparative assessment of cigarettes, (ii) human behavioural studies in the assessment of an individuals' nicotine dose in response to modification in cigarette design. (1208.05, p 1)

Thus, the absorbed dose of nicotine was regarded as an important consideration in cigarette design. Cigarettes for which the delivered nicotine dose is a design parameter would seem to fall squarely under the definition of a drug in the Food, Drug, and Cosmetic Act.[21] One of the definitions of "drugs" in the act is "articles (other than food) intended to affect the structure or any function of the body of man or other animals" [21 USC §321 (g)(1)].

A similar concern with the relationship of nicotine dose and product design is evident in a paper describing the conclusions of a research conference setting priorities for the R&D group at Southampton in 1984 (1210.01). Under the category "Smoker Behaviour," a series of studies was planned, which, among other things, would explore "the efficient use of smoke nicotine through pH modification" (1210.01, p 2).

These studies will identify the relationship between nicotine dose and nicotine-related subjective improvement. This will further help to identify the relationship between product acceptability and smoker satisfaction. (1210.01, p 2)

This comment ties together the terms *satisfaction*, *nicotine dose*, and *nicotine-related subjective improvement*. This, too, is about affecting the structure and function of the body, not about simply using nicotine as a flavoring agent.

### Research Conference, 1983

The 1983 research conference covered a variety of topics related to nicotine (1180.07). These included inhalation and nicotine itself.

The minutes of the meeting focused on the tension between delivering an effective dose of nicotine to the consumer and minimizing the delivery of tar to the lungs. These were discussed under the category of "Inhalation and Product Improvement."

There are two potential ways of modifying the cigarette for product improvement: (i) reduced retention of smoke in the lung [and] (ii) increase of the level of irritation to reduce depth of inhalation.

Although it was appreciated that irritation may be changed to give a product advantage, it was agreed that the research should concentrate on the first route, ie the modification of the smoke aerosol to decrease the amount of smoke retained in the lung. An important criterion is that any changes made to the product must not damage smoker acceptability—indeed the aim must be to increase it.

The basic assumption is that nicotine, which is almost certainly the key smoke component for satisfaction, is fully released to the body system before exhalation takes place. It is essential, therefore, to attempt to quantify the change in chemical composition between inhaled and exhaled smoke under different conditions of smoking, ie shallow, medium and deep inhalation. The absorption of nicotine via the nasal cavity should also be investigated. (1180.07, p 10)

Nicotine absorbed through the lungs was essential for the provision of "satisfaction" to the consumer, that is, for the normal functioning of a cigarette. The noninhalable cigarette was not a realistic alternative, so to reduce tar absorption, the smoke should be exhaled as quickly as possible. This, in turn, suggested a series of experiments to measure nicotine absorption as a function of lung retention time. While it is not known if these studies were done, the quoted passage clearly shows that the absorption of nicotine is necessary for the intended functioning of a cigarette.

The 1983 meeting developed a research agenda on nicotine itself. The notes on nicotine are:

The growing concern about compensation is focussing attention on the role of nicotine in the smoking process. It was agreed that we must know as much as possible about:

- factors that affect the transfer of nicotine from leaf to smoke aerosol
- factors that influence the rate of transfer of nicotine from particulate matter to the vapour phase
- the contribution of nicotine to smoke sensory characteristics (including harshness and irritation)
- *the site and mechanisms of absorption of nicotine within the human system*
- *the way nicotine stimulates both the central nervous system and the peripheral organs (eg heart and lung)*

- *the metabolism of nicotine within the body, including rates and equilibrium levels.*

The developing programme of research at Southampton was supported, albeit *that greater emphasis should be placed on direct human studies rather than on animals—particularly in view of recent major advances in brain pharmacology.* It is envisaged that much of such work will be undertaken under contract. It was proposed that a senior person at Southampton should be responsible for coordinating all the relevant interest and work throughout the Group. There is an urgent need to prepare a status review on all major aspects of the pharmacological influences of nicotine in the smoking process. [emphasis added] {1180.07, pp 13-14}

Nicotine is important because of its pharmacological properties. The reference to the action of nicotine on the lung may be a recognition of the fact that the lung has an extensive network of nerve endings that can respond to nicotine and directly stimulate the brain.[1] The emphasis on nicotine in these conference minutes can only be because of an intention to have a product that delivers a reliable and predictable dose of nicotine to the consumer.

### Conclusions of Technical Exchange Meeting on Nicotine, 1984

In June 1984, a 3-day technical exchange meeting among BAT scientists was held on nicotine {1181.07}. The entire summary stated:

The main conclusions reached were:

a) Plasma nicotine/cotinine measurements can give reliable estimates of the nicotine uptake by groups of smokers, and with suitable precautions, by an individual smoker. Many smokers appear to obtain 12-14 mg. of nicotine per day from their cigarettes.

b) Cigarettes which have a delivery of less than 0.7 mg. of nicotine per cigarette as measured on a smoking machine, do not achieve large volume sales.

c) Providing smoke is inhaled—even shallow inhalation—95% of the nicotine is retained.

d) Intuitively it is felt that "satisfaction" must be related to nicotine. Many people believe it [is] a "whole body response" and involves the action of nicotine in the brain.

e) Although many smokers appear to approach a plateau or constant level of nicotine in the blood, it is not known: (i) whether a smoker feels the need for another cigarette when his blood level falls significantly below this plateau level or (ii) whether the smoker is seeking the more transient peak levels superimposed upon the general plateau level.

f) If level in the brain is the key feature, we have little idea at present on the relationship between blood levels/pattern and those in the brain.

g) An immediate sensory affect [*sic*] associated with nicotine is the "impact" on inhaling. Is this sensation a genuine part of the reward a smoker is seeking, or is it a "cue", i.e. a smoker has learnt by experience, that if he perceives a particular level of impact, he will subsequently receive an acceptable degree of satisfaction.

h) If we are to make better use in product terms of the levels of nicotine in smoke currently available—and even more so if we are forced to market cigarettes with reduced levels of nicotine—then it is important to significantly increase our understanding of impact/satisfaction. There is an urgent need for experimental cigarettes in which the levels of nicotine in smoke (and smoke pH) are carefully controlled. {1181.07}

BAT scientists had a sophisticated and up-to-date understanding of nicotine and its role in smoking behavior. The importance of smoke pH in designing an effective product at lower nicotine deliveries is apparent. Satisfaction is described as being related to the effects of nicotine on the body, especially on the brain, and the importance of inhalation is emphasized. This is the first place where "satisfaction" is clearly defined by the staff of a tobacco company.

The discussions held at this technical exchange were shared with divisions outside of R&D, at BAT's joint R&D/marketing conference in July 1984. Both the notes summarizing the technical exchange and the minutes of the discussion at that conference mention the importance of considering nicotine levels in product design {1226.01, pp 61-63}. The minutes note:

an improvement in our understanding of nicotine action is of major importance for future product development. {1226.01, p 63}

This comment is yet another indication of intent on the part of BAT to affect the structure or function of the body through the delivery of nicotine in its tobacco products.

## AVOIDING MENTION OF NICOTINE

While company scientists worked on nicotine pharmacology, B&W avoided talking about nicotine in its marketing campaigns. One of the documents shows how references to nicotine and withdrawal were edited out of an externally prepared prospectus for a marketing plan for a low-delivery cigarette. In 1978, Lisher & Co, a marketing management consulting firm in New York, NY, submitted a draft proposal for a low-delivery cigarette to B&W for review. The goal of the project was to develop cigarettes that matched the parameters suggested as desirable by the National Cancer Institute. A marked-up copy of this draft appears in the documents. Before editing, one paragraph read:

Current market trends clearly indicate a major trend toward low-tar brands, *although current "ultra" low tar brands have had limited success because of their failure to deliver satisfaction/maintain an adequate nicotine level.* An ancillary concern relative to nicotine delivery is that *if a satisfying, low-nicotine cigarette were to be developed, it could represent an effective means of withdrawal with severe implications for long-term market growth.* [emphasis added] {1203.01, p 1}

After editing, it read:

Current market trends clearly indicate a major trend toward low-"tar" brands, although current "ultra" low "tar" brands have had limited success because of their failure to deliver satisfaction. {1203.01, p 1}

All specific mention of nicotine was excised. As originally written, the paragraph accurately reflected a concern with providing a pharmacologically sufficient dose of nicotine to consumers. The editing process concentrated all of this meaning into the term "satisfaction." "Satisfaction" is a euphemism that obscures the genuine pharmacological intent. The intent to provide satisfaction is, as the scientists discussed at their conferences, an intention to maintain an "adequate nicotine level."

## CONCLUSION

The documents show that the role of nicotine in tobacco products is that of a pharmacological agent: B&W and BAT value nicotine not for what it does to taste and olfaction but for what it does to the brain. The absorbed dose of nicotine is a factor to be considered in product design. Nicotine is irrelevant to taste. The sensory panels occasionally described were not asked to measure taste in relation to nicotine. Rather, they measured the irritation nicotine caused in different forms, or whether nicotine had a certain "impact." In contrast, inhalation is essential to the core function of a cigarette, which is to deliver nicotine to the brain. Inhalation is necessary for nicotine absorption. BAT's idealized cigarette was embodied in the Ariel concept: a device designed to minimize toxic smoke components and deliver nicotine.

The contract work and the internal company research projects on nicotine reviewed herein have not been published in the scientific literature. Often, the work was well ahead of its time. The Battelle work in Geneva was at the cutting edge of nicotine pharmacology. The work on smoker compensation in the 1970s preceded the main published reports from the general scientific community by several years.[22]

The public relations posture of B&W differs markedly from the internal working views expressed by B&W and BAT during the last 30 years.[3] While the public posture is that nicotine is not addicting,[23] company internal writings 30 years

ago assumed addiction. Throughout the 22 years from the Southhampton to Montreal conferences, B&W and BAT had a keen interest in all aspects of the pharmacology of nicotine. Today, B&W publicly accepts one, and only one, conclusion from the 1964 surgeon general's report: that nicotine is a habituating, not an addicting drug.[24] Yet high-level executives and scientists at both B&W and BAT, at one time at least, privately appeared to take Addison Yeaman's 1963 observation to heart: they were in the nicotine business.

This work was supported in part by grant CA-61021 from the National Cancer Institute and grants 2KT-0072 and 4RT-0035 from the University of California Tobacco Related Diseases Research Program.

We also thank Phil Lollar of the University of California, San Francisco, and Robin Barthalow and Tim Nolan of Lieff, Cabraser and Heimann, who provided assistance in indexing the documents, and Adriana Marchione for assistance in manuscript preparation.

Finally, in an era in which public institutions are increasingly held in disdain, we would like to thank the University of California for providing an environment committed to academic freedom and the public interest. It would have been simpler—and cheaper—for the university to simply walk away from this project. After all, the history of the tobacco issue is one in which many institutions have followed the path of least resistance and failed to confront the issues raised in these documents. No administrator or other official ever told us to stop. Quite the contrary, we were encouraged and protected in our work. This behavior is what makes the University of California a great public institution.

### References

1. US Dept of Health and Human Services. *The Health Consequences of Smoking: Nicotine Addiction: A Report of the Surgeon General.* Washington, DC: US Dept of Health and Human Services, Public Health Service, Centers for Disease Control, Center for Health Promotion and Education, Office on Smoking and Health; 1988. DHHS publication CDC 88-8406.
2. US Dept of Health and Human Services. *Reducing the Health Consequences of Smoking: 25 Years of Progress.* Washington, DC: US Dept of Health and Human Services, Public Health Service, Centers for Disease Control, Center for Chronic Disease Prevention and Health Promotion, Office on Smoking and Health; 1989. DHHS publication CDC 89-8411.
3. Glantz SA, Barnes DE, Bero LA, Hanauer P, Slade J. Looking through a keyhole at the tobacco industry: the Brown and Williamson documents. *JAMA.* 1995;274:219-224.
4. Kessler D. Statement on nicotine-containing cigarettes. *Tobacco Control.* 1994;3:148-158.
5. Hanauer P, Slade J, Barnes DE, Bero LA, Glantz SA. Lawyer control of internal scientific research to protect against products liability lawsuits: the Brown and Williamson documents. *JAMA.* 1995; 274:234-240.
6. Royal College of Physicians. *Smoking and Health: A Report of the Royal College of Physicians on Smoking in Relation to Cancer of the Lung and Other Diseases.* London, England: Pitman Medical Publishing Co Ltd; 1962.
7. Martini L, Ganong W. *Neuroendocrinology.* New York, NY: Academic Press; 1966.
8. Medvei V. *The History of Clinical Endocrinology.* Pearl River, NY: The Parthenon Publishing Group; 1992.
9. Grunberg N. The effects of nicotine and cigarette smoking on food consumption and taste preferences. *Addict Behav.* 1982;7:317-331.
10. Slade J. Nicotine delivery devices. In: Orleans C, Slade J, eds. *Nicotine Addiction: Principles and Management.* New York, NY: Oxford University Press Inc; 1993:3-23.
11. Henningfield J, Keenan R. Nicotine delivery kinetics and abuse liability. *J Consult Clin Psychol.* 1992;61:743-750.
12. Ellis C, Schachner H, Williamson D. Smoking device: US patent 3 258 015. Assigned to Battelle, 1966.
13. Ellis C, Hughes W. Smoking devices: US patent 3 356 094. Assigned to Battelle, 1967.
14. Johnson R, Tang J-Y. Cigarette: US patent 4 955 397. Assigned to Brown and Williamson Tobacco Co, 1990.
15. Litzinger E. Smoking article: US patent 4 924 886. Assigned to Brown and Williamson Tobacco Co, 1990.
16. Porenski H, Plotner R. Smoking article: US patent 5 327 915. Assigned to Brown and Williamson Tobacco Co, 1994.
17. Kozlowski L, Pope M, Lux J. Prevalence of the misuse of ultra-low-tar cigarettes by blocking filter vents. *Am J Public Health.* 1988;78:694-695.
18. Kozlowski L, Healtherton T, Frecker R, Nolte H. Self-selected blocking of vents on low-yield cigarettes. *Pharm Biochem Behav.* 1989;33:815-819.
19. Ockene J, Hymowitz N, Sexton M, Broste S. Comparison of patterns of smoking behavior change among smokers in the Multiple Risk Factor Intervention Study (MRFIT). *Prev Med.* 1982;10:476-500.
20. Benowitz NL, Henningfield JE. Establishing a nicotine threshold for addiction: the implications for tobacco regulation. *N Engl J Med.* 1994;331: 123-125.
21. Food, Drug, and Cosmetic Act. 21 USC chap 9.
22. Russell M, Jarvis M, Iyer R, Feyeraband C. Relation of nicotine yield of cigarettes to blood nicotine concentrations in smokers. *BMJ.* 1980;280: 972-976.
23. *Hearings Before the House Subcommittee on Health and the Environment, of the Energy and Commerce Committee, US House of Representatives,* 103rd Cong, 2nd Sess (1994) (testimony of T. J. Sandefur, Regulation of Tobacco Products).
24. US Dept of Health, Education, and Welfare. *Smoking and Health: Report of the Advisory Committee to the Surgeon General of the Public Health Service.* Washington, DC: US Dept of Health, Education, and Welfare; 1964. Public Health Service publication 1103.

### Cited Brown and Williamson Documents

1006.01. Chronology of Brown & Williamson Smoking and Health Research, 1988.
1102.01. McCormick A. Smoking and Health: Policy on Research. Minutes, 1962.
1112.01. Green S. Research conference held at Hilton Head Island, SC. Minutes, September 24, 1968.
1125.01. Green S. Notes on the Group Research & Development Conference at Duck Key, Fla, January 12 to 18, 1974. Notes.
1132.01. Sanford R. [Avoid "dangerous" research]. Letter to A. Heard. August 18, 1980.
1165.01. BAT R&D Conference, Montreal, Quebec, Proceedings, Tuesday, October 24, 1967. Minutes, 1967.
1165.02. BAT R&D Conference, Montreal, Quebec, Proceedings, Wednesday, October 25, 1967. Minutes, 1967.
1165.03. BAT R&D Conference, Montreal, Quebec, Proceedings, Thursday, October 26, 1967. Minutes, 1967.
1169.01. Green S. Research conference held at Kronberg, Germany, June 2-6, 1969. Minutes, June 23, 1969.
1170.01. Summary & Conclusions: BAT Group Research Conference, November 9-13, 1970, St. Adele, Quebec. 1970.
1174.01. Green S. Notes on Group Research & Development Conference, Sydney, Australia, March 1978. Minutes, April 6, 1978.
1179.01. Blackman L. Research conference, Montebello, Quebec, August 30-September 3, 1982. Minutes, September 10, 1982.
1180.07. Blackman L. Research Conference, Rio de Janeiro, Brazil, August 22-26, 1983. Minutes, October 13, 1983.
1181.07. Nicotine conference, Southampton, England, June 6-8, 1984. BAT Research Conference, 1984.
1184.02. Wood D. Aspects of the R.&D.E. function, notes for a talk by D. J. Wood given at Chelwood, September 1969. Notes, 1969.
1200.01. Haselbach C, Libert O. *A Tentative Hypothesis on Nicotine Addiction.* London, England: British American Tobacco Co Ltd; 1963.
1200.06. Wade T. [Re: "The Fate of Nicotine in the Body"]. Memo to E. Finch, July 31, 1963.
1200.10. Note for Mr Cutchins [regarding beneficial effects of nicotine]. Memo to W. Cutchins, June 19, 1963.
1200.12. Yeaman A. Outgoing cable [regarding disclosure of research on nicotine to Surgeon General's committee]. Letter to A. McCormick, July 3, 1963.
1200.16. Ellis C. [Transmitting "The Fate of Nicotine in the Body"]. Letter to W. Cutchins, July 31, 1963.
1201.01. Johnson R. Comments on nicotine. Minutes.
1202.01. McCormick A. [Re: Ariel]. Letter to A. Yeaman, July 20, 1970.
1203.01. Lisher and Co. Proposal for low delivery project for Brown and Williamson.
1205.01. BAT R&D Southampton. *Further Work on 'Extractable' Nicotine.* Southampton, England: [BAT] Research and Development Establishment; 1966. Publication RD 437-R.
1205.03. Wood DJ. *Relation Between 'Extractable Nicotine' Content of Smoke and Panel Response.* Southampton, England: [BAT] Research and Development Establishment; 1967. Publication L.228-R.
1205.14. Brotege RF, Kennedy JE. *Human Smoking Studies: Acute Effect of Cigarette Smoke on Brain Wave Alpha Rhythm—First Report.* Louisville, Ky: Brown and Williamson Tobacco Co Research and Development Department; 1974. Publication 74-20.
1205.15. Comer AK, Thornton RE. *Interaction of Smoke and the Smoker, Part 3: The Effect of Cigarette Smoking on the Contingent Negative Variation.* Southampton, England: BAT Group Research and Development Centre; 1974. Publication RD.1164-R.
1207.01. Conference on Smoking Behaviour. [BAT] Group Research and Development Centre, 1976.
1208.04. BAT Group Research and Development Centre. *Method for Nicotine and Cotinine in Blood and Urine.* Southampton, England: BAT Group Research and Development Centre; 1980. Publication RD.1737-C.
1208.05. BAT Group Research and Development Centre. *Nicotine Studies: A Second Report: Estimation of Whole Body Nicotine Dose by Urinary Nicotine and Cotinine Measurement.* Southampton, England: BAT Group Research and Development Centre; 1981. Publication R&D-L023-81.
1210.01. Research conference, United Kingdom 1984. BAT, 1984.
1212.01. Libert O. *Final Report On Project Hippo I.* Prepared for British American Tobacco Co Ltd., Geneva, Switzerland: Battelle Memorial Institute; 1962.
1212.02. Libert O. *Report No. 1 Regarding Project Hippo II.* Prepared for British American Tobacco Co Ltd. Geneva, Switzerland: Battelle Memorial Institute; 1962.
1212.03. Haselbach C, Libert O. *Final Report On Project Hippo II.* Prepared for British American Tobacco Co Ltd. Geneva, Switzerland: Battelle Memorial Institute; 1963.
1213.01. Geissbuhler H, Haselbach C. *The Fate of Nicotine in the Body.* Geneva, Switzerland: Battelle Centre de Recherche de Geneve; 1963.
1223.01. Thornton R. *Some 'Benefits' of Smoking.* Southampton, England: BAT Group Research and Development Centre; 1977. Publication RD.1461, unclassified.
1226.01. Proceedings of the Smoking Behaviour-Marketing Conference, July 9-12, 1984, session III. 1984.
1802.01. Yeaman A. [Objecting to the fact that Battelle report was sent to TIRC]. Letter to A. McCormick, June 28, 1963.
1802.02. McCormick A. Incoming cable. Letter to A. Yeaman, July 3, 1963.
1802.05. Yeaman A. Implications of Battelle Hippo I & II and the Griffith Filter, 1963.

• plasma profiles of nicotine and its metabolites.[260]

Nicotine metabolism. The industry has investigated the metabolic fate of nicotine, including the metabolites (breakdown products) of nicotine.[261] Studies have also been done on the enzymatic systems involved in nicotine

---

Isaac. The Absorption and Effects of Nicotine from Inhaled Tobacco Smoke

**INDUSTRY SUPPORTED AMA/ERF STUDIES**
Rosecrans. Brain area nicotine levels in male and female rats with different levels of spontaneous activity

Rosecrans. Brain area nicotine levels in male and female rats of two strains

**OTHER**
Cholerton. Sources of inter-individual variability in nicotine pharmacokinetics

Schmiterlow. Distribution of Nicotine in the Central Nervous System

**OTHER, Literature Review**
Edwards. Smoking, nicotine and electrocortical activity

[260] **COUNCIL FOR TOBACCO RESEARCH-USA**
Castro. Nicotine enzyme immunoassay

Haines. Radioimmunoassay of plasma nicotine in habituated and naive smokers

Monji. A Plasma nicotine pharmacokinetics in dogs after intravenous administration: Determination by radioimunassay

Rama. Distribution and Retention of nicotine and its major metabolite cotinine, in the rat as a function of time

**AMERICAN TOBACCO COMPANY**
Castro. Nicotine antibodies: comparison of ligand specificities of antibodies produced against two nicotine conjugates

**R. J. REYNOLDS COMPANY**
Davis. The determination of nicotine and cotinine in plasma

deBethizy. Absorption of nicotine from a cigarette that does not burn tobacco

Kyerematen. Pharmacokinetics of nicotine and 12 metabolites in the rat Application of a new radiometric high performance liquid chromatography assay

Kyerematen. Radiometric high performance liquid chromatographic assay for nicotine and twelve of its metabolites

**BRITISH-AMERICAN TOBACCO COMPANY, LTD. Unpublished**
Isaac. The absorption and effects of nicotine from inhaled tobacco smoke

**TOBACCO RESEARCH COUNCIL LABS., U.K.**
Armitage. Absorption and metabolism of nicotine from cigarettes

Armitage. Absorption of nicotine by man during cigar smoking [proceedings]

Armitage. Absorption of nicotine from small cigars

Armitage. The transfer of endogenous and exogenous radioisotopically labelled nicotine to mainstream cigarette smoke and its absorption into the blood of anaesthetized cats

Stepney. Behavioural regulation of nicotine intake in cigarette smokers presented with a 'shortened' cigarette [proceedings]

**OTHER**
Isaac. Cigarette smoking and plasma levels of nicotine

Isaac. Blood levels of nicotine and physiological effects after inhalation of tobacco smokeIsaac. Blood levels of nicotine and physiological effects after inhalation of tobacco smoke

Schievelbein. Nicotine Workshop

[261] **COUNCIL FOR TOBACCO RESEARCH-U.S.A**
Abood. Specific binding and metabolism of (-)- and (+)-[3H]-nicotine in isolated rat hepatocytes and hepatocyte membranes

Hibberd. Nicotine delta 1' (5)' iminium ion: a reactive intermediate in nicotine metabolism

Vincek. Synthesis of 4,4-ditritio-(+)-nicotine: comparative binding and distribution studies with natural enantiomer

**AMERICAN TOBACCO COMPANY**
Bowman. Studies on the metabolism of (-)-cotinine in the human

Bowman. Disposition and fate of (-)-cotinine-H3 in the mouse

Hucker. Studies on the metabolism of nornicotine in the dog

Larson. Studies on the fate of nicotine in the body III: On the pharmacology of some methylated and demethylated derivatives of nicotine

Larson. Studies on the fate of nicotine in the body IV: Observations on the chemical structure of an end product of nicotine metabolism

McKennis. Gamma-(3-pyridyl)-gamma-methylaminobutyric acid as a urinary metabolite of nicotine

McKennis. The excretion and metabolism of nicotine

McKennis. Mammalian degradation of (-)-nicotine to 3-pyridylacetic acid and other compounds

McKennis. Demethylation in the metabolism of (-)-nicotine

McKennis. Metabolic release of methyl groups from a series of N-methylpyridinium compounds

McKennis. Metabolism of nicotine to (+)-gamma-(3-pyridyl)-gamma- methylaminobutyric acid

McKennis. Demethylation of cotinine in vivo

McKennis. Metabolites of nicotine and a synthesis of nornicotine

metabolism.[262] Industry-suppc—d research shows that smokers metaboliz— nicotine faster than non-smokers because one or more of the substances in cigarette smoke increases the production of the enzymes that metabolize nicotine.[263] Industry-funded studies have also shown that there may be gender differences in the metabolism of nicotine.[264]

Nicotine pharmacodynamics. The tobacco industry has studied a wide range of factors related to the pharmacodynamics of nicotine and nicotine delivery systems. (Pharmacodynamics is the study of a drug's effects on the body over time. A pharmacodynamic study would involve, for example, administering a drug and then evaluating its behavioral and physiological effects over time.) The industry has funded research on:

- factors affecting the onset and duration of nicotine's physiological effects on the body;[265]

---

McKennis. Demethylation in the metabolism of (-)-nicotine in vivo

McKennis. N-methylation of nicotine and cotinine in vivo

McKennis. The Metabolic Formation of Gamma-(3-Pyridyl)-Gamma- Hydroxybutyric Acid and Its Possible Intermediary Role in the Mammalian Metabolism of Nicotine

McKennis. The isolation and structure of a ketoamide formed in the metabolism of nicotine

Meacham. Additional routes in the metabolism of nicotine to 3-pyridylacetate

Miller. Observations on the metabolism of nicotine by tissue slices

Owen. Studies on the fate of nicotine in the animal body VIII: Observations on the nubmer and chemical nature of nicotine metabolites in the dog and cat

Schwartz. Studies on the degradation of the pyrrolidine ring of (-)-nicotine in vivo

Schwartz. Mammalian degradation of (-)-demethylcotinine

R. J. REYNOLDS COMPANY
Caldwell. Characterization of the glucuronide conjugate of cotinine: a previously unidentified major metabolite of nicotine in smokers' urine

Kyerematen. Disposition of nicotine and eight metabolites in smokers and nonsmokers: Identification in smokers of two metabolites that are longer lived than cotinine

TOBACCO RESEARCH COUNCIL LABS., U.K.
Jenner. Factors affecting the in vitro metabolism of R-(+)- and S-(-)-nicotine by guinea-pig liver preparations

Jenner. Species variation in the metabolism of R-(+)- and S-(-)-nicotine by alpha-C- and N-oxidation in vitro

OTHER
Fuxe. On the action of nicotine and cotinine on central 5-hydroxytryptamine

[262] COUNCIL FOR TOBACCO RESEARCH-U.S.A
Hibberd. Enzymology of the metabolic pathway from nicotine to cotinine, in vitro

Wilson. Nicotine-like actions of cis-metanicotine and trans-metanicotine

R. J. REYNOLDS COMPANY
Hammond. Metabolism of nicotine by rat liver cytochromes P-450: Assessment utilizing monclonal antibodies to nicotine and cotinine

[263] COUNCIL FOR TOBACCO RESEARCH-U.S.A
Hatchell. The influence of genotype and sex on behavioral sensitivity to nicotine in mice

Jusko. Role of tobacco smoking in pharmacokinetics

TOBACCO RESEARCH COUNCIL LABS., U.K.
Beckett. The effect of smoking on nicotine metabolism in vivo in man

[264] COUNCIL FOR TOBACCO RESEARCH-U.S.A
Jusko. Role of tobacco smoking in pharmacokinetics

TOBACCO RESEARCH COUNCIL LABS., U.K.
Beckett. The effect of smoking on nicotine metabolism in vivo in man

OTHER
Cohen. Monograph on the Pharmacology and Toxicology of Nicotine and its Role in Tobacco Smoking

[265] COUNCIL FOR TOBACCO RESEARCH-USA
Domino. Electroencephalographic and behavioral arousal effects of small doses of nicotine: A neuropsychopharmacological study

Hoff. Neurophysiological aspects of the action of nicotine

Lapin. Dopamine-like action of nicotine: lack of tolerance and reverse tolerance

Stitzer. Effects of nicotine on fixed-interval behavior and their modification by cholinergic antagonists

TOBACCO RESEARCH COUNCIL LABS., U.K.
Armitage. Absorption of nicotine in cigarette and cigar smoke through the oral mucosa

- the relationship of nicotine's physiological effects on the body to nicotine blood levels;[266] and
- physiological effects of ...cotine on the brain and their time-course

### 3. Industry Research Establishes That Nicotine Produces Pharmacological Effects Similar to Those of Other Addictive Drugs

The tobacco industry has conducted or sponsored studies which demonstrate that nicotine produces pharmacological effects similar to those of other addictive substances. See FINDINGS § I.B., supra, for a discussion of the properties of addictive substances. Indeed, a number of industry-funded studies state that

---

**COUNCIL FOR TOBACCO RESEARCH-USA, Literature Reviews**
Larson. Tobacco -- Experimental and Clinical Studies -- A Comprehensive Account of the World Literature -- Supplement I

Larson. Tobacco -- Experimental and Clinical Studies -- A Comprehensive Account of the World Literature -- Supplement II

Larson. Tobacco -- Experimental and Clinical Studies -- A Comprehensive Account of the World Literature --Supplement III

**OTHER**
Battig. Smoke yield of cigarettes and puffing behavior in men and women

Nordberg. Pharmacodynamic effects of nicotine and acetylcholine biosynthesis in mouse brain

[266] **COUNCIL FOR TOBACCO RESEARCH-U.S.A**
Hatchell. The influence of genotype and sex on behavioral sensitivity to nicotine in mice

Westfall. Influence of nicotine on catecholamine metabolism in the rat

**R.J. REYNOLDS COMPANY**
Pritchard. Flexible effects of quantified cigarette-smoke delivery on EEG dimensional complexity

**BRITISH-AMERICAN TOBACCO COMPANY, LTD. Unpublished**
Isaac. The absorption and effects of nicotine from inhaled tobacco smoke

**OTHER**
Isaac. Blood levels of nicotine and physiological effects after inhalation of tobacco smoke

[267] **COUNCIL FOR TOBACCO RESEARCH-U.S.A**
Abood. Comparison of the binding of optically pure (-)- and (+)-[3H]nicotine to rat brain membranes

Andersson. Effects of withdrawal from chronic exposure to cigarette smoke on hypothalamic and preoptic catecholamine nerve terminal systems and on the secretion of pituitary hormones in the male

Andersson. Effects of acute intermittent exposure to cigarette smoke on catecholamine levels and turnover in various types of hypothalamic DA and NA nerve terminal systems as well as on the secretion of adenohypophyseal hormones and corticosterone

Bhagat. Influence of chronic administration of nicotine on the turnover and metabolism of noradrenaline in the rat brain

Fuxe. Increases in dopamine utilization in certain limbic dopamine terminal populations after a short period of intermittent exposure of male rats to cigarette smoke

Fuxe. Effects of Nicotine and exposure to cigarette smoke on discrete dopamine and noradrenaline nerve terminal systems of the telencephalon and diencephalon of the rat: Relationship to reward mechanisms and neuroendocrine functions and distribution of nicotinic binding sites in brain

Tung. Peripheral induction of burst firing in locus coeruleus neurons by nicotine mediated via excitatory amino acids

Wong. Pharmacology of nicotinic receptor-mediated inhibition in rat dorsolateral septal neurones

Yamamoto. Nicotine-induced EEG and behavioral arousal

**R.J. REYNOLDS COMPANY**
Byrd. Evidence for urinary excretion of glucuronide conjugates of nicotine, cotinine, and trans-3'-hydroxycotinine in smokers

**INDUSTRY SUPPORTED SYMPOSIA**
Binnie. The effect of cigarette smoking on the contingent negative variation (CNV) and eye movement

**INDUSTRY SUPPORTED AMA/ERF STUDIES**
Hirschhorn. Studies on the time course and the effect of cholinergic and adrenergic receptor blockers on the stimulus effect of nicotine

Rosecrans. Brain area nicotine levels in male and female rats with different levels of spontaneous activity

**TOBACCO RESEARCH COUNCIL LABS., U.K.**
Armitage. The effects of nicotine on the electrocorticogram and spontaneous release of acetylcholine from the cerebral cortex of the cat

Wesnes. Smoking, nicotine and human performance

**OTHER**
Fuxe. On the action of nicotine and cotinine on central 5-hydroxytryptamine neurons

Hasenfratz. Development of central and peripheral smoking effects over time

Hasenfratz. Can smoking increase attention in rapid information processing during noise? Electrocortical, physiological and behavioral effects

Perez de la Mora. Neurochemical effects of nicotine on glutamate and GABA mechanisms in the rat brain

**OTHER, Literature Review**
Edwards. Smoking, nicotine and electrocortical activity

nicotine is an addictive/depend—ce-producing drug.[268]

Nicotine psychoactivity and discrimination studies. Industry studies have shown that nicotine is psychoactive and produces clearly discriminable stimulus effects[269] in both animals and humans.[270]

Nicotine reinforcement/self-administration studies. The industry has examined nicotine's ability to serve as a positive reinforcer in self-administration studies involving rats and monkeys. For example, Philip Morris conducted studies in rats demonstrating that nicotine is self-administered by rats and has other hallmark properties of addictive susbstances.[271] The industry-supported research on monkeys led prominent drug addiction researchers Deneau and Inoki to conclude in a paper published in 1967 that nicotine "may be one of

---

[268] COUNCIL FOR TOBACCO RESEARCH-U.S.A
Bosse. Age and addiction to smoking

Martin. Tobacco Smoking and Nicotine: A Neurobiological Approach

Rosecrans. Noncholinergic Mechanisms involved in the behavioral and stimulus effects of nicotine, and relationships to the process of nicotine dependence

Rosecrans. Nicotine as a discriminative stimulus: a neurobehavioral approach to studying central cholinergic mechanisms

Svensson. Effect of nicotine on dynamic function of brain catecholamine neurons

Tung. Peripheral induction of burst firing in locus coeruleus neurons by nicotine mediated via excitatory amino acids

Williams. Stability of a factor-analytic description of smoking behavior

TOBACCO RESEARCH COUNCIL LABS., U.K.
Hall. New evidence for a relationship between tobacco smoking, nicotine dependence, and stress

OTHER
Andersson. Effects of acute central and peripheral administration of nicotine on ascending dopamine pathways in the male rat brain. Evidence for nicotine-induced increases of dopamine turnover in various telencephalic dopamine nerve terminal systems

Nisell. Systemic nicotine-induced dopamine release in the rat nucleus accumbens is regulated by nicotinic receptors in the ventral tegmental area

[269] These effects are evaluated in animals using drug discrimination techniques which enable direct comparisons of the effects of different drugs. Such studies evaluate whether an animal experiences a psychoactive effect from a drug and facilitate comparisons of the effect of the study drug with the effect of other psychoactive drugs. Industry-funded studies have shown that animals can distinguish (discriminate) nicotine from other drugs or a placebo, and can communicate their identification of nicotine (as distinct from other drugs) to the investigator by pressing a bar or providing other behavioral signals. These studies also provide information on the similarity of nicotine's effects to effects of other dependence-producing drugs, including the degree to which nicotine mimics the psychoactive effects of those other drugs. *See* p. 95.

[270] INDUSTRY SUPPORTED AMA/ERF STUDIES
Hirschhorn. Studies on the time course and the effect of cholinergic and adrenergic receptor blockers on the stimulus effect of nicotine

Schechter. Behavioral evidence for two types of cholinergic receptors in the C.N.S.

Schechter. Behavioral tolerance to an effect of nicotine in the rat

Schechter. Effect of mecamylamine on discrimination between nicotine- and arecoline- produced cues

Schechter. Nicotine as a discriminative cue in rats: inability of related drugs to produce a nicotine-like cueing effect

Schechter. Nicotine as a discriminative stimulus in rats depleted of norepinephrine or 5-hydroxytryptamine

Schechter. C.N.S. effect of nicotine as the discriminative stimulus for the rat in a T-maze

COUNCIL FOR TOBACCO RESEARCH-U.S.A
Chance. A comparison of nicotine and structurally related compounds as discriminative stimuli

Rosecrans. Nicotine as a discriminative stimulus: a neurobehavioral approach to studying central cholinergic mechanisms

PHILIP MORRIS TOBACCO COMPANY
Kallman. Nicotine as a discriminative stimulus in human subjects

TOBACCO RESEARCH COUNCIL LABS., U.K.
Morrison. Nicotine injections as the conditioned stimulus in discrimination learning

[271] PHILIP MORRIS TOBACCO COMPANY, Unpublished
DeNoble. Manuscript: Nicotine as a Positive Reinforcer for Rats: Effects of Infusion Dose and Fixed Ratio Size

See also pp. 278-79, *infra*.

INDUSTRY SUPPORTED AMA/ERF STUDIES
Deneau. Nicotine self-administration in monkeys

the substances in tobacco smoke which is responsible for man's use of tobacco."[272] The industry has also funded studies demonstrating that nicotine could enhance the rewarding effe... of electrical brain stimulation.[273] A book resulting from The International Smoking Behaviour Conference held at Chelwood Vachery, Sussex, England, in 1978, which was edited by a senior scientist at British-American Tobacco, included a "Conference Overview" stating: "At this stage, we hypothesize that nicotine (possible [sic] interacting with tar) is the main reinforcing agent in cigarettes . . . "[274] Moreover, as noted earlier, the industry has conducted studies showing that nicotine is active in the same dopaminergic pathways that modulate cocaine's effects. These studies are relevant to understanding how nicotine causes addiction.

<u>Tolerance to nicotine</u>. Tolerance to the physiological and behavioral effects of nicotine has been thoroughly studied by the tobacco industry and has been demonstrated to occur in animals as a result of nicotine use.[275]

---

[272] INDUSTRY SUPPORTED AMA/ERF STUDIES
Deneau. Nicotine self-administration in monkeys

[273] COUNCIL FOR TOBACCO RESEARCH-U.S.A.
Olds. Comparision of muscarinic and nicotinic cholinergic agonists on self-stimulation behavior

Pradan. Effects of nicotine on self-stimulation in rats

[274] INDUSTRY SUPPORTED SYMPOSIA
Jarvik. Smoking Behaviour – Physiological and psychological influences. 31. Conference overview

[275] COUNCIL FOR TOBACCO RESEARCH-U.S.A
Abood. Acute and chronic effects of nicotine in rats and evidence for a non-cholinergic site of action

Abood. Behavioral and biochemical studies in rats after chronic exposure to nicotine

Andersson. Effects of withdrawal from chronic exposure to cigarette smoke on hypothalamic and preoptic catecholamine nerve terminal systems and on the secretion of pituitary hormones in the male

Cronan. Effects of chronically administered nicotine and saline on motor activity in rats

Domino. Tolerance to the effects of daily nicotine on rat bar pressing behavior for water reinforcement

Fuxe. Effects of nicotine and exposure to cigarette smoke on discrete dopamine and noradrenaline nerve terminal systems of the telencephalon and diencephalon of the rat: Relationship to reward mechanisms and neuroendocrine functions and distribution of nicotinic binding sites in brain

Lapin. Dopamine-like action of nicotine: lack of tolerance and reverse tolerance

Nelsen. Improvement of performance on an attention task with chronic nicotine treatment in rats

Rosecrans. Noncholinergic Mechanisms involved in the behavioral and stimulus effects of nicotine, and relationships to the process of nicotine dependence

Stitzer. Effects of nicotine on fixed-interval behavior and their modification by cholinergic antagonists

Wenzel. Studies on the acute and chronic depressor actions of nicotine in the rat

Westfall. Studies on the mechanism of tolerance to nicotine-induced elevations of urinary catecholamines

R. J. REYNOLDS COMPANY
Bjercke. Anti-idiotypic antibody probes of neuronal nicotinic receptors

Collins. Modulation of nicotine receptors by chronic exposure to nicotinic agonists and antagonists

Marks. Downregulation of nicotinic receptor function after chronic nicotine infusion

PHILIP MORRIS TOBACCO COMPANY, Unpublished
DeNoble. Manuscript: Development of behavioral tolerance following chronic nicotine administration.

INDUSTRY SUPPORTED AMA/ERF STUDIES
Schechter. Behavioral tolerance to an effect of nicotine in the rat

TOBACCO RESEARCH COUNCIL LABS., U.K.
Morrison. The occurrence of tolerance to a central depressant effect of nicotine

OTHER
Larsson. Subchronic treatment of rats with nicotine: effects on tolerance and on [3H]acetylcholine and [3H]nicotine binding in the brain

Nordberg. Effect of acute and subchronic nicotine treatment on cortical acetylcholine release and on nicotinic receptors in rats and guinea-pigs

Nordberg. Effect of long-term nicotine treatment on [3H]nicotine binding sites in the rats brain

Nicotine's withdrawal effects. Sci—tists funded by the tobacco industry hav—conducted research on various aspects of withdrawal, including potential neurochemical mechanisms[276] and the effects of withdrawal on performance.[277] Symptoms of withdrawal may include craving, irritability, nervousness, tension, emotional strain, depression, inability to concentrate, sleep disturbance, sweating, gastrointestinal changes, drop in blood pressure and pulse rate, impaired performance, and changes in the electroencephalogram.[278]

The industry has also funded studies showing that tobacco users report "craving" for tobacco.[279]

Continued use of tobacco despite attempts to quit. As described in § II.C.4., infra, the tobacco industry has conducted a number of studies documenting the large percentage of tobacco users who have attempted to quit using tobacco and the very small percentage who have succeeded.

---

[276] **COUNCIL FOR TOBACCO RESEARCH-U.S.A**
Andersson. Effects of withdrawal from chronic exposure to cigarette smoke on hypothalamic and preoptic catecholamine nerve terminal systems and on the secretion of pituitary hormones in the male

Fuxe. Effects of Nicotine and exposure to cigarette smoke on discrete dopamine and noradrenaline nerve terminal systems of the telencephalon and diencephalon of the rat: Relationship to reward mechanisms and neuroendocrine functions and distribution of nicotinic binding sites in brain

Rosecrans. Noncholinergic Mechanisms involved in the behavioral and stimulus effects of nicotine, and relatinships to the process of nicotine dependence

**COUNCIL FOR TOBACCO RESEARCH-U.S.A., Literature Reviews**
Larson. Tobacco -- Experimental and Clinical Studies -- A Comprehensive Account of the World Literature -- Supplement II

Larson. Tobacco -- Experimental and Clinical Studies -- A Comprehensive Account of the World Literature --Supplement III

**AMERICAN TOBACCO COMPANY**
Finnegan. The role of nicotine in the cigarette habit

[277] **COUNCIL FOR TOBACCO RESEARCH-U.S.A**
Heimstra. The effects of deprivation of cigarette smoking on psychomotor performance

Heimstra. Effects of smoking upon sustained performance in a simulated driving task

**COUNCIL FOR TOBACCO RESEARCH-U.S.A., Literature Reviews**
Fuxe. Neuroendocrine actions of nicotine and of exposure to cigarette smoke: medical implications

Larson. Tobacco -- Experimental and Clinical Studies -- A Comprehensive Account of the World Literature --Supplement III

**OTHER**
Hasenfratz. Psychophysiological reactions during active and passive stress coping following smoking cessation

[278] **COUNCIL FOR TOBACCO RESEARCH-U.S.A., Literature Reviews**
Larson. Tobacco -- Experimental and Clinical Studies -- A Comprehensive Account of the World Literature -- Supplement II

Larson. Tobacco -- Experimental and Clinical Studies -- A Comprehensive Account of the World Literature --Supplement III

**AMERICAN TOBACCO COMPANY**
Finnegan. The role of nicotine in the cigarette habit

[279] **R. J. REYNOLDS COMPANY**
Robinson. The meaning of addiction: reply to West

**OTHER**
Hasenfratz. Development of central and peripheral smoking effects over time

Hasenfratz. Post-lunch smoking for pleasure seeking or arousal maintenance?

## C. INDUSTRY RESEARCH ON THE CONSUMER'S NEED FOR AN ADEQUATE DOSE OF NICOTINE

### 1. Industry Research on Importance of Supplying Sufficient Nicotine to Provide Consumer Acceptance and "Satisfaction"

The industry has conducted extensive research establishing that smokers require a certain level of nicotine from their cigarettes and that tobacco "satisfaction" is attributable to nicotine's systemic effects after absorption, rather than to its immediate sensory effects in the mouth, nose, and throat.[280]

In the mid 1970's, BATCO Group Research & Development conducted Project Wheat, a study whose purpose was to identify the different motivations for smoking and correlate those motivations with what BATCO characterized as a smoker's "Inner Need level."[281] The researchers established smokers' "Inner Need level" by identifying the extent to which they smoked to relieve stress, to aid concentration, and as a food substitute to avoid weight gain.[282] In other words, a smoker's "Inner Need" was defined by the extent to which the smoker used cigarettes for the drug effects of nicotine. (See description of the effects of nicotine on mood and weight in FINDINGS § I.D., supra.) The researchers hypothesized that the "Inner Need

---

[280] BATCO Group Research & Development Centre. Research Conference. Southampton, England. September, 1984. Page 1. Proposed Revisions for 1985-87:

> *Specific attention will be focussed on nicotine to identify its contribution to product attributes, particularly acceptability and satisfaction. A range of de-nicotinised tobacco blends, supplemented with varying levels of nicotine, will be prepared. These will be used in studies aimed at assessing the specific sensory properties of nicotine and the relationship between tar and nicotine in terms of product acceptability. The studies will provide an initial opportunity to separate immediate product acceptability from longer-term satisfaction.*

[281] *See* Project Wheat - Part 1, note 204, *supra,* at p. 1; Project Wheat - Part 2, note 204, *supra,* at p. 1.

[282] *See* Project Wheat - Part 1, note 204, *supra,* at pp. 5, 10-11, 16-25.

level" would correlate with the smoker's preferred nicotine delivery, and that smokers with higher "Inner Need" would prefer cigarettes that delivered higher nicotine levels.

Project Wheat was intended to help BATCO develop cigarettes that were more acceptable to consumers.[283] The Project Wheat researchers emphasized the importance of nicotine delivery over all other product features (including taste) in achieving an acceptable and satisfying cigarette:

> *In considering which product features are important in terms of consumer acceptance, the nicotine delivery is one of the more obvious candidates. Others include the taste and flavour characteristics of the smoke, physical features such as draw resistance and rate of burn, and the general uniformity of the product, to name but a few. The importance of nicotine hardly needs to be stressed, as it is so widely recognised.*[284] [Emphasis added.]

The researchers found that "Inner Need" correlated positively with daily cigarette consumption, depth of inhalation, and anticipated difficulty in giving up smoking; i.e., a higher "Inner Need" smoker would smoke more cigarettes, inhale more deeply, and anticipate greater difficulty in quitting smoking than a lower "Inner Need" smoker.[285] The researchers concluded that "Inner Need" defined a requirement for nicotine by the smoker.[286]

---

[283] *See* Project Wheat - Part 1, note 204 *supra,* at p.1.

[284] *See* Project Wheat - Part 1, note 204 *supra,* at p. 3.

[285] *Id.* at p. 2.

[286] BATCO Group R&D *Conference on Smoking Behavior.* October 11-12, 1976, at p. BW-W2-02295.

The Project Wheat researchers also found that smokers of low nicotine delivery cigarettes derive less satisfaction from their cigarettes than smokers of medium or high nicotine cigarettes.

> *Compared with the other two categories of smoker [medium and high], those respondents who smoke low nicotine cigarettes (less than 1.0 mg per cigarette) see their brand as milder, smoother, less satisfying and with not quite such a good taste, comments which are of course perfectly logical.*

Project Wheat - Part 2, note 204, *supra,* at p. 10.

Tobacco industry documents show that smoker "satisfaction" is one of the key attributes of consumer acceptance of tobacco products. These documents also make clear that "satisfaction" is a tobacco industry euphemism that refers to the pharmacological response to nicotine that smokers seek to obtain from smoking.[287] A BATCO scientist, in a 1969 presentation describing the research activities of BATCO Group Research & Development, stated that:

> *The presence of nicotine is the reason why the tobacco plant was singled out from all other plants for consumption in this rather unusual way.*

---

[287] Wood DJ. BATCO Group Research & Development. "Aspects of the R&DE Function. Notes for a talk given at Chelwood. September, 1969." (The document bears the date July 20, 1970). Page 7.

*See also:*
Proceedings of BATCO Group R&D Smoking Behaviour-Marketing Conference, Session I. July 9-12, 1984. Session I discusses nicotine's whole body dose and its relationship to smoker satisfaction. *See*, e.g., p. BW-W2-03242: nicotine underlies smoking maintenance "and as a consequence probably provides the basis of smoking satisfaction"; at p. 03243: nicotine's "whole body response [is] associated with satisfaction." Session II discusses methods for assessing smoker response to changing deliveries:

> *German butt analysis [testing of cigarette butts to determine smokers' nicotine uptake] and switching experiments [exposing smokers to cigarettes with varying deliveries] were used to indicate the capacity of external studies [as opposed to laboratory measures of smokers' nicotine uptake] to indicate . . . measurement of smokers changing the way they smoke in order to satisfy their needs.*

Ferris, RP. Notes from the Proceedings of the Smoking Behaviour-Marketing Conference. July 9-12, 1984. Page 21.

Imperial Tobacco. Matinee Marketing Strategy. 1971. Page 11. "A cigarette that delivers physiological satisfaction, yet is low in tar and nicotine, must surely be a major objective..."

BATCO Structured Creativity Conference. Southampton, England. June 25-28, 1984. The purpose of this conference was "to stimulate genuinely innovative product-based project ideas." Moist snuff was proposed as an alternative to cigarettes so as "[t]o capitalise on the potential downtrend of the smoking habit as the only means to achieve <u>nicotine satisfaction</u> by participating in a parallel product market free of social/health concerns and with attractive profitability." [Emphasis added.]

BATCO Group R & D. Research Conference. Rio de Janeiro, Brazil. August 22-26, 1983, at p. BW-W2-01838.

BATCO Group R & D. Nicotine Conference Outline. Southampton, England. June 6-8, 1984, at p. BW-W2-01977.

*Nicotine has well documented pharmacological action. It is claimed to have a dual effect, acting both as a stimulant and a tranquilliser. It is believed to be responsible for the "satisfaction" of smoking, using this term in the physiological rather than the psychological sense.*[288]

The proceedings to the 1983 BATCO Group R&D Research Conference in Rio de Janeiro state that:

*The basic assumption is that nicotine, which is almost certainly the key smoke component for satisfaction, is fully released to the body system before exhalation takes place.* [Emphasis added].[289]

A 1984 BATCO Nicotine Conference similarly concluded that:

*Intuitively it is felt that "satisfaction" must be related to nicotine. Many people believe it [is] a "whole body response" and involves the action of nicotine in the brain.*[290]

An RJR-MacDonald Marketing Summary Report from 1983 concludes that the primary reason people smoke "is probably the physiological satisfaction provided by the nicotine level of the product."[291]

The term "satisfaction" is also used by the smokeless tobacco industry to refer to the physiological effects of nicotine on the user. The senior vice president for marketing of the U.S. Tobacco Co. wrote in a memo on new product development:

*Flavorwise we should try for innovation, taste and strength, nicotine should be medium . . . Virtually all tobacco usage is based upon nicotine, "the kick."*

---

[288] *See* Wood, note 287, *supra*, at p. 7.

[289] *See* BATCO Group R & D Research Conference, Rio de Janeiro, 1983, note 287, *supra,* at p. 10.

[290] *See* BATCO Conference Outline, 1984, note 287, *supra,* at p. BW-W2-01977.

[291] *RJR-MacDonald v. Canada*, 5.3 TPLR 4.26.

*satisfaction*. [Emphasis added.][292]

These documents show that tobacco companies know that tobacco "satisfaction" is provided by nicotine's pharmacological effects on the brain and that the industry strives to offer products that meet this need.

[292] Deposition of Per Erik Lindqvist, *Marsee v. U.S. Tobacco,* Civil Action No. 84-2777R (W.D. Ok. 1986). Transcript of Jury Trial Proceedings at p.1662. In: 1.7 TPLR 3.216.

## 2. Industry Research to Determine the Minimum and Maximum "Dose" of Nicotine Required by Consumers of Tobacco

The tobacco industry has focused extensive research efforts on methods to assay systemic nicotine absorption so that it may estimate nicotine doses obtained and required by smokers.[293] Tobacco company documents reveal that the primary purposes of these efforts are to better understand the relationship between nicotine dose and nicotine's pharmacological effects in smokers, and to establish the level of nicotine that must be provided in tobacco to produce these effects. Better knowledge of nicotine's dose-response effect in smokers results in a better understanding of how smokers respond to cigarettes with varying nicotine deliveries and how different doses of nicotine may affect smoker satisfaction.

As early as 1970, the tobacco industry had investigated and attempted to determine the

---

[293] *See e.g.*:
BATCO. *Fate of Nicotine in the Body*. 1963.

BATCO R&D. *Relation Between 'Extractable Nicotine' Content of Smoke and Panel Response*. March 17, 1967.

BATCO R&D. *Nicotine in Smoke and Human Physiological Response*. March 26, 1970.

BATCO. *Relative Contributions of Nicotine and Carbon Monoxide to Human Physiological Response*. November 15, 1971.

BATCO Group R&D *Further Studies of the Effect of Nicotine on Human Physiological Response*. June 5, 1973.

*Proceedings of the BATCO Group R&D Smoking Behaviour-Marketing Conference*. Session I. July 9-12, 1984. Page 16 (slides).

*See* Ayres, note 172, *supra*.

BATCO Group R&D *Nicotine Studies: A Second Report. Estimation of Whole Body Nicotine Dose by Urinary Nicotine and Cotinine Measurement*. March 31, 1981. Page 3.

*Proceedings of the BATCO Smoking Behaviour-Marketing Conference, Session I* (1984):21, slide at p. BW-W2-03243; *Session II* (1984):21, slide at p. BW-W2-02406.

minimum level of nicotine necessary for consumer acceptance. At a BATCO R&D Conference held that year, the conferees agreed that:

> *Nicotine is important, and there is probably a minimum level necessary for consumer acceptance in any given market.*[294]

A 1972 Philip Morris document from a Council for Tobacco Research conference addressing why people smoke reveals the basis of the industry's concern about maintaining nicotine levels above a defined minimum:

> *Despite many low nicotine brand entries into the marketplace, none of them have captured a substantial segment of the market. In fact, critics of the industry would do well to reflect upon the indifference of the consumer to the industry's efforts to sell low-delivery brands. 94% of the cigarettes sold in the U.S. deliver more than 1 mg of nicotine. 98.5% deliver more than 0.9 mg. The physiological response to nicotine can readily be elicited by cigarettes delivering in the range of 1 mg of nicotine.* [Emphasis added.][295]

Similarly, the 1984 BATCO Group R & D Nicotine Conference concluded:

> *Cigarettes which have a delivery of less than 0.7 mg of nicotine per cigarette as measured on a smoking machine, do not achieve large volume sales.*[296]

In Project Wheat, discussed in § II.C.1., supra, a 0.7 mg nicotine test cigarette was found to be unacceptable by smokers regardless of the smokers' relative nicotine requirements; the low-dose product was rejected by smokers with both high and low nicotine requirements.[297]

An internal Philip Morris document from 1978, detailing plans to study cigarettes with

---

[294] BATCO Group R&D *Summary Conclusions: Group Research Conference.* St Adele, Canada. September 11, 1970. Page 1.

[295] *See* Dunn, note 133, *supra,* at p. 4.

[296] BATCO Conference Outline, 1984, note 287 *supra,* at p. BW-W2-01977.

[297] *See* Project Wheat - Part 2, note 204, *supra,* at p. 47.

different levels of nicotine at a given tar level, shows that Philip Morris, too, conducted studies to find the minimum level of nicotine delivery necessary to satisfy smokers' need for nicotine:

> *Question 4.* *Tar delivery delivery being the same, what are the behavioral consequences of smoking low nicotine rather than high nicotine cigarettes?*
> *This question will be answered by conducting a series of shift studies using cigarettes of similar low tar but differential nicotine deliveries. The low nicotine delivery will ensure that the total nicotine in the system remains at or near the nicotine need threshold, thus maximizing the proportion of the day's cigarette consumption which is smoked out of need . . .*
> *The results may shed light on the manner by which nicotine control is achieved.*[297a] [Emphasis added.]

Demonstrating the industry's continuing interest in determining the minimum dose of nicotine that must be contained in a cigarette to provide satisfaction, the BATCO "Group R&D Research Programme, 1984: Proposed revisions for 1985-87," states that studies would be done by the industry

> *to establish the minimum dose of smoke nicotine that can provide pharmacological satisfaction for the smoker.* [Emphasis added.][298]

One key to identifying the minimum and maximum doses of nicotine was the development of a method to accurately measure nicotine in the human body. A 1976 Council for Tobacco Research Annual Report identifies a need for better methods to measure nicotine levels in human smokers:

> *. . .an expansion of information on the actual ranges or durations of plasma nicotine levels attained by human smokers (and users of other forms of tobacco) under actual conditions of life should be attainable . . . Sensitive, specific and rapid assays for plasma nicotine and its major metabolites have*

[297a] Memorandum to T.S. Osdene from W.L. Dunn. Plans and Objectives - 1979. December 6, 1978. *In* Cong Rec. H7670 (daily ed. July 25, 1995).

[298] *See* BATCO, note 280, *supra*, at p. 2.

*long been needed.*[299]

Another series of studies conducted by Philip Morris was designed to discover the relationship between the dose of nicotine provided by a cigarette, the level of nicotine in the bloodstream following that cigarette, and the length of time before the nicotine in the bloodstream fell to the point that the smoker experienced the urge for another cigarette. This required Philip Morris to develop an assay for nicotine and saliva and correlate salivary nicotine with blood nicotine:

> *Our theorizing on the role of nicotine suggests that cigarettes will be smoked whenever body nicotine content drops below a certain (unknown) level. . . .*
> *We are engaged in systematic investigation of the changes in salivary nicotine content as a function of the time since smoking and magnitude of intake . . . .*
> *Assuming that salivary nicotine concentrations will reflect blood nicotine concentrations, we can then proceed to a fourth stage in the research, relating the easily obtained salivary concentrations to the urge to smoke.*[299a] [Emphasis added.]

A 1980 BATCO Group R&D study report, "Method for Cotinine and Nicotine in Blood and Urine," describes an improved analytical method for the simultaneous measurement of nicotine and cotinine (nicotine's major metabolite in man) in samples of blood and urine.[300]

---

299 Report of the Council for Tobacco Research - U.S.A., Inc. Annual Report 1976. Page 12.

299a Memorandum to T.S. Osdene from W.L. Dunn. Plans and Objectives - 1980. January 7, 1980. *In* Cong Rec. H7672 (daily ed. July 25, 1995).

300 Read GA, Anderson IGM. BATCO Group R&D *Method for Nicotine and Cotinine in Blood and Urine.* Report No. RD 1737-C. May 21, 1980. Page 12 (established and validated an assay for nicotine and cotinine in blood and urine that is sufficiently sensitive to determine changes in ". . . plasma levels of nicotine achieved in response to varying concentrations of or different dose levels of nicotine").

*See also New Cigarette Prototypes that Heat Instead of Burn Tobacco.* Winston-Salem, NC: R.J. Reynolds Tobacco Co. 1988:457-557. Comparative study of humans smoking the NEW CIGARETTE and a Reference Cigarette. (Compared nicotine pharmacokinetics in smokers smoking the New (heated tobacco) cigarette and a regular burning cigarette to determine whether the New cigarette provided a nicotine dose comparable to a regular burning cigarette. Researchers measured smokers' plasma and urine

The method was developed to better study the systemic effects of nicotine and the extent to which those effects influence smoking behavior and smoker satisfaction. The report states:

> *In some instances, the pharmacological response of smokers to nicotine is believed to be responsible for an individual's smoking behaviour, providing the motivation for and the degree of satisfaction required by the smoker. [Emphasis added.]*[301]
>
> *Naturally, during any study of the biological effect of nicotine it is of paramount importance to accurately assess the dose of nicotine absorbed . . . [W]here the causal relationship between nicotine and individual biochemical, physiological or psychological responses are to be investigated, accurate information regarding nicotine dose is essential.* [Emphasis added.][302]

A 1981 BATCO Group R&D study developed a rat model to estimate "whole body nicotine dose" by measuring urinary nicotine and cotinine levels. The researchers concluded that the model would likely be a good predictor of nicotine dose in humans and, therefore, would aid in understanding the relationship between nicotine delivery and smokers' choice of particular brands:

> *These results strongly suggest that the whole body dose of nicotine can be predicted from urinary levels of nicotine and cotinine. The findings have immediate and obvious significance to both animal toxicity and human behavioural studies. They are particularly relevant to the development of an understanding of an individual smoker's daily nicotine requirement and the relationship between nicotine dose and smoking behaviour under conditions of brand switching/delivery modification.* [Emphasis added.][303]

A presentation at a 1983 BATCO Smoking Behavior Conference describes how to

---

concentrations of nicotine to compare nicotine doses.)

[301] *See* Read, note 300, *supra,* at p. 2.

[302] *Id.* at pp. 2-3.

[303] BATCO Group R&D *Nicotine Studies: A Second Report. Estimation of Whole Body Nicotine Dose by Urinary Nicotine and Cotinine Measurement.* March 3, 1981, at pp. 9-10.

design and execute a study of plasma cotinine as a function of cigarette nicotine delivery.[304] It establishes that there is a linear relationship between plasma cotinine and nicotine delivery. A session on "Nicotine Dose Estimation" at BATCO's 1984 Smoking Behaviour-Marketing Conference was intended "to review the current status of plasma/urinary measures estimates [sic] of nicotine dose and to identify the significance of those measures for the smoker and product design." It was concluded that:

> *[u]nder appropriate conditions plasma nicotine and cotinine measures can be used to estimate daily nicotine intake.*[305]

Using assay methods such as those discussed above, tobacco companies have discovered that smokers obtain a fairly consistent dose of nicotine from tobacco. Moreover, tobacco companies are aware that smokers obtain this dose to maintain a desired blood level of nicotine throughout the day, and that achieving this dose results in smoker satisfaction.[306] For example, following a presentation on the role of nicotine in smoking behavior at the 1976 BATCO Conference on Smoking Behavior, it was observed "that smokers may be people suffering from a nicotine disorder and needed a certain dose level per day."[307] The speaker agreed and referred to a Battelle study which found that the nicotine level of smokers remained constant during the day, dropped during the night, and was restored to near its

---

[304] Deines WH. BATCO. *Smoking Behaviour Conference: Overview.* 1983. (Attended by eight B&W employees). Page BW-W2-03280.

[305] Proceedings of the BATCO Smoking Behaviour-Marketing Conference, Session I. July 9-12, 1984. Montreal, Canada. Slide at p. BW-W2-02641, "Nicotine Dose Estimation."

[306] Proceedings of the BATCO Smoking Behaviour-Marketing Conference, Session I. July 9-12, 1984. Slides at pp. BW-W2-03243, BW-W2-03236: "whole body response: associated with satisfaction . . . [whether] dose of nicotine is adequate or inadequate."

[307] Proceedings of the BATCO Group R&D Smoking Behaviour-Marketing Conference. (Mrs. A.K. Comer, speaker.) Discussion on paper No. 2. October 1976. Southampton, England. Page BW-W2-02150.

daytime constant level by the first cigarette of the day.[308] The conferees then speculated that there may be a maximum dose of nicotine and that after this dose is achieved smokers may use cigarettes for reasons other than obtaining nicotine:

> *A further question in this area was whether there is a maximum nicotine level in smokers and, when this has been achieved, does the smoker smoke for reasons other than to obtain nicotine?*[309]

A paper presented at the 1977 BATCO International Smoking Behaviour Conference concluded that smokers adjust their smoking rate, depending on psychological factors and even diet, to maintain a certain body nicotine content.[310]

Relying on plasma nicotine/cotinine measurements, a 1984 BATCO Nicotine Conference concluded that:

> *[such] measurements can give reliable estimates of the nicotine uptake by groups of smokers, and with suitable precautions, by an individual smoker. Many smokers appear to obtain 12-14 mg of nicotine per day from their cigarettes.*[311]

A BATCO presentation from the 1984 BATCO Smoking Behaviour-Marketing Conference entitled "Current Status and Future Direction of Smoking Behavior Research" contains a discussion of whole body dose and whole body pharmacological properties of nicotine in relation to smoking satisfaction.[312] A chart accompanying the presentation plots a

---

[308] *Id.* at p. BW-W2-02151.

[309] *Id.* at p. BW-W2-02151.

[310] BATCO International Smoking Behaviour Conference. Chelwood Vachery, England. 1977. Page 2.

[311] *See* BATCO Conference Outline, 1984, note 287, *supra,* at p. BW-W2-01977.

[312] Proceedings of the BATCO Smoking Behaviour-Marketing Conference, Session I. Montreal, Canada. July 9-12, 1984. Page BW-W2-03236.

24-hour nicotine blood level curve, with peaks representing the nicotine dose obtained from cigarettes smoked during the day. Each peak actually represents a series of smaller peaks that indicate the dose of nicotine delivered by each puff. Each puff is characterized as a "pulsed high concentration bolus dose of nicotine."[313]

The report states that among smokers there is broad consistency in the whole body nicotine doses obtained by different groups and types of smokers.[314] This is so despite the fact that smoking products have a wide range of nicotine deliveries and despite wide variations in smoking behavior, such as puff duration, puff intensity, puff volume, puff interval, and depth of inhalation. The report states that the fact that widely disparate smoking behavior nonetheless results in fairly consistent whole body nicotine doses (12-14 mg per day) across a broad range of smokers demonstrates that nicotine underlies smoking maintenance.[315] Smokers maintain a fairly consistent whole body dose or blood level and self-administer additional nicotine doses when total body nicotine dose declines due to metabolism of nicotine. Therefore, the report concludes, the dose of nicotine "probably provides the basis for smoking satisfaction"[316] as it restores the whole body dose to the desired level.

The smokeless tobacco industry has also investigated the dose of nicotine that is absorbed into the blood and bodies of smokeless tobacco users. Pharmacokinetic studies

---

[313] *Id.* at p. BW-W2-03238.

[314] *Id.* at p. BW-W2-03241.

[315] *Id.* at p. BW-W2-03241-42.

[316] *Id.* at p. BW-W2-03242.

performed by the U.S. Tobacco Co. (UST) reveal that the researchers were interested in how much nicotine was absorbed into the body, how much was metabolized, and how fast nicotine and its metabolites were eliminated from the body. Documents admitted into evidence in a court case reveal that the company investigated the disposition profile of nicotine and its metabolite in both plasma and urine in naive and habituated users of tobacco snuff.[317] The study found no difference between these two populations. UST also performed a study to compare the pharmacokinetics of nicotine and its metabolites following administration of snuff and cigarettes.[318] According to a report of the study, the purpose of this research was to "delineate the similarities and differences in nicotine pharmacokinetics after acute and chronic use of smoked and smokeless tobacco products."[319]

The tobacco industry has also investigated the difference between minimum acceptable and optimum nicotine levels. Project Wheat was designed to test the assumption that the <u>optimum</u> level of nicotine might vary for different types of smokers. The study report concludes that the optimum nicotine delivery for U.K. male smokers is approximately 1.5 mg of nicotine. An earlier Imperial Tobacco study referenced in the Project Wheat report had similarly concluded that the optimum nicotine delivery for U.K. smokers was around 1.4 mg per cigarette and that stepwise reduction in nicotine delivery caused progressive rejection of

---

317 U.S. Tobacco Co. *Pharmacokinetics of Nicotine and its Major Metabolites in Naive and Habituated Snuff Takers*. Plaintiffs exhibit 3.27 from *Marsee v. U.S. Tobacco* (W.D. Ok. 1986) (Civil Action No. 84-2777R).

318 U.S. Tobacco Co. *Results of Comparison of Routes of Nicotine Administration.* Plaintiffs exhibit 3.28 from *Marsee v. U.S. Tobacco*, note 317, *supra*.

319 *Id.*

the 1.4-mg cigarette by consumers.[320]

These documents make clear that the industry is aware that tobacco products must deliver an adequate dose of nicotine, that there is a minimum dose below which the desired pharmacological effects of nicotine are not elicited, and that consumers will not accept a product that does not deliver an adequate dose of nicotine.[321]

---

[320] *See* Project Wheat - Part 2, note 204, *supra,* at p. BW-W2-01721-2.

[321] Although currently marketed low-delivery products may "yield" less than the amount of nicotine shown in these industry documents to be the minimum accepted dose, machine measured yields may underestimate the amount of nicotine smokers actually obtain from cigarettes. *See* FINDINGS § I.C. at p. 112.

### 3. Industry Research on How Consumers "Compensate" to Achieve an Adequate Dose of Nicotine

When smokers are given cigarettes with a lower nicotine yield (as measured by a smoking machine), than their regular brands, they often "compensate" by smoking the cigarette more intensely, e.g., by taking larger or more puffs, or by smoking more cigarettes.[322] Tobacco company documents reveal that the industry recognizes both that smokers compensate and that the purpose of compensating behavior is to allow smokers to obtain a dose of nicotine that satisfies their physiological need for nicotine.[323] The industry's

---

[322] *See, e.g.:*

Guyatt AR, Kirkham AJ, Baldry AG, Dixon M, Cumming G. *How Does Puffing Behavior Alter During Smoking of a Single Cigarette?* Pharmacol. Biochem. Behav. 1989;33(1):189-195.

Benowitz NL, Hall SM, Herning RI, Jacob P III, Jones RT, Osman AL. *Smokers of Low-Yield Cigarettes Do Not Consume Less Nicotine.* N. Engl. J. Med. 1983;309(3):139-142.

Memorandum from P.N. Lee to H.R. Bentley. *Tar Reduction and Nicotine Compensation.* July 19, 1979. Attached to the memorandum is a document that reviewed the existing scientific literature on smoking compensation prepared by Lee for the UK's Tobacco Advisory Council, July 19, 1979. The author concluded, at page 4, that:

> *Taken together, the evidence above seems to indicate that a smoker, when switching to a brand with lower nicotine yield, will tend to 'compensate' mainly by altering inhalation patterns but partly perhaps by a small increase in consumption.*

[323] "Compensation" is acknowledged in the following documents, among others:

BATCO Group R&D Conference. *The Effect of Puff Volume on "Extractable Nicotine" and on the Retention of Nicotine in the Mouth.* Laboratory Report No. L.314-R. Southampton, England. August 21, 1969.

Creighton D, McGillivray LM. BATCO R&DE. *Relative Contributions of Nicotine and Carbon Monoxide to Human Physiological Response.* Report No. RD839-R. Southampton, England. November 15, 1971. Page 22.

Armitage AK. Some recent observations relating to the absorption of nicotine from tobacco smoke. In: Dunn WL, ed. *Smoking Behavior: Motives and Incentives.* Washington, DC: VH Winston & Sons; 1973:83:

> *The human smoker can and does adjust the dose of nicotine he takes into his mouth very subtly, by adjusting either the size of his puff or the rate at which he puffs (this was shown very clearly by the elegant experiments of Ashton and Watson [1970], to which*

study of compensation by smokers provides compelling evidence that the industry knows that its market is based on nicotine dependence and that tobacco products are nicotine delivery systems.

Tobacco company researchers have repeatedly recognized the phenomenon of compensation and acknowledge that it occurs because smokers are seeking a specific dose of

---

*Domino [this volume] referred); . . . and the smoke taken into the mouth can be inhaled very deeply, moderately deeply, slightly, or not at all.*

BATCO Group R&D Conference on Smoking Behaviour. October 11-12, 1976. Southampton. Table III. Page BW-W2-02251 (questions whether increase in CO can result when a smoker compensates for reduced nicotine delivery to the mouth.)

Thornton RE. BATCO Group R&D *Some "Benefits" of Smoking*. Report No. RD 1461. January 26, 1977.

Courtney JR, Comer AK. BATCO Group R&D *The Study of Human Smoking Behaviour Using Butt Analysis*. Report No. RD 1608. August 7, 1978.

Lee, note 322, *supra*.

Read G, Anderson IGM, Chapman RE. BATCO Group R&D *Nicotine Studies: A Second Report. Estimation of Whole Body Nicotine Dose By Urinary Nicotine and Cotinine Measurement.* March 31, 1981. Pages 9-10.

Proceedings of the BATCO Smoking Behaviour-Marketing Conference, Session III. July 9-12, 1984. Slides at p. BW-W2-02748-02750, 02754-02759.

*Id.* Koehn E. Potential of nicotine addiction. Page 64, BW-W2-02651.

*Id.* Pangritz D. Discussion (Minutes). Page 65, BW-W2-02647-02651.

R.J. Reynolds, note 300, *supra,* at pp. 479, 482-3, 490-2.

Tobacco Advisory Council. *Reduction in Sales Weighted Average Cigarette Brand Tar Yield: Problems Associated with the Suggestion to Achieve Further Stages According to a Fixed Timetable* (prepared by TAC for members of the Independent Scientific Committee on Smoking and Health) at p. 3:

> *There are circumstances in which smokers, when switching to a brand with a reduced tar yield, will tend to 'compensate' whether consciously or subconsciously, if they find some aspect of a new cigarette less acceptable than that of their normal brand, in such a way as to restore to some extent the loss of satisfaction associated with the reduced tar yield itself, or associated with some inevitable consequence of the reduced tar yield, for example reduced nicotine yield. . . .*

nicotine from each cigarette. For example, Senior Philip Morris scientist William L. Dunn wrote to an outside researcher in 1975 that smokers compensate for reduced nicotine in cigarettes through a variety of techniques designed to increase the amount of nicotine that enters the bloodstream:

> *The ultimate index [of nicotine consumption] is how much passes over into the bloodstream . . . We're now looking at the fate of the smoke entering the mouth; how much goes down, how much comes back out, and related behavioral events that we anticipate finding to be dose-regulating mechanisms of remarkable precision and sensitivity.*
>
> *Thus to accommodate to the 15 percent reduction in available Marlboro nicotine, the smoker who was getting 50 percent of the available nicotine over into his blood from the Marlboro delivering 1.1 mg of nicotine into a smoking machine now must get 59 percent of what the current Marlboro offers him. He can take bigger puffs, or inhale more from the supply drawn into the mouth . . . or for more efficient extraction of the goodies, he can draw it in deeper or hold it longer.*[323a] [Emphasis added.]

---

[323a] Letter to Stanley Schachter, Columbia University from William L. Dunn. September 8, 1975. *In* Cong Rec. H7662 (daily ed. July 25, 1995).
*See also:*
Memorandum to T.S. Osdene from W.L. Dunn. Behavioral Research Accomplishments-1977. December 19, 1977. *In* Cong Rec. H7666, *supra*:

> *[N]icotine compensation is a real phenomenon . . .*

In this report, the researchers describe a study confirming their hypothesis that "some people smoke for nicotine, and that these people try to obtain a relatively constant amount of nicotine from their cigarettes." The internal study showed that smokers they called "nicotine regulators" obtained more nicotine from their cigarettes following a period of deprivation than when allowed to smoke freely.

Dunn WL. 1600/Smoker Psychology/January 1-31, 1976 [Monthly Report]. February 10, 1976. *In* Cong Rec. H7663, *supra*. This report describes a new study being undertaken by Philip Morris "to identify nicotine regulators and non-regulators." The study design involved measuring "the daily nicotine intakes" of a group of smokers when allowed to smoke their own cigarettes, then measuring their nicotine intakes when given cigarettes with higher or lower delivery than their own brand:

> *We want to find out if we can "force" our potential regulators to modify their puff volumes, inhalation volumes, and/or smoke retention times in order to obtain their usual nicotine dose.* [Emphasis added.]

Memorandum from W.L. Dunn to T.S. Osdene. Quarterly Report - January 1-March 31, 1975. March 25, 1975. *In* Cong Rec. H7662, *supra*. Reports on a Philip Morris study showing compensation behavior in smokers:

> *Preliminary data suggest that more cigarettes are smoked and more puffs taken when the observations follow a two-hour deprivation period than following two hours when smoking is*

In 1984, the minutes of the BATCO Smoking Conference included the following summary of the researchers' discussion of compensation:

> <u>*Compensation*</u>
>
> *There are two general forms of compensation:*
>
> *a) Number of cigarettes smoked eg. [sic] low tar smokers increasing consumption.*
> *b) Puffing/inhalation regime eg. [sic] increasing or decreasing/puff volume, duration, puff frequency, amount inhaled.*[324]

The researchers further stated that:

> *it is accepted that nicotine is both the driving force and the signal (as impact) for compensation in human smoking behaviour.*[325]

In fact, the tobacco industry is not merely aware of compensation behavior but has conducted extensive research on compensation. Company researchers administer cigarettes that deliver a range of nicotine doses to smokers and then measure the amount of nicotine

---

*permitted.*

Dunn WL. 1600/Smoker Psychology/October 1-31, 1977 [Monthly Report]. November 11, 1977. *In* Cong Rec. H7665, *supra*. Philip Morris researchers describe a study on whether smokers who smoke many cigarettes out of "need" will demonstrate compensation behavior if given low nicotine cigarettes.

Memorandum to T.S. Osdene from W.L. Dunn. Plans and Objectives - 1980. January 7, 1980. *In* Cong Rec. H7665, *supra*. This document describes Philip Morris' development of specialized monitoring devices designed to determine whether smokers, when given cigarettes with different nicotine deliveries "regulate or 'titrate' the amount of nicotine taken up via inspiration of smoke."

[324] Brooks GO. Minutes from BATCO Group R&D Smoking Behaviour-Marketing Conference, Session III. July 9-12, 1984. Page 55.

[325] *Id.* at p. 56.

Later at the same conference, there was a discussion of a study showing that when given a cigarette with a significantly different yield than his own, a smoker will alter his puffing behavior but will not alter his inhalation pattern. To explain this phenomenon, "[d]elegates were reminded that a smoker extracts virtually all of the nicotine from the smoke even with a <u>shallow</u> inhalation. Therefore what has he to gain by deliberately inhaling more deeply?" *Id.* at p. 69.

actually absorbed by the smoker, per puff or per cigarette.[326] These studies show that smokers tend to obtain close to the same amount of nicotine from each cigarette, despite differences in yield as measured by the smoking machine. In a 1974 BATCO conference, researchers described the results of one such study:

> *The Kippa study in Germany suggests that whatever the characteristics of cigarettes as determined by smoking machines, the smoker adjusts his pattern to deliver his own nicotine requirements (about 0.8 mg. per cigarette).* [Emphasis added.][327]

---

[326] *See:*
BATCO Group R&D Conference on Smoking Behaviour. Southampton, England. October 11-12, 1976. Page BW-W2-02253-85.

Adams PI. Research Dept., Imperial Tobacco Ltd. Changes in personal smoking habits brought about by changes in cigarette smoke yield. In: *Proceedings of the Sixth International Tobacco Scientific Congress*. November 1976. Pages 102-108.

BATCO, note 310, *supra*, at p. 2.

> *Although conflicting results were presented, the prevailing view is that smokers do tend to compensate in some way when going from a high tar (nicotine) to a low tar (nicotine) cigarette, or vice versa. Studies have been carried out with high and low nicotine cigarettes, "anti-smoking" cigarette holders, and cigarettes with shortened tobacco sections.*

Pritchard WS, Robinson JH. The sensory role of nicotine in cigarette "taste", smoking satisfaction, and desire to smoke. As abstracted in: *International Symposium on Nicotine: The Effects of Nicotine on Biological Systems II*. Satellite Symposium of the 12th International Congress of Pharmacology. Montreal, Canada. July 21-24, 1994. Page 113.

*See also:*
Ashton H, Stepney R, Thompson JW. Self-titration by cigarette smokers. *British Medical Journal*. 1979;2:357-360.

[327] Notes on the BATCO Group R&D Conference at Duck Key, FL. January 12-18, 1974. (Attended by Hughes, Sanford, Esterle of B&W). Page 2.

*See also* Notes from the German presentation. BATCO Group R&D Conference 1979. Part I, February 5-9, 1979. Page BW-W2-03536:

> *One of the interesting results from the KIPA studies is that cigarettes which vary from 1.1 - 0.4 mg nicotine by machine smoking are smoked by humans in the narrow range of 0.8 - 0.7 mg nicotine.*

At a 1984 conference, a BATCO researcher also reviewed several other studies indicating that when smokers are given cigarettes with higher or lower nicotine levels than their regular brands, they tend to adjust both the number of cigarettes they smoke and the way they smoke them to attain a steady dose of nicotine.[328] In support of this conclusion, the BATCO researcher presented a chart showing that between 1965 and 1975, as the machine-measured nicotine yield of cigarettes went down, the annual consumption of cigarettes per smoker went up.[329]

The researcher concluded that "increased consumption is related to reduced nicotine"[330] but that the relationship is not one-to-one. Instead, he found that a 10% reduction in nicotine resulted in a 1% rise in the number of cigarettes smoked, and a 50% reduction in nicotine resulted in a 10% rise in the number of cigarettes smoked.[331] As a result of this finding, he concluded that "most compensation must occur at the individual cigarette level;"[332] i.e., by altering the way the smokers smoked individual cigarettes. In fact, the data he presented showed that when smokers were given cigarettes with a range of nicotine yields, their nicotine intake from each cigarette hovered around the amount they took in from their regular brand rather than varying to the degree that would have been predicted from the

---

[328] Proceedings of the BATCO Smoking Behaviour-Marketing Conference, Session III. July 9-12, 1984. Ferris. Pages BW-W2-02748 - 02750, BW-W2-02754 - 02759.

[329] *Id.* at p. BW-W2-02754.

[330] *Id.* at p. BW-W2-02755.

[331] *Id.*

[332] *Id.*

machine yields.[333]

Other tobacco company studies show similar results.[334] A report on research conducted by Philip Morris Europe in the early 1970's concluded that smokers tended to obtain the same amount of nicotine from a cigarette, regardless of the nicotine content of the cigarette or its machine-tested yield:

> *The most frequent nicotine yield was 0.4 to 0.5 mg of nicotine per cigarette. This yield is not dependent upon the nicotine content of the tobacco and is not related to the nicotine yield under Coresta (machine) smoking conditions. The difference between nicotine yields obtained under standard laboratory procedures and yields obtained under "real" smoking conditions is explained by the existence of a compensation mechanism in the smoker. This compensation mechanism seems to be in operation for a proportion of the consumer population to adjust the nicotine yield to their needs or liking.*[334a]

---

[333] *Id.* at p. BW-W2-02757. Ashton, Stepney, and Thompson (1979b). *Expected and observed nicotine intake in a brand-switching experiment.* (Chart.)

[334] *See:*
BATCO Group R&D Proceedings of the R & D Conference. Montreal, Canada. October 25, 1967. Page 4.

> *The development of low TPM [total particulate matter], low nicotine cigarette should be expanded. This raises the question of the level of nicotine required and the consumer study by Bristol can be helpful in determining this . . . there was evidence that in Germany per capita cigarette consumption increased for the lower nicotine brands.*

Proceedings of the BATCO Group R&D Smoking Behaviour-Marketing Conference, Session I. July 9-12, 1984. Presentation slide BW-W2-03231. Under the heading *Brand Switching Down Delivery*, the chart provides a list of three "means to achieve a higher dose[:] . . . increase in puffing parameters, increase in numbers of cigs. smoked, more puffs taken."

Read GA. Internal v. external studies. Proceedings of the BATCO Smoking Behaviour-Marketing Conference, Session II. July 9-12, 1984. Page 19.

> *The German butt analysis studies have indicated how smokers respond to reductions in machine smoked nicotine deliveries under natural smoking conditions. This observation of product oversmoking supports the laboratory findings of an increase in smoking behaviour parameters in subjects switched to lower delivery products.*

R.J. Reynolds, note 300, *supra,* at pp. 479, 482-3, 490-2.

[334a] Gustafson and Haisch. PME Research: 1972-1974. *In* Cong Rec. H7662 (daily ed. July 25, 1995).

[Emphasis added.]

Thus, the tobacco companies' own studies demonstrate that smokers use the cigarette as a nicotine delivery system and vary their smoking behavior to obtain a specific dose of nicotine.

### 4. Industry Research and Knowledge of Tobacco Users' Inability to Quit

Tobacco companies are aware of the large number of smokers who have tried to quit using tobacco, and of the very small number who actually succeed. The evidence known to tobacco companies about smokers' unsuccessful attempts to quit shows that tobacco companies know that a large percentage of their market consists of people who demonstrate one of the characteristic features of addiction. See p. 81 et seq.

The great difficulty smokers experience when they try to quit was conceded by Joseph F. Cullman, III, the former chief executive officer of Philip Morris. Mr. Cullman was called as a witness in the Cipollone lawsuit and gave the following answers in response to questions from one of the plaintiff's attorneys:

> *Q. But it is difficult [to quit]?*
>
> *A. That's what it says here and I'm not disagreeing with it.*
>
> *Q. They said it was very difficult. Do you agree with that?*
>
> *A. I would say it's difficult.*
>
> *Q. And it's difficult for the vast majority of smokers, you would agree with that, too, would you not?*
>
> *A. That's a question of semantics. What's the vast majority? A lot of smokers have a hard time quiting [sic].*
>
> *Q. Let's see, most smokers have a tough time giving up cigarettes?*
>
> *A. Well, if they didn't, there would be many fewer smokers than there are today.*[335] [Emphasis added.]

Furthermore, internal Brown and Williamson documents reveal that the tobacco

---

[335] Examination of Joseph Cullman, III, former chief executive officer, Philip Morris, Inc. *Cipollone v. Liggett Group, Inc., et al.*, Civil Action No. 83-2864 (SA)(D.N.J.) . February 29, 1988. Afternoon Session. Transcript of proceedings, at pp. 3311-3314.

industry is extremely interested in rates of attempted and successful quitting, and keeps close track of these rates. At the 1984 BATCO Smoking Behaviour-Marketing Conference, attended by representatives from various BATCO companies, including Brown and Williamson, each of the participating companies was asked to fill out a questionnaire that asked how many smokers in their respective countries attempted to quit in each of the previous 5 years and how many actually quit (for as long as 6 months). Brown and Williamson's response to the questionnaire, which covered quitting rates in the United States, reported that, for the years 1981 through 1983, 32 million to 34 million Americans attempted to quit each year, while only 9 million to 10 million of those were able to quit for as long as 6 months.[336] Thus, Brown and Williamson's own data reveal that while almost half the total number of U.S. smokers attempted to quit each year, only about a third of those who tried to stop smoking were able to quit for as long as 6 months. These tobacco industry data suggest that at least one-third of U.S. consumers of cigarettes are purchasing cigarettes because they are unable to stop smoking.

In fact, data reported at the same conference showed that the percentage of smokers who continue to smoke even though they do not want to is much higher than suggested by 6-month data. Data from the Canadian tobacco company representatives indicated that rates of permanent quitting were well below quitting rates reported at 6 months. A Canadian participant reported to the assembled BATCO researchers that only 10% to 12% of those Canadian smokers attempting to quit succeeded for up to 1 year; less than 4% were able to

---

[336] Proceedings of the BATCO Smoking Behaviour-Marketing Conference, Session I. July 9-12, 1984. Page BW-W2-03212. No figures were provided by B&W on attempts to quit for the years 1979 and 1980.

quit permanently.[337]

The presenter responsible for summing up the results of the conference questionnaire agreed that, while a large percentage of smokers do not want to smoke, most of those smokers feel compelled to continue to smoke:

> *Although intentions and attempts to quit are relatively high (30-40% of smokers [in a given year]), the actual success rate of quitting is relatively low and stable.*[338]

It was thus well known to the participating companies that a very large percentage of their customers were smoking not out of choice but because they could not quit.

Other companies also understand that many of their consumers would like to quit but are unable to do so.[339] A Philip Morris researcher who studied a "cold turkey" campaign in

---

[337] Proceedings of the BATCO Group R&D Smoking Behaviour-Marketing Conference. July 9-12, 1984. Session IV. Page BW-W2-03381. *See also* Session III at p. 83 (BW-W2-03379-03382). The researcher also presented data showing that while 22% of smokers claimed that they intended to "cut down," in fact "both the claimed and calculated rate of daily usage (21.6 and 25.6 [cigarettes] respectively) have increased since the introduction of lights." (BW-W2-02790, 03379, 033820). Other data reported at the same conference provided additional confirmation of the large percentage of smokers who would prefer not to smoke. A study on "Smoker Consonance-Dissonance Breakdown" was presented which showed that approximately 75% of smokers surveyed had attempted to quit, and approximately 60% were currently serious about quitting. Session III at p. BW-W2-03386.

*See also*, Larsen PS, Silvette H. *Tobacco Experimental and Clinical Studies: A Comprehensive Account of the World Literature, Supplement I.* (1968), Chapter 15; *Supplement II* (1971), Chapter 17; *Supplement III* (1975), Chapter 21, which contain discussions of surveys concerning smokers' desire to quit and difficulty in successfully quitting. This review was funded by the Council for Tobacco Research.

[338] Proceedings of the BATCO Smoking Behaviour-Marketing Conference, Session IV. July 9-12, 1984. Page 12.

[339] *See:*
R.J. Reynolds Tobacco Company, response to Citizen Petitions 94-0069/CP1 and 94P-0077/CP1. November 2, 1994. Pages 66-69.

RJR-MI Brand Group and Ogilvy & Mather (Canada) Ltd. *Vantage Brand Positioning Statement.* 1979. Page 80041:

*B. User Image*

*Primarily female, white collar, extremely concerned about their health, and would like to*

the small Iowa town of Greenfield in 1969 reported that those who succeed in quitting smoking over the long term are a much smaller group than those who would like to quit and who attempt to quit.[340] The researcher cited the findings of Hunt and Matarazzo[341] in proposing that most attempts to quit smoking are not long-lasting: "[I]n summarizing many reports of long-term quitting using various techniques, [the authors] show that the percentage of nonrecidivists [successful quitters] decreases as a function of time . . . in a negatively accelerated fashion."[342] The Philip Morris researcher found that in Greenfield only 28% of those smokers who agreed to quit as part of the cold turkey campaign were still not smoking after 7 months. The researcher then observed that the small number of Greenfield residents who managed to stay off cigarettes for more than 7 months was, based on other published reports of success rates for quitting smoking, about average.[343]

The researcher also described findings that revealed in part why it is so hard for smokers to quit. He reported that smokers who quit for more than 7 months continued to

---

*quit smoking.*

Kwechansky Marketing Research for Imperial Tobacco Ltd. *Project 16.* October 18, 1977. Page vi.

Kwechansky Marketing Research for Imperial Tobacco Ltd. *Project Plus/Minus.* May 7, 1982. Page i.

[340] Ryan FJ. Philip Morris Research Center. Cold turkey in Greenfield, Iowa: a follow-up study. In: Dunn WL, ed. *Smoking Behavior: Motives and Incentives.* Washington, DC: VH Winston & Sons; 1973:231-241.

[341] *Id.* at p. 233.

[342] *Id.* at p. 233.

[343] Ryan FJ. Bird-I. A study of the quit-smoking campaign in Greenfield, Iowa, in conjunction with the movie, *Cold Turkey.* Appendix 1, p. 1000348712. The author also appended to the unpublished version of this report excerpts from internal company memos, pointing out that although the cold turkey campaign in Greenfield was as intense an anti-smoking effort as could be imagined, "carton sales at the Super Value store have shown a strong increase since the dog days of August."

suffer a variety of adverse effects related to quitting, including weight gain, restlessness, depression, ill-temper, constipation, nervous mannerisms, and loss of energy.[344] These are some of the classic symptoms of nicotine withdrawal, described earlier.[345]

Market research documents also show that tobacco companies have conducted research in quitting behavior and have documented the reasons why people quit and why they fail to quit, despite a desire to do so.[346] A market research firm reporting on a survey of smokers' views about the health implications of smoking observed that:

> *a minority expresses a resentment about the addictive aspects of smoking. Being "out of control," unable to quit causes them to feel somehow unworthy . . . . Nicotine is usually singled out as the culprit here. However, even these smokers would be reluctant to give up the satisfaction elements in smoking. So they are in a quandry [sic]."* [347]

Another market research firm reported its findings about the inability of young smokers to quit when they want to:

> *However intriguing smoking was at 11, 12 or 13, by the age of 16 or 17 many regretted their use of cigarettes for health reasons and because they feel*

---

[344] *See* Ryan, note 340, *supra,* at p. 234.

[345] *See* FINDINGS § I.B., *supra.*

[346] *See e.g.* The Creative Research Group. *Project Viking, Vol. III: Product Issues.* Prepared for Imperial Tobacco Ltd., Feb/Mar 1986.

Kwechansky Marketing Research for Imperial Tobacco Ltd. *Project Plus/Minus.* May 7, 1982. Pages 41-51.

[347] The Creative Research Group. *Project Day-Exploratory Phase in Edmonton.* Prepared for Imperial Tobacco Ltd. August 1988. Page 11.

*See also* Market System, Inc. *Project Eli Focus Groups Final Report.* Prepared for Imperial Tobacco Ltd. July, 1982. Page 5. Smokers refer to smoking as "satisfying a craving."

*unable to stop smoking when they want to.*[348]

The fact that many smokers smoke even though they do not enjoy smoking is conceded in a candid marketing research document prepared for Imperial Tobacco Ltd., which reported that it is particularly difficult to sell cigarettes by "trading on the positives" because the industry is "vexed by the unique problem that users of the category do not necessarily like the product."[349] Another document reports that many smokers of ultra-low tar and nicotine cigarettes want to quit and "refer to their behavior in terms of 'satisfying a craving' while smokers of stronger cigarettes talk about taste and satisfaction."[350]

In summary, the tobacco companies' data show that users find it extremely difficult to quit smoking and that many tobacco users would quit if they could. Their data also show that, of those smokers who try to quit, only a small percentage succeed permanently. Consequently, tobacco manufacturers are aware that the large percentage of their customers who try to quit but fail continue to buy and use tobacco products, in large part to satisfy their dependence on nicotine-containing tobacco. Use of tobacco to satisfy nicotine dependence is

---

[348] *See* Kwechansky Marketing Research. *Project 16*, note 339, *supra,* at p. vi.

*See also* Kwechansky Marketing Research. *Project Plus/Minus*. May 7, 1982. Study Highlights. In a follow-up study, the same market research firm reported the following results:

> *The desire to quit seems to come earlier now than before, even prior to the end of high school....However, the desire to quit, and actually carrying it out, are two quite different things, as the would be quitter soons [sic] learns...*

According to a report in *Newsday*, a 1957 "motivation survey" prepared for Liggett on smoker attitudes about smoking amid growing health concerns contained the following statement:

> *What smokers are really saying is: 'I wish I had never started to smoke . . . but now that it's got me, I know that I can't stop.'*

Riley J. Smoke-Trial Documents Make Titillating Reading. *Newsday.* July 19, 1988.

[349] *See* The Creative Research Group Ltd., note 346, *supra,* at p. 64451.

[350] *See* Market System Inc., note 347, *supra,* at p. 5.

a use that affects the structure or function of the body.

## D. INDUSTRY PRODUCT DEVELOPMENT RESEARCH TO ENSURE AN ADEQUATE DOSE OF NICOTINE

### 1. Industry Emphasis on Nicotine in Product Development Research

Tobacco industry documents show that adequate nicotine delivery is a dominant consideration in product development research. As discussed above, many tobacco industry documents demonstrate the industry's understanding that the amount of nicotine delivered from tobacco must not fall below a certain threshold.[351] These and other documents also reflect the industry's recognition that below that threshold, tobacco fails to deliver a pharmacologically active dose of nicotine, and that consumers will reject the resulting product. The documents described in this and the next section reveal the industry's extensive product development research to maintain or increase nicotine delivery from tobacco products.

Industry patents disclose that the industry has long recognized the importance of developing methods to maintain or increase the amount of nicotine in tobacco, and that the purpose of these methods is to ensure that consumers experience nicotine's pharmacological effects. For example, a patent held by Philip Morris states:

> *Maintaining the nicotine content at a sufficiently high level to provide the desired physiological activity, taste, and odor . . . can thus be seen to be a significant problem in the tobacco art. The addition of nicotine to tobacco in such a way that it remains inert and stable in the product and yet is released in a controlled amount into the smoke aerosol when the tobacco is pyrolyzed, is a*

[351] *See* documents cited in FINDINGS § II.C.1. and 2.

*See also* F.H. [Initials of BATCO R&D employee] Memorandum. *Developments in the Product in the Next Ten years.* 1973-1974. Page 3. ("The maintenance of adequate levels of nicotine in cigarettes could become a difficult problem as more synthetics are used.")

*result which is greatly desirable.* [Emphasis added.][352]

In fact, over the past several decades, enhancing and optimizing nicotine delivery has been a major focus of tobacco industry product design research. The American Tobacco Company (ATC) devoted substantial research to finding methods of increasing the amount of nicotine delivered by its cigarettes. For example, in 1963, ATC conducted research on increasing the nicotine yield in Lucky Strike cigarettes by increasing the proportion of Burley tobacco, a high-nicotine tobacco, in the tobacco blend used to make the cigarettes.[353] The company found that it could increase the nicotine yield of the cigarettes up to 10% in this manner and that smokers perceived the resulting cigarettes as having more "strength."[354] In 1969, ATC test-marketed Lucky Strike cigarettes that had been enriched with added nicotine.[355] ATC developed other methods for increasing the amount of nicotine delivered by its cigarettes over the subsequent decades, including:

- the use of carbon tips in the filter "impregnated with nicotine or nicotine salts" to

---

[352] U.S. Patent No. 3,280,823. Bavley A, Air D, Robb E II. *Additive-Releasing Filter for Releasing Additives into Tobacco Smoke.* Philip Morris, Inc. October 25, 1966. Page C1:43-48.

[353] "Tobacco Blends for Filter Cigarettes: Effect of Increasing the Concentration of Burley Tobacco in a Blend" at Page 1. June 21, 1963. The various ATC documents discussed in this section were provided by the company to the Subcommittee on Health and the Environment of the House Energy and Commerce Committee, and attached as exhibits to the Dec. 20, 1994, Subcommittee Staff Report, entitled, "Evidence of Nicotine Manipulation by the American Tobacco Company."

[354] *Id.* at pp. 4, 5. The company again experimented with increasing the nicotine content of Lucky Strikes through changes in the tobacco blend in 1968. Memo to Mr. H.V.H. Stoever, Jr., Manager, Durham Branch, from O.N. Coty, Manager-Quality Control, Research and Development (June 4, 1968). Pages 1-2; Tables X003384-3387. *See also* memo to R.F. MacDonald from O.N. Coty, July 5, 1968.

[355] Letter from Chadbourne & Park, representing ATC, to the Honorable Henry A. Waxman, Chairman, Subcommittee on Health and the Environment of the House Committee on Energy and Commerce. Oct. 14, 1994. Page 3 of attachment to ATC Response.

increase the nicotine content of cigarette smoke;[356]

- direct addition of commercial nicotine to reconstituted tobacco;[357]
- addition of nicotine to the "finishing flavor" used in Pall Mall 85's;[358]
- growing tobacco plants in different locations to determine, among other things, whether varieties with different ratios of nicotine to tar could be produced;[359]
- addition of nicotine to the "dip casing" (one of several solutions used in the manufacture of cigarettes) to compensate for loss of nicotine from other manipulations

---

[356] Memo to E.S. Harlow from ATC Analytical Chemistry Section, Group I, Aug. 8, 1963, Progress Report, March 1962-July 1963," with attached smoke analysis 2-12-68, 2-1-68, 1-29-68, 1-15-68, 1-4-68, 12-28-67, 12-22-67 (impregnating a carbon tip with nicotine permitted transfer of about 22% of the added nicotine to the smoke).

[357] ATC experimented with adding nicotine to reconstituted tobacco on several occasions. *See*:

"The Effect of the Addition of 1% Nicotine on the Quality of RC Tobacco" (Oct. 8, 1963) (nicotine citrate was added to reconstituted tobacco to triple its nicotine content, from about 1/2% to about 1 1/2%). Pages 1,2,6.

"Evaluation of Nicotine-Fortified RC-A Tobacco" (May 2, 1968) (nicotine malate was added to reconstituted tobacco to increase its nicotine content from .94% to 1.27%; the company concluded that "to markedly improve RC [reconstituted tobacco] . . . in addition to increasing its nicotine content it should also include the other constituents present in natural leaf tobacco, particularly those tobaccos of high nicotine content."). Pages 1-2.

Memo to J.B. McCarthy, Executive Vice President, from R.M. Irby, Jr., Manager-New Products Div., Research and Development, "Nicotine Content of Reconstituted Tobacco." June 5, 1974. (Nicotine added to tobacco extract which is applied to reconstituted tobacco, doubling the nicotine content of the reconstituted tobacco from 0.9% to about 1.8%.) Page 1.

[358] Memo to E.S. Harlow from O.N. Coty *Special PALL MALL 85's with added nicotine*. July 12, 1968. (Nicotine content of final blend increased by 0.47%; smoke panel preferred regular blend.)

[359] Memo to Dr. E.C. Cogbill, Manager-Analytical Research, Research and Development from J.M. Moseley Manager-Basic Materials Research, Research and Development. *Genetic Variation in "Tar" Delivery*. January 8, 1969.

of the tobacco blend;[360]

- addition of nicotine to both Pall Mall and Lucky Strike cigarettes, increasing their nicotine content 35% per cigarette (41% per puff for Pall Mall, slightly less per puff for Lucky Strike);[361] and
- addition of nicotine to tobacco stems (which are used in the manufacture of cigarettes) to increase their nicotine content from 0.5% to 1.87%.[362]

ATC also considered replacing the tobacco used in its reconstituted tobacco with "high nicotine tobacco such as Malawi sun-cured scrap (5% nicotine)" to increase the nicotine content from 0.9% to about 1.6%,[363] increasing "nicotine transfer to the smoke" by dilution or use of filter additives,[364] and increasing, in various ways, the proportion of nicotine relative to tar by adding nicotine to the tobacco, the filter, and the cigarette paper.[365]

Philip Morris documents show that it, too, conducted research on altering and optimizing nicotine delivery from its cigarettes. According to a 1972 memo from William

---

360 Memo to Mr. J.B. McCarthy, Vice President, Manufacture and Leaf from J.T. Ashworth, Manager - Process Development, Research and Development. "Experimental *LUCKY STRIKE Cigarettes (RC-E)*." May 29, 1969. (The author recommends that the experimental cigarettes with added nicotine replace the regular Lucky Strike brand; these may be the cigarettes that were test marketed in 1969). This memo refers to nicotine as "Compound W". An earlier ATC memo instructs employees to refer to nicotine as "Compound W" in all future experimental work, reports, and memorandums. ATC memo to W.W. Sadler, J.G. Brooks, and R.D. Chumney, from John T. Ashworth, "Compound W" (May 14, 1969).

361 Memo to Mr. V.B. Lougee, III, from R.M. Irby, Jr. *Compound W.* April 29, 1974. Pages 1-2.

362 *Id.* at p. 2.

363 Irby memo, note 357, *supra*, at p. 2.

364 *Id.* at p. 3.

365 Memo to Dr. P.H. Leake from P.M. Pedersen, transmitting a copy of *A Study of the Nicotine to Tar Ratio.* April 18, 1977. Pages 3-4.

Dunn, a senior official at Philip Morris, research was underway to identify optimal nicotine levels for menthol cigarettes:

> *This study has a three stage design. The first stage is designed to identify those nicotine delivery levels which we might reasonably wish to consider for menthol cigarettes. Having identified these nicotine delivery levels, in stage 2 we will determine combinations of nicotine and menthol which make for optimal acceptability. And then in stage 3, cigarettes with these combinations will be tested against current brands of known quality and sales potential.*[365a]

Philip Morris was thus engaged in research in which nicotine delivery was systematically manipulated, independent of other tobacco variables.

Industry patents from various tobacco companies show that substantial research throughout the industry has been directed at developing methods for selectively increasing nicotine levels and the amount of nicotine delivered by tobacco products.[366] BATCO documents show significant research efforts directed at increasing nicotine delivery. A 1978 BATCO R&D Conference included a discussion of the economic importance of increasing the proportion of nicotine that is actually delivered from the tobacco to the smoker during the consumption of the product:

---

[365a] P.A. Eichorn and W.L. Dunn. Quarterly Report-Projects 1600 and 2302. October 5, 1972. *In* Cong Rec. H7649 (daily ed. July 25, 1995).

[366] *See, e.g.*:

U.S. Patent No. 5,031,646 at C5:65-68 ("nicotine can be incorporated into the expansion solvents used to provide a volume expanded processed tobacco material having a high nicotine content").

U.S. Patent No. 4,676,259 at C2:30-33, 53-56 ("The present invention provides a nicotine-enhanced smoking device with a high nicotine release efficiency").

U.S. Patent No. 4,898,188 at C1:37-47 (utilizing supercritical extraction to transfer nicotine from high-nicotine tobacco to lower-nicotine tobaccos, thereby increasing the nicotine content of the latter).

U.S. Patent No. 5,065,775 (describing technology for modifying the nicotine content of tobacco filler, enabling a manufacturer to double the nicotine content of tobacco).

> *With conventional cigarettes, the transfer of nicotine to the smoker from the tobacco has very low efficiency. Potentially, therefore, opportunities exist for very big savings in tobacco if this low efficiency can be greatly increased.*[367]

In other words, BATCO wanted to increase the amount of nicotine delivered to the consumer without changing the amount of nicotine already present in the tobacco. (This is what one or more tobacco companies have in fact achieved by the use of the "ammonia technology" described in § II.E., infra.) A 1968 BATCO study approached the objective of enhancing nicotine delivery from a different angle. This study was intended to help develop methods of increasing the smoker's absorption of nicotine, while decreasing other undesirable physiological effects of inhaling tobacco smoke. The study examined the factors that influence the amount of nicotine that is absorbed from tobacco through the oral mucosa (mouth), with an eye toward designing products that would increase nicotine absorption in the mouth, thus avoiding or reducing the need to inhale smoke into the lungs. The study authors maintained that:

> *If it can be shown that appreciable amounts of nicotine can be absorbed via the mouth, and which factors contribute to enhanced absorption, it may be possible to design cigarettes so that it would only be necessary to inhale the smoke to a very limited extent.*[368]

This focus on absorption makes clear that the industry's primary interest is in delivering nicotine to the blood for its systemic effects, rather than in the immediate sensory effects in the mouth (e.g., flavor). Methods of optimizing nicotine delivery were also discussed at two

---

[367] BATCO Group Research & Development Conference, Sydney. March 1978. Page 4. Notes on Group Research R&D.

[368] Evelyn SR. BATCO Group Research & Development. *Absorption of Nicotine via the Mouth: Studies Using Model Systems*. Report No. RD 560-R. May 9, 1968. Page 4.

separate BATCO R&D conferences in 1984.[369]

The industry has also developed product design options to manipulate the amount of nicotine delivered to ensure smoker satisfaction, even at the level of the individual puff. For example, an industry patent states:

> *It is a further object of this invention to provide a cigarette which delivers a larger amount of nicotine in the first few puffs of the cigarette than in the last few puffs.*[370]

The focus on nicotine delivery in product development and the fact that nicotine manipulation is intended to ensure that consumers experience nicotine's pharmacological effects is also shown by the tobacco industry's research to improve tobacco "satisfaction." "Satisfaction" is one of the industry's principal product development research objectives. As already described in FINDINGS § II.C.1., supra, the term "satisfaction" is generally used by the tobacco industry to refer to the ability of a tobacco product to satisfy the consumer's desire for the pharmacological

---

369 *See* BATCO Group R&D Research Conference. September 1984. Proposed Revisions for 1985-1987. Pages 1-2:

> *The experimental cigarettes used in 1(b)[denicotinized, then supplemented with varying levels of nicotine] will also be used to improve the efficient use of smoke nicotine through pH modification. These studies will identify the relationship between nicotine dose and nicotine-related subjective improvement. This will further help to identify the relationship between product acceptability and smoker satisfaction.* [Emphasis added.]

Proceedings of the BATCO Group R&D Smoking Behaviour-Marketing Conference, Session III. July 9-12, 1984. Ferris at p. 81:

> *How we use this perspective in terms of marketing action requires careful consideration since most of this evidence is ostensibly of industry strategic defence value. However product development to optimise efficiency of nicotine delivery, and a better understanding of the "visual-tactile" smoker (albeit limited segment) are obvious starting points.* [Emphasis added.]

370 U.S. Patent No. 4,595,024. Greene TB, Townsend DE, Perfetti TA. *Segmented Cigarette.* R.J. Reynolds Tobacco Company. June 17, 1986. C2:23-26.

*See also* U.S. Patent No. 3,280,823 Bavley A, Air B, Robb II EW. *Additive-Releasing Filter for Releasing Additives into Tobacco Smoke.* Philip Morris Inc. October 25, 1966. C2:37-40 ("This invention permits the release into tobacco smoke, in controlled amounts . . . and when desired of nicotine into tobacco smoke").

effects of nicotine, and is understood by the industry as an essential component of consumer acceptance of tobacco products. The conferees at a 1983 BATCO Research Conference in Rio de Janeiro sought to expand research efforts on nicotine as the principal source of smoker satisfaction and to "develop products that give improved smoker satisfaction."[371] The conferees agreed that to achieve this goal, BATCO must know as much as possible about nicotine, including:

> - *factors that affect the transfer of nicotine from leaf to smoke aerosol*
> - *factors that influence the rate of transfer of nicotine from particulate matter to the vapour phase*
> - *the contribution of nicotine to smoke sensory characteristics (including harshness and irritation)*
> - *the site and mechanisms of absorption of nicotine within the human system*
> - *the way nicotine stimulates both the central nervous system and the peripheral organs (eg heart and lung)*
> - *the metabolism of nicotine within the body, including rates and equilibrium levels.* [Emphasis added.][372]

---

[371] BATCO Group R&D Research Conference. Rio de Janeiro, Brazil. August 22-26, 1983. Page BW-W2-01837.

[372] *Id.* at p. 13. Philip Morris documents similarly show that that company's research on manipulating nicotine delivery was aimed at ensuring that smokers experience nicotine's pharmacological effects. *See e.g.:*
Philip Morris employee (almost certainly W.L. Dunn). *Smoker Psychology Program Review.* October 19. 1977. This paper sets forth questions being asked by researchers at Philip Morris, at pages 5-6:

> *a) What is the lower delivery level limit beyond which the smoking act is not reinforced?*
> *b) Within what limits can we vary nicotine concentration relative to other smoke constituents?*
> *1) What is the optimum nicotine/tar ratio?*
> *c) Given a fixed quantity of nicotine in the tobacco, what factors in cigarette design determine its availability for delivery to the smoker?. . . .*
> *e) Does the smoker seek spike effects, bloodstream constancy?. . . .*
> *g) How important is the form of the delivered nicotine? (salt vs. free base? pH? particle size?)*

Ryan, FJ, Jones, BW, Martin, PG, Dunn, WL. Behavioral Research Annual Report. July 18, 1975. Page

This list of product development research objectives makes clear BATCO's interest in the delivery of nicotine for absorption into the bloodstream and in its systemic effects once absorbed.

The tobacco industry's product development research on manipulating the amount and manner in which nicotine is delivered to the consumer demonstrates the industry's intent to sell tobacco products that provide a pharmacologically active dose of nicotine.

---

17:

> *As deliveries drop we reasoned that eventually they could reach a point where all the cigarettes in a pack would be unsatisfying.*

The same document reports on Philip Morris studies of: 1) acceptability of various nicotine/tar ratios in a 10 mg tar cigarette, and 2) methods of producing a low delivery cigarettes "with impact and flavor." Pages 23-25.

Dunn, WL. Project 1600/Consumer Psychology/Annual Report. November 18, 1966. Page 9.

> *Is the transition to preference for a lower delivery cigarette more explicable in terms of (a) Reduction in sought dosage level, or (b) Adaptation of puffing pattern?*

Memo to T.S. Osdene from W.L. Dunn. Plans and Objectives - 1982. November 5, 1981. Discusses Philip Morris research on changes in inhalation behavior and puff parameters as a result of changes in nicotine delivery, and on which parameters influence nicotine retention. Pages 7-8.

### 2. Industry Research on Maintaining Adequate Nicotine Delivery When Lowering Tar

Product design to ensure adequate nicotine absorption by the smoker appears to have been driven, to a large extent, by the growing awareness of smoking-related diseases and the resulting efforts of the tobacco companies to provide cigarettes that delivered lower quantities of known toxic smoke constituents, in particular tar. However, reducing tar levels tends to also reduce the nicotine content.[373] Thus, the industry has known that in designing lower-yield products, nicotine delivery could not be reduced below a certain threshold.[374] In order to reduce tar while maintaining a level of nicotine delivery that would satisfy consumers' desire for the pharmacological effects of nicotine, the industry has focused considerable attention and research on how to maintain or enhance the amount of nicotine delivered by lower-tar products.

A patent held by Imperial Tobacco Ltd. states that the purpose of the technology described in the patent is to permit a cigarette manufacturer to maintain or increase nicotine levels while lowering levels of "undesirable" smoke constituents:

> *[This] invention concerns . . . the problem of maintaining or increasing the nicotine content of the smoke whilst avoiding an undesirable level of particulate*

---

[373] *See:*

Spears AW, Jones ST. Chemical and physical criteria for tobacco leaf of modern day cigarettes. *Recent Advances in Tobacco Science.* 1981;7:19-39.

*Regulation of Nicotine under the Federal Food, Drug and Cosmetic Act: Hearings Before the Subcommittee on Health and the Environment of the House Committee on Energy and Commerce,* 103rd Cong., 2d Sess. (March 25, 1994) (statement of AW Spears, at pp. 1-3).

[374] *See* Project Wheat - Part 2 , note 204, *supra,* at p. 48:

> *Concern for the possible health risks of smoking influences consumers in the direction of trying low delivery brands. . . . However, there is evidence of a conflict between concern for health and the desire for a satisfying cigarette, from which it follows that low tar brands would be much more widely accepted if their nicotine deliveries could be brought within the range required by groups of consumer[s].*

*matter in the smoke . . .*[375]

A 1976 BATCO "Smoking Behavior" conference report states the industry's dilemma more succinctly:

> *[I]n that the 'benefits' of smoking appear to be related to nicotine, we can infer that the 'benefits' of smoking might disappear if cigarettes with low levels of nicotine became the norm . . . .*[376]

Philip Morris conducted research to find the optimum nicotine delivery level and the optimum nicotine-to-tar ratio for low tar cigarettes. In 1970, a company document stated that Philip Morris planned to conduct a test in which it would reduce tar and add nicotine to Marlboro:

> *We are initiating a study of the effect of systematic variation of the nicotine/tar ratio upon smoking rate and acceptability measures. Using Marlboro as a base cigarette we will reduce the tar delivery incrementally . . . and increase the nicotine delivery by adding a nicotine salt [a commercial form of nicotine].*[376a]

A 1972 Philip Morris document identifies the natural nicotine-to-tar ratio in tobacco as 0.07, which is "characteristic of a broad range of natural leaf."[376b] Within the next three years, Philip Morris had studied and found the "optimal" nicotine-to-tar ratio for consumer ratings of acceptability and "strength." A 1975 Philip Morris document containing the results of a study

---

[375] U.S. Patent No. 3,861,400. Perkins PR, Bale CR. *Nicotine Fortification of Smoking Products.* Imperial Tobacco Group Limited. January 21, 1975. C1:1-10.

[376] BATCO Group R&D Conference. Southampton, England. October 11-12, 1976. Page 4.

[376a] P.A. Eichorn and W.L. Dunn. Quarterly Report of Projects 1600 and 2302. December 31, 1970. *In* 141 Cong. Rec. H8008 (daily ed. July 31, 1995)(statement of Rep. Waxman). These studies of optimal nicotine/tar ratios were intended to be used "to provide insight leading to new cigaret designs." Philip Morris, USA. Research and Development Five Year Plan, 1974-1978. May 1973. *In* 141 Cong. Rec. H8008, *supra.*

[376b] Memorandum to P.A. Eichorn from W.L. Dunn et al. Plans for 1972. September 8, 1971. *In* 141 Cong. Rec. H8008 (daily ed. July 31, 1995)(statement of Rep. Waxman).

conducted by the company stated that the optimal nicotine-to-tar ratio was about 0.1, higher than the "natural" ratio:

> *This study provides evidence that the optimum nicotine-to-tar (N/T) ratio for a 10mg tar cigarette is somewhat higher than occurring in smoke from the natural state of tobacco.*[376c]

In other words, the study showed that for a given level of tar (10 mg), it was optimal to supply a higher level of nicotine than would occur naturally in tobacco. According to the authors, the study shows that smokers prefer a higher nicotine delivery in low tar cigarettes than the delivery level that would occur if nicotine were allowed to fall proportionately with tar:

> *[T]he experimental cigarette with the moderate level of nicotine addition was rated higher in acceptability than the proportional reduction cigarette and equal to the Marlboro control.*[376d]

A later quote from the same document, reported in the New York Times, indicates that this study was conducted to provide data on how to alter the natural nicotine-to-tar ratio of a low tar cigarette in such a way as to make the cigarette comparable to Marlboro (Philip Morris' most popular high tar cigarette) in consumer acceptability and "strength":

> *We are using the guidelines suggested by this study to attempt to make a 10mg tar cigarette that will equal a Marlboro in both subjective acceptability and strength.*[376e]

---

[376c] Low Delivery Cigarettes and Increased Nicotine/Tar Ratios, A Replication. Approved by W.L. Dunn and distributed to H. Wakeham. October, 1975. *In* 141 Cong. Rec. H8009 (daily ed. July 31, 1995)(statement of Rep. Waxman).
*See also:*
Hilts PJ. "Documents Disclose Philip Morris Studied Nicotine's Effect on Body." *New York Times.* June 8, 1995.

[376d] Low Delivery Cigarettes and Increased Nicotine/Tar Ratios, A Replication. Approved by W.L. Dunn and distributed to H. Wakeham. October, 1975. *In* 141 Cong. Rec. H8009 (daily ed. July 31, 1995)(statement of Rep. Waxman).

[376e] Hilts PJ. "Documents Disclose Philip Morris Studied Nicotine's Effect on Body." *New York Times.* June 8, 1995.

The term "strength," as used in industry documents, is associated with nicotine delivery. A Philip Morris document from 1978 describes further studies being conducted by that company to systematically vary the nicotine-to-tar ratio to find the "optimal" ratio for the company's ultra low (5-7 mg) tar products.[376f]

As early as 1965, a Brown and Williamson official reported to other Brown and Williamson executives that BATCO research was focused on "the smoking and health problem" and that:

> *Their approach seems to be to find ways of obtaining maximum nicotine for minimum tar. Approaches being used include:*
> *(a) P.E.I. treatment of filters*
> *(b) Nicotine fortification of cigarette paper*
> *(c) Addition of nicotine containing powders to tobacco*
> *(d) Alteration of blends.*[377]

Minutes from BATCO Group Research & Development Conferences in 1967 and 1969 reflect the importance of nicotine to the industry when considering product modifications to respond to concerns about smoking and health issues. Among other things, it was recommended that:

> *The development of low TPM [tar], normal nicotine cigarettes should continue. In this connection, the use of filter additives, such as PEI could be helpful in rendering the nicotine more available to the smoker.*
>
> *The development of a low TPM, low nicotine cigarette should be expanded. This raises the question of the level of nicotine required and the consumer study by*

---

[376f] Memorandum to T.S. Osdene from W.L. Dunn. Plans and Objectives-1979. December 6, 1978. *In* 141 Cong Rec. H7670 (daily ed. July 25, 1995).

> *[W]e will evaluate low delivery experimental cigarettes in the 5-7 mg FTC tar range but with nicotine levels which are discernibly higher than, equal to, and lower than the typical level expected of cigarettes in this range (which would be .53 mg).*

[377] Griffith RB. Report to the Executive Committee. With attached handwritten note. July 1, 1965. Page 2.

> *Bristol can be helpful in determining this. [It was] pointed out that there was evidence that . . . per capita cigarette consumption increased for the lower nicotine brands. It cannot, however, be assumed that the minimum nicotine offered to the smoker is the optimal level, and some consideration should be given to establishing this.* [Emphasis added.][378]

Similarly, a 1975 BATCO Group Research & Development Conference report states that:

> *Once again the need for <u>normal nicotine low tar</u> cigarettes which appeal to the consumer was identified.*[379] [Emphasis added.]

Another BATCO document recommended in 1976 that when tar levels are lowered, nicotine delivery should be maintained:

> *A second approach which could be made both with existing brands and with new brands is to aim at a lower smoke production per cigarette (i.e. lower tar) while maintaining "normal" nicotine. <u>Work along these lines is already going on</u>. A <u>further modification of this approach is to maintain normal nicotine reaction for the smoker while actually reducing the total amount of nicotine per cigarette</u>. It is believed that this can be done, e.g. by the use of P.E.I. or by alkali treatment of tobacco stems.* [Emphasis added.][380]

At the 1976 BATCO "Smoking Behavior" conference it was also observed that "there would

---

[378] *See:*
BATCO Group R&D Conference. Montreal, Canada. October 25, 1967. Pages 4-5.

BATCO R&D Conference. Kronberg, Germany. June 2-6, 1969.

[379] BATCO Group R&D Conference. Merano, N. Italy. April 2-8, 1975. Page 4.

*See also* BATCO Group Research & Development, Conference on Smoking Behavior, Southampton, UK, October 11-12, 1976. Page 8:

> *Provided we can get smokers to dissociate tar from nicotine in their minds in terms of a possible health hazard, then there is a clear opportunity for a range of products which at present do not exist in order to suit those who combine above average inner need [nicotine requirement - see p. 184, supra] with above average concern for health. This is very much in line with some of Russell's pronouncements, and the fact that he is advocating the 'low tar normal nicotine' cigarette fairly forcibly is something we could turn to our advantage when considering how to market such cigarettes.*

[380] Morini HA. *Cigarettes with health reassurance.* BATCO Opinion. 1976. Page 1.

appear to be a forthcoming demand for high nicotine tobaccos"[381] in order to develop cigarettes that provide a higher nicotine to tar ratio.

A 1978 BATCO Group R&D Conference, which focused on product design issues, discussed several options for maintaining pharmacological satisfaction from low-tar cigarettes, including use of pharmacologically active nicotine substitutes:

> *Marketing opportunities will exist for cigarettes which are designed to replace the '1 mg cigarette.' Innovation on taste, tighter control of deliveries which may include a wider range of specified compounds, and improved control of the physical properties of the cigarette will obviously require attention. The pressure to retain smoking satisfaction may require more attention to be paid to the puff-by-puff delivery profile of the cigarette and perhaps the use of alternative active materials to augment or replace nicotine*. [Emphasis added.][382]

A 1979 BATCO R&D Policy Conference recommended continued research on aerosol growth, yet another means of reducing tar without simultaneously reducing nicotine:

> *Research on aerosol growth between inhalation and exhalation offers a way of reducing the retention of tar without at the same time reducing nicotine retention; this offers great potential to the Industry and should be continued.*[383]

A report by Imperial Tobacco Ltd. also focused on the importance of developing low-yield cigarettes that address smokers' concerns about health, but that nevertheless provide the desired "physiological satisfaction":

> *A cigarette that delivers physiological satisfaction, yet is low in T & N, must*

---

[381] BATCO Conference on Smoking and Behavior, Southampton, England. October 11, 1976. Page BW-W2-02311.

[382] Green SJ. Notes on Group Research & Development Conference. Sydney, Australia. March 1978. Page 3.

[383] BATCO Notes on the R&D Policy Conference. Chewton Glen (February 10, 1979), Torquay (February 12-14, 1979). Page 4.

*surely be a major objective and represents an R & D challenge.*[384]

American Tobacco Company memoranda written in 1980 reveal a similar focus on increasing nicotine in relation to tar deliveries. The company conducted research on the addition of potassium carbonate to Tareyton and Pall Mall cigarettes to "increas[e] the amount of nicotine that is transferred from the tobacco to the mainstream smoke while leaving the 'tar' level unchanged."[385] One of these memoranda states that the company plans additional research on "addition of sodium carbonate, [and] treatment of stems with alkali base" with the apparent goal of "liberat[ing] nicotine as a free base . . . and thereby increas[ing] the amount of nicotine in the smoke."[386]

A large number of industry patents also demonstrate that the industry has focused substantial resources on developing methods of maintaining adequate nicotine delivery to ensure smoker satisfaction while lowering levels of other smoke constituents.[387]

---

384 Imperial Tobacco Ltd. Summary of Matinee marketing plans 1971. Page 11.

385 *See:*
Bodenhamer NL. *Leaf Services Monthly Report for June; Increasing Nicotine Transfer in Smoke.* Memo to Dr. Eugene Glock. June 30, 1980.

Bodenhamer NL. *Leaf Services Monthly Report for August.* Memo to Dr. Eugene Glock. August 29, 1980.

386 Memo to Dr. Eugene Glock dated July 31, 1980. Page 2. [The first page of this memo is missing from the exhibits to the Staff Report prepared by the majority Staff of the Subcommittee on Health and the Environment, 103 Cong. 2d. Sess., entitled "Evidence of Nicotine Manipulation by the American Tobacco Company" (Dec. 20, 1994).]

387 *See, e.g.:*
U.S. Patent No. 3,584,630. Inskeep GE. *Tobacco Product Having Low Nicotine Content Associated with a Release Agent Having Nicotine Weakly Absorbed Thereon.* Philip Morris Inc. June 15, 1971. C2:5-15

U.S. Patent No. 3,861,400. Perkins PR, Bale CR. *Nicotine Fortification of Smoking Products.* Imperial Tobacco Group Limited. January 21, 1975. C1:1-10.

Industry studies on smoker compensation[388] have also led companies to be concerned that decreases in tar and nicotine yields will lead to dissatisfaction with smoking unless cigarettes are designed to allow smokers to compensate for the reduction in nicotine.[389] Consequently, tobacco manufacturers have actually attempted to assist smokers to compensate for lower nicotine yields, i.e., to obtain more nicotine from a cigarette than its machine-tested yield. They have done so by attempting to design cigarettes with "elasticity." "Elasticity" refers to the ability of a cigarette, whatever its nicotine yield as measured by a smoking machine, to deliver enough smoke to permit a smoker to obtain the nicotine he needs, e.g., through more or longer puffs or by covering ventilation holes.[390]

BATCO researchers described corporate policy on compensation and elasticity at a 1984 conference:

---

U.S. Patent No. 4,215,706. Larson TM, Moring TB, Ireland MS. *Nicotine Transfer Process*. Loew's Theatres, Inc. C1:40-48, C3:61-66.

U.S. Patent No. 4,236,532. Schweizer AD, et al. *Smoking Rod Wrapper*. Gallaher Limited. December 2, 1980. C1:35-40.

U.S. Patent No. 4,830,028. Lawson JW, Bullings BR, Perfetti A. *Salts Provided From Nicotine and Organic Acid as Cigarette Additives*. R.J. Reynolds Tobacco Company. May 16, 1989. C1:40-47.

[388] *See* FINDINGS § II.C.3., *supra*.

[389] *See* Adams, note 326, *supra*, at p. 108:

> *We believe in overall conclusion, that our data shows Firstly, that individual smokers adapt their smoking habit to the type of cigarette being smoked in order to try to obtain what they need from their cigarette*
>
> . . . .
>
> *Thirdly, that if because of the design of the cigarette they cannot adapt sufficiently, dissatisfaction will result.*

[390] BATCO R&D Conference. 1983. Brazil. Page BW-W2-03952: A paper on the effects of filters on cigarette smoke stated that elasticity was one of the factors that allowed a greater impression of "strength" (which is related to nicotine delivery) "within a given tar segment."

*Compensation by modifying smoking regime [increasing or decreasing/puff volume, duration, puff frequency, amount inhaled] is a topic which is being explored at GR & DC and this includes designing products which aid smoker compensation.*

*The marketing policy concerning this type of product is not clear but it is believed it will depend largely on the degree of elasticity in the design and how overtly this elasticity is achieved. The consensus is that small improvements in elasticity which are less obvious, visually or otherwise is likely to be an acceptable route.* [Emphasis added.][391]

Tobacco companies have attempted to improve elasticity through a variety of techniques. BATCO researchers noted at a 1983 conference that "elasticity can be designed into a cigarette using tobacco blend and pressure drop components. . . ."[392] Researchers at a 1972 BATCO Conference cited the need for "means of increasing the puff number of low density, low delivery cigarettes . . . in addition to those at present available."[393] At a 1975 conference, BATCO researchers were told about a German cigarette that had a number of design features that were intended to allow human smokers to obtain higher yields than the smoking machine. These design features included a higher than normal moisture content, reduced humectant, shorter cigarette rods, increased paper burn rate, additives, porous tipping, perforated tipping, acid filters, and the addition of sugars.[394]

At a 1983 BATCO R&D Conference, one of the workshops was entitled "Making the Smoke Work Harder." Notes of suggestions from that workshop include the question "What

---

[391] Proceedings of the BATCO Group R&D Smoking Behaviour-Marketing Conference, Session III. July 9-12, 1984. Page 55.

[392] BATCO Smoking Behavior Conference Overview, 1983. Page BW-W2-03292.

[393] BATCO. Notes from Group R&D Conference, Chelwood; 1972. Page BW-W2-01764.

[394] BATCO Group R&D Conference, 1975, note 379, *supra*, at p. 4.

factors control human ability to change T[ar]/N[icotine] ratios?," i.e., how can a smoker, through his own behavior, alter the amount of tar and nicotine he obtains from a cigarette of a particular machine-derived yield? Many of the remaining suggestions from the workshop offer possible methods to alter the tar/nicotine ratio of a cigarette, including manipulating the pH of the smoke, and altering the ratio of free to bound nicotine. By 1984, BATCO marketing and product development personnel were recommending the use of "compensatable" filters, intended "[t]o make it easier for smokers to take what they require from a cigarette."[395]

These documents show the extent of the tobacco industry's focus on nicotine in the face of increasing pressure to alter other characteristics of their products for health reasons. The documents reveal the industry's concern with the trend toward lower-tar products, and the industry's intense preoccupation with the need to provide adequate nicotine deliveries despite lowered tar deliveries. The documents establish that the industry's rationale for seeking to provide adequate nicotine deliveries in lower-delivery products is to ensure that these low-delivery products provide smoker satisfaction. These and other documents have shown the tobacco industry's awareness that smoker satisfaction is a function of the pharmacological effects of nicotine on the brain, and the industry's keen desire to be able to offer cigarettes that will allow smokers to obtain the threshold level of nicotine necessary to experience these effects.

---

[395] Structured Creativity Conference, Southampton, June 25-28, 1984. Page BW-W2-01993; attended by Ted Parrack of Brown and Williamson.

**THIS SECTION OF THE DOCUMENT CONTAINS INFORMATION THAT MAY BE CONSIDERED TO BE OF A TRADE SECRET OR COMMERCIAL CONFIDENTIAL NATURE. EACH PAGE CONTAINING SUCH INFORMATION BEARS A NOTE ON THE TOP OF THE PAGE AND THE INFORMATION HAS BEEN PURGED FROM THE TEXT.**

## E. INDUSTRY MANIPULATION AND CONTROL OF NICOTINE DELIVERY IN MARKETED TOBACCO PRODUCTS

### 1. Industry Manipulation and Control of Nicotine in Cigarettes

FDA's investigation has revealed the painstaking attention that tobacco companies pay to nicotine during every phase of cigarette manufacture. This section details the methods used by the industry to manipulate nicotine delivery at each stage of production and some of the effects of these manipulations on the nicotine content (the amount of nicotine in the tobacco rod) and delivery (the amount of nicotine delivered in the smoke for absorption into the bloodstream of the smoker) of modern cigarettes.

At each step -- from tobacco growing, purchasing of tobacco leaves, and blending different types of tobacco, to cigarette design and manufacture -- ensuring adequate nicotine delivery is a central objective of cigarette manufacturers. According to a tobacco industry official:

> *Generally speaking, the nicotine yield of a cigarette is determined by the nicotine content of the tobacco; the static burn rate or amount of tobacco consumed during puffing; the pressure drop of the tobacco column; porosity of the wrapper and or ventilation at the filter; the pressure drop of the filter, the filter material, the surface area of the filter material; and the affinity of the filter material for nicotine particularly as a function of smoke pH. Through the combination of these variables, plant genetics, and commercial processes to remove nicotine from tobacco, it is possible to manipulate the yield of nicotine from about .1 mg to*

4 mg per cigarette.[395a] [Emphasis added.]

The first manufacturing step in nicotine control is the development and selection of raw materials. The tobacco industry has, through breeding and cultivation practices, developed high-nicotine tobacco plants that provide higher-potency raw material, giving manufacturers greater flexibility in blending and in providing uniform and sufficient nicotine deliveries.

Even without the selective breeding and cultivation of plants for nicotine content, careful tobacco leaf purchasing plans permit the manufacturers to control nicotine content in their products. For example, nicotine content varies among types of tobacco and from one crop year to the next. Awareness of these basic differences and monitoring of the nicotine levels in purchased tobacco allows the companies to produce cigarettes with nicotine deliveries consistent to a tenth of one percent, despite variations as high as 25% in the nicotine content of the raw material originating in the same area, from year to year.

The primary control of nicotine delivery (the amount received by the smoker), however, is in the design and careful, sophisticated manufacture of the cigarette, to ensure that the smoker obtains the precise amount of nicotine intended by the manufacturer. FDA's investigation has revealed that despite reductions in the amount of tar delivered by cigarettes over the past several decades, nicotine delivery in low-yield[396] cigarettes has not fallen proportionately with the reductions in tar. Instead, nicotine delivery has apparently risen over the last decade, a result

[395a] Spears, AW. Lorillard Tobacco Co. *Factors Affecting Smoke Delivery of Nicotine and Carbon Monoxide*. Presented at the 1975 Symposium- Nicotine and Carbon Dioxide. November 17-18, 1975. In Symposium Proceedings-1, at p.12. FDA notes that when the author testified before Congress, he stated that nicotine manipulation does not occur and that nicotine yields simply follow tar yields. *See* note 479, *infra*. In this article he does not mention tar yield as factor in determining nicotine yield.

[396] "Low-yield" is used to denote cigarettes advertised as low-tar and low-nicotine.

that confirms that nicotine delivery is being independently and carefully manipulated by tobacco manufacturers. This newly gathered information, together with the other evidence of the industry's breeding, purchasing, blending, and manufacturing practices, reveals the extent to which manufacturers control the amount of nicotine that is delivered to the consumer from cigarettes and provides further support for the Agency's conclusion that tobacco manufacturers intend their products to affect the structure or function of the human body.

### a. Tobacco Leaf Growing

The industry's control and manipulation of nicotine in the production of cigarettes begins long before the cured tobacco leaf reaches the manufacturing plant. The characteristics of leaf tobacco, including nicotine content, are established by the genetic makeup of the plant, developed during growing, and fixed by post-harvest handling. Like other raw agricultural commodities, the physical and chemical properties of tobacco, including nicotine, can vary widely, depending on genetic differences, growing season conditions, and soil type. This subsection describes the methods used by the tobacco industry to control and manipulate nicotine through careful genetic breeding and agronomic practices. As one industry expert stated, "nicotine is the key chemical constituent of the leaf and smoke and the reason for which tobacco is grown."[397]

Modern types of cultivated tobacco (*Nicotiana tabacum L*) have been selected for a relatively high level of nicotine.[398] Five major types of tobacco make up nearly all tobacco

---

[397] Adapting agronomy to the needs of the low-tar era. *World Tobacco*. October 1977. Page 137.

[398] *Id.*

products marketed in the United States: Burley, flue-cured, Maryland, the Dark tobaccos, and Oriental. These tobaccos vary both in nicotine levels and in pH. The pH of a tobacco can have a significant influence on the amount of, and rate at which, nicotine is absorbed into the bloodstream of the tobacco user and delivered to the brain.

Of the five major types of tobacco, Burley tobacco generally contains the highest nicotine levels compared to other tobacco varieties, and it has an alkaline pH. Flue-cured tobacco represents the major tobacco ingredient in American cigarettes. In comparison with other tobacco varieties, flue-cured tobacco has a medium nicotine content and is somewhat acidic.[399] Maryland tobacco has a low nicotine content in comparison with other varieties and has an alkaline pH. The Dark tobaccos produce an alkaline smoke, and are the traditional tobaccos for cigar wrappers and fillers as well as for chewing tobacco and for many pipe tobacco mixtures. Oriental tobaccos, cultivated in southeastern Europe and Turkey, are used for their characteristic aroma; they have a low nicotine content, and low pH.[400]

American tobaccos of all types have undergone cumulative increases in total nicotine levels since the 1950's.[401] As the following chart demonstrates, nicotine levels in the most widely grown American tobaccos increased almost 10% for Burley and more than 50% for flue-cured between 1955 and 1980:

---

[399] Browne CL. *The Design of Cigarettes*. Hoechst Celanese Corporation; 1990. Page 43.

[400] *Id.* at pp. 22, 44.

[401] DeJong DW. The role of American tobacco leaf chemistry in low-yield cigarettes: an agricultural viewpoint. *Tabak Journal International.* May 1985. Pages 376-83. DeJong notes that higher-nicotine American tobaccos are needed in limited quantities to "spike" low yield cigarette blends. He further notes that off-shore tobaccos are invariably lower in nicotine, but serve to provide "filler" style leaf materials deemed necessary for the manufacturing of low-tar cigarettes, which comprise the majority of the U.S. market.

| Tobacco Type | Percent Nicotine 1955 | Percent Nicotine 1980 |
|---|---|---|
| U.S. BURLEY | 2.91 | 3.18 |
| U.S. FLUE-CURED | 1.93 | 3.07 |

Two tobacco industry activities over the last several decades appear to be responsible for this increase: 1) the industry's active and controlling participation in the Minimum Standards Program, which ensures that nicotine levels of U.S.-grown and marketed tobacco are maintained within specified ranges;[402] and 2) the industry's breeding and cultivation of tobacco for high nicotine levels.

The Minimum Standards Program, which began in 1963 for flue-cured tobacco and in 1977 for Burley tobacco,[403] is a component of the tobacco price-support program administered by the U.S. Department of Agriculture (USDA). With regard to domestically grown tobaccos, the industry maintains control over which varieties are suitable for growing in the United States

---

402 *Id.* at p. 382.

403 *See:*
Letter to M. Murray, FDA, from E. Wersman, North Carolina State University, March 23, 1994, transmitting:
1) The Burley Tobacco Quality Committee-Varieties "Testing Procedure to Assure Acceptable Quality In Burly Tobacco Varieties" revised February 24, 1993.
2) The Flue-Cured Tobacco Quality Committee-Varieties "Testing Procedure to Assure Acceptable Quality In Flue-Cured Tobacco Varieties" amended January 1991.

Letter to M. Zeller, FDA, from E.M. Pfeifer, King & Spalding on behalf of the Brown and Williamson Tobacco Corp., pp.1-8, with enclosures:
Attachment 1 "Flue-Cured Tobacco Variety Committee";
Attachment 2 "Burley Variety Evaluation Committee Membership";
Attachment 3 Slides, pp. 90025-90091.

and thereby eligible for price support.

One key objective of the tobacco industry's involvement in the Minimum Standards Program appears to be to ensure that nicotine levels in marketed tobacco do not fall below specified levels. The program was initiated in response to the emergence, in the 1950's, of several so-called "discount" varieties of tobacco (e.g., "Coker 139," "Coker 187-Golden Wilt," "Coker 282," "Coker 140," "Coker 316," and "Reams 64") that failed to meet current industry specifications established, among other things, to control the amount of nicotine delivery when used in manufacturing filtered cigarettes. To insure the elimination of "discount" or low-nicotine varieties from the market, the industry obtained the necessary cooperation from USDA to eliminate these varieties from the price-support program. In fact, to be eligible under this program, growers must certify, even to this day, that "discount" varieties are not being grown.[404]

In 1979, one major U.S. manufacturer requested that the tobacco variety committee under the Minimum Standards Program lower the acceptable nicotine range, established in 1967, for the specific tobacco varieties used as the standard. Support for lowering the acceptable nicotine range was not forthcoming from the rest of the industry and the change was never adopted.[405] In fact, in spite of the trend toward marketing cigarettes advertised as low delivery, the criteria under the Minimum Standards Program for nicotine content of new varieties have not changed since 1967.

While the Minimum Standards Program ensured that nicotine levels in marketed tobaccos

---

[404] USDA Agricultural Stabilization and Conservation Service (ASCS) Manual. "Identification of certain flue-cured tobacco varieties under the price support program." April, 1964. Pages 3-5, 8, 10-11. Obtained on June 15, 1994, from USDA-ARS-SAA, Crops Research Laboratory.

[405] Collins WK. Cultural practices increase nicotine content of U.S. flue-cured leaf. *Tabak Journal International.* [4] 1981:328, 330.

did not fall, breeding and cultivation initiatives undertaken by the industry caused nicotine levels to increase. When health concerns prompted the tobacco industry to begin to market low-tar cigarettes in the 1960's and 70's, the industry turned to tobacco breeders to develop tobacco varieties that produced less tar. Breeders found that without intervention in the breeding of these varieties, nicotine levels were reduced along with tars.[406] Thus, the industry has long been able to grow low-tar and low-nicotine varieties of tobacco for use in manufacturing cigarettes.

By 1978, however, the industry had abandoned its interest in the development of low-tar/low-nicotine varieties of tobacco for manufacturing low-yield cigarettes, and instead turned to the development of higher nicotine varieties. According to one expert in the field, it was necessary to focus on developing tobacco that was higher in nicotine, not lower:

> *. . . manufacturers have means of reducing tars but most of the methods reduce nicotine and other constituents at the same time. Therefore it may be desirable to develop levels constant or to develop lines higher in nicotine so that when the tar and nicotine are reduced there will still be enough nicotine left to satisfy the smoker.*[407] [Emphasis added.]

Industry experts agreed, stating in 1981 that the nicotine content of tobacco "will increase if the very low 'tar' brands continue to expand in market share,"[408] They further stated that:

> *[c]urrent research is directed toward increasing the nicotine levels while maintaining or marginally reducing the 'tar' deliveries.*[409]

---

[406] Tailoring tobacco plants to meet future demands. *World Tobacco*. October 1978. Page 148. Abbreviation of talk by J.F. Chaplin at meeting of CORESTA scientists in Sofia, Bulgaria.

[407] *Id.*

[408] Spears AW, Jones ST. Chemical and physical criteria for tobacco leaf of modern day cigarettes. *Recent Advances in Tobacco Science*. 1981;7:19-39, 37.

[409] *Id* at p. 31. *See* DeJong, note 401, *supra*, at p. 378. In anticipation of a move toward low-yield cigarettes, USDA was once petitioned by the industry to promulgate regulations to allow for the growing of ultra-low nicotine tobacco. The regulations were actually published in the *Federal Register* in June 1947. The nicotine concentration was to be no higher than 0.8%, which is significantly lower than the

The industry has elsewhere acknowledged that the role of American tobacco is to provide high levels of nicotine in the finished product to offset the diluting effect of bland foreign tobaccos and reconstituted tobacco sheet.[410]

FDA's investigation has revealed that at least one cigarette manufacturer, Brown and Williamson, has developed and marketed a tobacco so high in nicotine that it exceeded the limits imposed for U.S.-grown tobacco under the Minimum Standards Program. These limits cannot be exceeded without significant risk of losing government-administered price support. However, foreign-grown tobaccos are not subject to these specifications and are not subject to testing for nicotine content upon entry into the United States. This high-nicotine tobacco was therefore grown in South America.

FDA found that Brown and Williamson was involved for more than a decade in developing, through a combination of conventional and advanced genetic breeding techniques, a high-nicotine, flue-cured tobacco plant, named "Y-1," for use in a number of low-tar brands of cigarettes in the United States.

Brown and Williamson characterized its achievement in a patent filing in the following way:

> *By the present invention or discovery, applicants have succeeded in developing a tobacco plant that is agronomically and morphologically suitable for commercial tobacco production, i.e. it closely resembles SC 58, and provides a pleasant taste and aroma when included in smoking tobacco products, yet it is possessed of the N. rustica high-nicotine attribute. So far as we know, this has not been*

---

concentration of nicotine in domestic tobaccos. These low-nicotine varieties were to be kept entirely separate and marketed under contract. These regulations remain in the Code of Federal Regulations (7 CFR [illegible]), but they have never been taken advantage of, indicating industry's lack of interest in the development of ultra-low nicotine tobaccos.

[410] *See* DeJong, note 401, *supra.*

*accomplished before* . . . [Emphasis in original.] [411]

The development of Y-1 dates back to at least the mid-1970's. In 1977, James F. Chaplin, who was affiliated with both USDA and North Carolina State University, indicated that tobacco could be bred to increase nicotine levels, by crossbreeding commercial varieties of tobacco with *Nicotiana rustica*. *N. rustica* is a wild tobacco variety that is very high in nicotine, but is not used in manufacturing cigarettes because of its harshness.[412]

By combining conventional and advanced breeding techniques, Brown and Williamson succeeded in developing commercially viable Y-1 from seeds initially produced by Chaplin's crossbreeding work. The nicotine content of the leaf of this variety is about 6% by weight, which is higher than that of any other varieties of tobacco commercially grown in the United States. (Domestically grown varieties of flue-cured tobacco, for example, naturally contain 2.5% to 3.5% nicotine.[413])

Company officials admitted to FDA that Y-1 was intended as a "blending tool" to enable the company to design products that were lower in tar but not lower in nicotine.[414] The company disclosed to FDA that Y-1 had been used commercially in the manufacturing of Viceroy King Size, Viceroy Lights King Size, Richland King Size, and Richland Lights King Size and it

---

[411] U.S. patent application No. 761,312 submitted on September 17, 1991.

[412] Chaplin JF. *Breeding for varying levels of nicotine in tobacco.* Proceedings from a symposium on Recent Advances in the Chemical Composition of Tobacco and Tobacco Smoke. 1977. Page 334.

[413] Letter to D.A. Kessler, FDA, from J. W. Johnston, R.J. Reynolds Tobacco Co. February 28, 1994. Pages 1-2.

[414] Transcript of FDA meeting with Brown and Williamson. June 17, 1994. Pages 18, 29, 85-86, 124.

constituted about 10% of the tobacco blend of these products.[415] These brands were manufactured and distributed throughout the United States in 1993.[416] FDA's investigation revealed that, as of mid-1994, Brown and Williamson still had between 3.5 million and 4 million pounds of this high-nicotine tobacco on hand.[417]

In addition to breeding high-nicotine tobacco varieties, the tobacco industry engages in a number of agronomic practices that increase nicotine levels in tobacco. Heavy application of nitrogen fertilizers, early topping, and tight "sucker" (i.e., bud growth at the junction of stalk and leaves) control have all acted in concert to push nicotine levels upward.[418] In addition, tobacco varieties have been selected for tolerance to brown spot, a leaf disease that makes early harvest necessary. Leaves of disease-resistant varieties tend to remain in the field longer, resulting in maximum nicotine accumulation.[419] Since the introduction in 1965 of the acreage-poundage control system, farmers have reduced the number of harvestable leaves per plant and have tended to increase plant spacing. Both of these practices tend to increase nicotine content in the leaf.[420] Finally, tobacco growers are transplanting tobacco crops earlier, which, coupled with the widespread use of pesticides in the soil, often results in slow early season growth, and also tends

---

[415] *Id.* at pp. 153, 165.

[416] *Regulation of Nicotine under the Federal Food, Drug, and Cosmetic Act: hearings Before the Subcommittee on Health and the Environment of the Committee on Energy and Commerce, U.S. House of Representatives,* 103 Cong. 2d Sess. (June 21, 1994)(statement of David A. Kessler, M.D., Commissioner of Food and Drugs, "The Control and Manipulation of Nicotine in Cigarettes," at pp. 9-12). The Commissioner's statement is included as Appendix 8 to this document.

[417] *See* Transcript, note 414, *supra,* at p. 124.

[418] *See* DeJong, note 401, *supra,* at p. 382.

[419] *See* Collins, note 405, *supra,* at p. 330.

[420] *Id.*

to increase nicotine content in the leaves.[421]

These nicotine-raising agronomic practices have been adopted by U.S. growers in recent years, even though over 50% of the U.S. cigarette market is now characterized as low delivery. Thus, the tobacco industry has developed a number of sophisticated methods for manipulating nicotine levels through breeding and cultivation of tobacco plants and has used these methods to maintain and increase concentrations of nicotine in tobacco leaves. These methods enable the industry to use high-nicotine leaf in low-tar cigarettes, so that, paradoxically, certain low-tar cigarettes now contain more of the higher nicotine tobacco in their blend than cigarettes with higher tar deliveries.[422] See p. 261 infra. The use of these methods demonstrates that the industry manipulates nicotine independently of other tobacco components to ensure that cigarettes contain sufficient nicotine to satisfy smokers.

**b. Leaf Purchasing**

Nicotine is perhaps the most important criterion employed by cigarette companies in the purchase of tobacco leaf. As one tobacco company official stated over 20 years ago in an industry publication:

> *It is believed that one important reason why the consumer smokes cigarettes is for the nicotine which they contain . . . Manufacturers, therefore, must have all options open in selecting leaf to buy.*
>
> *They are most concerned with the nicotine levels in leaf, so that after manufacture of their blends, the nicotine percentages in the cigarettes will vary minimally both*

---

[421] *See* Collins, note 405, *supra.*

[422] *See* Spears, note 408, *supra,* at p. 22.

THIS PAGE HAS BEEN PURGED OF INFORMATION THAT MAY BE CONSIDERED TO BE OF A TRADE SECRET OR COMMERCIAL CONFIDENTIAL NATURE

> *from one to another within a packet, and from packet to packet.*[423] [Emphasis added.]

The key factor related to nicotine in leaf purchasing is stalk position. The concentration of nicotine is lowest at the bottom of the plant and highest in the top leaves of flue-cured tobacco.[424] Thus, the position of the leaf on the stalk determines how much nicotine the leaf will contain. In fact, "stalk position" is an industry euphemism for nicotine content. The stalk position of a leaf can be determined by its appearance, shape, color, and thickness, even after harvest.[425] Therefore, an experienced buyer, whose instructions are dictated by the manufacturer's chemists,[426] need only be concerned with these physical characteristics in identifying leaves of varying nicotine content.

The significance of stalk position in leaf purchasing was confirmed when FDA visited cigarette manufacturers. [redacted][427]

---

[423] What changing technology means for leaf producers and packers. *World Tobacco*. September 1971. Page 137. Based upon lecture by J.S. Campbell, American Organisation of the Imperial Tobacco Group Ltd. at a Conference on Social and Economic Issues Confronting the Tobacco Industry in the Seventies, Lexington, KY.

[424] *See* 1977 *World Tobacco* article, note 397, *supra*. *See also* Browne, note 399, *supra,* at p. 15.

[425] *See* 1977 *World Tobacco* article, note 397, *supra*.

[426] Evolving techniques of making cigarettes milder. *World Tobacco*. April 1979. Page 95.

[427] FDA officials Mitch Zeller, Kevin Budich, Barbara Frazier, and Bob Spiller visited the sites of R.J. Reynolds Tobacco Company on April 11-12, 1994, and Brown and Williamson Tobacco Company on May 3, 1994. The following references refer to their summary notes of the visits.

Zeller notes from RJR visit at p. 2.
Budich notes from RJR visit at p. 3.

THIS PAGE HAS BEEN PURGED OF INFORMATION THAT MAY BE CONSIDERED TO BE OF A TRADE SECRET OR COMMERCIAL CONFIDENTIAL NATURE

Furthermore, this RJR representative revealed that "impact" is a criterion in leaf purchasing and that "impact" is "basically a function of nicotine in tobacco."[428] RJR also indicated that "impact" is measured in the company's laboratories if there is enough time to do so prior to purchase.[429]

Representatives from Brown and Williamson also described the significant role that nicotine plays in the purchase of tobacco leaf. The company stated that stalk position is the "first thing" they look for during leaf purchasing.[430] At Brown and Williamson, the lower stalk positions are considered to have the least amount of "smoke quality," which was defined as including "impact level."[431] The company defines "impact" as "the hit or punch in the back of the throat when you first inhale."[432]

Nicotine levels are so crucial to leaf purchasing at Brown and Williamson that the

---

[428] Zeller notes from RJR visit at p. 2.
Budich notes from RJR visit at p. 3.
Frazier notes from RJR visit at p. 2.
RJR overhead was provided at visit.

[429] Zeller notes from RJR visit at p. 2. [redacted]

[430] Zeller notes from B&W visit at p. 2.
Frazier notes from B&W visit at p. 2.
Spiller notes from B&W visit at p. 2.

[431] Zeller notes from B&W visit at p. 2.

[432] Zeller notes from B&W visit at p. 2.
Budich notes from B&W visit at p. 4.
Frazier notes from B&W visit at p. 2.
Spiller notes from B&W visit at p. 2.

THIS PAGE HAS BEEN PURGED OF INFORMATION THAT MAY BE CONSIDERED TO BE OF A TRADE SECRET OR COMMERCIAL CONFIDENTIAL NATURE

company actually adjusts the stalk positions of its leaf purchases based upon the results of nicotine analyses that are performed during the course of the buying season.[433] In addition, Brown and Williamson employs special measures when purchasing foreign tobacco to ensure adequate nicotine levels. The company stated that foreign Burley and flue-cured tobaccos are smoked prior to their purchase so that they get some sense of the "impact" of the tobacco,[434] [redacted][435]

c. **Leaf Blending**

After purchase, tobacco leaves are blended to attain target levels of nicotine and tar in the smoke. FDA's investigation noted particular attention on the part of manufacturers to the nicotine content of the leaf in the blending operation. As noted above, blending practices by manufacturers are designed to: (1) control the naturally occurring variations in nicotine and other components caused by genetics, growing season conditions, and soil type within a given type and grade; and (2) particularly for low-tar cigarettes, to increase nicotine concentrations and thereby maintain an acceptable nicotine level in the cigarettes.

As described above, each type of tobacco has unique characteristics of nicotine and tar delivery. Moreover, within each type, levels of nicotine increase with ascending stalk position

---

[433] Frazier notes from B&W visit at p. 2.

[434] Spiller notes from B&W visit at p. 2.
Frazier notes from B&W visit at p. 2.

[435] [redacted]

THIS PAGE HAS BEEN PURGED OF INFORMATION THAT MAY BE CONSIDERED TO BE OF A TRADE SECRET OR COMMERCIAL CONFIDENTIAL NATURE

(grade). Armed with this knowledge, tobacco manufacturers blend various types of tobaccos and various stalk positions to achieve specific nicotine levels in particular brands.

Manufacturers also pay attention to other features of tobaccos that can affect nicotine delivery during blending. For example, cigarette filling power (bulk), pressure drop or resistance to draw, and static burn rate are all decreased with ascending stalk position. Decreases in burn rate increase the puff count, and thereby result in the delivery of more nicotine to the smoker because less tobacco is burned between puffs.[436]

The pH of cigarette smoke directly affects the delivery of nicotine because it alters the amount of nicotine that is absorbed in the mouth or lungs.[437] PH is controlled by the manufacturer in the selection of the type of tobacco used and blended. For example, smoke-condensate pH is higher from certain tobacco varieties as well as from leaves at upper stalk positions.

Blending techniques have been used to finely control nicotine concentrations in marketed cigarettes. [redacted][438] This is a high

---

[436] *See* Browne, note 399, *supra,* at p. 12.

[437] *See* Surgeon General's Report. *Nicotine Addiction.* 1988. Pages 29-31.

[438] [redacted]

**THIS PAGE HAS BEEN PURGED OF INFORMATION THAT MAY BE CONSIDERED TO BE OF A TRADE SECRET OR COMMERCIAL CONFIDENTIAL NATURE**

degree of control even in a product manufactured from synthetic, homogeneous materials. It is a remarkable degree of control for a product such as cigarettes, which are made from highly variable biological materials whose nicotine content is ordinarily dependent upon such uncontrollable factors as weather and plant attack by insects and plant diseases.

Significant evidence also demonstrates that tobacco manufacturers have used blending techniques to increase nicotine concentrations in low-tar cigarettes and thereby maintain nicotine delivery while reducing tar delivery. FDA has observed the industry's use of proportionately greater amounts of higher nicotine-containing Burley tobacco in the tobacco blends of the lowest-tar varieties of cigarettes. In fact, Thomas Sandefur, the chief executive officer of Brown and Williamson, admitted to Congress that nicotine levels can be adjusted "up or down" depending on the blend of tobaccos used in a particular cigarette.[439] Industry scientists have also acknowledged that tobacco manufacturers blend high-nicotine tobaccos to compensate for the reductions in nicotine caused by innovations in cigarette design and manufacturing to reduce tar deliveries.[440]

[redacted]

---

[439] *Regulation of Nicotine under the Federal Food, Drug, and Cosmetic Act: hearings Before the Subcommittee on Health and the Environment of the Committee on Energy and Commerce, U.S. House of Representatives,* 103 Cong. 2d Sess. (June 23, 1994) (testimony of Thomas E. Sandefur, Jr., CEO, Brown and Williamson Corp., transcript at p.133).

[440] *See:*
DeJong, note 401, *supra.*

Spears, note 408, *supra,* at pages 22-24.

**THIS PAGE HAS BEEN PURGED OF INFORMATION THAT MAY BE CONSIDERED TO BE OF A TRADE SECRET OR COMMERCIAL CONFIDENTIAL NATURE**

[redacted][441] These examples demonstrate that tobacco manufacturers deliberately increase the proportion of high-nicotine tobaccos in low-tar cigarettes to prevent reductions in nicotine delivery that would otherwise result in these products.

Moreover, as described above, Brown and Williamson developed "Y-1," its ultra-high nicotine tobacco, for the purpose of having a "blending tool" that could be used to maintain nicotine delivery while reducing tar.

**d. Cigarette Design and Manufacture**

Cigarettes are not simply cut tobacco rolled into a paper tube. Modern cigarettes, as sold in the United States, are painstakingly designed and manufactured to control the amount of nicotine delivered to the smoker. The following aspects of cigarette design and manufacturing all affect the nicotine delivery of a finished cigarette:

(i) the chemical manipulation of tobacco smoke;

(ii) the use of flavors and casings;

(iii) filtration;

[441] Zeller M, Budich K. Notes from March 22-23, 1994 meeting with Philip Morris and April 10-12, 1994, meeting with RJR. Mitch Zeller's notes, at pp. 2-3, and Kevin Budich's notes at p. 9.

(iv) the use of reconstituted tobacco; and

(v) use of wider tipping paper.

(i) Chemical Manipulation

Tobacco manufacturers add certain chemicals to the tobacco to enhance the efficient extraction by the smoker of nicotine from the tobacco in the rod. For example, certain additives can alter the pH of cigarette smoke, which is known to affect the rate of absorption of nicotine into the bloodstream of the smoker.[442]

FDA's investigation has disclosed efforts by the industry to chemically enhance nicotine delivery. A major American tobacco company's 1991 handbook on leaf blending and product development shows that ammonia from such sources as diammonium phosphate (DAP),[443] ammonium hydroxide, and urea can be used in cigarette manufacturing to increase the amount of nicotine delivered to the smoker.

The handbook states that ammonia in cigarette smoke:

> *can liberate free nicotine from the blend, which is associated with increases in impact and 'satisfaction' reported by smokers.*[444]

The handbook goes on to describe ammonia as an "impact booster":

> *Ammonia, when added to a tobacco blend, reacts with the indigenous nicotine salts and liberates free nicotine. As a result of such change, the ratio of extractable nicotine to bound nicotine in the smoke may be altered in favor of extractable nicotine. As we know, extractable nicotine contributes to impact in*

---

[442] Surgeon General's Report. *Nicotine Addiction.* 1988. Pages 29-31.

[443] *See* Statement of David A. Kessler, note 416, *supra,* at pp. 9-12.

[444] *Id.* at p. 10.

*cigarette smoke and this is how ammonia can act as an impact booster.*[445]

Ammonia increases the pH of the smoke and thereby enhances the absorption of nicotine by the body.[446] FDA's investigation has revealed at least one common site for the application of ammonia and ammonia-like compounds: reconstituted tobacco. The agency has found levels of these compounds to be as high as 10 % in reconstituted tobacco.

The company handbook describes the benefits of the treated reconstituted tobacco as a source of ammonia to absorb nicotine from higher alkaloid-containing components in the blend. This company handbook also describes the application of ammonia directly to the leaf tobacco.

With regard to the question of the efficiency of this technology in increasing nicotine delivery, the handbook states that smoke analysis shows that an experimental cigarette made of reconstituted tobacco treated with ammonia has almost double the nicotine transfer efficiency of tobacco.[447] This handbook also states that many U.S. tobacco manufacturers utilize ammonia technology. One company has admitted to FDA that it uses DAP in manufacturing cigarettes, and that such use increases nicotine delivery.[448]

(ii) Flavors and Casings

Various substances are added to tobacco components to affect the flavor and palatability of smoke, alter smoke composition and yield, modify burn rate, and alter pH to optimize nicotine

---

[445] *Id.*

[446] Surgeon General's Report. *Nicotine Addiction.* 1988. Pages 29-31.

[447] *See* Statement of David A. Kessler, note 416, *supra,* at pp. 10-12.

[448] *See* King and Spalding letter, note 403, *supra,* at p. 6.

delivery. According to one industry expert,[449] the major contribution of the tobacco flavor specialist is to:

> *help provide a rich, clean, full-bodied tobacco flavour, to keep to a minimum hotness and irritation in the mouth, and to ensure high satisfaction from an adequate level of nicotine per puff . . . requirements that guarantee the consumer a pleasurable smoke . . .*

So-called "casings" are solutions of usually water-soluble ingredients that provide a means of incorporating flavorings and other additives into the tobacco blend. Casings are often used in tobacco processing to reduce the harshness of nicotine in high-nicotine tobaccos, thus permitting greater use of these tobaccos in cigarette manufacture. This use of casings is described by an industry "flavorist" in the following quote:

> *It is assumed that nicotine is one of the primary satisfaction factors for which tobacco products are used. However, in air-cured tobaccos (cigar, burley, Maryland), the pH of the smoke is generally alkaline and the flavor effect of nicotine is a "harshness" which can be choking and unpleasant. In the case of tobaccos containing sugars (flue-cured, oriental), the tobacco is weakly acidic, the effect of the nicotine is greatly modified, and the harshness is dramatically reduced. This same effect is often achieved by addition of sugars to air-cured tobaccos to "mellow" the smoke and/or by the blending of air-cured tobaccos with flue-cured and oriental. [Citation omitted.] Thus, smoke pH and leaf sugar content are factors which play an important role in the nicotine strength perceived in the smoking process.*[450]

As is clear from this quote, casings are used to permit the incorporation of high-nicotine tobaccos in cigarette blends, <u>despite</u> their unpleasant taste. Casings composed of such additives as sugar, licorice, or cocoa help to overcome the bitterness of nicotine in smoke. The lengths to which tobacco manufacturers go to use high-nicotine tobaccos, despite the harsh taste of

---

[449] Hertz AN. The flavourist's role in the cigarette design team. *World Tobacco.* March 1985. Page 97.

[450] Leffingwell JC. Nitrogen components of leaf and their relationship to smoking quality and aroma. *Recent Advances in Tobacco Science.* Volume 2. Page 9.

THIS PAGE HAS BEEN PURGED OF INFORMATION THAT MAY BE CONSIDERED TO BE OF A TRADE SECRET OR COMMERCIAL CONFIDENTIAL NATURE

nicotine, reveals that the nicotine in these tobaccos is not being used for its taste but for another purpose.

FDA's investigation revealed the following example of the application of casings to permit a use of a high-nicotine tobacco that would otherwise have been unpalatable to consumers. [redacted][451]

Manufacturers also reduce harshness by routinely adding acids to tobacco to lower the pH of the smoke.[452] Manufacturers also use conventional casing materials, such as sugars and cocoa, to produce acids in the smoke and reduce harshness.[453] Harshness from nicotine is also reduced by spraying on top dressings after the tobacco is cut and shredded for cigarette making.[454]

Casings often include a humectant, usually glycerine or a higher glycol, which serves to

---

451 [redacted]

452 *See* King and Spalding letter, note 403, *supra*, at p. 6.

453 *Id.*

454 *Id.*

**THIS PAGE HAS BEEN PURGED OF INFORMATION THAT MAY BE CONSIDERED TO BE OF A TRADE SECRET OR COMMERCIAL CONFIDENTIAL NATURE**

keep the tobacco moist and less sensitive to changes in humidity.[455] RJR acknowledged using glycerine as a humectant.[456] Tobacco industry officials acknowledge that controlling moisture content is essential to ensure that nicotine content does not fall.[457] Humectants also act to control particle size in the formation of the smoke aerosol, making the smoke "smoother" or less harsh on the back of the throat. Smoother smoke facilitates inhalation, ensuring that the nicotine will be taken into the lungs and rapidly and completely absorbed.

Nicotine can also be added to cigarettes through application of tobacco extracts in the processing of tobacco. Although calling the contribution of flavored tobacco extracts to the overall nicotine delivery from cigarettes "trivial," tobacco companies admitted to having used such extracts in testimony before Congress,[458] in other public statements,[459] [redacted]

---

[455] *See* Browne, note 399, *supra,* at pp. 55-56.

[456] Budich K. Notes from April 10-12, 1994, meeting with RJR. Page 8.

[457] DeBardeleben MZ, Clafin WE, Gannon WF. (Philip Morris Research Center). Role of cigarette physical characteristics on smoke composition. *Recent Advances in Tobacco Science.* Volume 4. Page 98 ("Nicotine decreases on a per puff basis as moisture content increases . . . . The decrease is dramatic as moisture content rises above 12%").

[458] *Regulation of Tobacco Products (Part I): Hearings Before the Subcommittee on Health and the Environment of the Committee on Energy and Commerce, U.S. House of Representatives*, 103 Cong. 2d Sess. 592, 596 (April 14, 1994) (testimony of Edward A. Horrigan, Jr., Liggett Group, Inc. and Andrew Tisch, Lorillard Tobacco Co.).

[459] Philip Morris press release. *Philip Morris Statement on Nicotine in Cigarettes.* March 25, 1994. Page 2.

**THIS PAGE HAS BEEN PURGED OF INFORMATION THAT MAY BE CONSIDERED TO BE OF A TRADE SECRET OR COMMERCIAL CONFIDENTIAL NATURE**

[redacted][460]

(iii) <u>Filtration</u>

The filter plug provides a mouthpiece that captures particulate matter from the smoke and absorbs vapors. The filter can be used as a vehicle to carry filter aids such as charcoal and other solids and liquid additives that permit selective filtration of certain chemicals. The manufacturer's selection of a particular filter is determined largely by the target levels of nicotine and tar.[461]

Significant research has been conducted by the tobacco industry on the use of filter additives to enhance nicotine delivery.[462] FDA's investigation revealed that at least one major cigarette manufacturer has added a chemical to the filters used on its marketed cigarettes that increases the amount of nicotine delivered to smokers, by increasing the amount of nicotine that is eluted from the filter. "Elution" is the process by which nicotine that is initially trapped on a

---

[460] *See:*

Hunter J. FDA memo to the record. Conversation with Steve Block of IFF. March 23, 1994.

Layloff T, FDA. Memo to James Hunter, FDA. Tobacco Extract Analyses. February 24, 1995.

[redacted] The actual contribution of tobacco extracts to total nicotine delivered to the smoker by tobacco so treated is unclear. The industry has conducted research to examine the specific activity of added versus naturally occurring nicotine. *See* Jenkins RW, Comes RA. Exogenous vs Endogenous Transfer of Nicotine During Smoking. *Int. J. Appl. Radiat. Isotopes*. 1976;27:323-324.

[461] *See* Browne, note 399, *supra,* at p. 66.

[462] Reynolds ML. Influence of filter additives on smoke composition. Page 54. Undated.

**THIS PAGE HAS BEEN PURGED OF INFORMATION THAT MAY BE CONSIDERED TO BE OF A TRADE SECRET OR COMMERCIAL CONFIDENTIAL NATURE**

filter is remobilized into the mainstream smoke by hot vapors and becomes available for inhalation by the smoker. [redacted][463]

Filter ventilation, which is accomplished by making holes in the filter wrap and tipping paper, is also a major means of controlling the nicotine delivery of a cigarette. Ventilation has apparently now largely replaced interest in filter additives as a means of enhancing nicotine delivery.[464] Ventilation holes allow fresh air to be pulled in by the smoker's suction, thereby diluting the smoke. Ventilation does not, however, simply reduce the concentration of each smoke component in proportion to the degree of dilution. Instead (while ventilation does reduce the tar and nicotine deliveries compared to a non-ventilated cigarette), ventilation can be used to increase the proportion of nicotine compared to tar.[465]

Tobacco manufacturers control filter ventilation by (1) changing the number and location

---

[463] [redacted]

[464] *See* Reynolds, note 462, *supra,* at p. 61.

[465] Kiefer JE. Ventilated Filters and their Effect on Smoke Composition. In: *Recent Advances in Tobacco Science.* Volume 4. Physical Parameters which Affect the Composition of Cigarette Smoke from 32nd Tobacco Chemists Research Conference. October 30 - November 1, 1978. Montreal, Canada. Pages 78,79.

of holes in the filter tipping paper, which surrounds the filter at the smoker's end of the cigarette rod; and (2) by controlling the porosity of the plug wrap, which underlies the tipping paper and surrounds the filter.[466]

As the amount of ventilation increases, the amount of tar and nicotine are not proportionately reduced. Instead, tar is reduced at a greater rate than nicotine, thereby increasing the proportion of nicotine to tar. For instance in one reported measurement, as the proportion of filter ventilation went from 0% to 50%, mainstream smoke tar dropped 47% (29.38 to 15.71 mg/cigarette), while mainstream smoke nicotine dropped 37% (1.70 to 1.07 mg/cigarette).[467] The effect of using such ventilation is that the manufacturer has selectively reduced tar while delivering a higher percentage of the available nicotine to the smoker.

Filter ventilation can produce low nicotine and tar delivery ratings when measured by the FTC smoking machine, yet still manage to deliver higher nicotine levels to the smoker than indicated by the FTC yield. Research has shown that, unlike the FTC smoking machine, 32% to 69% of low-tar cigarette smokers block the perforations in ventilated filters with their fingers or lips. This behavior is not unexpected because some smokers are unaware of these ventilation holes or their function, and because the holes are generally tiny, laser-generated perforations and difficult for the smoker to see. Blockage of these holes results in greater nicotine yields to the smoker than those measured by the FTC smoking machine.[468] This filter design provides a

---

[466] *See* Browne, note 399, *supra,* at p. 10.

[467] *See* Browne, note 399, *supra,* at p. 84.

[468] Kozlowski LT, Frecker RC, Khouw V, Pope MA. The misuse of 'less hazardous' cigarettes and its detection: hole-blocking of ventilated filters. *American Journal of Public Health.* 1980;70(11):1202-1203.

THIS PAGE HAS BEEN PURGED OF INFORMATION THAT MAY BE CONSIDERED TO BE OF A TRADE SECRET OR COMMERCIAL CONFIDENTIAL NATURE

means of compensating for reductions in nicotine delivery that are produced by unblocked filter ventilation. The ability to block ventilation holes is thus a means of improving a cigarette's "elasticity," i.e., a design feature that allows smokers to "compensate" for nicotine losses that would otherwise be caused by tar-reducing modifications. See p. 229, supra.

Another ingenious compensatory method to boost nicotine delivery has been the development of the so-called channel-ventilated filter system. This system has been employed by Brown and Williamson for its BARCLAY brand launched in 1981, and represents an attempt to avoid some of the reduction in nicotine that can accompany the use of ventilated conventional filters. The channel-ventilated filter functioned differently when tested on the FTC smoking machine than when used by humans. In fact, in an investigation that commenced in 1981, the FTC found that air flow through these channels is indeed compromised during actual smoking and that BARCLAY's channel filter actually delivers considerably more nicotine and tar to the smoker than is obtained using the FTC's testing method.[469] In 1983, the FTC successfully sued to enjoin Brown and Williamson from using nicotine, tar, and carbon monoxide results obtained from the FTC's smoking machine testing method in its BARCLAY advertising.[470] [redacted]

---

[469] Federal Trade Commission. "Report to Congress Pursuant to the Federal Cigarette Labeling and Advertising Act," for the year 1981(July 1984) and 1984(1986).

[470] FTC v. Brown & Williamson Tobacco Corp., 580 F. Supp. 981, 983, 987, n. 35, and 988 (D.D.C.1983), aff'd in part (affirmed holding that the 1 mg tar claim had a tendency to deceive) and remanded in part, 778 F. 2d 35 (D.C. Cir. 1985). RJR and Philip Morris had complained to the F.T.C. that Brown and Williamson's Barclay advertisement claim of 1 mg tar was inaccurate and misleading, and that "when the cigarette is smoked between human lips its air ventilation system is inevitably obstructed and the cigarette delivers disproportionately more tar and nicotine than other comparably rated cigarettes." 778 F.2d at 37. Brown and Williamson argued, among other things, that Barclay had a higher ratio of nicotine to tar. 580 F. Supp. at 981, 984.

THIS PAGE HAS BEEN PURGED OF INFORMATION THAT MAY BE CONSIDERED TO BE OF A TRADE SECRET OR COMMERCIAL CONFIDENTIAL NATURE

[redacted][471]

(iv) Reconstituted Tobacco

Cigarette manufacturers claim that the development and use of reconstituted tobacco sheet represents a cost-cutting measure to minimize tobacco waste. But the role of reconstituted tobacco in reducing tar and in controlling nicotine delivery is also apparent. The first use of reconstituted tobacco occurred in the 1950's by RJR, primarily as a method for reducing tar, in WINSTON cigarettes.[472] RJR estimates that reconstituted tobacco is used in virtually every cigarette brand on the market.[473] U.S. manufacturers generally use between 20% and 25% of this material.[474]

In the reconstitution process, pieces of tobacco material undergo treatment that results in the extraction of some soluble components, including nicotine. The pieces are then physically formed into a sheet of tobacco material, to which the extracted nicotine is re-added. Even if this

---

[471] Budich K. Notes from May 3, 1994, meeting with Brown and Williamson. Page 12.

Federal Trade Commission. "Tar, Nicotine, and Carbon Monoxide of the Smoke of 933 Varieties of Domestic Cigarettes." 1994. Pages 9-10.

[472] Chemical and Biological Studies On New Cigarette Prototypes That Heat Instead of Burn Tobacco, R.J. Reynolds Tobacco Co. Winston-Salem, NC. 1988. Page 29. By increasing the use of reconstituted tobacco sheet in the cigarette rod (thereby reducing the amount of cut tobacco leaf needed) and using increasingly more efficient filtration, the levels of tar have been further reduced by the industry since the 1950's.

[473] *Id.*

[474] *See* Browne, note 399, *supra,* at p. 47.

reconstituted material contains only the original nicotine, its recombination with the tobacco material may be viewed as adding nicotine to the cigarette because the nicotine had been removed. Although denied by tobacco executives,[475] it is publicly reported that this process adjusts nicotine levels in the products, and that one manufacturer "readily admits to setting levels of nicotine . . . for the tobacco sheet."[476]

The agency has observed that the primary methods of producing reconstituted tobacco sheet are closely monitored and controlled to preserve the amount of nicotine in the tobacco components. These processes enable the manufacturer to precisely control and evenly disperse nicotine throughout this material, bringing a high degree of uniformity and consistency to the composition of a raw agricultural commodity. This control is so refined that despite the wide variability in the nicotine content of unprocessed tobaccos, reconstituted tobacco contains a generally uniform concentration of nicotine of around 1%, industry-wide. And, as described below, the reconstitution process can actually be used to elevate the level of available nicotine.

At least one company, LTR Industries, LeMans, France, which is involved exclusively in the production of reconstituted tobacco sheet for the cigarette industry, has publicly acknowledged the extent to which the production of such material can be controlled to precisely affect nicotine and tar deliveries.

According to an article appearing in the February 1983 issue of Tobacco Journal International, LTR claims that its process can produce reconstituted tobacco sheet to satisfy any

---

[475] *Regulation of Tobacco Products (Part I): Hearings Before the Subcommittee on Health and the Environment of the Committee on Energy and Commerce, U.S. House of Representaives,* 103 Cong. 2d Sess. 543 (April 14, 1994) (testimony of William I. Campbell, President and CEO, Philip Morris U.S.A.).

[476] Sisele S. Tobacco scrap: cigarette makers are taking heat for adjusting nicotine levels. *The Charlotte Observer.* March 6, 1994. Page 1C.

manufacturer's specifications for nicotine delivery. In this article, LTR states that "based on the idea that reconstituted tobacco could be used as a nicotine regulator, we have developed products with reduced or fortified nicotine." LTR has also been identified as having the ability to manipulate nicotine levels in reconstituted tobacco either by working into the scrap and waste new nicotine-rich tobacco of the "*rustica* type," or by adding purified salts of nicotine into the slurry, to boost the levels of nicotine in the finished reconstituted tobacco sheet.[477]

(v) Use of Wider Tipping Paper

Another means to compensate for nicotine losses from tar-reducing design options is the industry's use of wider tipping paper overwrap. According to a study conducted by Grunberg et al.,[478] between 1967 and 1978, the width of the overwrap was increased on 18 brands of filter cigarettes, even though there was smokable tobacco under the widened overwrap. The Grunberg study found that the wider tipping paper reduced the amount of tobacco smoked during the FTC testing method, because the FTC method prescribes that cigarettes be smoked down to within 3 millimeters of the tipping paper rather than until all of the tobacco is burned. Thus, use of wider tipping paper causes a decrease in the FTC yields of tar and nicotine while permitting smokers to obtain a higher yield of both tar and nicotine from the cigarette. Like the use of ventilation holes, use of wider tipping paper constitutes a form of built-in "elasticity" because it increases the amount of nicotine a smoker can obtain from a cigarette over the advertised FTC yield.

---

477 Evolving techniques of making cigarettes milder. *World Tobacco*. April 1979. Pages 93-101.

478 Grunberg NE, Morse DE, Maycock VA, Kozlowski LT. Changes in overwrap and butt length of American filter cigarettes. *NY State Journal of Medicine*. July 1985. Pages 310-312.

### e. Manipulation of Nicotine in Low-Yield Cigarettes

The manipulation and control of nicotine in cigarette design and manufacture is particularly apparent when low-yield cigarettes are analyzed. Since the genesis of the low-tar cigarette, the industry has recognized that the use of tar-reducing modifications, such as those described above, can reduce nicotine delivery. This has led some manufacturers to compensate for the effects of tar reduction to ensure an adequate delivery of nicotine in the low-yield products.[479] As one article in a 1979 industry publication states, the current practice is "to prefer tobaccos rich in flavour elements, even though that may mean their having more nicotine and tar than is desirable, and seeking to reduce the latter without doing too much harm to the former."[480]

To a remarkable degree, the cigarette industry has accomplished the task of maintaining delivery of nicotine while decreasing tar in low-tar products. In 1988, Jacob et al.[481] found that,

---

[479] The tobacco industry has repeatedly stated that reductions in tar yields result in proportionate reductions in nicotine yields. *See, e.g. Regulation of Tobacco Products (Part I): Hearings Before the Subcommittee on Health and the Environment of the Committee on Energy and Commerce, U.S. House of Representatives,* 103rd Cong., 2d Sess. 363 (1994) (statement of R. J. Reynolds Tobacco Company); *Regulation of Tobacco Products (Part I): Hearings Before the Subcommittee on Health and the Environment of the Committee on Energy and Commerce, U.S. House of Representatives,* 103rd Cong., 2d Sess. 378 (1994) (statement of Alexander W. Spears, Vice Chairman and Chief Operating Officer, Lorillard Tobacco Company); ATC letter to the Honorable Henry A. Waxman, note 355, *supra*, at pp. 2-3 of attachment. The evidence in this section demonstrates that nicotine levels in some cigarettes have not fallen proportionately with tar and, in fact, are subjected to independent manipulation and control.

[480] *See* 1979 *World Tobacco* article, note 426, *supra,* at page 95.

The manipulation of nicotine levels relative to tar levels in European cigarettes was noted in *The Lancet* in 1979. The author reported that the tar-to-nicotine ratio had declined from 1973 to 1979 and concluded that "the consistent fall in tar yield relative to nicotine over a period of years suggests an element of conscious manipulation." Tar: nicotine ratio of cigarettes 1973-79. *The Lancet.* No. 8139. August 25, 1979. Pages 422-423. [Emphasis added.]

[481] *See:*

Jacob P, Benowitz NL, Shulgin AT. Recent studies of nicotine metabolism in humans. *Pharmacology, Biochemistry, and Behavior.* 1988. Volume 30. Pages 249-250. In a more recent study, Benowitz states that cigarettes currently contain 8 to 9 mg of nicotine. Benowitz NL, Henningfield JE. Establishing a nicotine threshold for addiction. *N Engl J Med.* 1994;331:123-125.

regardless of the labeled and advertised FTC nicotine yields and manufacturers' claims of low-nicotine delivery for certain brands, all cigarettes contained at least about 10 mg of nicotine in the cigarette rod. Consistent with this finding, a study by Benowitz and Hall et al.[482] in 1983 demonstrated that cigarettes advertised as having a low-nicotine yield do not contain less nicotine than high-yield cigarettes. Moreover, the nicotine yield of cigarettes, as defined by the FTC smoking machine tests, correlates inversely with nicotine concentrations in the tobacco.[483] In other words, cigarettes advertised as low-tar and low-nicotine have higher concentrations of nicotine, by weight, than high-yield cigarettes. This has been accomplished by a combination of the methods described above for boosting nicotine delivery to compensate for nicotine losses from the application of tar-reducing design modifications.

FDA's analysis of marketed cigarettes has disclosed similar results. There is little variation in nicotine content from one U.S. brand to another. FDA also measured the actual amount of nicotine contained in several brands of cigarettes, and the amount of nicotine in three varieties of the Merit brand of cigarettes: one regular, one low-tar, and one ultra low-tar. The results of this testing showed that the variety labeled and advertised as the lowest in nicotine actually had the highest nicotine concentration, suggesting that the nicotine content was

---

Benowitz NL. Dosimetric studies of compensatory cigarette smoking. In: Wald N, Froggatt P, eds. *Nicotine, Smoking and The Low Tar Programme*. Oxford, England: Oxford University Press; 1989:chap 10.

[482] Benowitz NL, Hall SM, Herning RI, Jacob III P, Jones RT, Osman A. Smokers of low yield cigarettes do not consume less nicotine. *New England Journal of Medicine*. 1983;309:139-142.

[483] *Id.*

manipulated to compensate for reductions caused by design features intended to reduce tar.[484]

In addition, FDA evaluated the tar and nicotine data for domestically marketed cigarettes published by the FTC for 1994. These data demonstrate that the lowest tar products have a markedly higher ratio of nicotine to tar than higher tar products. None of the 153 products with 14 or more milligrams of tar (high tar) had a nicotine to tar ratio greater than 1 to 12. By contrast, 88 of the 93 products with 6 or fewer milligrams of tar (ultra-low tar) had a nicotine to tar ratio greater than 1 to 12.[485]

The increase in nicotine-to-tar ratios between 1972 and 1994, see note 485, especially in low tar cigarettes, is particularly revealing in the light of industry research dating from the 1970's showing that the "optimum" nicotine-to-tar ratio for acceptability of low tar cigarettes is higher than the "natural" ratio. As described earlier, a 1975 Philip Morris study showed that "the optimum nicotine-to-tar (N/T) ratio for a 10mg [low] tar cigarette is somewhat higher than

[484] According to FDA's analysis, whereas Merit Regular 100's contained 1.46% nicotine, Merit Low Tar 100's contained 1.67% nicotine, and Merit Ultra Low Tar 100's contained 1.99% nicotine. *See Regulation of Tobacco Products (Part I): Hearings Before the Subcommittee on Health and the Environment of the Committee on Energy and Commerce, U.S. House of Represantarives,* 103 Cong. 2d Sess. 121 (March 25, 1994) (statement of David A. Kessler, M.D., Commissioner of Food and Drugs, "The Control and Manipulation of Nicotine in Cigarettes," Chart P). The Commissioner's statement is included as Appendix 7 to this document.

[485] Federal Trade Commission. 1994 report of the tar and nicotine content of domestic cigarettes. (FDA's analysis included only those products that were evaluated by the Tobacco Industry Testing Laboratory.) By contrast, only 2 of the 142 marketed cigarettes included in the FTC report for 1972 had a nicotine to tar ratio greater than 1 to 12. (Federal Trade Commission. 1972 report of the tar and nicotine content of domestic cigarettes.) On a percentage basis, only 1.4 percent of the 1972 products had a nicotine to tar ratio greater than 1 to 12. In 1994, that figure grew to 26.3 percent overall, and rose to 95 percent for the 93 products in the lowest tar category. This suggests that as the market for lower yield cigarettes has grown over the last 20 years, the cigarette industry has altered the traditional ratio of nicotine to tar.

occurring in smoke from the natural state of tobacco."[485a] [Emphasis added.] The Philip Morris researchers went on to say that this study would be used to "attempt to make a 10 mg [low tar] cigarette that will equal a Marlboro in subjective acceptability and strength." According to these researchers, the naturally occurring nicotine-to-tar ratio was 0.07, while the optimal ratio was about 0.1. See p. 223, supra.[485b]

As noted above, tobacco industry officials have repeatedly stated that nicotine yields are not manipulated and are simply a function of tar yields, i.e., that reductions in tar yields result in proportionate reductions in nicotine yields. For example, the chief operating officer of Lorillard

---

485a Low Delivery Cigarettes and Increased Nicotine/Tar Ratios, A Replication. Approved by W.L. Dunn and distributed to H. Wakeham. October, 1975. *In* 141 Cong. Rec. H8009 (daily ed. July 31, 1995)(statement of Rep. Waxman). *Also in* Hilts PJ. Documents Disclose Philip Morris Studied Nicotine's Effect on Body. *New York Times.* June 8, 1995.

485b According to an analysis of FTC nicotine and tar delivery levels conducted by a member of Congress, at least two Philip Morris low-tar products show evidence that the data on "optimal" nicotine-to tar ratios was applied by the company to make changes in the nicotine-to-tar ratios of marketed cigarettes. One marketed cigarette underwent an increase in its nicotine-to-tar ratio, beginning in 1978, that closely corresponds to the change from the "natural" ratio to the "optimum" ratio described by Philip Morris researchers in 1975. From 1968 to 1978, tar and nicotine levels in regular Benson & Hedges filtered cigarettes dropped from 21 mg tar and 1.29 mg nicotine to 0.9 mg tar and 0.06 mg nicotine. Throughout this period, the nicotine-to tar ratio in the cigarettes remained stable, i.e., tar and nicotine delivery levels were falling proportionately. The ratio during this period was 0.7, the ratio described by Philip Morris researchers as "natural" for tobacco. Then, beginning in 1978, nicotine delivery from Benson & Hedges began to increase, while tar remained stable. By 1983, the nicotine delivery had jumped from 0.06 to 0.1, an increase of over 60%. The result was an increase in the nicotine-to tar ratio to 0.11, approximately the same level found by Philip Morris researchers to be "optimal." Congressman Waxman reported that the chance that this change in the nicotine-to-tar ratio could have been due to random fluctuations in tar and nicotine levels is less than 1 in 100,000. The tar-to-nicotine ratio for Benson & Hedges dropped back to 0.07 in 1984 and 1985. Although the reasons for this change are unknown, Congressman Waxman noted that the change could have been due to a decision to phase out the product or to the use of technologies that permit manipulation of the amount of nicotine delivered to the smoker but that do not affect the amount of nicotine measured by a smoke machine. Waxman also analyzed Philip Morris product, Merit Ultra Lights. This product was introduced in 1981 with a nicotine/tar ratio of 0.11, which corresponds to the "optimal" ratio found by Philip Morris researchers, rather than to the "natural" ratio of 0.07. The elevated nicotine-to-tar ratio in Merit Ultra Lights has remained constant in the years since its introduction. 141 Cong. Rec. H8009-10 (daily ed. July 31, 1995)(statement of Rep. Waxman). Philip Morris denied that the changes were deliberate. Hilts PJ. Philip Morris Denies Charge By Lawmaker. *New York Times.* August 2, 1995.

Tobacco Co. testified before Congress in 1994 that:

> *We do not set nicotine levels for particular brands of cigarettes. Nicotine levels follow the tar level. . . . The correlation coefficient of 0.975 is essentially perfect correlation between tar and nicotine and shows that there is no manipulation of nicotine.*[485c]

The significant increase in the nicotine to tar ratio for low delivery products contradicts these statements and provides strong evidence that nicotine deliveries are independently manipulated. In fact, an industry document states that the nicotine-to-tar ratios in ultra low tar cigarettes are higher than would be expected if nicotine fell proportionately with tar. In 1978, Philip Morris surveyed the nicotine-to-tar ratios in its competitors' ultra low tar products (5-7 mg tar) and found that these ultra low tar cigarettes "seem to be higher in nicotine delivery than we would otherwise expect" and found further that "nicotine/tar ratios go up as tar goes down":

> *The table [of nicotine-to-tar ratios for a range of low tar brands] suggests that Philip Morris brands (asterisked) have lower nicotine/tar ratios than do other brands with about the same FTC tar delivery. . . . The table also suggests that nicotine/tar ratios go up as tar goes down, and that our competitors' brands . . . seem to be higher in nicotine delivery than we would otherwise expect from our own experience with low delivery cigarettes . . . .*
>
> *It appears therefore that the mechanics of cigarette engineering and the deliberate decisions of our competitors are such as to suggest high nicotine/tar ratios be used at ultra low tar levels.*[485d] [Emphasis added.]

The Philip Morris researchers suggest that the high nicotine-to-tar ratios in the low tar products of Philip Morris' competitors have been achieved through certain kinds of filters and by "the use of

---

[485c] *Regulation of Tobacco Products (Part I): Hearings Before the Subcommittee on Health and the Environment of the Committee on Energy and Commerce, U.S. House of Representatives,* 103rd Cong., 2d Sess. 378 (1994) (statement of Alexander W. Spears, Vice Chairman and Chief Operating Officer, Lorillard Tobacco Company)

[485d] Memorandum to T.S. Osdene from W.L. Dunn. Plans and Objectives-1979. December 6, 1978. *In* 141 Cong. Rec. H7670 (daily ed. July 25, 1995).

high alkaloid blends,"[485e] i.e., the use of tobaccos containing high nicotine levels.

FDA also analyzed other information supplied by the FTC that was derived from the FTC's database on nicotine levels in cigarettes. FDA's analysis of the FTC data demonstrates two very important results. First, there is an apparent increase in the sales-weighted FTC nicotine delivery ratings, for all cigarettes, since 1982 (the earliest year for which the computer database is available). Second, consistent with the data on the increase in nicotine to tar ratios, when FDA segmented FTC's sales data into high-tar, low-tar, and ultra low-tar cigarettes, nicotine yields had the greatest increase in the ultra low-tar group.[486] These findings are depicted in the following charts:

[485e] *Id.*

[486] *See:*
Kessler, note 484, *supra,* at charts Q, R, S, T. "Sales-weighted" nicotine delivery ratings represent the average nicotine yield of all cigarette brands sold in a given year, adjusted (weighted) to reflect the actual sales of the brands.

Hoffman D, Hoffman I. On the Reduction in Cigarette Smoke. In: Wald and Froggatt, note 481, *supra,* at pp. 200-201.

## Sales-Weighted Nicotine and Tar Levels in Smoke
## As % of 1982 Levels
### Average of All Brands*




(*Source:* FTC Annual Data)

*by FTC method

# Sales-Weighted Nicotine and Tar Levels in Smoke As % of 1982 Levels

## Low Tar Category*




*Low Tar Category = 6-15 mg tar by FTC method

(*Source:* FTC Annual Data)

## Sales-Weighted Nicotine and Tar Levels in Smoke
## As % of 1982 Levels
### High Tar Category*




(*Source:* FTC Annual Data)

*High Tar Category = greater than 15 mg tar by FTC method

## Sales-Weighted Nicotine and Tar Levels in Smoke As % of 1982 Levels

### Ultra-Low Tar Category*




*Ultra-Low Tar Category = less than 6 mg tar by FTC method

(*Source:* FTC Annual Data)

**f. Conclusion**

The information in the preceding sections demonstrates that cigarette manufacturers manipulate and control the delivery of nicotine in marketed products. Cigarettes are designed to supply nicotine at consistent levels despite the wide variations in the nicotine levels of the raw materials, the immensely complicated combustion chemistry, and the complex chemical flow properties of a modern cigarette.

Manufacturers use many techniques to control nicotine deliveries. The application of these modifications in cigarette design and their interactive nature pose complex problems in maintaining brand uniformity and consistency regarding nicotine delivery. Yet, the nicotine content and delivery of each brand of cigarettes is remarkably consistent from batch-to-batch and year-to-year. This level of control is analogous to that of the pharmaceutical industry in the production of prescription drugs. In fact, to determine how well nicotine content is controlled in cigarettes, FDA laboratories compared the content uniformity of drugs in tablet or capsule form to the content uniformity of nicotine in cigarettes. The results showed that nicotine content varies from cigarette to cigarette no more than the content of active ingredients in marketed pharmaceuticals.[487]

FDA's investigation has also disclosed that the tobacco industry uses a number of methods to boost nicotine delivery in low-yield cigarettes. The cigarette industry has successfully used these methods to maintain adequate nicotine delivery from low-yield products. Without the independent manipulation of nicotine, many of the techniques used to reduce tar

---

[487] FDA, CDER, DDA, Report on Analysis of Packages of Cigarettes, April 4, 1994. *See* Kessler, note 416, *supra,* at p. 12.

would also substantially reduce nicotine. Instead, regardless of differences in labeled/advertised FTC nicotine yields and manufacturers' claims of low-nicotine delivery for certain brands, all cigarettes contain approximately the same amount of nicotine in the rod, and deliver about 1 mg of nicotine, enough to produce pharmacological effects. See p. 108, supra. Moreover, studies by FDA and others have demonstrated that the lowest-yield cigarettes have the highest concentrations of nicotine, demonstrating that nicotine delivery has been independently manipulated.

The tobacco industry's control and manipulation of nicotine delivery from cigarettes provides additional evidence of the industry's intent to deliver pharmacologically satisfying levels of nicotine to smokers.

## 2. Industry Manipulation and Control of Nicotine in Smokeless Tobacco

Smokeless tobacco manufacturers control the delivery of nicotine from smokeless tobacco to produce a line of smokeless products that deliver nicotine in graduated amounts. Products that deliver lower doses of nicotine are marketed to new users of smokeless tobacco. Smokeless tobacco marketing then encourages them to "graduate" to products that deliver higher doses of nicotine. Smokeless tobacco manufacturers' manipulation of nicotine deliveries and marketing of low-nicotine products to new users and high-delivery nicotine products to experienced users demonstrates their intention to market products that facilitate nicotine dependence, a significant effect on the structure and function of the body. Smokeless tobacco manufacturers' products are thus intended to affect the structure and function of the body.

Moist snuff is the most popular form of smokeless tobacco. U.S. Tobacco Co. ("UST"), which accounts for 85% of the moist snuff sales in the U.S.[488] markets a line of moist snuff products that includes Skoal Bandits, Skoal Long Cut, Original Fine Cut Skoal, and Copenhagen. Skoal Bandits deliver a very small amount of absorbable nicotine, Skoal Long Cut and Original Fine Cut Skoal deliver sequentially more absorbable nicotine, while Copenhagen delivers the highest amount of absorbable nicotine. UST representatives in fact acknowledge that the company's products provide users with a range of nicotine deliveries.[489]

Smokeless tobacco manufacturers produce graduated nicotine delivery products primarily

---

[488] *See* Appendix 5.

[489] *Marsee v. U.S. Tobacco,* note 317, *supra.* (Remarks of Mr. Finnegan, attorney for U.S. Tobacco.) In: 1.7 TPLR 3.202.

*See also* deposition of Erik Lindqvist, Senior Vice President for Marketing, U.S. Tobacco, in *Marsee v. U.S. Tobacco.* Transcript of Jury Trial Proceedings, at pp. 1648-1676.

by manipulating the pH of the tobacco.[490] Smokeless manufacturers add compounds and manipulate the design of each smokeless product to create a specific pH. The higher the pH of a product, the more nicotine is transformed from the salt form to "free nicotine." Both forms of nicotine are highly soluble in saliva. However, the free form of nicotine is absorbed more rapidly in the mouth of smokeless tobacco users and into the bloodstream for delivery to the brain. Raising the salivary pH from 7.0 to 8.0 increases the percentage of free nicotine available for absorption from 10% to 50%, a fivefold increase.[491]

Various documents show that UST understands the relationship between the pH of its products and their nicotine delivery. For example, in a deposition, UST's Senior Vice President for Marketing acknowledged that he had written a memo in which he had recommended a specific pH level for a new product and that he understood that there was a relationship between pH and nicotine.[492] When asked whether pH affected nicotine absorption, he agreed:

---

[490] *See:*
Henningfield JE, Radzius A, Cone EJ. Estimation of available nicotine content of six smokeless tobacco products. (Submitted to *Tobacco Control* November 17, 1994.)

U.S. Food and Drug Administration. *Report on study of smokeless tobacco products: pH and free base nicotine.* November 4, 1994.

U.S. Food and Drug Administration. National Forensic Chemistry Center. Cincinnati Laboratory. *National survey of smokeless tobacco products.* December 13, 1994, memo from Laura Ciolino, Research Chemist to Fred Fricke, Director.

[491] *See:*
Armitage AK. Some recent observations relating to the absorption of nicotine from tobacco smoke. In: Dunn WL. ed. *Smoking Behavior: Motives and Incentives.* Washington, DC: VH Winston & Sons; 1973. Pages 86 (figure 2) and 87.

Henningfield JE, Radzius AC, Cooper TM, Clayton RR. Drinking coffee and carbonated beverages blocks absorption of nicotine from nicotine polacrilex gum. *JAMA.* 1990;264(12):1560.

[492] Transcript of Jury Trial Proceedings, *Marsee v. U.S. Tobacco*, note 317, *supra,* at pp. 1666-8.

*Q. Mr Lindqvist, is it your understanding that as the pH of the product is lowered, that the rate of absorption of nicotine by the user is also lowered?*

*A. That would be my understanding, yes.*[493]

The major smokeless tobacco manufacturers in the United States each market products that range from low to high pH, producing a corresponding graduation in the amount of "free nicotine" delivered by these products. The products with the lowest pH deliver the least amount of absorbable nicotine, while those with the highest pH deliver a significantly higher amount of absorbable nicotine.[494]

FDA laboratories comprehensively analyzed several marketed snuff products.[495] The following table demonstrates the characteristics of marketed smokeless tobacco products related to nicotine delivery.[496]

---

[493] *Id.* at p. 1668.
*See also:*
U.S. Tobacco Company documents discuss the pH of various brands, also suggesting a knowledge of the relationship between pH and nicotine absorption:

> *Red Seal Menthol. . . 2. Lower pH than Skoal through flavor if possible. . . Premium project. . . Full tobacco flavor, pH at the level of Copenhagen or higher.*

U.S. Tobacco memo from Erik Lindqvist. (This document was discussed in the trial in *Marsee v. U.S. Tobacco*, note 317, *supra*. These quotes were authenticated by Erik Lindqvist, the author, in his deposition. Transcript of Jury Trial Proceedings, at pp.1666-1671.)

According to the trial transcript of *Marsee*, UST recognizes that pH can affect how much of the nicotine is free. (U.S. Tobacco document No. 4486792, dated Oct. 5, 1981. In: 1.7 TPLR 3.208, July/August 1986.)

[494] The amount of absorbable nicotine is dependent on the pH and not the total amount of nicotine that is in the product. For this reason, the total amount of nicotine in the products throughout the product line can remain relatively constant and still permit graduated nicotine delivery.

[495] FDA laboratories in St. Louis and Cincinnati performed these studies. The results are summarized in two separate reports. *See* note 490, *supra.*

[496] This table reflects the two separate studies which were performed by the two FDA laboratories in St. Louis, MO and Cincinnati, OH. Both laboratories used the same analytical procedures for these analyses.

| MANUFACTURER/ PRODUCT NAME | pH St. Louis | pH Cinc. | % Free Nicotine* St. Louis | % Free Nicotine* Cinc. | Total Nicotine Content (mg/gm)** St. Louis | Total Nicotine Content (mg/gm)** Cinc. |
|---|---|---|---|---|---|---|
| **U.S. Tobacco Co.** | | | | | | |
| Skoal Key | -- | 8.22 | -- | 61.3 | -- | 12.4 |
| Copenhagen Snuff | 8.14 | 7.71 | 56.5 | 32.7 | 13.2 | 13.8 |
| Skoal L.C. Class. | 8.04 | 7.92 | 51.1 | 45.5 | 12.7 | 13.8 |
| Skoal L.C. Wint. | 7.50 | 7.57 | 23.1 | 26.0 | 12.7 | 13.9 |
| Skoal L.C. Mint. | 7.35 | 7.52 | 17.6 | 24.0 | 13.2 | 13.7 |
| Skoal L.C. Spear | 7.20 | 7.50 | 14.0 | 23.3 | 12.5 | 13.8 |
| Skoal Or.F.C. Wint. | -- | 7.41 | -- | 19.7 | -- | 13.6 |
| Skoal L.C. Strai. | 7.47 | 7.41 | 22.0 | 19.5 | 12.1 | 13.8 |
| Skoal L.C. Cherry | 7.15 | 7.38 | 12.3 | 18.5 | 12.5 | 13.6 |
| Skoal Band. Mint | 6.83 | 7.06 | 6.4 | 9.9 | 6.7 | 8.8 |
| Skoal Band Wint. | 6.56 | 6.72 | 3.3 | 4.8 | 7.8 | 8.2 |
| Happy Days L.C. Mint | -- | 6.00 | -- | 0.9 | -- | 13.9 |
| Skoal Band. Strai. | -- | 5.48 | -- | 0.3 | -- | 10.8 |
| Skoal Band. Class. | 5.61 | 5.23 | 0.39 | 0.2 | 10.4 | 9.9 |
| **Helme Tobacco Co.** | | | | | | |
| Redwood Full Flavor | -- | 7.52 | -- | 24.0 | -- | 12.6 |
| Silver Cr. L.C. | -- | 7.22 | -- | 13.7 | -- | 6.0 |
| Cooper Wint. L.C. | -- | 6.99 | -- | 8.5 | -- | 5.7 |
| Gold River L.C. | -- | 5.77 | -- | 0.6 | -- | 6.4 |
| **C.C. Conwood Co.** | | | | | | |
| Kodiak Wint. | 8.20 | 8.22 | 59.9 | 61.0 | 11.4 | 11.7 |
| Kodiak Choice Wint. | -- | 7.98 | -- | 47.7 | -- | 11.4 |
| Kodiak Straight | 7.39 | 7.82 | 19.0 | 38.4 | 10.6 | 10.4 |
| Hawken Wint. | 5.56 | 5.58 | 0.35 | 0.4 | 4.4 | 4.0 |
| **Pinkerton Tobacco Co.** | | | | | | |
| Redman F.C. Ex. Wint. | -- | 7.58 | -- | 12.3 | -- | -- |
| Renegade Wint. | 6.81 | 7.17 | 5.8 | 13.2 | 11.8 | -- |

L.C. = long cut

* Calculated using the Henderson-Hasselbach equation for acid-base equilibrium. This calculation strictly is dependent on the pH determination. Any error in the pH determination will affect the percent free nicotine calculation.

** Measured on wet basis.

This table demonstrates that each of the smokeless tobacco companies whose products were tested by the FDA laboratories markets products that have low, medium, and high pH values, delivering corresponding low, medium, and high levels of free nicotine to the users of the products.[497] It is apparent from the data that providing graduated nicotine deliveries through manipulation of pH is an industry-wide practice. Other researchers have described similar findings.[498]

Other features of these products demonstrate how the smokeless tobacco companies use product design features to control nicotine delivery. For example, UST's Skoal Bandits and Pinkerton's Renegades are packaged in teabag-like pouches, which both limits the amount of snuff that is placed into the mouth and creates a barrier that retards nicotine release from the product. FDA laboratory analysis shows that the effect of the Bandits' pouch is to delay nicotine release by an average factor of three, compared to the same tobacco tested outside of the pouch, during the first 2 minutes of the study.[499] Thus, users of Skoal Bandits get less nicotine into their mouth, and the nicotine is released into their mouths at a slower rate.

---

[497] In the chart, the first column lists the products marketed by specific manufacturers. For each manufacturer, the products are listed in descending order of nicotine delivery. The second and third columns list the pH of each product as measured by two separate FDA labs. The fourth and fifth columns list the amount of absorbable (free) nicotine in each product, calculated from the pH measured at each of the two labs. The sixth and seventh columns list the total nicotine content of each of the products as measured by each of the two labs.

[498] *See* Henningfield, note 490, *supra,* at p. 2. This study found that Skoal Bandits have a pH of about 6.9, providing only 7% of its nicotine in the free form. Skoal Long Cuts have a pH of about 7.4-7.5, providing 19%-23% free nicotine. Original Fine Cut Skoal has a pH of about 7.6, providing 28% free nicotine. Copenhagen was found to be a potent form of snuff, with a pH of about 8.6, producing 79% free nicotine, a very high level for absorption. Page 2 and figure 1.

[499] Department of Health and Human Services, FDA, National Forensic Chemistry Center. *Relative Buffering Capacity of Saliva and Moist Snuff* and *Moist Snuff Nicotine Content Code Date Survey.* Memorandum from Laura A. Ciolino to Elizabeth Berbakos and Thomas Layloff. September 28, 1994.

Smokeless tobacco products are also engineered in such a way that users get a bolus dose of nicotine within the first 5 minutes of inserting the product into the mouth.[500] After the first 5 minutes, nicotine is still released from the product but at a much slower rate. An FDA study showed widely divergent results when comparing Copenhagen and Skoal Bandits under typical use conditions.[501] The amount of nicotine released from a usual "pinch" of Copenhagen (about 1.5 gm) was 12 times higher than from a pouch of Bandits (about 0.5 grams) in the first 2 minutes of the experiment. The bolus dose results in nicotine concentrations in the bloodstream that produce a peak pharmacological concentration in users. These pharmacological concentrations are then maintained by the slow continued release of nicotine from the products following the bolus dose.

Both nicotine release and pH of smokeless products are also affected by the tobacco fermentation process used to make smokeless tobacco products. Tobacco fermentation causes an increase in pH with fermentation time.[502] The age of packaged smokeless products is thus a factor in each product's pH because fermentation can continue within the package due to the high

---

[500] *See:*

U.S. Food and Drug Administration, Center for Drug Evaluation and Research, Division of Drug Analysis. *Nicotine Studies of Chewing and Smokeless Tobacco Products.* Memorandum from Henry D. Drew, Chief, Drug Monitoring Branch, to Elizabeth Berbakos. September 22, 1994. Table 4.

U.S. Food and Drug Administration. National Forensic Chemistry Center. Cincinnati Laboratory. *Moist Snuff Nicotine Release Studies.* September 28, 1994, memo from Laura Ciolino, Research Chemist to Fred Fricke, Director. Page 1.

[501] *Id.* September 28, 1994, memorandum.

[502] Tso TC. *Kirk-Othmer Encyclopedia of Chemical Technology.* John Wiley and Sons; 1970;20:510. This occurs because organic acids are lost through oxidation and decarboxylation.

moisture content of the tobacco.[503] Because fermentation increases pH, and increasing pH increases free nicotine, continued fermentation increases the amount of nicotine that is delivered to smokeless tobacco users. Fermentation also breaks down the plant tissue. This results in nicotine release from the plant intracellular tissue, causing much of the nicotine to come to the surface of the tobacco leaf.[504]

Manufacturers also add humectants to their products to increase or maintain the moisture content. The resulting high moisture content of smokeless products affects nicotine delivery by ensuring that tobacco leaves are well wetted, thus allowing nicotine easily to go into solution (i.e., saliva).

The evidence demonstrates that smokeless tobacco manufacturers design their products to deliver controlled amounts of nicotine to the user by manipulating pH, placing starter products in pouches, and using additives that control the moisture content of the products. Smokeless manufacturers use these sophisticated design features to manipulate the pharmacological response of the user to the product. In doing so, manufacturers intend to market products that affect the structure or function of the body.

The marketing practices of the smokeless tobacco industry further demonstrate the intent of manufacturers to factilitate nicotine dependence among smokeless tobacco users. Until the 1970's, smokeless tobacco companies were marketing only products with high nicotine delivery.

---

[503] Andersen RA, Fleming PD, Hamilton-Kemp TR, Hildebrand DF. pH changes in smokeless tobaccos undergoing nitrosation during prolonged storage: effects of moisture, temperature, and duration. *J. Agric. Food. Chem.* 1993;41:968-972.

[504] This may explain the fast nicotine release from the tobacco products studied by FDA under *in vitro* conditions.

Their market was steadily diminishing because these products were not well tolerated by new users. Evidence from the files of smokeless tobacco companies shows that, in the late 1960's or early 1970's, these companies began to try to entice new users of smokeless tobacco, including people as young as 15 years old.[505] To do so, they developed low-nicotine products in teabag-like pouches to encourage people to begin using smokeless tobacco. A UST document describes the company's rationale for developing a new oral snuff product under the code name "The Lotus Project":

> *__AIM__:* *To make it easier for a new user to use tobacco in the mouth.*
>
> *__TARGET GROUP__:* *New users, mainly cigarette smokers age group 15-35*
>
> *__PRODUCT__:* *A. __Strength__*
>
> *1. Nicotine Satisfaction*
>
> *Mild like Happy Days [a low-nicotine product]*
> *Instant but not shocking*
>
> *2. Feeling in the mouth*
>
> *As little harshness as possible on the gum and in the throat*
>
> * * *
>
> *__PACK__:* *A. __Size of Pinch__*

[505] *See* documents on "Lotus Project":
Undated document entitled "The Lotus Project." From *Marsee v. U.S. Tobacco*, note 317, *supra,* Trial Exhibit 159.

U.S. Tobacco Co. Intra-company Correspondence from W.W. Watson, President - United Scandia International to Mr. L.A. Bantle, President. June 2, 1972. From *Marsee v. U.S. Tobacco*, Trial exhibit 158.

Minutes from a Meeting in Greenwich at Mr. L.A. Bantle's Office. July 18, 1972. From *Marsee v. U.S. Tobacco,* Trial exhibit 159.

> *Small enough for a new user to manage . . . This point has to be closely worked out, takes into consideration the desired effect mentioned under "Strength."*[506]

This document clearly discloses UST's intention to develop a low-nicotine product suitable for "new users," i.e., those not yet tolerant to the harsh effects of nicotine on the gum and throat, and not yet requiring high levels of nicotine for "satisfaction."

Another UST document that discusses the "Lotus Project" and product development discloses the company's intent to produce products with varying amounts of nicotine.[507] The document states:

> *"[t]here should be three products of three different tastes and strengths of nicotine . . .*
>
> *a. High nicotine, strong tobacco flavor . . .*
>
> *b. Medium strength of nicotine. . .*
>
> *c. Low nicotine, sweet product. . ."*[508]

By acknowledging that the objective is to produce products with varying strengths of nicotine and differentiating strength from taste, the document demonstrates the company's intent to manufacture products with distinct pharmacological effects based on the nicotine delivery.

A document that posed potential questions and answers related to UST's introduction of Skoal Bandits in a new market also demonstrates the manufacturer's intention to provide nicotine

---

[506] *Id.* Trial Exhibit 159 (minutes from July 18, 1972, meeting).

[507] *See* Watson, note 505, *supra,* at p. 2.

[508] *Id.*

for absorption and thereby to produce "satisfaction" in the user of the product.[509] The document provides the following questions and anwers about Skoal:

> *3. - How does it work ?*
>
> > *It gives the satisfaction from tobacco want* [sic]. *It is real tobacco and contains nicotine. . .*
>
> *4. - How much nicotine does it contain ? Is it absorbed ?*
>
> > *The nicotine contents are more or less equivalent to that of a good quality cigarette of average strength. The nicotine is absorbed, given [sic] satisfaction to the smoker.*

A senior UST official stated in another memorandum that "satisfaction" refers to the "kick" that users obtain from tobacco products.[510]

Shortly after the "Lotus Project" documents were written, UST began to aggressively market the low-nicotine "starter" products to new users of smokeless tobacco. An early advertisement for "Happy Days," one of the first low-nicotine products, targeted the product "for you guys just starting out."[511] The marketing of starter products relied heavily on "sampling," a technique in which company representatives distribute free samples on college campuses and sports events, and encourage nonusers to use smokeless tobacco.[512] Advertisements then

---

509 *Potential Questions and Answers.* Bate stamp nos. 2054948-2054951, submitted in *Marsee v. U.S. Tobacco*, note 317, *supra.*

510 *Marsee v. U.S. Tobacco*, note 317, *supra.* Deposition of Erik Lindqvist, Senior Vice President, Marketing. Transcript of Jury Trial Proceedings, at p.1662.

511 Connelly GN. In the search for a perfect starter product: manipulation of nicotine in oral snuff brands. August 1994. (Unpublished.)

512 U.S. Tobacco Company. College Representative Manual. Revised July 31, 1985:
*Success in reaching the college students today will determine the continued popularity and growth for our products in our adult market segments tomorrow.*

*Achieving these goals will require strong consumer sampling efforts. Success in this area can*

encouraged established users to graduate to higher-nicotine products. For example, an advertisement for Copenhagen, the highest nicotine product, said "Sooner or Later, It's Copenhagen."[513]

In the 1980's, "long cut" smokeless tobacco products were introduced. An internal UST memorandum, dated June 8, 1984, reported that customers and distributors of the Skoal "Long Cut" considered it a "'perfect' starter product," in part due to its relatively low "strength" (i.e., low delivery of nicotine).[514] This memorandum also acknowledges the role of low-nicotine products in facilitating graduation to high-nicotine brands like Copenhagen. In a long list of positive anecdotes about the introduction of Long Cut, the memorandum states that college representatives reported that "Long Cut makes it easier to become accustomed to using Cope[enhagen]" as well as "having sampled a person with Long Cut, and then seeing that person weeks later as a regular Cope consumer."[515] The same memorandum reports that Copenhagen sales "continue to rise on a weekly basis since the intro of Long Cut."[516]

A chart prepared by UST's marketing department further demonstrates the company's knowledge that consumer use of its products follows the graduated nicotine deliveries of those products and shows the company's desire to capitalize on a "graduation process" to enhance sales

---

*only be achieved with an aggressive, efficient program. . .*

[513] Connelly, note 511, *supra*, at p. 5.

[514] U.S. Tobacco Company. Intra-company Correspondence from K.C. Carlsen to O.M. Bryant. *Skoal Long Cut.* June 8, 1984. Page 1.

[515] *Id.* at pp. 2-3.

[516] *Id.* at p. 2.

of its highest nicotine products.[517] The chart is labeled "graduation process" and shows a hierarchy of products, with arrows pointing from Skoal Bandits to Happy Days and Skoal Long Cuts, and culminating with Copenhagen. This "graduation" corresponds exactly to the progression of nicotine deliveries from the listed products.

The company's reliance on the graduation process is further evidenced in a UST document entitled "Expanding User Base", which depicts a "bullseye" chart that lists the company's moist snuff products.[518] The chart follows:

[517] *Marsee v. U.S. Tobacco,* note 317, *supra,* Plaintiff's Exhibit 100, "Graduation Process." (Undated.)

*See also* U.S. Tobacco Company. One-on-one interview with Mr. Manuel Leitao, Executive Vice President, U.S. Tobacco and President Tobacco Division. *Up to Snuff.* Autumn 1984:2:

> *Some people will remain with the Bandits, and some people will get into a sort of graduation process. The bottom line, and we must never forget the bottom line, is that Bandits is a vehicle that is going to expand the use of smokeless tobacco.*

Another company document sets out a similar strategy for entering new markets. The strategy involved starting users on the lower nicotine Skoal Bandits with an eye toward "establishing a normal graduation process." U.S. Tobacco Company. International Division-Very Optimistic About U.S. Tobacco's Worldwide Expansion. *Up to Snuff.* March 15, 1988. Page 2.

[518] U.S. Tobacco Company. *Expanding User Base.* (Undated.) This document was disclosed during discovery in *Marsee v. U.S. Tobacco,* note 317, *supra.* The document was authenticated by Dr. Jack Henningfield in a letter to Rep. Henry Waxman (D-Ca), in which Dr. Henningfield states his awareness of the origins of the chart as "provided by the United States Tobacco Company to the plaintiffs in the *Marsee v. United States Tobacco Company* law suit in which I served as an expert witness in 1986. This chart was provided to me by the plaintiffs attorney, Mr. Braly, to review." Letter from Jack E. Henningfield, Ph.D., Chief, Clinical Pharmacology Branch, National Institute on Drug Abuse to The Honorable Henry A. Waxman, Chairman, Subcommittee on Health and the Environment, House of Representatives (Dec. 13, 1994).

## EXPANDING USER BASE



Outside the outermost ring of the chart is the label "Prospective New Users"; the subsequent concentric rings are labeled "Bandits," "Long Cut, and "Skoal," respectively, and a ring labeled "Cope" (representing Copenhagen) is the bullseye in the middle. The rings of the chart thus progress from the lowest delivery nicotine products on the outside to the highest nicotine delivery products in the center of the bullseye. The chart's further annotations - - "Consumer Promotions," "Peer Grouping," "Spokesmen," "Public Relations," "Advertising Expenditures," "Advertising Media," and "Sampling" - - clearly demonstrate the company's intent to advertise, promote, and provide free samples of the lower delivery nicotine products, which are on the lowest level of the "graduation process," to new users. The highest nicotine products, however, are to be advertised only to current users in a highly focused manner.

Several other company documents discuss the graduation process. A UST document discussed in a trial transcript mentions Skoal Bandits and the company's intent to use the product to fuel the graduation process:

> *Skoal Bandits, which is at the bottom of the previous graduation chart, 'will continue to fuel the new user base to assure graduation to our priority moist brands'.*[519]

Another UST document, discussed in the same trial transcript, again acknowledges the company's deliberate use of the graduation process:

> *. . . sample Skoal Bandits often and intensively in and around the retail account to create new customers and feed the graduation process.*[520]

These marketing strategies for smokeless tobacco have been extremely successful in

---

[519] UST document No. 2077832, in *Marsee v. U.S. Tobacco*, note 317, *supra.* In:1.7 TPLR 3.209. Another U.S. Tobacco document (no. 1023186-89), discussed in *Marsee* mentions introducing a product that will fill the gap between Bandits and Skoal in the graduation process. In:1.7 TPLR 3.209.

[520] UST document No. 2101576, discussed in *Marsee v. U.S. Tobacco*, note 317, *supra* (1.7 TPLR 3.210).

recruiting new users. Use of smokeless tobacco products has risen substantially since the 1970's: overall, consumption of moist snuff almost tripled from 1972 through 1991; use by adolescent males aged 18 to 19 increased almost 1,500% between 1970 and 1991.[521] The success of the graduation strategy in getting users to the point where they want to consume the high-nicotine products is demonstrated by the market share of various products. While the majority of advertising dollars are spent on the low and medium nicotine products like Skoal Long Cuts, the great bulk of the increased sales is in Copenhagen, the high-nicotine product.[522] The consistently small market share for the low-nicotine products shows that they serve only as a steppingstone to the high-nicotine products. Consistent with the graduation strategy, a recent study found that older smokeless tobacco users are more likely to purchase the brands that deliver high levels of nicotine than are younger smokeless tobacco users.[523]

The evidence of manipulation of nicotine delivery in smokeless tobacco and the deliberate marketing of higher and higher nicotine-containing products shows clearly that smokeless tobacco manufacturers intend consumers to become tolerant to, and dependent on, the

---

[521] *See:*

Centers for Disease Control and Prevention. Office of Smoking and Health. Unpublished data from 1970 and 1991 National Household Interview Surveys. (Rate of snuff use among 18-19 year-old males was 0.5% in 1970 and 7.6% in 1991).

Marcus AC, Crane LA, Shopland DR, Lynn WR. Use of smokeless tobacco in the United States: Recent estimates from the current population survey. In: *Smokeless Tobacco Use in the United States: NCI Monographs*. 1989;8:17-23.

Sullivan LW. Keynote Address. In: *Smokeless Tobacco or Health: An International Perspective: Smoking and Tobacco Control Monograph 2*. National Cancer Institute. NIH Pub. No. 92-3461. 1992.

[522] *See* Connolly, note 511, *supra*, at p. 5.

[523] Hatsukami D, Nelson R, Jensen J. Smokeless tobacco: current status and future directions. *Brit. J. of Addiction*. 1991; 86:559-563.

nicotine in smokeless tobacco. Both tolerance and dependence are effects on the structure and function of the body produced by nicotine. Accordingly, smokeless tobacco products, as designed and marketed by the tobacco industry, are intended to affect the structure or function of the body.

## F. INDUSTRY ALTERNATIVE TOBACCO PRODUCTS

### 1. Industry Development of Nicotine Substitutes That Mimic Nicotine's Drug Effects

Tobacco manufacturers' intention to offer tobacco products that will be used to affect the structure or function of the body is further demonstrated by the research programs tobacco companies have undertaken to develop "nicotine analogues." Nicotine analogues are chemical substances that are closely related to nicotine. Both Philip Morris and Brown and Williamson have had substantial research programs to identify nicotine analogues that would produce nicotine-like effects on the central nervous system[524] and that either could be substituted for nicotine if nicotine-containing tobacco became regulated or unattractive to consumers, or that could be added to currently marketed products to enhance the effects of nicotine.

---

[524] *See the following documents:*
Kilburn KD, Underwood JG. BATCO Group Research and Development Center. *Preparation and Properties of Nicotine Analogues*. Report No. RD 953-R. November 9, 1972.

Kilburn KD, Underwood JG. BATCO Group Research and Development Center. *Preparation and Properties of Nicotine Analogues, Part II.* Report No. RD 1048-R. October 11, 1973

Kilburn KD. BATCO Group Research and Development Center. *Preparation and Properties of Nicotine Analogues, Part III.* June 20, 1979.

BATCO R&D. *Notes on the R&D Conference*. October 29, 1979 - November 1, 1979. Page 01794-01808.

Declaration of former Philip Morris scientist Victor John DeNoble, Ph.D., executed on February 2, 1995. (hereafter cited as DeNoble Declaration) (A copy of the declaration is on file at FDA.)

The Council for Tobacco Research - U.S.A. and the American Tobacco Co. also funded research on nicotine analogues. *See, e.g.:*

Report of the Council for Tobacco Research - U.S.A., Inc. 1978.

Meacham RH, Bowman ER, McKennis H. Additional routes in the metabolism of nicotine to 3 pyridylacetate. The metabolism of dihydrometanicotine. *J-Biol-Chem.* 1972;247(3):902-08.

These programs were also designed to identify substances that shared nicotine's "desired" effects on the central nervous system, without producing nicotine's undesirable effects on the cardiovascular system.[525] In the words of former Philip Morris scientist Dr. Victor J. DeNoble:

> *Our goal was to identify the effects of nicotine in the central nervous system, and to establish structural activity relationships among organically synthesized analogues of nicotine. The purpose of this nicotine analogue program was to develop an analogue that would retain the physiological effects of nicotine in the brain as well as the behavioral effects, but not have adverse effects on the cardiovascular system.*[526]

The tobacco industry's programs to develop nicotine analogues were, according to company documents, prompted by the industry's recognition that the market for tobacco depends on the pharmacological effects of nicotine on the central nervous system. For example, in 1968, BATCO researchers reported the following conclusion at a research conference:

> *In view of its pre-eminent importance, the pharmacology of nicotine should continue to be kept under review and attention paid to the possible discovery of other substances possessing the desired features of brain stimulation and stress-relief without direct effects on the circulatory system. The possibility that nicotine and other substances together may exert effects larger than either separately (synergism) should be studied and if necessary the attention of Marketing Departments should be drawn to these possibilities.* [Emphasis

---

[525] BATCO R&D. BATCO Research Conference. Hilton Head, SC. September 24-30, 1968. Page 3.

*See also:*
U.S. Patent No. 5,138,062. Osdene TS, Secor HV, Seeman JI. *Nicotine Analogues*. Philip Morris Inc. August 11, 1992. C1:57-60.

U.S. Patent No. 5,015,741. Osdene TS, Secor HV, Seeman JI. *Nicotine Analogues*. Philip Morris Inc. May 14, 1991. C1:56-60.

*See* DeNoble Declaration, note 524, *supra,* at pp. 3-4.

[526] *Regulation of Tobacco Products (Part 2): Hearings Before the Subcommittee on Health and the Environment of the Committee on Energy and Commerce. U.S. House of Representatives.* 103rd Cong. 2d Sess. 5 (April 28, 1994) (testimony of former Philip Morris scientist Victor J. DeNoble).

added.][527]

This document shows that BATCO was interested in using chemicals with nicotine-like effects to replace nicotine or enhance the drug effects of nicotine in cigarettes.[528] Another BATCO document underscores the fact that the search for nicotine analogues was designed to implement the industry's belief that nicotine's drug effects are essential to sustain the market for tobacco. S.J. Green, director of research at BATCO, in a paper on future research policy, stated:

> *While other factors cannot be ignored and their influence is not completely understood, it seems a good assumption that nicotine plays a predominant role for many smokers. So that a good part of the tobacco industry is concerned with the administration of nicotine to consumers. If this assumption is correct two long-range research projects become immediately apparent. These are to find pharmacological alternatives to nicotine and to explore alternatives to tobacco as a source of nicotine.*[529]

Other documents show that nicotine analogues were also believed by BATCO to be necessary to protect against three potential threats to the company's nicotine-based market: 1) government action to prohibit the use of nicotine because of nicotine's cardiovascular toxicity; 2) the development by other pharmaceutical companies of alternative, more socially and medically acceptable means of administering nicotine; or 3) the discovery and use by pharmaceutical companies or anti-tobacco activists of nicotine "antagonists," that is, substances that block the

---

[527] *See* BATCO Research Conference, note 525, *supra,* at p. 3.

[528] *See also* U.S. Patent No. 4,340,072. Bolt AJ, Chard B. *Smokable Device.* Imperial Group Ltd. (1982). This patent describes an alternative cigarette-like device providing an aerosol that may contain nicotine or another psychoactive substance:

> *The aerosol material may, as an alternative to a flavourant solution, comprise a solution of a flavourant and/or nicotine in triacetin or benzyl benzoate. Any psycho-active or physiologically active compound such as ephedrine or a nicotine/ephedrine mixture may be used.*

[529] Green SJ. *BAT Group Research.* September 4, 1968. Page 2.

effects of nicotine on the central nervous system.

A BATCO research report dated November 9, 1972, and entitled "Preparation and Properties of Nicotine Analogues," provided the following rationale for BATCO's long-term research program to develop nicotine analogues:

> *Summary*
> *Should nicotine become less attractive to smokers, the future of the tobacco industry would become less secure.*
>
> *Factors that could influence the attractiveness of nicotine are discussed, and it is concluded that substances closely related to nicotine in structure (nicotine analogues) could be important.*
>
> . . . .
>
> *Introduction*
> *It has been suggested that a considerable proportion of smokers depend on the pharmacological action of nicotine for their motivation to continue smoking (1, 2, 3[530]).*
>
> *If this view is correct, the present scale of the tobacco industry is largely dependent on the intensity and nature of the pharmacological action of nicotine.*
>
> *A commercial threat would arise if either an alternative product became acceptable or the effect of nicotine was changed.*
>
> *An alternative product could come from the pharmaceutical industry. With a socially acceptable route for administration, and with medical endorsement, the product could be successful.*
>
> *The effect of nicotine could be inhibited by an antagonist, and cigarettes would tend to become insipid. Such an antagonist could arise by accident or design from the pharmaceutical industry. It might be used tactically to advance that industry's alternative product, or its general use could be advocated by the anti-smoking lobby, with or without government support.*
>
> *The obvious starting point of a search, either for alternatives or antagonists to nicotine, is the nicotine molecule and close analogues of it. The present report*

---

[530] The page of the report that contains the citations for these footnotes is missing from the document provided by Brown and Williamson to Congress.

*discussed nicotine and some of its analogues. . .*[531]

These internal documents reflect the tobacco industry's awareness that nicotine's drug effects are critical to the continued success of tobacco in the marketplace. Indeed, they show that the industry views nicotine's drug effects as so important that if nicotine's drug effects were interfered with in any way, tobacco companies would seek to substitute another drug for nicotine to ensure the continued market for tobacco.

Internal documents from Philip Morris' nicotine analogue program show that this company also sought nicotine analogues with pharmacological effects on the central nervous system, including effects associated with addiction.

For example, an internal 1980 company memorandum describes the rationale for Philip Morris' research into nicotine analogues. After asserting that nicotine "is a powerful pharmacological agent" which is "cited often as 'the reason for smoking,'" the memorandum describes the importance of discovering compounds related to nicotine:

> *[O]ur ability to ascertain the structural <u>features of the nicotine molecule</u> which are <u>responsible for its various pharmacological properties can lead to the design of compounds with enhanced desirable properties (central nervous system effects)</u> and minimized suspect properties (peripheral nervous system effects). There are many opportunities for acquiring proprietary compounds which can serve as a firm foundation for new and innovative products in the future.*[532]

Between 1980 and 1984, Dr. DeNoble conducted research for Philip Morris on nicotine analogues,[533] first identifying the pharmacological effects of nicotine on the brains and behavior

[531] *See* Kilburn (1972), note 524, *supra,* at pp. 1-2.

[532] Philip Morris Interoffice Correspondence from J.L. Charles to Dr. R. B. Seligman. Nicotine Receptor Program-University of Rochester. March 18, 1980.

[533] The nicotine analogue program at Philip Morris began before Dr. DeNoble's arrival. *See*, e.g. Secor HV, Edwards WB. Philip Morris Research Center. Nicotine analogues: synthesis of pyridylazetidines. *J.*

of animals[534] and then comparing these effects to the physiological and pharmacological effects of nicotine analogues synthesized by chemists at Philip Morris.[535] Dr. DeNoble's studies, which were conducted as part of the "Behavioral Pharmacology" Program at Philip Morris, were intended to characterize the pharmacologic effects of nicotine and then to identify those analogues that affected the central nervous system in the same way that nicotine affects the central nervous system. An internal Philip Morris document states:

> *Major objectives of the Behavioral Pharmacology Program are (1) To develop a better understanding of the reinforcing actions of nicotine and nicotine*

---

*Org. Chem.* 1979;44(18):3136.

*See* DeNoble Declaration, note 524, *supra,* at p. 4.

[534] Dunn WL. Philip Morris Inter-Office Correspondence to T.S. Osdene. *Possible Restructuring of the Behavioral Research Lab.* June 18, 1980. Page 100019244.

[535] *See:*
DeNoble Declaration, note 524, *supra,* at pp. 2-9.

U.S. Patent No. 4,452,984. Edwards III WB. *Optically Active Nicotine Analogues and Process For Their Preparation.* Philip Morris Inc. June 5, 1984.

U.S. Patent No. 4,442,292. Edwards III WB. *Optically Active Nicotine Analogues and Process For Their Preparation.* Philip Morris Inc. April 10, 1984.

U.S. Patent No. 4,332,945. Edwards III WB. *Optically Active Nicotine Analogues and Process For Their Preparation.* Philip Morris Inc. June 1, 1982.

U.S. Patent No. 4,321,387. Chavdarian CG, Sanders EB. *Process for the Preparation of Optically Active Nicotine Analogues.* Philip Morris Inc. March 23, 1982.

U.S. Patent No. 4,220,781. Sanders EB, Secor HV, Seeman JI. *Process for Preparing 2-ALKYL Nicotinoids.* Philip Morris Inc. September 2, 1980.

U.S. Patent No. 4,155,909. Sanders EB, Secor HV, Seeman JI. *2-ALKYL Nicotinoids and Processes For Their Production.* Philip Morris Inc. May 22, 1979.

Work on nicotine analogues continued after Dr. DeNoble's departure from the company. *See* U.S. Patent No. 5,138,062, note 525, *supra.*; U.S. Patent No. 5,015,741, note 525, *supra.*; U.S. Patent No. 4,590,278. Edwards III WB. *Nicotine Analogues.* Philip Morris Inc. May 20, 1986.

*analogues, (2) To gain insight into the neurobehavioral actions of nicotine, and (3) To develop and use animal behavior techniques to screen nicotine analogues for their nicotine eliciting properties.*[536]

Dr. DeNoble's research and that of other scientists working at Philip Morris on the pharmacologic effects of nicotine showed that nicotine is self-administered by rats (i.e., is a "positive reinforcer"), produces tolerance, causes a unique "prostration syndrome" when injected into the rat brain that correlates to nicotine's ability to produce behavioral changes, and that nicotine loses its effects when the rat is pretreated with mecamylamine, a substance that blocks nicotine's effects in the brain.[537] These studies also demonstrated that nicotine has pharmacological activity in the brain, and that it has characteristics of other addictive substances that make it likely to be abused.[538] To evaluate potential nicotine analogues, Philip Morris tested numerous substances to determine whether they duplicated nicotine's effects on the brain and whether they had the same characteristics associated with abuse liability.[539] Dr. DeNoble and

---

[536] DeNoble VJ, Carron L. Philip Morris Inter-Office Correspondence to Dr. T. Osdene. *Progress Report: The Behavioral Pharmacology Program*. October 14, 1980.

*See* Dunn, note 534, *supra*, which proposes the creation of the "Behavioral Pharmacology Project."

[537] *See:*

DeNoble Declaration, note 524, *supra*, at pp. 5-9.

DeNoble VJ. Philip Morris Inter-Office Correspondence to W.L. Dunn. *Nicotine Program-Behavioral Research Laboratory.* April 24, 1980. Page 2.

DeNoble VJ, Mele PC, Ryan FJ. Philip Morris Research Center. *Nicotine as a Positive Reinforcer for Rats: Effects of Infusion Dose and Fixed Ratio Size*. Unpublished Manuscript.

Dunn, note 534, *supra*, at p. 100019244.

[538] *See* DeNoble Declaration, note 524, *supra*, at pp. 7-9. *See also* FINDINGS § II.A.2., *supra*.

[539] *See:*

DeNoble, note 536, *supra*.

other scientists working at and for Philip Morris used nicotine analogues in discrimination tests in rats, in prostration studies, and in self-administration studies.[540] As noted in FINDINGS § I.B.3., supra, discrimination and self-administration studies provide key evidence of the likelihood that a substance will be addictive in humans.

Philip Morris documents state explicitly that the purpose of the research on nicotine analogues was to find nicotine substitutes that were behaviorally active and had the same reinforcing properties as nicotine; i.e., produced effects on the central nervous system associated with addiction. A progress report from the behavioral pharmacology group identified as its major objectives:

> *Nicotine Analogues*
>
> *Research Objectives*
>
> *1. Determine if behaviorally active nicotine analogues can be directly substituted for nicotine in rats for which nicotine is functioning as an intravenously delivered positive reinforcer.*
> *2. Establish nicotine analogues as an intravenously delivered positive reinforcer.*
> *3. Compare the potencies of nicotine analogues to nicotine in producing positive reinforcing effects.*[541]

The objectives of the studies conducted by the behavioral pharmacology group were developed in conjunction with senior management at Philip Morris, and the study results were shared with

---

DeNoble Declaration, note 524, *supra,* at pp. 4-5.

[540] DeNoble VJ, Carron L. Philip Morris Inter-Office Correspondence to W.L Dunn. *Research Progress Concerning Discrimination and Prostration Studies*. August 18, 1980. Pages 1003030001-1003030007.

Carron LM, Levy CJ, Allen A. Philip Morris Inter-Office Correspondence to V.J. DeNoble. *Discrimination Studies*. May 7, 1980. Pages 1003030008, 1003030009.

[541] DeNoble VJ, Carron L. Philip Morris Inter-Office Correspondence to W. Dunn. *Progress in Behavior Pharmacology Laboratory*. March 27, 1981. Pages 1-32.

upper management as well.[542]

Thus, it is evident from tobacco manufacturers' interest in developing nicotine analogues with central nervous system effects comparable to nicotine that these manufacturers (1) believe that the pharmacological effects of nicotine on the central nervous system, and in particular the pharmacological effects that reinforce continued tobacco use, are necessary to ensure a long-term market for tobacco; and (2) intend to market products that affect the central nervous systems of their customers.

---

[542] *See:*

DeNoble Declaration, note 524, *supra,* at pp. 4, 11-12.

Charles JL. Philip Morris Inter-Office Correspondence to T.S. Osdene. March 1, 1983. Page 2: "Because of the sensitive nature of Vic's assignment, documentation of much of his work has been restricted to the Director and Vice President level."

## 2. Industry Research on Acetaldehyde As a Reinforcer

The behavioral pharmacology program at Philip Morris also conducted pharmacological and behavioral research on another constituent of cigarette smoke, acetaldehyde. This research was intended to find a combined dose of acetaldehyde and nicotine in cigarettes that would produce "maximal reinforcing effects."[543] The reinforcing capability of a drug is a measure of the dependence-producing properties of a drug.[544] In undertaking research on how to maximize the reinforcing effects of cigarettes, Philip Morris demonstrated its understanding of the dependence-producing nature of cigarettes and its intention to manufacture and sell cigarettes that affect the structure or function of the smoker's body.

Acetaldehyde, like nicotine, is present in, and delivered to the smoker from, cigarette smoke.[545] At the time Philip Morris conducted research on the reinforcing properties of acetaldehyde in cigarettes, acetaldehyde had been studied as a potential contributing factor to the

---

[543] DeNoble VJ. Philip Morris U.S.A. Inter-office correspondence to J.L. Charles. *Project Number 1610 (Behavioral Pharmacology) Objectives and Plans - 1982-1983.* July 20, 1982. Page 2.

[544] *See:*
Balster RL. Drug abuse potential evaluation in animals. *Brit. J. of Addiction.* 1991;86:1549-1558.

Henningfield JE, Cohen C, Heishman SJ. Drug self-administration methods in abuse liability evaluation. *Brit. J. of Addiction.* 1991;86:1571-1577.

Griffiths RR, Lamb RJ, Ator NA, Roache JD, Brady JV. Relative abuse liability of triazolam: experimental assessment in animals and humans. *Neuroscience and Biobehavioral Reviews.* 1985;9:133-151.

[545] Acetaldehyde is present in tobacco at 1.6 - 7.4 mg/gm of processed tobacco. It is contained in mainstream smoke at 18-1400 mg per cigarette. U.S. Department of Health and Human Services. *Reducing the Health Consequences of Smoking: 25 Years of Progress. A Report of U.S. Surgeon General.* U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control and Prevention, Center for Chronic Disease Prevention and Health Promotion, Office on Smoking and Health. DHHS Publication No. (CDC) 89-8411, 1989.

rewarding effects of alcohol.[546] This information led Philip Morris to explore its reinforcing properties in cigarettes.[547]

Researchers in Philip Morris' behavioral pharmacology program first conducted studies that showed that acetaldehyde acts on the brain and is a positive reinforcer when present in amounts comparable to those delivered by cigarette smoke.[548] By this time, the company had already demonstrated that nicotine was also a positive reinforcer. The researchers noted that it was well-known that the presence of two reinforcers together can modify the behavioral effect of either one, and decided to study whether rats would self-administer nicotine and acetaldehyde in combination. Recognizing that the reinforcing effects of nicotine and acetaldehyde are pharmacological, the researchers stated that their efforts were intended to determine whether the combination produced a "modification of the pharmacologic effect of one compound by the other."[549] The researchers found that rats self-administered the combination of acetaldehyde and

---

[546] *See:*

Schuckit MA, Rayses V. Ethanol ingestion: Differences in blood acetaldehyde concentrations in relatives of alcoholics and controls. *Science.* 1979;203:54-55.

Brown ZW, Amit Z, Smith B. Intraventricular self-administration of acetaldehyde and voluntary consumption of ethanol in rats. *Behavioral and Neural Biology.* 1980;28:150-155.

[547] *See* DeNoble Declaration, note 524, *supra,* at p.10.

[548] *See:*

DeNoble VJ. Philip Morris U.S.A. Inter-office correspondence to W.L. Dunn. *Progress Report* from the Behavioral Pharmacology Laboratory for the period beginning September 1, 1980, to March 30, 1981. August 24, 1981. Pages 12-16.

DeNoble Declaration, note 524, *supra,* at pp. 10-11.

[549] DeNoble VJ, Mele PC. Philip Morris U.S.A. Inter-office correspondence to W.L. Dunn. *Progress Report* from the Behavioral Pharmacology Laboratory for the period beginning March 1, 1981, to March 1, 1982. April 21, 1982. Pages 18-19.

nicotine to a greater extent than either compound alone.[550] This finding suggested that the combination was a more potent positive reinforcer than nicotine or acetaldehyde alone.[551]

The culmination of this research was Philip Morris' attempt to establish the "optimum" ratio of acetaldehyde to nicotine in cigarette smoke:

> *Since both acetaldehyde and nicotine are reinforcing agents and each are contained in smoke it becomes important to determine [sic] ratio of acetaldehyde to nicotine which produce maximal reinforcing effects.... This will allow us to determine the optimum ratio of acetaldehyde to nicotine that maintains the most behavior.*[552] [Emphasis added.]

As this passage makes clear, Philip Morris viewed the "optimal" ratio of acetaldehyde to nicotine as the ratio that would maximize the positive reinforcing effects of cigarettes; i.e., maximize their potential to produce dependence in smokers.

The behavioral pharmacology group conducted further studies suggesting that the ratio of acetaldehyde to nicotine that produced the greatest positive reinforcement in rats was in the range of 4:1.[553] While FDA does not know whether or how this research was implemented by Philip Morris, Dr. DeNoble was present at a meeting at which Philip Morris officials discussed the possibility of producing a cigarette with this ratio of acetaldehyde to nicotine and test-

---

[550] *Id.* at pp. 19-21.

[551] *See* DeNoble Declaration, note 524, *supra,* at p. 11.

[552] DeNoble, note 543, *supra,* at p. 2.

[553] Philip Morris U.S.A. Behavioral Pharmacology Annual Report - June 1, 1983. Philip Morris Research Center. Richmond, VA. Pages 20-23. This work was still going on at the time the Behavioral Pharmacology program was terminated at the Philip Morris Research Center in Richmond, VA.

*See also*, DeNoble VJ. Philip Morris U.S.A. Inter-office correspondence to J.L. Charles. *Project 1610 (Behavioral Pharmacology) Objectives and Plans, 1984.* September 6, 1983. (Continued research on the ratio of acetaldehyde and nicotine with optimum reinforcing effects scheduled for 1984.)

marketing it in South America.[554]

It is thus clear that Philip Morris was interested in implementing the research to maximize the reinforcing effects of cigarettes by manipulating acetaldehyde and nicotine. The data on the reinforcing properties of particular ratios of acetaldehyde and nicotine were also used by researchers at Philip Morris to predict cigarette sales based on the delivery of nicotine and acetaldehyde. The researchers found that they could predict sales of particular brands with an accuracy above 80 % by comparing nicotine and acetaldehyde ratios.[555] This evidence compellingly demonstrates Philip Morris' reliance on, and intention to increase, the reinforcing effect of cigarettes on the structure or function of the smoker's body.

---

[554] *See* DeNoble Declaration, note 524, *supra*, at p. 12.

[555] *Id.* at p. 11.

### 3. Industry Development of Alternative Cigarettes That Deliver Nicotine

Tobacco companies have developed a number of cigarette alternatives. These alternatives to conventional cigarettes have generally been created in response to perceived societal pressure to market safer cigarettes. In developing cigarette alternatives, tobacco companies have sought to eliminate many of the traditional components and characteristics of cigarettes and cigarette smoke, such as tar and carbon monoxide. Tobacco companies have consistently recognized, however, that cigarette alternatives must deliver adequate amounts of nicotine to satisfy consumers. As a result, most of the alternative cigarette products developed by tobacco companies are simply nicotine delivery systems.

Tobacco company development of alternatives to cigarettes demonstrates the industry's knowledge that nicotine is the critical or "active" ingredient in cigarettes, and that smokers smoke primarily to obtain nicotine. The nature of the alternatives they believe could be substituted for currently marketed tobacco products strongly supports the inference that companies intend currently marketed tobacco products to serve as nicotine delivery systems.

In the late 1980's, RJR developed Premier, a "smokeless" cigarette that contained very little tobacco.[556] Although designed to be "smoked" and inhaled, Premier actually worked by

---

[556] Premier resembled a conventional cigarette in outward appearance only. It contained a carbon tip which served as the heat source. RJR informed FDA that at least 70% of the nicotine delivered by "Premier" was provided from spray-dried tobacco. This nicotine source had been combined with glycerol and adsorbed within alpha-alumina spheres contained within an aluminum cylinder positioned directly behind the carbon heat source. The remaining nicotine was provided from the cut tobacco leaf surrounding this cylinder and the tobacco extract-treated paper filter positioned in front of the cellulose acetate filter. Letter with enclosures from Peter B. Hutt, outside counsel for RJR, to Kevin M. Budich, FDA, January 26, 1988.

heating rather than burning tobacco.[557] RJR claimed that by altering the composition of conventional cigarettes and by eliminating the pyrolysis products produced by burning, Premier reduced by about 90% the chemical compounds delivered to smokers by conventional cigarettes.[558] Virtually the only compound (other than the paper and the filter) that was present in Premier in quantities similar to conventional cigarettes was nicotine.[559]

RJR's willingness to eliminate from Premier almost every conventional cigarette component but nicotine was not a coincidence. According to a memorandum of meeting dated October 23, 1987, the attorney representing RJR told FDA officials that for a cigarette substitute like Premier to be successful in the marketplace, it must contain nicotine.[560] Observing that herbal cigarettes had failed as substitutes due to the absence of nicotine, the attorney said that RJR would never eliminate nicotine from Premier because "without nicotine, you don't have a cigarette."[561]

RJR documents also show that the purpose of including nicotine in Premier was to deliver nicotine to the smoker's blood and brain. Studies conducted by RJR to determine

---

[557] *See* R.J. Reynolds, note 300, *supra*. Premier was withdrawn from the market shortly after its introduction.

[558] *Id.* at p. 8.

Department of Health and Human Services. *RJR's "Smokeless" Cigarette*. October 23, 1987, memorandum of meeting between Peter B. Hutt, representing RJR Nabisco Inc., and FDA representatives (Daniel L. Michels, Sammie R. Young, Rudolf Apodaca, and Kevin M. Budich).

[559] *See* R.J. Reynolds, note 300, *supra,* at pp. 1-10. In the mainstream smoke produced by Premier, the only components that were similar in quantity to conventional cigarettes were nicotine and carbon dioxide.

[560] *See* Memorandum of Meeting, note 558, *supra*.

[561] *Id.*

whether Premier would be an acceptable cigarette substitute show unequivocally that RJR was interested in Premier's ability to deliver specific blood levels of nicotine to the smoker. Delivery of nicotine to the smoker's blood is relevant only if the company was interested in producing physiological effects in the smoker's body. The company itself reported, in a book published at the time of Premier's introduction, that it wanted to assess whether differences in composition and function between Premier and conventional cigarettes might alter nicotine delivery to the smoker's blood and body.[562] To assure itself that the absorption of nicotine into the smoker's body from Premier and conventional cigarettes was similar, RJR conducted plasma studies on rats and humans comparing the levels of nicotine in smokers' blood produced by smoking conventional cigarettes with the levels of nicotine produced by smoking Premier.[563]

RJR found the absorption and elimination of nicotine from Premier to be comparable to conventional cigarettes.[564] Because, however, Premier contained somewhat less nicotine than the reference cigarette tested, the blood levels of nicotine found in smokers of Premier were somewhat lower than those from the reference cigarette. The blood-level studies conducted by

---

562 *See* R.J. Reynolds, note 300, *supra,* at p. 460.

563 During its investigation FDA asked R.J. Reynolds about the company's use of human body fluid testing to measure nicotine levels in smokers. Counsel to R.J. Reynolds informed FDA that it "should come as no surprise to the Agency that RJRT [R.J. Reynolds Tobacco Company] did some body fluids testing and used the services of Bellomy Research, Inc. to solicit participants." Letter to E. Blumberg, FDA, from R. Cooper, Williams & Connolly, on behalf of R. J. Reynolds. November 18, 1994. Page 2. It appears that R.J. Reynolds has conducted such testing not only in conjunction with the development of Premier, but in other circumstances "in which a developmental product incorporated new technology, and the testing was conducted in order to understand . . . for example, whether nicotine is absorbed or metabolized differently by smokers smoking the new technology product when compared to other cigarettes . . ." *Id.*

564 *See* R.J. Reynolds, note 300, *supra,* at pp. 496-497. *See also* p. xii:

> *. . . in the short-term measurements of nicotine pharmacokinetics, the [Peer Review] Committee agreed with the conclusion that there was no significant difference in this response in individuals smoking either the reference or the new cigarette.*

RJR demonstrated that smokers compensated for the lower levels of nicotine in Premier. The researchers stated that subjects smoked Premier more intensely, speculating that they inhaled a greater volume of the smoke from Premier.[565] Thus, while Premier contained about 52% of the nicotine of the reference cigarette, after 39 days of smoking Premier the volunteers were absorbing 69% of the nicotine they had absorbed from the reference cigarette.[566] RJR has patented other cigarette alternatives whose basic function is also to deliver nicotine.[567]

More recently, RJR detailed plans to unveil a low-smoke cigarette, Eclipse, in 1995. It has a charcoal heat source for the tip. Behind the charcoal tip, there are processed tobacco parts containing more than 50% glycerine, which vaporizes at temperatures below those that burn tobacco. Behind the processed tobacco, there is blended tobacco. The charcoal heats the processed tobacco and glycerine, which creates smoke-like vapor. The glycerine vapor then passes through the blended tobacco, picking up flavor and nicotine before passing through a standard cellulose filter, and into the smoker's mouth. According to RJR, Eclipse vapor contains about 85% water, glycerol, and nicotine (versus 25% in standard cigarette smoke) and about 15% tars and related particles (versus 75% in standard smoke).[568]

Other tobacco companies have also developed cigarette alternatives similar to Premier in design and intent. In the 1960's, Charles Ellis of BATCO developed "Ariel." Like Premier,

---

[565] *Id.* at p. 482.

[566] *Id.* at pp. 479, 482-483, 490-492.

[567] U.S. Patent No. 5,285,798. Banerjee et al. *Tobacco smoking article with electrochemical heat source.* R.J. Reynolds Tobacco Company. February 15, 1994. (Alternative cigarette that is designed to generate enough heat, without burning, to volatilize and deliver to the smoker only the nicotine and flavor materials in the tobacco).

[568] Hilts P. Little smoke, little tar, but still lots of nicotine. *New York Times.* November 27, 1994;A1.

Ariel eliminated most of the compounds delivered by conventional cigarettes, but ensured delivery of a sufficient amount of nicotine to satisfy smokers' need for nicotine. Ariel was an alternative smoking device that contained a capsule of nicotine-enriched tobacco. The nicotine-enriched tobacco was heated by burning tobacco surrounding the capsule.[569] The nicotine was supposed to be released into an aerosol and inhaled by the smoker. The patents for this device make clear that its purpose was to provide an alternative to conventional cigarettes that would provide the same "satisfaction" as a traditional cigarette. The principal (indeed, almost the only) ingredient it was designed to deliver to achieve this goal was nicotine:

> *This invention relates to an improved smoking device whereby an improved smoke stream of a controlled character is delivered to the smoker.*
>
> . . . .
>
> *A further object is the provision of an improved smoking device of the above character which simulates a conventional or traditional smoking device, such as a cigarette, in appearance and in social habit attributes, and which affords the same benefits, pleasure and satisfaction without the attendant disadvantages.*
>
> . . . .
>
> *Our invention contemplates the provision of an improved smoking device having the appearance of a traditional smoking device and embodying a composition which releases nicotine vapor and potentially aerosol forming materials, including water vapor, when subjected to an elevated temperature . . .*[570]

A subsequent patent for a modification of this device stated that:

> *the invention thus seeks primarily to furnish a smoking device which will yield nicotine in an acceptable form, both psychologically and physiologically, but without the necessity for taking into the system so much of the products of combustion as is usual when*

---

[569] *See:*
U.S. Patent No. 3,258,015. Ellis CD, Dean C, Schachner H, Williamson D. *Smoking Device*. Battelle Memorial Institute. June 28, 1966.

U.S. Patent No. 3,356,094. Ellis CD, Dean C, Hughes IW. *Smoking Devices*. Battelle Memorial Institute. December 5, 1967.

[570] *See* U.S. Patent No. 3,258,015, note 569, *supra*.

*smoking a conventional cigarette . . .*[571] [Emphasis added.]

At a 1968 conference of BATCO researchers, the conferees succinctly described Ariel as a "device[] for the controlled administration of nicotine."[572]

Other documents reveal that tobacco companies have consistently recognized that alternative tobacco products must contain sufficient amounts of nicotine to satisfy users.[573] For example, the minutes of a BATCO Group R&D Conference held in 1969 disclose that the conferees agreed that non-tobacco cigarettes could not succeed in the marketplace without the addition of nicotine:

---

[571] *See* U.S. Patent No. 3,356,094, note 569, *supra*.

[572] BATCO Research Conference. Hilton Head Island, SC. September 24-30, 1968. Page 3.

[573] *See the following documents:*
BATCO Group Research Conference. St. Adele, Quebec. November 9-13, 1970.

S.J. Green. *Appendix I. Smoking and Health: Some Recent Findings.* Memo to D.S.F. Hobson. March 2, 1967. Page 2:

> *A non-tobacco smoking material has been made from cellulose and nicotine . . .*

*Proceedings of the BATCO Smoking Behaviour - Marketing Conference.* July 9-12, 1984.

Ayres CI. *Notes from the 1984 GR&DC Nicotine Conference.* Conference Outline. July 9-12, 1984.

U. S. Patent No. 5,050,621. Creighton DE, Grieg CC. *Smoking Articles.* BATCO. September 24, 1991.

> *Abstract: There is provided a smoking article comprising a heating unit aerosol generation section in flow communication at a first end thereof with the heating unit, nicotine source in flow communication at a first end thereof with said heating unit, a mixing space with which said aerosol generation section and nicotine source means are in flow communication at or via respective second ends thereof, and a velocity accelerating orifice in flow communication with the mixing space.* [Emphasis added.]

In a document submitted to the Food and Drug Administration in 1985 pursuant to an FDA examination of their product, Advance Tobacco Products, Inc., offered the following description of their smokeless cigarette:

> *[It] has the appearance and feel and provides a sensation similar to a conventional cigarette, but [ ] delivers nicotine satisfaction to the user by inhalation of nicotine vapor in a manner not requiring the combustion of tobacco.*

> *There was a general discussion on non-tobacco materials and, largely due to the difficulties foreseen with the addition of nicotine, the Conference did not envisage at present the likely success of a totally non-tobacco cigarette.*[574]

The conferees went on to express their view that, if non-tobacco ingredients were used as part of the tobacco blend in cigarettes, cigarette manufacturers would have to compensate for the absence of nicotine in the non-tobacco materials by using high-nicotine tobaccos:

> *However, it now seems quite likely that non-tobacco materials will be successfully incorporated into cigarettes as blend constituents, particularly in health orientated products. A large usage of non-tobacco materials would be likely to increase the demand for high-nicotine tobaccos.*[575]

A 1970 BATCO R&D Conference included a particularly telling illustration of the tobacco industry's recognition of the central importance of nicotine in cigarette alternatives. The minutes of that conference contain the following finding, agreed to by the conference attendees:

> *It was agreed that, if and when total cigarette consumption declined, great opportunities for supplying the demands of other socially acceptable habits could follow. Discussion followed on those opportunities which might arise. Amongst those discussed were a) chewing products, and b) wet snuff* [both of which are smokeless tobacco products]. *It was felt that this whole area, much of which is already in the tobacco industry, should be examined more thoroughly. Particular attention should be given to buccal administration of nicotine and other physiologically active ingredients. At the same time, it was re-affirmed that we would not contemplate the incorporation of nicotine in edible products.*[576] [Emphasis added.]

---

574 BATCO Research Conference. Kronberg, Germany. June 6, 1969. Page 8. Brown and Williamson representatives attended.

575 *Id.*

*See also,* BATCO, note 573, *supra,* at p. 4. A similar expression of the need to increase the nicotine content of the tobacco blend where tobacco substitutes without nicotine are used as part of the blend is contained in the minutes of a 1970 BATCO research conference:

> *The addition of nicotine to SM [a tobacco substitute] was considered, and it was recommended that nicotine per se, should not be used inside any tobacco factory. However, high nicotine content tobacco extract might be added.*

576 *Id.* BATCO Group Research Conference at p. 3.

In 1984, BATCO marketers and "product application thinkers" convened to discuss innovative product ideas and were still convinced that if the tobacco industry lost a significant number of smokers, the industry should move to administration of nicotine through moist snuff. According to the conferees, the objective of shifting to moist snuff would be:

> *To capitalise on the potential downtrend of the smoking habit as* *__the only means to achieve nicotine satisfaction__* *by participating in a parallel product market free of social/health concerns and with attractive profitability.*[577] [Emphasis added.]

As these passages make clear, tobacco manufacturers understand that what both cigarettes and smokeless tobacco products have in common is the ability to administer nicotine to consumers, and that the purpose of the nicotine is to produce physiological effects on the consumer. If nicotine-containing cigarettes were to become socially unacceptable, it was the tobacco industry's intention to find another method of supplying nicotine to consumers.

Smokeless tobacco manufacturers, like cigarette manufacturers, understand that tobacco substitutes must include nicotine. Unlike BATCO, however, the major smokeless tobacco manufacturer, UST, has considered adding nicotine to food to create a nicotine delivery system that would function as an alternative to smokeless tobacco. At a meeting of UST executives, researchers, and marketers held in 1968 to discuss future directions for the company, the director of research proposed that the company develop a "swallowable chew: a confection with nicotine (artificial snuff)."[578] Later in the same document, he made clear that the purpose of adding nicotine to artificial snuff would be to "satisfy" snuff users;[579] __i.e.__, to satisfy their need for

---

[577] BATCO. *Structured Creativity Conference*. Southampton, England. June 25-28, 1984. List C.

[578] Minutes of Snuff and Chewing Tobacco Research - Manufacturing - Marketing Meeting. New York Hilton. January 22-23, 1968. Page 5.

[579] *Id.* at p. 10.

nicotine.

Thus, company documents related to the development of alternatives to cigarettes and smokeless tobacco establish tobacco manufacturers' knowledge that nicotine is the critical or "active" ingredient in cigarettes and smokeless tobacco, and that consumers use these products primarily for nicotine. Moreover, the fact that currently marketed and alternative products are studied for their ability to deliver nicotine to the bloodstream shows that the companies know that consumers use currently marketed tobacco products for the effects of nicotine on the structure and function of their bodies, rather than for taste or flavor. The fact that the tobacco industry considers nicotine delivery systems to be functional equivalents to tobacco demonstrates that tobacco companies intend their currently marketed tobacco products to deliver nicotine to consumers to affect the structure or function of their bodies.

## G. INDUSTRY KNOWLEDGE THAT NICOTINE'S SENSORY EFFECTS ARE SECONDARY TO ITS PHARMACOLOGICAL EFFECTS

Despite the tobacco industry's public assertions that nicotine is in cigarettes only to provide flavor, taste, or mouth feel (immediate sensory effects) to the smoker,[580] the evidence shows that tobacco companies view nicotine's primary role as providing the smoker with the pharmacological effects that smokers seek from tobacco.

As described earlier, the tobacco industry knows that the primary significance of nicotine in tobacco is to provide pharmacological effects, both acute (mood regulation, weight control) and long-term (reinforcing effects that create a continuing physiological need for nicotine). While nicotine in tobacco has both systemic pharmacological effects and acute sensory effects in the mouth, nose, and throat,[581] the evidence in the preceding sections and other industry documents demonstrates that the acute sensory effects of nicotine are secondary in importance to

---

[580] *See:*
*Regulation of Tobacco Products (Part 1): Hearings Before the Subcommittee on Health and the Environment of the Committee on Energy and Commerce, U.S. House of Representatives,* 103 Cong. 2d Sess. 763 (April 14, 1994). (testimony of TF Riehl, Vice President for Research & Development, Brown and Williamson Tobacco Corp.):

*We blend for taste, not nicotine.*

*Id.* 103 Cong. 2d Sess. 590 (statement of Thomas E. Sandefur, Jr., CEO Brown and Williamson Tobacco Corp.) :

*Without nicotine, cigarettes simply would not taste like cigarettes.*

Statement of Brennan Dawson, Vice President, Tobacco Institute. *Face the Nation.* March 27, 1994. Page 7:

*Nicotine is essential. It has a taste. It has what's called a mouth feel.*

[581] *See, e.g.,* Proceedings of the BATCO Smoking Behaviour-Marketing Conference, Session III. Montreal, Canada. July 9-12, 1984. Pages BW-W2-02709, BW-W2-02698. Breaks down smoke sensations into (1) mouth sensations, including mouth feel, texture and taste; (2) sensations on inhalation, including throat feel, irritation, and impact; and (3) wholebody pharmacological and psychological effects.

the pharmacological effects of nicotine that underlie consumer satisfaction. For example, a 1972 Philip Morris document from a Council for Tobacco Research conference addressing the issue of why people smoke makes clear that:

> *The primary incentive to cigarette smoking is the immediate salutory effect of inhaled smoke upon body function . . . . The physiological effect serves as the primary incentive; all other incentives are secondary.*[582] [Emphasis added.]

A nicotine monograph prepared for the Tobacco Advisory Council in the United Kingdom also makes clear that smoking satisfaction is dependent on the inhalation of nicotine.

> *Whilst smoking fulfils [sic] a psychological need in certain individuals it is only the inhaling cigarette smoker who is likely to gain psychopharmacological satisfaction from nicotine and become dependent on it.*[583]

Many industry documents reveal that the industry draws a clear distinction between nicotine's pharmacological effects and any effects it has on flavor. A 1984 letter from a BATCO Group R&D researcher to a Brown and Williamson executive drew the distinction between nicotine's pharmacological effects and the sensory properties of cigarette smoke, underscoring the distinction by pointing out that people inhale cigarette smoke (an act that occurs after any sensory effects of cigarette smoke are felt in the nose, mouth, and throat) in order to obtain nicotine's pharmacological effects on the brain:

> *It is well known that nicotine can be removed from smoke by the lung and transmitted to the brain within seconds of smoke inhalation. Since it is the major or sole pharmacologically active agent in smoke, it must be presumed that this is its preferred method of absorption and thus why people inhale smoke. . . . . The organoleptic [sensory] properties of smoke are more complex since they involve*

---

[582] Dunn WL. Philip Morris Research Center. *Motives and Incentives in Cigarette Smoking*. Philip Morris Research Center. Richmond, VA. 1972. Pages 3-4.

[583] Cohen AJ, Roe FJC. *Monograph on the Pharmacology and Toxicology of Nicotine and its Role in Tobacco Smoking*. Tobacco Advisory Council. U.K. July 1979. Page 38.

*the stimulation of a variety of areas in the mouth, nose and throat.*[584]

At the 1983 BATCO Research Conference in Rio de Janeiro, the industry discussed its understanding that nicotine "satisfaction" comes from inhalation and absorption of nicotine into the bloodstream rather than from its flavor. There was discussion of possible cigarette modifications to reduce inhalation of toxic smoke components and thus reduce smoker health risk. Smoker risk could be reduced (1) by modifying the cigarette to reduce retention of smoke in the lung, or (2) by increasing smoke irritation to reduce depth of inhalation and thus resulting absorption. The conferees were reminded, however, that such modifications, to the extent that they result in decreased nicotine absorption and resulting pharmacological effects, may threaten smoker "satisfaction." They were told that it was therefore essential to pay attention to the amount of nicotine that was inhaled, to determine whether absorption was adequate with less deep inhalation:

> *The basic assumption is that nicotine, which is almost certainly the key smoke component for satisfaction, is fully released to the body system before exhalation takes place. It is essential, therefore to attempt to quantify the change in chemical composition between inhaled and exhaled smoke under different conditions of smoking, ie., shallow, medium and deep inhalation. The absorption of nicotine via the nasal cavity should also be investigated.*[585]

Other BATCO documents also show that the industry treats nicotine's pharmacological

---

[584] Ayres CI. BATCO letter to E.E. Kohnhorst, Brown and Williamson, transmitting partial summary of issues presented at Montebello Research Conference in 1982. Page BW-W2-03949. (Summary prepared in 1984.)

*See also* a BATCO report in which it was hypothesized that "increased smoker response is associated with nicotine reaching the brain more quickly." Backhurst JD. BATCO R&D. *Further Work on "Extractable Nicotine."* Report No. RD 437-R. Southampton, England. September 30, 1966. Page 1.

[585] BATCO Research Conference. Brazil. July 1983. Page 7.

effects as distinct from the flavor characteristics of tobacco.[586] As described in FINDINGS § II.C.1., supra, "Project Wheat" was an industry study intended to aid BATCO in developing cigarettes with increased consumer acceptance.[587] The Project Wheat researchers emphasized the importance of nicotine delivery over all other product features and specifically distinguished the effects of nicotine from the taste and flavor characteristics of cigarettes:

> *In considering which product features are important in terms of consumer acceptance, the nicotine delivery is one of the more obvious candidates. Others include the taste and flavour characteristics of the smoke, physical features such as draw resistance and rate of burn, and the general uniformity of the product, to name but a few. The importance of nicotine hardly needs to be stressed, as it is so widely recognised.*[588] [Emphasis added.]

Even RJR research scientists publicly acknowledge that the nicotine in cigarettes provides pharmacological and psychological effects to smokers in addition to any mere sensory effects.[589] An internal RJR document from 1972 is more explicit in showing that the industry views nicotine's role as pharmacological and distinct from the smoke components that provide flavor:

> *If nicotine is the sine qua non of tobacco products, and tobacco products are recognized as being attractive dosage forms of nicotine, then it is logical to design our product - and where possible our advertising - around nicotine delivery rather than around tar delivery or flavor.*[589a] [Emphasis added.]

---

[586] BATCO Group R&D Sydney, Australia. March 1978. Page 6. According to "Notes on Group Research & Development Conference" written by S.J. Green on April 6, 1978, the conferees were asked to assist in developing "an effective means of obtaining a nicotine-rich, and preferably flavour-rich extract from waste tobacco."

[587] *See* Project Wheat - Part 1, note 204, *supra,* at p. 1.

[588] *Id.* at pp. 3-4.

[589] Robinson JH, Pritchard WS. The role of nicotine in tobacco use. *Psychopharmacology.* 1992;108:405.

[589a] Hilts PJ. U.S. Convenes Grand Jury to Look at Tobacco Industry. *New York Times.* July 26, 1995. An internal Philip Morris document similarly reveals the industry's understanding that people smoke for the pharmacological effects of nicotine, not for flavor. Reporting on a survey of the reasons

Industry patents also distinguish the role of nicotine from flavorants.[590] An RJR book on flavoring tobacco lists approximately a thousand flavorants, but fails to list nicotine as a flavoring agent.[591] In fact, nicotine's flavor is unpleasant,[592] and the tobacco industry has gone to significant lengths to mask the flavor of increased levels of nicotine in cigarettes.[593]

Moreover, there is evidence that some of the sensory effects associated with nicotine, e.g., irritation and "impact," are sought by smokers at least in part because these effects are always followed by the pharmacological effects they seek. Thus, smokers learn to associate the sensory impact of nicotine (burning in the throat) with the resulting psychoactive effects of nicotine, and thus look for these sensory signals in tobacco products. This is known as secondary reinforcement.[594] Industry documents show that the industry is aware of this

---

people say they smoke, a Philip Morris researcher says that the reasons given fall into three categories: 1) "as a narcotic, tranquilizer, or sedative," 2) at the beginning or end of a basic activity, and 3)automatic smoking behavior. The researcher concludes:

> *It should be noted that there was scarcely any unprompted reference to smoking for "taste," or "flavor," until it was suggested-and then everyone agreed that it was the major element in smoking satisfaction.*

Memorandum from Al Udow, Philip Morris, New York, NY, to Mr. J.J. Morgan. Why People Start to Smoke. June 2, 1976. *In* 141 Cong. Rec. H7665 (daily ed. July 25, 1995).

590 U.S. Patent No. 3,584,630. Inskeep GE. *Tobacco Product Having Low Nicotine Content Associated with a Release Agent having Nicotine Weakly Absorbed Thereon*. Philip Morris Inc. June 15, 1971. C1:57-58.

591 Leffingwell JC, Yound HJ. *Tobacco Flavoring for Smoking Products.* Winston-Salem, NC: R.J. Reynolds Tobacco Company; 1972.

592 Budavari S, O'Neil MJ, Smith A, Heckelman PE, eds. The Merck Index. 11th ed. Rahway, NJ: Merck & Co., Inc. 1989:1030. *The Merck Index* describes nicotine as having "an acrid, burning taste."

593 *See, e.g.,* U.S. Patent No. 4,830,028. Lawson JW, Bullings BR, Perfetti TA. *Salts Provided from Nicotine and Organic Acid as Cigarette Additives.* R.J. Reynolds Tobacco Company. May 16, 1989. C1. *See also* p. 250 *et seq.*

594 *See* p. 102. Rose JE, Levin ED. Inter-relationships between conditioned and primary reinforcement in the maintenance of cigarette smoking. *British J. of Addiction.* 1991;86:605-609.

relationship.[595]

The industry's development of nicotine analogues also demonstrates that the industry is more interested in nicotine's pharmacological effects on the central nervous system than in its sensory effects. The focus of industry research has been to develop compounds that will duplicate the pharmacological effects of nicotine on the central nervous system. Nowhere in the referenced tobacco industry documents concerning nicotine analogues is there mention of concern to duplicate any flavor, taste, or other acute sensory effects that may be associated with nicotine. This fact was acknowledged by Dr. DeNoble in his congressional testimony, as evidenced by the following exchange with Congressman Waxman:

> *Waxman: Now, you ran a laboratory that was charged with identifying the essential characteristics of nicotine so that a synthetic form of nicotine could be developed, yet you didn't test for the taste of nicotine. Did you ever hear any serious discussion to the effect that Philip Morris leaves nicotine in cigarettes for taste?*
>
> *DeNoble: No, sir. None at all.*[596]

In summary, tobacco industry documents make clear that the industry understands that the pharmacological effects of nicotine explain why there is a market for cigarettes, and why

---

[595] BATCO Conference Outline, 1984, note 287, *supra*, at p. BW-W2-01977:
> *An immediate sensory affect [sic] associated with nicotine is the "impact" on inhaling. Is this sensation a genuine part of the reward a smoker is seeking, or is it a "cue", i.e., a smoker has learnt by experience, that if he perceives a particular level of impact, he will subsequently receive an acceptable degree of satisfaction.*

Other BATCO documents refer to a 1969 BATCO study (B-A.T. R. & D.E. Report No. RD.640-R) whose objective was to determine the relationship between "impact" and physiological response. *See, e.g,* BATCO. Relative Contributions of Nicotine and Carbon Monoxide to Human Physiological Response. Nov. 15, 1971. Page 2. RD.640-R was not among the documents provided to Congress by Brown and Williamson.

[596] *Regulation of Tobacco Products (Part 2): Hearings Before the Subcommittee on Health and the Environment of the Committee on Energy and Commerce, U.S. House of Representatives,* 103 Cong. 2d Sess. 16 (April 28, 1994) (testimony of Victor DeNoble).

nicotine's sensory effects are distinct and quite secondary. Tobacco industry documents concerning nicotine analogues further support the conclusion that the pharmacological effects of nicotine are of much greater importance to the industry than nicotine's sensory effects.

## H. INDUSTRY FAILURE TO REMOVE NICOTINE FROM TOBACCO DESPITE AVAILABLE TECHNOLOGY

The tobacco industry has developed, over several decades, technologies to selectively remove nicotine from tobacco. This capability is evidenced by the various patents for methodologies to extract nicotine from tobacco,[597] attempts to market denicotinized cigarettes,[598]

---

[597] *See, e.g.:*
U.S. Patent No. 3,139,435. Staley J, Clarke AB. *Process for Selective Extraction of Alkaloid.* Philip Morris Inc. June 30, 1964.

U.S. Patent No. 4,557,280. Gravely LE, Geiss VL, Knobs F, Gregory CF. *Process for Reduction of Nitrate and Nicotine Content of Tobacco by Microbial Treatment.* Brown and Williamson Tobacco Corporation. December 10, 1985.

U.S. Patent No. 3,046,997. Hind JD. *Selective Alkaloid Extraction.* Philip Morris Inc. July 31, 1962.

U.S. Patent No. 4,068,671. Casey WJ. *Nicotine Removal Process.* AMF Inc. January 17, 1978.

U.S. Patent No. 4,821,749. Toft HC, Smith KW, Carpenter CR. *Extruded Tobacco Materials.* R.J. Reynolds Tobacco Company. April 18, 1989.

U.S. Patent No. 5,018,540. Grubbs HJ, Prasad R, Howell TM. *Process for Removal of Basic Materials.* Philip Morris Inc. May 28, 1991.

U.S. Patent No. 5,119,835. Heeman V, Schmekel G, Ebling U, Hauser B, Koene CH, Rabitz H. *Method for Extracting Tobacco Alkaloids.* B.A.T. Cigarettenfabriken GmbH. June 9, 1992.

U.S. Patent No. 4,898,188. Niven Jr BF, Mays CD. *Tobacco Processing.* R.J. Reynolds Tobacco Company. February 6, 1990.

U.S. Patent No. 4,967,771. Fagg BS, Frederickson JD. *Process for Extracting Tobacco.* R.J. Reynolds Tobacco Company. November 6, 1990.

U.S. Patent No. 4,150,677. Osbourne Jr JS, Hartung HA, Bebbs Jr JF. *Treatment of Tobacco.* Philip Morris Inc. April 24, 1979.

U.S. Patent No. 5,065,775. Fagg BS. *Tobacco Processing.* R.J. Reynolds Tobacco Company. November 19, 1991.

European Patent No. 280,817. Grubbs HJ, Prasad H, Howell TM. *Process for Removal of Basic Materials.* Philip Morris Inc. Filed on December 24, 1987.

[598] Citizen Petition submitted by the American Heart Association, the American Lung Association and the American Cancer Society, acting as the Coalition on Smoking OR Health, to the U.S. Food and Drug

ONE HUNDRED THIRD CONGRESS

HENRY A. WAXMAN, CALIFORNIA, CHAIRMAN

THOMAS J. BLILEY, JR., VIRGINIA
MICHAEL BILIRAKIS, FLORIDA
ALEX McMILLAN, NORTH CAROLINA
J. DENNIS HASTERT, ILLINOIS
FRED UPTON, MICHIGAN
BILL PAXON, NEW YORK
SCOTT KLUG, WISCONSIN
GARY A. FRANKS, CONNECTICUT
JAMES C. GREENWOOD, PENNSYLVANIA
CARLOS J. MOORHEAD, CALIFORNIA
(EX OFFICIO)

KAREN NELSON, STAFF DIRECTOR

U.S. HOUSE OF REPRESENTATIVES
COMMITTEE ON ENERGY AND COMMERCE

SUBCOMMITTEE ON HEALTH AND THE ENVIRONMENT

2415 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-6118
PHONE (202) 225-4952

# THE HILL and KNOWLTON DOCUMENTS: HOW THE TOBACCO INDUSTRY LAUNCHED ITS DISINFORMATION CAMPAIGN

A Staff Report, Majority Staff
Subcommittee on Health and the Environment
U.S. House of Representatives

May 26, 1994

PLAINTIFF'S EXHIBIT 7

This majority staff report of the Subcommittee on Health and the Environment analyzes documents that describe in detail the formation and early years of the Tobacco Industry Research Committee, a joint tobacco industry group now known as the Council for Tobacco Research.

The ostensible purpose of the Tobacco Industry Research Committee was to provide "aid and assistance to the research effort into all phases of tobacco use and health." In a full-page advertisement run in over 400 newspapers on January 4, 1954, the major tobacco companies explained that they formed the Research Committee because they "accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business."

The documents obtained by the Subcommittee were written by top officials at the Hill and Knowlton public relations firm, an advisor to the Tobacco Industry Research Committee during its formative years. The documents show that contrary to the industry's public assertions, the real purpose of the Tobacco Industry Research Committee was to "sponsor a public relations campaign which is ... entirely 'pro-cigarettes.'" The goal was "reassurance of the public" through "communication of ... the existence of weighty scientific views which hold there is no proof that cigarette smoking is a cause of lung cancer." The public relations campaign was so extensive that in 1955 the Tobacco Industry Research Council hired 35 staff members of Hill and Knowlton to conduct the campaign.

The documents describe in detail the massive campaign undertaken from 1954 through 1956 by the Tobacco Industry Research Committee to influence public opinion. They explain how during these early years the Tobacco Industry Research Committee:

- transformed obscure scientific reports favorable to the industry into headline news across the country;
- courted the editors of the nations' major news organizations, advising them in personal meetings of "the need for editorial responsibility in handling stories that rouse unwarranted fears";
- influenced the content of news reports in major newspapers, magazines, and television shows, including the New York Times, the Washington Post, and the Edward R. Murrow Television Show;
- planned a 17-step public relations campaign to respond to one particularly unfavorable report;
- influenced medical opinion by sending hundreds of thousands of copies of booklets prepared by the



Berly

Tobacco Industry Research Committee to "all doctors" in the United States;

- established "personal liaisons" in organizations like the American Medical Association and American Cancer Society to secure "advance information ... concerning research" and "first-hand knowledge of the theories, methods, and personalities of those involved in research on tobacco and health"; and

- ultimately succeeded in shifting national opinion, so that by 1956 Hill and Knowlton could report that "neither the press nor the public seems to be reacting with any noticeable fear or alarm to the recent attacks."

As recounted by one Hill and Knowlton executive in 1953, the chief executive officers of the leading tobacco companies were "emphatic in saying that the entire activity is a long-term, continuing program, since they feel the problem is one of promoting cigarettes and protecting them from these and other attacks that may be expected in the future." Forty years later, the Council for Tobacco Research is still in operation and the campaign of disinformation continues.

<u>Chronological Summary of Key Documents</u>

<u>December 1953</u>. Dr. Earnest Wynder and his colleagues at the Sloan-Kettering Institute in New York City publish research showing that cigarette tar condensate causes fatal cancers when painted on the skin of mice. The research study, a copy of which is attached as exhibit 1, attracts massive media coverage.

<u>December 15, 1953</u>. The chief executive officers of the nation's largest tobacco companies meet on the morning of December 15, 1953, at the Plaza Hotel in New York City to discuss the implications of the new health research. Hill and Knowlton executives attend the meeting and, later in the day, write a memorandum summarizing the meeting. The memorandum is attached as exhibit 2.

The meeting is unprecedented: it is the first time the CEOs had met together outside of occasional dinners honoring an industry leader. In attendance were Paul M. Hahn, President, American Tobacco Company; Joseph F. Cullman, Jr., Chairman and President, Benson & Hedges; O. Parker McComas, President, Philip Morris & Co.; and J. Whitney Peterson, President, U.S. Tobacco Company.

At the meeting, the CEOs agree that the health criticisms are "extremely serious" and "worthy of drastic action" (p. 3). According to the memorandum, "the officials stated that salesmen in the industry are frantically alarmed and that the

decline in tobacco stocks on the stock market has caused grave concern" (p. 4).

According to the memorandum, "the chief executive officers of all the leading tobacco companies -- R.J. Reynolds, PM, B&H, U.S. Tobacco Company, B&W -- have agreed to go along with a public relations program on the health issue" (p. 1).

Specifically, they agree that:

"They should sponsor a public relations campaign which is positive in nature and is entirely 'pro-cigarettes.' ... They are also emphatic in saying that the entire activity is a long-term, continuing program, since they feel the problem is one of promoting cigarettes and protecting them from these and other attacks that may be expected in the future. Each of the company presidents attending emphasized the fact that they consider the program to be a long-term one." (p. 2)

December 24, 1953. Less than two weeks later, on December 24, 1953, Hill and Knowlton writes a set of "Preliminary Recommendations for Cigarette Manufacturers." This document is attached as exhibit 3.

The paper observes:

"[T]he grave nature of a number of recently highly publicized research reports on the effects of cigarette smoking ... have confronted the industry with a serious problem of public relations. ... The situation is one of extreme delicacy. There is much at stake and the industry group, in moving into the field of public relations, needs to exercise great care not to add fuel to the flames." (pp. 1-2)

According to Hill and Knowlton:

"The recommended approach is conservative and long-range. ... There is no public relations nostrum, known to us at least, which will cure the ills of the industry with one swallow. The need is for a soundly conceived and effectively executed program based upon continuing research and factual information." (p. 2)

Hill and Knowlton recommended:

"The underlying purpose of any activity at this stage should be reassurance of the public through wider communication of facts to the public. It is important that the public recognize the existence of weighty scientific views which hold there is no proof that cigarette smoking is a cause of lung cancer." (p. 2)

In particular, Hill and Knowlton recommended that the tobacco manufacturers take "joint action" by establishing a "Tobacco Research Committee" headquartered in New York City (p. 3).

Hill and Knowlton recommended that:

"The first public statement of the Committee should be designed to clarify the problem and to reassure the public that: (a) the industry's first and foremost interest is the public health; (b) there is no proof of the claims which link smoking and lung cancer; and (c) the industry is inaugurating a joint plan to deal with the situation." (p. 4)

This statement should be "placed as an advertisement in leading newspapers" (p. 4).

<u>January 4, 1954</u>. The CEOs followed the advice of Hill and Knowlton on January 4, 1954, running a full-page advertisement in newspapers across the country. This advertisement is attached as exhibit 4.

The advertisement is called "A Frank Statement to Cigarette Smokers." It announces the formation of the Tobacco Industry Research Committee to provide "aid and assistance to the research effort into all phases of tobacco use and health."

In the advertisement, the tobacco companies assert:

"<u>We accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business</u>. ... <u>We always have and always will cooperate closely with those whose task it is to safeguard the public health</u>."

<u>January 15, 1954</u>. Hill and Knowlton writes a "Progress Report" of activities. This progress report is attached as exhibit 5.

The progress report states that the "Frank Statement" appeared in 448 newspapers, reaching a circulation of 43,245,000 in 258 cities. The advertisement was run in virtually all cities with a population above 50,000. The total cost was $257,276.

<u>May 3, 1954</u>. Hill and Knowlton reports to the Tobacco Industry Research Committee on a booklet, "A Scientific Perspective on the Cigarette Controversy." The report is attached as exhibit 6.

According to the report, 205,000 copies of the booklet were printed. The booklet was sent to 176,000 doctors. The booklet and an accompanying press release were also sent to 15,000 editors and reporters.

June 21, 1954. Hill and Knowlton writes a "Public Relations Report and Recommendations for the Tobacco Industry Research Committee." The report is attached as exhibit 7.

By June 21, 1954, the Tobacco Industry Research Committee had selected a scientific advisor (Dr. Clarence Cook Little, a former director of the American Cancer Society) and a scientific advisory board. According to Hill and Knowlton, with these steps in place:

> "The Committee now has the basis needed for carrying on a long-range plan of public relations activities. ... These activities will endeavor to keep the following facts before the Public:
> 1. That there is no proof that smoking is a cause of lung cancer;
> 2. That an impartial and independent Board of scientists, doctors and educators is advising the TIRC, as a public service, on all aspects of tobacco use and health;
> 3. That the TIRC is determined, through a long-range program, to make every possible effort to help get the facts through laboratory and statistical research." (p. 2)

August 17, 1954. Hill and Knowlton sends T.V. Harnett, the Chairman of the Tobacco Industry Research Committee, a "Confidential Report of Activities through July 31, 1954." The confidential report, and an accompanying cover letter, are attached as exhibit 8.

The cover letter to Harnett calls the report "highly confidential" and "request[s] that you retain it only for your personal consideration." The letter warns that "no additional copies be made and that this copy not be placed in files."

The report itself is 24 pages long and describes many details of the public relations campaign being run by the Tobacco Industry Research Committee.

The report makes it clear that Hill and Knowlton -- not the independent scientists -- actually ran the Tobacco Industry Research Committee. According to the report:

> "Since the Committee had no headquarters and no staff, Hill and Knowlton, Inc. was asked to provide a working staff and temporary office space. As a first organizational step, public relations counsel assigned one of its experienced executives, W.T. Hoyt, to serve as account executive and handle as one of his functions the duties of executive secretary for the Tobacco Industry Research Council." (p. 3)

The report further states that Hill and Knowlton "provided

assistance in selecting" the Scientific Advisory Board (p. 3), "proposed" Dr. Little for the Scientific Director (p. 3), and "handled liaison, agendas, organizational plans, business affairs, reports, and materials for meetings of the TIRC [and] the Scientific Advisory Board, ... in addition to developing operating procedures for the research program" (p. 5).

The report provides a "case history" that describes how the Tobacco Industry Research Committee would transform an obscure scientific report favorable to the industry into national headline news (pp. 7-9). According to the case history, "advance checking" by TIRC revealed that Dr. Hueper was scheduled to give an unpublicized report "concerning the lack of a proven link between lung cancer and smoking" in July in Sao Paulo, Brazil. TIRC reproduced the report and two pages of highlights and established a "special liaison" in Sao Paulo "to give word of Dr. Hueper's delivery as quickly as possible, so as to enable distribution of the talk while it was still newsworthy." As soon as the talk was given, "personal delivery of the Hueper release was made to important newspapers and services as well as distribution to science writers, editorial writers and feature writers." In the end:

> "Although may of the writers covering the Sao Paulo meeting failed to mention the Hueper talk in their dispatches, it is significant that, as a result of the distribution in the U.S.A., stories questioning a link between smoking and cancer were given wide attention, both in headlines and stories. In some press accounts, the Hueper story took precedence over the reports of Drs. Hammond and Wynder, even though the latter were made available to the press in advance of their delivery on a hold-for-release basis."

The report describes many other efforts of the Tobacco Industry Research Committee to influence media, including "special personal contacts" with Time, Newsweek, U.S. News and World Report, and Business Week (p. 9); preparation of editorials entitled "The Same Old Culprit" and "Truth Makes a Slow Crop" that were "widely used in 'home town' dailies and weeklies throughout the country" (p. 10); and "assistance ... provided to the New York Times for a Sunday Magazine piece ... on "Why People Smoke," which discussed some of the now-abandoned old charges against cigarettes" (p. 12).

In many instances, the Tobacco Industry Research Committee worked behind the scenes to influence the content of individual articles. In one case, the intervention of TIRC resulted in "seven revisions and five qualifying additions" to a story in Cosmopolitan magazine that "was already in type" (p. 10).

In other cases, it was quicker and more effective simply to hire free-lance authors to write favorable articles for the Tobacco Industry Research Committee:

Case 5:96-cv-00091-JRG Document 1 Filed 03/28/96 Page 476 of 575 PageID #: 38741

"Especially-written articles are being developed that can be used or adopted for use in various media receptive to or seeking material relating to the subject. ... To achieve this objective more quickly and effectively, the free lance services of qualified science writers are being used." (p. 23)

Another important function of the Tobacco Industry Research Council was to infiltrate anti-smoking organizations to obtain "advance information." According to the report:

"Personal contacts are advantageous not only in disseminating and gathering information but for enlisting support and advice on problems. ... Personal liaison has been established in such cancer, research, and medical organizations and associations as the American Medical Association, American College of Chest Physicians, American Cancer Society, Sloan-Kettering Foundation, New York University School of Industrial Medicine, National Cancer Institute, International Cancer Congress' Cancer Prevention Committee, as well as with individual doctors and scientists. These continue to make possible obtaining advance information or papers concerning research being done in this and related fields." (pp. 17-18)

Moreover, "individual coverage of medical and scientific meetings such as the AMA meeting in San Francisco have resulted in first-hand knowledge of the theories, methods, and personalities of those involved in the research on tobacco and smoking" (p. 19).

October 7, 1954. Hill and Knowlton writes a "confidential memorandum" describing "Tobacco Industry Research Committee Information Activities" in August and September 1954. The memorandum is attached as exhibit 9.

The memorandum describes "recent major public relations projects" from August through September 1954. According to the memorandum, the Scientific Director and Chairman of the Tobacco Industry Research Committee met with the following publishers to "explain the industry's long-range intention to support a research program devoted primarily to the public interest": Arthur Hays Sulzberger, the president and publisher of the New York Times; Helen Rogers Reid, chairman of the board of the New York Herald Tribune; Jack Howard, president of Scripps-Howard Newspapers; William Randolph Hearst, Jr., president and publisher of the Hearst Consolidated Publications; and Roy E. Larsen, president of Luce Publications (p. 1).

The memorandum describes how the Tobacco Industry Research Council influenced the content of the Edward R. Murrow Television Show:

"A conference was held with Edward R. Murrow, Fred Friendly, his producer, ... at the Tobacco Industry Research Committee offices in the Empire State Building. ... The Murrow staff emphasized the intention to present a coldly objective program with every effort made to tell the story as it stands today, with special effort toward balanced perspective and concrete steps to show that the facts still are not established and must be sought by scientific means such as the research activities the Tobacco Industry Research Committee will support. Mr. Murrow was assured of continued cooperation from the Tobacco Industry Research Committee to the extent possible under the scope of the TIRC program." (p. 2)

The memorandum describes how an article being prepared by Leonard Engle for Harper's magazine "use[s] TIRC as a source of information" and "should lend weight to the industry's contention that there is no proof of the charges and that there are many other factors that enter strongly into the increasing incidence of lung cancer" (pp. 2-3). It also reports that in the Washington Post "a feature story by Nate Haseltine us[es] long excerpts from paper by Dr. Hueper, which was supplied him in personal contact through Hill and Knowlton, Inc., Washington office" (p. 3).

Finally, the memorandum describes the tactic of hiring free-lance authors to write ostensibly independent articles favorable to the industry, reporting that "C.B. Colby, free lance popularizer of science, was retained for research and possible writing of article concerning all the hazards of modern life which people are cautioned against and leading to the conclusion that in spite of all the death scares, "You Still Live Longer" (p. 4).

November 26, 1954. John W. Hill, the founder of Hill and Knowlton, writes a memorandum to Hartnett, the chairman of the Tobacco Industry Research Committee, on "Proposed Budget for 1955." The memorandum is attached as exhibit 10.

According to the memorandum, "the budget for staff operations provides for the use of all or part of the time of 35 different staff members of Hill and Knowlton, Inc." (p. 1). This compares with 23 Hill and Knowlton staff who were hired in 1954.

The memorandum also explains that the budget includes 70,000 to print 200,000 copies of a booklet describing the obacco Industry Research Council for distribution to "all octors" and $250,000 for "one nationwide advertisement eporting to the public at the end of TIRC's first year."

All told, in 1954 the Tobacco Industry Research Committee pent $477,955 on payments to Hill and Knowlton and on dvertising -- slightly over 50% of the organization's entire



Berly

Case 5:96-cv-00091-JRG Document 1 Filed 03/28/96 Page 478 of 575 PageID #: 38743

budget. In 1955, the public relations and advertising expenditures were budgeted to increase by 13% to $539,400. In 1994 dollars, this would represent an expenditure of over $2.5 million.

April 28, 1955. Hill and Knowlton writes a confidential "Public Relations Report" to the Tobacco Industry Research Council. The report is attached as exhibit 11.

The report finds that after a year of intensive public relations activities, "progress has been made" (p. 1). Specifically:

> "The first "big scare" continues on the wane. There is much general awareness of the big IF factors involved. ... Treatment of the cigarette-health issue in public media continues to improve from the Tobacco Industry Research Committee point of view. Even adverse stories now tend to carry modifying statements. Positive stories are on the ascendancy." (pp. 1-2)

However, the report also warned that "the next major public problem" will be a report by Drs. Hammond and Horn, scheduled for release at a conference of the American Medical Association in June in Atlantic City:

> "There is no reason to hope that the .. report will be in any way better than the one last year. There is no reason to hope that it will not result in widespread attention in the press. The A.M.A. meeting this year is closer to the major news centers than it was last year in San Francisco."

May 25, 1955. One month after warning about the upcoming Hammond-Horn report, Hill and Knowlton sends the Tobacco Industry Research Committee a "rundown of the status of certain steps being taken in anticipation of the June 6 presentation of the second Hammond-Horn report." The rundown is attached as exhibit 12.

The report from Hill and Knowlton details a 17-step program for anticipating and responding to the Hammond-Horn report. Among the steps outlined in the report are harvesting the results of the Tobacco Industry Research Council's earlier contacts with the Edward R. Murrow television show. Step 8 calls for "provid[ing] all the assistance possible in making the two Murrow shows, scheduled for May 31 and June 7, as timely and positive as possible" (p. 2). Step 9 is "transcribing pertinent sections of the Murrow show immediately after its presentation, and providing copies of these transcripts to major news outlets in New York early in the morning following the show" (p. 2).

February 14, 1956. Hill and Knowlton writes another



ly

confidential "Public Relations Report" to the Tobacco Industry Research Committee. A copy of the report is attached as exhibit 13.

The report finds that the activities of the Tobacco Industry Research Council have shifted public opinion in favor of the tobacco industry and succeeded in isolating many of the industry's critics. According to the report:

> "A large proportion of the attacks against smoking made recently, and expected to continue in the next few months, originate with the same small group of critics who have led the anti-tobacco moves of the past two or three years. Neither the press nor the public seems to be reacting with any noticeable fear or alarm to the recent attacks." (p. 1)

The report also notes the success of the program to influence medical opinion:

> "A factor that has become more noticeable ... is that, more and more, doctors and scientists are voluntarily speaking up at medical meetings to express disagreement with the flat charges made against tobacco. They do not exonerate tobacco but say that the case against smoking has not been proved and that much more evidence is needed." (p. 2)

Furthermore:

> "Another aspect that also is becoming more apparent is the great emphasis being placed by scientists in this country and abroad on the role of air pollution as the major cause of lung cancer. Two recent scientific reports on air pollution and health received national newspaper attention. The subject is being treated by the press as a new, interesting and important phase of the overall situation." (p. 2)

Despite these important successes, the memorandum warns against "any attitude of complacency in our public relations approach, especially when we consider ... it is not possible at this time to assess fully the probable impact of federal government reports and activities that are indicated in the months ahead" (p. 1).

July 19, 1956. Hill and Knowlton writes a confidential memorandum to Hartnett, the chairman of the Tobacco Industry Research Committee, regarding "Conferences with Life and Reader's Digest. The memorandum is attached as exhibit 14.

According to the memorandum, Dr. Little of TIRC met with the Deputy Managing Editor of Life, Robert T. Elson, on July 17. At the meeting:



Berly

"Dr. Little ... pointed out the importance to the public of receiving a balanced presentation of all the facts and underscored the need for editorial responsibility in handling stories that rouse unwarranted fears." (p. 1)

The next day, on July 18, Dr. Little met with DeWitt Wallace, the editor of Reader's Digest. At this meeting:

"Dr. Little stressed the importance of the public not being stampeded into undue fears and the great responsibility held by major publications to keep the public adequately informed so that they would not tend to over-simplify the problem and expect a "push-button answer" to problems so complex as cancer and heart disease." (p. 2)

# REGULATION OF TOBACCO PRODUCTS (Part 2)

## HEARINGS

BEFORE THE

SUBCOMMITTEE ON HEALTH AND THE ENVIRONMENT

OF THE

COMMITTEE ON ENERGY AND COMMERCE HOUSE OF REPRESENTATIVES

ONE HUNDRED THIRD CONGRESS

SECOND SESSION

APRIL 28, MAY 17 AND 26, 1994

**Serial No. 103–153**

Printed for the use of the Committee on Energy and Commerce

## COMMITTEE ON ENERGY AND COMMERCE

JOHN D. DINGELL, Michigan, *Chairman*

HENRY A. WAXMAN, California
PHILIP R. SHARP, Indiana
EDWARD J. MARKEY, Massachusetts
AL SWIFT, Washington
CARDISS COLLINS, Illinois
MIKE SYNAR, Oklahoma
W.J. "BILLY" TAUZIN, Louisiana
RON WYDEN, Oregon
RALPH M. HALL, Texas
BILL RICHARDSON, New Mexico
JIM SLATTERY, Kansas
JOHN BRYANT, Texas
RICK BOUCHER, Virginia
JIM COOPER, Tennessee
J. ROY ROWLAND, Georgia
THOMAS J. MANTON, New York
EDOLPHUS TOWNS, New York
GERRY E. STUDDS, Massachusetts
RICHARD H. LEHMAN, California
FRANK PALLONE, Jr., New Jersey
CRAIG A. WASHINGTON, Texas
LYNN SCHENK, California
SHERROD BROWN, Ohio
MIKE KREIDLER, Washington
MARJORIE MARGOLIES-MEZVINSKY, Pennsylvania
BLANCHE M. LAMBERT, Arkansas

CARLOS J. MOORHEAD, California
THOMAS J. BLILEY, Jr., Virginia
JACK FIELDS, Texas
MICHAEL G. OXLEY, Ohio
MICHAEL BILIRAKIS, Florida
DAN SCHAEFER, Colorado
JOE BARTON, Texas
ALEX McMILLAN, North Carolina
J. DENNIS HASTERT, Illinois
FRED UPTON, Michigan
CLIFF STEARNS, Florida
BILL PAXON, New York
PAUL E. GILLMOR, Ohio
SCOTT KLUG, Wisconsin
GARY A. FRANKS, Connecticut
JAMES C. GREENWOOD, Pennsylvania
MICHAEL D. CRAPO, Idaho

ALAN J. ROTH, *Staff Director and Chief Counsel*
DENNIS B. FITZGIBBONS, *Deputy Staff Director*
MARGARET A. DURBIN, *Minority Chief Counsel and Staff Director*

---

## SUBCOMMITTEE ON HEALTH AND THE ENVIRONMENT

HENRY A. WAXMAN, California, *Chairman*

MIKE SYNAR, Oklahoma
RON WYDEN, Oregon
RALPH M. HALL, Texas
BILL RICHARDSON, New Mexico
JOHN BRYANT, Texas
J. ROY ROWLAND, Georgia
EDOLPHUS TOWNS, New York
GERRY E. STUDDS, Massachusetts
JIM SLATTERY, Kansas
JIM COOPER, Tennessee
FRANK PALLONE, Jr., New Jersey
CRAIG A. WASHINGTON, Texas
SHERROD BROWN, Ohio
MIKE KREIDLER, Washington
JOHN D. DINGELL, Michigan (Ex Officio)

THOMAS J. BLILEY, Jr., Virginia
MICHAEL BILIRAKIS, Florida
ALEX McMILLAN, North Carolina
J. DENNIS HASTERT, Illinois
FRED UPTON, Michigan
BILL PAXON, New York
SCOTT KLUG, Wisconsin
GARY A. FRANKS, Connecticut
JAMES C. GREENWOOD, Pennsylvania
CARLOS J. MOORHEAD, California (Ex Officio)

KAREN NELSON, *Staff Director*
WILLIAM SCHULTZ, *Counsel*
PHILLIP BARNETT, *Counsel*
MARY M. McGRANE, *Minority Counsel*



Hearings held o
April 28, 19
May 17, 19
May 26, 19
Testimony of:
Califano, J
Abuse at
DeNoble,
Mental F
Glenn, Jar
Research
Mele, Paul
Material submi
Coalition o
Council fo
addition
hearing
Health an
and Kn
Disinfor
Health an
Additi
and
List o

rnia
ia

a

vania

a

# CONTENTS

| | Page |
|---|---|
| Hearings held on: | |
| April 28, 1994 | 1 |
| May 17, 1994 | 157 |
| May 26, 1994 | 331 |
| Testimony of: | |
| Califano, Joseph A., Jr., president, Center on Addiction and Substance Abuse at Columbia University | 162 |
| DeNoble, Victor John, senior behavior analyst, Delaware Community Mental Retardation Program | 4 |
| Glenn, James F., chairman, president, and CEO, Council for Tobacco Research, USA | 340 |
| Mele, Paul C., Armed Forces Radiobiology Research Institute | 16 |
| Material submitted for the record by: | |
| Coalition on Smoking OR Health: News release and statement | 395 |
| Council for Tobacco Research, USA: Letter dated September 27, 1994, additional clarification of questions asked Mr. Glenn at May 26, 1994 hearing | 403 |
| Health and the Environment Subcommittee, majority staff report: Hill and Knowlton Documents: How the Tobacco Industry Launched Its Disinformation Campaign | 418 |
| Health and the Environment Subcommittee: | |
| Additional questions for Dr. DeNoble from Hon. Thomas Bliley, Jr., and responses | 151 |
| List of documents which have been retained in committee files | 155 |

# THE HILL and KNOWLTON DOCUMENTS: HOW THE TOBACCO INDUSTRY LAUNCHED ITS DISINFORMATION CAMPAIGN

A Staff Report, Majority Staff
Subcommittee on Health and the Environment

This majority staff report of the Subcommittee on Health and the Environment analyzes documents that describe in detail the formation and early years of the Tobacco Industry Research Committee, a joint tobacco industry group now known as the Council for Tobacco Research.

The ostensible purpose of the Tobacco Industry Research Committee was to provide "aid and assistance to the research effort into all phases of tobacco use and health." In a full-page advertisement run in over 400 newspapers on January 4, 1954, the major tobacco companies explained that they formed the Research Committee because they "accept an interest in the people's health as a basic responsibility, paramount to every other consideration in our business."

The documents obtained by the Subcommittee were written by top officials at the Hill and Knowlton public relations firm, an advisor to the Tobacco Industry Research Committee during its formative years. The documents show that contrary to the industry's public assertions, the real purpose of the Tobacco Industry Research Committee was to "sponsor a public relations campaign which is ... entirely 'pro-cigarettes.'" The goal was "reassurance of the public" through "communication of ... the existence of weighty scientific views which hold there is no proof that cigarette smoking is a cause of lung cancer." The public relations campaign was so extensive that in 1955 the Tobacco Industry Research Council hired 35 staff members of Hill and Knowlton to conduct the campaign.

The documents describe in detail the massive campaign undertaken from 1954 through 1956 by the Tobacco Industry Research Committee to influence public opinion. They explain how during these early years the Tobacco Industry Research Committee:

- transformed obscure scientific reports favorable to the industry into headline news across the country;
- courted the editors of the nations' major news organizations, advising them in personal meetings of "the need for editorial responsibility in handling stories that rouse unwarranted fears";
- influenced the content of news reports in major newspapers, magazines, and television shows, including the New York Times, the Washington Post, and the Edward R. Murrow Television Show;
- planned a 17-step public relations campaign to respond to one particularly unfavorable report;
- influenced medical opinion by sending hundreds of thousands of copies of booklets prepared by the

Tobacco Industry Research Committee to "all doctors" in the United States;

- established "personal liaisons" in organizations like the American Medical Association and American Cancer Society to secure "advance information ... concerning research" and "first-hand knowledge of the theories, methods, and personalities of those involved in research on tobacco and health"; and

- ultimately succeeded in shifting national opinion, so that by 1956 Hill and Knowlton could report that "neither the press nor the public seems to be reacting with any noticeable fear or alarm to the recent attacks."

As recounted by one Hill and Knowlton executive in 1953, the chief executive officers of the leading tobacco companies were "emphatic in saying that the entire activity is a long-term, continuing program, since they feel the problem is one of promoting cigarettes and protecting them from these and other attacks that may be expected in the future." Forty years later, the Council for Tobacco Research is still in operation and the campaign of disinformation continues.

<u>Chronological Summary of Key Documents</u>

**<u>December 1953</u>**. Dr. Earnest Wynder and his colleagues at the Sloan-Kettering Institute in New York City publish research showing that cigarette tar condensate causes fatal cancers when painted on the skin of mice. The research study, a copy of which is attached as exhibit 1, attracts massive media coverage.

**<u>December 15, 1953</u>**. The chief executive officers of the nation's largest tobacco companies meet on the morning of December 15, 1953, at the Plaza Hotel in New York City to discuss the implications of the new health research. Hill and Knowlton executives attend the meeting and, later in the day, write a memorandum summarizing the meeting. The memorandum is attached as exhibit 2.

The meeting is unprecedented: it is the first time the CEOs had met together outside of occasional dinners honoring an industry leader. In attendance were Paul M. Hahn, President, American Tobacco Company; Joseph F. Cullman, Jr., Chairman and President, Benson & Hedges; O. Parker McComas, President, Philip Morris & Co.; and J. Whitney Peterson, President, U.S. Tobacco Company.

At the meeting, the CEOs agree that the health criticisms are "extremely serious" and "worthy of drastic action" (p. 3). According to the memorandum, "the officials stated that salesmen in the industry are frantically alarmed and that the

decline in tobacco stocks on the stock market has caused grave concern" (p. 4).

According to the memorandum, "the chief executive officers of all the leading tobacco companies -- R.J. Reynolds, PM, B&H, U.S. Tobacco Company, B&W -- have agreed to go along with a public relations program on the health issue" (p. 1).

Specifically, they agree that:

> "They should sponsor a public relations campaign which is positive in nature and is entirely 'pro-cigarettes.' ... They are also emphatic in saying that the entire activity is a long-term, continuing program, since they feel the problem is one of promoting cigarettes and protecting them from these and other attacks that may be expected in the future. Each of the company presidents attending emphasized the fact that they consider the program to be a long-term one." (p. 2)

December 24, 1953. Less than two weeks later, on December 24, 1953, Hill and Knowlton writes a set of "Preliminary Recommendations for Cigarette Manufacturers." This document is attached as exhibit 3.

The paper observes:

> "[T]he grave nature of a number of recently highly publicized research reports on the effects of cigarette smoking ... have confronted the industry with a serious problem of public relations. ... The situation is one of extreme delicacy. There is much at stake and the industry group, in moving into the field of public relations, needs to exercise great care not to add fuel to the flames." (pp. 1-2)

According to Hill and Knowlton:

> "The recommended approach is conservative and long-range. ... There is no public relations nostrum, known to us at least, which will cure the ills of the industry with one swallow. The need is for a soundly conceived and effectively executed program based upon continuing research and factual information." (p. 2)

Hill and Knowlton recommended:

> "The underlying purpose of any activity at this stage should be reassurance of the public through wider communication of facts to the public. It is important that the public recognize the existence of weighty scientific views which hold there is no proof that cigarette smoking is a cause of lung cancer." (p. 2)

In particular, Hill and Knowlton recommended that the tobacco manufacturers take "joint action" by establishing a "Tobacco Research Committee" headquartered in New York City (p. 3).

Hill and Knowlton recommended that:

"The first public statement of the Committee should be designed to clarify the problem and to reassure the public that: (a) the industry's first and foremost interest is the public health; (b) there is no proof of the claims which link smoking and lung cancer; and (c) the industry is inaugurating a joint plan to deal with the situation." (p. 4)

This statement should be "placed as an advertisement in leading newspapers" (p. 4).

January 4, 1954. The CEOs followed the advice of Hill and Knowlton on January 4, 1954, running a full-page advertisement in newspapers across the country. This advertisement is attached as exhibit 4.

The advertisement is called "A Frank Statement to Cigarette Smokers." It announces the formation of the Tobacco Industry Research Committee to provide "aid and assistance to the research effort into all phases of tobacco use and health."

In the advertisement, the tobacco companies assert:

"We accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business. ... We always have and always will cooperate closely with those whose task it is to safeguard the public health."

January 15, 1954. Hill and Knowlton writes a "Progress Report" of activities. This progress report is attached as exhibit 5.

The progress report states that the "Frank Statement" appeared in 448 newspapers, reaching a circulation of 43,245,000 in 258 cities. The advertisement was run in virtually all cities with a population above 50,000. The total cost was $257,276.

May 3, 1954. Hill and Knowlton reports to the Tobacco Industry Research Committee on a booklet, "A Scientific Perspective on the Cigarette Controversy." The report is attached as exhibit 6.

According to the report, 205,000 copies of the booklet were printed. The booklet was sent to 176,000 doctors. The booklet and an accompanying press release were also sent to 15,000 editors and reporters.

**June 21, 1954.** Hill and Knowlton writes a "Public Relations Report and Recommendations for the Tobacco Industry Research Committee." The report is attached as exhibit 7.

By June 21, 1954, the Tobacco Industry Research Committee had selected a scientific advisor (Dr. Clarence Cook Little, a former director of the American Cancer Society) and a scientific advisory board. According to Hill and Knowlton, with these steps in place:

> "The Committee now has the basis needed for carrying on a long-range plan of public relations activities. ... These activities will endeavor to keep the following facts before the Public:
>
> 1. That there is no proof that smoking is a cause of lung cancer;
> 2. That an impartial and independent Board of scientists, doctors and educators is advising the TIRC, as a public service, on all aspects of tobacco use and health;
> 3. That the TIRC is determined, through a long-range program, to make every possible effort to help get the facts through laboratory and statistical research." (p. 2)

**August 17, 1954.** Hill and Knowlton sends T.V. Harnett, the Chairman of the Tobacco Industry Research Committee, a "Confidential Report of Activities through July 31, 1954." The confidential report, and an accompanying cover letter, are attached as exhibit 8.

The cover letter to Harnett calls the report "highly confidential" and "request[s] that you retain it only for your personal consideration." The letter warns that "no additional copies be made and that this copy not be placed in files."

The report itself is 24 pages long and describes many details of the public relations campaign being run by the Tobacco Industry Research Committee.

The report makes it clear that Hill and Knowlton -- not the independent scientists -- actually ran the Tobacco Industry Research Committee. According to the report:

> "Since the Committee had no headquarters and no staff, Hill and Knowlton, Inc. was asked to provide a working staff and temporary office space. As a first organizational step, public relations counsel assigned one of its experienced executives, W.T. Hoyt, to serve as account executive and handle as one of his functions the duties of executive secretary for the Tobacco Industry Research Council." (p. 3)

The report further states that Hill and Knowlton "provided



assistance
"proposed"
"handled li
affairs, re
the Scienti
operating p

The re
the Tobacco
obscure sci
national he
history, "a
was schedul
lack of a p
in Sao Paul
of highligh
"to give wo
so as to er
newsworthy.
of the Huep
services as
writers and

"Altho
meetin
dispat
distri
betwee
in hea
Hueper
Hammon
availa
hold-f

The re
Industry Re
"special pe
World Repor
editorials
Slow Crop"
weeklies th
provided to
on "Why Peo
abandoned c

In man
worked behi
articles.
"seven revi
Cosmopolita

In oth
to hire fre
Tobacco Ind

assistance in selecting" the Scientific Advisory Board (p. 3), "proposed" Dr. Little for the Scientific Director (p. 3), and "handled liaison, agendas, organizational plans, business affairs, reports, and materials for meetings of the TIRC [and] the Scientific Advisory Board. ... in addition to developing operating procedures for the research program" (p. 5).

The report provides a "case history" that describes how the Tobacco Industry Research Committee would transform an obscure scientific report favorable to the industry into national headline news (pp. 7-9). According to the case history, "advance checking" by TIRC revealed that Dr. Hueper was scheduled to give an unpublicized report "concerning the lack of a proven link between lung cancer and smoking" in July in Sao Paulo, Brazil. TIRC reproduced the report and two pages of highlights and established a "special liaison" in Sao Paulo "to give word of Dr. Hueper's delivery as quickly as possible, so as to enable distribution of the talk while it was still newsworthy." As soon as the talk was given, "personal delivery of the Hueper release was made to important newspapers and services as well as distribution to science writers, editorial writers and feature writers." In the end:

> "Although may of the writers covering the Sao Paulo meeting failed to mention the Hueper talk in their dispatches, it is significant that, as a result of the distribution in the U.S.A., stories questioning a link between smoking and cancer were given wide attention, both in headlines and stories. In some press accounts, the Hueper story took precedence over the reports of Drs. Hammond and Wynder, even though the latter were made available to the press in advance of their delivery on a hold-for-release basis."

The report describes many other efforts of the Tobacco Industry Research Committee to influence media, including "special personal contacts" with Time, Newsweek, U.S. News and World Report, and Business Week (p. 9); preparation of editorials entitled "The Same Old Culprit" and "Truth Makes a Slow Crop" that were "widely used in 'home town' dailies and weeklies throughout the country" (p. 10); and "assistance ... provided to the New York Times for a Sunday Magazine piece ... on "Why People Smoke," which discussed some of the now-abandoned old charges against cigarettes" (p. 12).

In many instances, the Tobacco Industry Research Committee worked behind the scenes to influence the content of individual articles. In one case, the intervention of TIRC resulted in "seven revisions and five qualifying additions" to a story in Cosmopolitan magazine that "was already in type" (p. 10).

In other cases, it was quicker and more effective simply to hire free-lance authors to write favorable articles for the Tobacco Industry Research Committee:

"Especially-written articles are being developed that can be used or adopted for use in various media receptive to or seeking material relating to the subject. ... To achieve this objective more quickly and effectively, the free lance services of qualified science writers are being used." (p. 23)

Another important function of the Tobacco Industry Research Council was to infiltrate anti-smoking organizations to obtain "advance information." According to the report:

"Personal contacts are advantageous not only in disseminating and gathering information but for enlisting support and advice on problems. ... Personal liaison has been established in such cancer, research, and medical organizations and associations as the American Medical Association, American College of Chest Physicians, American Cancer Society, Sloan-Kettering Foundation, New York University School of Industrial Medicine, National Cancer Institute, International Cancer Congress' Cancer Prevention Committee, as well as with individual doctors and scientists. These continue to make possible obtaining advance information or papers concerning research being done in this and related fields." (pp. 17-18)

Moreover, "individual coverage of medical and scientific meetings such as the AMA meeting in San Francisco have resulted in first-hand knowledge of the theories, methods, and personalities of those involved in the research on tobacco and smoking" (p. 19).

October 7, 1954. Hill and Knowlton writes a "confidential memorandum" describing "Tobacco Industry Research Committee Information Activities" in August and September 1954. The memorandum is attached as exhibit 9.

The memorandum describes "recent major public relations projects" from August through September 1954. According to the memorandum, the Scientific Director and Chairman of the Tobacco Industry Research Committee met with the following publishers to "explain the industry's long-range intention to support a research program devoted primarily to the public interest": Arthur Hays Sulzberger, the president and publisher of the New York Times; Helen Rogers Reid, chairman of the board of the New York Herald Tribune; Jack Howard, president of Scripps-Howard Newspapers; William Randolph Hearst, Jr., president and publisher of the Hearst Consolidated Publications; and Roy E. Larsen, president of Luce Publications (p. 1).

The memorandum describes how the Tobacco Industry Research Council influenced the content of the Edward R. Murrow Television Show:

"A conference was held with Edward R. Murrow, Fred Friendly, his producer, ... at the Tobacco Industry Research Committee offices in the Empire State Building. ... The Murrow staff emphasized the intention to present a coldly objective program with every effort made to tell the story as it stands today, with special effort toward balanced perspective and concrete steps to show that the facts still are not established and must be sought by scientific means such as the research activities the Tobacco Industry Research Committee will support. Mr. Murrow was assured of continued cooperation from the Tobacco Industry Research Committee to the extent possible under the scope of the TIRC program." (p. 2)

The memorandum describes how an article being prepared by Leonard Engle for Harper's magazine "use[s] TIRC as a source of information" and "should lend weight to the industry's contention that there is no proof of the charges and that there are many other factors that enter strongly into the increasing incidence of lung cancer" (pp. 2-3). It also reports that in the Washington Post "a feature story by Nate Haseltine us[es] long excerpts from paper by Dr. Hueper, which was supplied him in personal contact through Hill and Knowlton, Inc., Washington office" (p. 3).

Finally, the memorandum describes the tactic of hiring free-lance authors to write ostensibly independent articles favorable to the industry, reporting that "C.B. Colby, free lance popularizer of science, was retained for research and possible writing of article concerning all the hazards of modern life which people are cautioned against and leading to the conclusion that in spite of all the death scares, "You Still Live Longer" (p. 4).

November 26, 1954. John W. Hill, the founder of Hill and Knowlton, writes a memorandum to Hartnett, the chairman of the Tobacco Industry Research Committee, on "Proposed Budget for 1955." The memorandum is attached as exhibit 10.

According to the memorandum, "the budget for staff operations provides for the use of all or part of the time of 35 different staff members of Hill and Knowlton, Inc." (p. 1). This compares with 23 Hill and Knowlton staff who were hired in 1954.

The memorandum also explains that the budget includes $70,000 to print 200,000 copies of a booklet describing the Tobacco Industry Research Council for distribution to "all doctors" and $250,000 for "one nationwide advertisement reporting to the public at the end of TIRC's first year."

All told, in 1954 the Tobacco Industry Research Committee spent $477,955 on payments to Hill and Knowlton and on advertising -- slightly over 50% of the organization's entire

budget. In 1955, the public relations and advertising expenditures were budgeted to increase by 13% to $539,400. In 1994 dollars, this would represent an expenditure of over $2.5 million.

<u>April 28, 1955</u>. Hill and Knowlton writes a confidential "Public Relations Report" to the Tobacco Industry Research Council. The report is attached as exhibit 11.

The report finds that after a year of intensive public relations activities, "progress has been made" (p. 1). Specifically:

> "The first "big scare" continues on the wane. There is much general awareness of the big IF factors involved. ... Treatment of the cigarette-health issue in public media continues to improve from the Tobacco Industry Research Committee point of view. Even adverse stories now tend to carry modifying statements. <u>Positive stories are on the ascendancy</u>." (pp. 1-2)

However, the report also warned that "the next major public problem" will be a report by Drs. Hammond and Horn, scheduled for release at a conference of the American Medical Association in June in Atlantic City:

> "There is no reason to hope that the .. report will be in any way better than the one last year. There is no reason to hope that it will not result in widespread attention in the press. The A.M.A. meeting this year is closer to the major news centers than it was last year in San Francisco."

<u>May 25, 1955</u>. One month after warning about the upcoming Hammond-Horn report, Hill and Knowlton sends the Tobacco Industry Research Committee a "rundown of the status of certain steps being taken in anticipation of the June 6 presentation of the second Hammond-Horn report." The rundown is attached as exhibit 12.

The report from Hill and Knowlton details a 17-step program for anticipating and responding to the Hammond-Horn report. Among the steps outlined in the report are harvesting the results of the Tobacco Industry Research Council's earlier contacts with the Edward R. Murrow television show. Step 8 calls for "provid[ing] all the assistance possible in making the two Murrow shows, scheduled for May 31 and June 7, as timely and positive as possible" (p. 2). Step 9 is "transcribing pertinent sections of the Murrow show immediately after its presentation, and providing copies of these transcripts to major news outlets in New York early in the morning following the show" (p. 2).

<u>February 14, 1956</u>. Hill and Knowlton writes another

confidential "Public Relations Report" to the Tobacco Industry Research Committee. A copy of the report is attached as exhibit 13.

The report finds that the activities of the Tobacco Industry Research Council have shifted public opinion in favor of the tobacco industry and succeeded in isolating many of the industry's critics. According to the report:

"A large proportion of the attacks against smoking made recently, and expected to continue in the next few months, originate with the same small group of critics who have led the anti-tobacco moves of the past two or three years. Neither the press nor the public seems to be reacting with any noticeable fear or alarm to the recent attacks." (p. 1)

The report also notes the success of the program to influence medical opinion:

"A factor that has become more noticeable ... is that, more and more, doctors and scientists are voluntarily speaking up at medical meetings to express disagreement with the flat charges made against tobacco. They do not exonerate tobacco but say that the case against smoking has not been proved and that much more evidence is needed." (p. 2)

Furthermore:

"Another aspect that also is becoming more apparent is the great emphasis being placed by scientists in this country and abroad on the role of air pollution as the major cause of lung cancer. Two recent scientific reports on air pollution and health received national newspaper attention. The subject is being treated by the press as a new, interesting and important phase of the overall situation." (p. 2)

Despite these important successes, the memorandum warns against "any attitude of complacency in our public relations approach, especially when we consider ... it is not possible at this time to assess fully the probable impact of federal government reports and activities that are indicated in the months ahead" (p. 1).

July 19, 1956. Hill and Knowlton writes a confidential memorandum to Hartnett, the chairman of the Tobacco Industry Research Committee, regarding "Conferences with Life and Reader's Digest. The memorandum is attached as exhibit 14.

According to the memorandum, Dr. Little of TIRC met with the Deputy Managing Editor of Life, Robert T. Elson, on July 17. At the meeting:

> "Dr. Little ... pointed out the importance to the public of receiving a balanced presentation of all the facts and underscored the need for editorial responsibility in handling stories that rouse unwarranted fears." (p. 1)

The next day, on July 18, Dr. Little met with DeWitt Wallace, the editor of Reader's Digest. At this meeting:

> "Dr. Little stressed the importance of the public not being stampeded into undue fears and the great responsibility held by major publications to keep the public adequately informed so that they would not tend to over-simplify the problem and expect a "push-button answer" to problems so complex as cancer and heart disease." (p. 2)



Experimenta

Ernest L.

(Department of Surg
Investigati

The increasing freque
the lung in many parts
great interest in this cor
a search for an explanat
Graham (40), on the ba
tical investigation, pre
association between lun
pecially of cigarettes. T
substantiated by a lar
Doll and Hill (9, 10). Bo
risk of developing cance
direct proportion to the
other recent studies re
(3, 11, 15, 20, 21, 24, 26,
Council of International
Sciences convened a sym
gy of lung cancer and ag
dence points to a relatio
and cigarette smoking (
Tobacco is also though
production of cancer of t
esophagus. Although the
ships are not so comple
cancer, the collected dat
The increasing incide
cinoma and the availabl
ing to it and possibly to c
to undertake the experim
This investigation is dire
in laboratory animals w
genic factors in cigarette

Previous In

Many attempts have
products to induce cance
mental animals. The firs
in 1900 (4). He painted
"juice" for an unknown

* This investigation was sup
the National Cancer Institute
Health, Public Health Service.

† Present Address: Memori
Diseases, 444 East Sixty-eight

Received for publication Ju

Exhibit 1

Reprinted for private circulation from
CANCER RESEARCH
Vol. 13, No. 12, pp. 855–64, December 1953
Copyright 1953 by Cancer Research, Inc.
PRINTED IN U.S.A.

# Experimental Production of Carcinoma with Cigarette Tar*

Ernest L. Wynder,† Evarts A. Graham, and Adele B. Croninger

*(Department of Surgery, Washington University School of Medicine, St. Louis, Mo., and the Division of Clinical Investigation of the Sloan-Kettering Institute of the Memorial Center for Cancer and Allied Diseases, New York, N.Y.)*

The increasing frequency of primary cancer of the lung in many parts of the world has aroused great interest in this condition and has stimulated a search for an explanation. In 1950, Wynder and Graham (40), on the basis of a clinical and statistical investigation, presented evidence of a real association between lung cancer and smoking, especially of cigarettes. These data have been well substantiated by a large-scale British study by Doll and Hill (9, 10). Both studies showed that the risk of developing cancer of the lung increases in direct proportion to the amount of smoking. Ten other recent studies reached similar conclusions (3, 11, 15, 20, 21, 24, 26, 33, 34, 42). In 1952, The Council of International Organisations of Medical Sciences convened a symposium on the endemiology of lung cancer and agreed that the present evidence points to a relationship between lung cancer and cigarette smoking (12).

Tobacco is also thought to play some role in the production of cancer of the larynx, oral cavity, and esophagus. Although the studies of those relationships are not so complete as the studies on lung cancer, the collected data are suggestive (33, 41).

The increasing incidence of bronchiogenic carcinoma and the available evidence relating smoking to it and possibly to cancer of other sites led us to undertake the experimental work reported here. This investigation is directed toward determining in laboratory animals whether there are carcinogenic factors in cigarette smoke.

## Previous Investigations

Many attempts have been made with tobacco products to induce cancers in a variety of experimental animals. The first was reported by Brosch in 1900 (4). He painted guinea pigs with tobacco "juice" for an unknown period of time and described epithelial proliferation. Subsequently, many different approaches to the problem were undertaken with various types of tobacco, different methods of tar preparation, and different species of animals. Many of those studies were carried on for too brief a period of time or with too few animals to be regarded as significant. Hoffmann and his associates (17), for instance, painted animals for only 14 days, at which time they noted hair loss. Wacker and Schmincke (37) observed proliferation of epithelium in rabbits' ears 21 days after a subcutaneous injection of pipe tar.

The first recorded experiment with mice and with tobacco tars as the suspected carcinogen was the one just cited by Hoffmann and co-workers. The more detailed of the subsequent studies are listed in Table 1. This table attempts to summarize the methods used in the various studies and the results obtained. In many instances the method of study was not described in sufficient detail to give all the information considered essential.

From this survey of the literature it is found that, before our study, all the previous attempts to produce experimental cancer in mice with tobacco products were successful in the production of only seven epidermoid cancers of the skin.

Several investigators attempted to induce pulmonary tumors in mice with tobacco smoke. Lorenz and co-workers (22) obtained negative results in this manner. Campbell (6), and especially Essenberg (13), however, claim to have found a significantly higher percentage of pulmonary adenomas in the experimental than in the control group. It is doubtful that such a finding is important. At any rate, so far these methods have not induced true bronchiogenic carcinomas.

The majority of the investigators working with tobacco tars used rabbits as the experimental animals (14, 23, 27–32, 36). In view of the fact that the present work deals with mice we shall only briefly list some of the studies with rabbits. Roffo reported the production of carcinomas in rabbit ears after painting the ears with a distillate of tobacco (28, 30, 32). Sugiura (36), in attempting

* This investigation was supported by a research grant from the National Cancer Institute of the National Institutes of Health, Public Health Service.

† Present Address: Memorial Center for Cancer and Allied Diseases, 444 East Sixty-eighth Street, New York 21, N.Y.

Received for publication June 8, 1953.

man carcinogen, is present in tobacco, but recent studies by Daff and co-workers (8) based on the arsenic content of various types of European tobacco tends to place less emphasis on this inorganic element. Heat, cigarette paper, flavoring, and wetting agents have been suggested as etiologic factors in the production of cancer, but it must be noted that clinical evidence has also pointed to cigar-smoking, pipe-smoking, and tobacco-chewing as possible factors in the production of cancer of the respiratory and alimentary tract.

The actual carcinogenic agent or agents in tobacco remain to be identified. Studies combining chemical and biologic efforts leading to their identification are urgently needed. Should one be able to identify definite carcinogens and succeed in removing them, or at least in reducing their quantity in tobacco, proper preventive methods would be at hand. Such studies may further our understanding of human and animal carcinogenesis and may lead to the development of practical preventive measures against cancer.

## SUMMARY AND CONCLUSIONS

1. A cigarette tar condensate was obtained with a smoking machine which simulated human smoking habits. The resulting tar was dissolved in acetone and applied to the backs of $CAF_1$ mice in a dosage of 40 mg. of tar/acetone solution 3 times a week. Control mice were painted with acetone.

2. Of 81 tarred mice, 59 per cent developed papillomas. The first lesion was noted in the 23d week, and the mean time of appearance was 56 weeks.

3. Of 81 tarred mice, 44 per cent developed histologically proved carcinomas. The first carcinoma was observed in the 42d week, and the average time of appearance was 71 weeks. Of 62 mice alive at 12 months, 58 per cent developed cancer. Seventy-one weeks constitutes approximately one-half of the life span of $CAF_1$ mice. This corresponds roughly with the fact already noted that in the human about 30-35 years of smoking, or approximately one-half the life span, are required for the production of bronchiogenic carcinoma.

4. One carcinoma was transplanted for 4 generations and another one is currently growing in the 15th generation.

5. Control mice painted with acetone alone showed no skin lesions. At the end of 20 months of painting, 53 per cent were still living, compared to 9.8 per cent in the group painted with tobacco tars.

6. The group of mice painted with croton oil in addition to the tar, starting in the 7th month, cannot be properly evaluated because of a greater number of deaths occurring during the 12th and 14th months, although within the period of observation no acceleration of cancer formation was noted.

7. The group of mice started with acetone and receiving croton oil beginning in the 7th month showed roughening and thickening of the epidermis, but no tumor formation was noted.

8. All $CAF_1$ mice painted with 0.3 per cent solution of methylcholanthrene in acetone developed cancer within 4½ months. The first papilloma appeared during the 6th week, with average appearance during the 7th week. The first carcinoma was observed during the 12th week, with a mean time of appearance of 16 weeks.

9. The results obtained with $CAF_1$ mice establish condensed cigarette tar as a carcinogen for mouse epidermis. These studies provide a tool to determine and isolate the possible carcinogenic agent(s) within tobacco tar. At present it is not known which fraction or fractions in tobacco tars are carcinogenic. Combined chemical and biologic studies are now in progress to search for such agents. Such studies, in view of the corollary clinical data relating smoking to various types of cancer, appear urgent. They may result not only in furthering our knowledge of carcinogenesis, but in promoting some practical aspects of cancer prevention.

## ACKNOWLEDGMENTS

The authors wish to express their gratitude to Galen B. Cook, Mary Gay Crow, and Gertrude Camel of Washington University School of Medicine, Department of Surgery, St. Louis, Mo., for their technical assistance.

## REFERENCES

1. BERENBLUM, I. The Mechanism of Carcinogenesis: A Study of the Significance of Co-carcinogenic Action and Related Phenomena. Cancer Research, 1:807-14, 1941.
2. BOGEN, E., and LOOMIS, R. N. Tobacco Tar: An Experimental Investigation of Its Alleged Carcinogenic Action. Am. J. Cancer, 16:1515-21, 1936.
3. BRESLOW, L. Does Cigarette Smoking Cause Lung Cancer? California's Health, 9:1-4, 1951.
4. BROSCH, A. Theoretische und experimentelle Untersuchungen zur Pathogenesis und Histogenesis der malignen Geschwülste. Virchows Arch. pathol. Anat. u. Physiol., 162:32-84, 1900.
5. CAMPBELL, J. A. The Effects of Exhaust Gases from Internal Combustion Engines and of Tobacco Smoke upon Mice, with Special Reference to Incidence of Tumours of the Lung. Brit. J. Exper. Path., 17:146-58, 1936.
6. ———. Carcinogenic Agents Present in the Atmosphere and Incidence of Primary Lung Tumours in Mice. Ibid., 20:122-32, 1939.
7. COOPER, E. A.; LAMB, F. W. M.; SANDERS, E.; and HIRST, E. L. The Role of Tobacco Smoking in the Production of Cancer. J. Hyg., 32:293-300, 1932.
8. DAFF, M. E.; DOLL, R.; and KENNAWAY, E. L. Cancer of the Lung in Relation to Tobacco. Brit. J. Cancer, 5:1-20, 1951.

Hill & Know[illegible]

The
leading tobac

I.

Ther
because the t
1911 and the
carrying on r

As t
cigarette mar
honoring some

The
American Tob
companies - I
Company, Bro
tions progra

Lig
that company
versy.

In
of tobacco g
Together the
farmers. Ob
with the 1,3
represented

II.

Be
the incorpo
the organiz
charged wit

Hill & Knowlton Exhibit 2 Hill Client 839 F: Foundation Mem

December 15, 1953

HK 60

BACKGROUND MATERIAL ON THE CIGARETTE INDUSTRY CLIENT

The following information was given us by the presidents of the leading tobacco companies at the Hotel Plaza this morning.

I. Participants

There is no trade association in the cigarette industry. This is because the tobacco companies are prevented by the dissolution decree of 1911 and the criminal convictions under the Anti-Trust Act in 1939 from carrying on many group activities.

As a matter of fact, before the current health crisis arose, cigarette manufacturers never met together at any time except at dinners honoring some industry leader.

The group was called together by Mr. Paul Hahn, President of the American Tobacco Company. The chief executive officers of all the leading companies - R. J. Reynolds, Philip Morris, Benson & Hedges, U. S. Tobacco Company, Brown & Williamson - have agreed to go along with a public relations program on the health issue.

Liggett & Myers is not participating in the organization because that company feels that the proper procedure is to ignore the whole controversy.

In addition to the cigarette companies, the two important groups of tobacco growers involved are enthusiastically supporting the new program. Together these tobacco growers represent some 600,000 farms and 2,700,000 farmers. Obviously, the tobacco growers are the political strength along with the 1,300,000 retail tobacco outlets. The tobacco growers will be represented by officials of the grower organizations.

II. Organization

Because of the anti-trust background, the companies do not favor the incorporation of a formal association. Instead, they prefer strongly the organization of an informal committee which will be specifically charged with the public relations function and readily identified as such.

For example, Mr. Hahn reported that one name they had considered was the "Tobacco Industry Committee for Public Information." John Hill suggested that he felt the word "research" should appear along with "information" in the title of the committee.

III. The Industry's Position

The industry is strongly convinced that there is no sound scientific basis for the charges that have been made. They believe that the more sensational accusations in the recent papers were premature and in some cases represent publicity issued in the hopes of attracting funds and support for further research.

They point out that the National Cancer Institute of the U. S. Public Health Administration, which is a government agency and supported by Congressional appropriations, has officially refuted the tie-up between cigarette smoking and cancer.

Nevertheless, they realize that the industry should not engage merely in a defensive campaign, replying to and answering individual research papers or magazine articles.

They feel that they should sponsor a public relations campaign which is positive in nature and is entirely "pro-cigarettes." They are confident they can supply us with comprehensive and authoritative scientific material which completely refutes the health charges.

They are also emphatic in saying that the entire activity is a long-term, continuing program, since they feel that the problem is one of promoting cigarettes and protecting them from these and other attacks that may be expected in the future. Each of the company presidents attending emphasized the fact that they consider the program to be a long-term one.

IV. Responses to Questions

The companies' answers to questions put them by John Hill and the undersigned provide valuable background. They are as follows:

> Will the cigarette companies organize themselves into an association publically announced, which will openly sponsor their public relations activities?

The companies replied that they had no desire to set up a smoke screen or "front" type of organization. They are perfectly willing to sponsor any statements that may be issued or any institutional advertising that may be recommended and approved.

> Do they accept the principle that public health is paramount to all else, and would they issue a public statement spelling this out?

Everyone present wholeheartedly agreed to this principle and readily consented to widespread dissemination of a sound statement of principles.

Distribution of such a statement it was agreed would probably be the first step in the public relations program that Hill and Knowlton would recommend.

> Do the companies consider that their own advertising and competitive practices have been a principal factor in creating a health problem?

The companies voluntarily admitted this to be the case even before the question was asked. They have informally talked over the problem and will try to do something about it. They do, however, point out that this is the one important public relations activity that might very clearly fall within the purview of the anti-trust act. Accordingly, it is doubtful that we will be able to make any formal recommendation with regard to advertising or selling practices and claims.

> Will the companies agree to sponsor new research which will provide definite answers to the charges?

A clear-cut answer to this question was deferred for the time being. The companies all say that they are carrying on much more research in their own laboratories and are sponsoring more research at hospitals and universities than is generally recognized. They believe that when we are acquainted with all of the scientific and factual material in the hands of the companies, we will agree that the major problem is to disseminate information on hand rather than to conduct new research.

However, John Hill did not agree to this and emphatically warned the companies that they should probably expect to sponsor additional research.

> Do the companies view this problem as being extremely serious and worthy of drastic action?

The answer is obvious since the companies have met together for the first time since 1939, since they have promptly proceeded to retain Hill and Knowlton, and are already considering such expensive techniques as the use of institutional advertising. They recognize the possibility that it might be desirable to use institutional advertising to promote the basic statement.

As another indication of how serious the problem is, the officials stated that salesmen in the industry are frantically alarmed and that the decline in tobacco stocks on the stock exchange market has caused grave concern, especially since tobacco earnings will be much higher next year because of the termination of excess profits taxes.

Are we primarily concerned with cigarettes rather than all tobacco?

There can be no doubt but that the problem is cigarettes and the task is to get out information concerning cigarettes. The attacks have all been against cigarettes. Of course, it is true that the attacks now made on cigarettes will eventually be made against all tobacco if not stopped, and it is also true that anything done in favor of cigarettes will be favorable to all tobacco.

Another reason why the emphasis should be on cigarettes is that there are existing trade associations in the cigar and tobacco field. They are all jealous of their prerogatives and if we stick to cigarettes we will avoid all such complications.

IV. Other Information

The current plans are for Hill and Knowlton to serve as the operating agency of the companies, hiring all the staff and disbursing all funds. The chairman will probably be Mr. Hahn or the head of one of the other companies resident in New York. There will be a strong subcommittee of chief executives, all resident in New York.

Tommy Ross, counsel for American Tobacco Company, has almost completed a "white paper" on the scientific facts involved in the health issue which he will make available to us for use or inclusion in something we will want to distribute to all the press, magazines, etc.

It was arranged for Hill and Knowlton to interview the scientific directors of all the leading companies. Three interviews are being held today, December 15, at 12:30, 2:30 and 4 p.m. respectively. Another will be held on Wednesday.

Following completion of the scientific interviews we will interview Tommy Ross, Ben Sonenberg (counsel for Philip Morris), and Sidney J. Wayne Associates (counsel for Lorillard).

It was also suggested that we might want to interview the advertising people, although the company presidents indicated that the advertising agencies did not have a great deal of material bearing upon the controversy. They thought it most important for us to see the scientific directors and the public relations people mentioned.

The Question of Polls:

The presidents indicated that they had thought about the possibility of a public opinion poll. We agreed that such a poll might prove to be necessary, and also indicated that a poll of certain important groups such as the doctors themselves and teachers might be desirable. Clearly, it is necessary to know: (a) the awareness of the problem, and (b) the extent to which the charges are believed, before extensive action is recommended.

Present at the Meeting:

| | |
|---|---|
| Paul M. Hahn | President, American Tobacco Company |
| Joseph F. Cullman, Jr. | Chairman and President, Benson & Hedges |
| O. Parker McComas | President, Philip Morris & Co., Ltd., Inc. |
| J. Whitney Peterson | President, U. S. Tobacco Company |
| - - - - | P. Lorillard Company |

BCG:AO

Bert C. Goss

Exhibit 3

H&K / 324 HK 1
TIRC 1953

December 24, 1953

PRELIMINARY RECOMMENDATIONS FOR
CIGARETTE MANUFACTURERS

Because of the grave nature of a number of recently highly publicized research reports on the effects of cigarette smoking, widespread public interest has developed, causing great concern within and without the industry.

These developments have confronted the industry with a serious problem of public relations. Obviously, that problem would be quickly solved if the adverse publicity would cease and people would stop talking about the whole matter.

But there is no evidence that the publicity has abated, or is about to abate, or that the research workers who are critical of cigarettes are going to cease these criticisms. A check among national magazines indicates that other periodicals are considering articles on the subject. Among them are Woman's Home Companion, Look and Cosmopolitan. The February issue of Pageant has an article publicizing the Wynder researches.

There is nothing the manufacturers can say or refrain from saying that can stop people from being interested in their health, nor allay their fear of cancer. So long as the causes and cure of this dread disease remain unknown people will be subject to waves of fear regarding it.

It is important that the industry do nothing to appear in the light of being callous to considerations of health or of belittling medical research which goes against cigarettes.

The industry should lose no time in making it completely clear to the American people that it is not unmindful of the public health.

There is an evident urgency about the matter which makes it advisable to suggest certain immediate steps. A fully rounded-out program

will be
hensive
various
stake a
tions,
do not
ballyho
which w
for a s
continu
contempl
of three
could ha
reassura
public.
weighty
smoking
overlook
serious
will not
of the a
mind whi
relation

will be developed when there has been enough time to make a more comprehensive study of additional aspects of the problem and to think through various courses of action and projects.

The situation is one of extreme delicacy. There is much at stake and the industry group, in moving into the field of public relations, needs to exercise great care not to add fuel to the flames.

The recommended approach is conservative and long-range. We do not believe the industry should indulge in any flashy or spectacular ballyhoo. There is no public relations nostrum, known to us at least, which will cure the ills of the industry with one swallow. The need is for a soundly conceived and effectively executed program based upon continuing research and factual information.

It would be a mistake for the industry group to inaugurate the contemplated program unless it is prepared to maintain it for a minimum of three years. The results of some of the medical research suggested could hardly be in hand short of that period of time.

The underlying purpose of any activity at this stage should be reassurance of the public through wider communication of facts to the public. It is important that the public recognize the existence of weighty scientific views which hold there is no proof that cigarette smoking is a cause of lung cancer.

In connection with the proposed activity, it is impossible to overlook the fact that some of the industry's advertising has come in for serious public criticism because of emphasis on health aspects of smoking.

This, of course, is a problem for the individual companies and will not be included in this program. But it must be recognized that some of the advertising may have created a degree of skepticism in the public mind which at the start at least could affect the believability of any public relations effort.

The decision of a group of companies in the industry to take joint action needs to be implemented by the selection of a Chairman and Treasurer and the adoption of procedures for the collection and disbursement of funds. In addition, it is important that the group establish procedures for expeditious clearance of any policy statements it may decide to issue.

The following recommendations are submitted for consideration by the manufacturers:

1. Headquarters of the Committee. Headquarters should be established in New York City.

2. Name of Committee. The following name is submitted: Tobacco Research Committee.

3. Set-up and function of Committee. The word "research" should be included in the name of the Committee to establish the fact that the group will carry on or sponsor fundamental scientific research and will not be solely an information agency. The Committee's research should be of two kinds:

(a) scientific, medical research

(b) editorial and statistical research into pertinent phases of the current controversy.

The Committee should be prepared on competent scientific advice from outside the industry to give substantial support to objective non-duplicating medical research that is most likely to be productive promptly of convincing results.

The Committee should have a Director of Research, a medical research authority of unquestioned national repute. The Director would have such research assistants as may be required. The Research Director would serve as spokesman for the Committee on medical and scientific matters.

group of
education
sulted by
statement
to reassu
interest
link smok
plan to d
should be

The Committee should also form an Advisory Board composed of a group of distinguished men from the fields of medicine, research and education. These should be men whose integrity is beyond question.

The Director of Research and the Advisory Board should be consulted by the Committee on these points:

a. What areas of objective medical research should be undertaken? Should it be confined to the problem of lung cancer or extend to other aspects of cigarette smoking and health?

b. How and where and under what auspices should the industry carry out its joint research effort? Should a Research Foundation be established which would finance research projects by existing laboratories and institutions, and if so, which ones? Or should the industry establish a new jointly financed research laboratory to carry on the work?

c. How much money, in the opinion of the Committee's Director of Research and its Advisory Board, should the member companies appropriate for medical research undertaking?

4. Public Statement by cigarette makers. The first public statement of the Committee should be designed to clarify the problem and to reassure the public that: (a) the industry's first and foremost interest is the public health; (b) there is no proof of the claims which link smoking and lung cancer; and (c) the industry is inaugurating a joint plan to deal with the situation.

This statement should be:

(a) distributed widely as news, and to employees, stockholders, distributors, tobacco growers, dealers, suppliers, public officials, national and community leaders and other groups;

(b) placed as an advertisement in leading newspapers and in leading news magazines.

(Draft of suggested copy of statement is attached.)

5. Research Sub-committee. A scientific research sub-committee should be set up by the top committee to be composed of Research Directors

of member companies for the purpose of:

a. working with the Committee's Director of Research;

b. reviewing scientific materials assembled for public information;

c. initiating scientific material for educational use by the Committee.

6. Continuing Public Relations Research. There should be set up at the headquarters of the Committee, under the direction of the Research Director, a continuing research project to collect, coordinate and disseminate (where practical) available information on various medical research activities bearing on pertinent phases of cigarettes and health. As time permits, this project would explore such questions as:

a. Why do mice show no tendency to develop lung cancer in experiments where they live half their lives in smoke-filled chambers?

b. Why, in some experiments, do mice show a tendency to develop skin cancer, when painted over a period with tobacco tars - whereas efforts to produce lung cancer in mice, by keeping them immersed in tobacco smoke, have failed?

c. Why has the rise in lung cancer been most marked among men, although the greatest rise in the use of cigarettes in the last 25 years seems to have been among women?

d. Why does the rate of lung cancer vary so greatly between certain cities, although the per capita rate of cigarette consumption in these cities seems approximately the same?

e. What is the correlation, if any, between lung cancer and certain changes in American life - such as steadily increased industrialization, increased urbanization, and the rising problem of atmospheric pollution in many of our urban centers?

f. Why is cancer of the lung on the increase, whereas no such rise appears in similar illness of the tongue, lip or throat?

g. Is the incidence of lung cancer less in rural areas than it is in urban areas, and if so what is the per capita consumption of cigarettes in these respective areas?

h. Is the incidence of lung cancer greater in cold climates than in mild climates and in the south, and if so what is the per capita consumption of cigarettes in the respective areas where this differential seemingly occurs?

purs

vigo

thei

* nee

the

i. The figures of the Damon Runyon Cancer Fund estimate in 1952 twenty-two thousand deaths from lung cancer in the United States in an estimated population of over one hundred fifty million individuals. The report in the New York Herald Tribune as of Sunday, December 13th, quoted the British Medical Society as advising that there were thirteen thousand cases of lung cancer in Great Britain last year. With Britain approximately one-quarter the size of the United States, their incidence of lung cancer would be approximately four times as great as the United States. What are the facts about this and what is the incidence of climate, etc. in the development of lung cancer?

j. Is it possible that England, with a larger percentage of lung cancer incidence, may possible have obtained this result due to the fact that the tobacco for their cigarettes is not treated in any way with casing? Should the efficacy of casing used in the manufacture of American cigarettes be studied as possibly an antidote to the deleterious effects of tobacco, if any?

k. With the extension of human life due to miracle drugs, etc. what is the percentage of the increase of lung cancer, if any, comparable to other diseases during the past ten years?

l. What may be the effect on the significance of statistical comparisons of more accurate diagnosis during the past few years into specific causes of death?

✓ m. What are the benefits and enjoyment derived from smoking, both by scientific tests and by measurement of smoker reactions and attitudes?

✓ n. What are the smoking habits of long-lived distinguished public leaders?

✓ o. What are the human ills erroneously attributed to tobacco over the centuries?

There are many similar lines of inquiry which have so far been pursued without definitive answers. They should be explored still more vigorously, and with still greater resources; and the results studied for their usefulness as a matter of public information.

7. Public Opinion Poll. A national survey of public opinion is needed to determine attitudes toward cigarettes and tobacco held by (a) the medical profession; and (b) the public at large. The results of such

a poll should be helpful in developing more effectively the continuing program of public information that may be required to offset anti-cigarette propaganda and to give justified reassurance to the public.

8. White Paper. The Committee should distribute as soon as possible a scientific White Paper digesting current available opinion of authorities on cigarette smoking and lung cancer.

9. Relations with the Press. An important function of the Committee will be to see that the pertinent facts are made available to the press.

In addition to any current statements or releases that may be issued, background memoranda of facts may be circulated to the press when occasion requires. The Committee, of course, will be alert to what is being published or said on the subject of concern to the industry and if any misstatements appear, the facts will be offered to proper sources.

In the case of magazines, the facts will be placed in the hands of editors for such use as may suit their purposes. Available for this work will be the publicity staff of public relations counsel. Any publicity activities, of course, will be adapted to current needs and opportunities as indicated by trends in public and professional opinion and discussions.

10. Radio and Television. Millions of people are informed and their attitudes influenced by radio and television. It will be important to keep commentators and other key people in broadcasting aware of the Committee's existence and of any facts it may assemble.

Moreover, the Committee should be on the alert for public discussion programs where spokesmen for the facts as the Committee sees them might be welcome. Public relations counsel has a radio and television specialist who can function in this area.

Plans should be explored for giving attention to the positive aspects of smoking through motion pictures suitable for television use as well as group showings.

11. Committee as a source of facts. The work of the Committee in the field of public information should be such as to establish the Committee as a reliable source of industry facts on this subject, and a flow of enquiry by mail, telephone and personal visitation most likely can be expected gradually to develop. The Committee should develop as rapidly as possible materials, data and statistics bearing on various aspects of the cigarette industry, and have adequate staff to insure meticulous attention to all enquiries from the press or public.

12. Information for special groups. Attention should be given to material on cigarettes going to special groups such as women's clubs, garden clubs and other organizations that have discussion and study programs, and corrections offered in the case of any misinformation noted.

13. Washington Activities. The Washington office and staff of public relations counsel will be available to place accurate and up-to-date information into the hands of appropriate Committees of Congress, Congressmen and Senators from tobacco states, and interested government officials.

14. Materials for company distribution. It is extremely important that the facts and views as developed by the Committee be communicated promptly to various elements within the industry itself. Employees, stockholders, distributors, growers and others should know the facts in order that they can speak intelligently when the subject is discussed in their own groups.

15. <u>Medical Groups</u>. The Committee will need to keep abreast of programs of various medical associations and groups.

16. <u>Cooperation of other groups</u>. The Comittee should explore and develop to the greatest extent that it can, the possibility of cooperation from allied groups such as growers, retailers and distributors.

## CONCLUSION

As already noted, it has not been practical to develop a full program in the brief space of time available. The effort has been to outline a basic policy approach to the problem and to indicate the direction which the activity should take in implementing policy.

We believe that the correct path to follow is one of patient, continuing, sure-footed presentation of the facts to the public -- facts supported and documented by careful research.

Exhibit 4

THE NEW YORK TIMES, MONDAY, JANUARY 4, [illegible]

# A Frank Statement to Cigarette Smokers

RECENT REPORTS on experiments with mice have given wide publicity to a theory that cigarette smoking is in some way linked with lung cancer in human beings.

Although conducted by doctors of professional standing, these experiments are not regarded as conclusive in the field of cancer research. However, we do not believe that any serious medical research, even though its results are inconclusive should be disregarded or lightly dismissed.

At the same time, we feel it is in the public interest to call attention to the fact that eminent doctors and research scientists have publicly questioned the claimed significance of these experiments.

Distinguished authorities point out:

1. That medical research of recent years indicates many possible causes of lung cancer.

2. That there is no agreement among the authorities regarding what the cause is.

3. That there is no proof that cigarette smoking is one of the causes.

4. That statistics purporting to link cigarette smoking with the disease could apply with equal force to any one of many other aspects of modern life. Indeed the validity of the statistics themselves is questioned by numerous scientists.

We accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business.

We believe the products we make are not injurious to health.

We always have and always will cooperate closely with those whose task it is to safeguard the public health.

For more than 300 years tobacco has given solace, relaxation, and enjoyment to mankind. At one time or another during those years critics have held it responsible for practically every disease of the human body. One by one these charges have been abandoned for lack of evidence.

Regardless of the record of the past, the fact that cigarette smoking today should even be suspected as a cause of a serious disease is a matter of deep concern to us.

Many people have asked us what we are doing to meet the public's concern aroused by the recent reports. Here is the answer:

1. We are pledging aid and assistance to the research effort into all phases of tobacco use and health. This joint financial aid will of course be in addition to what is already being contributed by individual companies.

2. For this purpose we are establishing a joint industry group consisting initially of the undersigned. This group will be known as TOBACCO INDUSTRY RESEARCH COMMITTEE.

3. In charge of the research activities of the Committee will be a scientist of unimpeachable integrity and national repute. In addition there will be an Advisory Board of scientists disinterested in the cigarette industry. A group of distinguished men from medicine, science, and education will be invited to serve on this Board. These scientists will advise the Committee on its research activities.

This statement is being issued because we believe the people are entitled to know where we stand on this matter and what we intend to do about it.

## TOBACCO INDUSTRY RESEARCH COMMITTEE

5400 EMPIRE STATE BUILDING, NEW YORK 1, N. Y.

*SPONSORS:*

THE AMERICAN TOBACCO COMPANY, INC.
*Paul M. Hahn, President*

BENSON & HEDGES
*Joseph F. Cullman, Jr., President*

BRIGHT BELT WAREHOUSE ASSOCIATION
*F. S. Royster, President*

BROWN & WILLIAMSON TOBACCO CORPORATION
*Timothy V. Hartnett, President*

BURLEY AUCTION WAREHOUSE ASSOCIATION
*Albert Clay, President*

BURLEY TOBACCO GROWERS COOPERATIVE ASSOCIATION
*John W. Jones, President*

LARUS & BROTHER COMPANY, INC.
*W. T. Reed, Jr., President*

P. LORILLARD COMPANY
*Herbert A. Kent, Chairman*

MARYLAND TOBACCO GROWERS ASSOCIATION
*Samuel C. Linton, General Manager*

PHILIP MORRIS & CO., LTD., INC.
*O. Parker McComas, President*

R. J. REYNOLDS TOBACCO COMPANY
*E. A. Darr, President*

STEPHANO BROTHERS, INC.
*C. S. Stephano, D'Sc., Director of Research*

TOBACCO ASSOCIATES, INC.
(An organization of flue-cured tobacco growers)
*J. B. Hutson, President*

UNITED STATES TOBACCO COMPANY
*J. W. Peterson, President*

Exhibit 5

Hill Cases 821
F: [illegible]

January 15, 1954

HK55

PROGRESS REPORT

I. ADVERTISING

The Committee statement, entitled "A Frank Statement to Cigarette Smokers," appeared in 448 newspapers, reaching a circulation of 43,245,000 in 258 cities. This included, with very few exceptions, all cities of 50,000 or more population, plus all plant or headquarters cities of Committee members. Total cost for newspaper space will be approximately $244,304. Cost of three press publications (EDITOR AND PUBLISHER, PUBLISHERS' AUXILIARY AND AMERICAN PRESS) will be approximately $2,113. Production costs will add $3,040 to this.

In addition to the above cost covered in the $250,000 appropriation, a cost of $4,213 was incurred to transmit by telegram the revised list of sponsors and the prescribed change in headline. ?

On authorization by the Chairman, 11 tobacco industry publications were added to the list and received the same two-page version of the advertisement which appeared in the press publications. Total cost of space and preparation for this will be approximately $3,606.

This will make the total advertising expenditure, not including reprints, $257,276.

To date 200,000 reprints of the advertisement have been ordered by the companies.

Additional Advertising Solicitation

The question of extending the advertising to appear in a variety of additional publications was suggested, in some instances by Committee members and, in others, by direct solicitation from the publications. These included the food and drug trades; the negro and labor press as well as the foreign language press; and the news weeklies -- Time, Newsweek, and U. S. News.

It is our recommendation that no further advertisement be placed using the original statement, and that the above suggested groups of publications be carefully considered in relation to any subsequent plans for new advertisements. The circulation of all the above groups, with the possible exception of the foreign language press, can be considered to have been reached in large measure by the original daily newspaper advertising.

II. REQUEST FOR REPRINTS FROM N.A.T.D.

Mr. Kolodny of the National Association of Tobacco Distributors has indicated he is willing to distribute the statement advertisement to 1,000,000 tobacco dealers throughout the country.

In tabloid size, production of 1,000,000 reprints would cost about $3,000.

III. PRESS RELEASE AND PRESS COVERAGE

The press release announcing formation of the Committee was given national distribution and was widely covered by newspaper, radio, TV and the magazines.

Typical clippings of this coverage have been sent to Committee members.

Editorial comment was most favorable, .th editorials still being received from all over the country.

IV. INFORMATION AND CORRESPONDENCE

During the first week after appearance of the ad, we handled many personal and telephone calls, including professional men offering services, crackpots and others. These were in addition to the many inquiries from the networks and the press.

During the first two weeks after the appearance of the ad, over 1,000 telegrams and letters were received at Hill and Knowlton offices. A preliminary analysis indicates that objective or pro-tobacco comments run better than two to one.

V. MEETING OF COMPANY RESEARCH DIRECTORS

Chairman Hahn called a meeting of Research Directors of the tobacco companies on Thursday, January 7. A report on this meeting will be presented to the Tobacco Industry Research Committee.

VI. "WHITE PAPER"

A draft of the "White Paper" was submitted to the Research Directors Advisory Committee and suggestions from these officials are being coordinated into a revised draft for final clearance.

VII. CALLS ON ADVERTISING AGENCIES

Messrs. Hill, Goss and Littin have called on senior executives of the principal advertising agencies to obtain their suggestions and comments. In addition, a meeting of the Research Directors of advertising agencies was called to discuss the matter of a poll and depth survey.

"White Max"
Exhibit 6

May 3, 1954

JHH file
HK47

TO: TOBACCO INDUSTRY RESEARCH COMMITTEE

RE: Report on TIRC booklet, "A Scientific Perspective on the Cigarette Controversy"

The booklet, "A Scientific Perspective on the Cigarette Controversy," was released April 14, 205,000 copies being printed. It was sent to 176,800 doctors, general practitioners and specialists. It also was sent to the deans of medical and dental colleges. The booklet and the covering press release went to a press distribution of 15,000. Included were editors of daily and weekly newspapers, consumer magazines, veterans magazines and medical and dental journals, news syndicate managers, business editors, editorial writers, science writers, radio and TV commentators, news columnists and members of Congress.

Several days in advance of the release date every doctor and publisher who had given permission for quotes in the booklet received copies with a letter thanking them for their courtesy. One of these doctors, Edouard D. Gagnon, M.D., M.S., F.R.C.S., replied as follows: "... A perusal of this report and especially of the paragraph that concerns me has impressed me as being a non-biased statement of facts. ..."

One week after the press mailing a letter, over the signature of the Chairman, O. Parker McComas, went to 114 key publishers and media heads calling their attention to the booklet. Following are several typical replies to the Chairman's letter:

> "... I have read it with interest and have had it read by the heads of our Radio and Television News Departments as well as the head of the ABC Continuity Acceptance Department." - Robert E. Kintner, President, American Broadcasting Company

> "... I have been a cigarette smoker for some forty-five years and I am still a pretty healthy specimen - despite the fact that I have had to listen to a lot of scare talk about cigarette smoking. What I believe the general public needs and wants is more light and not so much heat." - Roger H. Ferger, President & Publisher, The Cincinnati Enquirer

> "Many thanks for sending me a copy of 'A Scientific Perspective on the Cigarette Controversy.' I shall look forward to future material as it is issued." - Roger Dakin, Editor, Collier's

> "Thank you on behalf of Mr. Robert H. Reed, our editor, for your letter of April 14 and for the brochure titled 'A Scientific Perspective on the Cigarette Controversy' which accompanied it. We know only too well of the many unproven charges that have been made against the use of cigarettes. We shall, therefore, read this brochure with a great deal of interest." - J. T. Bingham, Associate Editor, Country Gentleman

"This w
sures,
Sulzber

The Public
release a
in advance
alerted b
paper desk
Knowlton,
and Washi
Los Angel
stations

Substanti
Press, Un

All New Y
Age, and
planning
lation 3,
page, dev

AP radio
Henry Gla
program.
news prog

The story
the count
the Chica
the help

Because c
sentative
the news

cb
atts.

"This will acknowledge your letter of April 14 with its enclosures, which I am sharing with my associates." - Arthur Hays Sulzberger, Publisher, The New York Times

## PUBLICITY PLACEMENT

The Publicity Department of Hill & Knowlton, Inc. sent the booklet and release a week in advance of release to the news magazines. Several days in advance, ' press, network, wire services and columnist contacts were alerted by phone and in person. The booklet was hand delivered to newspaper desks and tobacco trade publications in the New York area. Hill & Knowlton, Inc. field offices in Los Angeles, Chicago, Cleveland, Pittsburgh and Washington, D.C. alerted local press, radio and TV to the story. Our Los Angeles field office made special placement to dailies, radio and TV stations in West Coast states.

## PUBLICITY RESULTS

Substantial stories of several hundred words each were used by Associated Press, United Press, International News Service and Dow-Jones wires.

All New York dailies, Business Week, Newsweek, Printer's Ink, Advertising Age, and Editor & Publisher carried stories. At this writing, Time is planning a story in its next issue. The Sunday N.Y. Daily News (circulation 3,800,000) gave feature treatment to the booklet on their editorial page, devoting the major part of the page to comment and a cartoon.

AP radio news teletype sent the story to approximately 1,400 radio stations. Henry Gladstone did a piece on it for his Mutual syndicated business news program. Max Roby also used it on his KNX (Los Angeles) CBS Pacific Coast news program.

The story was carried by hundreds of papers and radio stations throughout the country. The Washington, D.C. Evening Star, the Cleveland News and the Chicago American carried special staff-written stories developed with the help of Hill & Knowlton, Inc. field offices.

Because clipping services are always several weeks behind, only a representative sampling can be shown with this report. Photostats of some of the news stories and editorials are attached.

Hill & Knowlton, Inc.

cb
atts.

Exhibit 7

HILL AND KNOWLTON, INC.

HK TIRC 1954 824

PUBLIC RELATIONS REPORT
AND RECOMMENDATIONS FOR
TOBACCO INDUSTRY RESEARCH COMMITTEE

6/21/54

(As discussed and approved on June 10 by a group of Public Relations people representing a number of Company members of the Tobacco Industry Research Committee. This group meets at intervals with Public Relations Counsel, to discuss TIRC Public Relations problems.)

Early in the life of the Tobacco Industry Research Committee, it was accepted as a basic principle that every effort should be made to avoid stimulating more adverse publicity and controversy on the subject of tobacco and health.

That principle has been and will continue to be carefully adhered to in the work carried on for the Committee. Nevertheless attacks on the industry recurrently stimulated by various individuals and groups antagonistic to tobacco, have been increasing, and some elements of the press are continuing to feature unfavorable aspects of any medical report bearing on tobacco.

On its part, the Committee properly has refrained from engaging in any direct controversy with the industry's critics. It has stood upon the basic statement of January 4 and upon the symposium of views of 36 scientists issued by the Committee in booklet form in April. Both of these statements received wide and favorable comment in the press.

In
in January
public inf
Scientific
preliminar
have been
rying on a
lishing th
research.
before the
1.
2.
3.
4.
5.

In public relations recommendations submitted to the Main Committee in January, it was contemplated that a basis for an affirmative program of public information would be provided when the Scientific Advisory Board and Scientific Director had been selected and were at work, and when various preliminary editorial research projects were well under way. These things have been accomplished and the Committee now has the basis needed for carrying on a long-range plan of public relations activities aimed at establishing the TIRC in the public mind as a constructive force in scientific research. These activities will endeavor to keep the following facts before the Public:

1. That there is no proof that smoking is a cause of lung cancer;
2. That an impartial and independent Board of scientists, doctors and educators is advising the TIRC, as a public service, on all aspects of tobacco use and health;
3. That the TIRC is determined, through a long-range program, to make every possible effort to help get the facts through laboratory and statistical research;
4. That initial funds for research have been appropriated and more will be provided as warranted to help in getting the answers by scientific means;
5. That all the laboratory research recommended by the Advisory Board and financed by the TIRC will be carried on by recognized and independent laboratories, institutions and hospitals.

## Report of Activities

As background for the recommendations which follow, certain active and continuing projects are briefly summarized:

Press Conference - First formal announcement of the appointment of Dr. Clarence Cook Little as Director of Research was made at a Press Conference, June 15, in New York City. A transcript of the conference has been sent to all TIRC members. Press, radio and television coverage was extensive.

TIRC as a Source of Information - Committee headquarters is steadily gaining recognition as a source of authoritative information on the subject of tobacco and health. The result is that news and magazine writers, columnists and commentators are turning to the Committee and its public relations counsel more and more for information. This will increase as the Advisory Board gets into action and more material is released.

As part of this service, bibliographic files are being developed for two purposes, (a) public relations reference; and (b) technical reference.

Clippings have been sifted for significant stories and ten publicity reports have been made to the TIRC.

Misstatements Corrected - Reports and statements appearing in the press, radio, television and newsreels are carefully monitored. Whenever misstatements are made steps are taken to correct the record. This has been done by personal contact and letters to the editor.

Ame
clo
to
per
bei
Com
tai

by
duc
giu
and

dev
gov

res
fro
sen
tif
inc

Coverage of Medical Meetings - With the cooperation of the AMA, the American Cancer Society, the New York Medical Society and industry people, close check is kept on medical meetings. A calendar of coming events having to do with tobacco and health is being maintained. The important ones are personally covered through New York staff or field offices and reports are being sent to the TIRC, its Scientific Advisory Board and Industry Technical Committee. Where possible, abstracts or texts of important papers are obtained for TIRC distribution.

Foreign Surveys - As proposed in the January 15 program, and approved by the Main Committee, surveys on the cigarette controversy have been conducted in European countries. Reports have been made on Switzerland, Belgium and the Netherlands, and detailed reports are in preparation on France and England.

Hill and Knowlton, Inc. overseas associates will continue to watch developments in these countries, particularly in Great Britain, where the government has taken an official position.

Correspondence and Callers - A large volume of public relations correspondence, which at times has topped over 100 letters a week, continues from lay press, trade press and the industry. Individual letters have been sent to a large number of doctors who wrote detailed comments on the "Scientific Perspective" booklet. Personal and phone calls of the same type are increasing.

In keeping with the objectives outlined on page one of this memorandum, the following recommendations are presented:

Reserve Fund - It is suggested that when the present fund of $500,000 for research is exhausted, or before, the Committee give consideration to setting up a substantially larger reserve fund for research over a period of two or three years. This will keep before the public a more accurate view of the magnitude of the job the industry has undertaken, and the sincerity of its purpose.

Releases - As developments warrant, and subject to approval of the Scientific Advisory Board, information on the work of the Board should be released to the public. Three such announcements have been made. As grants are made the essential facts of each should be released to the press. It seems probable that the Advisory Board will come forth with some new and intriguing ideas for fields of research. Dr. Little would be the logical spokesman for the Board in connection with such reports or any other statements to be made to the press, on the air, or before groups. Various opportunities for television appearances for Dr. Little will be explored.

Results of medical statistical research to be authorized by the TIRC should provide valuable information bearing upon tobacco use and health. It should be in order, subject to clearance in each case with the TIRC, to release some of this information to the press.

Scie
tour of sc
for scienc
the Americ
were taken
search. M
funds driv

Back
editorial
as a follo
press such
umnists, ec
The
and effecti
follow-up t

Edito
developed t
publishing
structive a
its Scienti
portant pub
In ad
editorial w

Science Writers Tour - As soon as enough grants are operating, a tour of some of the most significant research projects should be arranged for science writers. This would be similar to the project conducted by the American Cancer Society in April, when 10 some top science writers were taken on a tour of the principal laboratories engaged in cancer research. Much good publicity resulted for the Cancer Society and its funds drive.

Background Memo and Booklet on TIRC and its Advisory Board - A brief editorial memo giving the facts about TIRC and its medical board is proposed as a follow-up to the press conference. This would be distributed to special press such as science writers, medical press and organizations; also to columnists, editorial writers and Sunday editors.

The material in this editorial memo could be developed into a dignified and effective booklet for wider public distribution to doctors, etc., as a follow-up to the "Scientific Perspective" booklet which was issued in April.

Editorial Contact Project - A program of informal contacts is being developed to enable Dr. Little to better inform important elements of the publishing field, and scientific and editorial writers, regarding the constructive aims and policies of the Tobacco Industry Research Committee and its Scientific Advisory Board. This activity will be centered in the important publishing center of New York.

In addition, public relations staff members should visit publishers, editorial writers and commentators in other principal cities.

__Editorial Research__ - Continued emphasis should be given to editorial research. In the January 15 program, two lines of inquiry were suggested: (a) smoking habits of long-lived distinguished public leaders; and (b) human ills erroneously attributed to tobacco over the centuries. The second subject has been found more marketable and has received the placement emphasis thus far.

In addition, research should be carried forth on (c) current scientific opinion holding that no case has been proved against tobacco; (d) the many theories about cancer causes; and (e) the psychology of how the public is carried away by over-simplified reading of scientific experiments.

All the material resulting from this research would be made available to interested writers for magazines, newspapers, columns, radio and television. None of this would be for sponsorship or release by TIRC.

-o-

C. V. Hartnett
Carl Thompson
Report through

The attached repo
should be conside
of circulatio
principals of the
have a copy.
a few, it is sugg
the report to this

The attached rep
that you retain it
that of your immed
be made and that t

When I assumed th
Committee, I asked
counsel in order t
relations and info

As I read it, it
the report to you
acquaintanceship wit
will agree with my

Hill
Goss
Hoyt

Exhibit 8

T. V. Hartnett

Carl Thompson

Report through July 31

August 17, 1954

The attached report contains material that, as you will see, should be considered highly confidential and receive the minimum of circulation. However, you may want some of the other principals of the Tobacco Industry Research Committee to see or have a copy. Should you desire to make copies available to a few, it is suggested that you append a note to the front of the report to this effect:

'The attached report is highly confidential. It is requested that you retain it only for your personal consideration and for that of your immediate associates; also that no additional copies be made and that this copy not be placed in files.

'When I assumed the chairmanship of the Tobacco Industry Research Committee, I asked for a detailed report from public relations counsel in order that I could be fully informed on the public relations and information program to date.

'As I read it, it occurred to me there would be merit in bringing the report to your attention so that you could gain a closer acquaintanceship with this extensive program. I am sure that you will agree with my opinion this is a highly confidential report.

CT

ch-

att.

[illegible]: Hill
Goss
Hoyt

**CONFIDENTIAL**

TO: T. V. Hartnett, Chairman
Tobacco Industry Research Committee

FROM: Hill and Knowlton, Inc.

SUBJECT: Report of Activities through July 31, 1954

SUMMARY OF ACTIVITIES

The functions of public relations counsel have been threefold: (1) Over-all policy guidance and programming; (2) administration of Committee affairs; and (3) public and press relations and contacts. Since these functions frequently overlap, there can be no clear-cut delineation of activities into these three categories. In the first section of this report, "Summary and Background," the historical approach is taken. In the second section, "Other Public Relations Activities," a topical presentation is used.

SUMMARY AND BACKGROUND

In mid-December, 1953, executives of leading tobacco companies decided some kind of joint action was imperative in the face of widely publicized attacks alleging a link between cigarette smoking and lung cancer. Representatives of Hill and Knowlton, Inc., were invited to meet with these executives for consultation on ways and means of dealing with the problem.

At this first meeting, it was agreed that the wisest course of action would be for the industry to find out, through objective research, what truth there was, if any, in the charges being made against it. Mr. Hill stated it would be a serious public relations mistake for the industry to make any move that could cause it to be accused of disregard of people's health and under no circumstances could the industry afford to engage in direct controversy with its detractors. With the acceptance of these principles, Hill and Knowlton, Inc. was asked to recommend a program to implement them.

After two weeks of intensive study of the problem, public relations counsel developed a step-by-step program which was discussed at a meeting with a small group of public relations representatives of a number of tobacco companies. Valuable suggestions were made at this meeting, and the program was put into final shape and submitted to the principals at another meeting the last week of December.

Taking into consideration court ruling inhibiting the industry from ordinary trade association activities, the program recommended:

1. Formation of an industry group to be known as the Tobacco Industry Research Committee, dedicated to sponsoring and financing research into all phases of tobacco use and health.
2. Establishment of a Scientific Advisory Board, to be composed of distinguished research scientists and educators, and a Scientific Director, to guide the research objectives.
3. Undertaking of continuous editorial research into relevant scientific, statistical and medical material, past and current, for an effective information program.
4. Keeping the public informed regarding the Committee's activities. As a first step, a newspaper advertisement outlining the industry's plans was proposed, copy for which was submitted.

The program and the public statement advertisement were approved. The agreed-upon approach was to sponsor genuinely objective research and to bring to public attention the fact that there is now no conclusive proof that cigarette smoking is a cause of lung cancer or other serious problems of human health.

On January 4, the advertisement and news announcement appeared and the Tobacco Industry Research Committee was in being, with Paul M. Hahn as Chairman for the first three months.

Since the Committee had no headquarters and no staff, Hill and Knowlton, Inc. was asked to provide a working staff and temporary office space. As a first organizational step, public relations counsel assigned one of its experienced executives, W. T. Hoyt, to serve as account executive and handle as one of his functions the duties of executive secretary for the Tobacco Industry Research Committee.

Selection of Scientific Advisors

The task of selecting a Scientific Director prior to getting a Scientific Advisory Board proved difficult, and Chairman Hahn decided to reverse the order and select the Board.

Public relations counsel provided assistance in selecting and inviting a group of seven scientists, all of whom agreed to serve, and the first meeting of the Board was held on April 26.

On a number of occasions, from the start of the Tobacco Industry Research Committee early in the year, when his name was put forward by Mr. Hill, Dr. Clarence Cook Little was proposed to the Committee as excellent possibility for Scientific Director. When Dr. Little accepted a place on the Advisory Board, these recommendations were renewed to O. Parker McComas, who had become Chairman of the Tobacco Industry Research Committee, and various members of the Board. He was unanimously requested by the members to serve as Chairman and to consider becoming Scientific Director. On June 15, Dr. Little's acceptance was formally announced.

Dr. Little as Scientific Director

With a highly-respected and qualified scientist now in a position to speak for the Committee on its research problems, it became possible to meet more of the public relations problems facing the Committee.

For exampl
arrangements that inc
it was possible to ac
industry's research
After the
was asked to dictate
shape for a press re
this was issued to t
hysteria caused by t
Dr. Litt
adopted by the Scie
oped into a full st
wide and favorable
Reaction
plified in a column
country's scientifi
"The
canc
Comm
Amer
impa
expe
gene
fact
Because
industry must make
supported by facts
Mr. Hartnett as F
Final

For example, through Dr. Little's full cooperation in press conference arrangements that included photographers, radio, television and scientific writers, it was possible to achieve wide coverage of the purposes and philosophy behind the industry's research efforts.

After the Hammond-Horn report was delivered at San Francisco, Dr. Little was asked to dictate a statement by telephone from Bar Harbor which was put into shape for a press release. After clearance with the Scientific Advisory Board, this was issued to the press and widely used, resulting in tempering some of the hysteria caused by the Hammond-Horn report.

Dr. Little also approved an announcement of the outline of research adopted by the Scientific Advisory Board. Dr. Little's skeleton outline was developed into a full statement for general release to press and radio, with resultant wide and favorable attention.

Reaction of the press to such steps has been generally good, as exemplified in a column by Waldemar Kaempffert of The New York Times, dean of the country's scientific writers:

> "The case for and against tobacco consumption as a cause of cancer may be settled by the Tobacco Industry's Research Committee of which Dr. C. C. Little, former director of the American Cancer Society, is head. Many will argue that an impartial investigation can hardly be expected from a body of experts paid by the tobacco industry. Dr. Little is an eminent geneticist, a type of scientist who has the courage to face facts and to state them."

Because of his scientific approach, Dr. Little correctly feels that the industry must make no controversial statement on scientific matters unless fully supported by facts and approved by the Scientific Advisory Board.

## Mr. Hartnett as Full-Time Chairman

Final step in the formal organization of the Tobacco Industry Research

Committee was the selection of Timothy V. Hartnett, retiring president of Brown and Williamson Tobacco Corporation, as full-time chairman, rather than to continue rotating the chairmanship. He assumed his duties on July 1, with appropriate public announcement.

Throughout the formative period, Chairmans Hahn and McComas provided valuable leadership in developing both the organizational and public relations aspects of the Committee's work. Mr. Hoyt, with staff assistance, handled liaison, agendas, organizational plans, business affairs, reports, and materials for meetings of the Tobacco Industry Research Committee, the Scientific Advisory Board, and the Industry Technical Committee, in addition to developing operating procedures for the research program and carrying on continuing contacts with the Committee and Advisory Board members.

Periodic meetings are held with public relations representatives of the various companies. Worthwhile suggestions have come from members of this group, both at the meetings and in the interim.

## OTHER PUBLIC RELATIONS ACTIVITIES

The information work of public relations counsel was carried on and developed throughout the formative period of the Committee. It includes several categories of activities which will be described in detail.

I. TIRC As An Information Source

A continuing important function is to build up the TIRC as a reliable and authoritative source of facts relating to the tobacco and health problem. That this is being done is indicated by the growing number of inquiries from writers and editors of various publications, newspapers, press services and broadcasting companies.

As a part
of basic information
1. A cros
smokin
in so
pertin
2. Basic
techni
3. Specia
4. A cros
ette c
compil
5. Full t
materi
6. Data r
here a
This i
Educat
Agricu
Associ
7. Curric
on fil

II. General Ne
Eleven gen
of the Co
with major news outl

As a part of this work, the building and maintaining of a TIRC library of basic informational material is in progress. Present materials include:

1. A cross indexed card file on medical and scientific papers regarding smoking and health that are noted by the N. Y. Academy of Medicine in some 2,500 medical journals published throughout the world. Most pertinent material is obtained in full.
2. Basic books dealing with tobacco, its history, and other relevant technical or general volumes.
3. Special files of all pertinent press clippings.
4. A cross indexed card file on medical opinions regarding the cigarette controversy as noted in press, radio and other popular media is compiled from the clippings.
5. Full texts of speeches, announcements, panel discussions, and similar material which are germane and available.
6. Data relating to other related phases of smoking and health, both here and in foreign countries, obtained from established sources. This includes published material from U. S. Department of Health, Education and Welfare, Bureau of Internal Revenue, Department of Agriculture, Food and Agricultural Organization, the Tobacco Merchants Association and the U. N.
7. Curriculum vitae of Scientific Advisory Board members is maintained on file, as well as some information about their scientific work.

II. General News Releases

Eleven general news stories have been distributed since the formation of the Committee. In each instance, direct personal contact was made with major news outlets in the press, radio and magazine fields, through staff

members in New York and field offices. An indication of the results has been included in the photostatic news summaries that have been sent regularly to Committee members.

The releases were:

1. Announcement of the formation of the Committee, January 4, 1954.
2. Abstract of Dr. Rosenblatt's paper, March 17, 1954.
3. Announcement of publication of "Scientific Perspective," April 14, 1954.
4. Selection of Scientific Advisory Board, April 27, 1954.
5. Research Projects invited for consideration by Scientific Advisory Board, May 18, 1954.
6. Appointment of Dr. Little as Scientific Director of the Tobacco Industry Research Committee and Chairman of the Scientific Advisory Board, June 15, 1954.
7. Dr. Little's statement regarding the Hammond-Horn Report, June 22, 1954.
8. Mr. Hartnett appointed Chairman of the Tobacco Industry Research Committee, July 1, 1954.
9. Dr. E. B. Wilson becomes a member of Scientific Advisory Board, July 20, 1954.
10. Dr. Hueper's talk at Sao Paulo distributed with "Highlights," July 26, 1954.
11. Dr. Little announces scope of research program, July 28, 1954.

Each press announcement is prepared and distributed individually, according to the type of story. A case history of some of the steps taken on one release is that of Dr. Hueper's talk at Sao Paulo, Brazil:

-7-

been in-
Committee

, 1954.

April 14,

Advisory

Tobacco In-
Advisory

, June 22,

Research

y Board,

ghts," July

, 1954.
ually, ac-
en- on one



1. Advance checking on the Sixth International Cancer Congress revealed that Dr. Hueper of the National Cancer Institute was scheduled to talk on "Environmental Cancer of the Lung." (Other information, of course, was also obtained and followed up.)

2. The Hill and Knowlton, Inc., Washington office, requested to follow up on this information, obtained from Dr. Hueper an advance copy of his talk and sent it to New York.

3. Study of the paper showed it contained newsworthy material concerning lung cancer and particularly concerning the lack of a proven link between lung cancer and smoking.

4. Further inquiry in Washington brought out that no press distribution of the talk was contemplated either by Dr. Hueper or the National Cancer Institute. In view of this, permission from Dr. Hueper was obtained to distribute copies of his talk to the press, on his strict condition that this be done only after it was certain that he had actually delivered it -- placing it in the public domain.

5. Reproduction of the 17-page paper, of two pages of highlights, and of a covering note to editors from Hill and Knowlton, Inc., and all preparations for distribution were made in advance of the talk.

6. Special liaison with representatives in Sao Paulo was established to give word of Dr. Hueper's delivery as quickly as possible, so as to enable distribution of the talk while it was still newsworthy. However, due to postponement in Dr. Hueper's presentation, this notification did not arrive until after 2 o'clock Monday afternoon -- quite late to begin press distribution.

7. Personal delivery of the Hueper release was made to important newspapers and services as well as distribution to science writers, editorial writers and feature writers. Evidence of use of the material

is still being observed. (For example, "Science in Review," page E-7, New York Times, Sunday, August 1; INS Sunday column for August 8; U. S. News and World Report, August 6, page 85.)

8. Although many of the writers covering the Sao Paulo meeting failed to mention the Hueper talk in their dispatches, it is significant that, as a result of the distribution in the U.S.A., stories questioning a link between smoking and cancer were given wide attention, both in headlines and stories. In some press accounts, the Hueper story took precedence over the reports of Drs. Hammond and Wynder, even though the latter were made available to the press in advance of their delivery on a hold-for-release basis.

III. Special Assistance to Press, Radio, Magazines and Others

This category might include many more items than those listed since there have been numerous telephone calls and personal contacts made on which the ultimate results are not yet known.

Following are some examples of such assistance:

1. Considerable source material was read and digested to provide facts for a column written by Hal Boyle, distributed nation-wide by the Associated Press. (Note: Many of the basic facts also are incorporated in material given to other writers.)

2. Special personal contacts are being made regularly with Time, Newsweek, U. S. News and World Report, and Business Week editors to encourage use of TIRC material.

3. Through personal contacts, advance information was obtained that a prominent magazine intended to report a growing lack of interest in the TIRC program on the part of participating companies. This ref-

erence was
the magazi
4. By persona
smoking by
was suppli
tions to t
5. Considerab
in the pre
conference
6. Further re
have been
writing of
at the ide
is issuing
early Sept
7. Personal d
material p
the New Yo
8. Several ot
out the co
through di
Hill and K
papers are
9. Two editor
out the co
Press Asso
Makes a Sl
received.

erence was removed from the story when the facts were brought before the magazine editors.

4. By personal contact, advance knowledge was obtained of a story on smoking by Bob Considine for Cosmopolitan Magazine. Information was supplied resulting in seven revisions and five qualifying additions to the story which was already in type.

5. Considerable information and assistance was provided Donald G. Cooley in the preparation for his story in True Magazine. This entailed conferences with the author to work on factual revisions.

6. Further research and assembling of material and personal conferences have been extended Mr. Cooley to provide him requested aid in his writing of a 48-page, low-priced book for newsstand sales and angled at the idea "You don't have to give up smoking." Fawcett Publications is issuing the book entitled "Smoke Without Fear," in late August and early September.

7. Personal discussions with editorial writers and the supplying of material preceded the appearance of several positive editorials in the New York Daily News.

8. Several other editorials which have appeared in newspapers throughout the country were the result of information provided by mail or through direct personal contacts by branch office staff members of Hill and Knowlton, Inc. Editorials in the influential Washington papers are an example.

9. Two editorials widely used in "home town" dailies and weeklies throughout the country were prepared for and then distributed by the U. S. Press Association. These were "The Same Old Culprit" and "Truth Makes a Slow Crop." Over 100 clippings of these have already been received.

Case 5:96-cv-00091-JRG Document 1 Filed 03/28/96 Page 534 of 575 PageID #: 38799



10. Through personal contacts radio and TV newsmen and commentators receive frequent information concerning TIRC activities. Some of the results of such efforts show in the press-radio-TV reports. For example, Dr. Little's press conference was reported on film on: NBC-TV network, "Today"; NBC-TV and CBS-TV syndicated newsreels, UP Movietone News; and MGM Telenews, both of which go to some 80 TV stations. Radio uses included Lyle Van, WOR; Frank Edwards, MBS network; the Yankee Network; KHJ, Los Angeles and the regional MBS West Coast network; CKLW, Windsor, Ont.; KNX, Los Angeles; KABC, Los Angeles, and the regional ABC West Coast network. At other times, many programs which indicated an interest in presenting TIRC facts sought an interview or appearance by a TIRC spokesman but these requests could not be filled.

11. One negatively-aimed program (WNBT) which was being scheduled on the cigarette controversy was postponed after discussion of TIRC facts.

12. Another TV program (ABC-TV, Martin Agronsky), which did deal with the cigarette controversy, ended on a favorable note after conferences with producers and presentation of facts.

13. A special radio script for a Louisville, Ky. radio interview with T. V. Hartnett was prepared and used.

14. Conferences were held with Dwight Macdonald regarding article he was preparing for The New Yorker. Macdonald was doing research on an article that was to be a blast at the tobacco industry. "Special data" he wanted were "accurate figures" regarding the number of scientists who were unconvinced by charges against smoking. A list was prepared of over 100 eminent cancer experts, each of whom had

stated since 1948 t
dence has been esta
information also wa
has yet appeared.

15. Assistance was prov
piece which appeare
discussed some of t

16. The Louisville Cour
statement was obtair
supplied to the new
The story was carrie
other papers.

17. Early in the public
zines, features and
articles were plannе
in any way possible.
were checked and it
and contact was estat
checking continues a
weekly.

18. Conferences were held
of Coronet Magazine f

19. Special Fact Sheet on
prior to his talk bef
June. The material w
the same time, multip

stated since 1948 that, in his (or her) opinion, no conclusive evidence has been established linking tobacco and lung cancer. Other information also was supplied. No article by Macdonald on this issue has yet appeared.

15. Assistance was provided to the New York Times for a Sunday Magazine piece which appeared on Sunday, July 4, on "Why People Smoke," which discussed some of the now-abandoned old charges against cigarettes.

16. The Louisville Courier-Journal story on the Kentucky Heart Association statement was obtained in New York from Louisville by telephone and supplied to the news services, editorial writers and columnists. The story was carried by INS, the New York Journal-American and other papers.

17. Early in the public relations program, an informal survey of magazines, features and syndicates was undertaken to see what, if any, articles were planned on the smoking controversy, and to follow up in any way possible. Twenty magazines of nation-wide circulation were checked and it was found five magazines were working on pieces and contact was established with authors and editors. Such regular checking continues as standard practice, requiring numerous contacts weekly.

18. Conferences were held with and materials supplied to Hertha Striker of Coronet Magazine for possible article.

19. Special Fact Sheet on TIRC was supplied to Dr. Charles S. Cameron prior to his talk before the National Press Club in Washington in June. The material was used in his question-and-answer period. At the same time, multiple copies of True Magazine with Don Cooley's

smoking article were made available at the Press Club for pick-up following the Cameron appearance.

20. Special conferences are held with AP, UP and INS science writers. These have been helpful in obtaining guidance on attitudes of writers, in learning best sources of information from them, and in learning best methods of supplying information to them.

21. Often news releases become available late in the day, when most "inside" newspaper matter is set. Personal outlets with wire services, including telephoning texts of releases, are necessary to get coverage. Frequently, this means individualized services, such as the handling of a story on Dr. Little's press conference to International News Service, which was unable to send a man to cover the conference.

22. Conversations were held to supply information to Robert Heilbroner whose balanced piece on the cigarette controversy appeared in the June issue of Today's Woman.

23. Available material was supplied to Sheldon Binn of the New York World-Telegram & Sun for his January series in the Scripps-Howard papers and for his article in Real Magazine issue of May.

24. Personal conferences were held with writers for the N. Y. Post, which ran a well-balanced series on the cigarette controversy.

IV. Editorial Research and Materials

Public information for the TIRC has been handicapped by the time required to pull together an adequate body of organized factual material. This applies not only to the current controversy in the news, but to facts relating to many other aspects of smoking, suitable for suggestions for use by news writers, columnists, magazine writers, and others.

(The program a
ion for the development
ocess, with much of the
blic attitudes, but is
esearch. Therefore, it
mbers, and by outside s
ul and interesting infor

Some of the sc
still in preparation are:

1. "A Scienti
undertaken
rector had
present to
nimity amo
Quotations
were assem
The Law Co
mission fo
most cases
scientists
April 14,
tributed t
lication h
subject.
editorials
Western Jo

(The program approved by the industry in December contained a recommendation for the development of such editorial research material and this research is in process, with much of the material now in hand. One aspect of this research bears on public attitudes, but is not directly concerned with either medical or statistical research. Therefore, it is being done by Hill and Knowlton, Inc. research staff members, and by outside science writers. The purpose is to have a supply of colorful and interesting information on hand for writers.)

Some of the scientific and editorial materials already distributed or still in preparation are:

1. "A Scientific Perspective on the Cigarette Controversy." This was undertaken before a Scientific Advisory Board or a Scientific Director had been named. It was held necessary and urgently timely to present to leaders of public opinion the fact that there was no unanimity among scientists regarding the charges against cigarettes. Quotations from some three dozen research and medical authorities were assembled from authoritative sources in this country and abroad. The Law Committee ruled it would be necessary to get a written permission for each quotation. This involved getting clearance, in most cases, from the publications as well as from the individual scientists. Some weeks were required to cover this ground, but on April 14, 1954 the booklet came off the press and copies were distributed to doctors, scientists, editors, and many others. The publication has since been used as source material for writers on the subject. It was widely publicized and resulted in many favorable editorials, including a lengthy one in the June, 1954 issue of the Western Journal of Surgery, Obstetrics and Gynecology.

2. A special packet of timely background information was compiled following the Hammond-Horn Report in San Francisco and hand-distributed or mailed to editors throughout the country. Included in this packet were: Statements by Dr. Little, Dr. Cameron and the American College of Chest Physicians; excerpts from Dr. Weller's report and Dr. McCormick's statement and an information summary on TIRC.

3. A basic information folder has been assembled to include all important material on TIRC. This is intended for hand and mail distribution on an individual basis to by-line writers on the subject, new contacts in the various media, and others who are planning articles. Included at this point are: The original TIRC advertisement, a statement concerning origin and purpose of the TIRC, a "Scientific Perspective," the column by Hal Boyle, the release on Dr. Little's appointment, a condensation of Dr. Little's June 15th press conference of the TIRC, press background material, historical tobacco facts, Dr. Hueper's paper, and the release describing the scope of research interests.

4. In final stages of preparation is a Background Memorandum on the Tobacco Industry Research Committee, designed to set forth succinctly the organization, research policy, scope and purposes of the group. This will supplement and become a part of the Basic Information folder and will also be available to answer inquiries about the Committee.

5. "Editorial Comment on Tobacco and Health" is nearing completion. (Due to be distributed on or about August 20.) This is a 20-page compilation of newspaper editorials, by-lined articles, and columns relating to the smoking and health controversy that have appeared

throughout the c
to newspaper edi
late positive ac
carefully screer
at the same time
to reprint was c

V. Informational Repor

A continuing effort
committees informed
entails the reading and cullin
monitoring radio programs; of r
developments in publications ar
determining what is of suffici

1. Regular reports
feature, radio
comprise selecte
rial. Special r
time on specific

2. Other informatio
a. Advance noti
July issue
b. Report on th
c. Report on th
ing in the r
d. Report on th
ference in

throughout the country. Copies of this booklet will be distributed to newspaper editors and writers to provide information and stimulate positive action on future editorial writing. Material was carefully screened to select articles which were well-balanced but at the same time would not unnecessarily antagonize. Permission to reprint was obtained from each publisher, syndicate or author.

V. Informational Reports to TIRC

A continuing effort is made to keep members of the TIRC and related committees informed of current or anticipated events. This function entails the reading and culling of hundreds of published clippings monthly; of monitoring radio programs; of mail and personal contacts with sources of news or developments in publications and in medical and research organizations; and then determining what is of sufficient importance for special communications to the TIRC.

1. Regular reports are being made to TIRC groups on editorial, news, feature, radio and magazine attention given to the subject. These comprise selected pieces that are representative of published material. Special mailings of such compilations are made from time to time on specific articles or events.

2. Other informational mailings to the Committee have included:

   a. Advance notice on Reader's Digest article that appeared in the July issue - May 3, 1954.

   b. Report on the Industrial Health Conference, Chicago.

   c. Report on the article, "The Harmful Effects of Tobacco," appearing in the magazine, "New York Medicine."

   d. Report on the American Association for Thoracic Surgery Conference in Montreal.

e. Report on the National Tuberculosis Association meeting in Atlantic City.

f. Transcript of the Dr. Charles S. Cameron talk at the National Press Club.

g. Report on the American Association for Cancer Research session at Atlantic City.

h. Preliminary report on the American Medical Association Convention in San Francisco.

i. Excerpts from the Annual Report of the British Empire Cancer Campaign.

j. Advance report on plans for the International Cancer Congress in Sao Paulo.

3. Much reporting is done that does not go out in mailings. For example, leading life insurance companies were checked as to their plans to adjust premium rates for smokers, as had been reported in some press accounts. It was found no such move was contemplated and this information was passed along informally to interested committee members and press contacts.

VI. <u>General Contacts -- New and Old</u>

Personal contacts are advantageous not only in disseminating and gathering information but for enlisting support and advice on problems. Relationships established with scientists in connection with the "Scientific Perspective," for example, helped lead to selection of several members of the Scientific Advisory Board.

1. Personal liaison has been established in such cancer, research, and medical organizations and associations as the American Medical Association, American College of Chest Physicians, American Cancer Society, Sloan-Kettering Foundation, New York University School of

Indust
Congre
doctor
advanc
and re
2. Persor
columr
broade
normal
and pr
3. Mailir
for ma
servic
of Sci
public
ject,
medica
additi
4. Severa
Do to
but th
was sc
rights
these
film s
A Fox

Industrial Medicine, National Cancer Institute, International Cancer Congress' Cancer Prevention Committee, as well as with individual doctors and scientists. These continue to make possible obtaining advance information or papers concerning research being done in this and related fields.

2. Personal contacts with selected science writers, editorial writers, columnists, publishers, magazine writers and editors are being broadened, in relation to TIRC activities. This is in addition to normal press relations activities or handling of specific requests and projects.

3. Mailing lists, another important form of direct contact, are tailored for maximum effectiveness. In addition to general paper and wire service lists, special categories are maintained for the Association of Science Writers, medical journals, trade associations and trade publications, by-line writers who have shown an interest in the subject, selected free-lance writers, editorial writers and columnists, medical columnists, and tobacco country newspapers. Regular revision, additions and deletions are made.

4. Several movies have been screened. "Alcohol and Tobacco: What They Do to Our Bodies" (Coronet Films) appeared to present a real problem, but this has been withdrawn. "One in 20,000" featuring Dr. Ochsner was screened and several approaches have been made to sell TIRC full rights to the film for $250,000 (no doubt a bargaining figure) but these overtures were definitely and emphatically rejected. This film still apparently has not been made available for distribution. A Fox Movietone newsreel featuring Dr. Ochsner was screened with a

recommendation of no action. A proposed anti-tobacco film, "Slow Suicide," was investigated; this project had been abandoned at last report.

VII. Meetings -- Calendar, Coverage and Reports

1. A calendar of state, national and international medical and scientific meetings which may bear upon the subject is kept up to date. Information contained in these lists include the location of the meeting, its sponsorship and the persons in charge. Agendas are obtained by correspondence and/or personal contact. Whenever desirable and available, abstracts of appropriate papers to be presented are obtained in advance. (See discussion of Dr. Hueper's paper under "I".)

2. Individual coverage of medical and scientific meetings such as the AMA meeting in San Francisco have resulted in first-hand knowledge of the theories, methods, and personalities of those involved in the research on tobacco and smoking, in an awareness of reactions to and an understanding of the theses which may be expected to be advanced from various individuals in the future.

3. On-the-spot coverage of these meetings also makes possible securing for TIRC such items as the tape recording transcript of Dr. Hammond's presentation at the AMA meeting, the original press release and official statements on which newspaper accounts are based, transcripts of papers given and press conferences held, contact with the press representatives as well as scientific personnel. A representative at Sao Paulo, for instance, alerted U.S. newsmen to Dr. Shear's talk, although no copies of his paper were available. (See AP dispatch from Sao Paulo, Pueblo, Colo., Chieftain, July 27, 1954.)

VIII. Forei
Upon
Engla
the smoking cont
except the one f
The British repo
In Ma
bacco industry c
heim and Partrid
The w
suggestions from
Chairman Hahn.
Knowlton, Inc. E
liaison through
opments which it
Mr. Hartnett

VIII. Foreign Studies and Liaison

Upon approval by TIRC, Hill and Knowlton, Inc. asked its associates in England, France, Switzerland, Belgium and Holland to submit reports on the smoking controversy in their respective countries. Summaries of these reports, except the one from England, have been prepared and distributed to TIRC members. The British report is in course of preparation.

In March, Mr. Hill had a meeting in London with the heads of the tobacco industry of Great Britain, including Sir Robert Sinclair, and Messrs. Oppenheim and Partridge.

The work of the TIRC was explained to the British group, and certain suggestions from them regarding the "Compendium" were received and submitted to Chairman Hahn. Also, it was suggested to the British group that the Hill and Knowlton, Inc. English associate, Alan Campbell-Johnson, could if desired act as liaison through which the British industry could clear information regarding developments which it desired to communicate to TIRC. This arrangement was confirmed by Mr. Hartnett when he was in London later in the Spring.

## A FORWARD LOOK

Although the industry has been bedeviled by sensational headlines generated often by publicity seeking researchers and a seeming revival of the anti-cigarette crusade, the trend is beginning to turn. In 1953, no voice was being raised in behalf of the industry. Press comment was almost entirely limited to a reflection of unproven theories which most people were accepting as proven facts. No balancing information was being made available.

The progress of the Tobacco Industry Research Committee's program is bringing greater acceptance of the industry's sincere efforts. The publicity accompanying each step taken so far by the Tobacco Industry Research Committee, particularly since the selection of the Scientific Director and the Scientific Advisory Board, has helped bring understanding that the charges against tobacco are not proven and are not joined in by a large body of scientific opinion. The bulk of editorial comment now appearing approves and, at times, applauds the action of the industry.

There are, however, many indications that the researchers and associations who have led the attacks against cigarettes are going to continue their efforts publicly and are even more anxious than ever to justify their position and put their case before the public. Recurrent publicity about such attacks can be expected and is anticipated.

It is not enough, of course, to be prepared to answer (or prepared not to answer) attacks when they come. It is necessary to continue building a broad base of public knowledge of the total story. Progress is being made along these lines:

1. Basic Public Approach. In all endeavors, continuous emphasis is placed on (a) informing the public of the

4. Special Editorial Material. Especially-written articles are being developed that can be used or adapted for use in various media receptive to or seeking material relating to the subject. These will not be limited to the cigarette controversy but will often deal with broader fields of research on cancer and other health questions. The purpose is to spread a wider understanding of all factors involved without directly encouraging continuing articles on just "The Controversy." To achieve this objective more quickly and effectively, the free lance services of qualified science writers are being used.

5. Congressional Information. A congressional information project is being developed, designed to better inform those members of Congress from leading tobacco-interest states whose constituents have a direct interest in the problem.

6. Publicity for Grants. The judicious use of information concerning the research grant program, just now getting started, will include immediately the announcement of grants as they are made as well as follow-ups as some of the research gets underway. Proper handling will be worked out in conjunction with the Scientific Advis[illegible]ry Board.

7. Special Editorial Services. Several projects are now underway to provide special material to writers, publishers and radio-TV producers for work they plan relating to the subject. Among those now in progress are Jack Ratcliff, for story idea in Cosmopolitan; Leonard Engel for tentative

(Page 22 is missing)

Harper's assignment; U. S. News and World Report for proposed interviews with Drs. Hueper and Shear of National Cancer Institute; Fred Friendly of the Edward R. Murrow show; United Features for a possible series on Dr. Hueper's work; Ernie Heyn of American Weekly; Wade Nichols of Redbook and Bluebook; Sumner Alhbum of Newspaper Enterprise Association; and Pete Arthur of Associated Press Features.

8. Review of Scientific Papers. Recent scientific papers are being reviewed in detail and findings summarized in order to supplement and improve the amount and quality of information that can be made available. This will be organized according to subject matter (i.e., "smoking machines and what is being done with them" and the like).

9. Continuing Projects. In conformance with the Public Relations Report and Recommendations approved on June 10, activities are going forward in broadening and intensifying press and public contacts; the search for and compilation of information, here and abroad; making full use of material that can be issued as general press releases; channeling background information where it will be most effectively used; encouraging writers and others to regard the Tobacco Industry Research Committee as a reliable font of basic information; keeping the Committee informed on all significant developments; exercising constant alertness for possible new attacks on the industry or support for the industry's approach to the problem; and constantly evaluating the progress and activities to assure maximum effectiveness and new approaches and action as developments warrant.

Exhibit 9

Hill Ctr 329 F: TIRC Con 1954

HK66

HILL AND KNOWLTON, INC.

CONFIDENTIAL MEMORANDUM

SUBJECT: Tobacco Industry Research Committee Information Activities, August and September, 1954.

The following is a summary of recent major public relations projects for the Tobacco Industry Research Committee covering August through September. In addition, assistance was given to various news and feature writers in response to inquiries.

Conferences with Publishers

Conferences with several major publishing groups in New York City were planned and carried out for Dr. Clarence Cook Little, Scientific Director, and Timothy V. Hartnett, Chairman.

Sessions were held with the following:

New York Times: Arthur Hays Sulzberger, president and publisher; Charles Merz, editor; Turner Catledge, managing editor; Julius Ochs Adler, vice-president and general manager; Lester Markel, Sunday editor; Orvil E. Dryfoos, assistant to the publisher; Robert K. Plumb, science writer; Luther Huston, Washington Bureau and Dr. Matthew Rosenschein (an M.D. Like Mr. Dryfoos, he is a son-in-law of Mr. Sulzberger).

New York Herald Tribune: Mrs. Helen Rogers Reid, chairman of the board; Geoffrey Parsons, former chief editorial writer, now retired into a consulting capacity; Luke Carroll, news editor; Earl Ubell, science editor.

Scripps-Howard Newspapers: Jack Howard, president.

Hearst Consolidated Publications, Inc.: William Randolph Hearst, Jr., president and publisher; Richard E. Berlin, president of the Hearst Corporation (the magazine corporation); Glen Neville, editor, New York Daily Mirror; Frank Coniff, chief editorial writer, New York Journal American, and assistant to Mr. Hearst; Seymour Berkson, general manager, International News Service; Sam Day, managing editor, New York Journal American.

Luce Publications: Roy E. Larsen, president.

At each conference Dr. Little outlined the scientific approach being developed by him and the Scientific Advisory Board and made clear the freedom of action given the Board and research grantees. Mr. Hartnett explained the industry's long-range intention to support a research program devoted primarily to the public interest.

Each session resulted in interested questions and lengthy discussion, both of the industry's problem and of the scientific soundness of the Tobacco Industry Research Committee approach. Constructive suggestions were made

on the approach to the public information program. There was also expression on the part of the publisher-participants that the sessions had been most helpful in clarifying the Tobacco Industry Research Committee program.

Edward R. Murrow Television Show

Continued assistance has been given to the staff of the proposed "See It Now" program being developed for presentation later in the fall, the exact date not yet set.

A conference was held with Edward R. Murrow, Fred Friendly, his producer, and Arthur D. Morse, researcher and writer, at the Tobacco Industry Research Committee offices in the Empire State Building. Mr. Hartnett and Dr. Little were in attendance, in addition to representatives of Hill and Knowlton, Inc. At this conference Mr. Murrow made clear his intention to follow through on the program and indicated the only possibility of his discarding it would be the finding that the material collected was not suitable for telling a good story through the medium of television. The Murrow staff emphasized the intention to present a coldly objective program with every effort made to tell the story as it stands today, with special effort toward balanced perspective and concrete steps to show that the facts still are not established and must be sought by scientific means such as the research activities the Tobacco Industry Research Committee will support. Mr. Murrow was assured of continued cooperation from the Tobacco Industry Research Committee to the extent possible under the scope of the TIRC program.

In fulfillment of this assurance, Mr. Morse was assisted in visiting the Jackson Memorial Laboratory at Bar Harbor, and in interviewing Dr. Paul Kotin, University of Southern California, Los Angeles. Included also was the filming of a sequence of Dr. Kotin in his laboratory in California. Arrangements were also completed for the shooting of separate sequences with Dr. Little and Mr. Hartnett early in October.

Magazine Articles and Writers

In addition to routine contacts or conferences, the result of which are not yet certain, the following can be reported:

Investor's Reader: Personal conferences were held and material supplied to Miss Anne Holden, staff writer for the Investor's Reader, publication of Merrill Lynch, Pierce, Fenner & Beane. The article appeared in the September 8, issue and although primarily devoted to financial analysis of the companies, its references to the activities of the Tobacco Industry Research Committee were well balanced.

Harper's: An article being prepared by Leonard Engel for Harper's magazine was re-scheduled from the November to the December issue. Mr. Engel continued to use TIRC as a source of information and,

near t
Mr. En
air po
the ci
light
cigare
to the
that t
incide

and Kn
tion a
Digest
and Wi
public
ago wh

Specia
U.S. N
Lawren

Newspa

excerp
contac

in mid
develo

Blakes
Associ
bacco
up for
piece

1st Sy
concer
remove
indust

Scienc

Person
for sp
were:

near the completion of his writing, was put in touch with Dr. Kotin, at Mr. Engel's request, for information concerning proved carcinogens in air pollutants. Engel's article will not be solely a defense against the cigarette attacks, but will attempt to analyze the charges in the light of the widely prevalent skepticism concerning the extent to which cigarette smoking can be implicated. On balance it should lend weight to the industry's contention that there is no proof of the charges and that there are many other factors that enter strongly into the increasing incidence of lung cancer.

Current Medical Digest: As a result of distribution by Hill and Knowlton, Inc. of Dr. W. C. Hueper's talk at Sao Paulo, a condensation appears as the lead article in the October issue of Current Medical Digest, which came off the press at the end of September. The Williams and Wilkins Company, Baltimore publishers of the magazine, says that the publication reaches the 123,000 doctors in the country under 65 years of age who are in active practice.

Special conferences were also held with Jules Billard and W. C. Bryant, U.S. News and World Report; Art King, TV Age; Marguerite Clark, Newsweek; Lawrence Anderson, American Press.

## Newspaper Writers

Washington Post: A feature story by Nate Haseltine using long excerpts from paper by Dr. Hueper, which was supplied him in personal contact through Hill and Knowlton, Inc., Washington office.

International News Service: The Sunday feature story distributed in mid-August by International News Service science writer Jack Geiger was developed primarily from the Hueper talk.

Associated Press: Through Pete Arthur, feature editor and Alton Blakeslee, science editor, material has been supplied for the basis of an Associated Press feature story, or series, on the development of the Tobacco Industry Research Committee. Two sessions with Dr. Little were set up for Mr. Blakeslee to get more background for the article. The piece awaits a news peg before being completed and sent out.

New York Post & Post-Hall Syndicate: At the request of Columnist Sylvia Porter, considerable material was rounded up and made available concerning Internal Revenue Service figures on cigarette manufacture and removals. Miss Porter was also referred to Harry S. Wootten for further industry information which she desired concerning cigarette sales outlook.

## Science Writers

Personal contacts with science writers for general purposes as well as for specific assignments were expanded. Included in personal contacts were: Alton Blakeslee, Associated Press; Jack Geiger, International News

Service; Robert Plumb, New York Times; Earl Ubell, New York Herald Tribune; Roland Berg, Lock Magazine; Marguerite Clark, Newsweek.

In addition, a number of writers were intervievd for research reports, looking toward possible magazine articles.

C. B. Colby, free lance popularizer of science, was retained for research and possible writing of article concerning all the hazards of modern life which people are cautioned against and leading to the conclusion that in spite of all the health scares, "You Still Live Longer."

Robert T. Miller, an experienced researcher, writer and public relations man, was assigned a research report on the wide range of things common today which are suspect as carcinogens. A tentative agreement was reached with another writer to popularize the technical Hueper paper but this has been postponed.

Special conference was held with Pat McGrady, science editor of the American Cancer Society, who has been critical of some of the material issued for the Tobacco Industry Research Committee, specifically the "Scientific Perspective" and Dr. Hueper's paper. Mr. McGrady was informed of the great precautions taken prior to the preparation and distribution of both of these. His objections were also checked informally with other science writers and there appears to be little agreement with Mr. McGrady's position that these materials should not have been issued.

Material Issued

An announcement of Dr. Julius Comroe's addition to the Scientific Advisory Board was released to the press on August 19.

Two other releases were prepared for and are awaiting clearance by Dr. Little and the Scientific Advisory Board. They deal with the statement of policy on research grants and a news announcement on the issuing of the first grants.

Three statements by Dr. Little that could be used in the event a press comment is needed were prepared and are being cleared with the Scientific Advisory Board.

The booklet "Editorial Comment on Tobacco and Health" was distributed widely to press and information leaders. Some strategic use of this material has already been noted, both in the press and on the radio or TV.

Mailing and Lists

A special mailing was made to selected papers in tobacco areas in 16 states. This included a letter informing the editors of material available concerning the Tobacco Industry Research Committee, a copy of the "Editorial Comment" booklet and the "Scientific Perspective." These same papers will be included in future distribution of releases and background material.

Special lists were also prepared on radio commentators throughout the country who have been noticed as devoting more than passing attention to the tobacco and health issue.



Ex

MEMORANDUM TO
FROM: John W. H
RE: Proposed Budg
Attached are budget
Committee during t
activities reflects t
interest in the subje
get the industry's s
The budget for staff
of 25 different staff
a total of 23 people,
Research Committee
The staff budget pro
writing, editorial re
informational assist
public education pro
increased provision
The budget for Print
three large-quantity
research program of
be published in quant
writers, editors and
distribution at booth
The Booklet budget a
105,000, to be distri
This would cover the
spective on the prese
The third item is pre
important and helpful
issue of HARPER'S
for 1954. The reprin
In addition, you will
first item is $250,00
lic at the end of THE

[illegible] 1955 (826) F: Budgets

Exhibit 10

HK32

November 30, 1954

MEMORANDUM TO: Mr. Timothy V. Hartnett

FROM: John W. Hill

RE: Proposed Budget for 1955

Attached are budget estimates for operations of the Tobacco Industry Research Committee during the calendar year 1955. The budget for public information activities reflects the increased activities made necessary by growing press interest in the subject of tobacco and health as well as additional efforts to get the industry's case before the public.

The budget for staff operations provides for the use of all or part of the time of 25 different staff members of Hill and Knowlton, Inc. This compares with a total of 23 people, full or part-time, provided for in the Tobacco Industry Research Committee budget as revised on June 30, 1954.

The staff budget provides for one additional staff member to assist on science writing, editorial research and coverage of scientific and medical meetings. Informational assistance to other organizations interested in helping with the public education program is reflected in the budget for field offices and in increased provision for travel expenses.

The budget for Printing, Booklets, etc. is shown at $70,000. This covers three large-~~volume~~ quantity items, the first of them being a booklet describing the research program of the Tobacco Industry Research Committee. This would be published in quantities of 200,000 in order to cover all doctors, science writers, editors and editorial writers and to provide a quantity available for distribution at booths at medical and scientific meetings.

The Booklet budget also provides for a question-and-answer booklet, quantity 100,000, to be distributed to medical, scientific, editorial and other groups. This would cover the subject of tobacco and health more broadly, giving perspective on the present controversy.

The third item is provision for a wide mailing of at least one reprint of an important and helpful article such as the Leonard Engel piece in the December issue of HARPER'S Magazine, which is covered under the estimated expenses for 1954. The reprint to be mailed in 1955 has not yet been selected, of course.

In addition, you will note that there are additional recommended projects. The first item is $250,000 for one nation-wide advertisement reporting to the public at the end of TIRC's first year. The second provision is for two additional

cont'd

Mr. Timothy V. Hartnett
-8-
November 28, 1984

booklets and another mailing of a magazine reprint. This allocation of $87,000 would cover the preparation and mailing of an up-dated scientific perspective presenting some of the excellent medical and scientific information of a helpful nature which has become available in the past eight months, and a more limited booklet based on favorable editorial attention to tobacco and health. The reprint budget allocation would be used to give wider visibility to another article of specific value to TIRC's objectives.

I believe you are generally familiar with these details and other items of the budget as proposed. Please let us know if you need anything further from us.

Kind regards.

John W. Hill

jwh:w

HILL AND KNOWLTO

has been
progress
Board is
problem b
scientist
write off

public co
unsensati
informati
major ind

Factors Sh

these fact

much gene
stances,
is being

Committee
valuable
of the me
the resea
and of th

itself ha
the incre
of approa
in the fi
Tobacco I

HILL AND KNOWLTON, INC.

Exhibit 11

11/40/... /TIRC
226 PR Committee
HK30

CONFIDENTIAL

PUBLIC RELATIONS REPORT

to the
TOBACCO INDUSTRY RESEARCH COMMITTEE
April 28, 1955

The foundation which the Tobacco Industry Research Committee has been building is gaining strength in both breadth and depth. The progress of the scientific program developed by the Scientific Advisory Board is an essential and pervading force. The sound approach to the problem by the Scientific Advisory Board has encouraged other qualified scientists to speak out courageously in questioning those who would write off the lung cancer problem as a smoking problem.

Of necessity, efforts to bring the known facts before the public continue to be in the nature of an educational campaign -- slow, unsensational, factual. Neither the circumstances nor the available information lend themselves to the sensational treatment accorded the major indictments of tobacco use.

Factors Show Improved Position

Nevertheless, progress has been made. On the positive side, these factors stand out:

1. The first "big scare" continues on the wane. There is much general awareness of the big IF factors involved. In some instances, the accusers have gone to such extremes that their credibility is being questioned by their colleagues in their own profession.

2. The research program of the Tobacco Industry Research Committee has won wide acceptance in the scientific world as a sincere, valuable and scientific effort. This is due primarily to the stature of the men serving on the Scientific Advisory Board, the soundness of the research program developed, the caliber of research so far approved, and of the investigators receiving grants.

3. The status of the Tobacco Industry Research Committee itself has been enhanced by the freedom of action granted scientists, the increase to $1 million of research funds, and the obvious sincerity of approach to the problems. Both governmental and institutional groups in the field of health have shown recognition of the contribution the Tobacco Industry Research Committee is making.

4. There is greater and growing expression of the position that cigarettes do not and should not stand convicted. This is evident in both the scientific and lay communities. Suspicion is still widespread but the lynching party seems to have been called off, at least temporarily.

5. Treatment of the cigarette-health issue in public media continues to improve from the Tobacco Industry Research Committee point of view. Even adverse stories now tend to carry modifying statements. Positive stories are on the ascendancy. They may not always be in the places we would like to see them and they may not always say the things we would like them to say. But at least they are now showing up and they do cast doubt on the cigarette attacks. A year ago attacks predominated and they were generally immoderate.

Issue Being Kept Alive

On the other side of the ledger, we have to face up to these situations:

1. The cigarette-health issue is still considered top news. This is often more apparent at a local level than in national news. While there is a growing tendency to emphasize the uncertainties and disputes in the issue, the end result is to keep the controversy constantly alive.

2. Medical, dental and other groups continue to schedule cigarette-health discussions, oftentimes for the apparent purpose of stimulating interest in their meetings.

3. Anti-tobacco crusaders continue to ride the health issue. Our clippings show continual local activities by the American Temperance Society, the Seventh Day Adventists, and similar groups scheduling lectures and movies dealing with the cigarette and health issue. Dr. Ochsner and Dr. Wynder continue to be the leading anti-tobacco crusaders of stature in the medical and scientific world.

4. While the American Cancer Society has tempered its emphasis on the lung cancer and smoking issue so far as its national fund drive publicity is concerned, it continues to play up smoking and lung cancer in its literature. Local groups also use the issue, particularly the Hammond-Horn findings, in their fund raising drives.

5. An increasing number of scientists and researchists are anxious to report on their works involving cigarettes. Of late, most of these have been anticipated and, when necessary, steps are taken to deal with the findings. These reports include studies on the relation of tobacco and heart as well as tobacco and lung cancer.

(Page 3 is missing)

5. A 6,000 word manuscript by John Pfeiffer, well-known science writer, has been prepared and is now in process of preparation for wide use. This discusses the "Fight Against Lung Cancer," with all elements placed in perspective. It is designed as the basis for a T.I.R.C. document and for other public distribution material, for articles and for policy statements.

6. Clearances are continuing for a possible brochure of news reports of doctors and scientists who question the cigarette link or express reservations about it. It is felt that publication should not be rushed, but the material is kept up-to-date for possible quick issuance.

7. Current scientific reports are screened as they appear for possible inclusion in a new scientific perspective, as well as for adding to scientific files for special reference and distribution.

8. Reprints of the PAGEANT article by Dr. William Rienhoff are being widely distributed to various media through the publishers of Pageant. A news notice summarizing the article was widely released by the magazine.

9. The article by Dr. Herbert Arkin appearing in the April issue of CURRENT MEDICAL DIGEST is being reprinted for broad distribution.

10. News releases on announcements of grants and increase of the research funds to $1 million were widely published. A special article concerning participation of the Medical College of South Carolina was prepared for and used by the CHARLESTON NEWS AND COURIER.

11. Information was supplied for the article "Phoney Cigarette Scare" in the March 23 issue of PEOPLE TODAY; for "A Psychologist on the Cigarette Scare" in the April issue of POPULAR MEDICINE, and for a piece scheduled for the August issue of ARGOSY magazine.

12. Information supplied to TV station KALB in Alexandria, La., was used April 17 when Dr. Ochsner appeared on a local program devoted to a review of his book. Reviews from CALIFORNIA MEDICINE and the AMERICAN PUBLIC HEALTH ASSOCIATION JOURNAL, as well as Dr. Rienhoff's article in PAGEANT, provided information for the rebuttal.

After considerable negotiation, recent permission was obtained to distribute to radio stations recordings of a panel discussion on the problems of aging, featuring three doctors, including Dr. Elmer Hess, president-elect of the American Medical Association, in which the question, "Does Smoking Shorten the Average Life?" was interestingly discussed.

13. The book, "Why Stop Smoking?" by Albert Ostrow has been officially published and first promotion started in Chicago last Friday. A special press release commenting on the book has been prepared by the publisher, E. P. Dutton for distribution to press and radio stations throughout the country. Most recent information is that the book has already gone into a second printing.

14. A proposed syndicated feature story devoted almost entirely to Dr. Wynder's opinions and research was checked by the editors for additional facts and information. This story is being held in abeyance pending possible development of a series.

15. The Public Affairs Committee pamphlet by Pat McGrady, science editor of the American Cancer Society, has been issued under the title, "Smoking = Lung Cancer?". Though the contents are not compatible with T.I.R.C. policy, they were greatly and helpfully modified from the original manuscript. A number of outstanding cancer scientists contributed suggestions for editing this manuscript and modifying its original strong indictment of cigarettes.

16. Gathering, analyzing, preparation and distribution of various materials continued. The Research Program booklet was mailed to all doctors and scientific journals and institutions, including the membership of the American Association for Cancer Research. Reference files of relevant abstracts from pertinent scientific articles are being augmented for a wide variety of uses, including individual requests from students and scientists, newspaper and magazine writers, and industry members. Useful magazine and newspaper articles are reproduced, when permission is obtained, and made available to public information media.

## OUTLOOK FOR IMMEDIATE FUTURE

At this particular moment, the immediate past looks better than the immediate future.

The next major public problem will be the second Hammond-Horn report. This is now scheduled to be given before the American Medical Association meeting from June 6 to 10 in Atlantic City.

There is no reason to hope that the second report will be in any way better than the one last year.

There is no reason to hope that it will not result in widespread attention in the press. The A.M.A. meeting this year is closer to the major news centers than it was last year in San Francisco.

The program of the Tobacco Industry Research Committee should help maintain press and public perspective on the findings reported by Drs. Hammond and Horn.

The
the public wi
leadership in
The industry

Thi
and the publi
it has create

Fir
facts through

Sec
for the desir
relationship
to the public

This
longer can we
that "nobody k

Posi
future, in bri

1.
where the prob
the efforts of
tributed to th
science and ot

2.
material desig
This will incl

is now going t

the Hammond-Ho
part of May.

the Pfeiffer m
proper perspec

medical or sci
on the basis o

than $450,000 a
to go at any ti
with Dr. Little

3. A

? Smoking?" by Albert Ostrow
motion started in Chic
enting on the book has
r distribution to press and
st recent information is that
inting.

ed feature story devoted almost
arch was checked by the editors
s story is being held in abey-
ies.

Committee pamphlet by Pat
ncer Society, has been is-
er?". Though the contents
hey were greatly and help-
t. A number of outstanding
for editing this manuscript
t of cigarettes.

g, preparation and distribu-
Research Program booklet was
als and institutions, in-
ociation for Cancer Research.
pertinent scientific articles
uses, including individual
spaper nd magazine writers,
newspaper articles are re-
made available to public

E FUTURE

mediate past looks better

l be the second Hammond-
iven before the American
10 in Atlantic City.

he second report will be

will not result in wide-
meeting this year is closer
year in San Francisco.

ry Research Committee
ective on the findings



PROPOSALS FOR IMMEDIATE FUTURE

The Tobacco Industry Research Committee first appeared before the public with an assurance that the industry itself would assume leadership in research into all aspects of tobacco use and health. The industry is now moving into a position of leadership.

This brings with it a greater responsibility to the press and the public. The T.I.R.C. will have to live up to the expectations it has created on two fronts:

First, by pushing ahead soundly but steadily to get at the facts through widespread scientific investigation;

Second, to report to the public where it stands in the search for the desired information about cancer and its causes, as well as the relationship of tobacco use to other phases of health, and to describe to the public the nature and scope of T I.R.C.-sponsored research.

This calls for a more active and outspoken position. No longer can we expect the press and public to accept the terse comment that "nobody knows any answers."

Positive steps being planned and recommended for the immediate future, in brief, are as follows:

1. A strong affirmative report in mid-May by Dr. Little of where the problem stands today and what progress has been made through the efforts of the T.I.R.C. This should be a prepared statement distributed to the press and accompanied by a discussion with Dr. Little, science and other writers participating.

2. Carefully spaced distribution of basic informational material designed to implement the position set forth by T.I.R.C. This will include:

a. Through PAGEANT magazine, the article by Dr. Rienhoff is now going to important information media.

b. A reprint of Dr. Herbert Arkin's article analyzing the Hammond-Horn methods, will be ready for mailing to media the latter part of May.

c. A special report of the fight against lung cancer -- the Pfeiffer manuscript -- which will put the cigarette issue in its proper perspective. This should be set for sometime in May or June.

d. Reproductions of news reports quoting prominent medical or scientific figures who caution against condemning cigarettes on the basis of present evidence.

e. Announcement of new grants bringing the total to more than $450,000 actually approved for specific research. This is ready to go at any time but perhaps should be held for release coincidentally with Dr. Little's press conference.

3. A strong positive statement is being prepared to serve as the Tobacco Industry Research Committee's comment on the new Hammond-Horn report. This should be a statement from Mr. Hartnett, re-emphasizing the affirmative approach.

Exhibit #6

Mr. Richard W. Darrow

Carl Thompson

May 25, 1955

Messrs. Hill
Goss
Hoyt
Kahn

The following is a rundown of the status of certain steps being taken in anticipation of the June 6 presentation of the second Hammond-Horn report at Atlantic City:

1. Reprints of the Dr. Rienhoff article in Pageant were mailed on May 6 to our complete lists of public information media. Fairly good newspaper response, both editorial and news, have already been noticed.

2. Dr. Little's press conference, held May 16, resulted in fairly good publicity. Copies of this statement and press release went to our complete lists. The statement is being printed in a 3-5/8" x 6½" pamphlet for further distribution.

A request for 300 additional copies has already been received from one local medical group in Pennsylvania for distribution to its members.

3. On Monday, May 23, reprints from the Arkin article in Current Medical Digest were mailed to our complete lists. This was a followup to the original publication of the article and press release which was sent out by the Digest at that time.

4. An announcement of grants, bringing the total to date to $490,000, is being prepared for release Wednesday, June 1, with a mailing scheduled for Friday, May 27.

5. Recordings of the "Growing Old Symposium," featuring a discussion on smoking with Dr. Hess, etc., which we all have heard and transcripts of which we have, have been sent out to certain key radio stations and some report of their use, or intended use, have already been received.

6. A brief report on Dr. Little's press conference was prepared for the radio-TV news service, AIR LINES, and distributed through that organization in their service of May 20.

7. Two editorials are scheduled for distribution by the U. S. Press Association. The first is a brief summary of Dr. Little's press discussion, which will go out in the May 25 U.S.P.A. report. The second, scheduled for the June 2 mailing of the report, is a comment on the Dr. Arkin article.

8. Efforts have been made to provide all the assistance possible in making the two Murrow shows, scheduled for May 31 and June 7, as timely and positive as possible.

9. Arrangements have been made — and will be covered in detail under a separate memorandum — for transcribing pertinent sections of the Murrow show immediately after its presentation, and providing copies of these transcripts to major news outlets in New York early in the morning following the show.

10. Arrangements have been made for coverage of the A.M.A. meetings, including the symposium at the American College of Chest Physicians in Atlantic City on June 2, which will include Dr. Ochsner among the participants.

Leonard Zahn plans to go to Atlantic City, Thursday, June 2, and return Tuesday, June 7. We have been assured that he will be given press privileges to attend the various sessions (arranged through Ben Fillis in Chicago).

In addition, Jack Geiger plans to attend the meeting but exact arrangements for him have not yet been confirmed.

11. Drafts of the statement to be issued at the time of the Hammond-Horn report are in preparation — and probably will continue to be up until the last minute.

The following are less directly related:

12. The proposed *Argosy* piece, by Dick Reddy, is now scheduled for the August issue and the latest revision we have seen in proof form shows that it will be an extremely positive piece.

13. A new magazine entitled *Male Illustrated* carries a positive piece by Albert Abarbanel. This is the first issue of that magazine and it is being distributed by the American News Company. The author is the same man who edited (?) wrote (?) the piece that appeared a couple of months ago in *Popular Medicine*.

Page 3

14. An article debunking the lung cancer scare is scheduled for an early issue of the widely-read magazine, Confidential. The exact present status is not known.

15. A popularized version of the Pfeiffer piece has been submitted for consideration by American Weekly and no current information is available on its status.

16. The proposed Dr. Harry Greene book has been submitted to the chairman of the Law Committee for an opinion as to TIRC's distribution of this, when published, to scientific and public libraries. This book could probably hit late in the fall if everything goes well -- especially with Mr. Whiteside.

17. No definite moves have been made yet concerning the possibility of a prominent statistician (Arkin?) for meeting with the press shortly after the Hammond-Horn report. This project should be firmed up.

C. T.

CT:tms

HILL AND KNOWLTON, INC.

The period im
tific papers, medic
ically concerned wi
meetings, books and
the next four month

With respect t
recognized:

1. A large pr
expected to continue
of critics who have

2. Neither th
able fear or alarm t

This outlook d
relations approach,
public of a possible
leging that they hav
it is not possible a
government reports a

With a number
their research to da
will be closely scru
to the stand and att
tegrity of the indus
clusive reaffirmatio
TIRC grantees can be

Our public rel
keeping the press we
new attacks arise, a
showing that TIRC is
nanced and carefully

The research p
to a point warrantin
the fields of scienc

Exhibit 13

ILL AND KNOWLTON, INC.

B30 Hill/Hill / TIRC /1956 F. PR Report

ATTACHMENT #1

HK 76

CONFIDENTIAL

PUBLIC RELATIONS REPORT

to the

TOBACCO INDUSTRY RESEARCH COMMITTEE

February 14, 1956

## General Introduction

The period immediately ahead will produce a considerable number of scientific papers, medical meetings and public statements both generally and specifically concerned with the subject of smoking and health. Additional reports, meetings, books and articles will focus still more attention on this subject in the next four months.

With respect to this increased activity, however, two points should be recognized:

1. A large proportion of the attacks against smoking made recently, and expected to continue in the next few months, originate with the same small group of critics who have led the anti-tobacco moves of the past two or three years.

2. Neither the press nor the public seems to be reacting with any noticeable fear or alarm to the recent attacks.

This outlook does not warrant any attitude of complacency in our public relations approach, especially when we consider what could be the impact on the public of a possible announcement (which has been rumored) by researchers alleging that they have isolated and identified a carcinogen in tobacco. Also, it is not possible at this time to assess fully the probable impact of federal government reports and activities that are indicated in the months ahead.

With a number of grantees at or near the stage of public reporting on their research to date, the conduct of the Tobacco Industry Research Committee will be closely scrutinized by the scientific world, as well as the press, as to the stand and attitude assumed toward those reports. Protection of the integrity of the industry's position in this regard is vitally necessary, and conclusive reaffirmation that true freedom of thought and action has been given TIRC grantees can be rewarding.

Our public relations efforts will continue to be directed toward: (a) keeping the press well informed of the balancing aspects of the situation as new attacks arise, and (b) increasing the prestige of TIRC's own efforts by showing that TIRC is helping to gain the needed facts through adequately financed and carefully planned scientific research.

The research program of the Scientific Advisory Board has now progressed to a point warranting fuller description of its accomplishments and aims within the fields of science and medicine. With the valuable guidance and assistance

of Drs. Little and Hockett, steps are being worked out to give doctors and scientists greater knowledge of the scope, composition and nature of the program.

Meanwhile, the TIRC continues increasingly to benefit from the leadership which Dr. Little, Dr. Hockett and the members of the SAB are providing. Dr. Little's forthcoming editorial and speeches will be a further contribution to the prestige of the TIRC research program.

## The Recent Months

A factor that has become more noticeable since the last TIRC meeting is that, more and more, doctors and scientists are voluntarily speaking up at medical meetings to express disagreement with the flat charges made against tobacco. They do not exonerate tobacco but say that the case against smoking has not been proved and that much more evidence is needed.

Another aspect that also is becoming more apparent is the greater emphasis being placed by scientists in this country and abroad on the role of air pollution as the major cause of lung cancer. Two recent scientific reports on air pollution and health received national newspaper attention. The subject is being treated by the press as a new, interesting and important phase of the overall situation.

Meanwhile, reports adverse to tobacco from two major sources, which previously received much publicity, were largely ignored by the press in recent months because of their apparent failure to contribute anything pertinent or different to the problem.

In England the situation as regards the press appears to be quite different than that in this country. There is frequent and increasing mention of attacks on smoking in the British press.

## The Future

Smoking and health will be the subject of many papers and symposia at scientific meetings during the next several months. Some of the papers will be given by TIRC grantees, one of whom is scheduled to present an exhibit and paper at three medical meetings. Several grantees have submitted papers on their research findings to date for publication in professional journals.

Reports by grantees, whether they are made at meetings or appear in scientific journals, may lead to requests from the press for comment by TIRC. Regardless of what the reports say, TIRC intends only to restate its guarantee of complete scientific freedom to those who have received, and will receive, research grants. Such action will enhance the acceptability and sincerity of TIRC's research program with the scientific world and the public at large.

Several TIRC grantees already have presented papers at separate medical meetings but none received any press mention.

Meetings at which smoking and health are expected to be discussed:

1. Feb. 24, Long Island sub-section of the American Chemical Society, Brooklyn. The entire day is devoted to tobacco. The morning session, to be

3. The N
its in women.

4. Dr. W
stitutes of Hea
ing to lung can
Wynder will pre

5. The V

6. Two g
regard to influ
World War I. T

7. The N
of the Census B
of the relation
ment and covere
at least for th

Other fact
coming report (
gram, the talks
written for CAN
for Cancer Resea

Dr. Little
Detroit. On Jun
Lung" at the Thi
speak at a sympo
annual meeting o

The Third
cer Society and
meeting has sugg
cer -- Tobacco"
etiology.

The editor
crease scientifi
to science repor

April has
the American Can
of $26,000,000.

1. An art
ACS' medical and
ATLANTIC. Virtu
1954. The ACS w
newspapers by va

(Page 3 is missing)



3. The NCI is doing a retrospective study of lung cancer and smoking habits in women.

4. Dr. Wynder, in collaboration with a statistician at the National Institutes of Health, is reported preparing a paper from Wynder's material relating to lung cancer statistics in women. (This may be one of the papers Dr. Wynder will present in April.)

5. The Veterans Administration study is continuing.

6. Two government health statisticians are studying old VA records with regard to influenza, gas exposure and other respiratory conditions of men in World War I. This study will be compared with the VA study.

7. The NCI is considering a retrospective study that also would make use of the Census Bureau survey. This would replace the previously proposed study of the relationship of smoking to mortality among women employed by the government and covered by federal employe insurance. The latter plan has been dropped, at least for the present.

Other factors of public relations interest to TIRC are Dr. Little's forthcoming report (in May) on the progress and accomplishments of the research program, the talks he will give at three medical meetings and the editorial he has written for CANCER RESEARCH, official publication of the American Association for Cancer Research.

Dr. Little will speak March 5 before the Wayne County Medical Society in Detroit. On June 5 he will present a paper at a symposium on "Cancer of the Lung" at the Third National Cancer Conference in Detroit. On June 7 he will speak at a symposium on "The Present Concept of Bronchogenic Carcinoma" at the annual meeting of the American College of Chest Physicians in Chicago.

The Third National Cancer Conference is co-sponsored by the American Cancer Society and the National Cancer Institute. The planning committee for the meeting has suggested to Dr. Little that he speak on "Etiology and Lung Cancer -- Tobacco" and also has asked him to participate in a panel discussion on etiology.

The editorial Dr. Little has written and the talks he is to give will increase scientific appreciation of the research program and will be of interest to science reporters in their normal coverage of such occurrences.

Cancer Month

April has been designated "Cancer Month" and during the next few months the American Cancer Society will conduct an active campaign to achieve its goal of $26,000,000. The build-up has been apparent in recent weeks:

1. An article on lung cancer and smoking by Dr. Charles Cameron, the ACS' medical and scientific director, appeared in the January issue of THE ATLANTIC. Virtually the entire text was word for word from his report of 1953-1954. The ACS wrote a news release on the article which was released to local newspapers by various ACS divisions.

Dr. Cameron also has written a book, "The Truth About Cancer," which is expected to be published in March. The book contains a section on smoking and lung cancer and will be promoted nationally by the ACS.

2. The Feb. 10 issue of U.S. NEWS & WORLD REPORT featured an interview with Dr. C. P. Rhoads, director of the Sloan-Kettering Institute, on "Is A Cancer Cure Near?" One section dealt with Dr. Rhoads' conclusions on cigarette smoking as a cause of lung cancer.

3. The lead article in the Feb. 8 issue of the WALL STREET JOURNAL was on cancer chemotherapy. The February issue of McCALL'S magazine has a human interest article based on Sloan-Kettering. The science editor of Scripps-Howard Newspaper Alliance carried a column on cancer Feb. 7.

4. Columnist Ed Sullivan is national campaign chairman for the ACS drive. In his syndicated column of Feb. 5, Sullivan said that cancer research doctors "are planning a statement that will jolt the country in March."

This may be a report by Dr. Wynder and his associates alleging that they have isolated a carcinogen in tobacco. On Dec. 27, 1955, speaking from the floor at a "Lung Cancer-Tobacco Controversy" session at the American Statistical Association meeting, Dr. Wynder said that he will announce soon the isolation of a substance in cigarette smoke, "not benzpyrene but a member of the benzpyrene family," which has, in every instance, produced tumors in animals.

5. The March issue of READER'S DIGEST has a condensation of an anti-smoking editorial that appeared in the December 1955 issue of SOUTHWESTERN MEDICINE, journal of three southwestern medical societies.

6. The June issue of GERIATRICS will be devoted entirely to the subject of cancer and will have an editorial written by Dr. Cameron.

<u>Highlights of Recent Activities</u>

1. The biennial report of the Sloan-Kettering Institute, issued Dec. 7, purported to disclose "new" evidence linking smoking to larynx cancer. The report also dismissed air pollution as a possible causative factor in lung cancer. A TIRC statement was released to help put the report in factual perspective. General press treatment of the report did not stress the smoking and health sections.

2. Two papers on benzpyrene in cigarette paper and tobacco were given by the Rand Development Corporation before the American Association for the Advancement of Science meeting at Atlanta, Ga., Dec. 27. Hill and Knowlton, Inc., arranged for coverage of the meeting at which the Rand company's claims were challenged by Dr. Louis Fieser, a Harvard University professor who is an authority on benzpyrene and related compounds. The Rand papers were widely publicized and Dr. Fieser's comments also appeared in many of the newspaper stories.

3. Dr. Hammond and Dr. Berkson appeared on the same platform Dec. 27 at a session on the "Lung Cancer-Tobacco Controversy" at the meeting of the American Statistical Association in New York. The American Cancer Society made available a release on Dr. Hammond's paper but none was issued on Dr. Berkson's talk either by his own organization or the statistical group. There was little press mention of this session.

4. A repor
British medical j
air pollution and
tion was obtained
it was brought tc
torials on it apr

5. A paper
Health Service ir
arettes as only e
were obtained anc
ices and appearec
on many radio anc

6. A book
by science write:

7. A year
a number of the

8. Releas
to the research
has been prepare
pansion of the T

9. The ed
racks requested
later decided tc
condensation of

10. The l
ment of the subj
editor several m

11. Infor
to be supplied t
dents and others

4. A report from a New Zealand public health official, published in a British medical journal, attributed the increase in lung cancer incidence to air pollution and not to smoking. Advance information of the date of publication was obtained from contacts in New Zealand and England and when it appeared it was brought to the attention of the United States press. Stories and editorials on it appeared in many newspapers.

5. A paper by Dr. Hueper appeared in a publication of the U. S. Public Health Service in January. Advance copies of the article, which described cigarettes as only a minor possible contributory factor, if any, in lung cancer, were obtained and distributed. Stories were carried by several news wire services and appeared in newspapers throughout the country. It also was mentioned on many radio and television news broadcasts.

6. A book on the scientific aspects of smoking and health, being written by science writer Eric Northrup, is expected to be published by June 1.

7. A year-end statement by Mr. Hartnett was released to and published in a number of the tobacco trade magazines.

8. Releases were issued on new TIRC grants and the addition of $500,000 to the research fund, and stories on both appeared in many newspapers. A story has been prepared for release at an appropriate time on the continuance and expansion of the TIRC medical student fellowship program.

9. The editor of a company which prepares pamphlets for employe reading racks requested information for a proposed pamphlet on smoking and health. He later decided to discard the smoking and health angle and instead is planning a condensation of a 1954 popular-priced book on "How To Stop Smoking."

10. The 1956 WORLD ALMANAC was published and contains a balanced treatment of the subject of smoking and health. Informational material was given the editor several months ago.

11. Informational material, both from TIRC and other sources, continued to be supplied to large numbers of doctors, scientists, science writers, students and others interested in smoking and health

- xxx -

Exhibit 14

HK 20

HILL AND KNOWLTON, INC.

CONFIDENTIAL

July 19, 1956

CONFERENCES WITH LIFE AND READER'S DIGEST, JULY 17-18, 1956

MEMORANDUM TO: Mr. Timothy V. Hartnett

This memorandum will summarize our contacts with LIFE staff members on July 17, and DeWitt Wallace, editor of THE READER'S DIGEST, on July 18. Participants on behalf of TIRC were Dr. Little and Messrs. Hartnett and Darrow.

LIFE Contact

This was a luncheon-meeting initiated at the invitation of Mr. Robert T. Elson, Deputy Managing Editor of LIFE.

Those attendi_ for LIFE were: Mr. Elson; Albert L. Furth, assistant to the editor-in-chief; George Hunt, assistant managing editor; Warren Young, science editor; Ed Kern, science writer; Hugh Sidey and Miss Alix Witteborg, science researchers.

In extending the original invitation, Mr. Elson stated an interest in having LIFE'S science staff gain a fuller appreciation of Dr. Little's personal views on the subject of cancer generally, particularly his estimate of the importance of factors within the individual as opposed to external stimuli.

At the luncheon, which was conducted in a friendly and congenial atmosphere, Mr. Elson asked Mr. Hartnett to open the discussion by outlining the thinking behind the formation of TIRC and describing its organizational set-up. A number of interested questions were prompted by Mr. Hartnett's description of TIRC policies. Particular note was taken of the freedom of action given the SAB, as well as grantees.

Dr. Little then covered a number of aspects of the broad subject of cancer in a brief talk along much the same lines as his presentation at the last meeting of the TIRC on February 14, 1956.

He pointed out the importance to the public of receiving a balanced presentation of all the facts and underscored the need for editorial responsibility in handling stories that rouse unwarranted fears.

Questions from those present indicated an active interest in what Dr. Little had to say. While their schedules did not permit as much discussion as might have been desired by several of the LIFE staff members, it was pointed out that Dr. Little would be happy to talk further on those items of special interest to them at a later date of their choosing.

Arrangements were made to send along certain materials of interest to the LIFE staff members. A visit to TIRC and Hill and Knowlton, Inc., by some of the editors and writers is to be arranged at an early date. This will provide an opportunity for up-dating on the scope and nature of information available and provide further knowledge of how TIRC and SAB operate. An opportunity of the LIFE staffers to meet Dr. Hockett will be provided on the occasion of that visit.

READER'S DIGEST Contact

This was an afternoon meeting at the READER'S DIGEST headquarters offices near Pleasantville with DeWitt Wallace, editor, and James Monahan, senior editor and Lois Mattox Miller, roving editor, attending for the publication and Dr. Little, Mr. Hartnett and Mr. Darrow for TIRC.

This was a most pleasant and congenial discussion.

Mr. Wallace said that through Mr. Monahan and Mrs. Miller he had a good understanding of TIRC and what it was doing but would welcome knowing more about it.

Mr. Hartnett briefly outlined the background of TIRC, discussed some of the problems in organizing an industry approach to the question and made clear the open-minded approach that had been adopted.

Dr. Little stressed importance of the public not being stampeded into undue fears and the great responsibility held by major publications to keep the public adequately informed so that they would not tend to over-simplify the problem and expect a "push-button answer" to problems so complex as cancer and heart disease.

Mr. Monahan expressed the belief that the Scientific Advisory Board and Dr. Little had thoroughly dissipated any skepticism about the sincerity of the TIRC program and the industry's support of it. He commented that a phenomenally good job had been done in getting the research program under way so quickly on such a sound basis.

Both he and Mrs. Miller indicated considerable knowledge of TIRC but said they wanted to be even more closely kept up to date in the future. They also asked to be alerted on all materials of significance dealing with any aspect of tobacco and health. Copies of the June, 1956, issue of CANCER RESEARCH, including an article by Dr. Kotin; CANCER NEWS, including the American Cancer Society story on environmental cancer, and a recent Armour Research bulletin, including a report on air pollution research, were given to Mr. Monahan as samples of the recent literature of interest.

The recent Robert Buck article "Why an Airline Pilot Quit Smoking" was discussed with Mr. Wallace. He expressed surprise that their Research Department had not caught the error which referred to 900 people involved in tests as "airmen" when they were actually college students.

Both Mr. Monahan and Mrs. Miller expressed interest in visiting TIRC and Hill and Knowlton, Inc., offices to gain a better knowledge of data and services available which might be helpful to them on future assignments. Mr. Wallace said they would be happy to talk further any time we felt it was warranted.

Hill and Knowlton, Inc.

January 11, 19

Principal
Willow Ridge S
480 Willow Rid
Amherst, NY 1

Dear Sir or Ma

A number of yo
Tobacco Compan
should allow t
candy cigarett

As information
allow our bran
any current us
tioned by our

Some of the st
surrounding ci
smoking to be
it. We belie
should be fre
mature judgme
adult smokers

The tobacco i
made that smo
Long before t
a sincere att
smoking might
Tobacco Resea
grants direct
years the tob
independent r
more than all

Despite all t
fact is that
chronic disea

# EVIDENCE OF NICOTINE MANIPULATION BY THE AMERICAN TOBACCO COMPANY

Staff Report

Prepared by the Majority Staff
Subcommittee on Health and the Environment

December 20, 1994

PLAINTIFF'S EXHIBIT
8

## I. INTRODUCTION

The American Tobacco Company is the nation's fourth largest cigarette manufacturer, selling brands such as Pall Mall, Tareyton, and Lucky Strike. On April 14, 1994, its president and CEO, Donald Johnson, joined other tobacco industry CEOs in denying that nicotine is addictive and that his company manipulates nicotine.

The Subcommittee has reviewed documents submitted to the Subcommittee by the American Tobacco Company (ATC). These documents show extensive manipulation of nicotine as part of the company's research and development activities. They also show that ATC funded an extraordinary number of studies on the pharmacological effects of nicotine.

In correspondence to the Subcommittee, ATC states that despite its extensive research into nicotine manipulation, it did not market cigarettes incorporating the technologies it developed. However, the American Tobacco Company did acknowledge that in 1969 it test-marketed Lucky Strike cigarettes in which nicotine malate was added to increase nicotine levels.

## II. ATC NICOTINE STUDIES

In 1962, ATC prepared a report entitled "Biologic Research on Tobacco" describing biological research supported by ATC.[1] The foreword to the report describes tobacco as a "recreative herb" and calls nicotine a "highly valued agent in physiologic research."

The report reflects intense corporate interest in the properties of nicotine. The table of contents, for example, lists six separate areas of nicotine research supported by ATC, including the "Role of Nicotine in the Cigarette Habit," "Pharmacologic Effects of Nicotine Metabolites," and the "Fate of Nicotine in the Body." Contrary to tobacco industry assertions that nicotine is in cigarettes for taste, the report does not include research on the taste properties of nicotine.

In a 1945 study summarized in the report, "The Role of Nicotine in the Cigarette Habit," 24 smokers were given cigarettes with extremely low levels of nicotine. The study found that 12 of the subjects "definitely missed the nicotine." Nine of the subjects "continued to do so throughout the period (approximately one month)."

The study concluded that "with some individuals, <u>nicotine becomes a major factor in the cigarette habit</u>."[2]

In 1971, ATC released another report on the biologic research funded by the company. This report shows that over

three decades -- from 1940 through 1970 -- ATC funded over 90 studies on the pharmacological and other effects of nicotine on the body.[3] Of the 111 biologic studies funded by ATC over this period, 93 (over 80%) related to the effects of nicotine.

## III. NICOTINE MANIPULATION

At the same time that scientific researchers were being paid by ATC to study the pharmacological and other effects of nicotine on the human body, ATC scientists in company laboratories were developing and testing many methods of manipulating the nicotine content of cigarettes.

The following chronology describes these attempts to manipulate the level of nicotine in cigarettes over a 17-year period, from 1963 to 1980:

| | |
|---|---|
| June 21, 1963 | As part of its studies on low tar cigarettes, ATC investigates the effect of increasing Burley tobacco in the Lucky Strike blend. According to ATC researchers, "the object of this study was to determine the effect of increasing the Burley Tobacco in a blend on the yield of nicotine."[4] |
| Aug. 8, 1963 | An ATC "progress report" to its analytical chemistry section describes experimental work "to determine if the use of carbon tips impregnated with nicotine or nicotine salts may be feasible as an efficient means of increasing the nicotine content of smoke solids."[5] |
| Oct. 8, 1963 | ATC evaluates the effect of increasing the nicotine content of reconstituted tobacco from 0.56% to 1.47% by adding nicotine citrate. The evaluation includes both chemical analysis and a smoke panel test involving smoking of the nicotine-enriched cigarette.[6] |
| May 2, 1968 | ATC researchers write a memorandum evaluating "nicotine-fortified tobacco." The memorandum notes that "since the nicotine content of RC and RC-A tobaccos [two types of reconstituted tobacco] ranges from 0.7% to 0.9%, a gradual reduction in the nicotine content of our cigarette blend occurs as their RC content is increased." The memorandum describes "a pilot plant run of nicotine-fortified RC" that was made "to determine whether an RC of higher nicotine content will improve the |

| | |
|---|---|
| | cigarette blend by offsetting nicotine reduction." In this pilot run, nicotine malate was added to the reconstituted tobacco used in Pall Mall cigarettes.[7] |
| June 4, 1968 | ATC researchers make up four lots of Lucky Strike cigarettes. All four lots are "made up with a leaf blend to increase the nicotine level of this cigarette."[8] |
| Jan. 8, 1969 | ATC researchers write a memorandum on "Genetic Variation in 'Tar' Delivery." The memorandum explores the "opportunity to regulate the relative quantities of nicotine and FTC tar genetically" and finds them to be "limited."[9] |
| May 14, 1969 | An ATC memorandum directs that "in the future our use of nicotine should be referred to as 'Compound W.'"[10] |
| May 29, 1969 | J.T. Ashworth, the manager of process development, writes a memorandum to J.B. McCarthy, the vice president of manufacture and leaf, describing experimental Lucky Strike cigarettes. In the experimental cigarettes, "compound 'W' was added to the dip casing to maintain the same level of this constituent as is now present in the regular Lucky Strike blend."[11] |
| July-Nov. 1969 | ATC manufactures nicotine-enriched Lucky Strike cigarettes and test-markets them in Seattle, Washington. The cigarettes contain nicotine malate added to the tobacco.[12] |
| Apr. 29, 1974 | An ATC memorandum on "Compound W" describes tests in which compound W was added to Pall Mall and Lucky Strike cigarettes.[13] |
| June 5, 1974 | R.M. Irby, the manager of ATC's new products division, writes to J.B. McCarthy about "our current knowledge regarding increasing the nicotine content of reconstituted tobacco." Irby's memorandum discusses the following options for increasing nicotine content: (1) addition of "compound W" to reconstituted tobacco; (2) replacing "the lower nicotine-containing leaf components such as Turkish ... with high nicotine tobacco such as Malawi sun-cured scrap (5% nicotine)"; and "dilution and/or additives to the filter."[14] |

Apr. 18, 1977 — ATC researchers write a memorandum describing "suggested" methods for increasing the nicotine to tar ratio. The methods include: (1) "addition of nicotine to the tobacco"; (2) "addition of ammonia salts ... to tobacco, which on smoking would free the ammonia and thereby cause an increase in nicotine transfer to the smoke"; "adding a nicotine salt ... to cigarette paper"; and "making cigarette filter tips basic" to "enhance the nicotine transfer in the smoke."[15]

June 30, 1980 — An ATC memorandum on "Increasing Nicotine Transfer in Smoke" describes an experiment in which potassium carbonate was added to a Tareyton blend. The memorandum notes that "there has been an interest in increasing the amount of nicotine that is transferred from the tobacco to the mainstream smoke while leaving the 'tar' level unchanged." The memorandum further notes that "since most nicotine in tobacco is a non-volatile salt, it was thought that a greater transfer would take place if the tobacco was made basic causing the nicotine to volatilize when the cigarette is smoked."[16]

## IV. CONCLUSION

The ATC documents submitted to the Subcommittee reflect an intense research and commercial interest in nicotine. From 1940 to 1970, ATC funded over 90 studies on the pharmacological and other effects of nicotine. From 1963 to 1980, ATC researchers experimented with numerous methods to increase nicotine levels in cigarettes. On at least one occasion, in Seattle in 1969, nicotine-enriched cigarettes were test-marketed by ATC to the public.

# LIST OF EXHIBITS[17]

Exhibit 1: ATC, "Biological Research on Tobacco" (1962)

Exhibit 2: ATC, "Biological Research on Tobacco" (1968 with 1971 addenda)

Exhibit 3: ATC Memorandum on "Tobacco Blends for Filter Cigarettes: Effect of Increasing the Concentration of Burley Tobacco in a Blend" (June 21, 1963)

Exhibit 4: ATC Memorandum (Aug. 8, 1963)

Exhibit 5: ATC Memorandum on "The Effect of the Addition of 1% Nicotine on the Quality of RC Tobacco" (Oct. 8, 1963)

Exhibit 6: ATC Memorandum on "Evaluation of Nicotine-Fortified RC-A Tobacco (May 2, 1968); and related documents

Exhibit 7: ATC Memorandum (June 4, 1968); and related documents

Exhibit 8: ATC Memorandum on "Genetic Variation in 'Tar' Delivery" (Jan. 8, 1969)

Exhibit 9: ATC Memorandum on "Compound W" (May 14, 1969)

Exhibit 10: ATC Memorandum on "Experimental Lucky Strikes Cigarettes" (May 29, 1969); and related documents

Exhibit 11: Letter from ATC to Henry A. Waxman (Oct. 14, 1994)

Exhibit 12: ATC Memorandum on "Compound W" (Apr. 29, 1974)

Exhibit 13: ATC Memorandum on "Nicotine Content of Reconstituted Tobacco" (June 5, 1974)

Exhibit 14: ATC Memorandum on "The Nicotine to Tar Ratio" (Apr. 18, 1977)

Exhibit 15: ATC Memorandum on "Increasing Nicotine Transfer in Smoke" (June 30, 1980); and related documents

**ENDNOTES**

1. ATC, "Biologic Research on Tobacco" (1962) (exhibit 1).

2. Biologic Research on Tobacco, supra n. 1, at 65-66.

3. ATC, "Biologic Research on Tobacco" (1968 with 1971 addenda) (exhibit 2).

4. ATC Memorandum on "Tobacco Blends for Filter Cigarettes: Effect of Increasing the Concentration of Burley Tobacco in a Blend" (June 21, 1963) (exhibit 3).

5. ATC Memorandum (Aug. 8, 1963) (exhibit 4).

6. ATC Memorandum on "The Effect of the Addition of 1% Nicotine on the Quality of RC Tobacco" (Oct. 8, 1963) (exhibit 5).

7. ATC Memorandum on "Evaluation of Nicotine-Fortified RC-A Tobacco" (May 2, 1968) (exhibit 6). Related ATC documents are also included in exhibit 6.

8. ATC Memorandum (June 4, 1968) (exhibit 7). Related ATC documents are also included in exhibit 7.

9. ATC Memorandum on "Genetic Variation in 'Tar' Delivery" (Jan. 8, 1969) (exhibit 8).

10. ATC Memorandum on "Compound W" (May 14, 1969) (exhibit 9).

11. ATC Memorandum on "Experimental Lucky Strike Cigarettes" (May 29, 1969) (exhibit 10). Related ATC documents are also included in exhibit 10.

12. Letter from ATC to Rep. Henry A. Waxman (Oct. 14, 1994) (response to question 20) (exhibit 11).

13. ATC Memorandum on "Compound W" (Apr. 29, 1974) (exhibit 12).

14. ATC Memorandum on "Nicotine Content of Reconstituted Tobacco" (June 5, 1974) (exhibit 13).

15. ATC Memorandum on "The Nicotine to Tar Ratio" (Apr. 18, 1977) (exhibit 14).

16. ATC Memorandum on "Increasing Nicotine Transfer in Smoke" (June 30, 1980) (exhibit 15). Related ATC documents are also included in exhibit 15.

17. Copies of all exhibits are available upon request at the office of the Subcommittee on Health and the Environment and the office of Rep. Henry A. Waxman.