IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | |
|     *Plaintiff*, | § § § | |
| v. | § § | CIVIL ACTION NO. 5:96-CV-00091-JRG |
| THE AMERICAN TOBACCO COMPANY, et al., | § § § | |
|     *Defendants*. | § § | |

### MEMORANDUM OPINION AND ORDER

Before the Court are issues regarding damages and interest for underpayments submitted by Plaintiff the State of Texas ("Plaintiff" or the "State"), Defendant Philip Morris USA Inc. ("PM"), and Defendant RJ Reynolds Tobacco Company ("RJR" and with PM, the "Settling Defendants"). (Dkt. Nos. 2447, 2448, 2449, 2453, 2456, 2457.) For the following reasons, the Court finds that (1) ITG Brands, LLC ("ITG") should be included in the 2018 and 2019 profit adjustment calculations, and (2) the Settling Defendants owe Plaintiff prejudgment interest on the entire principal.

**I.    BACKGROUND**

On May 21, 2021, the Parties entered into an agreement formalized in the Notice Regarding ITG Brands, LLC's Status Under the Texas Tobacco Settlement Agreement and Agreement Resolving Disputes Thereunder (the "ITG Status Agreement"). (Dkt. No. 2448-1.) The ITG Status Agreement resolved a dispute among the Parties regarding the treatment of ITG—a company that had not been a Settling Defendant until it purchased several cigarette brands (the "Covered Brands") from RJR. According to the ITG Status Agreement, ITG "assumed all obligations and benefits under the Texas Tobacco Settlement Agreement with respect to the Covered Brands" as of June 12, 2015. (*Id*. § 1.) The ITG Status Agreement further provides the following:

> With respect to the Covered Brands, ITG Brands shall be treated as a Settling Defendant under the Texas Tobacco Settlement Agreement, shall be bound and governed by the Texas Tobacco Settlement Agreement and the Consent Order, and shall have the obligations under and receive the benefits of the Texas Tobacco Settlement Agreement and the Consent Order, including for the avoidance of doubt the release therein, from and after June 12, 2015.

(*Id*. § 3.) Additionally, the ITG Status Agreement provides how to allocate the payments the Settling Defendants owe the State beginning January 1, 2020. (*Id*. § 5.)

On March 14, 2024, the Court entered a Memorandum Opinion and Order in which it found that the Settling Defendants failed to adequately compensate Plaintiff in accordance with the Texas Tobacco Comprehensive Settlement Agreement (the "Texas Settlement Agreement" or "CSA"). (Dkt. No. 2446.) The Court therefore ordered each party "to present a respective memorandum to the Court pertaining to the issue of damages and interest for underpayments made by the Defendants beginning in April 2019." (*Id*. at 19.) On April 15, 2024, each Party to that dispute submitted its respective brief. (Dkt. Nos. 2447, 2448, 2449.) The Court further granted the Parties leave to file responsive briefs. (Dkt. Nos. 2453, 2456, 2457.)

All Parties agree on two key issues. First, the Parties agree that the Settling Defendants owe Plaintiff a principal amount of $134,786,035.42. (Dkt. Nos. 2447 at 3, 2448 at 4, 2449 at 2.) Second, PM and RJR agree that they respectively owe the following principal amounts for the years 2020–2022:

2

| Payment Year | Settling Defendant | Amount Owed |
|---|---|---|
| 2020 | PM | $10,174,504.41 |
| 2020 | RJR | $16,134,022.41 |
| 2021 | PM | $6,735,073.75 |
| 2021 | RJR | $21,424,626.41 |
| 2022 | PM | $6,820,517.42 |
| 2022 | RJR | $23,156,721.91 |

(Dkt. Nos. 2448 at 5, 2449 at 1–2.)[1]

## II. DISCUSSION

### A. Payment Allocation

#### 1. Party Arguments

RJR argues that PricewaterhouseCoopers LLP's ("PwC") original calculation correctly reflects how the Settling Defendants must allocate their payments to the State. (Dkt. No. 2449 at 2.)[2] According to RJR, PM "seeks to revise PwC's calculation of the damages allocations for 2018–2019 using a method not found anywhere in the Settlement Agreement, and which the [ITG Status Agreement] makes clear is expressly intended only for years after 2019." (*Id.* at 3.) RJR argues that such a recalculation would improperly reduce PM's debt to Plaintiff and increase RJR's debt to Plaintiff. (*Id.* at 4.) RJR further argues that PM's position violates the ITG Status Agreement. (*Id.* at 4–6 (citing Dkt. No. 2448-1 §§ 4, 5(5)–(6)).)

PM argues that the "parties clearly agreed that ITG would be treated as a Settling Defendant starting in 2015" and ITG therefore "must be included in calculating any allocation of the Profit Adjustments for all the payment years at issue here." (Dkt. No. 2448 at 2.) According to PM, the ITG Status Agreement states that "ITG shall be treated as a Settling Defendant from the date it

---

[1] The State "takes no position on the percentage of damages to be paid by each Settling Defendant." (Dkt. No. 2457 at 1.)
[2] RJR notes that it disagrees with PwC's calculations only for the year 2020. (Dkt. No. 2449 at 2 n.2.)

3

acquired the Covered Brands," *i.e.*, June 12, 2015. (*Id*. at 6 (citing Dkt. No. 2448-1 §§ 1, 3).) Additionally, the ITG Status Agreement "specifically applies this principle with respect to Profit Adjustment allocation in Section 5, which sets forth the parties' agreement to 'resolve the dispute among RJRT, PM USA, and ITG Brands regarding the allocation among manufacturers of the profit adjustment.'" (*Id*. at 7.) PM acknowledges that the ITG Status Agreement's methodology applies "on a going-forward basis, and that the parties themselves would recalculate the prior payments and resolve their disputes with respect to such prior payments without involving PwC." (*Id*. at 7–8 (citing Dkt. No. 2448-2 at 1–2).) In view of the Court's Order requiring the Settling Defendants to cure their underpayments, PM argues that the allocation method provided in the ITG Status Agreement should be used to determine the allocation between the Settling Defendants and ITG because "the parties indisputably agreed that ITG should be treated as a Settling Defendant from June 12, 2015 forward, and that its correct base year Operating Profit was $860 million." (*Id*. at 9.)

In RJR's response brief, it argues that PM ignores that the ITG Status Agreement "specifically provides for the allocation of $860 million to ITG only ***after*** 2019, but for the years 2018 and 2019 ITG's and [RJR's] profits are combined and not allocated between them." (Dkt. No. 2456 at 1.) In RJR's view, "the parties settled their disputes about how to handle the Profit Adjustment for the period ***through December 31, 2019*** (payments due through April 2020) through specified payments, and did ***not*** adjust Net Operating Profits for that period." (*Id*. at 1–2.) Subsection 5(6) of the ITG Status Agreement provides that the $860 million base year figure will be used only "for the purpose of the allocation among manufacturers pursuant to the Engagement Letter described in subsection (5) above," and subsection 5(5), in turn, specifies that it applies only "for the period beginning January 1, 2020, and in every subsequent period." (*Id*. at 2 (citing Dkt.

4

No. 2448-1 §§ 5(5)–(6).) Additionally, RJR argues that the parties knew about the corporate tax rate issue, and the parties could have—but did not—provided a methodology for calculating underpayments in the ITG Status Agreement. (*Id*. at 3.)

In PM's response brief, it argues that "RJR and ITG conceded [in the ITG Status Agreement] that ITG would indeed become a Settling Defendant as of June 2015." (Dkt. No. 2453 at 2.) However, PM argues that RJR incorrectly relies upon the ITG Status Agreement's provision that requires the parties, rather than PwC, to recalculate past payments (including the years in dispute). (*Id*. at 2–3.)

2. **Analysis**

The Court finds that the ITG Status Agreement is unambiguous: ITG is a Settling Defendant with respect to the Covered Brands as of June 12, 2015. (Dkt. No. 2448-1 §§ 1 ("RJRT, ITG Brands, the State, and PM USA agree that *as of June 12, 2015, ITG Brands was assigned and assumed all obligations and benefits* under the Texas Tobacco Settlement Agreement *with respect to the Covered Brands*." (emphasis added)), 3 ("With respect to the Covered Brands, *ITG Brands shall be treated as a Settling Defendant* under the Texas Tobacco Settlement Agreement, shall be bound and governed by the Texas Tobacco Settlement Agreement and the Consent Order, *and shall have the obligations under and receive the benefits of the Texas Tobacco Settlement Agreement and the Consent Order*, including for the avoidance of doubt the release therein, *from and after June 12, 2015*." (emphasis added)).)

The ITG Status Agreement provides the methodology for allocating payments for years after 2020, but it does not limit the application of this methodology to those years. (Dkt. No. 2448-1 §§ 4, 5.) According to the ITG Status Agreement, "for purposes of allocating amongst the Settling Defendants (including ITG Brands) payments owed to the State based on 'net operating

profits' for the period beginning January 1, 2020, and in every subsequent period," the Settling Defendants will make certain adjustments to the allocation calculations, including using "$860 million (before any adjustment for inflation) as the 1996 Net Operating Profits from domestic sales of the Covered Brands." (*Id*. §§ 5(5)–(6).) While RJR correctly observes that this provision applies to "the period beginning January 1, 2020,"[3] the agreement does not limit the application of this provision to account for underpayments. In fact, the ITG Status Agreement does not provide a procedure for allocating underpayments amongst the Settling Defendants. Instead, the ITG Status Agreement only concerns how to determine what the Settling Defendants, including ITG, owed the State as of May 21, 2021 and how the Settling Defendants would allocate payments in future years.[4]

The Court finds that the allocation methodology found in Section 5 of the ITG Status Agreement is an appropriate method for allocating underpayment liability amongst the Settling Defendants. ITG is a Settling Defendant as of June 15, 2015—omitting it from the allocation of underpayments for 2018 and 2019 would result in an unfair windfall for RJR. The Settling Defendants shall comply with PwC's calculations as set forth in Presentation 2 (Dkt. No. 2448-3).

### B. Interest

#### 1. Party Arguments

RJR argues that prejudgment interest began accruing on May 22, 2023. (Dkt. No. 2449 at 7.) According to RJR, under Texas state law, this prejudgment interest must be calculated as simple interest using the postjudgment interest rate applicable at the time of judgment, which here is

---

[3] While the Settling Defendants may have resolved ITG-related payments prior to the year 2020 without the involvement of PwC, the Settling Defendants clearly did not anticipate that they would be held liable for their underpayments. Otherwise, this issue would not be before the Court.

[4] While the Parties continually refer to "recalculating" the allocation of payments, this phrasing is imprecise. The Parties are requesting the Court to calculate the allocation of their underpayment for the relevant period. Accordingly, the Court is not "recalculating" what the Parties owe under the ITG Status Agreement—it is instead allocating liability for the underpayment.

6

8.50%. (*Id*. at 7–8.) Applying these principles, RJR determines that the Settling Defendants owe the State a total of $10,326,825.97 through April 15, 2024, and certain amounts per day through entry of this Order. (*Id*. at 9–10.)[5]

The State argues that interest "should be calculated as post-judgment interest because it was due to be paid after the CSA was complete." (Dkt. No. 2447 at 3.) Under Texas law, "post-judgment interest should accrue at the prime rate as published by the Board of Governors of the Federal Reserve System" and be compounded annually. (*Id*.) Accordingly, the "State requests that PwC be ordered to calculate the damages owed under the CSA using the compensatory damages with compound post-judgment interest through the April 30, 2024 payment date." (*Id*.) The State argues that following these principles results in approximately $25,161,128.36 of interest owed. (*Id*. at 4.) Alternatively, the State argues that it should at least be awarded prejudgment interest from April 2019 to the date of the Order. (*Id*. at 4–5.) Finally, the State argues the following:

> Settling Defendants have had in their possession approximately an extra $25 million per year or more that they could use to invest or otherwise collect interest and grow. Because that sum should have been in possession of the State, the State has been unable to allow that money to compound and grow for the benefit of Texans. Put simply, Settling Defendants have profited off of money that rightfully belonged to the State.

(Dkt. No. 2457 at 1–2.)

### 2. Analysis

As an initial matter, the Court finds that interest accrues from April 2019, when the underpayments at issue began. While the Settling Defendants argue that interest begins to accrue on May 22, 2023 (*i.e.*, the date that Plaintiff filed its Cross-Motion to Enforce Settlement Agreement), Defendants rely upon an improper application of Texas Finance Code Section

---

[5] PM does not substantively address the interest issue. Instead, it "agrees with and incorporates by reference RJR's argument that interest should be calculated using a simple rate of 8.5% from May 22, 2023, the date that Texas filed its Motion to Enforce the Settlement Agreement." (Dkt. No. 2448 at 10.)

7

304.104. (Dkt. No. 2449 at 7.) Under Section 304.104, "prejudgment interest accrues on the amount of a judgment during the period beginning on the earlier of the 180th day after the date the defendant *receives written notice of a claim or the date the suit is filed* and ending on the day preceding the date judgment is rendered." Tex. Fin. Code § 304.104 (emphasis added). However, Plaintiff does not assert a new "claim" or "suit." Instead, Plaintiff simply seeks to enforce the terms of the Texas Settlement Agreement, which has already been incorporated into the original Final Judgment of this Court. (Dkt. No. 1866.)

Regarding whether the interest should be prejudgment or postjudgment, the Court finds that prejudgment interest is appropriate, consistent with its previous Judgment. (Dkt. No. 2422 at 16.) "Prejudgment interest is 'compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment.'" *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998). Awarding prejudgment interest here prevents the Settling Defendants from profiting off of money that rightfully belonged to the State. If not for the Settling Defendants' underpayments, the State would have been able to use that money to benefit Texans. Prejudgment interest from April 30, 2019 through March 14, 2024 is necessary to make the State whole.[6]

### III.  CONCLUSION

Having considered the Parties' briefing, the Court finds that ITG must be treated as a Settling Defendant during the years in dispute. Accordingly, it is **ORDERED** that the Parties shall comply with PwC's calculations as set forth in Presentation 2 (Dkt. No. 2448-3).

The Court further finds that the Defendants owe the State prejudgment interest on the entire principal amount of their underpayments, from April 30, 2019 through March 14, 2024. It is further

---

[6] Additionally, the Court agrees with the State that postjudgment interest is appropriate for the applicable period after the Court issued its March 14, 2024 Memorandum Opinion and Order. (Dkt. No. 2446.)

8

**ORDERED** that postjudgment interest shall apply and be as of March 15, 2024 until paid at the statutory rate. Accordingly, it is **ORDERED** that PwC shall recalculate the damages owed under the CSA consistent with this Order.

  **So ORDERED and SIGNED this 27th day of March, 2025.**

                   _____
                   RODNEY GILSTRAP
                   UNITED STATES DISTRICT JUDGE